Risa S. Christensen, Esq. (SBN: 227799)
Dennis E. Wagner, Esq. (SBN: 99190)
**WAGNER ZEMMING CHRISTENSEN, LLP**
1325 Spruce Street, Suite 200
Riverside, CA  92507
Tel.:        (951) 686-4800
Fax:        (951) 686-4801
*rsc@wzclawfirm.com*
*dew@wzclawfirm.com*

Attorneys for Defendants, COUNTY OF SAN BERNARDINO; HUMBERTO MIRANDA; JULIAN MATA; and JESSAQUA ATTLESEY

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CECILIA VARGAS; ARIANA SALAS, individually and as a successor-in-interest to RUBEN ESCUDERO, deceased,<br><br>        Plaintiffs,<br>vs.<br><br>COUNTY OF SAN BERNARDINO; H. MIRANDA; S. CARTER; Z. VOGEL, J. MATA; Z. PRITCHETT; J. JIMENEZ; A. MATA; T. KAUTZ; J. ATTLESEY; RODRIGUEZ (first initial unknown) and DOES 1-10, inclusive,<br><br>        Defendants. | CASE NO: 5:20-cv-02646-JGB-KK<br><br>**DEFENDANTS' APPENDIX OF EVIDENCE IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT**<br><br>*[Filed concurrently w/ Notice of Motion and Motion for Summary Judgment; Statement of Undisputed Facts; and (Proposed) Order]*<br><br>**Date:**        March 6, 2023<br>**Time:**        9:00 a.m.<br>**Courtroom:** 1<br><br>Hon. Jesus G. Bernal<br>United States District Judge |

DEFENDANTS' APPENDIX OF EVIDENCE IN SUPPORT OF THEIR
MOTION FOR SUMMARY JUDGMENT

**TO THE COURT, ALL PARTIES, AND THEIR ATTORNEYS OF RECORD:**

      **PLEASE TAKE NOTICE THAT** Defendants, COUNTY OF SAN BERNARDINO; HUMBERTO MIRANDA; JULIAN MATA; and JESSAQUA ATTLESEY respectfully submit their Appendix of Evidentiary in Support of their Motion for Summary Judgment.  Defendants respectfully request that the Court consider the following evidence referenced in their Statement of Undisputed Facts in support of their Motion for Summary Judgment.

**DECLARATIONS AND NUMBERED EXHIBITS**

| EXHIBIT NO. | DESCRIPTION |
|---|---|
| **Exhibit A** | **Declaration of Dennis E. Wagner** |
| **Exhibit 1** | Thumb Drive (Physical Exhibit) containing audio recordings |
| **1(a)** | **Brett Lever** Recorded Interview with Detective Jerry Moreno (1:01:34) |
| **1(b)** | **Dyjuan Washington** Recorded Interview with Jerry Moreno (1:06:26) |
| **1(c)** | **Karla Lugo** Recorded Interview with Jerry Moreno (1:22:23) |
| **1(d)** | **Alex Gabler** Recorded with Detective Jerry Moreno (1:32:05) |
| **1(e)** | **Alex Gabler** *Second Recorded* Interview with Jerry Moreno (0:02:33) |
| **1(f)** | **Martin Alcon** Recorded Interview with Nicholas Craig (2:02:40) |
| **1(g)** | **Dorothy Hernandez** Recorded Interview with Deputy Tiffany Kautz (0:17:23) |

| EXHIBIT NO. | | DESCRIPTION |
|---|---|---|
| | **1(h)** | **David Crummel** Recorded Interview with Deputy Kautz (0:17:23) |
| | **1(i)** | **Martin Alcon** Recorded Interview with Deputy Kautz (0:07:12) |
| | **1(j)** | **Dyjuan Washington** Recorded Interview with Deputy Kautz (0:06:34) |
| | **1(k)** | **Brett Lever** Recorded Interview with Deputy Kautz (0:07:45) |
| | **1(l)** | **Alex Gabler** Recorded Interview with Deputy Zachary Pritchett (0:08:22) |
| | **1(m)** | **Karla Lugo** Recorded Interview with Deputy Zachary Pritchett (0:09:36) |
| | **1(n)** | **Humberto Miranda** Belt Recording of Incident (0:13:08) |
| **Exhibit B** | **Declaration of Sergeant Gerardo Moreno** | |
| | **Exhibit 2** | Transcript of Interview with Brett Lever |
| | **Exhibit 3** | Transcript of Interview with Dyjuan Washington |
| | **Exhibit 4** | Transcript of Interview with Karla Lugo |
| | **Exhibit 5** | Transcript of Interview with Alex Gabler |
| | **Exhibit 6** | Transcript of Interview with Alex Gabler (*Follow-Up*) |
| **Exhibit C** | **Declaration of Sergeant Nicolas Craig** | |
| | **Exhibit 7** | Transcript of Interview with Martin Alarcon |
| **Exhibit D** | **Declaration of Tiffany Kautz** | |
| | **Exhibit 8** | Transcript of Interview with Dorothy Hernandez |
| | **Exhibit 9** | Transcript of Interview with David Crummel |
| | **Exhibit 10** | Transcript of Interview with Martin Alcon |
| | **Exhibit 11** | Transcript of Interview with Dyjuan Washington |

3

| EXHIBIT NO. | | DESCRIPTION |
|---|---|---|
| | **Exhibit 12** | Transcript of Interview with Brett Lever |
| **Exhibit E** | **Declaration of Zachary Pritchett** | |
| | **Exhibit 13** | Transcript of Interview with Alex Gabler |
| | **Exhibit 14** | Transcript of Interview with Karla Lugo |
| **Exhibit F** | **Declaration of Humberto Miranda** | |
| | **Exhibit 15** | Transcript of Belt Recording |
| | **Exhibit 16** | INTENTIONALLY OMITTED |
| | **Exhibit 17** | Photo of Outside of Residence |
| | **Exhibit 18** | Photo of Living Room |
| | **Exhibit 19** | Photo of Front Doorway |
| | **Exhibit 20** | Photo of Kitchen |
| | **Exhibit 21** | Photo of Doorway Where Escudero was Found |
| **Exhibit G** | **Declaration of Jessaqua Attlesey** | |
| **Exhibit H** | **Declaration of Julian Mata** | |
| **Exhibit I** | **Declaration of Brett Lever** | |
| **Exhibit J** | **Declaration of Robert Fonzi** | |
| **Exhibit K** | **Declaration of Kevin Fries** | |
| **Exhibit L** | **Declaration of Al Huff** | |
| **Exhibit M** | **Declaration of Tyson Niles** | |
| **Exhibit N** | **Declaration of Miles Kowalski** | |
| **Exhibit O** | **Declaration of Risa S. Christensen** | |
| | **Exhibit 22** | Relevant Pages from the Deposition Transcript of David Crummel |
| | **Exhibit 23** | Relevant Pages from the Deposition Transcript of Dorothy Hernandez |

| EXHIBIT NO. | | DESCRIPTION |
|---|---|---|
| | **Exhibit 24** | Relevant Pages from the Deposition Transcript of Dyjuan Washington |
| | **Exhibit 25** | Relevant Pages from the Deposition Transcript of Alex Gabler |
| | **Exhibit 26** | Relevant Pages from the Deposition Transcript of Dr. Mark A. Fajardo |
| | **Exhibit 27** | Relevant Pages from the Deposition Transcript of Dr. Cho Lwin |
| **Exhibit P** | **Declaration of Dr. Binh Ly** | |
| | **Exhibit 28** | Dr. Ly's Curriculum Vitae |
| **Exhibit Q** | **Declaration of Dr. Gary Vilke** | |
| | **Exhibit 29** | Dr Vilke's Curriculum Vitae |
| **Exhibit R** | **Declaration of Dr. Theodore C. Chan** | |
| | **Exhibit 30** | Dr. Chan's Curriculum Vitae |

Dated:  January 26, 2023               WAGNER ZEMMING CHRISTENSEN

*/s/ Dennis E. Wagner*
RISA S. CHRISTENSEN, Esq.
DENNIS E. WAGNER, Esq.
Attorneys for Defendants, Attorneys for Defendants, COUNTY OF SAN BERNARDINO; HUMBERTO MIRANDA; JULIAN MATA; and JESSAQUA ATTLESEY

5

# EXHIBIT "A"

Risa S. Christensen, Esq. (SBN: 227799)
Dennis E. Wagner, Esq. (SBN: 99190)
**WAGNER ZEMMING CHRISTENSEN, LLP**
1325 Spruce Street, Suite 200
Riverside, CA 92507
Tel.:        (951) 686-4800
Fax:        (951) 686-4801
*rsc@wzclawfirm.com*
*dew@wzclawfirm.com*

Attorneys for Defendants, COUNTY OF SAN BERNARDINO; HUMBERTO MIRANDA; JULIAN MATA; and JESSAQUA ATTLESEY

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CECILIA VARGAS; ARIANA SALAS, individually and as a successor-in-interest to RUBEN ESCUDERO, deceased,<br><br>Plaintiffs,<br><br>vs.<br><br>COUNTY OF SAN BERNARDINO; H. MIRANDA; S. CARTER; Z. VOGEL; J. MATA; Z. PRITCHETT; J. JIMENEZ; A. MATA; T. KAUTZ; J. ATTLESEY; RODRIGUEZ (first initial unknown) and DOES 1-10, inclusive,<br><br>Defendants. | CASE NO: 5:20-cv-02646-JGB-KK<br><br>**DECLARATION OF DENNIS E. WAGNER IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT OR IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT**<br><br>*[Filed concurrently w/ Notice of Motion and Motion for Summary Judgment; Statement of Undisputed Facts;Declarations; and (Proposed) Judgment]*<br><br>**Date:**        March 6, 2023<br>**Time:**        9:00 a.m.<br>**Courtroom:**  1<br><br>Hon. Jesus G. Bernal<br>United States District Judge |

1

I, DENNIS E. WAGNER, declare as follows:

I am an attorney at law duly licensed to practice before the courts of the State of California and the before the United States District Court for the Central District of California and am a partner in the firm of Wagner Zemming Christensen, attorneys for defendants, County of San Bernardino; Humberto Miranda; Julian Mata; and Jessaqua Attlesey. I make this declaration of my own personal knowledge and if called as a witness I could and would competently testify as to the truth of the matters set forth as follows:

1.   I have personally placed all the audio recordings pertaining to the interviews of witnesses and the deputy belt recording onto a single thumb drive for ease of use for the court. The thumb drive is incorporated herein as **Exhibit 1** and is a true and correct compilation of recordings for the case. The index of what is contained on the thumb drive for the audio recordings, is as follows:

| Exhibit | Description of Recording |
|---------|--------------------------|
| 1(a) | Brett Lever Recorded Interview with Detective Jerry Moreno |
| 1(b) | Dyjuan Washington Recorded Interview with Jerry Moreno |
| 1(c) | Karla Lugo Recorded Interview with Jerry Moreno |
| 1(d) | Alex Gabler Recorded with Detective Jerry Moreno |
| 1(e) | Second Interview with Alex Gabler Recorded with Jerry Moreno |
| 1(f) | Martin Alcon Recorded Interview with Nicholas Craig |
| 1(g) | Dorothy Hernandez Recorded Interview with Deputy Tiffany Kautz |
| 1(h) | David Crummel Recorded Interview with Deputy Kautz |
| 1(i) | Martin Alcon Recorded Interview with Deputy Kautz |
| 1(j) | Dyjuan Washington Recorded Interview with Deputy Kautz |
| 1(k) | Brett Lever Recorded Interview with Deputy Kautz |
| 1(l) | Alex Gabler recorded Interview with Deputy Zachary Pritchett |
| 1(m) | Karla Lugo Recorded Interview with Deputy Zachary Pritchett |
| 1(n) | Belt Recording of Humberto Miranda of Incident |

1     That the recordings placed onto **Exhibit 1** are true and correct recordings of

2 the interviews provided to us by the San Bernardino County Sheriff's Department

3 (Civil Liabilities Division).  That the individual recordings are authenticated by the

4 involved deputy and are referenced in each of their individual declarations for

5 authentication and foundation.

6

7     I declare under penalty of perjury, under the laws of the State of California

8 and the United States of America, that the foregoing is true and correct.

9     Executed this 26th day of January 2023, in Riverside, California.

10

11     /s/   *Dennis E. Wagner*

12     DENNIS E. WAGNER, Declarant

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

3

# EXHIBIT "1"

# Non-Paper Exhibit – Exh. 1 (1(a)-1(n) Audio (Thumb Drive)

# EXHIBIT "B"

1 | Risa S. Christensen, Esq. (SBN: 227799)
2 | Dennis E. Wagner, Esq. (SBN: 99190)
**WAGNER ZEMMING CHRISTENSEN, LLP**
3 | 1325 Spruce Street, Suite 200
4 | Riverside, CA 92507
Tel.:      (951) 686-4800
5 | Fax:      (951) 686-4801
6 | rsc@wzclawfirm.com
7 | dew@wzclawfirm.com

8 | Attorneys for Defendants, COUNTY OF SAN BERNARDINO; HUMBERTO
9 | MIRANDA; JULIAN MATA; and JESSAQUA ATTLESEY

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| CECILIA VARGAS; ARIANA SALAS, individually and as a successor-in-interest to RUBEN ESCUDERO, deceased, | CASE NO: 5:20-cv-02646-JGB-KK |
|---|---|
| Plaintiffs, | **DECLARATION OF SERGEANT GERARDO MORENO IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT OR IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT** |
| vs. | |
| COUNTY OF SAN BERNARDINO; H. MIRANDA; S. CARTER; Z. VOGEL; J. MATA; Z. PRITCHETT; J. JIMENEZ; A. MATA; T. KAUTZ; J. ATTLESEY; RODRIGUEZ (first initial unknown) and DOES 1-10, inclusive, | *[Filed concurrently w/ Notice of Motion and Motion for Summary Judgment; Statement of Undisputed Facts; and (Proposed) Judgment]* |
| Defendants. | **Date:** March 6, 2023 <br> **Time:** 9:00 a.m. <br> **Courtroom:** 1 |
| | Hon. Jesus G. Bernal <br> United States District Judge |

1

1   I, GERARDO MORENO, declare as follows:

2   That I am presently a sergeant with the San Bernardino Sheriff's

3   Department and assigned to the Highland Station. I have been with the sheriff's

4   department for 15 years and had been on assignment to the homicide team for the

5   department from April 2018 to March 2021.  I have personal knowledge of the

6   facts as set forth in this declaration, and if called to testify could do so

7   competently based upon such personal knowledge.

8   1.   That on October 22, 20219, I was assigned to the homicide team to

9   investigate the death of Ruben Escudero, I and Detective Eric Ogaz, another team

10  member, traveled to the Victorville Fire Station to speak with some of the

11  firefighters who were present at the time of the drug overdose of Ruben

12  Escudero.  I participated in an interview with Detective Eric Ogaz and firefighter

13  paramedic Brett Lever.  On Friday, October 25, 2019, I did a subsequent follow-

14  up interview with firefighter medic Brett Lever at the fire station located at 16200

15  Desert Kroll in Victorville, California.  Accompanying me on that occasion was

16  Sergeant Joseph Steers.  That attached as **Exhibit 1(a)** is a true and correct copy

17  of the audio recording of the interview with Brett Lever that I conducted on

18  October 25.  That I have had a chance to review a written transcript of the

19  interview and have compared the written transcript with the audio recording of

20  the interview and find that the transcript fairly and accurately reflects what was

21  said in the interview on the 25th with Brett Lever.  That attached as **Exhibit 2** is a

22  true and correct copy of the typewritten statement of the Lever interview on

23  October 25, pgs. 1-5; 11, 12, 14-17, 19-28, 30, 33-34, 41, 42, 49-54, 56-58.

24  2.   That on October 23, 2019, myself and Detective Eric Ogaz conducted

25  an interview with Captain Dyjuan Washington with the Victorville Fire

26  Department.  That attached hereto and incorporated as **Exhibit 1(b)**, is a true and

27  correct copy of the recording of the interview that took place with Captain

28  Washington on October 23, 2019.  I have compared the audio recording with a

2

1   written transcript from the interview that was conducted by us and determined that

2   the transcript I reviewed fairly and accurately represents what was said in the

3   recorded interview.  That attached as **Exhibit 3** is a true and correct copy of the

4   written transcript of that interview, pgs. 1-12, 14-30, 40-58, 61-65.

5         3.    That on October 24, 2019, I conducted an interview with Carla Lugo

6   at the officers of AMR in Victorville, California. Ms. Lugo was an EMT and was

7   present at the time of the drug overdose involving Ruben Escudero.  That I

8   recorded the interview of Karla Lugo that was conducted.  In addition to myself

9   being present with Ms. Lugo, Detective Eric Ogaz was also present as part of the

10  homicide team.  That the interview with Ms. Lugo was recorded.  That attached

11  as **Exhibit 1(c)** is a true and correct of the recording of the interview with Karla

12  Lugo, myself and Detective Ogaz.  I have reviewed a transcript of the interview

13  and have compared the transcript with the audio recording of the interview with

14  Ms. Lugo and have determined that the transcript fairly and accurately reflects

15  what was said during the interview with Ms. Lugo.  That attached hereto and

16  incorporated herein as **Exhibit 4** is a true and correct copy of the written

17  transcript of the Lugo interview, pgs. 1, 16-18, 20-23, 26, 30-32, 40-44, 46, 47, 52,

18  55-59, 69-74, 77, 78.

19        4.    That on October 24, 2019, I conducted an interview with Alex Gabler

20  at the AMR office in Victorville, California.  Also present for the interview was

21  Sgt. Joseph Steers.  Alex Gable was the paramedic with AMR that was present at

22  the time of the drug overdose with Ruben Escudero.  That attached as **Exhibit 1(d)**

23  is a true and correct copy of the recording of the interview with Alex Gabler,

24  myself and Sgt. Steers.  I have reviewed a transcript of the interview and have

25  compared the transcript with the audio recording of the interview with Mr. Gabler

26  and have determined that the transcript fairly and accurately reflects what was said

27  during the interview with Alex Gabler.  That attached hereto as **Exhibit 5** is a true

28  and correct copy of the written transcript of the October 24, 2019 Gabler interview,

3

1  pgs. 1-7, 11-21, 24-36, 39, 41, 42, 49, 50, 53-56, 58-66, 71-81, 84-94, 97-101, 104,

2  105, 108, 110-113.

3       5.     That on Friday, October 25, 2019, I conducted another interview with

4  Alex Gabler, assisting me at that time was Sergeant Joseph Steers. The interview

5  was conducted in the parking lot of the Target in Apple Valley, and was just going

6  to be a quick follow up interview.  That attached hereto as **Exhibit 1(e)** is a true

7  and correct copy of the audio recording of the interview with Alex Gabler, myself

8  and Sgt. Steers.  I have reviewed and compared the transcript of the follow up

9  interview with Alex Gabler with the audio recording and have determined that the

10  transcript fairly and accurately reflects what was said during the follow up

11  interview with Alex Gabler.  That attached hereto as **Exhibit 6** is a true and correct

12  copy of the written transcript of the Gabler follow up interview, pgs. 1 and 2.

13       6.     That as a member of the homicide team, it is our team's duty to

14  investigate the death of Mr. Escudero.  Our job is to gather the facts and to

15  present the information to the San Bernardino County District Attorney for a

16  determination as to whether a crime has occurred for which prosecution is

17  appropriate.  As a result, it is our practice to record the interviews that we do so

18  that information is accurately captured and available for the District Attorney to

19  make any decision in a particular case.

20       7.     Even though the homicide may involve an investigation of members

21  of our department, the investigation is conducted in the same fashion as any other

22  homicide investigation, in that we gather all pertinent facts and provide

23  everything in a complete report for the District Attorney for review to determine

24  whether criminal charges should be forthcoming.

25  / / /

26  / / /

27  / / /

28  / / /

<center>4</center>

---

DECLARATION OF SERGEANT GERARDO MORENO IN SUPPORT OF DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT

1     I declare under penalty of perjury under the laws of the State of California

2 and the United States of America, that the foregoing is true and correct.

3     Executed this 25 day of January 2023 in ___HIGHLAND_____,

4 California, United States of America.

5

6                          GERARDO MORENO, Declarant

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DECLARATION OF SERGEANT GERARDO MORENO IN SUPPORT OF DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT

EXHIBIT "2"

Ruben Escudero

Transcription – BRETT LEVER PRT.1 BY OGAZ/MORENO

[1:01:34 minutes]

1   **Ogaz:    Det. Eric Ogaz**

2   **Moreno: Det. Jerry Moreno**

3   **Lever:    Brett Lever, Victorville Fire Dept. Paramedic**

4   ------------------------------------------------

5   OGAZ:       This is Detective Ogaz, it is October 22, 2019, I am with Detective

6                    Jerry Moreno. Reference case number 171909396, Henry# 2019-

7                    106. I am at the Victorville Fire Station, Station# 311, and I'm with,

8   LEVER:      Firefighter/Paramedic Brett Lever. B-R-E-T-T, L-E-V-E-R.

9   OGAZ:       You said you are a paramedic?

10  LEVER:      Yes, sir.

11  OGAZ:       What, what's your paramedic number?

12  LEVER:      Um, 4-3-, hold on one second.

13  OGAZ:       It starts with a "P" correct?

14  LEVER:      Yes, sir.

15  OGAZ:       P-3-7-4-3-3. Okay. How long have you been a paramedic for?

16  LEVER:      Ah, a little over two years.

17  **[00:52]**

18  OGAZ:       Two years.

19  LEVER:      Approximately, yeah, two years and four months, something like

20                   that.

21  OGAZ:       Okay and were you working on October 19th, 2019?

22  LEVER:      Yes, sir.

23  OGAZ:       Okay, and um were you, were you dispatched to Monte Vista Street,

24                   specifically the address of 16927 Monte Vista Avenue, or Street in

25                                                          1

27

28

Ruben Escudero

Transcription – BRETT LEVER PRT.1 BY OGAZ/MORENO

[1:01:34 minutes]

-

| | | |
|---|---|---|
| 1 | | the city of Victorville? |
| 2 | LEVER: | I don't remember the exact address number, but yes, sir we were |
| 3 | | dispatched to Monte Vista Street. |
| 4 | OGAZ: | Okay can you tell me more about that, the circumstances that you |
| 5 | | were dispatched under, who was working with you? |
| 6 | **[1:28]** | |
| 7 | LEVER: | So, I was here at Station 311. |
| 8 | OGAZ: | Okay. |
| 9 | LEVER: | On medic engine 311 |
| 10 | OGAZ: | Mm-hmm. |
| 11 | LEVER: | Ah, I was working with um my Captain, Dyjuan Washington. |
| 12 | OGAZ: | Mm-hmm. |
| 13 | LEVER: | As well as my normal Engineer, Marin Alcon. Approximately |
| 14 | | around 9, 9: 15'ish we were dispatched to an over dose on Monte |
| 15 | | Vista Street. Um we got into the engine, responded to the call, en |
| 16 | | route to the call my Captain was reading the notes in the call and |
| 17 | | stated that ah it was a possible heroin overdose based on the notes. |
| 18 | OGAZ: | Okay. |
| 19 | LEVER: | Ah, we arrive on scene secondary to two ah county Sheriffs officers. |
| 20 | OGAZ: | Okay. |
| 21 | LEVER: | Ah, we grabbed our equipment, our cardiac monitor, our drug box, |
| 22 | | our airway bag, all the equipment we felt necessary for the call. We |
| 23 | | went inside, I was the first one to make access inside the house, |
| 24 | | secondary to the officers, followed by the engineer and followed by |
| 25 | | 2 |
| 26 | | |
| 27 | | |
| 28 | | |

Ruben Escudero

Transcription – BRETT LEVER PRT.1 BY OGAZ/MORENO

[1:01:34 minutes]

| | | |
|---|---|---|
| 1 | | my captain. |
| 2 | OGAZ: | Okay. |
| 3 | LEVER: | Um, we were greeted inside in the kitchen by two Sheriff's officers |
| 4 | | and found the patient lying supine on his back on the kitchen floor. |
| 5 | | They had said that they had found paraphilia next to the patient and |
| 6 | | it was a, a possible heroin overdose. |
| 7 | OGAZ: | Mm-hmm. |
| 8 | LEVER: | I did not see any paraphilia. Ah, they asked me at that time if they |
| 9 | | wanted me have the patient move to the front living room, I said, |
| 10 | | yes. So, we walked into the front living room and the two Sheriff's |
| 11 | | officers moved, dragged the patient into the living room for just |
| 12 | | better, more room availability for us to work. |
| 13 | **[2:50]** | |
| 14 | OGAZ: | Okay. |
| 15 | LEVER: | Um, at that point and time kind of do a further assessment with the |
| 16 | | patient real brief, noticed his pupils were pinpoint, a sign of opiate |
| 17 | | overdose, overdose, heroin overdose. |
| 18 | OGAZ: | Um hum. |
| 19 | LEVER: | I noted that he was breathing inadequately, probably about four to |
| 20 | | six times a minute. |
| 21 | OGAZ: | Um hum. |
| 22 | LEVER: | Um, so I started administering Narcan. |
| 23 | OGAZ: | Um hum. |
| 24 | LEVER: | Ah, throughout the call he received a total of four, or sorry. |
| 25 | | |
| 26 | | |
| 27 | | |
| 28 | | |

3

Ruben Escudero

Transcription – BRETT LEVER PRT.1 BY OGAZ/MORENO

[1:01:34 minutes]

1    Throughout the call he received a total of 2 milligrams of Narcan.
2    Ah, given by me throughout the duration of it. My engineer was
3    obtaining further vital signs on the patient and began to assist the
4    patient ventilation with a bag mouth vest, breathing for him
5    essentially. Um, I advised the Sheriff's officers with the medication I
6    gave him. It's common for these patients to come, come awake and
7    become violent, so just be ready, all of us are going to be ready on
8    our hands and feet. Um, one of the Sheriff's officers said, okay and
9    stepped up towards, by the patient head. Um, at that point and time
10   AMR had arrived on scene, walked in the door, I gave them a brief
11   pass-down on what had happened.

12   **[3:59]**

13   OGAZ:     Mm-hmm.
14   LEVER:    I said, hey can you guys please grab your ah, we refer to as a mega
15             mover, it's kind of like a large tarp we use to carry patients out who
16             are unconscious, or you know cannot walk and heavier and has
17             handles on it, it's easier for us to carry patients. Um, while moving
18             the patient onto the mega mover, he kind of became a little more
19             responsive. We had advised him, hey, Fire Department, Sheriff's
20             office is here, were here to help you, relax. He kind of dry heaved
21             once, we sat him up to you know, that why he could aspirate on his
22             vomit. Okay, let's lay back down, lay back down and he dry-heaved
23             again, we sat him up again and at that point and time, he became
24             agitated, frustrated and kind of looked confused and a little

4

26
27
28

Ruben Escudero

Transcription – BRETT LEVER PRT.1 BY OGAZ/MORENO

[1:01:34 minutes]

1          combative.

2    OGAZ:      Mm-hmm.

3    **[4:42]**

4    LEVER:     Again, hey were here to help you, calm down, relax and at that point

5               ah as far as I can remember he, that's when he became combative

6               and pretty violent. Ah, throwing punches, swinging on anyone and

7               everyone in the room. Threw a punch at myself, um that's when I

8               kind of stepped back and let the Sheriff's officer's kind of do their

9               thing in attempts to properly restrain the patient with their powers.

10              And at that point and time a third, I believe it was that time, a third

11              Sheriff's officer came on scene.

12   OGAZ:      Okay.

13   **[5:15]**

14   LEVER:     Ah, the patient was extremely violent and combative throughout the

15              duration of it. The Sheriff's officers attempted to restrain the patient.

16              Um, he was tased I believe, twice with no, really no success. He was

17              still ah combative. I kind of stepped out, backed into a corner kind of

18              giving them the room and then also into the doorway I was trying to

19              move back and forth a little bit, kind of moving gear out of the

20              Sheriff's way and talking with the AMR paramedic. Um, me and

21              myself and the AMR paramedic communicated on ah giving the

22              patient another medication called, Versed. It's used in you know in

23              excited, delirium patients who are extremely combative or not really

24              cooperative to kind of chemically restrain them, sedate them.

25

5

26

27

28

Ruben Escudero

Transcription – BRETT LEVER PRT.1 BY OGAZ/MORENO

[1:01:34 minutes]

| | | |
|---|---|---|
| 1 | OGAZ: | Okay and so you did a total of? |
| 2 | LEVER: | Four times to 4 M.L.s. |
| 3 | **[11:44]** | |
| 4 | OGAZ: | Okay. Now you mentioned that you kind of pre-flighted the deputies |
| 5 | | on scene, like hey, it's in your training and experience, it's typical |
| 6 | | once you give someone that's been, been over dosed, and you give |
| 7 | | this Narcan that sometimes they wake up and they are disoriented, |
| 8 | | they don't know what's going on and the become combative? |
| 9 | LEVER: | Correct, yes sir. |
| 10 | OGAZ: | Have you seen that often? |
| 11 | LEVER: | A couple of times, yes, sir. |
| 12 | OGAZ: | Okay. |
| 13 | LEVER: | Never, never this combative or violent. |
| 14 | **[12:09]** | |
| 15 | OGAZ: | Never, to this extreme of level. |
| 16 | LEVER: | Never to this extreme. |
| 17 | OGAZ: | How many times have you, how many times would you say in your |
| 18 | | career that you have administered Narcan? |
| 19 | LEVER: | I couldn't even tell you. Um, I don't even know. |
| 20 | OGAZ: | Would you say it's um over 100 or under 100? |
| 21 | LEVER: | Under 100 for sure. |
| 22 | OGAZ: | Under a 100. Over 50, under 50? |
| 23 | LEVER: | Under 50. |
| 24 | OGAZ: | Under 50, okay. Over. |
| 25 | | |
| 26 | | |
| 27 | | |
| 28 | | |

11

Ruben Escudero

Transcription – BRETT LEVER PRT.1 BY OGAZ/MORENO

[1:01:34 minutes]

| | | |
|---|---|---|
| 1 | LEVER: | Probably around, if I had to ballpark it, I would maybe guess around |
| 2 | | 20 times. |
| 3 | OGAZ: | About 20 times? |
| 4 | LEVER: | Maybe, maybe. |
| 5 | OGAZ: | And out of those 20 times, how many times has someone become |
| 6 | | um combative, approximately? |
| 7 | LEVER: | Maybe, maybe half. |
| 8 | OGAZ: | About half the times? |
| 9 | LEVER: | So, about 10? |
| 10 | LEVER: | Usually about half the time they um become combative and violent |
| 11 | | for a little bit, but you're able to kind of restrain them. |
| 12 | OGAZ: | Mm-hmm. |
| 13 | LEVER: | And they kind of will wake up and wake up and understand what's |
| 14 | | going on. |
| 15 | OGAZ: | Okay, what's your, your definition of combative? |
| 16 | LEVER: | Ah, not allowing us to preform our jobs, um kind of fighting us off |
| 17 | | of them. |
| 18 | OGAZ: | Mm-hmm. |
| 19 | **[13:15]** | |
| 20 | LEVER: | You know weather that be punching or swinging their arms, not |
| 21 | | letting us touch them, not, not letting us obtain vital signs, you know |
| 22 | | breaking the blood pressure cuff off, that kind of stuff. |
| 23 | OGAZ: | That's probably like be in a dead sleep and then all of a sudden. |
| 24 | LEVER: | Yelling, you know, yes sir. Kind of like being dead sleep and woken |
| 25 | | |
| 26 | | |
| 27 | | |
| 28 | | |

12

Ruben Escudero

Transcription – BRETT LEVER PRT.1 BY OGAZ/MORENO

[1:01:34 minutes]

| | | |
|---|---|---|
| 1 | OGAZ: | Okay. |
| 2 | LEVER: | They were pulling up as we were kind of walking on scene, so they |
| 3 | | still had to grab all their equipment, grabbing in their gurney and |
| 4 | | then walk in and so by the time, you know we were there doing all |
| 5 | | the stuff it wasn't readerly available for us to kind of get him on the |
| 6 | | gurney and restrain him properly. |
| 7 | OGAZ: | So, you were just trying to provide medical aid to him as quick as |
| 8 | | possible based. |
| 9 | LEVER: | Yes, sir. |
| 10 | OGAZ: | Upon the situation. |
| 11 | LEVER: | Because his respiratory rate he was unresponsive, he wasn't |
| 12 | | breathing adequately. I wanted to administer the medication as fast |
| 13 | | and as safely as possible, just to kind of help him you know breath |
| 14 | | better and ultimately, you know save him. |
| 15 | OGAZ: | So, were you? |
| 16 | LEVER: | From further complications. |
| 17 | OGAZ: | So were you in fear that if you didn't right away, you didn't, were |
| 18 | | you in fear that you didn't have time to wait for AMR you just, you, |
| 19 | | you needed to. |
| 20 | LEVER: | Correct. |
| 21 | OGAZ: | Immediately apply the medication to possibly treat him to save his |
| 22 | | life? |
| 23 | LEVER: | Yes, sir. Correct. |
| 24 | OGAZ: | Okay. |
| 25 | | |
| 26 | | |
| 27 | | |
| 28 | | |

14

Lever –Interview Part I-by Ogaz & Moreno

Ruben Escudero

Transcription – BRETT LEVER PRT.1 BY OGAZ/MORENO

[1:01:34 minutes]

| | | |
|---|---|---|
| 1 | LEVER: | As fast as possible. |
| 2 | OGAZ: | And do you guys um, and when I say you guys, being the Fire |
| 3 | | Department. Do you guys have stuff to restrain them with, with |
| 4 | | absent a gurney? |
| 5 | LEVER: | Um, we do have like restraints that AMR uses to tie down their um |
| 6 | | patients onto the gurney. |
| 7 | OGAZ: | Mm-hmm. |
| 8 | LEVER: | We have the restrains that go around your arms, but we don't have |
| 9 | | anything to strap them down to. |
| 10 | OGAZ: | Okay. |
| 11 | LEVER: | Does that make sense? |
| 12 | OGAZ: | So, there is nothing for you to restrain them to? |
| 13 | LEVER: | Yes, us properly restraining them, no. We just, kind of like have to |
| 14 | | hold them down or hold their extremities down so they couldn't |
| 15 | | swing on us. |
| 16 | OGAZ: | Okay. |
| 17 | LEVER: | So, nothing to properly restrain um. |
| 18 | OGAZ: | Prior to giving him the Narcan was anyone attempting to restrain |
| 19 | | him while you were giving him the Narcan? |
| 20 | LEVER: | No, sir. |
| 21 | OGAZ: | Um, so basically it was advised, like hey, just FYI? |
| 22 | LEVER: | Just a heads up. |
| 23 | OGAZ: | This guy could jump up and be combative? |
| 24 | LEVER: | Just be ready is what, what I was kind of getting at. |
| 25 | | |
| 26 | | |
| 27 | | |
| 28 | | |

15

Ruben Escudero

Transcription – BRETT LEVER PRT.1 BY OGAZ/MORENO

[1:01:34 minutes]

| | | |
|---|---|---|
| 1 | OGAZ: | Okay. |
| 2 | LEVER: | Everyone kind of be alert, be ready and just in case. |
| 3 | OGAZ: | So, no instruction was given like, hey kind of hold an arm,, hold a |
| 4 | | leg? |
| 5 | LEVER: | No, sir. |
| 6 | OGAZ: | Okay. |
| 7 | LEVER: | No, sir. |
| 8 | **[16:14]** | |
| 9 | OGAZ: | Okay, now you mentioned the deputy, one deputy stood by the head |
| 10 | | of the subject? The patient? |
| 11 | LEVER: | He kind of stepped, um closer to the head of the patient, yes, sir. |
| 12 | OGAZ: | Can you describe that deputy, or do you know that deputies name? |
| 13 | LEVER: | I don't know the deputies name, no. I want to say he was a taller |
| 14 | | Hispanic male. |
| 15 | Okay. | Do you remember what his hairstyle was like? |
| 16 | LEVER: | No, I couldn't tell you. I believe, I believe there was one there with |
| 17 | | spiked hair. |
| 18 | OGAZ: | Mm-hmm. |
| 19 | LEVER: | And maybe one bald, I'm not 100 percent sure, though I couldn't tell |
| 20 | | you. |
| 21 | OGAZ: | You couldn't tell which one. Um. |
| 22 | LEVER: | If I saw him I would be able to identify him, but I couldn't base on |
| 23 | | the memory, no. |
| 24 | OGAZ: | Out of the two deputies was one taller than the other one? |
| 25 | | |
| 26 | | |
| 27 | | |
| 28 | | |

16

Ruben Escudero

Transcription – BRETT LEVER PRT.1 BY OGAZ/MORENO

[1:01:34 minutes]

1    **[16:55]**

2    LEVER:      Yes, one was taller than the other one?

3    OGAZ:       So, which deputy would be, would be the one by the head?

4    LEVER:      I believe the taller one. I believe the tall one was.

5    OGAZ:       The taller one.

6    LEVER:      I believe so.

7    OGAZ:       Okay. And you said, when you said he was standing by the head,

8                what, what was he doing?

9    LEVER:      Just observing.

10   OGAZ:       Okay.

11   LEVER:      Just ah. Watching the patient and watch us, making sure that kind of

12               the scene was safe and observing it.

13   OGAZ:       Was he saying anything?

14   LEVER:      I don't recall.

15   OGAZ:       Okay, what was the other deputy doing and where was he at?

16   LEVER:      He was down more towards the patient's feet.

17   OGAZ:       Okay.

18   LEVER:      And I believe he was observing as well.

19   OGAZ:       Okay.

20   LEVER:      I wasn't really focused on the deputies, I was kind of focused on the

21               patient.

22   OGAZ:       Mm-hmm.

23   LEVER:      Ah, my, my partners, my crew what they were doing.

24   OGAZ:       Mm-hmm.

25

26

27

28

17

Ruben Escudero

Transcription – BRETT LEVER PRT.1 BY OGAZ/MORENO

[1:01:34 minutes]

| | | |
|---|---|---|
| 1 | | scale, and this is just a rough draft. |
| 2 | LEVER: | I believe it kind of went something along the lines of this. And so, |
| 3 | | the kitchen. Alright. So. |
| 4 | OGAZ: | And then can you just put an um your initials to where you were at? |
| 5 | LEVER: | I was kind of moving around quite a bit. Um. |
| 6 | OGAZ: | Okay. |
| 7 | LEVER: | Throughout the duration of the call. I ah so he was drug in, I put my |
| 8 | | medical, my medications over here. |
| 9 | OGAZ: | Mm-hmm. |
| 10 | LEVER: | I put the cardiac monitor over here. |
| 11 | OGAZ: | Okay. |
| 12 | LEVER: | And then I administered the medication in the patients nose at first. |
| 13 | OGAZ: | Okay. |
| 14 | LEVER: | Got my, my airway stuff was over hear by the door. |
| 15 | OGAZ: | Mm-hmm. |
| 16 | LEVER: | Walked around and grabbed that. Started assisting ventilations. |
| 17 | OGAZ: | Okay. |
| 18 | LEVER: | Um and then kind of for the, with the treating the patient and giving |
| 19 | | more medications as needed. My partner was over hear giving vital |
| 20 | | signs. And I had to walk over here, there is a little dining room table |
| 21 | | over here. I was doing a blood check on the patient, so I had to walk |
| 22 | | back over here. So, my stuff. |
| 23 | **[20:06]** | |
| 24 | OGAZ: | It is safe to say you were kind of all over? |
| 25 | | |
| 26 | | |
| 27 | | |
| 28 | | |

19

Ruben Escudero

Transcription – BRETT LEVER PRT.1 BY OGAZ/MORENO

[1:01:34 minutes]

| | | |
|---|---|---|
| 1 | LEVER: | Kind of, mainly where I was at during the duration of the call, while |
| 2 | | I was treating him was by the patient's head. |
| 3 | OGAZ: | Okay, just put your initials right there. |
| 4 | LEVER: | Yeah, of course. |
| 5 | OGAZ: | And that being understood you know, right here you said you put |
| 6 | | your medication of the couch? |
| 7 | LEVER: | Correct. |
| 8 | OGAZ: | Could you just put meds right there? Can you also, yeah put it down |
| 9 | | where you put other things. Can I see this? On the drawing you put b |
| 10 | | the couch area you put meds, um just to the right of the patient and |
| 11 | | in the right-hand corner it looks like you put a cardiac monitor and |
| 12 | | then um what kind of bag is that? |
| 13 | LEVER: | An air-way bag. It has all the. |
| 14 | OGAZ: | An airway bag, just to the right of the front door, it looks like. |
| 15 | LEVER: | Correct, yes, sir. |
| 16 | OGAZ: | Okay, and can you put um just abbreviate for T for tall um can T for |
| 17 | | tall and the DEP from where he was standing at. |
| 18 | LEVER: | About right there. |
| 19 | Okay. | Um and just put D and small everything is d-e-p. And where was |
| 20 | | the other deputy at? |
| 21 | **[21:16]** | |
| 22 | LEVER: | He was around right here but. |
| 23 | OGAZ: | Okay, just put deputy. Shorter deputy. Okay. Okay. And you said, |
| 24 | | now where was where was your partners at? |
| 25 | | |
| 26 | | |
| 27 | | |
| 28 | | |

Ruben Escudero

Transcription – BRETT LEVER PRT.1 BY OGAZ/MORENO

[1:01:34 minutes]

| | | |
|---|---|---|
| 1 | LEVER: | My Captain um was kind of right here in the doorway. |
| 2 | OGAZ: | Okay. |
| 3 | LEVER: | And then my Engineer was kind of right here by the monitor. |
| 4 | OGAZ: | Okay. |
| 5 | LEVER: | And then hooking the patient up. |
| 6 | OGAZ: | Now you said there was a female that was present where was she at? |
| 7 | LEVER: | Ah the, she was over here by my Captain. |
| 8 | OGAZ: | Can you Just put down female? Was there anyone else in the room? |
| 9 | LEVER: | Not that I saw. |
| 10 | OGAZ: | Okay. |
| 11 | LEVER: | I don't, there wasn't, I don't know if there was anyone else. I believe |
| 12 | | there was rooms back here I believe. I didn't go that far. |
| 13 | OGAZ: | Mm-hmm. |
| 14 | LEVER: | I only walked into the kitchen and walked into the living room. I |
| 15 | | didn't see anyone else present in, in the house. |
| 16 | OGAZ: | Okay. You said that a, a third deputy arrived? |
| 17 | LEVER: | Correct. |
| 18 | OGAZ: | And what point did, did that deputy grab the, the, well first of all can |
| 19 | | you describe that third deputy? |
| 20 | LEVER: | Ah, female, blonde hair. |
| 21 | OGAZ: | Okay. Did she arrive um before he became combative or after? |
| 22 | LEVER: | I believe before. I'm not 100 percent sure though. |
| 23 | OGAZ: | Okay. |
| 24 | LEVER: | Like I said my main focus was on the patient. |
| 25 | | |
| 26 | | |
| 27 | | |
| 28 | | |

21

Ruben Escudero

Transcription – BRETT LEVER PRT.1 BY OGAZ/MORENO

[1:01:34 minutes]

| | | |
|---|---|---|
| 1 | OGAZ: | Mm-hmm. |
| 2 | LEVER: | And then my, kind of my main focus is always on the patient. |
| 3 | OGAZ: | Mm-hmm. |
| 4 | LEVER: | But also, on my crew and AMR, kind of giving them a brief run |
| 5 | | down. |
| 6 | OGAZ: | Mm-hmm. |
| 7 | LEVER: | On what we're going to do further from here. |
| 8 | **[22:40]** | |
| 9 | OGAZ: | Okay. When the female deputy arrived do you know where she |
| 10 | | stood at? |
| 11 | LEVER: | I believe somewhere by the shorter deputy by the doorway? |
| 12 | OGAZ: | Can you put that down "F" for female and then dep, D-E-P? Okay, |
| 13 | | when the subject became combative you mentioned that you put him |
| 14 | | on an ah what did you call that a sheet or whatever it is. |
| 15 | LEVER: | We refer to it as a mega mover. |
| 16 | OGAZ: | Mega mover? |
| 17 | LEVER: | It's a big tarp with handles on it. |
| 18 | OGAZ: | Okay. |
| 19 | LEVER: | To kind of help assist us with moving patients who are |
| 20 | | unresponsive, can't walk. It is a comfortable way for both us to carry |
| 21 | | them and both the patient. |
| 22 | **[23:17]** | |
| 23 | OGAZ: | Okay, was the patient on the mega mover when he first became |
| 24 | | combative? |
| 25 | | |
| 26 | | |
| 27 | | |
| 28 | | |

22

Ruben Escudero

Transcription – BRETT LEVER PRT.1 BY OGAZ/MORENO

[1:01:34 minutes]

| | | |
|---|---|---|
| 1 | LEVER: | Ah, we were, we were. |
| 2 | OGAZ: | Or was or was. |
| 3 | LEVER: | We were getting him placed on the mega mover, so we rolled him |
| 4 | | onto his left side. |
| 5 | OGAZ: | Uh huh. |
| 6 | LEVER: | To kind of place the tarp underneath him. |
| 7 | OGAZ: | Okay. |
| 8 | LEVER: | To roll him back onto the mega mover and that's when he kind of |
| 9 | | became more responsive. |
| 10 | OGAZ: | Ah, okay. So, now you rolled him on his left side, you guys slip the |
| 11 | | mega mover underneath him. You know rolled him back onto the |
| 12 | | mega mover am I, I correct? |
| 13 | LEVER: | Correct. |
| 14 | OGAZ: | By saying this? |
| 15 | LEVER: | Correct. |
| 16 | OGAZ: | And that's when he became more responsive. What do you mean by |
| 17 | | more responsive? |
| 18 | LEVER: | Ah, he opened his eyes, began breathing a lot more adequately. |
| 19 | OGAZ: | Okay. |
| 20 | LEVER: | Um, and then like I said, he had a period of two times where he ah |
| 21 | | we believed he was going to vomit. |
| 22 | OGAZ: | Mm-hmm. |
| 23 | LEVER: | He dry heaved. |
| 24 | OGAZ: | Mm-hmm. |
| 25 | | |
| 26 | | |
| 27 | | |
| 28 | | |

23

Ruben Escudero

Transcription – BRETT LEVER PRT.1 BY OGAZ/MORENO

[1:01:34 minutes]

| 1 | **[24:02]** |
|---|---|
| 2 | LEVER: | So, we sat him up, so that way he did not aspirate, ah advise him |
| 3 | | who we were, what we were there for. Set him back down and then |
| 4 | | had another episode of that and then we sat him back up again to |
| 5 | | allow him to vomit if he was going to vomit and then that's when he |
| 6 | | became a little bit agitated and combative. |
| 7 | OGAZ: | Did he seem like he was disoriented at the time? |
| 8 | LEVER: | Yes, sir. |
| 9 | OGAZ: | Okay. So, at this point and time no one has actually picking up the |
| 10 | | mega mover trying to move him out? |
| 11 | LEVER: | No, sir. |
| 12 | OGAZ: | You just got in place so if you had to get him up and get him out in a |
| 13 | | hurry. |
| 14 | LEVER: | Yes, sir. |
| 15 | OGAZ: | You were able to do so. |
| 16 | LEVER: | Yes, sir. |
| 17 | OGAZ: | Okay. And when I say these things, I'm, I'm if I say anything that is |
| 18 | | incorrect just let me know. |
| 19 | LEVER: | Yes, sir. |
| 20 | OGAZ: | Okay. Um, so now he is on the mega mover, he sits up like he is |
| 21 | | going to aspirate, what is the word I'm looking for? Throw up. |
| 22 | LEVER: | Yes, sir. |
| 23 | **[24:44]** |
| 24 | OGAZ: | Twice and you sit him up, put him down, sit him up and sit him |
| 25 | | |
| 26 | | |
| 27 | | |
| 28 | | |

24

Ruben Escudero

Transcription – BRETT LEVER PRT.1 BY OGAZ/MORENO

[1:01:34 minutes]

| | | |
|---|---|---|
| 1 | | down. Um, but he is not being combative at this point? |
| 2 | LEVER: | No, sir. He is just agitated. And the second time we sat him up he |
| 3 | | got a little agitated like trying to fight us off of him. |
| 4 | OGAZ: | How, how was he trying to fight you off of him? What was he |
| 5 | | doing? |
| 6 | LEVER: | Ah. You know, trying to like not lay down, not lay down in the |
| 7 | | mega mover, kid of stood up, kind of throwing his body around a |
| 8 | | little bit, like he didn't want us there and wanted to kind of get up on |
| 9 | | his own. |
| 10 | OGAZ: | Okay. So, he was ah, was like a passive resistant. He wasn't trying to |
| 11 | | hit anybody? |
| 12 | LEVER: | Not at that time, no. |
| 13 | OGAZ: | He was just trying to get up like get out of here or just like leave him |
| 14 | | alone and he didn't want to lay down? |
| 15 | LEVER: | Yes, sir. |
| 16 | OGAZ: | Okay. Um, so, what, what happened next? |
| 17 | LEVER: | Um, from what I can remember at that point and time, he became |
| 18 | | more combative, more agitated and began fighting us, ah throwing |
| 19 | | punches, he was kind of throwing punches anywhere and |
| 20 | | everywhere. Ah, he threw a punch at me and that's when I was right |
| 21 | | here ah attempting to kind of calm him down as well, sir were here |
| 22 | | to help you. |
| 23 | OGAZ: | Mm-hmm. |
| 24 | **[25:56]** | |
| 25 | | |
| 26 | | |
| 27 | | |
| 28 | | |

25

Ruben Escudero

Transcription – BRETT LEVER PRT.1 BY OGAZ/MORENO

[1:01:34 minutes]

| | | |
|---|---|---|
| 1 | LEVER: | And then he threw a punch at me and that's when I kind of stepped |
| 2 | | back Into this corner to allow the deputies to do their thing. |
| 3 | OGAZ: | Okay. So, after he sits up and sits back down, do you sit him up |
| 4 | | about the throwing up, you sit him back up, he starts to get a little |
| 5 | | agitated how far between that moment did he start punching? |
| 6 | LEVER: | A couple seconds, thirty-seconds, it wasn't. |
| 7 | OGAZ: | A couple of seconds? |
| 8 | LEVER: | It was a brief moment in time. I don't know the exact timeframe, but |
| 9 | | it was a brief moment. |
| 10 | OGAZ: | Okay. Describe that incident, I mean as, as best you can in detail |
| 11 | | how did he try punching and who did he try punching first and what |
| 12 | | was he doing? |
| 13 | LEVER: | I don't recall who he tried punching first, he was just kind of in, what |
| 14 | | I thought was just throwing punches at anyone and everyone he |
| 15 | | could, who was in the room who was attempting to kind of help him |
| 16 | | and restrain him. |
| 17 | OGAZ: | Okay. So that initial volley of punches, how many punches would |
| 18 | | you say he threw? |
| 19 | LEVER: | Oh dear, I couldn't even give you a number. |
| 20 | OGAZ: | Okay. He was just like openly flaring, was, was his fist closed? |
| 21 | LEVER: | Yes, yes it was. |
| 22 | OGAZ: | Okay. Was he kicking? |
| 23 | LEVER: | Ah, I don't believe he was kicking because he was on his knees. |
| 24 | OGAZ: | Okay. |

26

Ruben Escudero

Transcription – BRETT LEVER PRT.1 BY OGAZ/MORENO

[1:01:34 minutes]

| 1 | LEVER: | Um. |
| 2 | OGAZ: | So, he got himself up to his knees? |
| 3 | LEVER: | Correct and he started throwing punches. |
| 4 | OGAZ: | Okay. |
| 5 | **[27:07]** | |
| 6 | LEVER: | I don't, I don't remember him being on his feet, I could be wrong |
| 7 | | though. It kind of all happened fast so. |
| 8 | OGAZ: | So, how, how did he get upon his knees? |
| 9 | LEVER: | Oh, when we sat him up initially. |
| 10 | OGAZ: | Mm-hmm. |
| 11 | LEVER: | He kind of swung around onto his knees I believe. |
| 12 | OGAZ: | Okay. |
| 13 | LEVER: | And then I don't really remember, he might have been on his feet for |
| 14 | | a brief moment of time, I don't really recall though. |
| 15 | OGAZ: | Okay, okay. So, now he is just kind of punching at whoever is |
| 16 | | around him? |
| 17 | LEVER: | Correct. |
| 18 | OGAZ: | He takes a swing at you, where did he swing at you at? |
| 19 | LEVER: | He swung at me in the face. |
| 20 | OGAZ: | Okay. |
| 21 | LEVER: | I kind of backed up, dodge it and that's when I retreated back to that |
| 22 | | corner to allow more room for the Sheriffs deputies to kind of do |
| 23 | | their thing. |
| 24 | OGAZ: | Mm-hmm. Mm-hmm. |
| 25 | | |
| 26 | | |
| 27 | | |
| 28 | | |

27

Ruben Escudero

Transcription – BRETT LEVER PRT.1 BY OGAZ/MORENO

[1:01:34 minutes]

| | | |
|---|---|---|
| 1 | LEVER: | And then get myself out of harm's way. |
| 2 | OGAZ: | If you did not back up would he have punched you? |
| 3 | LEVER: | Yes, sir. |
| 4 | OGAZ: | Would he have hit you? |
| 5 | LEVER: | Yes, sir. |
| 6 | OGAZ: | He would have hit you, okay. How did you feel at that moment? |
| 7 | | What was your feelings? |
| 8 | LEVER: | Ah, I would say, you know a little nervous. |
| 9 | OGAZ: | Okay. |
| 10 | LEVER: | A little nervous a little worried. |
| 11 | OGAZ: | Okay. |
| 12 | LEVER: | Um, but ultimately my main focus at that time was the patient's |
| 13 | | care. |
| 14 | OGAZ: | Mm-hmm. |
| 15 | LEVER: | And just wanted to get, you know him calmed down and to the |
| 16 | | hospital for further treatment. |
| 17 | OGAZ: | Okay, so you step back to the corner um and you said you kind of let |
| 18 | | the deputy's do their thing, which is trying to subdue this guy. |
| 19 | LEVER: | Correct. |
| 20 | OGAZ: | Um, can you tell me more about that? As much detail as you can? |
| 21 | **[28:24]** | |
| 22 | LEVER: | As much details as I can. |
| 23 | OGAZ: | Um, correct. Where were you standing at during this? |
| 24 | LEVER: | So, there is couch right here and then there is like a little coffee table |
| 25 | | |
| 26 | | |
| 27 | | |
| 28 | | |

Ruben Escudero

Transcription – BRETT LEVER PRT.1 BY OGAZ/MORENO

[1:01:34 minutes]

| | | |
|---|---|---|
| 1 | OGAZ: | Okay. |
| 2 | LEVER: | I was kind of looking, you know looking around to see what was |
| 3 | | going on. I didn't recall how he got over there so fast. |
| 4 | OGAZ: | Mm-hmm. |
| 5 | LEVER: | Or, how exactly he was on his knees or his feet, all I remember was |
| 6 | | that he was over there. |
| 7 | OGAZ: | Okay. So, when he was over here by the couch. |
| 8 | LEVER: | Oh, he I'm sorry, he was on his feet for a brief moment. Um, so this |
| 9 | | how. |
| 10 | OGAZ: | Mm-hmm. |
| 11 | LEVER: | Off the mega mover, he got off the mega mover on his knees and got |
| 12 | | onto his feet. |
| 13 | OGAZ: | Mm-hmm. |
| 14 | LEVER: | And that's when the Sheriff's deputies, um again, kind of swarmed |
| 15 | | him trying to restrain, restrain him. |
| 16 | OGAZ: | Mm-hmm. |
| 17 | LEVER: | He tries throwing punches um onto his knees over here. |
| 18 | OGAZ: | Mm-hmm. |
| 19 | LEVER: | And that's when he then starts throwing punches at me. |
| 20 | OGAZ: | Okay. |
| 21 | **[30:18]** | |
| 22 | LEVER: | So, I remember him being on his feet for a brief moment and then he |
| 23 | | was on his knees in front of me. |
| 24 | OGAZ: | Was anyone saying anything to him at the time when he was |
| 25 | | |
| 26 | | |
| 27 | | |
| 28 | | |

30

Ruben Escudero

Transcription – BRETT LEVER PRT.1 BY OGAZ/MORENO

[1:01:34 minutes]

| 1 | | in restraining him. I believe he was trying to grab his arm. |
|---|---|---|
| 2 | OGAZ: | Okay. |
| 3 | **[32:22]** | |
| 4 | LEVER: | And restrain him. |
| 5 | OGAZ: | Okay, so the shorter deputy is trying to do like a grab his arm, what |
| 6 | | you recall? |
| 7 | LEVER: | From what I recall, yes sir. |
| 8 | OGAZ: | And um do you know which arm he was trying to grab? |
| 9 | LEVER: | I believe it was his left arm. I'm not 100 percent sure though. |
| 10 | OGAZ: | Okay, and so he tried to grab his left arm and then what, you're |
| 11 | | saying he is actually trying to punch deputies with his right arm as |
| 12 | | he Is holding this one arm, is the patient throwing punches with the |
| 13 | | right arm? |
| 14 | LEVER: | Flailing around trying to you know, hit behind them and cover his |
| 15 | | head and hit behind them and flailing around. |
| 16 | OGAZ: | Okay. And so, the other deputy returns punches as he is doing that. |
| 17 | | Okay. And the female deputy steps back and she pulls out her taser? |
| 18 | LEVER: | Correct. |
| 19 | OGAZ: | Okay, what happened next? |
| 20 | LEVER: | Um, I believed she tased them. |
| 21 | OGAZ: | Okay. |
| 22 | LEVER: | Um, I don't know well the taser worked cause the patient was still |
| 23 | | combative. |
| 24 | OGAZ: | Okay, what do you mean by combative? |
| 25 | | | |
| 26 | | | |
| 27 | | | |
| 28 | | | |

33

Ruben Escudero

Transcription – BRETT LEVER PRT.1 BY OGAZ/MORENO

[1:01:34 minutes]

| | | |
|---|---|---|
| 1 | LEVER: | He was still fighting, he wasn't he didn't stop. |
| 2 | OGAZ: | Okay. |
| 3 | LEVER: | He didn't go to the floor, he was still fighting at that time. |
| 4 | OGAZ: | When you say fighting does that mean? |
| 5 | LEVER: | He was agitated, flailing around, trying to get the deputies off of |
| 6 | | him. |
| 7 | OGAZ: | Okay, was he still throwing punches? |
| 8 | LEVER: | He could have been, I'm not 100 percent sure. |
| 9 | OGAZ: | Okay, so then what happened next? |
| 10 | LEVER: | Um, the deputies then again went back to trying to physically |
| 11 | | restrain him because the taser didn't work. |
| 12 | OGAZ: | Okay, how were they trying to physically restrain him? |
| 13 | LEVER: | Um, like I could see the female deputy hit the patient with the taser, |
| 14 | | gun. |
| 15 | OGAZ: | Okay. Where at? |
| 16 | LEVER: | Over the head? |
| 17 | OGAZ: | Over the head? Okay. |
| 18 | LEVER: | Correct, yes, sir. |
| 19 | OGAZ: | And then what happened next? |
| 20 | LEVER: | Um, flailed around some more. I know they attempted to get him on |
| 21 | | his stomach by grabbing his legs. Ah the female deputy grabbed his |
| 22 | | legs to get him on his stomach and then ah I believed he was still |
| 23 | | fighting and I believe at this point and time they tased him again. |
| 24 | OGAZ: | So, the first tasing began at this point? |
| 25 | | |
| 26 | | |
| 27 | | |
| 28 | | |

34

Ruben Escudero

Transcription – BRETT LEVER PRT.1 BY OGAZ/MORENO

[1:01:34 minutes]

| | | |
|---|---|---|
| 1 | LEVER: | Ah he was still fight, still combative, still trying to swing his arms |
| 2 | | around deputies. At this point and time, he was kind of on his, not |
| 3 | | necessarily all the way on his stomach, but he was on his side and |
| 4 | | they had his left arm behind his back and he was still fighting and |
| 5 | | still trying, you know, kick fight. |
| 6 | OGAZ: | Mm-hmm. |
| 7 | LEVER: | Whatever he could do to kind of get out of it and then they were |
| 8 | | eventually able to get him handcuffed. |
| 9 | OGAZ: | Do you recall which deputy was handcuffing? |
| 10 | LEVER: | No, sir. |
| 11 | OGAZ: | You don't know if it was the tall one, short one or the female? |
| 12 | LEVER: | No, sir. |
| 13 | **[40:12]** | |
| 14 | OGAZ: | Okay. So, after the handcuffs are on, what, what happens? |
| 15 | LEVER: | The handcuffs were on the patient was still combative, I, I believe |
| 16 | | the AMR medic had already given the first dose of medication. |
| 17 | OGAZ: | Mm-hmm. |
| 18 | LEVER: | Ah, still combative, still fighting and the Sheriffs deputies were kind |
| 19 | | of on top of him kind of holding him down at that point and time. |
| 20 | OGAZ: | So, at this point and time are there still being strikes made by the |
| 21 | | deputies? |
| 22 | LEVER: | No. |
| 23 | OGAZ: | Or are they just trying to hold him down? |
| 24 | LEVER: | I don't recall. I believe they were just trying to hold him down. |

41

Ruben Escudero

Transcription – BRETT LEVER PRT.1 BY OGAZ/MORENO

[1:01:34 minutes]

| 1 | OGAZ: | Okay. |
| 2 | LEVER: | I don't recall though. |
| 3 | OGAZ: | And was he trying to kick at the deputies at ·all while he was being |
| 4 | | down? |
| 5 | LEVER: | Yes, sir. |
| 6 | OGAZ: | And was, were the deputies able to hold his legs down or restrain |
| 7 | | him? |
| 8 | LEVER: | I believe there was one on his legs, one on his torso and one kind of |
| 9 | | holding his head down on the side. That way he didn't yank his head |
| 10 | | up or bite anyone. |
| 11 | OGAZ: | Okay. Um, during this whole time of the patient, other than earlier |
| 12 | | you said he made some statements. Was he saying anything else? |
| 13 | LEVER: | I don't recall what he was saying. I don't recall, I know he was |
| 14 | | screaming. |
| 15 | OGAZ: | Okay. |
| 16 | LEVER: | But there was a lot of commotion going on, a lot of noises. |
| 17 | OGAZ: | Mm-hmm. |
| 18 | LEVER: | I don't recall. |
| 19 | OGAZ: | Okay. So now he is handcuffed um how long does it take the |
| 20 | | medication to take affect? Or how long did it take the medication to |
| 21 | | take affect? |
| 22 | LEVER: | Roughly, probably a minute or two, approximately. Maybe a minute. |
| 23 | OGAZ: | So, what happened once, once it took effect and how did you know |
| 24 | | it took effect? |

Ruben Escudero

Transcription – BRETT LEVER PRT.1 BY OGAZ/MORENO

[1:01:34 minutes]

| | | |
|---|---|---|
| 1 | | to see where my Engine, my Captain where. Looked to see where |
| 2 | | the AMR medics and EMT were, you know and then. |
| 3 | OGAZ: | So, your, your direction of attention was towards the patient, then |
| 4 | | towards AMR to see where they are at, to see where your persons |
| 5 | | were at? |
| 6 | LEVER: | Kind of scanning the room, essentially, yes, sir. |
| 7 | OGAZ: | Just kind of looking around. Okay. |
| 8 | LEVER: | I was. |
| 9 | OGAZ: | So, you didn't have your focus just at one spot. It was kind of like. |
| 10 | LEVER: | Yes, sir. Just. |
| 11 | OGAZ: | Look at the totality of the freaking chaos that was going on? |
| 12 | LEVER: | To see where everyone is at, what everyone is doing at stuff like |
| 13 | | that. Yes, sir. |
| 14 | OGAZ: | Okay. |
| 15 | LEVER: | Trying to just make sure everyone is safe. |
| 16 | **[48:50]** | |
| 17 | OGAZ: | Okay. Where you injured at all? |
| 18 | LEVER: | No, sir. |
| 19 | OGAZ: | Were you aware of anyone, any fire personnel or AMR people that |
| 20 | | were injured? |
| 21 | LEVER: | No, sir. |
| 22 | OGAZ: | At what point did the patient code, and when I said code, code, |
| 23 | | referring to I think that means when they have no pulse or where |
| 24 | | they are no longer breathing or both? |
| 25 | | |

49

Ruben Escudero

Transcription – BRETT LEVER PRT.1 BY OGAZ/MORENO

[1:01:34 minutes]

| | | |
|---|---|---|
| 1 | LEVER: | Ah when we arrived at Victor Valley Medical Center. When we |
| 2 | | pulled into the parking lot. |
| 3 | OGAZ: | So, while still in the ambulance? |
| 4 | LEVER: | Yes, sir. |
| 5 | OGAZ: | Okay, and you started, started CPR. |
| 6 | LEVER: | Yes, sir. Correct. |
| 7 | OGAZ: | At some point did you get a pulse back? |
| 8 | LEVER: | Not responding EMS personnel, um they did in the hospital. The |
| 9 | | hospital staff took over patient care. |
| 10 | OGAZ: | Um huh. |
| 11 | LEVER: | And they got a pulse back before we left. |
| 12 | OGAZ: | So, the time you, he coded in the ambulance to the time that they |
| 13 | | actually got a pulse back, how much time had elapsed? |
| 14 | LEVER: | I don't know. I understand maybe somewhere around the ballpark |
| 15 | | range of five to ten minutes. |
| 16 | OGAZ: | About five to ten minutes? |
| 17 | LEVER: | Yes, sir. |
| 18 | OGAZ: | Okay. So, when they get a pulse back you see that and is it at that |
| 19 | | point you guys step back and leave? |
| 20 | LEVER: | That when we washed our hands um and then left. |
| 21 | OGAZ: | Did you have to brief any medical personnel once you got on scene |
| 22 | | as far as conditions or what happened? Did you talk to any medical |
| 23 | | staff like, hey this is what this patient is and la, la, la? |
| 24 | LEVER: | We ah, we, yeah when we wheel the patients on AMR's gurney into |

50

Ruben Escudero

Transcription – BRETT LEVER PRT.1 BY OGAZ/MORENO

[1:01:34 minutes]

| | | |
|---|---|---|
| 1 | | the hospital? |
| 2 | OGAZ: | Um huh. |
| 3 | LEVER: | We gave a brief rundown of the, the story. |
| 4 | OGAZ: | Mm-hmm. |
| 5 | LEVER: | What had happened um we got there we did this, we gave this, and |
| 6 | | this happened, the Sheriff's did this, this happened and then here he |
| 7 | | is now. |
| 8 | OGAZ: | Okay. Um, what you got Jerry? |
| 9 | MORENO: | Um, just a couple of follow up questions. Um, who was on scene |
| 10 | | when you and your partners arrived? Who was already on scene? |
| 11 | LEVER: | The two male Sheriff's deputies. |
| 12 | MORENO: | Okay. |
| 13 | LEVER: | And then the, the female by-stander was there, and I believe it was |
| 14 | | he house, from what I was told after the incident occurred I believe |
| 15 | | that was the female's house. She didn't know the gentleman he was |
| 16 | | just there. |
| 17 | OGAZ: | Okay. |
| 18 | MORENO: | Aside from that female by-stander did you see any other by-standers |
| 19 | | there? |
| 20 | LEVER: | No, sir. |
| 21 | MORENO: | And during this incident where was this female at? |
| 22 | LEVER: | Ah, I believe when we arrived on scene she was in the kitchen. |
| 23 | MORENO: | Mm-hmm. |
| 24 | LEVER: | And um in the living room/kitchen doorway and then I believed my |
| 25 | | |
| 26 | | |
| 27 | | |
| 28 | | |

51

Ruben Escudero

Transcription – BRETT LEVER PRT.1 BY OGAZ/MORENO

[1:01:34 minutes]

|   |   |   |
|---|---|---|
| 1 |  | Captain took her into the kitchen to kind of obtain some information |
| 2 |  | from her, however she did not know any information and I believe |
| 3 |  | she stayed in there throughout the duration of the incident. |
| 4 | MORENO: | In the kitchen? |
| 5 | LEVER: | In the kitchen. |
| 6 | MORENO: | Okay. |
| 7 | LEVER: | The kitchen/dining room area I believe that's where she stayed |
| 8 |  | throughout it. |
| 9 | MORENO: | Um. For about how long were you and your partners on scene from |
| 10 |  | the time that you arrived, from the time that you left with AMR |
| 11 |  | when they transported the patient? |
| 12 | LEVER: | Oh, I don't know. That would be in my report. I have all the |
| 13 |  | information. |
| 14 | MORENO: | Okay. Do you remember, or do you recall the patient's name, or had |
| 15 |  | you guys ever obtained his name at any point? |
| 16 | LEVER: | No, the only name we got was from was, was his first name from the |
| 17 |  | female by-stander when she gave us a name of Ruben. |
| 18 | MORENO: | Okay. |
| 19 | LEVER: | I don't know it that was his real name or what, but that's the name |
| 20 |  | that she gave us. |
| 21 | MORENO: | And describe Ruben or the patient's build. |
| 22 | LEVER: | Ah, ah I want to say stocky, kind of heavier seat. Probably around |
| 23 |  | 200 pounds, ah Hispanic male. |
| 24 | **[52:35]** |  |

52

25

26

27

28

Ruben Escudero

Transcription – BRETT LEVER PRT.1 BY OGAZ/MORENO

[1:01:34 minutes]

1 MORENO: About how tall do you believe he was, I mean if you can recall?

2 LEVER: Somewhere in the neighborhood 5'1 on- 6'00", roughly around there,

3  I believe. I'm not 100 percent sure.

4 MORENO: And I know my partner kind of went through this with you ah at

5  some point, the patient stood up, you don't recall for about how long

6  um do you remember how he went down to his knees or how that

7  came about?

8 LEVER: I believe, I don't recall, but I believe the Sheriffs deputies kind of leg

9  swept him, got him down to his knees. I believe but I don't 100

10  percent recall.

11 MORENO: And when the patient was throwing punches, um describe like I

12  know you had mentioned it was a close fist but how was he

13  swinging um and was this when he was standing on his feet or when

14  he was on his knees?

15 LEVER: Both.

16 MORENO: Or both?

17 LEVER: And he was swinging at anyone and everyone he could swing at and

18  it was in a violent and aggressive manner, you know to hurt

19  someone.

20 MORENO: Okay. How about his swinging motion, how would you describe

21  that?

22 LEVER: Kind of frantic, you know not really coordinated just swinging. Kind

23  of cocked his arm back and swung.

24  Okay. Was anyone hit by any of the punches that you are aware of?

25

26

27

28

Ruben Escudero

Transcription – BRETT LEVER PRT.1 BY OGAZ/MORENO

[1:01:34 minutes]

| | | |
|---|---|---|
| 1 | LEVER: | I don't recall. I didn't really see anyone getting struck by his |
| 2 | | punches. could have happened, but I don't recall. |
| 3 | **[54:24]** | |
| 4 | MORENO: | Um, what do you believe would have happened had the deputies um |
| 5 | | or anyone at the scene not ah restrained the patient? |
| 6 | LEVER: | He would have hurt someone. |
| 7 | MORENO: | That medication you said, is it Versed? |
| 8 | LEVER: | Versed. |
| 9 | MORENO: | If I'm saying it right, or Versed? |
| 10 | LEVER: | Versed. |
| 11 | MORENO: | How was that administered? |
| 12 | LEVER: | A shot in the patient's arm, I believe. AMR administered it, but I |
| 13 | | believe it was administered in his arm. |
| 14 | MORENO: | Okay. Was, where was AMR during the incident? Were they inside |
| 15 | | or where they, they outside? |
| 16 | LEVER: | Ah, they were inside initially. The female EMT was by the doorway. |
| 17 | | The AMR medic had stepped onto the couch ah however the AMR |
| 18 | | medic had briefly stepped out of the room to go back to the |
| 19 | | ambulance to get the medication and come back. |
| 20 | MORENO: | Um, is there an um protocol for administering Narcan as far um as |
| 21 | | do they have to be restrained or this is just one of those things where |
| 22 | | um it's just a case by case bases? |
| 23 | LEVER: | Case by case bases. It's not a protocol that they have to be restraint, |
| 24 | | it's just a case by case. |
| 25 | | |
| 26 | | |
| 27 | | |
| 28 | | |

Ruben Escudero

Transcription – BRETT LEVER PRT.1 BY OGAZ/MORENO

[1:01:34 minutes]

| | | |
|---|---|---|
| 1 | LEVER: | Yes, sir. We told him that. |
| 2 | MORENO: | Okay. Um, what was his reaction when um you guys said, when, |
| 3 | | when you said, or when you guys said Fire Department. |
| 4 | LEVER: | He. didn't care. |
| 5 | MORENO: | Okay. |
| 6 | LEVER: | He was just kind of still agitated, combative didn't really listen to |
| 7 | | and didn't care. |
| 8 | MORENO: | And at what point um, was it you or was it one of your partners that |
| 9 | | had said the fire department command? |
| 10 | LEVER: | I had said, it. |
| 11 | MORENO: | Mm-hmm. |
| 12 | LEVER: | And I believe my partners said it as well. |
| 13 | MORENO: | And at what point was this when, when you said that? |
| 14 | LEVER: | Ah, when he initially kind of got up and became you know when he |
| 15 | | became agitated. You know we're paramedics, fire department we're |
| 16 | | here to help you. |
| 17 | MORENO: | Um, did you hear any of the deputies say, Police, Sheriff's |
| 18 | | Department if you recall? |
| 19 | LEVER: | Yes, they did, I believe they said that, yes. |
| 20 | MORENO: | Do you recall at, at what point and time? |
| 21 | LEVER: | Um, initially when the patient became agitated. |
| 22 | MORENO: | Mm-hmm. |
| 23 | LEVER: | We heard that. |
| 24 | **[58:16]** | |

56

Ruben Escudero

Transcription – BRETT LEVER PRT.1 BY OGAZ/MORENO

[1:01:34 minutes]

| | | |
|---|---|---|
| 1 | MORENO: | Um, was anyone else outside of that, of the house as far as anyone |
| 2 | | that wasn't covered um in the sketch or in this interview um, |
| 3 | | neighbors or anything like that, that you recall? |
| 4 | LEVER: | Um. As we were rolling the patient out in the gurney, the next-door |
| 5 | | neighbors in the lot down. |
| 6 | MORENO: | Um. |
| 7 | LEVER: | I noticed that two people were outside in their front driveway by the |
| 8 | | street. They weren't by the house at all. |
| 9 | MORENO: | And that is the lot across the street or is it? |
| 10 | LEVER: | It's a lot, a lot um down from him to the left-hand side. If you are |
| 11 | | looking at the street from his house. |
| 12 | MORENO: | Um huh. |
| 13 | LEVER: | From the house that he was at, down to the left. |
| 14 | MORENO: | Okay. |
| 15 | LEVER: | They were out by the driveway by the street. |
| 16 | MORENO: | Um, have you guys ever contacted that patient before? |
| 17 | LEVER: | No, sir. |
| 18 | **[59:14]** | |
| 19 | MORENO: | Okay. And then um when you guys were dispatched, and you |
| 20 | | responded to that, that call for service per say um what updates did |
| 21 | | you receive as far as, what transpired there at the house, and what |
| 22 | | you guys were responding to? |
| 23 | LEVER: | Ah, the main one that I, the way the engine is set up, I sit in the |
| 24 | | backseat, my Captain has the tablet in front of him. |
| 25 | | |
| 26 | | |
| 27 | | |
| 28 | | |

57

Ruben Escudero

Transcription – BRETT LEVER PRT.1 BY OGAZ/MORENO

[1:01:34 minutes]

| | | |
|---|---|---|
| 1 | MORENO: | Mm-hmm. |
| 2 | LEVER: | With all the call information. The one that is said was ah, male ah |
| 3 | | possible heroin overdose was the one that I heard that he had read |
| 4 | | off to me and that's all I heard. |
| 5 | OGAZ: | You, you mentioned that um if the deputies were not trying to |
| 6 | | restrain him or detain him that and correct me if I'm wrong that you |
| 7 | | feel that the didn't do what they did that he would have hurt |
| 8 | | somebody? |
| 9 | LEVER: | Correct. |
| 10 | OGAZ: | Did you think the deputy's response to um what the patient was |
| 11 | | doing um was reasonable? |
| 12 | LEVER: | If that what that they usually, with the amount of force they were |
| 13 | | giving off they were using an equal amount of force back. |
| 14 | OGAZ: | So, it was basically reasonable. |
| 15 | LEVER: | Reasonable. |
| 16 | OGAZ: | They were matching. |
| 17 | LEVER: | They were matching forces with the patient. |
| 18 | OGAZ: | Okay. Um, I don't have anything else. Okay. I really appreciate it |
| 19 | | man thank you very much. |
| 20 | LEVER: | Thank you. |
| 21 | **[1:00:51]** | |
| 22 | OGAZ: | We're going to go off tape right now. Do you have anything else you |
| 23 | | would like to add anything else you can think about? |
| 24 | LEVER: | Not at this point and time, no. I wish I remembered the call more. It |
| 25 | | |
| 26 | | |
| 27 | | |
| 28 | | |

58

EXHIBIT "3"

Ruben Escudero

Transcription – Captain  Dyjuan Washington

1  **Ogaz:** **Detective: Eric Ogaz**

2  **Capt.:** **Victorville Fire Dept. Captain Dyjuan Washington**

3  **Moreno:** **Detective Jerry Moreno**

4  _____

5  **(05.0)**

6  Ogaz: This is detective Ogaz it is October 23rd, 2019

7  Reference case: 171909396.   Henry Number : 2019106 it is 11:08

8  hours, present with me is Detective Moreno and fire captain?

9  **CAPT.:** Dyjuan Washington.

10  Ogaz: Can you please spell that for me sir?

11  **CAPT.:** Sure, D-y-j-u-a-n  W-a-s-h-i-n-g-t-o-n

12  Ogaz: What's your date of birth sir?

13  **CAPT.:** ████████ 1977.

14  Ogaz: Okay very cool. Okay um, were here to talk to you about a call that

15  you responded to too. Were you working on October 19th, 2019?

16  **CAPT.:** I was.

17  Ogaz: And what was your position that day?

18  **CAPT.:** I was the fire captain for Medic engine 311.

19  Ogaz: Okay, and where you dispatched to um 16927 Monte Vista Avenue?

20  Or Monte Vista Street?

21  **(1:10.6)**

22  **CAPT.:** Yes, sir.

23  Ogaz: Okay. Can you tell me about that what you were dispatched there to

24  and where you responded from and just kind of start from the

25  beginning.

26  **CAPT.:** Okay. It was approximately nine o'clock in the morning, and we

27  1

28

Ruben Escudero

Transcription – Captain  Dyjuan Washington

1   were dispatched to ah the said address for an overdose. Ah when we

2   arrived on scene Sheriff  Deputies were already there, ah the person

3   the patient was located in the kitchen, and he was laying on his back

4   um so what had transpired there is we moved the patient from the

5   kitchen area to the living room area um so we would have more

6   room. Once we got him to a point where we had more room um, we

7   made a decision to give the patient Narcan um to counteract

8   whatever drugs ah the patient had taken at the time. Which was

9   suspected to be, we want to say heroin was the initial report that we

10  got. Um after we gave him the Narcan it takes, it takes a couple of

11  minutes for it to take effect. Um So he first when he started to come

12  to um, he turned over. I would say he was laying supine, so he

13  turned over to his left and he was going to vomit.

14  **2:21**

15  Ogaz:        Okay.

16  **CAPT.:**      And he did that two times. (Clears throat.) He didn't vomit um but

17  after um he made those two attempts he began to actually wake up at

18  this time. And then he started to sit up. Um the paramedics and the

19  sheriff deputies at that time advised him to lay down "hey were here

20  to help you" you know um you were unconscious and not breathing

21  and we gave you a drug to counteract with the drugs to wake you up

22  we need you to relax and lay down." Mm-hmm. He sat up we put

23  him back down to the ground,  he sat up we put him back down to

24  the ground. He did this about four or five times.

25  Ogaz:        Okay.

26  **CAPT:**       Um on or about the fifth time he was fully awake at that time. And

27

28

2

Captain Dyjuan Washington Interview Transcript

Ruben Escudero

Transcription – Captain  Dyjuan Washington

1    then he began to become very combative. Um so the fifth time he sat

2    up he threw two punches at the two AMR medics that were trying to

3    treat him in front of him. The sheriff deputies said, "Hey we need

4    you to calm down were trying to help you"  and they laid him back

5    down. Um he again tries to get back up, um and were trying to

6    restrain him down at this time but he's being very active and as he's

7    trying to get up again he's continuing to throw punches at who ever

8    is in his way whether it was a sheriff's deputy. Um we had another

9    paramedic on my rig um which he threw a pretty much ah nice hay

10    maker at him trying to knock him out. Um and he keep on just

11    fighting and trying to get up and throwing punches. The last punch

12    he threw at my medic is when the deputies really intervened.

13    **(03:58.1)**

14    **CAPT.:**    Okay, now we have a fight on our hands and the fight was on at this

15    time, so they began to try to restrain him umm punches were thrown.

16    Um we tried to get him back on the ground again, he kept trying to

17    get back up um at this time they advise him "Hey you need to relax"

18    during this whole process were telling him "Hey we need you to

19    relax were here to help you I need you to calm down" and he's still

20    being very combative. And when I say very combative, I mean he's

21    kicking, throwing punches he's doing everything in his means to

22    what to take the equipment we had on him off and he's trying to

23    sling the deputies or punch them just doing anything to get them off

24    of him. Um finally we get him on the ground he's like on all fours

25    he's continuing to try to stand up um he turns, and he tries to I want

26    to say he takes a swing at the female deputy that was their um and

27

28

3

Ruben Escudero

Transcription – Captain  Dyjuan Washington

1  then again the fight is on. Um so she's swinging back at him trying

2  to restrain him and the other deputy is like all on his back  trying to

3  restrain him um where trying to get him down we get one hand

4  cuffed one of my other engineer was probably, I think he was

5  holding his legs and then I'm in the door jam cause I was trying to

6  get the information from the um I guess whoever the person who

7  lived there um so I had to end up.  I put my tablet down and then

8  now its like full on " we need to get this guy supine  so we can

9  actually get him restrained. Um at that time I have my weight on his

10  back, I'm standing on his back trying to get him supine so we can

11  handcuff him. Um we get one hand handcuffed, but we cannot get

12  the other arm handcuff. So I put my foot on his shoulder he's so he is

13  like in a he's on all fours one arm is down behind his back but this

14  arm is still up so I put my foot on his right shoulder to get it down

15  enough so she can then get the bar and wrap his arm and and

16  handcuff him, and that's finally ah how we handcuffed him. **[6:01]**

17  Um in between all of that, um they tased him twice, um the first time

18  he got tased ah he said, "hey why'd you hit me" I was like "hey man

19  you're fighting like you need to relax" and I explained to him. And

20  as soon as they stopped tasing him the fight was on again. So, they

21  tased him again ah warning him each time "hey if you don't stop,

22  we're going to tase you, right" um second time they tase him again

23  and again as soon as they let off the taser the fight is on again. You

24  know um and he's still swinging trying to to interrupt now I wanna

25  say um man punches a ah a lot of punches were thrown um by him

26  and by ah the deputies. I did not throw any punches um the only

27  4

28  Captain Dyjuan Washington Interview Transcript

Ruben Escudero

Transcription – Captain  Dyjuan Washington

| | | |
|---|---|---|
| 1 | | thing I did was stand on his back to try to get him down, and that's |
| 2 | | eventually that's how they got him handcuffed. |
| 3 | **(06:52.3)** | |
| 4 | **Ogaz:** | Okay. |
| 5 | **CAPT.:** | So, um and after an and I wanna say he was still fighting after we |
| 6 | | get him cuffed um but even before like as we had him down on his |
| 7 | | back well he was on his not totally on his stomach but he's trying to |
| 8 | | fight up um is when ah the AMR medics gave him some Versed to |
| 9 | | try to calm him down. (*Clears throat*.) Um then after they gave him |
| 10 | | Versed, he he kind of came down and then we're able to get him on a |
| 11 | | back-board or get him onto the gurney so we can then get him into |
| 12 | | the ambulance and take him to the hospital. |
| 13 | **7:25** | |
| 14 | Ogaz: | Okay. Did you go with him to the hospital? |
| 15 | **(07:28.8)** | |
| 16 | **CAPT.:** | I did not. I stayed at the scene with the other deputies there and they |
| 17 | | took statements from us there. I only sent my paramedic with them |
| 18 | | to ride into the hospital. |
| 19 | Ogaz: | Okay. |
| 20 | **CAPT.:** | Mm-hmm |
| 21 | Ogaz: | Um so that was your last encounter with him is once he left? |
| 22 | **CAPT.:** | Yes. |
| 23 | Ogaz: | Okay. Um did you receive any updated information about his |
| 24 | | condition? |
| 25 | **CAPT.:** | Um yes, so I knew on the way to the hospital they had lost ah his |
| 26 | | pulse. |

5

Ruben Escudero

Transcription – Captain  Dyjuan Washington

| | | |
|---|---|---|
| 1 | Ogaz: | Mm-hmm. |
| 2 | **(07:52.5)** | |
| 3 | **CAPT.:** | And then they got it back and then they lost his pulse again at the |
| 4 | | hospital and they got it back. |
| 5 | Ogaz: | Mm-hmm. |
| 6 | **(07:58.4)** | |
| 7 | **CAPT.:** | And then they I know they had him on a respirator, and they had |
| 8 | | transported him Arrowhead, I believe. |
| 9 | Ogaz: | Okay. |
| 10 | **CAPT.:** | And they ah and I knew he was in and out of a ah bad shape or |
| 11 | | whatever so. |
| 12 | Ogaz: | Okay. Oh why do you say that? |
| 13 | **CAPT.:** | Um just because they were losing pulses and whenever you give |
| 14 | | someone Narcan. |
| 15 | Ogaz: | Mm-hmm. |
| 16 | **CAPT.:** | To counteract a overdose, and you're not supposed to really give |
| 17 | | them Versed. |
| 18 | Ogaz: | Mm-hmm. |
| 19 | **CAPT.:** | Um it it's a because the Versed is gonna counteract whatever we did |
| 20 | | in the first place, ah that was going on with the patient to begin with. |
| 21 | Ogaz: | Mm-hmm. |
| 22 | **CAPT.:** | But that is the only way we could ever get that guy on that gurney. |
| 23 | Ogaz: | Okay. |
| 24 | **CAPT.:** | Cause he was not going. |
| 25 | **(08:31.4)** | |
| 26 | Ogaz: | So, can you explain to me the reasons why the Versed was given |

6

27

28

Ruben Escudero

Transcription – Captain  Dyjuan Washington

| | | |
|---|---|---|
| 1 | | then I mean what was your mind what was the mindset that time? |
| 2 | **CAPT.:** | Um cause we had to calm him down he he was not he he we would |
| 3 | | of never cuffed him. |
| 4 | Ogaz: | Okay. So, if it wasn't for that you you feel that he would continue |
| 5 | | fighting? |
| 6 | **CAPT.:** | Oh yeah. |
| 7 | **(08:47.0)** | |
| 8 | Ogaz: | Do you think that someone would've got hurt? |
| 9 | CAPT.: | Oh yeah. |
| 10 | Ogaz: | Okay |
| 11 | CAPT.: | Oh yeah. |
| 12 | Ogaz: | Alright. Um let's kind of go back to the beginning. |
| 13 | **CAPT.:** | Mm-hmm. |
| 14 | Ogaz: | When you first arrived, you said the deputies were already on scene? |
| 15 | **CAPT.:** | Yes. |
| 16 | Ogaz: | Um, how many deputies are on scene? |
| 17 | **CAPT.:** | I believe two. |
| 18 | Ogaz: | Can you describe those deputies, or do you know their names are |
| 19 | | you familiar with them? |
| 20 | **CAPT.:** | Ah I've seen em before but I do not what is what is their names, um |
| 21 | | on of ems like ah a bigger Hispanic dude. |
| 22 | Ogaz: | When you say "bigger" you talking about tall? |
| 23 | **CAPT.:** | Tall and stocky, um. |
| 24 | Ogaz: | Okay does he well can you describe his hair is it spikey is it short? |
| 25 | **CAPT.:** | Spikey. |
| 26 | Ogaz: | Okay. |
| 27 | | |
| 28 | | |

7

Captain Dyjuan Washington Interview Transcript

Ruben Escudero

Transcription – Captain  Dyjuan Washington

| | | |
|---|---|---|
| 1 | **CAPT.:** | Mm-hmm. |
| 2 | **(09:19.9)** | |
| 3 | Ogaz: | And can you describe the other deputy? |
| 4 | **CAPT.:** | Ah he again is is a stocky Hispanic dude a little bit shorter um |
| 5 | | with he's I think he's bald, Mm-hmm. |
| 6 | Ogaz: | Okay, and at some point, did another deputy arrive? |
| 7 | **CAPT.:** | Yes. |
| 8 | Ogaz: | How long after um how long after you arrive did the other deputy |
| 9 | | arrive. |
| 10 | **CAPT.:** | I'm not sure because I was engaged with ah trying to get information |
| 11 | | from the people that were there of kind. |
| 12 | Ogaz: | Mm-hmm. |
| 13 | **CAPT.:** | Of what took place and what happened. Um so I don't under I don't |
| 14 | | know exactly when the third deputy get there um I'm not even totally |
| 15 | | sure if they weren't there to begin with. |
| 16 | Ogaz: | Okay. |
| 17 | **CAPT.:** | Mm-hmm. |
| 18 | Ogaz: | I'm gonna show you some pictures of of three deputies. |
| 19 | **CAPT.:** | Mm-hmm. |
| 20 | **(09:54.9)** | |
| 21 | Ogaz: | Can you tell me if they were these deputies were the ones that were |
| 22 | | there? |
| 23 | **CAPT.:** | Yes. |
| 24 | Ogaz: | Do you recognize this female deputy? |
| 25 | **CAPT.:** | Yep, she was there. |
| 26 | Ogaz: | Okay, do you recognize this male deputy? |
| 27 | | 8 |
| 28 | | Captain Dyjuan Washington Interview Transcript |

Ruben Escudero

Transcription – Captain  Dyjuan Washington

| | | |
|---|---|---|
| 1 | **CAPT.:** | Yep, he was there. |
| 2 | Ogaz: | And do you recognize this male deputy? |
| 3 | **CAPT.:** | I do, he was there. |
| 4 | Ogaz: | Okay. |
| 5 | Moreno: | Any way he can let's identify. |
| 6 | Ogaz: | Ye ye yeah I'm. |
| 7 | Moreno: | Their names for. |
| 8 | **(10:11.7)** | |
| 9 | Ogaz: | I don't know I'm trying to see their names and I forget. I got them |
| 10 | | right here. Okay so he um identified the three deputies that were |
| 11 | | present um the |
| 12 | | three deputies being look at my original notes, um Deputy Mata. |
| 13 | **(10:44.8)** | |
| 14 | **CAPT.:** | Deputy Mata is the. |
| 15 | Moreno: | Do first and last name. |
| 16 | Ogaz: | Oh Julian Mata. |
| 17 | **CAPT.:** | Mmm Mata I think is the one with no hair, right? |
| 18 | **(10:53.5)** | |
| 19 | Ogaz: | Correct. |
| 20 | **CAPT.:** | Mm-hmm. |
| 21 | Ogaz: | And then um Humberto Miranda. |
| 22 | **(10:56.4)** | |
| 23 | **CAPT.:** | Miranda, that's right, yep, he's spikey hair. |
| 24 | **(10:58.2)** | |
| 25 | Ogaz: | And then um, how do you say the female's name her last name |
| 26 | | Jerry? |
| 27 | | |
| 28 | | |

9

Captain Dyjuan Washington Interview Transcript

Ruben Escudero

Transcription – Captain Dyjuan Washington

| 1 | Moreno: | Attlesey, Jessaqua. |
|---|---|---|
| 2 | Ogaz: | Jessaqua. |
| 3 | Moreno: | Attlesey. |
| 4 | **CAPT.:** | Atta Attlesey, that's right, Attlesey yep. |
| 5 | **(11:05.4)** | |
| 6 | Ogaz: | He identified the the three deputies. |
| 7 | **CAPT.:** | Mm-hmm. |
| 8 | Ogaz: | Okay, now when you got on scene, you said originally the patient |
| 9 | | um were you ever able to get the patients name? |
| 10 | **CAPT.:** | Ruben. |
| 11 | Ogaz: | Ruben, okay, and how did you get that name? |
| 12 | **CAPT.:** | I got it from one of the people that were there, so it was either the |
| 13 | | female or the male that was there I I grabbed the name from from |
| 14 | | both of them. |
| 15 | Ogaz: | Okay. |
| 16 | **(11:31.0)** | |
| 17 | **CAPT.:** | The female didn't know who who he was the male I think it was her |
| 18 | | brother. |
| 19 | Ogaz: | Mm-hmm. |
| 20 | **CAPT.:** | As the who as the person who brought him in. |
| 21 | Ogaz: | Do you remember the two peoples names that you spoke with? |
| 22 | **CAPT.:** | I do not. |
| 23 | Ogaz: | Okay. But they identified the patient as being first of Ruben, did |
| 24 | | they give a last name? |
| 25 | **CAPT.:** | They did not know his last name. |
| 26 | **(11:46.5)** | |
| 27 | | |
| 28 | | |

10

Captain Dyjuan Washington Interview Transcript

Ruben Escudero

Transcription – Captain  Dyjuan Washington

1  Ogaz:       Okay, so just Ruben. Okay when you first got there you said Ruben

2              was in the kitchen, um what was he doing in the kitchen?

3  **CAPT.:**     Ah he was laying on his back unconscious.

4  **(11:55.9)**

5  Ogaz:       Okay, so non-responsive?

6  **CAPT.:**     Non-responsive.

7  Ogaz:       He had a pulse at that time?

8  **CAPT.:**     Um I am not sure if he had a pulse at this time because when we first

9              got there the deputies were moving him to um the living room.

10 Ogaz:       Okay.

11 **CAPT.:**     So.

12 **(12:08.3)**

13 Ogaz:       Did you when you first observations of Ruben, did you see any

14             injuries on him at that time?

15 **CAPT.:**     Ah not that I could remember um but we weren't really looking for

16             injuries at that time, so.

17 Ogaz:       You were there for an overdose?

18 **CAPT.:**     Right.

19 Ogaz:       And you didn't so nothing stood out to you like he didn't have no

20             swelling to the face no bleeding that you observed no.

21 **CAPT.:**     No.

22 **(12:34.5)**

23 Ogaz:       Okay. Um now you said "the deputies were moving him", um were

24             they directed to move him or were they just moving him on their

25             own?

26 **CAPT.:**     Ah I believe my medic directed to move them but I'm not 100

11

Captain Dyjuan Washington Interview Transcript

Ruben Escudero

Transcription – Captain  Dyjuan Washington

| | | |
|---|---|---|
| 1 | | percent sure on that. |
| 2 | Ogaz: | Okay, and where did they move him to? |
| 3 | **CAPT.:** | To the living room. |
| 4 | **(12:48.5)** | |
| 5 | Ogaz: | Okay, and and how did they move him? |
| 6 | **CAPT.:** | Ah one was carrying his legs and the other one was un underneath |
| 7 | | his shoulders and they kind of dragged him to the living room. |
| 8 | Ogaz: | Okay, when you say "they dragged him", um one carrying his legs |
| 9 | | one carrying his his shoulders, um so I picture they're kind of got |
| 10 | | him like this? |
| 11 | **(13:04.2)** | |
| 12 | **CAPT.:** | Right. So one is is behind has his arms underneath his armpits and |
| 13 | | he's holding him up the other one has his legs his butt when I say |
| 14 | | "drag him" his butt's probably dragging on the floor. |
| 15 | Ogaz: | Okay, was it do you feel like he was taken to the living room in a safe |
| 16 | | manner was it? |
| 17 | **CAPT.:** | Absolutely. |
| 18 | Ogaz: | Okay, so it was. |
| 19 | **CAPT.:** | Mm-hmm. |
| 20 | Ogaz: | The kind of a picked up kind of carry the best that they can. |
| 21 | **CAPT.:** | Absolutely. |
| 22 | **Ogaz:** | Safely and then lay him back down on the ground. |
| 23 | **(13:26.8)** | |
| 24 | **CAPT.:** | Absolutely. |
| 25 | Ogaz: | Okay, um now I heard there was some type of a what do you guys call |
| 26 | | it some type of mover where it has like a cloth. |
| 27 | | 12 |
| 28 | | |

Ruben Escudero

Transcription – Captain  Dyjuan Washington

| | | |
|---|---|---|
| 1 | | administer Narcan. |
| 2 | **Ogaz:** | Okay, do you know how they administered it? |
| 3 | **CAPT.:** | This was through ah intravenous. |
| 4 | Ogaz: | Through the veins. |
| 5 | **CAPT.:** | Mm-hmm. |
| 6 | Ogaz: | Okay, um and um do you know how much they gave him? |
| 7 | **(14:31.5)** | |
| 8 | **CAPT.:** | I do not know for sure how much he gave him. |
| 9 | Ogaz: | Okay. |
| 10 | **CAPT.:** | Yeah. |
| 11 | Ogaz: | Um how many times does Narcan applied to or administered do you |
| 12 | | know? |
| 13 | **CAPT.:** | Once. |
| 14 | Ogaz: | One time? |
| 15 | **CAPT.:** | Yes sir. |
| 16 | **(14:41.0)** | |
| 17 | Ogaz: | Okay, um…. now you said at some point he's he's on he's on this |
| 18 | | mover um laying sublime um they administer the Narcan and at some |
| 19 | | point he sits up? |
| 20 | **CAPT.:** | Yes. |
| 21 | | |
| 22 | Ogaz: | And you said that was he was going to he looked like he was going to |
| 23 | | vomit? |
| 24 | **(15:02.7)** | |
| 25 | **CAPT.:** | Well so he rolls over twice, so he's laying down he rolls over to his |
| 26 | | left side twice like he's you and he's like gaging like he's gonna like |
| 27 | | |
| 28 | | |

14

Captain Dyjuan Washington Interview Transcript

Ruben Escudero

Transcription – Captain  Dyjuan Washington

| 1 | | he's gonna hurl, um or vomit. |
|---|---|---|
| 2 | Ogaz: | Okay. |
| 3 | **CAPT.:** | He does that twice. He does not vomit either time. |
| 4 | Ogaz: | Okay. |
| 5 | **(15:16.5)** | |
| 6 | **CAPT.:** | But he lays back down I think now he's cause that that's what usually |
| 7 | | happens. |
| 8 | Ogaz: | Mm-hmm. |
| 9 | **CAPT.:** | When you administer Narcan, um and then he sits up the third time |
| 10 | | but now the third time he sits up like he's he's angry. |
| 11 | Ogaz: | Okay, did he say anything? |
| 12 | **CAPT.:** | Um not really, no. |
| 13 | **(15:32.3)** | |
| 14 | Ogaz: | Didn't say anything. We're um fire personal or deputies saying |
| 15 | | anything to him at that time? |
| 16 | **CAPT.:** | Yes, we were telling him that he needs to lay down um and he needs |
| 17 | | to relax because he overdosed and like we're trying to help him out |
| 18 | | here, and. |
| 19 | **Ogaz:** | Okay. |
| 20 | (15:45.3) | |
| 21 | **CAPT.:** | Keep him alive essentially. |
| 22 | Ogaz: | Do you know how many people were giving commands and who gave |
| 23 | | commands? Or or. |
| 24 | **CAPT.:** | Um it was mostly ah Deputy Mata. |
| 25 | Ogaz: | Uh-huh. |
| 26 | **CAPT.:** | And I would say one of the paramedics. |
| 27 | | 15 |
| 28 | | Captain Dyjuan Washington Interview Transcript |

Ruben Escudero

Transcription – Captain  Dyjuan Washington

| 1 | Ogaz: | Okay, okay. |
|---|---|---|
| 2 | **CAPT.:** | Um, I can't remember exactly what paramedic, but I think it was the |
| 3 | | male AMR paramedic. |
| 4 | Ogaz: | Okay. |
| 5 | **(16:02.3)** | |
| 6 | **CAPT.:** | I don't re recall what his name is. |
| 7 | Ogaz: | In in your 21 experience 21 years of experience how many times have |
| 8 | | you seen Narcan administered? |
| 9 | **CAPT.:** | Probably a dozen two dozen. |
| 10 | Ogaz: | Okay. |
| 11 | **CAPT.:** | Anywhere in there. |
| 12 | Ogaz: | Um when Narcan's administered, usually is because they're |
| 13 | | unconscious or because of the opioid. |
| 14 | **CAPT.:** | Right. |
| 15 | Ogaz: | Um when they come to is it normal for them to become combative is |
| 16 | | that something that happens often? |
| 17 | **CAPT.:** | It's normal for them to be kind of unaware where they are. |
| 18 | Ogaz: | Okay. |
| 19 | **CAPT.:** | Um and it's normal for them usually we get attitude we don't get |
| 20 | | combative. |
| 21 | Ogaz: | Okay. |
| 22 | **CAPT.:** | So, most of times. |
| 23 | **(16:46.6)** | |
| 24 | Ogaz: | What's what's attitude? |
| 25 | **CAPT.:** | Attitude means that they wake up and they're talking crap. Why are |
| 26 | | you guys here, oh oh you know I was fine why'd you wake me up you |
| 27 | | |
| 28 | | |

16

Captain Dyjuan Washington Interview Transcript

Ruben Escudero

Transcription – Captain  Dyjuan Washington

| | | |
|---|---|---|
| 1 | | know and and they become that that kind of attitude. |
| 2 | **Ogaz:** | Okay. |
| 3 | **CAPT.:** | Like leave me alone like I'm fine like like what are you doing here get |
| 4 | | out of my house. |
| 5 | Ogaz: | Okay. |
| 6 | **CAPT.:** | Like that type of stuff. |
| 7 | **(17:04.5)** | |
| 8 | **Ogaz:** | Have have you ever seen um someone become become combative |
| 9 | | mean and I say combative meaning fighting once they come out of |
| 10 | | that state? |
| 11 | **CAPT.:** | This was the first time that I've been into an altercation like this but it. |
| 12 | Ogaz: | Okay. |
| 13 | **(17:16.9)** | |
| 14 | **CAPT.:** | A person be given Narcan to. |
| 15 | Ogaz: | I guess you you kind of acquitted to if you were asleep in bed and all |
| 16 | | of a sudden you wake up and you got a bunch of people standing over |
| 17 | | you, you probably be disoriented like what's going on type thing, is |
| 18 | | that how you would acquitted to or no? |
| 19 | **(17:29.8)** | |
| 20 | **CAPT.:** | Um I I guess there there could be a parallel or or something similar to |
| 21 | | that. |
| 22 | Ogaz: | Uh-huh. |
| 23 | **CAPT.:** | Um but I've never been pulseless so I really can't (laughs). |
| 24 | Ogaz: | (laughs). Let's try not to have that happen. |
| 25 | **CAPT.:** | Right Yeah. So I I really cant speak on that you know for sure. |
| 26 | Ogaz: | Okay. |
| 27 | | |
| 28 | | |

17

Captain Dyjuan Washington Interview Transcript

Ruben Escudero

Transcription – Captain  Dyjuan Washington

| 1 | **CAPT.:** | So. |
| 2 | **(17:44.2)** | |
| 3 | Ogaz: | Do you guys have any um I know sa I wanna say policy or procedures |
| 4 | | that prior to ah giving a patient Narcam or Narcan that you restrain em |
| 5 | | prior to? |
| 6 | **CAPT.:** | We do not. |
| 7 | **(17:58.2)** | |
| 8 | Ogaz: | We do not, okay, so that's not something that's a procedure or a policy |
| 9 | | it's just okay. Did anyone make a statement that did you hear anyone |
| 10 | | make a statement like ·hey I'm gonna give him this Narcan um "he |
| 11 | | may become combative just be aware he may be coming combative |
| 12 | | once he once he comes through", did anyone make that statement? |
| 13 | **(18:17.5)** | |
| 14 | **CAPT.:** | No. |
| 15 | Ogaz: | Not that you're aware of? |
| 16 | **CAPT.:** | No sir. |
| 17 | Ogaz: | Okay. |
| 18 | **CAPT.:** | I'm ah it's kind of assumed you know that after you give someone |
| 19 | | Narcan they're gonna wake up and they're not gonna necessarily be |
| 20 | | totally happy. |
| 21 | Ogaz: | Mm-hmm. |
| 22 | **(18:28.1)** | |
| 23 | **CAPT.:** | But not necessarily combative. |
| 24 | Ogaz: | Okay. |
| 25 | **(18:30.5)** | |
| 26 | **CAPT.:** | An and usually we're we're pretty good at talking people down and if |
| 27 | | |
| 28 | | |

18

Captain Dyjuan Washington Interview Transcript

Ruben Escudero

Transcription – Captain  Dyjuan Washington

1    we have enough deputies there like the fight is not gonna break out

2    you usually that's how we feel about it is.

3    Ogaz:      Okay, so it's uncommon in in in your experience that they start

4               fighting usually just attitude.

5    **CAPT.:**      Right.

6    **(18:47.3)**

7    Ogaz:      Like what are you guys doing here.

8    **CAPT.:**      And then we just talk em through it it's like "hey man we're here to

9               help you, you need to go to the hospital to combat this you know".

10   Ogaz:      Mm-hmm.

11   **CAPT.:**      You you have a choice here either you can be combative and go to

12              jail.

13   Ogaz:      Mm-hmm.

14   **(18:59.1)**

15   **CAPT.:**      Or you can be noncombative and go to the hospital that's really your

16              options.

17   Ogaz:      In your experience um was she showing once he came out of his his

18              his state of being pulseless or or unconscious after being administered

19              the Narcan, the fact that he reacted the way he acted when you say

20              "combative", in your experience do you think there there's possibly

21              anything else on board, when I say "on board" any other type of drugs

22              that he may taken, did you think that at all?

23   **CAPT.:**      I did.

24   **Ogaz:**      Ah what was your what was your thoughts tell me more about that.

25   **(19:30.5)**

26   **CAPT.:**      Um I'm I I thought and and due to the amount of strength he had, the

27                           19

28

Ruben Escudero

Transcription – Captain Dyjuan Washington

| 1 | | dude was strong. |
|---|---|---|
| 2 | Ogaz: | Mm-hmm. |
| 3 | **CAPT.:** | Like I am six, one 230. |
| 4 | Ogaz: | Mm-hmm. |
| 5 | **CAPT.:** | Pounds. |
| 6 | Ogaz: | Mm-hmm. |
| 7 | **CAPT.:** | You know. |
| 8 | Ogaz: | Mm-hmm. |
| 9 | **(19:40.1)** | |
| 10 | **CAPT.:** | I'm not a little dude um and this guy was sl slinging and Deputy Mata |
| 11 | | is not  a little dude and Deputy Miranda is not a little dude, and it took |
| 12 | | all of us. |
| 13 | Ogaz: | Mm-hmm. |
| 14 | **(19:49.2)** | |
| 15 | **CAPT.:** | To get this dude handcuffed so I'm thinking he is on some type of acid |
| 16 | | or PCP or something like that because usually patients that are that |
| 17 | | strong. |
| 18 | Ogaz: | Mm-hmm. |
| 19 | **(19:58.6)** | |
| 20 | **CAPT.:** | And are that amped up are on not just heroin. |
| 21 | Ogaz: | Yeah, they just don't feel no pain. |
| 22 | **CAPT.:** | Right. |
| 23 | **(20:03.0)** | |
| 24 | Ogaz: | Okay, Um you said you mentioned that when he he sat up and I think |
| 25 | | you said like four to five times. |
| 26 | **CAPT.:** | Mm-hmm. |
| 27 | | 20 |
| 28 | | |

Ruben Escudero

Transcription – Captain  Dyjuan Washington

1

2   **(20:14.1)**

3   Ogaz:          He kind of just sat up, and at one point he threw his first volley of

4                  punches you said he threw two punches?

5   **CAPT.:**     About about two punches, yes.

6   Ogaz:          And who did he throw those at?

7   **CAPT.:**     At the two medics that were sitting in front of him uh and the deputy

8                  was also there, so I don't know where the punches were aimed at.

9   Ogaz:          Uh-huh.

10  **(20:30.3)**

11  **CAPT.:**     And the deputy could've construed that they were aimed at at him.

12  Ogaz:          Okay.

13  **(20:33.2)**

14  **CAPT.:**     Um but it was Deputy Mata, and the two and a AMR medic and then

15                 you had Deputy Miranda on the other side so that is kind of how if I'm

16                 sitting up here you had the AMR medic in the middle.

17  Ogaz:          Mm-hmm.

18  **(20:44.1)**

19  **CAPT.:**      And you had the two deputies on the on either side of him.

20  Ogaz:          Okay.

21  **CAPT.:**     And when he stood up, he came up firing so.

22  Ogaz:          Okay, so when he um threw these punches at the AMR personal, did

23                 he connect with any of his punches?

24  **CAPT.:**     No.

25  Ogaz:          When I say punches I assuming he had a closed fist?

26  **CAPT.:**     Oh yeah. Mm-hmm.

27                              21

28  ────────────────────────────────────────────────
    Captain Dyjuan Washington Interview Transcript

Ruben Escudero

Transcription – Captain  Dyjuan Washington

| 1 | **(21:00.0)** | |
|---|---|---|
| 2 | Ogaz: | Okay, um did the AMR personal have to move out ma move out of |
| 3 | | the way? |
| 4 | **CAPT.:** | Yes. |
| 5 | **(21:05.0)** | |
| 6 | Ogaz:: | Okay, in in your opinion if they did not move out of the way would |
| 7 | | they have been struck by the punches? |
| 8 | **CAPT.:** | Oh yeah. |
| 9 | Ogaz: | Okay. And I know a second a go you were describing kind of where |
| 10 | | everybody was at, um do you mind can you draw. |
| 11 | **CAPT.:** | Yeah. |
| 12 | Ogaz: | Ah ah ah (inaudible) like a diagram a layout. |
| 13 | **CAPT.:** | Mm-hmm. |
| 14 | Ogaz: | The best of your recollection I know it's not gonna be to scale. |
| 15 | **CAPT.:** | Yeah. |
| 16 | Ogaz: | Um the residence. |
| 17 | **(21:28.5)** | |
| 18 | **CAPT.:** | So, you have so this is the residence you have a background here I |
| 19 | | show so we have a building here (inaudible) right here this is like |
| 20 | | some kind of laundry room or something. |
| 21 | Ogaz: | Mm-hmm. |
| 22 | **(22:09.7)** | |
| 23 | **CAPT.:** | And then you have like another room here, and this is the living room |
| 24 | | here it's not a very big place and there's a door there. |
| 25 | Ogaz: | Can you write living room where living rooms at. And where would |
| 26 | | the front door be at? |

Ruben Escudero

Transcription – Captain  Dyjuan Washington

1   **(22:37.1)**

2   **CAPT.:**        Front door is here, and then there's some kind of back door back here

3              somewhere I don't know exactly where.

4   Ogaz:          Okay.

5   **CAPT.:**        It is but.

6   Ogaz:          Do you recall any furniture in that living room?

7   **(22:51.0)**

8   **CAPT.:**        Yep, there is a couch here and there's like a table or something like

9              that or something here and like some chairs there's there's there was

10             something else here maybe a bookcase or a cabinet or something.

11  Ogaz:          Mm-hmm.

12  **CAPT.:**        Like that, because when he threw one of the punches my medic was

13             here, and he had to like climb over some stuff to get out of the way if

14             not he would've got hit.

15  Ogaz:          Okay.

16  **CAPT.:**        So.

17  Ogaz:          And and can you describe this living room how I mean how big is this

18             living room is it a big living is it small.

19  **CAPT.:**        It's maybe the size of this room.

20  **(23:17.5)**

21  Ogaz:          Okay, this room is a about a average size room.

22  **CAPT.:**        Right, we're like eight by eight you know.

23  Ogaz:           Eight five so it's kind of for.

24  **CAPT.:**        It it's small.

25  Ogaz:          Okay and and how many people were in this living room during the

26             struggle?

27                          23

28  _____

                 Captain Dyjuan Washington Interview Transcript

Ruben Escudero

Transcription – Captain  Dyjuan Washington

1    (23:30.2)

2    CAPT.:        Two AMR medics, three deputies, my engineer, my firefighter medic

3                       and me.

4    Ogaz:          So, we got.

5    CAPT.:        So, three, six, eight.

6    Ogaz:          Eight people plus.

7    CAPT.:        Plus, him.

8    Ogaz: :        Plus, Ruben all in this small living room.

9    CAPT.:        Yes.

10   (23:45.4)

11   Ogaz:          While this is occurring, okay. Um and where was he lying at when

12                      they administered if you could just draw like a little stick figure where

13                      he where Ruben was lying at and I say "he".

14   CAPT.:        Mm-hmm.

15   (24:00.2)

16   Ogaz:          And where was Deputy Mata standing at and if you could put Mata

17                      just put a M D-E-P for deputy. And then where was Deputy ah

18                      Miranda, just put M l dep D-E-P. Okay, and where was the female

19                      deputy, just put F and then dep D-E-P, okay and where were you at?

20   CAPT.:        Right here.

21   Ogaz:          Just put your initials.

22   CAPT.:        And I'll just put WASH.

23   (24:32.4)

24   Ogaz:          Okay, and then where was your um fire engineer?

25   CAPT.:        Engineer is here.

26   Ogaz:          And then where was your paramedic?

27                                                        24

28   _____

                            Captain Dyjuan Washington Interview Transcript

Ruben Escudero

Transcription – Captain  Dyjuan Washington

| 1 | **CAPT.:** | Medic is here. |
| 2 | **(24:44.3)** | |
| 3 | Ogaz: | And where were the two AMR? |
| 4 | **CAPT.:** | By the door, so AMR, and the other medic was or the EMT was |
| 5 | | behind him so AMR. |
| 6 | Ogaz: | Okay, and where was the female? |
| 7 | **CAPT.:** | The female that I was talking to get the information? |
| 8 | Ogaz: | Mm-hmm. |
| 9 | **(25:00.9)** | |
| 10 | **CAPT.:** | Was in the kitchen, she's back here somewhere. |
| 11 | Ogaz: | And then how about was there a male there too? |
| 12 | **CAPT.:** | Yep, he was in the bedroom I don't think she ever left until we were |
| 13 | | done. |
| 14 | Ogaz: | Okay, um okay can you just sign that and date it. |
| 15 | **CAPT.:** | Mm-hmm. |
| 16 | Ogaz: | Please. And today is um. |
| 17 | **CAPT.:** | 23rd |
| 18 | Ogaz: | October 23rd Thank you sir. |
| 19 | **CAPT.:** | Mm-hmm. |
| 20 | **(25:34.6)** | |
| 21 | **Ogaz:** | Okay, so he throws a an initial volley of punches at the AMR |
| 22 | | personal, um what happens after that, does he get up on his feet does |
| 23 | | he get up on his knees does he. |
| 24 | **(25:44.5)** | |
| 25 | **CAPT.:** | After he throws the first set of punches, the two deputies lay him back |
| 26 | | down. |
| 27 | | |
| 28 | | |

25

Captain Dyjuan Washington Interview Transcript

Ruben Escudero

Transcription – Captain  Dyjuan Washington

1  Ogaz:          Okay, and then um how did they lay him down?

2  **CAPT.:**     Ah they were on either arm so they had his arms on his shoulders and

3              they kind of just push him down.

4  Ogaz:          Okay, using like their body weight?

5  **(26:00.0)**

6  **CAPT.:**     Ye yes I mean just using their arms, if I'm sitting up they have their

7              arms here and they're like kind of like bracing themselves and they're

8              they're laying him back down.

9  Ogaz:          Okay, and and.

10 **CAPT.:**     And also, I have my medic and my engineer right there and they're

11             helping bring him back down as well.

12 Ogaz:          How are they helping?

13 **(26:14.2)**

14 **CAPT.:**     Um just grabbing his shoulders and bringing him back down.

15 Ogaz:          So, at this point we have Deputy Mata, Deputy Washington ah or

16             Deputy Washington Deputy Mata and Deputy Miranda on one was on

17             the left arm ones on the right arm um do you remember which one?

18 **CAPT.:**     Deputy Mata is on the right and I wanna say Miranda is and and

19             actually I think Miranda wasn't on him at that time he was standing.

20 Ogaz:          Okay.

21 **CAPT.:**     Mm-hmm.

22 **(26:37.3)**

23 Ogaz:          So, we have just Deputy Mata?

24 **(26:40.5)**

25 **CAPT.:**     Deputy Mata and then I have cause my medic is the one who

26             administered Narcan.

27                                    26

28          _____

Ruben Escudero

Transcription – Captain  Dyjuan Washington

| | | |
|---|---|---|
| 1 | Ogaz: | Mm-hmm. |
| 2 | **(26:44.5)** | |
| 3 | **CAPT.:** | So, between Mata and my medic they they lay him down. |
| 4 | Ogaz: | Okay, so you have you have Deputy Mata and then two ah an AMR |
| 5 | | and then your medic. |
| 6 | **CAPT.:** | Mm-hmm. |
| 7 | Ogaz: | All applying um pressure on his back shoulders. |
| 8 | **CAPT.:** | Mm-hmm. |
| 9 | **(27:00.7)** | |
| 10 | Ogaz: | To try and push him down on the ground. |
| 11 | **CAPT.:** | Yes. |
| 12 | Ogaz: | And were they successful in doing so? |
| 13 | **CAPT.:** | Yes, he laid down the first time. |
| 14 | Ogaz: | Okay, did he say anything at that time? |
| 15 | **CAPT.:** | At that time, I don't believe he said anything I think he was still trying |
| 16 | | to come to and he's just trying to figure things out, you know. |
| 17 | **(27:15.8)** | |
| 18 | Ogaz: | Okay, were there any more commands being made at that time? |
| 19 | **CAPT.:** | Um we're just telling him "hey lay down, chill out, like we're trying to |
| 20 | | help you, like this is like we're the fire department we're paramedics |
| 21 | | like". |
| 22 | Ogaz: | Mm-hmm. |
| 23 | **CAPT.:** | "Chill out like we're we're here to help". |
| 24 | Ogaz: | So, you guys identified yourself as a fire personal? |
| 25 | CAPT.: | Yes. |
| 26 | **(27:30.4)** | |
| 27 | | |
| 28 | | |

27

Captain Dyjuan Washington Interview Transcript

Ruben Escudero

Transcription – Captain  Dyjuan Washington

| | | |
|---|---|---|
| 1 | Ogaz: | Do the sheriff deputies identify themselves as sheriff deputies? |
| 2 | **CAPT.:** | Ah yes. |
| 3 | Ogaz: | Okay. |
| 4 | **CAPT.:** | Mm-hmm. |
| 5 | Ogaz: | And it was during the beginning part where they first applied the |
| 6 | | Narcan, and he sat up and then also while they're trying to push him to |
| 7 | | the ground? |
| 8 | **(27:41.5)** | |
| 9 | **CAPT.:** | Right. I I as this whole thing is going through, I think if anything that |
| 10 | | was like really really good was the communication that we had with |
| 11 | | him. |
| 12 | Ogaz: | Okay. |
| 13 | **CAPT.:** | Ah the whole time through we're identifying who we are, right, we're |
| 14 | | identifying we're trying to help and we're telling him that he needs to |
| 15 | | relax and lay down because we're trying to help him. |
| 16 | Ogaz: | Okay. |
| 17 | **CAPT.:** | And over and over and over again at every time he tries to set up, |
| 18 | | we're identifying ourselves. |
| 19 | Ogaz: | Okay. |
| 20 | **(28:04.1)** | |
| 21 | **CAPT.:** | Over and over again and then like he didn't care. |
| 22 | Ogaz: | He didn't care. |
| 23 | **CAPT.:** | Right. |
| 24 | Ogaz: | And when you I I assume you're wearing ah ah fire uniform? |
| 25 | **CAPT.:** | Absolutely. |
| 26 | Ogaz: | With fire patches. |
| 27 | | |
| 28 | | |

28

Ruben Escudero

Transcription – Captain  Dyjuan Washington

1   **CAPT.:**      Mm-hmm.

2   Ogaz:           Okay. Um so what happened after that, so they got him down on the

3                   ground now, so how did he start throwing punches again was he

4                   kicking um how did he did he get back up?

5   **CAPT.:**      Yup, so like I said we went we went through this up down thing with

6                   him like three or four times.

7   **(28:33.6)**

8   Ogaz:           Okay, and how was he getting up, was he getting up like a push up

9                   style position or.

10  **CAPT.:**      No, he's lying on his back.

11  Ogaz:           Okay.

12  **CAPT.:**      So, he's kind of turned on his side and then he's coming up so that last

13                  time he turned on his side to come up he came up swinging.

14  Ogaz:           Okay.

15  **CAPT.:**      Um cause he got tired of being pushed back down.

16  Ogaz:           Okay.

17  **(28:46.8)**

18  **CAPT.:**      Is is what I'm you know I'm assuming.

19  Ogaz:           So, they pushed him down they didn't push him down and hold him

20                  down they kind of pushed down disengaged and were giving

21                  commands or they were trying to hold him down?

22  **CAPT.:**      We weren't trying to hold him down at that time because usually

23                  they're gonna kind of disoriented like they're they're trying to gather

24                  themselves.

25  Ogaz:           Mm-hmm.

26  **(29:01.5)**

27                                                      29

28                      Captain Dyjuan Washington Interview Transcript

Ruben Escudero

Transcription – Captain  Dyjuan Washington

| | | |
|---|---|---|
| 1 | **CAPT.:** | And and we expect em to be a a little kind of like "hey what's going |
| 2 | | on" type deal. |
| 3 | Ogaz: | Mm-hmm. |
| 4 | **CAPT.:** | But it's never to the point to where this guy went to like so we we |
| 5 | | already expect "hey man he's gonna be" he he's disoriented. |
| 6 | Ogaz: | Mm-hmm. |
| 7 | **CAPT.:** | So we got it..  he just woke up. |
| 8 | Ogaz: | Yeah yeah. |
| 9 | **(29:15.9)** | |
| 10 | **CAPT.:** | So, we understand some of that so we try to I don't wanna hold you |
| 11 | | down because that is only going to intensify the fight even more. |
| 12 | Ogaz: | Correct. |
| 13 | **CAPT.:** | You know so we we don't we don't hold em down. |
| 14 | Ogaz: | Okay. |
| 15 | **CAPT.:** | Yeah, cause at that point it's not need to restrain him cause we're still |
| 16 | | trying to talk him through "hey listen where is at this is what |
| 17 | | happened" type deal. |
| 18 | Ogaz: | Okay. |
| 19 | **CAPT.:** | You know. |
| 20 | Ogaz: | So, he throws a punch then, um and then what happens, does he get up |
| 21 | | on his feet does he get up on his knees? |
| 22 | **CAPT.:** | Ah he throws the punch the first time and we just lay him back down. |
| 23 | | Okay. |
| 24 | Ogaz: | Okay. |
| 25 | **CAPT.:** | Like so they didn't we didn't strike him after that. |
| 26 | Ogaz: | Okay. |
| 27 | | |
| 28 | | |

30

Captain Dyjuan Washington Interview Transcript

Ruben Escudero

Transcription – Captain  Dyjuan Washington

| | | |
|---|---|---|
| 1 | **(29:46.7)** | |
| 2 | **CAPT.:** | Like no no one struck him after that so. |
| 3 | Ogaz: | Okay and then how did you guys lay him down that time? |
| 4 | **CAPT.:** | The same. |
| 5 | Ogaz: | The same? |
| 6 | **CAPT.:** | Mm-hmm. |
| 7 | Ogaz: | Okay, so then what happened next? |
| 8 | **CAPT.:** | So, we are still trying to talk to him through this like "hey man we're |
| 9 | | here to help" like. |
| 10 | Ogaz: | Mm-hmm. |
| 11 | **(59:58.3)** | |
| 12 | **CAPT.:** | Like "relax like chill out" and then that's usually when we come and |
| 13 | | say hey there's two ways we can we can do this, either you can go to |
| 14 | | the hospital or you can go go to jail. And I don't know if we actually |
| 15 | | told him this guy that at that point um or where that came out. |
| 16 | Ogaz: | Mm-hmm. |
| 17 | **CAPT.:** | Throughout this whole thing. |
| 18 | Ogaz: | Mm-hmm. |
| 19 | **CAPT.:** | But um. |
| 20 | **(30:14.8)** | |
| 21 | Ogaz: | Do you know if that was said or not? |
| 22 | **CAPT.:** | Um I'm I'm pretty sure those words were said that that's pretty |
| 23 | | standard. |
| 24 | Ogaz: | Okay. |
| 25 | **CAPT.:** | For us. |
| 26 | Ogaz: | Okay, um so after you he swings, and you guys push him back down |
| 27 | | |
| 28 | | |

31

Ruben Escudero

Transcription – Captain  Dyjuan Washington

| | | |
|---|---|---|
| 1 | | on the ground the same manner. |
| 2 | **CAPT.:** | Mm-hmm. |
| 3 | Ogaz: | Um how long before he gets back up again? |
| 4 | **(30:32.0)** | |
| 5 | **CAPT.:** | Immediately. |
| 6 | Ogaz: | Okay, and then what'd he do when he got back up? |
| 7 | **CAPT.:** | Um the next time he got back up he swung more and and now it's like |
| 8 | | really okay the fight is on like it. |
| 9 | Ogaz: | Okay. |
| 10 | **(30:41.9)** | |
| 11 | **CAPT.:** | He's not he's not trying to lay back down again he's like he got up on |
| 12 | | his side he's now on a knee he's fighting he's pulling deputies down |
| 13 | | like he like like the fight is on like he's doing everything in his power |
| 14 | | to fight, resist not do like he's not complying at all. |
| 15 | Ogaz: | Okay in your opinion this time was he do you think he was still |
| 16 | | disoriented, or do you think he was making a conscious decision? |
| 17 | **(31:03.4)** | |
| 18 | **CAPT.:** | Um, no cause now he starts to talk right, because after that time um he |
| 19 | | throws a punch at a deputy, a deputy throws a punch back at him and |
| 20 | | then we kind of we we got him so somewhat restrained right. |
| 21 | Ogaz: | Mm-hmm. |
| 22 | **(31:15.8)** | |
| 23 | **CAPT.:** | And he's asking us "why why are you hitting me"? |
| 24 | Ogaz:: | Mm-hmm. |
| 25 | **CAPT.:** | And then (laughs) says (laughs) then deputy responds like "hey man |
| 26 | | you're resisting like you need to calm down you need to relax like |
| 27 | | |
| 28 | | |

32

Captain Dyjuan Washington Interview Transcript

Ruben Escudero

Transcription – Captain  Dyjuan Washington

| | | |
|---|---|---|
| 1 | | we're trying to help you here". |
| 2 | Ogaz: | Mm-hmm. |
| 3 | **(31:25.3)** | |
| 4 | **CAPT.:** | You know and then it's like he didn't even understand like what we |
| 5 | | told him or heard anything and then he starts swinging again like it's |
| 6 | | like I just asked you when you hitting me we just told you why you |
| 7 | | got hit but yet now the fight is on again. |
| 8 | Ogaz: | Mm-hmm. |
| 9 | **(31:39.1)** | |
| 10 | **CAPT.:** | So, it's like okay then just we went through this like I don't know. |
| 11 | **(31:42.1)** | |
| 12 | Ogaz: | Do you know what deputy told him "hey your resisting"? |
| 13 | **CAPT.:** | Yes, like. |
| 14 | **(31.47.4)** | |
| 15 | Ogaz: | Which deputy told him that? |
| 16 | **CAPT.:** | Ah Mata. |
| 17 | Ogaz: | Mata, okay. |
| 18 | **CAPT.:** | Mm-hmm. |
| 19 | Ogaz: | And when you say "he swung a punch at the deputy", where did he |
| 20 | | swing at do you know? |
| 21 | **CAPT.:** | Ah if I most all these punches were to the face like he was if he if he |
| 22 | | could see you like he he was focusing that he was he was going for |
| 23 | | the face. |
| 24 | **(32:04.1)** | |
| 25 | Ogaz: | Did he connect with any of these punches? |
| 26 | **CAPT.:** | Not to my knowledge at least not that I could I couldn't see that he |
| 27 | | |
| 28 | | |

33

Captain Dyjuan Washington Interview Transcript

Ruben Escudero

Transcription – Captain  Dyjuan Washington

| 1 | | connected with any of them. |
|---|---|---|
| 2 | Ogaz: | Okay, um so you said Deputy Nad ah Mata, returned a punch, did |
| 3 | | Deputy Mata connect with the punch? |
| 4 | **(32:18.0)** | |
| 5 | **CAPT.:** | Yes. |
| 6 | Ogaz: | And where was that at? |
| 7 | **CAPT.:** | Ah to the face. |
| 8 | Ogaz: | Okay, and how many times did that at that particular point? |
| 9 | **CAPT.:** | Ah two. |
| 10 | Ogaz: | Two times? |
| 11 | **CAPT.:** | Mm-hmm. |
| 12 | Ogaz: | And what was um Ruben's reaction to that? |
| 13 | **CAPT.:** | Ah again he asked "why are you hitting me". |
| 14 | Ogaz: | Okay. |
| 15 | **(32:30.2)** | |
| 16 | **CAPT.:** | And it's like well your hitting me because you're you're you're being |
| 17 | | you're you're fighting you're fighting us. |
| 18 | Ogaz: | Okay. |
| 19 | **(32:35.1)** | |
| 20 | **CAPT.:** | Like so stop fighting us like we're trying to help you. |
| 21 | **(32:38.4)** | |
| 22 | Ogaz: | And then what did he do? |
| 23 | **CAPT.:** | Um (laughs) then he takes a swing at my medic um who is standing if |
| 24 | | you look at the room by that table over there. |
| 25 | Ogaz: | Uh-huh. |
| 26 | **CAPT.:** | And he he takes him if my medic doesn't move he's he's out. |

34

Ruben Escudero

Transcription – Captain  Dyjuan Washington

| | | |
|---|---|---|
| 1 | Ogaz: | Okay, so like a good haymaker. |
| 2 | **CAPT.:** | Oh yeah. |
| 3 | Ogaz: | For you. Way back. |
| 4 | **CAPT.:** | Oh yeah. |
| 5 | Ogaz: | All the way around. |
| 6 | **CAPT.:** | Yeah. |
| 7 | Ogaz: | Okay, and then so what happened at that point? |
| 8 | **CAPT.:** | Ah then Mata hits him two more times. |
| 9 | Ogaz: | Okay. |
| 10 | **CAPT.:** | And. |
| 11 | Ogaz: | What were the other two deputies doing at this point? |
| 12 | **CAPT.:** | Um they're trying to restrain him um so at that time so if if you look at |
| 13 | | me so I'm the door is where you are, say this time he gets up right he |
| 14 | | he pushes Mata off of him he turns to my medic and this when he |
| 15 | | throws that big punch. |
| 16 | Ogaz: | Okay. |
| 17 | **(33:17.2)** | |
| 18 | **CAPT.:** | So, Mata comes and then he hits him with two more punches, and he |
| 19 | | grabs him and then he takes him to the ground. |
| 20 | Ogaz: | We see you grabbing you you're showing your arms, like like. |
| 21 | **CAPT.:** | Right, he's trying to to to hold him to to one to stop him from |
| 22 | | throwing more punches. |
| 23 | Ogaz: | Was he underneath his arms? |
| 24 | **CAPT.:** | I don't know if he ever I don't know what kind of grip he was able to |
| 25 | | get on him. |
| 26 | Ogaz: | It's more like a bear hug? |
| 27 | | |
| 28 | | |

35

Captain Dyjuan Washington Interview Transcript

Ruben Escudero

Transcription – Captain  Dyjuan Washington

| | | |
|---|---|---|
| 1 | **CAPT.:** | Right. Trying trying to get him back to the middle of the room and |
| 2 | | away from my medic and then at that time is when he hits the ground |
| 3 | | and then we have Miranda is in the back still um and the deputy the |
| 4 | | female deputy is there and then she's trying to restrain his arms you |
| 5 | | know. |
| 6 | Ogaz: | Okay. |
| 7 | **(33:53.4)** | |
| 8 | **CAPT.:** | And then she has I think it's her taser is is where who I think they use |
| 9 | | her taser to to tase him, um so he's st he's still fighting right and and |
| 10 | | and Mata is in it with him. |
| 11 | Ogaz: | Mm-hmm. |
| 12 | **CAPT.**: | On the ground. |
| 13 | Ogaz: | Are they both on the ground, Mata and Ruben? |
| 14 | **CAPT.:** | Yes. Mata and Ruben are both on the ground and then um the female |
| 15 | | deputy comes and tries to put her knee on him to try to get him to |
| 16 | | stop. |
| 17 | Ogaz: | Where at? |
| 18 | **CAPT.**: | I wanna say it's like in the abdomen section because. |
| 19 | Ogaz: | Okay. |
| 20 | **(34:17.5)** | |
| 21 | **CAPT.:** | When he pulls him down, he's like twisted like this and then she's |
| 22 | | there I think in in doing (phone rings) so I think she even ah catches |
| 23 | | Mata with a knee or a foot or something like that. |
| 24 | Ogaz: | Okay. |
| 25 | **CAPT.**: | Um. |
| 26 | Ogaz: | Is Mata on top of (phone rings) Ruben or is Ruben on top of Mata? |
| 27 | | |
| 28 | | |

36

Ruben Escudero

Transcription – Captain  Dyjuan Washington

| | | |
|---|---|---|
| 1 | **CAPT.:** | Mata they're like side to side. |
| 2 | Ogaz: | Okay. |
| 3 | **CAPT.:** | I I don't think he ever had like control to where he was like actually |
| 4 | | could like. |
| 5 | Ogaz: | When you say you don't think he had control" meaning. |
| 6 | **(34:44.0)** | |
| 7 | **CAPT.:** | Meaning Mata. |
| 8 | Ogaz: | Okay. |
| 9 | **CAPT.:** | Yeah, he he was never while they're on the ground he there would he |
| 10 | | would he did not have control where he could say like if you've ever |
| 11 | | wrestled like he. |
| 12 | Ogaz: | Mm-hmm. |
| 13 | **CAPT.:** | He was not mounted. |
| 14 | Ogaz: | Mm-hmm. |
| 15 | **CAPT.:** | He was not he didn't have side control he didn't have you know none |
| 16 | | none of that, so it was just and the scrap is on essentially you know. |
| 17 | Ogaz: | Okay, so she has a knee on his like abdomen. |
| 18 | **CAPT.:** | Mm-hmm. |
| 19 | Ogaz: | Mata's on the side um what was Deputy Miranda doing? |
| 20 | **CAPT.:** | Ah Deputy Miranda is on his legs trying to get his legs to stop moving |
| 21 | | because he's kicking and doing all kind of things with his legs so we're |
| 22 | | trying to just kind of hold him down to get him to stop resisting um |
| 23 | | and he's just squirming out and as soon as he can get a arm free he's |
| 24 | | throwing a punch. |
| 25 | Ogaz: | Were any more commands being made at that time? |
| 26 | **CAPT.:** | Ah commands are being made the whole time through. |
| 27 | | |
| 28 | | |

37

Captain Dyjuan Washington Interview Transcript

Ruben Escudero

Transcription – Captain  Dyjuan Washington

| 1 | Ogaz: | Okay. |
|---|---|---|
| 2 | **(35:26.2)** | |
| 3 | **CAPT.:** | "Hey stop fighting us, we're trying to (INAUDIBLE)" and then before |
| 4 | | he got tased "hey man we're gonna tase you like stop like blahblahn |
| 5 | | and um so I think Miranda was on his legs when he actually got tased |
| 6 | | and they I think I want but he barley got he barley got he almost got |
| 7 | | tased so. |
| 8 | Ogaz: | Okay, when they when who who deployed the taser? |
| 9 | **CAPT.**: | Ah the deputy with the the female deputy. |
| 10 | Ogaz: | And did she deploy the ta taser from a distance or was it like a direct |
| 11 | | connect? |
| 12 | **CAPT.:** | Umm… I would probably say medium distance It wasn't like. |
| 13 | Ogaz: | Okay. |
| 14 | **CAPT.:** | It I mean the size of the room was small. |
| 15 | Ogaz: | Mm-hmm. |
| 16 | **(36:00.7)** | |
| 17 | **CAPT.:** | So, it's I mean I mean I guess define close, medium and far. |
| 18 | Ogaz: | Yeah. |
| 19 | **CAPT.:** | I mean everything is gonna be close I mean it. |
| 20 | Ogaz: | But was it like. |
| 21 | **CAPT.:** | Compared (inaudible). |
| 22 | Ogaz: | Skin to skin? |
| 23 | **CAPT.:** | No. |
| 24 | Ogaz: | There was there's space between the taser and and Ruben's body? |
| 25 | **CAPT.:** | There's space between the taser and Ruben's body. |
| 26 | Ogaz: | Okay, and was that effective? |
| 27 | | 38 |

Ruben Escudero

Transcription – Captain  Dyjuan Washington

| | | |
|---|---|---|
| 1 | Ogaz: | Um did you see her connect with any of the punches? |
| 2 | **CAPT.:** | She definitely connected with some of the punches. |
| 3 | Ogaz: | And did you see where? |
| 4 | **CAPT.:** | Um some to the head some to the body. |
| 5 | Ogaz: | Okay, and then how about with the knee? |
| 6 | **CAPT.:** | Um the knee were all body shots. |
| 7 | Ogaz: | All body shots? |
| 8 | **CAPT.:** | Mm-hmm. |
| 9 | Ogaz: | And do you know how many knee strikes? |
| 10 | **CAPT.:** | Um four to five. |
| 11 | Ogaz: | Four to five? |
| 12 | **CAPT.:** | Mm-hmm. |
| 13 | **(37:22.1)** | |
| 14 | Ogaz: | Um did you see any of the deputies apply knee strikes? |
| 15 | **CAPT.:** | No. |
| 16 | Ogaz: | Okay, just the female deputy? |
| 17 | **CAPT.:** | Mm-hmm. |
| 18 | Ogaz: | And was she was he in a laying position at this time or is he standing? |
| 19 | **CAPT.:** | Um he's not on a laying position nor is he standing but he's he's trying |
| 20 | | to get up and he's trying to as soon as he can get like the MO was he's |
| 21 | | like like this and or on his knees and on his arms and as soon as he |
| 22 | | can get his arms up he's throwing punches. |
| 23 | Ogaz: | Okay, so he's going up into a kneel position. |
| 24 | **CAPT.:** | Mm-hmm. |
| 25 | Ogaz: | And he's just kind of cause it's close quarters. |
| 26 | **(37:51.1)** | |
| 27 | | |
| 28 | | |

40

Captain Dyjuan Washington Interview Transcript

Ruben Escudero

Transcription – Captain  Dyjuan Washington

| | | |
|---|---|---|
| 1 | **CAPT.:** | Right close quarters. |
| 2 | Ogaz: : | With everyone around him he's just trying to throw. |
| 3 | **CAPT.:** | Right. |
| 4 | Ogaz: | Punches, okay…….. Long pause) At some point you decided that you |
| 5 | | were gonna um assist the deputies, um in getting him detained, um |
| 6 | | what made you make that decision? |
| 7 | **CAPT.:** | Um because he was he he's he's big you know and I I figure I can use |
| 8 | | my weight. |
| 9 | Ogaz: | Mm-hmm. |
| 10 | **CAPT.:** | And my size as leverage to help get him handcuffed because at this |
| 11 | | point, we gonna fight this dude forever if if I don't intervene. |
| 12 | Ogaz: | So, at that point you didn't feel like the deputies had control of the |
| 13 | | situation, um that they were I don't know what to say, winning or |
| 14 | | losing but it was not was it you didn't see it coming to an end unless |
| 15 | | you stepped in? |
| 16 | **(38:55.4)** | |
| 17 | **CAPT.:** | Right. So someone's gonna get hurt. |
| 18 | Ogaz: | Okay. |
| 19 | **CAPT.:** | With whether it be Ruben get further injured or it's gonna be one of |
| 20 | | my my medic my engineer or the deputies. |
| 21 | Ogaz: | Okay. Um so how how did you intervene? |
| 22 | **CAPT.:** | Um I intervened so he was on his knees getting ready to get up again |
| 23 | | so I take my foot, right and I put it on his back and I get him and I I |
| 24 | | and I take his arm to get one of his shoulders down. |
| 25 | Ogaz: | Okay. |
| 26 | **CAPT.:** | So, he can't so he's take away his leverage. |
| 27 | | 41 |
| 28 | | |

Captain Dyjuan Washington Interview Transcript

Ruben Escudero

Transcription – Captain  Dyjuan Washington

| | | |
|---|---|---|
| 1 | Ogaz: | So, you're using your hands to hold an arm and then your foot on his |
| 2 | | back? |
| 3 | **CAPT.:** | Right. |
| 4 | Ogaz: | Okay, were you using both hands, one hand? |
| 5 | **CAPT.:** | Oh, I'm using both arms, yeah. |
| 6 | **(39:32.1)** | |
| 7 | Ogaz: | Okay. And then how was that how was that working? |
| 8 | **CAPT.:** | Um it actually worked because we were able to get that arm |
| 9 | | handcuffed. |
| 10 | Ogaz: | Okay. |
| 11 | **CAPT.:** | So, after we got that arm handcuffed my engineer handcuffed that |
| 12 | | arm cause he had the cuffs um and then the female deputy was kind of |
| 13 | | like where his head was at. |
| 14 | Ogaz: | Uh-huh. |
| 15 | **CAPT.:** | And we're she's like like pinned on the couch essentially you know |
| 16 | | and then Mata is on the other side so we're trying to get the other arm |
| 17 | | handcuffed and she was having the toughest time getting that other |
| 18 | | arm around and he's literally like has his elbow like against her trying |
| 19 | | to get it up to a point to where he he could probably throw a elbow |
| 20 | | strike at her or something like that but she's she's kind of pinned at |
| 21 | | that time and she has her baton and she's trying to like work it on |
| 22 | | pressure points like in his traps right here. |
| 23 | Ogaz: | Mm-hmm. |
| 24 | **CAPT.:** | And this and like not even phased like nothing. |
| 25 | Ogaz: | When you say, "she had her baton". |
| 26 | **CAPT.:** | Mm-hmm. |
| 27 | | |
| 28 | | |

42

Captain Dyjuan Washington Interview Transcript

Ruben Escudero

Transcription – Captain  Dyjuan Washington

| | | |
|---|---|---|
| 1 | Ogaz: | Was it ex expanded or was it collapsed? |
| 2 | **CAPT.:** | It was expanded. |
| 3 | **(40:24.4)** | |
| 4 | **Ogaz:** | Okay. Now when you say "pressure points" um was she striking with |
| 5 | | the baton or was she was using the baton to push against pressure |
| 6 | | points? |
| 7 | **CAPT.:** | She was using the baton to push against pressure points. |
| 8 | Ogaz: | And where were those pressure points at? |
| 9 | **CAPT.:** | In the in in his trap like right here. |
| 10 | Ogaz: | Okay. |
| 11 | **CAPT.:** | Like in his neck area. |
| 12 | Ogaz: | By the collar bone are? |
| 13 | **CAPT.:** | By the collar bone, yes. |
| 14 | Ogaz: | And and that was ineffective? |
| 15 | **CAPT.:** | Oh yeah, didn't do nothing. |
| 16 | **(40:43.0)** | |
| 17 | Ogaz: | Did she when he's pushing her against the couch with his elbow, and |
| 18 | | she's pinned, besides using the baton on a pressure point, did she give |
| 19 | | any additional strikes to him at all? |
| 20 | **CAPT.:** | I think the oh before that happened she I think she struck him with her |
| 21 | | taser. |
| 22 | Ogaz: | Okay, um tell me more about that. |
| 23 | **(41:02.1)** | |
| 24 | **CAPT.:** | Okay, ah and and so Mata wrestles him to the ground, she's like by the |
| 25 | | couch there, fight is on ah and after um I wanna say it's after he was |
| 26 | | tased and and after the. second time he was tased he was really mad. |
| 27 | | 43 |
| 28 | | |

Ruben Escudero

Transcription – Captain  Dyjuan Washington

| 1 | Ogaz: | Mm-hmm. |
|---|---|---|
| 2 | **CAPT.:** | So, he gets up and he's trying to strike her. |
| 3 | Ogaz: | Mm-hmm. |
| 4 | **(41:20.8)** | |
| 5 | **CAPT.:** | So, at that time is when he got wrestled down and she's hitting him |
| 6 | | with the taser. |
| 7 | Ogaz: | Okay, it it when she's hitting him with the taser, is this when she's |
| 8 | | pinned against the couch? |
| 9 | **CAPT.:** | She's definitely and she has no room to operate yeah. |
| 10 | Ogaz: | Okay. |
| 11 | **CAPT.:** | Mm-hmm. |
| 12 | Ogaz: | And he's trying to she's kind of pinned against the couch, she has no |
| 13 | | room and and he's actively trying to punch her? |
| 14 | **CAPT.:** | He's actively going after her, right. |
| 15 | Ogaz: | Okay. |
| 16 | **CAPT.:** | Cause he's he that's the way he's facing them. |
| 17 | Ogaz: | Mm-hmm. |
| 18 | **CAPT.:** | And that is the object that's kind of like in his way. |
| 19 | Ogaz: | Mm-hmm |
| 20 | **(41:46.6)** | |
| 21 | **CAPT.:** | And from what I could tell is whoever was in front of him at the time |
| 22 | | is the guy or the gal who's he's gonna try and take out. |
| 23 | Ogaz: | Okay. How many times did she strike him with the taser? |
| 24 | **(41:56.3)** | |
| 25 | **CAPT.:** | Ah I'm not totally sure but it was maybe once or twice. |
| 26 | Ogaz: | Maybe once or twice? |
| 27 | | |
| 28 | | |

Captain Dyjuan Washington Interview Transcript

Ruben Escudero

Transcription – Captain  Dyjuan Washington

| | | |
|---|---|---|
| 1 | **CAPT.:** | Mm-hmm. |
| 2 | Ogaz: | Okay, and how did he react to that, was it effective? |
| 3 | **CAPT.:** | No. |
| 4 | Ogaz: | No, like he felt nothing? |
| 5 | **CAPT.:** | Like he felt nothing. |
| 6 | Ogaz: | Okay (long pause) At first you were not able to handcuff him, and wh |
| 7 | | why was that just cause? |
| 8 | **CAPT.:** | Well, his arms are in front, right, so if his arms are in front we're |
| 9 | | trying to get his arms in back I'm saying this dude is strong. |
| 10 | Ogaz: | Mm-hmm. |
| 11 | **CAPT.:** | Like and I'm not I'm not a weak dude, but. |
| 12 | Ogaz: | Mm-hmm. |
| 13 | **CAPT.:** | Um we could not get his arms well my engineer was trying to take |
| 14 | | care of it he's not as big as me. |
| 15 | Ogaz: | Mm-hmm. |
| 16 | **(42:38.3)** | |
| 17 | **CAPT.:** | So, but he he could not get his arm um behind his back. |
| 18 | Ogaz: | Okay. |
| 19 | **CAPT.:** | Whatsoever. |
| 20 | Ogaz: | Now you mentioned that the female deputy used a bar, I'm. |
| 21 | **CAPT.:** | Mm-hmm. |
| 22 | Ogaz: | Assuming that's her baton? |
| 23 | **CAPT.:** | Right. |
| 24 | Ogaz: | How did she use that baton while attempting to get him handcuffed? |
| 25 | **CAPT.:** | Um so with one arm we didn't she didn't have to use the bar at all, the |
| 26 | | other arm so he's like got he's grabbing her I think he has her his arm |
| 27 | | |
| 28 | | |

45

Captain Dyjuan Washington Interview Transcript

Ruben Escudero

Transcription – Captain  Dyjuan Washington

| | | |
|---|---|---|
| 1 | | his hand on her leg, so she uses the bar and like uses his body as |
| 2 | | leverage to twist his other arm around, but only even but but bef so |
| 3 | | before I put my foot on his back and tries try to get him down. |
| 4 | Ogaz: | Mm-hmm. |
| 5 | **CAPT.:** | She she had the baton there and she cannot move his arm whatsoever. |
| 6 | Ogaz: | So, as she's using the baton as a I'm assuming. |
| 7 | **CAPT.:** | As a as a as a as a leverage tool. |
| 8 | **(43:25.3)** | |
| 9 | Ogaz: | As a leverage, does she have one hand on one side of the baton and |
| 10 | | then the other hand on the other side of the baton. |
| 11 | **CAPT.:** | Yeah. |
| 12 | Ogaz: | From like front to back. |
| 13 | **CAPT.:** | Yes. |
| 14 | **(43:31.0)** | |
| 15 | Ogaz: | Was using like to twist. |
| 16 | **CAPT.:** | Right |
| 17 | Ogaz: | His arm with leverage to get it behind his back? |
| 18 | **CAPT.:** | No. |
| 19 | Ogaz: | Okay. |
| 20 | **CAPT.:** | Not until um I could get my foot and really get his shoulder down. |
| 21 | Ogaz: | Mm-hmm. |
| 22 | **CAPT.:** | So, he lost his leverage and then she could then get his arm. We had to |
| 23 | | work in tandem to to to to to to make it work. |
| 24 | Ogaz: | Okay. |
| 25 | **CAPT.:** | So. |
| 26 | Ogaz: | Once he was handcuffed, was he still actively fighting? |
| 27 | | |
| 28 | | |

46

Ruben Escudero

Transcription – Captain  Dyjuan Washington

| 1 | **CAPT.:** | He was still actively fighting when when he was handcuffed, um. |
| 2 | Ogaz: | Can you tell me more about that? |
| 3 | **(44:02.5)** | |
| 4 | **CAPT.:** | Um he's just just moving and kicking and we're just like dude we have |
| 5 | | to we're gonna have to give him some Verset to calm him down if not |
| 6 | | we're never gonna get to the hospital. Ah almost to the point to where |
| 7 | | he would've probably either broke the handcuffs or tried to find a way |
| 8 | | to get out of them to then ah ah I like wouldn't've felt comfortable |
| 9 | | leaving the medics in the ambulance with him, even handcuffed. |
| 10 | **(44:26.0)** | |
| 11 | Ogaz: | So, he he in your opinion, and your mindset at the time, he displayed |
| 12 | | during this fight some type of like super strength that you actually |
| 13 | | thought he could actually break the handcuffs? |
| 14 | **CAPT.:** | Right. |
| 15 | Ogaz: | Okay, um when he was handcuffed, did anyone strike him when he |
| 16 | | was handcuffed? |
| 17 | **CAPT.:** | No. |
| 18 | Ogaz: | Okay so you didn't see anyone strike him while he was handcuffed? |
| 19 | **CAPT.:** | Right. |
| 20 | Ogaz: | Okay, so just to clarify, you guys' mindset or the mindset at the time, |
| 21 | | um was if we don't give him a sedative, we're not gonna be able to this |
| 22 | | is not gonna stop. |
| 23 | **CAPT.:** | Right. |
| 24 | Ogaz: | And it was to protect him and and to protect. |
| 25 | **CAPT.:** | Everyone else there all the responders. |
| 26 | Ogaz: | The the first responders. |
| 27 | | |
| 28 | | |

47

Captain Dyjuan Washington Interview Transcript

Ruben Escudero

Transcription – Captain  Dyjuan Washington

| | | |
|---|---|---|
| 1 | **CAPT.:** | Yes. |
| 2 | Ogaz: | Safety. Okay. Um (long pause) what how long did it take the sedative |
| 3 | | to take effect? |
| 4 | **CAPT.:** | Um probably two to three minutes. |
| 5 | Ogaz: | Okay, are you familiar with this sedative is is Verset? |
| 6 | | |
| 7 | **CAPT.:** | Semi familiar with it. Like I'm not a paramedic so I don't administer it |
| 8 | | but I know that anytime we have a behavioral patient this is what we |
| 9 | | give to them to kind of chill em out. |
| 10 | Ogaz: | To to clam down |
| 11 | **CAPT.:** | Mm-hmm. |
| 12 | Ogaz: | Is it usually effective? |
| 13 | **CAPT.:** | It's usually effective. |
| 14 | Ogaz: | Okay. And then so was it effective with him? |
| 15 | **CAPT.:** | It was effective with him. |
| 16 | Ogaz: | Ah but I'm sorry and I don't know if you already asked and answered |
| 17 | | this, how long did it take before? |
| 18 | **(45:46.7)** | |
| 19 | **CAPT.:** | I I think it it usually it takes about two minutes and then. |
| 20 | Ogaz: | And how long did it take with him? |
| 21 | **CAPT.:** | About the same. |
| 22 | Ogaz: | About the same. |
| 23 | **CAPT.:** | About two minutes, Mm-hmm. |
| 24 | Ogaz: | And how did you know it's effective? |
| 25 | **CAPT.:** | Um because he stop resisting. |
| 26 | Ogaz: | Okay. |
| 27 | | |
| 28 | | |

48

Captain Dyjuan Washington Interview Transcript

Ruben Escudero

Transcription – Captain  Dyjuan Washington

| | | |
|---|---|---|
| 1 | **CAPT.:** | Stopped resisting. |
| 2 | Ogaz: | Was he saying anything? |
| 3 | **CAPT.:** | No. |
| 4 | Ogaz: | Okay. What now that he's not resisting anymore, and now that he's |
| 5 | | somewhat calmed down because of the sedative. |
| 6 | **CAPT.:** | Mm-hmm. |
| 7 | **(46:11.6)** | |
| 8 | Ogaz: | What injuries did you see on him? |
| 9 | **CAPT.:** | Um there was blood everywhere so we couldn't really make out where |
| 10 | | the blood was coming from. |
| 11 | Ogaz: | Mm-hmm. |
| 12 | **CAPT.:** | We thought it was coming from his nose cause I think he got struck in |
| 13 | | the nose so most of the blood was coming from his nose, um I'm |
| 14 | | pretty sure that's probably where it was coming from. Um he probably |
| 15 | | he could it could also been coming from his mouth cause he was |
| 16 | | spitting as well. |
| 17 | Ogaz: | Mm-hmm. |
| 18 | **(46:33.6)** | |
| 19 | **CAPT.:** | Um I think that's where the majority of the blood was coming from |
| 20 | | um he did have a couple of lacerations on his head um but they |
| 21 | | weren't bleeding so. |
| 22 | Ogaz: | Okay, what what's your experience with cuts to the face, do they tend |
| 23 | | to bleed more? |
| 24 | **CAPT.:** | They bleed a lot more. |
| 25 | Ogaz: | Okay. |
| 26 | **CAPT.:** | Mm-hmm. |
| 27 | | |
| 28 | | |

49

Captain Dyjuan Washington Interview Transcript

Ruben Escudero

Transcription – Captain  Dyjuan Washington

| | | |
|---|---|---|
| 1 | Ogaz: | Um when you say "he was spitting", was he um just trying to spit |
| 2 | | blood out like he's trying to clear his mouth out or was he trying to |
| 3 | | spit on on responders? |
| 4 | **CAPT.:** | I don't think he was trying to spit on the responders, um cause at that |
| 5 | | time we had him pre pretty well restrained so. |
| 6 | Ogaz: | Okay. |
| 7 | **CAPT.:** | Um I don't think ah at one time when we were trying to handcuff him, |
| 8 | | I could see him spitting on the floor. |
| 9 | Ogaz: | Okay. |
| 10 | **CAPT.:** | Um but he didn't have any leverage to spit anywhere else. |
| 11 | Ogaz: | Okay. |
| 12 | **CAPT.:** | Um so that's kind of how that went down. |
| 13 | Ogaz: | Did you do any type of physical assessment of him after he was |
| 14 | | calmed down like did you put hands on his on his head to see touch |
| 15 | | him at all or? |
| 16 | **CAPT.:** | I did not, my paramedic evaluated him. |
| 17 | Ogaz: | Mm-hmm. |
| 18 | **(47:26.5)** | |
| 19 | **CAPT.:** | Um and one of the first things we did was check his pulse to make |
| 20 | | sure to see what was going cause that's a ah con ah a counter |
| 21 | | indication of giving Verset like you wanna make sure that their their |
| 22 | | pulse is not going and his pulse started to fade quickly, and that's why |
| 23 | | we loaded him and we took him to the hospital immediately because. |
| 24 | Ogaz: | Okay. |
| 25 | **(47:42.4)** | |
| 26 | **CAPT.:** | Whenever you have a overdose patient and you give em Narcan, right, |
| 27 | | |
| 28 | | |

50

Captain Dyjuan Washington Interview Transcript

Ruben Escudero

Transcription – Captain  Dyjuan Washington

| | | |
|---|---|---|
| 1 | | he was already unconscious and pulseless, right, and then you give em |
| 2 | | Verset, which is gonna wipe out the Narcan it's gonna then whatever |
| 3 | | he was suffering from the beginning is gonna all come back again. |
| 4 | Ogaz: | So, the opiate then is gonna take back control of the body. |
| 5 | **CAPT.**: | Mm-hmm. |
| 6 | Ogaz: | Um it cause the first Vers Versated Verset. |
| 7 | **CAPT**.: | Ver Verset Mm-hmm. |
| 8 | Ogaz: | Verset for lack of better words, deletes out the Narcan. |
| 9 | **CAPT**.: | Right. |
| 10 | Ogaz: | Okay. So, he's back in the condition that he put himself originally? |
| 11 | **CAPT**.: | Right. |
| 12 | Ogaz: | Okay. Um. |
| 13 | **(48:17.5)** | |
| 14 | **CAPT**.: | I believe that's how the science works like I said I'm not a paramedic. |
| 15 | Ogaz: | Okay. |
| 16 | **CAPT.**: | Or. |
| 17 | Ogaz: | I am sure (*inaudible*) |
| 18 | **CAPT**.: | (Laughs) |
| 19 | Ogaz: | (Laughs). But okay um did you receive any inj injuries? |
| 20 | **CAPT.**: | I did not. |
| 21 | **(48:35.1)** | |
| 22 | Ogaz: | Did any of your personal that you're aware of receive any injuries? |
| 23 | **CAPT**.: | They did not. |
| 24 | Ogaz: | Were you aware of AMR receiving any injuries? |
| 25 | **CAPT.**: | I'm not aware of AMR receiving any injuries. |
| 26 | Ogaz: | Are you aware of the deputies receiving any injuries? |
| 27 | | |
| 28 | | |

51

Captain Dyjuan Washington Interview Transcript

Ruben Escudero

Transcription – Captain  Dyjuan Washington

| | | |
|---|---|---|
| 1 | **CAPT.:** | Um the only one was Mata I know he's his jaw was kind of sore. |
| 2 | Ogaz: | Mm-hmm. |
| 3 | **CAPT.:** | But that might've been from the female deputy I'm not sure if that was |
| 4 | | from ah Ruben or from the female deputy I I think the female deputy |
| 5 | | caught him so. |
| 6 | Ogaz: | Did you see that connection with the jaw from the female deputy? |
| 7 | **CAPT.:** | I did not. |
| 8 | Ogaz: | Okay, you did see what you felt was a knee strike. |
| 9 | **CAPT.:** | Right. |
| 10 | Ogaz: | From the female deputy that connected with Mata. |
| 11 | **CAPT.:** | Right. |
| 12 | Ogaz: | Do you recall where that strike hit? |
| 13 | **(49:11.4)** | |
| 14 | **CAPT.:** | Um the only place he said he was sore was in his jaw so I'm thin I'm |
| 15 | | pretty sure that is where. |
| 16 | Ogaz: | Okay, so. |
| 17 | **CAPT.:** | That I don't know if it was a knee strike or a kick or something like |
| 18 | | that, but it was with her lower extremities for sure. |
| 19 | Ogaz: | Okay, and I don't know if you already asked or answered this or not, |
| 20 | | um I think you did, did you ever see Ruben make actual connection |
| 21 | | with any first responders being deputies or fire personal, when I say |
| 22 | | "connection". |
| 23 | **CAPT.:** | Mm-hmm. |
| 24 | Ogaz: | Where a punch landed. |
| 25 | **CAPT.:** | Right. I don't think so and and I didn't I don't re like I didn't know so I |
| 26 | | had to ask everyone "did he hit you". |
| 27 | | 52 |
| 28 | | |

Ruben Escudero

Transcription – Captain  Dyjuan Washington

| | | |
|---|---|---|
| 1 | Ogaz: | Mm-hmm. |
| 2 | **CAPT.:** | "Did he hit you, did he hit you" and everyone's answer was "no", so I |
| 3 | | have to take their word for for that so. |
| 4 | Ogaz: | And is that because and I can only imagine. |
| 5 | **CAPT.:** | Mm-hmm. |
| 6 | **(49:57.3)** | |
| 7 | Ogaz: | I'm trying to you know I was not there at the scene, but I'm trying to |
| 8 | | picture this total chaos in the small room with all these bodies you |
| 9 | | know I I'm sure at some point you had people in front of you. |
| 10 | **CAPT.:** | Mm-hmm. |
| 11 | Ogaz: | Or everyone's kind of moving around. |
| 12 | **CAPT.:** | Mmm. |
| 13 | Ogaz: | Was your attention diverted anywhere else besides the fight were you |
| 14 | | looking for your personnel to see where they were at I mean where |
| 15 | | was your main attention at and did you ever lose attention to anything |
| 16 | | else? |
| 17 | **CAPT.:** | Um I'm looking I'm checking where my people are I'm looking at |
| 18 | | where the fight is going, right. |
| 19 | Ogaz: | Mm-hmm. |
| 20 | **(50:31.4)** | |
| 21 | **CAPT.:** | I'm looking at the safety of the deputies I'm also keeping my eye on |
| 22 | | this back room because we got two people back there that I have no |
| 23 | | idea what they're capable of. |
| 24 | Ogaz: | Mm-hmm. |
| 25 | **CAPT.:** | Right, so I I I'm 20-year air force vet like I've been Afghanistan I've |
| 26 | | been to Iraq like I'm always watching my six right. |
| 27 | | 53 |
| 28 | | |

Ruben Escudero

Transcription – Captain  Dyjuan Washington

| | | |
|---|---|---|
| 1 | Ogaz: | Yeah yeah. |
| 2 | **CAPT.:** | So, I don't know what they were doing right so I'm I'm watching them |
| 3 | | and I'm watching so I'm in the doorway and I have my eyes on both. |
| 4 | Ogaz: | Okay. |
| 5 | **(50:53.6)** | |
| 6 | **CAPT.:** | So, there's a lot that could be missed on boon both sides just because I |
| 7 | | don't want these guys to come outta here you know they say they don't |
| 8 | | have a relationship with this guy but really like right you don't know |
| 9 | | so. |
| 10 | Ogaz: | He's in your house. |
| 11 | **CAPT.:** | Right. |
| 12 | Ogaz: | So, your just being very self-aware. |
| 13 | **CAPT.:** | I'm being. |
| 14 | Ogaz: | Of your surroundings. |
| 15 | **CAPT.:** | Self-aware. |
| 16 | Ogaz: | And what's going on. |
| 17 | **CAPT.:** | Yes sir. |
| 18 | Ogaz: | Okay, um what do you got Jerry? |
| 19 | Moreno: | I just have some clarifying questions, and. |
| 20 | Ogaz: | Mm-hmm. |
| 21 | **(51:14.8)** | |
| 22 | Moreno: | You know when I was on my phone a little bit I was getting texts so I |
| 23 | | some of these you probably already answered, but. |
| 24 | Ogaz: | Okay. |
| 25 | | |
| 26 | Moreno: | Um in case, have you had any prior contacts with the patient before? |
| 27 | | 54 |
| 28 | | |

Ruben Escudero

Transcription – Captain  Dyjuan Washington

| | | |
|---|---|---|
| 1 | **CAPT.:** | No. |
| 2 | Moreno: | How about any of your personal? |
| 3 | **CAPT.:** | Not, no not that I'm aware of. |
| 4 | **(51:30.5)** | |
| 5 | Moreno: | And then ah did did you ID the ah names of your crew um the |
| 6 | | engineer and then the medic? |
| 7 | **CAPT.:** | Yeah so, my engineer is Martin Alcon M-A-R-T-1-N Alcon A-L-C- |
| 8 | | O-N, and the medic was Brett Lever B-R-E-T-T L-E-V-E-R. |
| 9 | Moreno: | By chance do you know any of the AMR personal's names? |
| 10 | **CAPT.:** | Um man not by heart I I know who they are cause I see em all the |
| 11 | | time but I don't know um what their names are. |
| 12 | Moreno: | Um at any time during this incident was there any derogatory |
| 13 | | language used? |
| 14 | **CAPT.:** | No. |
| 15 | Moreno: | Did the patient say anything during this incident? |
| 16 | **CAPT.:** | Um he said "why are you hitting me, why are you here, leave me |
| 17 | | alone" um and I I wanna say that that's about it he repeated those |
| 18 | | words a couple times. |
| 19 | Moreno: | Um you had mentioned that there was bystanders at that at the house |
| 20 | | or there was people aside from first responders at the house. |
| 21 | **CAPT.:** | Right, there was a female and there was a male and I wanna say |
| 22 | | they're brother and sister and they were the actual residence of that |
| 23 | | house um and I guess the brother is a like a person who brought |
| 24 | | Ruben in he didn't even know him from from who you know so so |
| 25 | | they say so I that's why they didn't have any information and we didn't |
| 26 | | have a wallet we didn't have a ID card we didn't have any of that. |
| 27 | | |
| 28 | | |

55

Captain Dyjuan Washington Interview Transcript

Ruben Escudero

Transcription – Captain  Dyjuan Washington

1   **(53:01.8)**

2   Moreno:   And at some point you spoke to ah this male and this female that were

3   at the house?

4   **CAPT.:**   I definitely spoke to the female and then I asked the male like what is

5   his name like if he knows the guy he's like oh I just met him like

6   yesterday or something like that he said.

7   Moreno:   Do you recall their names the female and the male?

8   **CAPT.:**   I do not because ah I wasn't focused on their names at the time we

9   were trying to treat Ruben you know so.

10   Moreno:   And where were they during this incident, during the altercation

11   portion of the incident?

12   **CAPT.:**   The male was in the back bedroom, and the female was in the kitchen.

13   Moreno:   Did they witness this incident?

14   **CAPT.:**   Ah probably they missed most of it I would suspect um they probably

15   were peeking she was probably peeking in quite a bit I didn't really

16   see the male move out of that back-bedroom um but for the most part

17   when I was in the doorway she was staying in the kitchen, and she

18   stayed back. One I wanted to make sure she stayed back, right and

19   then cause I again I don't know what she's capable of and ah two I

20   don't think she wanted to be involved she didn't know him she's like I

21   just get this dude outta here.

22   Moreno:   About how many punches did the patient throw in total?

23   **CAPT.:**   20 to 25 probably. Cause I say we we we fought him man 15 over 15

24   minutes probably 20 minutes somewhere around there it it was a

25   while it seem it seemed that long I.

26   Moreno:   It appeared that long.

27

28

Ruben Escudero

Transcription – Captain  Dyjuan Washington

| | | |
|---|---|---|
| 1 | **CAPT.:** | Yep. |
| 2 | Moreno: | And about how long after um from the time that you arrived from the |
| 3 | | time that he was given Narcan? |
| 4 | **(54:39.9)** | |
| 5 | **CAPT.:** | Ah um maybe two or three minutes. |
| 6 | Moreno: | About two, three minutes? |
| 7 | **CAPT.:** | Yeah. |
| 8 | Moreno: | And when um you and your crew arrived to the house, who was |
| 9 | | already on scene or who was already there before you guys? |
| 10 | **CAPT.:** | Ah sheriff deputies were already there and I wanna say it was just |
| 11 | | Mata and Miranda. |
| 12 | Moreno: | Mata and Miranda? |
| 13 | **CAPT.:** | Mm-hmm. |
| 14 | Moreno: | And where was the patient at? |
| 15 | **CAPT.:** | He in the kitchen. |
| 16 | **(55:00.8)** | |
| 17 | Moreno: | In the kitchen. And then at some point he was brought into the living |
| 18 | | room. |
| 19 | **CAPT.:** | Yes |
| 20 | Moreno: | Okay, and was that by you guys or was that by the deputies? |
| 21 | **CAPT.:** | It was by the deputies. |
| 22 | Moreno: | And ah was that to create for for more space or was there. |
| 23 | **(55:14.8)** | |
| 24 | **CAPT.:** | It was for more space; yea cause the the kitchen was way too small |
| 25 | | um if he if that would've went down in the kitchen holy smokes whoo. |
| 26 | Moreno: | And ah at you had mentioned that at some point the patient grabbed |
| 27 | | |
| 28 | | |

57

Captain Dyjuan Washington Interview Transcript

Ruben Escudero

Transcription – Captain  Dyjuan Washington

| | | |
|---|---|---|
| 1 | | ah the female deputies name or the female's leg which is ah Deputy |
| 2 | | Jessaqua Attlesey. |
| 3 | **CAPT.:** | Mm-hmm. |
| 4 | Moreno: | Tell me more about that. |
| 5 | **(55:36.0)** | |
| 6 | **CAPT.:** | Um so as he as Mata wrestles him to the ground, he's trying to get |
| 7 | | back up and throw punches but she has her baton trying to get |
| 8 | | pressure points so she doesn't have control of his of her of his arm, so |
| 9 | | as he was trying to get up he's going to strike her, right, and I think |
| 10 | | Mata grabs his arm and shoves it back down to the ground, um or |
| 11 | | Miranda one of the other, um so he so he he he can't do so and then |
| 12 | | she switches and tries to get her baton to get his other arm cuffed and |
| 13 | | he's holding on her leg or Miranda's leg she's holding ah he's holding |
| 14 | | on to somebody's legs I don't so it's it's one of the other, um and but |
| 15 | | she's trying to get leverage to get his arm back and un un until I'm able |
| 16 | | to actually step on his back to get him down she able to use her |
| 17 | | leverage to get his arm back and cuff him. |
| 18 | Moreno: | Ah where was Deputy Attlesey positioned at this time when she was. |
| 19 | **CAPT.:** | She was. |
| 20 | Moreno: | Using the baton for leverage. |
| 21 | **(56:28.0)** | |
| 22 | CAPT.: | She was between she was almost like pinned between the couch and |
| 23 | | and the patient. |
| 24 | Moreno: | Aside from um the hand strikes and the knee strikes, were there any |
| 25 | | kicks? |
| 26 | **CAPT.:** | Ah I believe so um I don't I'm I'm not sure if they were knee strikes or |
| 27 | | |
| 28 | | |

58

Captain Dyjuan Washington Interview Transcript

Ruben Escudero

Transcription – Captain  Dyjuan Washington

| | | |
|---|---|---|
| 1 | Moreno: | What would have happened um had no one attempted to restrain the |
| 2 | | patient? |
| 3 | **(59:26.1)** | |
| 4 | **CAPT.:** | He would've kicked all our butts probably. |
| 5 | Moreno: | Um. |
| 6 | **CAPT.:** | Or or or lethal force would've had to had to happen you know it it |
| 7 | | would've got a lot worse I would say. And probably some first |
| 8 | | responders would've got hurt probably pretty bad. |
| 9 | (59:45.5) | |
| 10 | Moreno: | And at this house, um was there anything that you saw as far as drug |
| 11 | | paraphernalia um maybe in the living room in the kitchen or anywhere |
| 12 | | in the house that you were at? |
| 13 | CAPT.: | Um there was some stuff in the bedroom, I can't recall exactly what |
| 14 | | was going on in their cause the male was in there, so I wasn't trying to |
| 15 | | really focus on what he was doing I really wanted to get back to |
| 16 | | focusing on what I I wanted information from him and after he didn't |
| 17 | | have any information for me then I moved back to the living room ah |
| 18 | | to see what was going on with Ruben. |
| 19 | Moreno: | Um were there any items in the house that you saw that could've been |
| 20 | | used as a weapon um had the patient grabbed it or? |
| 21 | CAPT.: | Ah probably in the kitchen, if he would've stayed in the kitchen, it |
| 22 | | would've been all bad cause there's kitchen stuff in there pots, pans, |
| 23 | | knives you know all that stuff so ah if he would've stayed in there it it |
| 24 | | probably could've been a lot worse. |
| 25 | Moreno: | Um was there enough time for the patient to ah react that um law |
| 26 | | enforcement, AMR, and fire were on scene as far as after aside from |
| 27 | | |
| 28 | | |

61

Ruben Escudero

Transcription – Captain  Dyjuan Washington

| | | |
|---|---|---|
| 1 | | the commands that were given to him as far as for him to |
| 2 | | acknowledge or recognize that there was first responders there? |
| 3 | **(1:00:58.2)** | |
| 4 | **CAPT.:** | Yes, this is why we took our time um with when he sat up we laid him |
| 5 | | back down explaining to him the whole way through, um he even |
| 6 | | threw punches and we didn't do anything, right, we just laid him back |
| 7 | | down to tell him to calm down we're here to help you know it wasn't |
| 8 | | til like the third time til he really got violent you know til we had to |
| 9 | | really just let the deputies had to intervene and like the fight was on. |
| 10 | Moreno: | Can you describe the patients built for me please. |
| 11 | **CAPT.:** | Um man is probably six, one, six, two um 235-240. |
| 12 | Moreno: | Um aside from ah the taser strikes, were there any baton strikes? |
| 13 | **CAPT.:** | Ah not that I could recall. |
| 14 | **(1:01:51.7)** | |
| 15 | Moreno: | And do you know whose baton that was that was used to to apply |
| 16 | | pressure points or to control the patients' arms. |
| 17 | **CAPT.:** | Ah I would I would assume it's hers but I'm not 100 percent on that. |
| 18 | Moreno: | Then as far as for um administering Narcan, is there any procedure as |
| 19 | | far as to restrain them first or. |
| 20 | **(1:02:17.3)** | |
| 21 | **CAPT.:** | We yeah we don't have a procedure to restrain him first we might |
| 22 | | have one now but um or being in develop of one that's something that |
| 23 | | we're gonna have to look at for sure. |
| 24 | Ogaz: | How long from the the the from when Ruben threw the first punch |
| 25 | | until the Verset was administered, how how long was that fight in a |
| 26 | | time frame do you would would you guess? |
| 27 | | 62 |
| 28 | | Captain Dyjuan Washington Interview Transcript |

Ruben Escudero

Transcription – Captain  Dyjuan Washington

| | | |
|---|---|---|
| 1 | **CAPT.:** | I'm guessing 15 to 20 minutes. |
| 2 | **(1:02:46.8)** | |
| 3 | Ogaz: | Wow, that's a long fight, okay, um if it wasn't for the Verset would |
| 4 | | you feel that between fire personal and deputies that they could |
| 5 | | would've overcome his resistance? |
| 6 | **CAPT.:** | Um I don't know I I I I can't answer that with 100 percent certainty I |
| 7 | | think he was at the point to where he was gonna fight to the death. |
| 8 | Ogaz: | Okay. |
| 9 | **CAPT.:** | Mm-hmm. |
| 10 | Ogaz: | Do you feel that the force used by deputies and and and the |
| 11 | | (*inaudible*) firefighters don't use force, but the force used by deputies, |
| 12 | | do you feel is reasonable? |
| 13 | **CAPT.:** | I do. |
| 14 | Ogaz: | An and can you tell me more about that why you feel is reasonable? |
| 15 | **CAPT.:** | Um cause I feel like they used the escalation of force, right, um at no |
| 16 | | time were weapons drawn, right, I mean as far as the the they didn't |
| 17 | | draw their their their handguns or anything like that you know, um |
| 18 | | they they tried to talk him through the situation they only threw |
| 19 | | punches after he threw punches um he was only struck after he |
| 20 | | continued to tried to strike and um harm the people that were in the |
| 21 | | room um and then they used whatever means necessary to try to get |
| 22 | | him cuffed. |
| 23 | Ogaz: | Okay. |
| 24 | **(1:04:04.1)** | |
| 25 | **CAPT.:** | Um and even after being tased he's still you know was still coming |
| 26 | | coming at us coming at him so and usually I I'm not a use of force |
| 27 | | | |
| 28 | | | |

63

Captain Dyjuan Washington Interview Transcript

Ruben Escudero

Transcription – Captain  Dyjuan Washington

| | | |
|---|---|---|
| 1 | | expert but usually after tasing, right, comes shooting so. |
| 2 | Ogaz: | Mm-hmm. |
| 3 | **(1:04:17.3)** | |
| 4 | CAPT.: | They did not shoot him so um they continued to try to just cuff him at |
| 5 | | that time. |
| 6 | Ogaz: | Mm-hmm. |
| 7 | **CAPT.:** | And I mean to me that knowing use of force and and being in a a ah a |
| 8 | | air force member and being you know deployed and and having |
| 9 | | R.O.E.'s that you have to abide by I absolutely think the amount of |
| 10 | | force used was appropriate for that situation. |
| 11 | Ogaz: | Okay, so basically, they're just matching equal force with force. |
| 12 | **CAPT.:** | Right. |
| 13 | Ogaz: | He was throwing punches they were throwing punches. |
| 14 | **CAPT.:** | Mm-hmm absolutely. |
| 15 | **(1:04:45.9)** | |
| 16 | Ogaz: | Okay, Um is there anything else that you would would think would be |
| 17 | | important to add anything any concerns you have any any any |
| 18 | | anything else you think you wanna ta talk about? |
| 19 | **CAPT.:** | Um I'm just glad the sheriff were there. |
| 20 | Ogaz: | Okay. |
| 21 | **CAPT.:** | Because if we if I'd if I would have had to go through that with my |
| 22 | | firemen whoo man that would've been rough you know that would've |
| 23 | | been rough. So. |
| 24 | Moreno: | I have three more questions. |
| 25 | **CAPT.:** | Yes sir. |
| 26 | Moreno: | Um what was the intended goal of that call for service? |
| 27 | | |
| 28 | | |

64

Ruben Escudero

Transcription – Captain  Dyjuan Washington

1    **(1:05:12.9)**

2    **CAPT.:**    The intended goal was to get him to the hospital um breathing and

3    conscious.

4    Moreno:    And ah after um the patient was handcuffed and the Verset was given

5    ah to him, what was the intended goal then?

6    **CAPT.:**    To get him to the hospital arid get him stabilized semi-conscious and

7    breathing, right.

8    Moreno:    Um are you familiar with the Narcan dosages?

9    **CAPT.:**    Um I'm not a paramedic so I'm not 100 percent sure on Narcan

10    dosages.

11    Moreno:    Ah um I believe ah my partner touched on it earlier, but was this the

12    first time that you had any issues with anyone coming to Narcan and

13    and being this combative and causing a fight?

14    **CAPT.:**    Absolutely.

15    **(1:06:03.0)**

16    Moreno:    So, um just based off that is that a reason why he wasn't restrained

17    before Narcan was given to him?

18    **CAPT.:**    Absolutely.

19    Moreno:    Okay.

20    Ogaz:    Okay. Hey, I really appreciate your time sir.

21    **CAPT.:**    Oh no problem you're good.

22    Ogaz:    And if we you're a Captain you're a very busy man we took up

23    probably like an hour of your time I'm sure but thank you very much.

24    **CAPT.:**    No problem.

25    Ogaz**:**    We're gonna go off tape it is um 1214 hours.

26

27    65

28    Captain Dyjuan Washington Interview Transcript

EXHIBIT "4"

171909396
H# 2019-106
Typed by: KWalker
Reviewed by:   N. Craig   /   Date:01/14/2020

1    KARLA LUGO INTERVIEW

3    MORENO:         This is Detective Jerry Moreno, present with me is Detective Eric Ogaz,

4                    today is Thursday October 24th, 2019 1852 hours and we're going to

5                    conduct an interview with Karla Lugo at the AMR office located at

6                    14828 7th Street in Victorville, and it's going to be reference report

7                    number 171909396 H number 2019-016 (H#2019-106). Good

8                    afternoon. Um what is your occupation?

10   LUGO:           I'm an EMT for the Victorville AMR division.

12   MORENO:         And for about how long have you been an EMT for AMR?

14   LUGO:           Four and a half years.

16   MORENO:         Four and a half years and what does your training and experience

17                   consist of um with AMR?

19   LUGO:           Ah for EMT's we're just ah basic life support. You know um splints,

20                   control bleedings you know the basic stuff the only things we're not

21                   allowed to do is ah start IV's and give medications. Other than that we

22                   can hands on on anything.

24   MORENO:         Okay, and as far as driving are are.

26   LUGO:           I'm usually the person.

1

171909396
H# 2019-106
Typed by: KWalker
Reviewed by:   N. Craig   /   Date:01/14/2020

1

2   LUGO:          Their names.

3

4   MORENO:        So you just know that the first name of the fire medic is Brett.

5

6   LUGO:          Brett Lever or something like that.

7

8   MORENO:        Okay. And do you know where um north is in relation to this sketch or

9                  this room? No, okay.

10

11  LUGO:          No.

12

13  MORENO:        Mmm okay so you arrive on scene and then um what happens?

14

15  LUGO:          Arrive on scene I went right here I saw my partner go in this way ah like

16                 I said Brett was getting the BVM.

17

18  MORENO:        Mmm-huh.

19

20  LUGO:          Which is a master breath for the patient. Ah he just said "we're gonna

21                 put him on the four leaf" which is gives you a picture of the heart and

22                 then he said "we were gonna get going" that's basically all we got like

23                 "hey we're just gonna get going" and then while I was getting the mega

24                 mover, when we got back he said "let me check check the sugar real

25                 quick" so he did that and that's when we started putting the patient.

26

27

28

16

COSB Rule 26 000948

171909396
H# 2019-106
Typed by: KWalker
Reviewed by:   N. Craig   /   Date:01/14/2020

1  MORENO:     So if I understood correctly, you and your partner Alex you guys arrive
2                       on scene um what you describe and what you drew is what you um
3                       saw.
4
5  LUGO:          Mmm-huh.
6
7  MORENO:     And the fire medic um Brett he was getting the BVM the bag valve
8                       mask ready and then was it him was it Brett that said "get ready to go"
9                       or "get him ready to go" and what did that mean?
10
11 LUGO:          It means he was just gonna do put the get the first ah set of vitals and
12                       then just go.
13
14 MORENO:     And transport him?
15
16 LUGO:          Yes.
17
18 MORENO:     And when you so was it just you that left and grabbed that um the mega
19                       mover or was.
20
21 LUGO:          No, I think my partner went ah my partner went with me he was by the
22                       ah by the gurney he got it out of the back I was walking out so I was
23                       standing with him outside and then he gave it to me and I walked back
24                       in and he followed.
25
26 MORENO:     Okay, so once you retrieve this mega mover, what happens next?
27
28                                                          17

171909396
H# 2019-106
Typed by: KWalker
Reviewed by:    N. Craig   /   Date:01/14/2020

| | | |
|---|---|---|
| 1 | LUGO: | Ah we started getting it ready put the to put the patient on top we roll |
| 2 | | him to one side then we got it underneath him, and then we have to roll |
| 3 | | him to the opposite side to get the rest of it in. Ah once we rolled him to |
| 4 | | the so ah the second time to get him completely on it that's when he |
| 5 | | woke up. |
| 6 | | |
| 7 | MORENO: | And describe this um mega mover is it like a |
| 8 | | |
| 9 | LUGO: | Just like a tarp. |
| 10 | | |
| 11 | MORENO: | Uh-huh. |
| 12 | | |
| 13 | LUGO: | That we use to move the patients. |
| 14 | | |
| 15 | MORENO: | Okay. Is is it like plastic is it you know what's it made of? |
| 16 | | |
| 17 | LUGO: | It was it feels like it's not plastic it feels like fiber like super resistant |
| 18 | | one. |
| 19 | | |
| 20 | MORENO: | Okay. And that's used to assist you guys in carrying patients? |
| 21 | | |
| 22 | LUGO: | Yes. |
| 23 | | |
| 24 | MORENO: | Okay. And you were saying that this room was small. |
| 25 | | |
| 26 | LUGO: | Yes. |
| 27 | | |
| 28 | | 18 |

171909396
H# 2019-106
Typed by: KWalker
Reviewed by:   N. Craig   /   Date:01/14/2020

| | | |
|---|---|---|
| 1 | | |
| 2 | LUGO: | Yes. |
| 3 | | |
| 4 | MORENO: | The patient and the first responders? |
| 5 | | |
| 6 | LUGO: | Yes. |
| 7 | | |
| 8 | MORENO: | Okay. So once you guys get ah the patient on the mega mover, what |
| 9 | | happens? |
| 10 | | |
| 11 | LUGO: | He woke up. |
| 12 | | |
| 13 | MORENO: | Tell me more about that. |
| 14 | | |
| 15 | LUGO: | And that's when he just ah I remember his ah sorry ah I remember he |
| 16 | | went cause when he woke up he sat up and I just remember his eyes |
| 17 | | they were big like big it was kind of like this crazy crazy look that we get |
| 18 | | sometimes from people. |
| 19 | | |
| 20 | MORENO: | Now. |
| 21 | | |
| 22 | LUGO: | Ah after that like I said that's when like "who are you guys, what are you |
| 23 | | guys doing here" ah we just ah they just kept repeating that they were |
| 24 | | just there to help between fire, my partner and sheriff. Ah like I said he |
| 25 | | didn't listen and that's when things got a little out of hand and he just |
| 26 | | started fighting everybody. |
| 27 | | |
| 28 | | 20 |

171909396
H# 2019-106
Typed by: KWalker
Reviewed by:   N. Craig   /   Date:01/14/2020

2  LUGO:           Mmm-huh yes.

4  MORENO:         Okay. Now when you say that "the patient started fighting" it um arti
5                  explain what he was doing as far as fighting.

7  LUGO:           Okay so once he noticed or figured out that we weren't going anywhere,
8                  ah he tried to get up and like I said they were trying to hold him down
9                  he was talking pretty aggressively ah he just kept saying ah "just leave
10                 me alone I don't need you guys I don't need your help I'm fine" and he
11                 was told like I said multiple times to calm down and he didn't and then
12                 he just started swinging I remember he threw the first one ah he didn't
13                 hit anybody that I saw on that time and then like I said ah that's when
14                 mostly sheriff at this point were trying to control him. Ah as soon as he
15                 started as soon as he started swinging and stuff like that I looked at my
16                 partner and he was on top of the couch he just he just stood back from
17                 that. He just ah kind of got actually since the room was so small he had
18                 to actually jump on top of the couch.

20 MORENO:         Okay.

22 LUGO:           And that's when I started seeing that it was just too small for all that
23                 people there I just that's when I stepped out of the door like completely
24                 out of the house.

26 MORENO:         About how many punches did the patient throw um before deputies
27                 intervened?

28                            22

171909396
H# 2019-106
Typed by: KWalker
Reviewed by:   N. Craig   /   Date:01/14/2020

| | | |
|---|---|---|
| 1 | | |
| 2 | LUGO: | Easily five. |
| 3 | | |
| 4 | MORENO: | About five, and did you see those punches land? |
| 5 | | |
| 6 | LUGO: | I didn't see him actually being able to hit anybody. |
| 7 | | |
| 8 | MORENO: | Okay, so was he swinging um he was swinging at was he swinging at a |
| 9 | | certain person or was. |
| 10 | | |
| 11 | LUGO: | Whoever he could get I guess he was just swinging like I said just |
| 12 | | everywhere anywhere he was kicking too so you could tell he was just |
| 13 | | trying to get people off him. |
| 14 | | |
| 15 | MORENO: | Now if one of those punches would have landed, what would've |
| 16 | | happened? |
| 17 | | |
| 18 | LUGO: | I'm sure things were gonna escalate way faster. |
| 19 | | |
| 20 | MORENO: | Alright. Would you describe the punches as soft, hard, fast. |
| 21 | | |
| 22 | LUGO: | No. It was hard and fast. |
| 23 | | |
| 24 | MORENO: | And um at that point right before the patient started fighting, um did fire, |
| 25 | | AMR or the deputies identify themselves? |
| 26 | | |
| 27 | LUGO: | I don't remember that. |
| 28 | | 23 |

171909396
H# 2019-106
Typed by: KWalker
Reviewed by:   N. Craig   /   Date:01/14/2020

| 1 | | |
|---|---|---|
| 2 | LUGO: | Yes, like I said we use it to ah well medics use it to um when they |
| 3 | | suspect opioids overdose. |
| 4 | | |
| 5 | MORENO: | And about how many times with your experience um or working with |
| 6 | | AMR have you seen and um a medic or yeah a medic provide Narcan |
| 7 | | to an overdose patient? |
| 8 | | |
| 9 | LUGO: | Quite a few. |
| 10 | | |
| 11 | MORENO: | And what's their reactions like? |
| 12 | | |
| 13 | LUGO: | It's all different for every patient. They all react different there's no |
| 14 | | standard of how someone is gonna react to that. |
| 15 | | |
| 16 | MORENO: | Okay. Um what's the most common reaction from your experience? |
| 17 | | |
| 18 | LUGO: | I've had some that they just wake up and they just sit there and I had |
| 19 | | other ones a little less ah more they get a little bit more aggressive but |
| 20 | | ah this is the first time I've seen it going like that like when the patient |
| 21 | | wakes up ah agitated like that and starts fighting it's my first experience. |
| 22 | | |
| 23 | MORENO: | Okay. Okay. So getting back to the um store so then at this point um |
| 24 | | we're talking about the patient started to throw punches and then the |
| 25 | | deputies intervened so tell me what happened next. |
| 26 | | |
| 27 | | |
| 28 | | |

COSB Rule 26 000958

**171909396**
**H# 2019-106**
**Typed by: KWalker**
**Reviewed by:   N. Craig   /   Date:01/14/2020**

| | | |
|---|---|---|
| 1 | | was still um facing down and and then after like a minute or two that |
| 2 | | didn't work the patient just started fighting again and after like a minute |
| 3 | | or two she used it another time and I didn't know I don't know where |
| 4 | | that one landed. |
| 5 | | |
| 6 | MORENO: | Um what did the female deputy say before she applied that taser before |
| 7 | | she used the taser? |
| 8 | | |
| 9 | LUGO: | I didn't hear anything. |
| 10 | | |
| 11 | MORENO: | Okay. And the first one you did you say that she shot it? |
| 12 | | |
| 13 | LUGO: | Mmm-huh. |
| 14 | | |
| 15 | MORENO: | And about how close was she from what you remember? |
| 16 | | |
| 17 | LUGO: | Two feet maybe she was pretty let's say she was by the feet of the |
| 18 | | patient, and from that angle she shot it wasn't direct contact. |
| 19 | | |
| 20 | MORENO: | Okay so then at that time what when she um used the taser where were |
| 21 | | the deputies at in relation to the patient? |
| 22 | | |
| 23 | LUGO: | At this point they were like right next to the patient. |
| 24 | | |
| 25 | MORENO: | Okay. |
| 26 | | |
| 27 | LUGO: | Over here. |
| 28 | | |

30

COSB Rule 26 000962

171909396
H# 2019-106
Typed by: KWalker
Reviewed by:   N. Craig   /   Date:01/14/2020

1

2   MORENO:         And I'm sorry you said that the taser's prongs struck where?

3

4   LUGO:            The first one in the back the second one I didn't see.

5

6   MORENO:         You said patient's back and about now when she used the taser did

7                        that work?

8

9   LUGO:            No, it just ah well the patient ah did react to it he went like tense and

10                      then he just started cursing and saying ah just like screaming in pain

11                      kind of thing too.

12

13  MORENO:         Okay.

14

15  LUGO:            But after that feeling went away he just went back at swinging and

16                      kicking and everything started fighting again.

17

18  MORENO:         About how long would you say was the patient ah um.

19

20  LUGO:            Not long it was about five to ten seconds.

21

22  MORENO:         Okay, and then when you said "that after that the taser stopped

23                      working" what do you mean by he started um kicking and fighting and.

24

25  LUGO:            Ah like I said he got tense with the with the first taser.

26

27  MORENO:         Mmm-huh.

28                                            31

171909396
H# 2019-106
Typed by: KWalker
Reviewed by:   N. Craig   /   Date:01/14/2020

| | | |
|---|---|---|
| 1 | | |
| 2 | LUGO: | And then after five ten seconds he was able to move again and then |
| 3 | | that's when he started fighting. |
| 4 | | |
| 5 | MORENO: | Okay. And during that time was he on his st on his stomach on his |
| 6 | | knees was he on his feet? |
| 7 | | |
| 8 | LUGO: | Ah he I don't believe he made it to his feet. |
| 9 | | |
| 10 | MORENO: | Okay. |
| 11 | | |
| 12 | LUGO: | Every time he was trying to get up they were trying to hold him down. |
| 13 | | |
| 14 | MORENO: | Okay. And how was he punching at that moment after the taser was |
| 15 | | applied? |
| 16 | | |
| 17 | LUGO: | Ah when he got tased the first time he kind of went on his side and |
| 18 | | that's when ah he ended up on his back and that's when he tried to get |
| 19 | | up again and then he was like on his back and he was swinging. |
| 20 | | |
| 21 | MORENO: | About how many punches did the patient um use at that moment or |
| 22 | | throw? |
| 23 | | |
| 24 | LUGO: | Quite a few was about easily ten between the punches and kicks. |
| 25 | | |
| 26 | MORENO: | Did any of those punches or kicks land? |
| 27 | | |
| 28 | | 32 |

171909396
H# 2019-106
Typed by: KWalker
Reviewed by:   N. Craig   /   Date:01/14/2020

1

2   MORENO:      When you initially arrived then you first saw the patient, did you see any

3                       injuries on on his person?

4

5   LUGO:         No.

6

7   MORENO:      Um at ah any time did ah you or any of your partners grab um the

8                       patient's feet?

9

10   LUGO:        No.

11

12   MORENO:      Okay.

13

14   LUGO:         Wait if the patient or my partner did?

15

16   MORENO:      No, no if ah you or your partner or any of the fire personal grabbed a

17                       hold of the patient's feet or legs?

18

19   LUGO:         No.

20

21   MORENO:      Okay.

22

23   LUGO:         Like I said before I tried to like hold him with my I put my foot like just to

24                       hold him down but it didn't work so.

25

26   MORENO:      And at what point was that?

27

28                                              40

171909396
H# 2019-106
Typed by: KWalker
Reviewed by:   N. Craig   /   Date:01/14/2020

1    LUGO:          Right at the beginning when he woke up.

2

3    MORENO:        So it was right when the incident first started happening.

4

5    LUGO:          Mmm-huh.

6

7    MORENO:        And was it before or after the deputies intervened?

8

9    LUGO:          That was before.

10

11   MORENO:        Was it before he started punching or after?

12

13   LUGO:          Before he started punching.

14

15   MORENO:        Okay. And ah at what point did you back off or did you um let go of the

16                  feet or the patient's foot?

17

18   LUGO:          Oh like I said I just tried it once or twice just like kind of stimulate pain or

19                  something and I did it about two times it didn't work I just like.

20

21   MORENO:        Okay. Ah was the suspect handcuffed at any point?

22

23   LUGO:          At the end before we move him ah he was he was handcuff yeah.

24

25   MORENO:        Did you see how he was handcuffed or who handcuffed him?

26

27   LUGO:          No.

28

                                        41

171909396
H# 2019-106
Typed by: KWalker
Reviewed by:   N. Craig   /   Date:01/14/2020

1

2  MORENO:          Um at any point did you see um any anyone um kick the patient?

3

4  LUGO:            No.

5

6  MORENO:          Did you see anyone apply ah knee strikes to the patient?

7

8  LUGO:            No.

9

10 MORENO:          Ah did you see anyone um punch or strike the patient?

11

12 LUGO:            Mmm-huh.

13

14 MORENO:          Um aside from the taser being deployed per say, um was the taser
15                  used to strike the patient?

16

17 LUGO:            I don't know. I didn't see any of the actual punches or anything like that.
18

19 MORENO:          Okay. So the time that you were in there ah in the room watching you
20                  didn't see you saw the suspect punching you don't recall if it landed or if
21                  it connected with anyone?

22

23 LUGO:            Mmm-huh.

24

25 MORENO:          Um but you didn't see anyone else um aside from holding him or or
26                  trying to hold him down, you didn't see anyone ah strike him?

27

28                                          42

171909396
H# 2019-106
Typed by: KWalker
Reviewed by:   N. Craig   /   Date:01/14/2020

1   LUGO:            Correct besides ah wrestling with him I didn't actually see any punches.

2

3   MORENO:       Okay. And about how long would you say ah you were in the room

4                        watching for?

5

6   LUGO:            After he woke up, about a minute.

7

8   MORENO:       Okay. And at any time did you see any of the punches or any of the

9                        patient's kicks um hit anybody in the room?

10

11  LUGO:            Mmm-huh, no.

12

13  MORENO:       And ah how was the patient's ah placed in the ambulance?

14

15  LUGO:            Ah he we move him with the mega mover and we just put him with ah

16                       facing up on the gurney. Strap him seat belts and then we started

17                       going.

18

19  MORENO:       And ah what um and at that point when the patient was placed into the

20                       ambul into the ambulance, what was his demeanor like?

21

22  LUGO:            He looked ah unresponsive he was unresponsive that's why we were

23                       trying to breathe for him.

24

25  MORENO:       Okay. And what what do you believe what what happened there why

26                       why was he unresponsive?

27

28                                                        43

171909396
H# 2019-106
Typed by: KWalker
Reviewed by:    N. Craig   /   Date:01/14/2020

| | | |
|---|---|---|
| 1 | LUGO: | Ah when they got him out of the of the house he was full of blood. |
| 2 | | |
| 3 | MORENO: | Uh-huh. |
| 4 | | |
| 5 | LUGO: | Ah he's right eye was shut close and the left one it almost seemed like |
| 6 | | it was a lot of inflammation there. |
| 7 | | |
| 8 | MORENO: | Okay. And was the Versed already applied when the patient was being |
| 9 | | um taken into the ambulance? |
| 10 | | |
| 11 | LUGO: | Yes. |
| 12 | | |
| 13 | MORENO: | Okay. And what effects does ah Versed have on patients? |
| 14 | | |
| 15 | LUGO: | Versed is basically ah it just shuts you down it just puts you sometimes |
| 16 | | you can feel and see things but you can't really you don't have the |
| 17 | | strength to move a lot. |
| 18 | | |
| 19 | MORENO: | Oh and what ah why do you believe Versed is used in general? |
| 20 | | |
| 21 | LUGO: | Ah it's actually there is a protocol for medics to use Versed it's called for |
| 22 | | ah ah delirium so that's. |
| 23 | | |
| 24 | MORENO: | Excited delirium is that. |
| 25 | | |
| 26 | LUGO: | Excited delirium. |
| 27 | | |
| 28 | | 44 |

171909396
H# 2019-106
Typed by: KWalker
Reviewed by:   N. Craig   /   Date:01/14/2020

MORENO:       Okay. And ah do you believe that the Versed helped calm the patient down?

LUGO:         Yes.

MORENO:       Do you what do you believe would have happened had the Versed not been applied?

LUGO:         He was probably never gonna calm down.

MORENO:       He was gonna continue fighting?

LUGO:         He was just gonna continue fighting like he had for I don't know how long the entire thing lasted but he never stopped fighting.

MORENO:       In your opinion would you say that the Versed was somewhat successful to calm the person down to get him transported?

LUGO:         Yes.

MORENO:       Okay. And then you had mentioned the patient had blood on him, um did you see when you were inside the room and you were watching um him punch and the deputies wrestle with him, was he bleeding then?

LUGO:         No he he didn't have any blood.

46

COSB Rule 26 000978

171909396
H# 2019-106
Typed by: KWalker
Reviewed by:   N. Craig   /   Date:01/14/2020

1  MORENO:       So when when you were watching you didn't see any any blood?

2

3  LUGO:          Mmm-huh.

4

5  MORENO:       It wasn't until he was brought out.

6

7  LUGO:          Yes.

8

9  MORENO:       And placed into and who brought him out?

10

11  LUGO:          Ah it was I'm not completely sure but usually it's just in between fire and

12                 AMR that we carry people out.

13

14  MORENO:       Okay.

15

16  LUGO:          I was outside at this point just holding the gurney for them to put it on

17                 the gurney.

18

19  MORENO:       And after he placed into the ambulance um he was transported to what

20                 hospital?

21

22  LUGO:          Victor Valley Global.

23

24  MORENO:       And was it you that that drove?

25

26  LUGO:          Yes. I was.

27

28                              47

171909396
H# 2019-106
Typed by: KWalker
Reviewed by:   N. Craig   /   Date:01/14/2020

| | | |
|---|---|---|
| 1 | LUGO: | There's no rules. |
| 2 | | |
| 3 | MORENO: | There's nothing on that, okay. And ah how bout for the Versed is is |
| 4 | | there anyth an like any special way that that has to be administered um |
| 5 | | if they have to be restrained or in a certain position or anything like |
| 6 | | that? |
| 7 | | |
| 8 | LUGO: | No there's no. |
| 9 | | |
| 10 | MORENO: | Okay. And ah were you aware of any type of um warnings that may or |
| 11 | | may not have been given to um anyone in the room before Narcan was |
| 12 | | applied? |
| 13 | | |
| 14 | LUGO: | I wasn't there. |
| 15 | | |
| 16 | MORENO: | Okay. |
| 17 | | |
| 18 | LUGO: | When it was applied so I don't know anything about that. |
| 19 | | |
| 20 | MORENO: | Ah what do you believe would have happened had the deputies not |
| 21 | | attempted to restrain the patient? |
| 22 | | |
| 23 | LUGO: | Um it was probably gonna end up at I mean it it took three of em and |
| 24 | | they couldn't get him to calm down or get him to stay down it took a |
| 25 | | while so I can only imagine if we didn't have people there to help if it |
| 26 | | was just my partner and me and the fire or just me and my partner |
| 27 | | there's no way we could've handle him on our own. |
| 28 | | 52 |

171909396
H# 2019-106
Typed by: KWalker
Reviewed by:   N. Craig   /   Date:01/14/2020

1

2   LUGO:          I don't know if they did cause after you know we left and I don't know if

3                  they did.

4

5   MORENO:        Okay, aside from the three deputies and the fire personal and you and

6                  your partner, was anyone else involved with that incident there?

7

8   LUGO:          No just fire, sheriff and us.

9

10  MORENO:        Okay.

11

12  OGAZ:          Now I I some of these questions you may have already asked and

13                 answered but just in case I'm just gonna kind of go through em, um that

14                 that mega mover, cause you brought a gurney up but then you decided

15                 to use this mega mover, what what's the decision you use the mega

16                 mover why?

17

18  LUGO:          It was so tiny the gurney didn't fit in there.

19

20  OGAZ:          Okay so there's room is small.

21

22  LUGO:          So we left, yes room is small so gurney didn't fit there's no way the

23                 patient was walking out of that room so that's why we decided to grab

24                 the mega mover and then just get him out of the room.

25

26  OGAZ:          Okay. Now you said at some point he woke up, um when he woke up

27                 did you did you hear anybody identify themselves saying like "hey

28                                          55

171909396
H# 2019-106
Typed by: KWalker
Reviewed by:    N. Craig   /   Date:01/14/2020

| 1 | | sheriff department" or "fire department" you know just basically "hey |
| 2 | | calm down we're here to help you"? |
| 3 | | |
| 4 | LUGO: | Mmm-huh. |
| 5 | | |
| 6 | OGAZ: | You described or you you said you recognized one deputy in the |
| 7 | | photographs, and then one female deputy, one male deputy one female |
| 8 | | deputy, can you describe the other deputy that was on scene? |
| 9 | | |
| 10 | LUGO: | Hispanic that's all I can. |
| 11 | | |
| 12 | OGAZ: | Taller, shorter, you describe his hair do you know? |
| 13 | | |
| 14 | LUGO: | He was far from me so I didn't really take a look at him that good. |
| 15 | | |
| 16 | OGAZ: | When he first woke up and you say he sat up and then um at some |
| 17 | | point he the patient threw the first punch, correct? |
| 18 | | |
| 19 | LUGO: | Yes. |
| 20 | | |
| 21 | OGAZ: | Once he threw the first ah first punch, how many punches did he throw? |
| 22 | | |
| 23 | LUGO: | I guess ah easily five more than that. |
| 24 | | |
| 25 | OGAZ: | Okay, and what was the reaction of the deputies or fire personal when |
| 26 | | he when he first threw those punches? |
| 27 | | |
| 28 | | 56 |

171909396
H# 2019-106
Typed by: KWalker
Reviewed by:   N. Craig   /   Date:01/14/2020

| | | |
|---|---|---|
| 1 | LUGO: | Ah that's when they started being a little bit more aggressive as in |
| 2 | | holding him down. |
| 3 | | |
| 4 | OGAZ: | Okay so they just so the patient threw approximately five or six |
| 5 | | punches, at and I think correct me if I'm wrong cause I'm repeating |
| 6 | | what you what you stated, at whoever was around, correct? |
| 7 | | |
| 8 | LUGO: | Yes. |
| 9 | | |
| 10 | OGAZ: | And so their first reaction was not to punch back it was to just hold the. |
| 11 | | |
| 12 | LUGO: | It was more like jumped on him try to hold him. |
| 13 | | |
| 14 | OGAZ: | Use their body weight? |
| 15 | | |
| 16 | LUGO: | Yes. |
| 17 | | |
| 18 | OGAZ: | And was that successful? |
| 19 | | |
| 20 | LUGO: | No. |
| 21 | | |
| 22 | OGAZ: | Okay, why was that not successful? |
| 23 | | |
| 24 | LUGO: | The patient was still able to ah get out of their hold and started swinging |
| 25 | | again. |
| 26 | | |
| 27 | OGAZ: | Okay, did you see how he got out of their hold? |
| 28 | | |

57

COSB Rule 26 000989

171909396
H# 2019-106
Typed by: KWalker
Reviewed by:    N. Craig    /    Date:01/14/2020

1

2    LUGO:            No it's like I said he was jus wrestling around them trying to get away

3                    from them.

4

5    OGAZ:            So basically what you described is they're kind of on top of him, how

6                    many deputies are on top of him at that time?

7

8    LUGO:            Ah at first it was just the two males.

9

10   OGAZ:            Okay. And how were they on top of him?

11

12   LUGO:            More like ah knees on the floor and he their upper body on him.

13

14   OGAZ:            And he still had enough strength to get himself up, how did he get

15                   himself up, was like a push up position, did he turn left or right did you

16                   see how he actually got up?

17

18   LUGO:            Ah don't remember exactly how.

19

20   OGAZ:            Okay. Now you said that the you saw the first taser being deployed,

21                   how do you know that the taser was deployed a second time?

22

23   LUGO:            I saw it.

24

25   OGAZ:            You did see it?

26

27   LUGO:            Mmm-huh, I saw the first one.

28                                    58

171909396
H# 2019-106
Typed by: KWalker
Reviewed by:   N. Craig   /   Date:01/14/2020

| | | |
|---|---|---|
| 2 | OGAZ: | Uh-huh. |
| 4 | LUGO: | And I saw the second deployment I just didn't see where it landed. |
| 6 | OGAZ: | Where it landed, okay. Now when you stepped out of the out of the |
| 7 | | room and out of visual, as far as the altercation was being was |
| 8 | | happening, did you still still hear commands um from either fire |
| 9 | | personal or deputies to like you know what were the fire do you still |
| 10 | | hear them talking to the patient, what were they saying? |
| 12 | LUGO: | "Calm down, you need to stop, stop resisting" just commands like that. |
| 14 | OGAZ: | And how long how how many times did you hear these commands how |
| 15 | | long did that go on, was it the entire. |
| 17 | LUGO: | Throughout the entire time. |
| 19 | OGAZ: | The entire time, so it never stopped they were constantly saying "calm |
| 20 | | down, stop resisting"? |
| 22 | LUGO: | Mmm-huh. |
| 24 | OGAZ: | Okay. Now you're in school right now for? |
| 26 | LUGO: | Paramedic. |

59

171909396
H# 2019-106
Typed by: KWalker
Reviewed by:   N. Craig   /   Date:01/14/2020

1

2   LUGO:          To that room.

3

4   OGAZ:          Mmm-huh.

5

6   LUGO:          And I never went.

7

8   OGAZ:          Was anything obstructing.

9

10  LUGO:          That far.

11

12  OGAZ:          Your view from seeing back there?

13

14  LUGO:          It was a it was a the wall.

15

16  OGAZ:          Uh-huh.

17

18  LUGO:          And then that entrance only.

19

20  OGAZ:          Okay.

21

22  LUGO:          So.

23

24  OGAZ:          When the female deputy applied the taser the first time, and you said

25                 you saw the darts strike the patient, what did the other deputies do at

26                 that time when right you said it was effective for a second he kind of

27

28                                         69

171909396
H# 2019-106
Typed by: KWalker
Reviewed by:   N. Craig   /   Date:01/14/2020

1   cringed, what were the other deputies doing did they did they still were

2   they still hands on, did they step away?

3

4   LUGO:   No, the one that was next to me ah the deputy, I saw him just like stood

5   back for a little bit.

6

7   OGAZ:   Okay. So.

8

9   LUGO:   Same with the female she didn't jumped on him or nothing she was just

10   still still standing next to me kind of next to me.

11

12   OGAZ:   So did it appear to you like basically after she applied the the taser that

13   they kind of stepped back to allow the taser to do it's job and they

14   didn't.

15

16   LUGO:   Yes.

17

18   OGAZ:   They didn't try and do anything extra?

19

20   LUGO:   No.

21

22   OGAZ:   Okay. Now you mention when your your partner went to go get the

23   Versed, um and he left the house, did he run down to the ambulance or

24   did he like walk down, was it a fast pace was it a slow pace was he

25   taking his time was he in a hurry?

26

27

28   70

171909396
H# 2019-106
Typed by: KWalker
Reviewed by:   N. Craig   /   Date:01/14/2020

| | | |
|---|---|---|
| 1 | LUGO: | No, he was we say power walking he wasn't running but he wasn't just |
| 2 | | walking he was like. |
| 3 | | |
| 4 | OGAZ: | Okay. Have you had any training I know you said you haven't seen |
| 5 | | excited delirium before, but have you had any training in it? |
| 6 | | |
| 7 | LUGO: | No, we we don't really get training on that specific matter it's just like |
| 8 | | this is how it looks this is like you need to learn how to recognize it. |
| 9 | | |
| 10 | OGAZ: | And upon recognizing it, what do they suggest you do what's what's the |
| 11 | | what are you told about that? |
| 12 | | |
| 13 | LUGO: | Ah I've been told that you are never gonna win against them. |
| 14 | | |
| 15 | OGAZ: | Okay. |
| 16 | | |
| 17 | LUGO: | They're just super strong and nothing nothing is gonna call them calm |
| 18 | | them down. |
| 19 | | |
| 20 | OGAZ: | So what was your perception of how the patient was reacting. |
| 21 | | |
| 22 | LUGO: | Just like that he was extremely strong for being able to get away from |
| 23 | | three sheriff officers hold. |
| 24 | | |
| 25 | OGAZ: | Okay. Um when you so were you surprised that that altercation lasted |
| 26 | | so long? |
| 27 | | |
| 28 | | |

71

171909396
H# 2019-106
Typed by: KWalker
Reviewed by:   N. Craig   /   Date:01/14/2020

| | | |
|---|---|---|
| 1 | LUGO: | Ah I will say so I mean there was three sheriff there um I thought it was |
| 2 | | gonna be a little faster for them to get him to calm down or to get a hold |
| 3 | | on him and restrain him but like I said he just kept fighting. |
| 4 | | |
| 5 | OGAZ: | Okay. From what you observed with him throwing punches at the |
| 6 | | deputies or at ARM or at fire cause you said he was throwing at |
| 7 | | everybody, was the force that you observed the deputies apply to the |
| 8 | | patient, do you feel that was a reasonable amount of force or |
| 9 | | unreasonable? |
| 10 | | |
| 11 | LUGO: | For what I saw the way they were wrestling around it was what it |
| 12 | | needed to be done. |
| 13 | | |
| 14 | OGAZ: | Okay. Um so you feel it was you feel it was reasonable that they do |
| 15 | | they do anything that you felt was excessive that you observed? |
| 16 | | |
| 17 | LUGO: | That I observed, nnn no. |
| 18 | | |
| 19 | OGAZ: | Once the suspect was handcuffed, did you observe anyone striking or |
| 20 | | hitting him? |
| 21 | | |
| 22 | LUGO: | No after he was handcuffed, no. |
| 23 | | |
| 24 | OGAZ: | Okay. How did the did you see the deputies after the patient was |
| 25 | | brought out did you see them at all? |
| 26 | | |
| 27 | | |
| 28 | | 72 |

171909396
H# 2019-106
Typed by: KWalker
Reviewed by:   N. Craig   /   Date:01/14/2020

| | | |
|---|---|---|
| 1 | LUGO: | After we got him out I was bagging ah I was providing oxygen to the |
| 2 | | patient and I know I I kind of went like this and I saw one of the deputies |
| 3 | | kind of covered in blood. |
| 4 | | |
| 5 | OGAZ: | Okay. Besides the blood and everything how did how did they look I |
| 6 | | mean do they do they look like they were worn out, hurt, shock? |
| 7 | | |
| 8 | LUGO: | More like worn out. I. |
| 9 | | |
| 10 | OGAZ: | Oh yeah. |
| 11 | | |
| 12 | LUGO: | I didn't see him or her that complaining of anything. |
| 13 | | |
| 14 | OGAZ: | Okay. |
| 15 | | |
| 16 | MORENO: | I just have a couple more more questions, um after the patient was |
| 17 | | escorted or taken out of the apartment, did you look inside the |
| 18 | | apartment? |
| 19 | | |
| 20 | LUGO: | Not at all. |
| 21 | | |
| 22 | MORENO: | Um ah what do you believe led um to the patient being detained? |
| 23 | | |
| 24 | LUGO: | Meaning as in they finally got him handcuffed? |
| 25 | | |
| 26 | MORENO: | Yes. |
| 27 | | |
| 28 | | 73 |

171909396
H# 2019-106
Typed by: KWalker
Reviewed by:   N. Craig   /   Date:01/14/2020

1   LUGO:   Ah either he got tired, the Versed worked or they were finally able to get

2   a good hold on him enough to restrain him.

3

4   MORENO:   Okay. Ah how did you feel during this incident?

5

6   LUGO:   I did not wanted to be there. Um.

7

8   MORENO:   And why is that?

9

10   LUGO:   I'm the kind of person that doesn't like confrontation so as soon as I see

11   something I remove myself from it.

12

13   MORENO:   Now is it more because you were concerned or was it you what ah what

14   was your mindset what were you thinking?

15

16   LUGO:   For me I was just looking for my safety I mean if he's punching, kicking

17   and throwing things everywhere like as in everybody was trying to

18   wrestle him, I was more looking towards my I wanna be safe I'm

19   stepping out of the room.

20

21   MORENO:   Okay. And that's the primary reason why you stepped out was because

22   you were your safety you don't wanna get hit?

23

24   LUGO:   Yes. Tiny room everybody just wrestling around.

25

26

27

28                                        74

171909396
H# 2019-106
Typed by: KWalker
Reviewed by:   N. Craig   /   Date:01/14/2020

1  MORENO:  Okay and now did that block your view as far as what you were seeing

2  so what is it fair to say that you were looking at someone looking at her

3  back or facing her back at that time?

4

5  LUGO:  We didn't completely block my view because I was able to see where

6  the taser landed.

7

8  MORENO:  Okay.

9

10  LUGO:  Partially, yes.

11

12  MORENO:  Okay. So partially obstructed your your your view, um how bout the the

13  fire personal I know your partner jumped on top of the couch for his

14  safety but how bout the fire personal, do you recall what was going on

15  with them when all this was transpiring?

16

17  LUGO:  I just saw ah the fire medic he was towards the side too.

18

19  MORENO:  Okay. And is that towards if you're looking in to the apartment, towards

20  the left side?

21

22  LUGO:  Towards the left.

23

24  MORENO:  Okay.

25

26  OGAZ:  I just need to clarify, when you saw the deputy deploy her taser, what

27  was the patient doing at that time?

28

77

171909396
H# 2019-106
Typed by: KWalker
Reviewed by:   N. Craig   /   Date:01/14/2020

1

2    LUGO:          He was fighting.

3

4    OGAZ:          You say fighting like.

5

6    LUGO:          Fighting as in trying to get up and swinging and kicking.

7

8    OGAZ:          Okay.

9

10   MORENO:        Ah I have no further questions.

11

12   OGAZ:          I have no further questions.

13

14   MORENO:        It is 2019 hours and this concludes the interview.

15

16

17

18

19

20

21

22

23

24

25

26

27

28                                            78

EXHIBIT "5"

171909396
H# 2019-106
Typed by: KWalker
Reviewed by:   N. Craig   /   Date: 01/15/2020

1   ALEX GABLER INTERVIEW

3   MORENO:   This is Detective Jerry Moreno present with my is Sergeant Joseph
4   Steers, today is Thursday October 24th, 2019 0853 hours and we're
5   going to conduct an interview with Alex Gabler at the AMR office
6   located at 14828 7th Street in Victorville and it's gonna be reference ah
7   report number 171909396 H number 2019-106. Morning.

8   [00:34]

9   GABLER:   Good morning.

11   MORENO:   Um what's your ah occupation?

13   GABLER:   Ah paramedic for American Medical Response here in Victorville.

15   MORENO:   And how long have you been a paramedic with AMR?

17   GABLER:   Um I've been a paramedic with AMR for just over a year um I've been
18   employed with AMR for about three and a half now.

20   MORENO:   Can you tell me about your ah training and experience with AMR?

22   GABLER:   Um I worked as ah a emergency medical technician prior had ah like I
23   said about two years' experience doing that just learning the basics how
24   to run 9-1-1 calls I spent a year and some change in paramedic school
25   um with that I've been working as a paramedic in the field by myself for
26   like I said about a year and a half now.

28   1

COSB  004816

171909396
H# 2019-106
Typed by: KWalker
Reviewed by:   N. Craig   /  Date: 01/15/2020

| 1 | MORENO: | And what's your shift or your current shift? |
| 2 | | |
| 3 | GABLER: | Um I work seven 30 seven A it's a 24-hour shift in Apple Valley the shift |
| 4 | | I was working the day of was an overtime shift. |
| 5 | | |
| 6 | MORENO: | Okay, and on um Saturday October 19th, 2019, did you respond to |
| 7 | | 16927 Monte Vista Street in Victorville? |
| 8 | | |
| 9 | GABLER: | Yes. |
| 10 | | |
| 11 | MORENO: | Tell me about that. |
| 12 | [01:37] | |
| 13 | GABLER: | Um around 8:45, nine in the morning we had just came on shift we were |
| 14 | | posted at Palmdale and the 15 Freeway ah normal post for us normal |
| 15 | | morning start, ah we responded to a call for service at the address |
| 16 | | stated for a overdose um we were initially told to stage our response |
| 17 | | time estimated from where we were to the address was roughly six |
| 18 | | minutes ah before we even got to a location to stage we were cleared |
| 19 | | in. Ah we arrived on scene second behind two ah officer vehicles and a |
| 20 | | medic engine 311. As we were pulling up they were walking in, ah we |
| 21 | | got our gear together ah loaded up went in to the front door where we |
| 22 | | were greeted by the patient lying on his back on the floor um the |
| 23 | | paramedic on medic engine 311 ah told me that he had given a total of |
| 24 | | two milligrams of Narcan um suspected heroin overdose he also stated |
| 25 | | that there was I guess a needle found next to the patient, pretty typical |
| 26 | | for us to suspect heroin in that case, especially with the area. Um at |
| 27 | | that point I knew he was handing that aspect of patient care so my job |
| 28 | | |

COSB  004817

171909396
H# 2019-106
Typed by: KWalker
Reviewed by:   N. Craig   /   Date: 01/15/2020

1   was to more focus on getting the patient to our gurney so we could get

2   him to the ambulance and to the hospital. Um I stepped out of the room,

3   grabbed what we call a mega mover it's just a big tarp basically to load

4   him on to put him onto the gurney get him out. So while I was setting

5   that up the ah paramedic just assessed his vitals um they were bagging

6   the patient meaning they were breathing for him so he wasn't breathing

7   at the time when they first responded and arrived on scene. They um

8   controlled his airway with that aspect were bagging him like I said um

9   the paramedic checked the blood sugar was the last thing I really

10  remember him saying before um everything happened. At that point we

11  rolled the patient onto his left side, so I was standing between him and

12  the couch in the corner of the room, um we were working on getting the

13  tarp under him to move him to the gurney and that's when he woke up.

14  Um at this point the patient kind of looked up at me, and you know

15  usually when we have these instances we can talk the patient down

16  and we can explain why we're there what's going on and we don't have

17  issues. Um in this instance the patient didn't respond to any of us

18  talking to him trying to explain why we were there. He ah then tried to

19  grab onto me and one of the deputies on scene had grabbed him and

20  kind of slid him back, and at that point he had began trying to fight

21  basically and swinging at that deputy which then another deputy had

22  stepped in. Um at that point I kind of backed myself up, cause I was in a

23  bad spot basically and ah the fight consisted maybe one to two minutes

24  at that point with those two deputies and then the third deputy stepped

25  in stating "I'm gonna tase you if you don't stop". Um at that time she

26  tased him and he was still fighting. She ah um tased him I believe the

27  one one time that I can really remember um still fighting like I said with

28

3

COSB  004818

171909396
H# 2019-106
Typed by: KWalker
Reviewed by:   N. Craig   /   Date: 01/15/2020

1   both of the other deputies that were on scene. Ah at that point I had

2   made kind of a verbal contact with the other medic on scene, said "hey

3   let's let's get the medicine to to chemically sedate him" basically is what

4   our goal was. Um at that point I was trying to get myself out of the room

5   so I could go get mine um out of my ambulance we don't keep our

6   medicine for that on our person at all times it's always locked up. So I

7   had ah stepped out at that point, at that point like I said they were still

8   fighting it was all three deputies and the ah patient at this point still

9   fighting actively rather. Um I noticed at that point as I was leaving that

10   there was some blood on the ground coming off of the patient's head. I

11   ran out to my ambulance um got my medications Versed ah came back

12   into the house at that point they had had him kind of on the ground but

13   he was still fighting all three of them very avidly. I gave the medication

14   which in this instance it's to basically chemically sedate him so that he

15   doesn't fight anymore. Um at that point we know what we have to do on

16   our end (excuse me) gave him the medication, not really much changed

17   he um managed to get kind of sedated down to the ground ah we had

18   him in handcuffs rolled him over at that point we had noticed that he

19   had multiple lacerations on his head, both his eyes were swollen shut.

20   Um we threw put him onto the gurney um secured him, that's when we

21   noticed he wasn't breathing anymore. So at that point we took him to

22   the ambulance while still breathing for him via the bag mal bag valve

23   mask, um put him in the back of the ambulance, from that point it was a

24   three minute drive to Victor Valley we were right down the street. Um I

25   established a vascular access via an IO so drilling through the bone,

26   um the other medic on the fire engine rode in with me he was

27   controlling his airway, when we pulled up to Victor Valley is when we

28

4

COSB  004819

171909396
H# 2019-106
Typed by: KWalker
Reviewed by:   N. Craig   /   Date: 01/15/2020

1    noticed he was pulseless, so we began CPR. Ah we continued CPR

2    into the ER until we gave our report of and they continued CPR from

3    there. Um from that point on it's not really our our deal anymore, but I

4    do remember leaving and they were still working on the patient

5    performing CPR and so on so forth.

6    [06:30]

7    MORENO:        I'm gonna show you some photographs.

8

9    GABLER:        Okay.

10

11   MORENO:        Um, to see if you can identify some of the people that were in the room,

12                  in regards to fire to the fire department, ah do you recall their names by

13                  chance?

14

15   GABLER:        Um the fire medic his name is Brett Lever I don't know the captain or

16                  the engineer's name though I don't respond to calls with them very

17                  often, being that I usually work in Apple Valley.

18

19   MORENO:        Okay. So I'm gonna have the the photographs I'm gonna show you um

20                  label A, B, C and D.

21

22   GABLER:        Okay.

23

24   MORENO:        And just tell me if you saw um any of these people at that call for

25                  service that we're talking about, okay?

26

27   GABLER:        Okay.

28                                          5

171909396
H# 2019-106
Typed by: KWalker
Reviewed by:   N. Craig   /   Date: 01/15/2020

| | | |
|---|---|---|
| 2 | MORENO: | For the record I'm showing Gabler photograph of um labeled A. |
| 3 | [07:40] | |
| 4 | GABLER: | Labeled A was there. |
| 5 | | |
| 6 | MORENO: | Okay. And was he one of the deputies when that arrived when you |
| 7 | | were first so when you first arrived on the scene was he already there |
| 8 | | or did come after? |
| 9 | | |
| 10 | GABLER: | I believe he was already there. |
| 11 | | |
| 12 | MORENO: | Okay. Here is photograph labeled B. |
| 13 | | |
| 14 | GABLER: | Ah photograph labeled B was on scene prior to our arrival as well. |
| 15 | | |
| 16 | MORENO: | Okay. And then here is photograph labeled C. |
| 17 | | |
| 18 | GABLER: | Ah photograph C arrived on scene after we ah did she ah she arrived |
| 19 | | on scene prior to the fight um but after we had given the medic the |
| 20 | | Narcan. |
| 21 | | |
| 22 | MORENO: | Okay, so the first two A and B were present when you were when you |
| 23 | | arrived, and then C came after. |
| 24 | | |
| 25 | GABLER: | After. |
| 26 | | |
| 27 | MORENO: | You arrived. |
| 28 | | |

6

COSB  004821

171909396
H# 2019-106
Typed by: KWalker
Reviewed by:   N. Craig   /   Date: 01/15/2020

| 1 | | |
|---|---|---|
| 2 | GABLER: | Yes. |
| 3 | | |
| 4 | MORENO: | And then photograph labeled D. |
| 5 | [08:34] | |
| 6 | GABLER: | Ah yes that was the was the patient. |
| 7 | | |

8  MORENO:      Okay. So Gabler identified um photograph A as Deputy Humberto
9                Miranda, photograph labeled B as Deputy um Julian Mata, photograph
10               label C as Jessaqua Attlesey and D as the patient ah identified as
11               Escudero, Ruben Escudero. And if you can do me a favor, it doesn't
12               have to be to scale um if you could just kind of draw a sketch of the
13               area at this incident took took place at um and if there was any any
14               furniture you know whatever that you can recall.
15
16  GABLER:      Okay.
17

| 18 | MORENO: | To the best of your ability and then as far as when you first got there um |
| 19 | | the positioning of the patient and the deputies and any other staff that |
| 20 | | may have been on scene as far as fire wise. |
| 21 | | |
| 22 | GABLER: | Okay. |
| 23 | | |
| 24 | MORENO: | And again it's not to scale. |
| 25 | | |
| 26 | GABLER: | So. Stick figures okay? |
| 27 | | |
| 28 | | 7 |

**171909396**
**H# 2019-106**
**Typed by: KWalker**
**Reviewed by:   N. Craig   /   Date: 01/15/2020**

| | | |
|---|---|---|
| 1 | MORENO: | Fire engineer |
| 2 | | |
| 3 | GABLER: | Yeah. |
| 4 | | |
| 5 | MORENO: | Okay, right by the table. |
| 6 | | |
| 7 | GABLER: | Yeah. |
| 8 | | |
| 9 | MORENO: | Fire medic and that's and your that's Deputy B, right? |
| 10 | [13:42] | |
| 11 | GABLER: | That's that would be Deputy B, yes sir. |
| 12 | | |
| 13 | MORENO: | So that there would be Mata? |
| 14 | | |
| 15 | GABLER: | To what the best of my knowledge, yes. |
| 16 | | |
| 17 | MORENO: | Okay. And then at this time Deputy C wasn't there right? |
| 18 | | |
| 19 | GABLER: | No, so she had arrived um before the fight had went out, so at this point |
| 20 | | I gotten my the mega mover, ah we had just arrived on scene, made |
| 21 | | contact with the fire medic to figure out what's going on, I walked out to |
| 22 | | get my mega mover walked back in and as I walked back out to make |
| 23 | | sure the gurney was ready is when she arrived. |
| 24 | | |
| 25 | MORENO: | Okay. So it's fair to say that when you first arrived that could possibly |
| 26 | | be Deputy A um Deputy Miranda? |
| 27 | | |
| 28 | | 11 |

171909396
H# 2019-106
Typed by: KWalker
Reviewed by:   N. Craig   /   Date: 01/15/2020

1   GABLER:          Yes sir.

2

3   MORENO:          Since they were there the first two that were on scene.

4

5   GABLER:          Yes sir.

6

7   MORENO:          Okay. So you show up and this is what you see um tell me what what

8                           transpired.

9   [14:29]

10  GABLER:          Um from this point on kind of like I had stated, we had walked in, I

11                          made contact with the fire medic pretty standard for us he kind of gave

12                          me the quick pass down, believed it was the heroin overdose and he

13                          had given the total of two milligrams of Narcan. Um at this point the

14                          patient wasn't awake, alert or anything like that they were ventilating the

15                          patient via that BVM, so because they're doing the patient care aspect

16                          of it at that point, my job is to get facilitate how we're gonna get him out

17                          of there basically. Um so I had walked in, made contact, walked out to

18                          grab our mega mover which is like I said the big tarp and I had walked

19                          back in to get it set up to get him onto it.

20

21  MORENO:          Okay.

22

23  GABLER:          So basically to get him onto it it's a big process of rolling him onto their

24                          side and tucking it all under him rolling him back over and making sure

25                          we have it all out so basically they lay on a big tarp with handles is what

26                          it comes down to.

27

28                                                   12

COSB  004827

171909396
H# 2019-106
Typed by: KWalker
Reviewed by:  N. Craig   /  Date: 01/15/2020

| | | |
|---|---|---|
| 1 | MORENO: | Okay. |
| 2 | | |
| 3 | GABLER: | Um. |
| 4 | | |
| 5 | MORENO: | So you go outside you you retrieve that ah. |
| 6 | | |
| 7 | GABLER: | Mega mover. |
| 8 | [15:17] | |
| 9 | MORENO: | Mega mover, you come back in and then what happens? |
| 10 | | |
| 11 | GABLER: | Um at that point I was working on getting him set up I voiced to my |
| 12 | | partner "hey let's make sure the gurney's ready" I had walked back out |
| 13 | | just to double check this is when Deputy C arrived, as I walked back in I |
| 14 | | came back over here to the couch cause it was kind of the open space |
| 15 | | and where I needed to be at that point, we had rolled um the patient |
| 16 | | over onto his right side to get the part of the tarp under him, and then |
| 17 | | rolled him to his left so he was completely on his left side ah leaning up |
| 18 | | against my shins basically and that's at the point that he had waken up. |
| 19 | | |
| 20 | MORENO: | Okay. |
| 21 | | |
| 22 | GABLER: | Um like I had said we tried to talk to him tell him "hey hey hey you know |
| 23 | | we're here for this reason um we're just here to help we're trying to help |
| 24 | | you you need to calm down you need to calm down" that had transpired |
| 25 | | for maybe 30 seconds before he became violent. |
| 26 | | |
| 27 | MORENO: | Oh and just for the record, who is your partner that was. |
| 28 | | |

13

171909396
H# 2019-106
Typed by: KWalker
Reviewed by:   N. Craig   /   Date: 01/15/2020

1

2    GABLER:          Ah.

3

4    MORENO:          Outside the front door?

5

6    GABLER:          Karla Lugo.

7

8    MORENO:          Karla Lugo, and then when you retrieved the mega mover um sometime

9                     after that was when deputies see you and Deputy Attlesey arrived on

10                    scene?

11

12   GABLER:          Yes.

13

14   MORENO:          Okay, and where did she go when when she came?

15

16   GABLER:          She was.

17

18   MORENO:          When she walked in?

19   [16:22]

20   GABLER:          She was at the door I believe at the door with my partner kind of just

21                    standing not necessarily out of the way but out of the out of the way.

22

23   MORENO:          Okay. So then during the 30 seconds that you and fire were talking to

24                    Escudero and trying to um pretty much talk to him and let him know

25                    what's going on, ah as far as from you or deputies did anyone identify

26                    themselves "fire department" um.

27

28                                        14

171909396
H# 2019-106
Typed by: KWalker
Reviewed by:   N. Craig   /   Date: 01/15/2020

1    GABLER:          Yes.

2

3    MORENO:          "AMR, sheriff's department", tell me about that.

4    [16:52]

5    GABLER:          Um I identified myself "hey I'm a paramedic I'm a paramedic we're here

6                     to help you", same thing with the firefighters they did the same thing.

7                     Um the sheriff at this time had kind of just stood back a little bit letting

8                     us kind of handle the situation, once they had realized that we couldn't

9                     handle the situation is when they stepped in "hey it's sheriff's

10                    department you need to calm down you need to calm down". Um

11                    everybody in the room actually did a good job of identifying themselves.

12

13   MORENO:          And what was Escudero doing.

14

15   GABLER:          Ah.

16

17   MORENO:          When deputies were telling him to calm down?

18

19   GABLER:          He was trying to get up, and ah in the sense of getting up usually is

20                    when they run or they fight so we know better than to let them get up,

21                    our goal is to keep them on the ground until we can talk them down and

22                    calm them down. Um he was kind of grabbing on my legs trying to get

23                    himself up, I was trying to keep him down push him down to the ground

24                    and then he started kind of getting more violent with us in the sense

25                    that he was trying to push me away. Um at this time the fire medic had

26                    kind of stepped in trying to push him down with me and that's when he

27

28                                          15

COSB  004830

171909396
H# 2019-106
Typed by: KWalker
Reviewed by:   N. Craig   /   Date: 01/15/2020

1 | started trying to take swings which is when both of the deputies
2 | identified themselves and stepped in.
3 | [17:49]
4 | MORENO: | So at this point no one knows who the patient is um you guys are there
5 | for a overdose call, and he's trying to get up, was that concerning to
6 | you?
7 |
8 | GABLER: | Ah yes, anybody that can stand up in that kind of state of mind is
9 | usually a threat to us.
10 |
11 | MORENO: | Okay. And when you said that he started swinging, um describe that
12 | was he still on the floor was he you know standing up?
13 |
14 | GABLER: | He was part way on the floor kind of almost sitting on his bottom if that
15 | makes sense trying to throw his arms out and just kind of hit whatever it
16 | was around him. He wasn't making any noi he wasn't verbal at all he
17 | wasn't talking which is kind of a big alert sign for us, but he had just
18 | kind of angry eyes on him.
19 |
20 | MORENO: | And how were his hands, were they open, closed?
21 |
22 | GABLER: | They were closed.
23 |
24 | MORENO: | Closed. And was he describe his the movement with his arms and
25 | hands.
26 |
27 |
28 |

16

171909396
H# 2019-106
Typed by: KWalker
Reviewed by:   N. Craig   /   Date: 01/15/2020

| 1 | GABLER: | Um in a sense he was trying to to punch those who were around him. |
| 2 | | He was becoming violent with us trying to help him. |
| 3 | | |
| 4 | MORENO: | Was he trying to punch anyone specific? |
| 5 | | |
| 6 | GABLER: | No. I think it was whoever he could see. |
| 7 | | |
| 8 | MORENO: | Okay, and then what happens next? |
| 9 | [18:55] | |
| 10 | GABLER: | Um from that point that's when we come back into when the deputies |
| 11 | | had stepped in they identified themselves, ah we spent time trying to |
| 12 | | calm him down I don't know the exact amount before we anybody really |
| 13 | | became violent aside from him. Um when I say that I mean in the detent |
| 14 | | in the deputies trying to detain him to keep him calm for us so that we |
| 15 | | can treat him from there on out. That kind of puts us in a stand still |
| 16 | | cause we can't engage him obviously we're not trained in that sense. |
| 17 | | So what we do is we kind of stand back and let the the deputies on |
| 18 | | scene do their thing. Um I do remember a lot of him trying to get up and |
| 19 | | both Deputies A and B trying to keep him on the ground, every time that |
| 20 | | he would try and get up if he had a free arm he would hit one of them. |
| 21 | | Um I don't know exactly where on their body. Ah this is about the time |
| 22 | | the deputy see it walked in and really stepped in you know these the |
| 23 | | two deputies that probably A and B had probably been fighting with him |
| 24 | | for maybe 20, 30 seconds before she stepped in, ah she said "you need |
| 25 | | us you need to stop you need to stop, I'm gonna tase you, I'm gonna |
| 26 | | tase you" and then she tased him um the one time and he continued to |
| 27 | | fight and they all tried to kind of put him down to the ground so that way |
| 28 | | 17 |

COSB  004832

171909396
H# 2019-106
Typed by: KWalker
Reviewed by:    N. Craig    /    Date: 01/15/2020

| | | |
|---|---|---|
| 1 | | we can kind of control the situation. Um this is about the point that I had |
| 2 | | stepped out to go get the um medication. |
| 3 | [20:15] | |
| 4 | MORENO: | Now for before Deputy C stepped in and you described that Deputy A |
| 5 | | and B were were fighting with the patient Escudero, um tell me more |
| 6 | | about that the fighting like what what going on between the three? |
| 7 | | |
| 8 | GABLER: | Um Escudero was on the ground like I said, he was trying to get up |
| 9 | | there was one deputy trying to kind of keep him down almost holding |
| 10 | | his legs in a scene so that he couldn't bend his legs and his knees to |
| 11 | | get up. Um while he was doing that the other deputy was again trying to |
| 12 | | kind of hold his shoulders down and Escudero just kept swinging at him |
| 13 | | and hitting him and hitting him. Um they kind of began to not |
| 14 | | necessarily hit him but push their elbows into him to try and keep him |
| 15 | | down which he wouldn't do. He managed to break free from one of the |
| 16 | | deputies kind of holding up or holding down his upper part of his body |
| 17 | | and that's when he hit the other deputy a couple times in the head. Um |
| 18 | | that's about the time that Deputy C had stepped in. |
| 19 | | |
| 20 | MORENO: | Do you recall what deputy was hit in the head? |
| 21 | | |
| 22 | GABLER: | No. |
| 23 | | |
| 24 | MORENO: | Okay. Um and at this point were you still standing in this area here right |
| 25 | | by the couch? |
| 26 | | |
| 27 | GABLER: | Yes. |
| 28 | | |

<div align="center">18</div>

COSB  004833

171909396
H# 2019-106
Typed by: KWalker
Reviewed by:   N. Craig   /   Date: 01/15/2020

1

2   MORENO:        With I believe.

3

4   GABLER:        I was.

5   [21:15]

6   MORENO:        A south west area of the apartment?

7

8   GABLER:        Yes.

9

10  MORENO:        And then how about is your partner still outside the door?

11

12  GABLER:        She's.

13

14  MORENO:        From which you recall?

15

16  GABLER:        She's still outside the door, yes.

17

18  MORENO:        Okay, and then how bout um well that's Deputy B so how bout the fire

19                 medic?

20

21  GABLER:        Um the fire medic had stood more towards like the north east corner um

22                 same thing with the the fire engineer and fire captain had kind of

23                 backed themselves up against the wall and the east wall.

24

25  MORENO:        Okay, so it's fair to say that that the fire captain somewhat stayed in the

26                 same area and the fire engineer and the fire medic were more on the

27                 north east where the table's at?

28                                             19

COSB  004834

171909396
H# 2019-106
Typed by: KWalker
Reviewed by:   N. Craig   /   Date: 01/15/2020

1

2   GABLER:          Yeah they kind of backed themselves.

3

4   MORENO:          Is that about.

5

6   GABLER:          Up out of the way.

7   [21:53]

8   MORENO:          And all this is going on while Deputies A and B are struggling fighting

9                    with um the patient Escudero?

10

11  GABLER:          Yes.

12

13  MORENO:          And about how many punches would you say Escudero um threw at the

14                   deputies?

15

16  GABLER:          Ah 20 to 30 if I had to take a rough estimate.

17

18  MORENO:          And about how many punches do you recall landing on either Deputy A

19                   or Deputy B?

20

21  GABLER:          Um maybe ten to 15 on either of em.

22

23  MORENO:          Okay. And was this while um the patient was still somewhat on the

24                   ground or when he managed to break free and stand up?

25

26  GABLER:          When he managed to break free is when he landed most of his hits.

27

28                                          20

171909396
H# 2019-106
Typed by: KWalker
Reviewed by:   N. Craig   /   Date: 01/15/2020

| 1 | MORENO: | Okay. Um did he did the patient say anything while all this was going |
| 2 | | on? |
| 3 | [22:38] | |
| 4 | GABLER: | The only thing he would mumble from time to time was "get off of me" |
| 5 | | |
| 6 | MORENO: | Okay. |
| 7 | | |
| 8 | GABLER: | Um that was really it. |
| 9 | | |
| 10 | MORENO: | How bout Deputies A and B, what were they saying during this ah |
| 11 | | struggle? |
| 12 | | |
| 13 | GABLER: | Um they they just kept saying "you need to stop fighting, you need to |
| 14 | | stop resisting, let us help you", um there wasn't really much else said |
| 15 | | than that. |
| 16 | | |
| 17 | MORENO: | And about how long was that that altercation there, before you left to |
| 18 | | get the. |
| 19 | | |
| 20 | GABLER: | Medication prob. |
| 21 | | |
| 22 | MORENO: | The medication. |
| 23 | | |
| 24 | GABLER: | Probably um a minute to a minute and a half before I left. |
| 25 | | |
| 26 | MORENO: | Okay. And at what point did Deputy C tase Escudero? |
| 27 | | |
| 28 | | 21 |

**171909396**
**H# 2019-106**
**Typed by: KWalker**
**Reviewed by:   N. Craig   /   Date: 01/15/2020**

| | | |
|---|---|---|
| 1 | MORENO: | Okay, and when the patient was tased, what was his positioning like? |
| 2 | [25:06] | |
| 3 | GABLER: | Um at this point he was almost on his side, um not quite on his stomach |
| 4 | | yet, but he was still trying to kind of push off both Deputies A and B. |
| 5 | | |
| 6 | MORENO: | Okay. Um. |
| 7 | | |
| 8 | GABLER: | Um after she had tased him, he was able to kind of break free and |
| 9 | | that's when she had stepped in and he made a run towards her so she |
| 10 | | had kind of assist no I don't wanna say "assisted" she took him to the |
| 11 | | ground with the assistance of both Deputies A and B, and ah he had |
| 12 | | managed to land a couple more punches on ah some of the deputies I |
| 13 | | don't know which ones exactly, but that was about the time that I had |
| 14 | | stepped out. |
| 15 | | |
| 16 | MORENO: | Okay. |
| 17 | | |
| 18 | GABLER: | Um. |
| 19 | [25:52] | |
| 20 | MORENO: | And ah you stepped out to grab what medication? |
| 21 | | |
| 22 | GABLER: | Ah Versed. |
| 23 | | |
| 24 | MORENO: | Versed. |
| 25 | | |
| 26 | GABLER: | Midazolam. |
| 27 | | |
| 28 | | |

24

COSB  004839

171909396
H# 2019-106
Typed by: KWalker
Reviewed by:   N. Craig   /   Date: 01/15/2020

1   MORENO:        And what's Versed?

2

3   GABLER:        Versed is a Benzidiaphem ah we use it as a CNA depressant, so

4                  basically I don't wanna say "it paralyzes the patient", but it's for what we

5                  call excited delirium which this is exactly excited delirium. It um it

6                  relaxes you.

7

8   MORENO:        Okay. And ah who's decision was it for to apply the Versed?

9

10  GABLER:        Mine.

11

12  MORENO:        Okay, and how many times have you applied that before on on patients

13                 in general?

14

15  GABLER:        In the excited delirium state?

16

17  MORENO:        No, just as in general?

18

19  GABLER:        Oh oh quite a few um.

20

21  MORENO:        Okay.

22

23  GABLER:        Over 30 or 40.

24

25  MORENO:        And is that more used for patients that um need to calm down or maybe

26                 to better control them?

27

28                          25

COSB  004840

171909396
H# 2019-106
Typed by: KWalker
Reviewed by:  N. Craig   /   Date: 01/15/2020

| 1 | GABLER: | Um it's used in two different instances, ah we use it for seizures a lot |
| 2 | | and we also use it for the excited delirium too we call it chemically |
| 3 | | sedating. Um it basically does that exact thing, it'll calm them down it'll |
| 4 | | kind of help us be able to do our job and treat the patient. |
| 5 | [26:53] | |
| 6 | MORENO: | Okay. Um and where is that ah kept in your in your veh in your um |
| 7 | | ambulance? |
| 8 | | |
| 9 | GABLER: | Yes, it's in the patient compartment of the ambulance under a double |
| 10 | | locked safe. |
| 11 | | |
| 12 | MORENO: | Um, for about how long were you out retrieving this medication? |
| 13 | | |
| 14 | GABLER: | In total for door to door time I was probably 45 seconds. |
| 15 | | |
| 16 | MORENO: | Okay. So once you retrieved this this medication, you come back in um |
| 17 | | what do you see? |
| 18 | | |
| 19 | GABLER: | Um all three deputies were on the ground with the patient with the |
| 20 | | patient still he was still fighting um I had said "hey let me have an arm" |
| 21 | | so I can give the medication via IM which is just in the deltoid like we |
| 22 | | always do ah we managed to get an arm out, cleaned it, prepped it |
| 23 | | gave him the medication and from then he had kind of calmed down a |
| 24 | | little bit but he was still putting up a good fight. Um definitely wasn't as |
| 25 | | um strong as he was before so the medication did work in that aspect, |
| 26 | | but he wasn't completely um detainable. |
| 27 | | |
| 28 | | |

26

COSB  004841

171909396
H# 2019-106
Typed by: KWalker
Reviewed by:   N. Craig   /   Date: 01/15/2020

| | | |
|---|---|---|
| 1 | MORENO: | And was he handcuffed or unhandcuffed at that point when. |
| 2 | | |
| 3 | GABLER: | He was unhandcuffed. |
| 4 | | |
| 5 | MORENO: | He was unhandcuffed. |
| 6 | | |
| 7 | GABLER: | Cause I was able to bring an arm up. |
| 8 | [28:01] | |
| 9 | MORENO: | Okay, and was was he on his so describe um where the deputies and |
| 10 | | the patient were at the time that you you entered back in to apply the |
| 11 | | Versed. |
| 12 | | |
| 13 | GABLER: | Okay. Um at this point he was down on his stomach still trying to flail |
| 14 | | his arms around, Deputy A was up towards the head, Deputy B towards |
| 15 | | the torso trying to bring both his arms around to put him in handcuffs |
| 16 | | and Deputy C was down just holding his legs down. |
| 17 | | |
| 18 | MORENO: | And at that point, um before you applied the Versed, aside from the |
| 19 | | Deputies A, B and C attempting to hold the patient down, did you see |
| 20 | | them strike um Escudero? |
| 21 | | |
| 22 | GABLER: | Before sorry I. |
| 23 | | |
| 24 | MORENO: | Um as you walk back, sorry about that. |
| 25 | | |
| 26 | GABLER: | No no no it's all good. |
| 27 | | |
| 28 | | |

27

COSB  004842

171909396
H# 2019-106
Typed by: KWalker
Reviewed by:   N. Craig    /   Date: 01/15/2020

1  MORENO:    As you walk back in from your ambulance you have the Versed.

2

3  GABLER:    Mmm-huh.

4  [28:49]

5  MORENO:    And you had mentioned that the deputies were attempting to hold the

6           patient down on on the ground, um were the deputies striking him or

7           were they just holding him, from what you remember?

8

9  GABLER:    From what I remember they were holding him down.

10

11  MORENO:    Okay.

12

13  GABLER:    Um at this point he was still trying to get up trying to get up as hard as

14           he can but they were more or less just holding him down.

15

16  MORENO:    And when you say he was trying to get up um explain that a bit more.

17

18  GABLER:    He was he was trying to basically bring his knees to his abdomen and

19           push himself up from them, um from both the deputies ah from what I

20           can remember ah we'll say Deputy B had his right arm kind of behind

21           him so he was trying to to flail around with that still completely resisting

22           any treatment or anything that we could do. Um that's when we were

23           able to bring his left arm and I was able to give him the medication.

24

25  MORENO:    Okay. And how is that medication applied?

26

27

28                                    28

171909396
H# 2019-106
Typed by: KWalker
Reviewed by:    N. Craig    /    Date: 01/15/2020

1   GABLER:    Um in this instance it's given IM or intramuscular um there's a couple

2   different routes that we can give it but that's the easiest most effective

3   in this situation.

4   [29:46]

5   MORENO:    And the intramuscular is that a shot?

6

7   GABLER:    Yes.

8

9   MORENO:    Or is it okay.

10

11   GABLER:    Yeah it it's just via a little needle into the deltoid muscle.

12

13   MORENO:    Okay, and what was the amount of ah Versed that was given to the

14   subject?

15

16   GABLER:    In total it was ten milligrams.

17

18   MORENO:    And then what what happened after the Versed was applied to the

19   patient?

20

21   GABLER:    So the Versed was given in two different rounds, basically um we were

22   able to kind of get him somewhat calmer with that still kind of resisting,

23   so we had pulled that and then gave it one more time prior to actually

24   getting him to completely calm down. Um that medication like I said is

25   given twice in five milligram in increments so we gave a total of ten. Um

26   at that point he had calmed down um wasn't really saying anything but

27   we could kind of hear him breathing still, so that's a good sign on our

28

29

171909396
H# 2019-106
Typed by: KWalker
Reviewed by:   N. Craig   /   Date: 01/15/2020

| | | |
|---|---|---|
| 1 | | end. We were able to the the deputies were able to bring his arms |
| 2 | | around his back, put him in handcuffs which is then when we flipped |
| 3 | | him over and ah he was no longer responsive, so we were able to jump |
| 4 | | back in and do our job. Um from that point we assisted with ah the fire |
| 5 | | crew and the deputies to get him to the gurney and once we did that we |
| 6 | | established he was no longer breathing um he had pretty substantial |
| 7 | | trauma to his head and to his face, so we began providing him |
| 8 | | ventilations via the BVM and that's when we took off to the hospital. |
| 9 | [31:09] | |
| 10 | MORENO: | Um about how long were those um increments or how long were the |
| 11 | | increments of the Versed given, so if it was five. |
| 12 | | |
| 13 | GABLER: | It was five. |
| 14 | | |
| 15 | MORENO: | Milligrams at first and then about how long after was the the second. |
| 16 | | |
| 17 | GABLER: | It was very sh it was very short I can't remember off hand. |
| 18 | | |
| 19 | MORENO: | Okay. And was that applied in the same the same area? |
| 20 | | |
| 21 | GABLER: | The same vicinity. |
| 22 | | |
| 23 | MORENO: | Okay. And then how was the ah patient um escorted or or taken out of |
| 24 | | the apartment? |
| 25 | | |
| 26 | GABLER: | Um we were able to kind of just all pick him up as a group and take him |
| 27 | | to the gurney which was just placed right outside the front door. |
| 28 | | 30 |

COSB  004845

171909396
H# 2019-106
Typed by: KWalker
Reviewed by:   N. Craig   /   Date: 01/15/2020

| 1 | | |
|---|---|---|
| 2 | MORENO: | And at what point um was the patient handcuffed? |
| 3 | [31:46] | |
| 4 | GABLER: | Ah just before so we had given the total amount of Versed, we were |
| 5 | | able to handcuff they were able to handcuff him, put him onto his back |
| 6 | | which is when we kind of stepped in and did our job like I said, it was |
| 7 | | maybe a 15 second period from the time he was on to his back and |
| 8 | | handcuffed til he was on the gurney. For a 15 second period. |
| 9 | | |
| 10 | MORENO: | Do you remember who applied the handcuffs? |
| 11 | | |
| 12 | GABLER: | No. |
| 13 | | |
| 14 | MORENO: | Or how? Okay. And how did the scene look as far as um when you so |
| 15 | | before you got you retrieved the Versed, how did the scene look as far |
| 16 | | as with the deputies and the patient? |
| 17 | | |
| 18 | GABLER: | Um you saying in instance of the actual vicinity? |
| 19 | | |
| 20 | MORENO: | Yeah. |
| 21 | | |
| 22 | GABLER: | There was a lot of blood on the floor I definitely noticed that. |
| 23 | | |
| 24 | MORENO: | Okay. |
| 25 | | |
| 26 | | |
| 27 | | |
| 28 | | |

31

COSB  004846

**171909396**
**H# 2019-106**
**Typed by: KWalker**
**Reviewed by:   N. Craig   /   Date: 01/15/2020**

| | | |
|---|---|---|
| 1 | GABLER: | Um if I had to estimate like 1500 ML's of blood. Um not really much else |
| 2 | | I think the table had fallen over um in the the corner table had fallen |
| 3 | | over but aside from that I don't really recall. |
| 4 | | |
| 5 | MORENO: | Um did you see where the blood was coming from? |
| 6 | | |
| 7 | GABLER: | It looked like mostly just his head I didn't really get a good look at that |
| 8 | | point. |
| 9 | [32:55] | |
| 10 | MORENO: | Okay. Um um what would have happened had the deputies not |
| 11 | | attempted to restrain or um calm the patient down? |
| 12 | | |
| 13 | GABLER: | He would've been a threat to everybody in that room. Um if the deputies |
| 14 | | weren't there it would've been on us to do it and it it probably |
| 15 | | wouldn't've ended much differently. I can't I can't say that for a fact I |
| 16 | | can't say that with a confident voice we it it could've went a million |
| 17 | | different ways honestly um he could've got up and ran out of the house |
| 18 | | and we would've done our best to make sure that you know we could |
| 19 | | try to get him or make sure that he's safe and that those around us are |
| 20 | | safe, but I honestly don't know. |
| 21 | | |
| 22 | MORENO: | Have you made contact with the patient before? |
| 23 | | |
| 24 | GABLER: | No. |
| 25 | | |
| 26 | MORENO: | Have you had any prior calls at that apartment on Monte Vista before? |
| 27 | | |
| 28 | | 32 |

171909396
H# 2019-106
Typed by: KWalker
Reviewed by:   N. Craig   /   Date: 01/15/2020

| 1 | GABLER: | No. |
|---|---------|-----|
| 2 | [33:49] | |
| 3 | MORENO: | Describe the patients built? |
| 4 | | |
| 5 | GABLER: | Um if I had to rough estimate, patient was maybe five ten ah 260 kind of |
| 6 | | very muscular actually. |
| 7 | | |
| 8 | MORENO: | Um during this ah incident did you hear any derogatory language? |
| 9 | | |
| 10 | GABLER: | No. |
| 11 | | |
| 12 | MORENO: | Um at any time? |
| 13 | | |
| 14 | GABLER: | No. |
| 15 | | |
| 16 | MORENO: | Okay. Um what was the ah intended goal of of that ah call? |
| 17 | | |
| 18 | GABLER: | Um the same intended goal we care with any call, and that's to do the |
| 19 | | best for the patient and the public. |
| 20 | | |
| 21 | MORENO: | How about after ah the altercation and and and ah once he was be able |
| 22 | | to be detained and handcuffed, what was the intended goal then? |
| 23 | | |
| 24 | GABLER: | To get him to the hospital um our biggest goal at that point we need to |
| 25 | | make sure we maintain his airway because that's the biggest most |
| 26 | | important thing um that's what the medic on um the paramedic on the |
| 27 | | fire engine did, is he worked on keeping his airway open and clear as |
| 28 | | 33 |

171909396
H# 2019-106
Typed by: KWalker
Reviewed by:   N. Craig   /   Date: 01/15/2020

1       possible with all the blood on his face it was kind of a challenge, um

2       and also breathing for him. At that point our our training kicks in which

3       is where we know what we need to do basically.

4   [35:06]

5   MORENO:       At any point did you see any of the deputies kick Escudero?

6

7   GABLER:        No.

8

9   MORENO:       Did you see any of the deputies apply knee strikes to Escudero?

10

11  GABLER:        Not that I can recall.

12

13  MORENO:       And for the most part um where was where did the fight take place at?

14

15  GABLER:        Center of the living room, it it all stayed right in the the center of the

16               living room there.

17

18  MORENO:       Okay. From what you remember?

19

20  GABLER:        Yes, from what I remember.

21

22  MORENO:       Did any of either your partner or any of the fire staff did they try to help

23               with detaining Escudero?

24

25  GABLER:        No.

26

27

28                                    34

COSB  004849

171909396
H# 2019-106
Typed by: KWalker
Reviewed by:   N. Craig   /   Date: 01/15/2020

1   MORENO:         You had mentioned that there was two bystanders there um when you
2                   first arrived to the scene, where did they go once this altercation took
3                   place?
4   [35:56]

5   GABLER:         I wanna say that they maintained their space back in this kitchen um I
6                   don't remember I don't recall that super well I do remember seeing
7                   them there when we had walked in and we had talked about giving the
8                   Narcan before the incident but during and after the incident I I don't
9                   recall.

10
11  MORENO:         And during this um incident before you went to retrieve the Versed,
12                  what was your view point?
13
14  GABLER:         I was kind of tucked back here sitting up on top of the couch.
15
16  MORENO:         And from from your point of view, what what was your angle and um
17                  what were you able to see that was it the the deputies backs was it the
18                  patients' back or his front?
19
20  GABLER:         I was looking mostly at the deputies backs.
21
22  MORENO:         Okay. How bout the patient?
23
24  GABLER:         Um from what I could see and I was really just catch a glimpses of kind
25                  of his head and his arms flailing around um and also him trying to get
26                  up but mostly Deputy A and Deputy B stayed kind of to the side of him.
27
28                                              35

COSB  004850

171909396
H# 2019-106
Typed by: KWalker
Reviewed by: N. Craig  /  Date: 01/15/2020

| 1 | MORENO: | Um about how far away would you estimate that you were from when |
| 2 | | you stepped back and you were watching from where the deputies and |
| 3 | | the patient? |
| 4 | | |
| 5 | GABLER: | Maybe a foot. |
| 6 | | |
| 7 | MORENO: | About a foot? |
| 8 | | |
| 9 | GABLER: | Yeah, I I had stood back up onto the top of the couch just to make sure |
| 10 | | I could have some space for them to work. |
| 11 | [37:08] | |
| 12 | MORENO: | Um at any time did you see any of the of the deputies apply um aside |
| 13 | | from using the taser, did anyone strike the patient with the taser itself, if |
| 14 | | that makes sense? |
| 15 | | |
| 16 | GABLER: | Um I I don't recall. I I believe Deputy C may have but at that point she |
| 17 | | had tased him and ah she kind of got into the the scrap of it but I don't |
| 18 | | recall. |
| 19 | | |
| 20 | MORENO: | And at what point was that was that ah after the taser was deployed? |
| 21 | | |
| 22 | GABLER: | Yes. |
| 23 | | |
| 24 | MORENO: | Okay. Tell me tell me more about that, what her positioning was um |
| 25 | | what was going on at that moment if you remember when those taser |
| 26 | | strikes were applied. |
| 27 | | |
| 28 | | |

COSB  004851

171909396
H# 2019-106
Typed by: KWalker
Reviewed by:   N. Craig   /   Date: 01/15/2020

| | | |
|---|---|---|
| 1 | GABLER: | So she had come in kind of standing over him as he was starting to like |
| 2 | | get stand up almost. At that point Deputy A and Deputy B were at the |
| 3 | | same time getting up as he was cause he had managed to break free |
| 4 | | from them. Um he stood up part way which is when she um drive stun |
| 5 | | stunned him, drive tased him, and he came back to the ground. |
| 6 | [39:56] | |
| 7 | MORENO: | Where did she ah drive stun the patient? |
| 8 | | |
| 9 | GABLER: | I wanna say in the chest but I don't recall exactly. |
| 10 | | |
| 11 | MORENO: | And when she drive stunned the patient, um was it more in this area |
| 12 | | kind of by where you were pointing kind of by this couch or was it? |
| 13 | | |
| 14 | GABLER: | They were still kind of more in the center um that's when the fight had |
| 15 | | kind of escalated over here which is why I had left. |
| 16 | | |
| 17 | MORENO: | Uh-huh. |
| 18 | | |
| 19 | GABLER: | Because I knew I was in a bad spot and I could finally get out cause |
| 20 | | there wasn't anybody at the door. |
| 21 | | |
| 22 | MORENO: | Okay, so at some point the fight moved to where this couch is at? |
| 23 | | |
| 24 | GABLER: | Yes. |
| 25 | | |
| 26 | MORENO: | Somewhere on the south side of the apartment? |
| 27 | | |
| 28 | | 39 |

COSB  004854

171909396
H# 2019-106
Typed by: KWalker
Reviewed by:   N. Craig   /   Date: 01/15/2020

| | | |
|---|---|---|
| 1 | GABLER: | Not that I recall, no. |
| 2 | [41:21] | |
| 3 | MORENO: | Did you see ah um baton or a asp that was. |
| 4 | | |
| 5 | GABLER: | Not that I recall. |
| 6 | | |
| 7 | MORENO: | Did you um did you or your partner or any fire guys sustain any any |
| 8 | | injuries? |
| 9 | | |
| 10 | GABLER: | No. |
| 11 | | |
| 12 | MORENO: | How bout any of the Deputies A,B or C? |
| 13 | | |
| 14 | GABLER: | Ah none that were told or reported to me. |
| 15 | | |
| 16 | MORENO: | Um describe the ah room um just kind of estimate size. |
| 17 | | |
| 18 | GABLER: | Um. |
| 19 | | |
| 20 | MORENO: | The best you can. |
| 21 | | |
| 22 | GABLER: | Okay, um the room it was just one single living room with the attached |
| 23 | | door to the what I had assume was a kitchen. Ah the room itself was |
| 24 | | maybe maybe a 12 by ten space um not very much floor space with the |
| 25 | | the tv stand the table and the couch um I'd sa if I had to estimate from |
| 26 | | the edge of the couch to the tv stand maybe eight feet and then same |
| 27 | | |
| 28 | | 41 |

171909396
H# 2019-106
Typed by: KWalker
Reviewed by:   N. Craig   /   Date: 01/15/2020

1   thing from here to here um east to west end of the building was maybe

2   ten feet.

3   [42:24]

4   MORENO:     Were there any aside from um you had mentioned that you you saw

5                what you believe was needles, for possible heroin use, aside from the

6                paraphernalia did you see anything else maybe any anything that could

7                be used as a weapon that was in that small room close quarters room?

8

9   GABLER:     No.

10

11  MORENO:     And a just to clarify when you ah arrived on the scene the patient was

12                already at the center of the living room or the the main room where all

13                this took place?

14

15  GABLER:     That's affirm.

16

17  MORENO:     Okay. And what um is is there ah policies in place for administering the

18                Versed?

19

20  GABLER:     Um just the the local protocol that we follow for it. It's in the 70/40

21                portion of ICEMA. It's just under medication administration.

22

23  MORENO:     Um after the patient or after the taser was used on the patient, was the

24                patient still fighting and attempting to strike the deputies?

25

26  GABLER:     Yes.

27

28                                             42

171909396
H# 2019-106
Typed by: KWalker
Reviewed by:   N. Craig   /   Date: 01/15/2020

| 1 | STEERS: | Bag Valve. |
|---|---------|-----------|
| 2 | | |
| 3 | GABLER: | It's the ah devise that. |
| 4 | | |
| 5 | STEERS: | Mask. |
| 6 | | |
| 7 | GABLER: | We use to ah breathe for a patient. |
| 8 | [48:50] | |
| 9 | STEERS: | Okay. Alright cool. So can you just talk about your general regular roles |
| 10 | | or responsibilities as the paramedic and AMR, are you the driver or you |
| 11 | | know what do you what do you what are your regular responsibilities? |
| 12 | | |
| 13 | GABLER: | Um my regular responsibility is patient care um we have two levels of |
| 14 | | service via AMR ambulance it's a EMT basic and a EMT advance repai |
| 15 | | medic EMPT sorry not advanced. Um as a EMT paramedic your job like |
| 16 | | I said is to do patient care so you don't drive you ride in the back you're |
| 17 | | always with the patient our main goal is to obviously have a good |
| 18 | | patient outcomes on any call that we respond to. Um we also are the |
| 19 | | ones that handle all the documentation so basically our partners our |
| 20 | | drivers um they also assist us when we need it as a paramedic you are |
| 21 | | the patient care giver. |
| 22 | | |
| 23 | STEERS: | Okay. At any point and time during this incident, did your role or |
| 24 | | responsibility change I mean was your goal to provide patient care to |
| 25 | | Mr. Escudero? |
| 26 | | |
| 27 | GABLER: | Absolutely. |
| 28 | | |

49

COSB  004864

171909396
H# 2019-106
Typed by: KWalker
Reviewed by:   N. Craig   /   Date: 01/15/2020

1

2   STEERS:        Okay and ah in in everything that you did ah that your actions ah was it

3                         still for that goal?

4

5   GABLER:        Absolutely.

6   [49:47]

7   STEERS:        To provide him care, um for what was initially considered an overdose

8                         for heroin, correct?

9

10   GABLER:       Yes sir.

11

12   STEERS:        Okay. Um yeah I'm gonna go through my little check list, some of this

13                         you already answered so um let me see, so ah just for clarification

14                         cause and and I wanna make sure um did you see any drugs or

15                         paraphernalia inside this living room that that you were in?

16

17   GABLER:       I personally did not.

18

19   STEERS:        Okay.

20

21   GABLER:       I was told by the fire fighter ah paramedic on scene that he had stated

22                         that "when the deputies arrived they had noticed a needle" I didn't see

23                         what happened to it.

24

25   STEERS:        Right.

26

27

28                                        50

COSB  004865

171909396
H# 2019-106
Typed by: KWalker
Reviewed by:   N. Craig   /   Date: 01/15/2020

| | | |
|---|---|---|
| 1 | GABLER: | No sir. |
| 2 | | |
| 3 | STEERS: | Okay. Never saw anything that was beyond there or anything? |
| 4 | | |
| 5 | GABLER: | No sir. |
| 6 | [51:33] | |
| 7 | STEERS: | Okay. Um do you guys have any individual ah digital audio recordings |
| 8 | | ah video recordings like you ll ah whatsoever when you respond do you |
| 9 | | guys have a tape recorder that you initiate or anything like that? |
| 10 | | |
| 11 | GABLER: | No sir. |
| 12 | | |
| 13 | STEERS: | Okay. And then if you can again I may have missed this as I you know |
| 14 | | cause you try to we're tying to think about make sure we. |
| 15 | | |
| 16 | GABLER: | Abs absolutely. |
| 17 | | |
| 18 | STEERS: | Ask ask all these things, you described the mega mover it's a big it's a |
| 19 | | big tarp with handles, um describe the size of Mr. Escudero please. |
| 20 | | |
| 21 | GABLER: | Um if I had to take a rough estimate of ms Mr. Escudero was maybe |
| 22 | | five ten, six foot tall um if I had to rough estimate weight probably 265 to |
| 23 | | 280 very built not like he runs. |
| 24 | | |
| 25 | STEERS: | Wh what do you mean very built? |
| 26 | | |
| 27 | | |
| 28 | | 53 |

COSB  004868

171909396
H# 2019-106
Typed by: KWalker
Reviewed by:   N. Craig   /   Date: 01/15/2020

1   GABLER:        Not like he runs or works out at the gym every day, but he wasn't um

2                  obese. He had very built muscular arms ah.

3

4   STEERS:        He's a genetically big man?

5

6   GABLER:        Yes sir.

7   [52:40]

8   STEERS:        Okay. Not like a body builder type but more maybe like a life his given

9                  him strength.

10

11  GABLER:        Yes.

12

13  STEERS:        Type of guy. Okay. Alright. Okay. So I just wanna go over some of this

14                 ah movement when you when you show up, cause I think I have good

15                 grasp on it, I just wanna kind of understand because is it fair to say that

16                 during this whole entire incident bodies and people were moving all

17                 around in the center in the center of the room changing position and

18                 and and going back and forth from what you remember what you saw?

19

20  GABLER:        Yes sir.

21

22  STEERS:        Okay. So this this sketch is when you first arrive, correct?

23

24  GABLER:        This is when I arrive and kind of make myself into my corner.

25

26  STEERS:        Right, and so you go into north.

27

28                                       54

COSB  004869

171909396
H# 2019-106
Typed by: KWalker
Reviewed by:   N. Craig   /   Date: 01/15/2020

| | | |
|---|---|---|
| 1 | GABLER: | So south west. |
| 2 | | |
| 3 | STEERS: | South. South west so you go into the south west corner you're standing |
| 4 | | by the couch? |
| 5 | | |
| 6 | GABLER: | Yes. |
| 7 | | |
| 8 | STEERS: | And Mr. Escudero is down um unconscious? |
| 9 | | |
| 10 | GABLER: | Yes. |
| 11 | [53:32] | |
| 12 | STEERS: | Um is there like anything that ah noises, smells anything else that |
| 13 | | makes you think like oh okay this is what I'm dealing with, um other |
| 14 | | than just you getting the notification that that there was ah that there |
| 15 | | was ah that he was possibly overdose on heroin? |
| 16 | | |
| 17 | GABLER: | Patient presentation more than anything. |
| 18 | | |
| 19 | STEERS: | What's pasent patient presentation? |
| 20 | | |
| 21 | GABLER: | Um the unresponsive kind of pale if that makes sense. |
| 22 | | |
| 23 | STEERS: | Mmm-huh. |
| 24 | | |
| 25 | GABLER: | Um lighter toned usually they're very diaphoretic or sweaty. |
| 26 | | |
| 27 | STEERS: | Mmm-huh. |
| 28 | | |

55

COSB  004870

171909396
H# 2019-106
Typed by: KWalker
Reviewed by:    N. Craig    /    Date: 01/15/2020

1

2    GABLER:          Um when they overdose like this and then the the fact that he wasn't

3                           breathing. Um.

4

5    STEERS:          He wasn't breathing at that time?

6

7    GABLER:          No, that's when we were starting to ventilate him with the BVM.

8

9    STEERS:          Okay.

10

11   GABLER:          Yeah, when we fir when I first got there that's what they were doing

12                         they were they had given the Narcan the two milligrams.

13

14   STEERS:          They had already given him Narcan.

15

16   GABLER:          And they were bagging him so that's that's very common practice for

17                         us.

18   [54:18]

19   STEERS:          Okay. So you weren't there bef prior to that to know like before they

20                         bagged him weather or not he had some weather or not he was making

21                         any noises have any deep breathing or having trouble breathing labor

22                         breathing or anything else.

23

24   GABLER:          No I.

25

26   STEERS:          Like that, they were already doing the bagging and everything. So

27                         who's doing the bag the fire medic?

28                                                      56

COSB  004871

171909396
H# 2019-106
Typed by: KWalker
Reviewed by:   N. Craig   /   Date: 01/15/2020

1

2   STEERS:        At the patient's head.

3

4   GABLER:        Yeah.

5

6   STEERS:        Okay, that makes sense to me.

7

8   GABLER:        Yeah.

9   [54:54]

10  STEERS:        So, fire engineer's at patient's head, fire captain is kind of like in the

11                 doorway here there's two unknown subjects that's in the kitchen, right?

12

13  GABLER:        Yes sir.

14

15  STEERS:        And so the fire captain's in the doorway of the ah living room to the

16                 kitchen and then you have Deputy A now ah kind of in front of which

17                 would be west of the fire captain also at the patient's head on the other

18                 side of the patient's head next to the fire fire medic, is that correct?

19

20  GABLER:        Roughly yes, the the Deputy A ah was kind of working with the fire

21                 captain gathering information.

22

23  STEERS:        Okay.

24

25  GABLER:        So they they were kind of working in tandem to get information based

26                 on the patient.

27

28                                          58

171909396
H# 2019-106
Typed by: KWalker
Reviewed by:   N. Craig   /   Date: 01/15/2020

| | | |
|---|---|---|
| 1 | STEERS: | And specifically just looking at that, this is Deputy A that deputy or the |
| 2 | | or the other deputy you. |
| 3 | | |
| 4 | GABLER: | I don't. |
| 5 | [55:37] | |
| 6 | STEERS: | You don't remember which one? |
| 7 | | |
| 8 | GABLER: | I don't recall. |
| 9 | | |
| 10 | STEERS: | So, one of the two male deputies. |
| 11 | | |
| 12 | GABLER: | One of the two male deputies. |
| 13 | | |
| 14 | STEERS: | Not specifically Deputy A that's in the photograph here it's just one of |
| 15 | | the two deputies, male deputies. |
| 16 | | |
| 17 | GABLER: | Yes sir. |
| 18 | | |
| 19 | STEERS: | Is that correct? Alright, I just wanna clarify that cause you wrote it on |
| 20 | | your sketch so. |
| 21 | | |
| 22 | GABLER: | Yeah. |
| 23 | | |
| 24 | STEERS: | Then the other male deputy, you can't recall which one, was over here |
| 25 | | closer to the tv stand um which would be on the north side of the north |
| 26 | | side of the room, right? |
| 27 | | |
| 28 | | 59 |

171909396
H# 2019-106
Typed by: KWalker
Reviewed by:  N. Craig   /   Date: 01/15/2020

| 1 | GABLER: | Yes. |
| 2 | [56:02] | |
| 3 | STEERS: | Okay. And then you post up there right here by the couch, and then |
| 4 | | your partner Lugo Ms. Lugo is is basically outside the doorway to the |
| 5 | | location ah looking in cause you guys have the gurney there, correct? |
| 6 | | |
| 7 | GABLER: | Yes. |
| 8 | | |
| 9 | STEERS: | And you haven't gone to get the mega mover yet or anything like that, |
| 10 | | right? |
| 11 | | |
| 12 | GABLER: | No. This is this is what I noticed when I walked in. |
| 13 | | |
| 14 | STEERS: | Mmm-huh. |
| 15 | | |
| 16 | GABLER: | At this point I made the decision I need to go get that mega mover, walk |
| 17 | | back out to grab it walked back in is when we started kind of working |
| 18 | | him to get him onto our mega mover. |
| 19 | | |
| 20 | STEERS: | Okay. So when you come back in everyone's still in the same position, |
| 21 | | right? |
| 22 | | |
| 23 | GABLER: | From what I recall, yes. |
| 24 | | |
| 25 | STEERS: | From what you remember, cool. |
| 26 | | |
| 27 | GABLER: | Yeah. |
| 28 | | |

<div align="center">60</div>

COSB  004875

171909396
H# 2019-106
Typed by: KWalker
Reviewed by:   N. Craig   /   Date: 01/15/2020

1

2  STEERS:         And if you don't remember anything please tell you know.

3

4  GABLER:         Yeah.

5

6  STEERS:         Tell me I don't remember or I don't recall you know what I mean

7                  because I I'm not trying to put any words in your mouth I just want to try

8                  to have a better understanding of what happened so we can explain the

9                  whole entire incident and and and put it there based on your

10                 observations.

11

12 GABLER:         Absolutely.

13 [56:50]

14 STEERS:         Um so you come back back in with the mega mover, and you still take

15                 this this same position south of Mr. Esc Escudero by the couch?

16

17 GABLER:         Yes.

18

19 STEERS:         And you set up the mega mover on the south side of Mr. Escudero's

20                 body?

21

22 GABLER:         Yes.

23

24 STEERS:         And he's still lying on his back receiving treatment at that time, correct?

25

26 GABLER:         Yes.

27

28                                          61

171909396
H# 2019-106
Typed by: KWalker
Reviewed by:   N. Craig   /   Date: 01/15/2020

| 1 | STEERS: | Okay, and they had already administered the Narcan so you guys are |
| 2 | | kind of waiting for the Narcan. |
| 3 | | |
| 4 | GABLER: | Yes. |
| 5 | [57:13] | |
| 6 | STEERS: | Was there any warnings I talk when you administer Narcan, do people |
| 7 | | become combative or incoherent or are they groggy I mean you know |
| 8 | | describe a typical how many times do you administer Narcan. |
| 9 | | |
| 10 | GABLER: | Ah. |
| 11 | | |
| 12 | STEERS: | Let's put it that way. |
| 13 | | |
| 14 | GABLER: | Too many to count. |
| 15 | | |
| 16 | STEERS: | Too many to county. |
| 17 | | |
| 18 | GABLER: | Yeah. |
| 19 | | |
| 20 | STEERS: | Over 100 fair? |
| 21 | | |
| 22 | GABLER: | 50 to 100. |
| 23 | | |
| 24 | STEERS: | 50. |
| 25 | | |
| 26 | GABLER: | We'll say. |
| 27 | | |
| 28 | | |

62

171909396
H# 2019-106
Typed by: KWalker
Reviewed by:   N. Craig   /   Date: 01/15/2020

| 1 | STEERS: | 50 to 100. |
| 2 | | |
| 3 | GABLER: | I don't wanna over shoot. |
| 4 | | |
| 5 | STEERS: | And out of that 50 yeah I know I don't want you and I don't wanna put |
| 6 | | words in your mouth so in that 50 to 100 times ah talk about just what |
| 7 | | seems to be a basic normal response to it. |
| 8 | [57:44] | |
| 9 | GABLER: | Um so when we give the Narcan it's usually you know we'll we'll give it |
| 10 | | a point five increments however many times we gotta give it til we get a |
| 11 | | response basically. Ah what we'll shoot for is to to bring the respirations |
| 12 | | back because when they do drugs like heroin it knocks out their |
| 13 | | respiratory drive, and we wanna wake them up basically but not |
| 14 | | basically what we're trying to do is bring the respiratory drive back. Um |
| 15 | | a usual response to the Narcan is usually a minute or two sometimes |
| 16 | | three or four, um what usually happens is the patient will wake up they'll |
| 17 | | look around wonder why there's all these people in uniform standing in |
| 18 | | their apartment or whatever it may be, but we can usually talk to them |
| 19 | | like "hey you know you need to sit down just relax take a minute sit |
| 20 | | down" we can talk them down 90 percent of the time. Um ten percent of |
| 21 | | the time they they do sometimes get combative but even in that sense |
| 22 | | it's never been um to the instance that this was. |
| 23 | | |
| 24 | STEERS: | Never to this degree. |
| 25 | | |
| 26 | GABLER: | Never to this degree. No. |
| 27 | | |
| 28 | | |

63

171909396
H# 2019-106
Typed by: KWalker
Reviewed by:   N. Craig   /   Date: 01/15/2020

| | | |
|---|---|---|
| 1 | STEERS: | Okay. |
| 2 | | |
| 3 | GABLER: | Um in my personal experience. |
| 4 | [58:39] | |
| 5 | STEERS: | Do now ah based on your training cause you are a paramedic, and you |
| 6 | | talk about Narcan, and like point five increments, is it pre pre ah pre set |
| 7 | | dosages like that like um. |
| 8 | | |
| 9 | GABLER: | I get what you're saying. |
| 10 | | |
| 11 | STEERS: | You know what I mean I don't know do you guys like eh first of all how |
| 12 | | do you administer Narcan? |
| 13 | | |
| 14 | GABLER: | Ah we have four different routes that we can administer it and almost |
| 15 | | every heroin overdose incidence is called "IN" so it's in the nose. |
| 16 | | |
| 17 | STEERS: | Okay. |
| 18 | | |
| 19 | GABLER: | Um it's what we use a mad devise it's a little paper foam cone thing that |
| 20 | | just atomizes all the medication into the nasal and then that way it goes |
| 21 | | into the nasal cavity via stuff. The Narcan is pre-packaged and what we |
| 22 | | call a "pre load" so you have to pop some mints, screw it together and |
| 23 | | that'll give you a total of two milligrams. |
| 24 | | |
| 25 | STEERS: | Okay. |
| 26 | | |
| 27 | GABLER: | So you give it in a point five increment. |
| 28 | | |

<div align="center">64</div>

COSB  004879

171909396
H# 2019-106
Typed by: KWalker
Reviewed by:   N. Craig   /   Date: 01/15/2020

1

2   STEERS:          Okay.

3

4   GABLER:          So we don't we don't we don't give it all.

5

6   STEERS:          So you get a point five point so in this case if there was a total of two

7                    then they gave four point five dosages essentially.

8

9   GABLER:          Four dosses of total, yeah.

10  [59:31]

11  STEERS:          Four, four total to get it, um and in your opinion is that is that odd I

12                   mean have you given two milligrams before to to someone in order to in

13                   order to ah have them overcome you know the effects of the heroin?

14

15  GABLER:          Yes.

16

17  STEERS:          Now ah I'm being a little off track but I know where we're at with this

18                   incident, going now going toward the Narcan stuff, um is Narcan only

19                   supposed to effect opiates or can it effect with other things?

20

21  GABLER:          Ah more or less it only works on opiates.

22

23  STEERS:          Is it.

24

25  GABLER:          It only works on opiates.

26

27

28

                                          65

171909396
H# 2019-106
Typed by: KWalker
Reviewed by:   N. Craig   /   Date: 01/15/2020

| 1 | STEERS: | Is it a central central nervous systems stimulant, does it does it I mean |
| 2 | | I'm trying to understand what it what it does. |
| 3 | [1:00:09] | |
| 4 | GABLER: | So it's an opioid analgestic or not analgestic an anatagonist. Um |
| 5 | | basically what it does is the receptors that get blocked when you get |
| 6 | | when you take heroin or CNS depressant. |
| 7 | | |
| 8 | STEERS: | Mmm-huh. |
| 9 | | |
| 10 | GABLER: | It can reactivate those if that makes sense. |
| 11 | | |
| 12 | STEERS: | Okay. |
| 13 | | |
| 14 | GABLER: | Trying to sum this up the easiest way I can. |
| 15 | | |
| 16 | STEERS: | So so if I'm not under the influence of opium, and someone gives me |
| 17 | | Narcan, what would be the effects on on a person like that? |
| 18 | | |
| 19 | GABLER: | Probably nothing. |
| 20 | | |
| 21 | STEERS: | Okay, what if I was under the influence of a different controlled |
| 22 | | substance like methamphetamine? |
| 23 | | |
| 24 | GABLER: | Probably nothing. |
| 25 | | |
| 26 | STEERS: | Okay. |
| 27 | | |
| 28 | | |

66

COSB  004881

171909396
H# 2019-106
Typed by: KWalker
Reviewed by:   N. Craig   /   Date: 01/15/2020

| 1 | STEERS: | Okay, that's fine. Do you see any injuries to him on his body as part of |
| 2 | | the patient care, do you see that he if he has any injuries is any pre- |
| 3 | | existing head wounds or anything else like that on him that you see? |
| 4 | | |
| 5 | GABLER: | No. |
| 6 | | |
| 7 | STEERS: | Any bleeding at that time or anything? |
| 8 | | |
| 9 | GABLER: | Nn nothing that I could see. |
| 10 | [1:03:39] | |
| 11 | STEERS: | Nothing that you could see. So at that point the only type of patient care |
| 12 | | that we're trying to deal with is just a possible of heroin overdose, right? |
| 13 | | |
| 14 | GABLER: | Yes sir. |
| 15 | | |
| 16 | STEERS: | Okay. You guy you weren't able to even were you able to move him to |
| 17 | | his side for ah to get him onto the bag? |
| 18 | | |
| 19 | GABLER: | Yes. So we had moved him with his we'll say face facing the north. |
| 20 | | |
| 21 | STEERS: | Okay. |
| 22 | | |
| 23 | GABLER: | And it wound up under him. |
| 24 | | |
| 25 | STEERS: | So onto his right side? |
| 26 | | |
| 27 | GABLER: | Onto his right side. |
| 28 | | |

71

COSB  004886

171909396
H# 2019-106
Typed by: KWalker
Reviewed by:   N. Craig   /   Date: 01/15/2020

1

2  STEERS:        Okay.

3

4  GABLER:        And then we rolled him back over onto his left side.

5

6  STEERS:        Okay.

7

8  GABLER:        Which is when he was kind of leaning up against me and that's when

9              he had woke up.

10  [1:04:07]

11  STEERS:        So this area is so tight that even though you're standing all in next to

12              the couch, he you lean you lean him up to his left side and he and as

13              you're putting him in the bag, he's right at your feet?

14

15  GABLER:        Yes.

16

17  STEERS:        Right? I mean it how close is he to you?

18

19  GABLER:        His sternum was laying up against my legs.

20

21  STEERS:        Okay, that's how tight these quarters are?

22

23  GABLER:        Yeah.

24

25  STEERS:        Okay. And then he starts waking up and when he starts waking up,

26              what does he start doing?

27

28                              72

COSB  004887

171909396
H# 2019-106
Typed by: KWalker
Reviewed by:   N. Craig   /   Date: 01/15/2020

| | | |
|---|---|---|
| 1 | GABLER: | He's looking around, um looking concerned not saying anything which |
| 2 | | is a weird oddity for us. |
| 3 | | |
| 4 | STEERS: | Okay. |
| 5 | [1:04:37] | |
| 6 | GABLER: | Cause usually they you know "what are you doing why are you here", |
| 7 | | they don't know why we're there. They have no recollection at all. Um at |
| 8 | | that point like I said we had identified all of ourselves "hey you know |
| 9 | | paramedics you just need to calm down calm down it's okay this is what |
| 10 | | happened we're here we're here to help you" and he wasn't saying |
| 11 | | anything. |
| 12 | | |
| 13 | STEERS: | And you guys are all in uniform, correct? |
| 14 | | |
| 15 | GABLER: | Yes. |
| 16 | | |
| 17 | STEERS: | And you're wearing ah describe what your uniform is. |
| 18 | | |
| 19 | GABLER: | Um black cargo pants pockets on the side black button up ah class B |
| 20 | | with a badge and a name tag on it. |
| 21 | | |
| 22 | STEERS: | Class B is that a polo shirt, t-shirt? |
| 23 | | |
| 24 | GABLER: | Um button up with a collar. |
| 25 | | |
| 26 | STEERS: | Button up shirt with a collar? |
| 27 | | |
| 28 | | 73 |

171909396
H# 2019-106
Typed by: KWalker
Reviewed by:   N. Craig   /   Date: 01/15/2020

| 1 | GABLER: | Yes sir. |
| 2 | | |
| 3 | STEERS: | It has do you have like a badge or anything that says AMR on you? |
| 4 | | |
| 5 | GABLER: | Yeah, it says AMR paramedic on it. |
| 6 | | |
| 7 | STEERS: | On you? Okay so um sa same one that all the paramedics from from |
| 8 | | your ah department wear all the time? |
| 9 | | |
| 10 | GABLER: | Yes sir. |
| 11 | | |
| 12 | STEERS: | Right, you're not in like your street clothes. |
| 13 | | |
| 14 | GABLER: | No I'm not looking different. |
| 15 | | |
| 16 | STEERS: | Or anything else like that. At any point and time do you recall him like |
| 17 | | dry heaving or ah like maybe throwing up? |
| 18 | | |
| 19 | GABLER: | Not that I recall, no. |
| 20 | | |
| 21 | STEERS: | Okay. So he stands up he's looking ah he's looking around and he tries |
| 22 | | to get himself to a seated position? |
| 23 | [1:05:39] | |
| 24 | GABLER: | Yes. |
| 25 | | |
| 26 | STEERS: | Okay. And then that's when you and the fire medic are trying to tell him |
| 27 | | "no lie down lie down"? |
| 28 | | 74 |

COSB  004889

171909396
H# 2019-106
Typed by: KWalker
Reviewed by:   N. Craig   /   Date: 01/15/2020

1

2   GABLER:         Yes.

3      [1:05:46]

4   STEERS:         Okay  And then from that point til the point where he starts swinging,

5                        what happens, anything?

6

7   GABLER:         Not not entirely no, um we were like we said we were trying to calm him

8                        down sit him down and that's when he I think he kind of realized what

9                        was going on and that was his defense mechanism was to to hit things

10                       around him or people around him.

11

12  STEERS:         So, when you're trying to keep him seated and he's trying to raise up,

13                       did he get all the way up to his seated on his butt position or was he

14                       trying in the process of trying to do so?

15

16  GABLER:         He was in the process.

17

18  STEERS:         And what were you guys doing when did you guys have your hands on

19                       him like trying to reassure him to sit lie down or do you were you do you

20                       guys just hands free off of him at that point?

21

22  GABLER:         We were we were hands on him trying to res reassure him you know.

23

24  STEERS:         Uh-huh.

25

26  GABLER:         Explain why we're there kind of get onto his level a little bit and explain

27                       why we're there basically.

28
                                                     75

171909396
H# 2019-106
Typed by: KWalker
Reviewed by:   N. Craig   /   Date: 01/15/2020

1

2   STEERS:          Oh in a reassuring manner or like.

3

4   GABLER:          Reassuring.

5   [1:06:31]

6   STEERS:          In a forceful I'm gonna hold you down manner?

7

8   GABLER:          Reassuring.

9

10  STEERS:          Okay.

11

12  GABLER:          Yet.

13

14  STEERS:          I just wanna understand what kind of force.

15

16  GABLER:          No ab absolutely, it's reassuring yet a little forceful.

17

18  STEERS:          Okay.

19

20  GABLER:          Because we know if they stand up we we lose our advantage.

21

22  STEERS:          And what do you mean by "lose your advantage"?

23

24  GABLER:          If they stand up and he's willing to fight, it kind of puts us in a bad

25                   position especially for me cause I was against the couch in the corner.

26

27

28                                        76

171909396
H# 2019-106
Typed by: KWalker
Reviewed by:   N. Craig   /   Date: 01/15/2020

| | | |
|---|---|---|
| 1 | STEERS: | Okay. And that's kind of what you meant by the bad position earlier |
| 2 | | when you said "I was in a bad spot"? |
| 3 | | |
| 4 | GABLER: | Yes. |
| 5 | [1:06:58] | |
| 6 | STEERS: | Okay. So at that time were the deputies doing anything? |
| 7 | | |
| 8 | GABLER: | They were coming in on him like assisting us almost in a sense |
| 9 | | explaining "hey you know we're we're deputies we're sheriff's we're |
| 10 | | here to help you need to calm down you need to listen" and that's about |
| 11 | | the time is when he had started throwing punches. |
| 12 | | |
| 13 | STEERS: | Okay. So then he starts throwing punches. |
| 14 | | |
| 15 | GABLER: | Mmm-huh. |
| 16 | | |
| 17 | STEERS: | How close are you to him when he throws the punches? |
| 18 | | |
| 19 | GABLER: | Um at that point I had stood back a little bit so I'm maybe six to eight |
| 20 | | inches away from him. |
| 21 | | |
| 22 | STEERS: | So maybe six inches instead of him actually touching your feet maybe |
| 23 | | six inches from your from your feet um did he swing at you? |
| 24 | | |
| 25 | GABLER: | Not that I recall. |
| 26 | | |
| 27 | STEERS: | Okay. Who's he swinging at? |
| 28 | | 77 |

COSB  004892

171909396
H# 2019-106
Typed by: KWalker
Reviewed by:   N. Craig   /   Date: 01/15/2020

1

2  GABLER:       Um the deputies as they were coming in and I wanna say he swung at

3              the fire medic but I don't recall perfectly.

4  [1:07:40]

5  STEERS:       Okay, So as he's trying to get up, he's facing what would be to the west

6              and he's he's swi he swings and you said "possibly at the fire medic"

7              who is basically at his upper torso and the two deputies are coming in

8              one on each side, ah one from the south and one from the north to his

9              upper torso, and that's when that's when he starts swinging?

10

11 GABLER:       Yes.

12

13 STEERS:       And about how many punches did you see at that time ah as you

14              retreated back toward this couch here and tried to get six to eight

15              inches away?

16

17 GABLER:       Maybe four or five.

18

19 STEERS:       Four or five? Okay. Um and it was it what do you think he was trying ah

20              Mr. Escudero was trying to do I mean was it obvious based off of him

21              punching was he wildly just swinging in the air ah like say "hey get off

22              me" or was he actually ah trying to punch with the intent of hitting the

23              fire medic and the deputies?

24

25 GABLER:       I think it was with the intent of trying to hurt.

26

27 STEERS:       Just on his demeanor?

28

COSB  004893

171909396
H# 2019-106
Typed by: KWalker
Reviewed by:   N. Craig   /   Date: 01/15/2020

| | | |
|---|---|---|
| 1 | | |
| 2 | GABLER: | ==Based on his demeanor.== |
| 3 | | |
| 4 | STEERS: | Okay. Um could you see his eyes? |
| 5 | | |
| 6 | GABLER: | Ah slightly, yes. |
| 7 | | |
| 8 | STEERS: | Ah did they look ah could you see his pupils to ah. |
| 9 | | |
| 10 | GABLER: | Ah I couldn't see his pupils. |
| 11 | | |
| 12 | STEERS: | Cause he you know you didn't examine his pupils to see. |
| 13 | | |
| 14 | GABLER: | I I didn't get a chance to. |
| 15 | | |
| 16 | STEERS: | Okay. |
| 17 | | |
| 18 | GABLER: | At that point. |
| 19 | [1:08:56] | |
| 20 | STEERS: | Um wa where were his eyes tracking? |
| 21 | | |
| 22 | GABLER: | Um towards the door and towards the deputies the or A Deputy or B |
| 23 | | Deputy which ever one was coming towards him from the position that |
| 24 | | he could see. So at at this point basically he's kind of on his back sitting |
| 25 | | up trying to sit up he's got this deputy coming down to try and st um put |
| 26 | | him onto the ground. |
| 27 | | |
| 28 | | 79 |

171909396
H# 2019-106
Typed by: KWalker
Reviewed by:   N. Craig   /   Date: 01/15/2020

| 1 | STEERS: | Okay. |
| 2 | | |
| 3 | GABLER: | And this deputy trying to also kind of do the same thing so he's he's |
| 4 | | more fixated on where the door is and what this guys doing. |
| 5 | | |
| 6 | STEERS: | Okay. |
| 7 | | |
| 8 | GABLER: | What this deputy's doing. |
| 9 | | [1:09:23] |
| 10 | STEERS: | So Deputy A and Deputy B are coming up trying to hold down the torso, |
| 11 | | he's looking at the door, he's looking at the deputies and he's swinging |
| 12 | | at the deputies and where did the fire where did the fire medic go? |
| 13 | | |
| 14 | GABLER: | He had stood back back up into the corner. |
| 15 | | |
| 16 | STEERS: | So he's the fire medic is going back up into the north east corner, you're |
| 17 | | going down to the south west corner making room for the deputies to |
| 18 | | essentially ah restrain and detain Mr. Escudero, correct? |
| 19 | | |
| 20 | GABLER: | Yes. |
| 21 | | |
| 22 | STEERS: | And and by this time you had already gotten the mega mover so Deputy |
| 23 | | C the female deputy, is right here in the doorway, correct? |
| 24 | | |
| 25 | GABLER: | Yes. |
| 26 | | |
| 27 | | |
| 28 | | |

80

171909396
H# 2019-106
Typed by: KWalker
Reviewed by:   N. Craig   /   Date: 01/15/2020

| | | |
|---|---|---|
| 1 | STEERS: | And you don't know weather this was Deputy Miranda or deputy which |
| 2 | | one was Deputy Miranda as far as the two male deputies you don't |
| 3 | | know which one was which in based on your recollection in the photos |
| 4 | | you see here you don't know which male deputy was in which spot |
| 5 | | other this is south side or the north side, right? |
| 6 | | |
| 7 | GABLER: | No, I do not. |
| 8 | [1:10:11] | |
| 9 | STEERS: | Okay. Um at any point during these first initial four to five ah punches, |
| 10 | | did you see him connect ah and actually punch ah one of the deputies |
| 11 | | or the fire medic? |
| 12 | | |
| 13 | GABLER: | Ah definitely not the fire medic he had stood back by this point, um I |
| 14 | | wanna say he connected with at least one of the deputies one or two |
| 15 | | times but I'm not 100 percent positive. |
| 16 | | |
| 17 | STEERS: | Okay. And do you know which deputy it was the one on the north or the |
| 18 | | one on the south? |
| 19 | | |
| 20 | GABLER: | No. |
| 21 | | |
| 22 | STEERS: | Okay. So they're just all three in the center of this room right here? |
| 23 | | |
| 24 | GABLER: | Yes sir. |
| 25 | | |
| 26 | STEERS: | Okay. Could you do you know what the fire captain was doing or the fire |
| 27 | | engineer? |
| 28 | | |

81

COSB  004896

171909396
H# 2019-106
Typed by: KWalker
Reviewed by:   N. Craig   /   Date: 01/15/2020

| | | |
|---|---|---|
| 2 | STEERS: | Correct, okay. So Deputy C's in the doorway and Escudero is th |
| 3 | | throwing these punches four to five punches at the deputies which you |
| 4 | | think may possibly connected with one of the deputies and initially |
| 5 | | swung at the fire medic, and um Deputy C chooses to ch to tase |
| 6 | | Escudero at that time, correct? |
| 7 | | |
| 8 | GABLER: | Yes. |
| 9 | [1:12:17] | |
| 10 | STEERS: | And when Deputy C ah fi discharges her taser at Escu at Escudero, um |
| 11 | | was Escudero throwing punches at that time? |
| 12 | | |
| 13 | GABLER: | Yes. |
| 14 | | |
| 15 | STEERS: | Okay. So he's actively fighting. |
| 16 | | |
| 17 | GABLER: | He was. |
| 18 | | |
| 19 | STEERS: | At the deputies assaulting the deputies? |
| 20 | | |
| 21 | GABLER: | Yes. |
| 22 | | |
| 23 | STEERS: | Okay. So you're is that the what at what point and time did you have to |
| 24 | | like stand up on the couch to get it get out of the way? |
| 25 | | |
| 26 | GABLER: | Um I'd say about the time that they had escalated towards the center of |
| 27 | | the room. |
| 28 | | 84 |

COSB  004899

171909396
H# 2019-106
Typed by: KWalker
Reviewed by:  N. Craig   /   Date: 01/15/2020

1

2    STEERS:         Mmm-huh.

3

4    GABLER:         And both deputies were attempting to detain him down onto the ground

5                    as when I stepped back.

6

7    STEERS:         Is that before the tasing or after?

8

9    GABLER:         Before.

10

11   STEERS:         T you so you even had to get out of the way before then before the

12                   tasing?

13

14   GABLER:         Yes sir.

15   [1:12:57]

16   STEERS:         And why did you have to get out of the way?

17

18   GABLER:         I just didn't feel safe where I was standing. I felt like I would've been in

19                   the way.

20

21   STEERS:         Ah in the way of the deputies or poss get assaulted by Mr. Escudero?

22

23   GABLER:         Both.

24

25   STEERS:         Okay. So now you have um an at this time Lugo's still outside?

26

27   GABLER:         Yes.

28                                      85

COSB  004900

171909396
H# 2019-106
Typed by: KWalker
Reviewed by:   N. Craig   /   Date: 01/15/2020

| | | |
|---|---|---|
| 1 | | |
| 2 | STEERS: | Okay. That's the only one I didn't check. Alright, so she deploys the |
| 3 | | taser, and you said it hits like maybe one on the back and one the leg? |
| 4 | | |
| 5 | GABLER: | To my best get. |
| 6 | | |
| 7 | STEERS: | Okay. |
| 8 | | |
| 9 | GABLER: | My best recollection, yeah. |
| 10 | [1:13:25] | |
| 11 | STEERS: | And and during this time Escudero's throwing punches to both sides so |
| 12 | | he's turning his body back and forth? |
| 13 | | |
| 14 | GABLER: | Yes. So at at this point yeah, I don't know I don't know where I was |
| 15 | | going with that one, yes. |
| 16 | | |
| 17 | STEERS: | Okay. So then um my next question is when the taser hits him, did it |
| 18 | | appear effective to you? |
| 19 | | |
| 20 | GABLER: | No. |
| 21 | | |
| 22 | STEERS: | Okay, why not? |
| 23 | | |
| 24 | GABLER: | Because he was able to still fight he he didn't it it didn't stop him he was |
| 25 | | still able to kind of swing around um make I wouldn't say make contact |
| 26 | | with. |
| 27 | | |
| 28 | | 86 |

COSB  004901

171909396
H# 2019-106
Typed by: KWalker
Reviewed by:   N. Craig   /   Date: 01/15/2020

| | | |
|---|---|---|
| 1 | STEERS: | Mmm-huh. |
| 2 | [1:13:56] | |
| 3 | GABLER: | Those deputies in the sense that he was hitting them but they were still |
| 4 | | putting up a fight trying to keep him down. Um when the taser was |
| 5 | | deployed they both kind of took a step I don't wanna say. |
| 6 | | |
| 7 | STEERS: | Both deputies? |
| 8 | | |
| 9 | GABLER: | Took a step back, yes. |
| 10 | | |
| 11 | STEERS: | Okay. |
| 12 | | |
| 13 | GABLER: | Um I don't wanna say took a step back and let him get tased, but they |
| 14 | | both kind of took a step back just to see I think rea re-access or |
| 15 | | reevaluate what was going on, and see that it wasn't really effecting him |
| 16 | | at all. |
| 17 | | |
| 18 | STEERS: | Okay. |
| 19 | | |
| 20 | GABLER: | Um. |
| 21 | | |
| 22 | STEERS: | To. |
| 23 | | |
| 24 | GABLER: | At that. |
| 25 | | |
| 26 | STEERS: | See if the taser was effective? |
| 27 | | |
| 28 | | 87 |

COSB  004902

171909396
H# 2019-106
Typed by: KWalker
Reviewed by:   N. Craig   /   Date: 01/15/2020

| | | |
|---|---|---|
| 1 | GABLER: | Yes. |
| 2 | | |
| 3 | STEERS: | To see if it worked? |
| 4 | | |
| 5 | GABLER: | Yes. |
| 6 | | |
| 7 | STEERS: | To see if it deescalated the situation? |
| 8 | | |
| 9 | GABLER: | Yes. |
| 10 | [1:14:25] | |
| 11 | STEERS: | Okay. And then um it you said "it wasn't effective" have you seen taser |
| 12 | | deployments before? |
| 13 | | |
| 14 | GABLER: | Yes. |
| 15 | | |
| 16 | STEERS: | Have you seen when they have been effective? |
| 17 | | |
| 18 | GABLER: | Yes. |
| 19 | | |
| 20 | STEERS: | Describe what you believe wh is an effective taser deployment based |
| 21 | | on your experience. |
| 22 | | |
| 23 | GABLER: | Um I've seen it a couple other times the the last most recent time aside |
| 24 | | from this um the subject was tased both prongs straight to the chest, |
| 25 | | um it stood him straight up and he fell straight down. He was unable to |
| 26 | | move any of his muscles or anything like that. |
| 27 | | |
| 28 | | |

88

171909396
H# 2019-106
Typed by: KWalker
Reviewed by:   N. Craig   /   Date: 01/15/2020

| | | |
|---|---|---|
| 1 | STEERS: | So it loc it locked him up. |
| 2 | | |
| 3 | GABLER: | Locked him up. |
| 4 | | |
| 5 | STEERS: | And muscle tension and everything like and then he wasn't able to like |
| 6 | | assault or throw punches? |
| 7 | | |
| 8 | GABLER: | Yes. |
| 9 | | |
| 10 | STEERS: | And in this case that didn't occur? |
| 11 | | |
| 12 | GABLER: | That did not occur. |
| 13 | [1:15:04] | |
| 14 | STEERS: | Okay. So at that point I think what you said was "Escudero is able to get |
| 15 | | himself up to a seated position, and he charges toward ah Deputy C the |
| 16 | | female deputy who is down here on the west side west wall right right |
| 17 | | here where she tased", is that correct? |
| 18 | | |
| 19 | GABLER: | She's more towards the door but yes. |
| 20 | | |
| 21 | STEERS: | More towards the door but st along the west wall. |
| 22 | | |
| 23 | GABLER: | But along that west wall. |
| 24 | | |
| 25 | STEERS: | So he he charges her, correct? |
| 26 | | |
| 27 | GABLER: | Yes. |
| 28 | | 89 |

171909396
H# 2019-106
Typed by: KWalker
Reviewed by: N. Craig / Date: 01/15/2020

| | | |
|---|---|---|
| 1 | | |
| 2 | STEERS: | And you're still on the couch here. |
| 3 | | |
| 4 | GABLER: | I'm still on the couch. |
| 5 | [1:15:33] | |
| 6 | STEERS: | Okay. And the deputies are each on on each side against still where his |
| 7 | | head was at that time or the upper torso was at that time when when he |
| 8 | | charged? |
| 9 | | |
| 10 | GABLER: | Yes. |
| 11 | | |
| 12 | STEERS: | How was Esc was Escudero able to get a hold of that deputy um or was |
| 13 | | he able to wrap his arms around her, get a hold of her, get close to her I |
| 14 | | mean talk about what his actions were at that time. |
| 15 | | |
| 16 | GABLER: | Um I don't recall exactly but what I do recall is after the tase, both the |
| 17 | | two deputy two male deputies um had kind of stood back to assist to |
| 18 | | see if it was working, when the taser had stopped, Escudero was able |
| 19 | | to sit himself up kind of get onto his feet almost on a knee. |
| 20 | | |
| 21 | STEERS: | Mmm-huh. |
| 22 | | |
| 23 | GABLER: | And look like he was making a charge for the door or towards Deputy C |
| 24 | | the female deputy, and that's when she had came in dry stunned him |
| 25 | | back down the other two deputies had gathered themselves and pulled |
| 26 | | him down to the ground again and then the fight was back on. |
| 27 | | |
| 28 | | 90 |

171909396
H# 2019-106
Typed by: KWalker
Reviewed by:   N. Craig   /   Date: 01/15/2020

| | | |
|---|---|---|
| 1 | STEERS: | Okay. So Deputy C approaches him, goes to drive stun  him, where |
| 2 | | does she apply that taser in the drive stun? |
| 3 | | |
| 4 | GABLER: | I don't I don't recall. |
| 5 | | |
| 6 | STEERS: | Upper torso I mean was it. |
| 7 | | |
| 8 | GABLER: | Up upper torso. |
| 9 | [1:16:35] | |
| 10 | STEERS: | Was it his legs or upper torso or or you don't recall? |
| 11 | | |
| 12 | GABLER: | Up upper torso. |
| 13 | | |
| 14 | STEERS: | Okay. |
| 15 | | |
| 16 | GABLER: | Yeah. I don't recall the exact location but. |
| 17 | | |
| 18 | STEERS: | Okay, and then at that point um did you see any punches, strikes from |
| 19 | | any of the deputies on Mr. Escudero? |
| 20 | | |
| 21 | GABLER: | Not that I recall, that was about the point that I had stepped out. |
| 22 | | |
| 23 | STEERS: | Okay. |
| 24 | | |
| 25 | GABLER: | To. |
| 26 | | |
| 27 | | |
| 28 | | |

91

COSB  004906

171909396
H# 2019-106
Typed by: KWalker
Reviewed by:   N. Craig   /   Date: 01/15/2020

| | | |
|---|---|---|
| 1 | STEERS: | So, she drive stuns what happens to Mr. Escudero when she drive |
| 2 | | stuns? |
| 3 | | |
| 4 | GABLER: | Um he fell back to the ground. |
| 5 | | |
| 6 | STEERS: | Okay. |
| 7 | | |
| 8 | GABLER: | Then begin attempting to get back up. |
| 9 | | |
| 10 | STEERS: | Okay. |
| 11 | | |
| 12 | GABLER: | In the sense that he was swinging punches and doing anything he |
| 13 | | could to get the deputies off of him basically. |
| 14 | | |
| 15 | STEERS: | Okay. And so you're on the couch at the time, he goes da back down |
| 16 | | onto his butt, was he flat on his back or all the way down to his butt? |
| 17 | | |
| 18 | GABLER: | Ah I don't recall. |
| 19 | | |
| 20 | STEERS: | Okay. And you said you saw him punching his arms though still at that |
| 21 | | time? |
| 22 | | |
| 23 | GABLER: | Yes. |
| 24 | | |
| 25 | STEERS: | How many punches did you see? |
| 26 | | |
| 27 | GABLER: | Maybe another five to ten before I made it out of the room. |
| 28 | | 92 |

171909396
H# 2019-106
Typed by: KWalker
Reviewed by:   N. Craig   /   Date: 01/15/2020

|    |          |                                                                          |
|----|----------|--------------------------------------------------------------------------|
| 1  |          |                                                                          |
| 2  | STEERS:  | Okay. So at at that point you made the decision I'm gonna go out and      |
| 3  |          | get the Versed?                                                          |
| 4  |          |                                                                          |
| 5  | GABLER:  | Yes.                                                                     |
| 6  | [1:17:33]|                                                                          |
| 7  | STEERS:  | How do you spell Versed?                                                 |
| 8  |          |                                                                          |
| 9  | GABLER:  | V-E-R.                                                                   |
| 10 |          |                                                                          |
| 11 | STEERS:  | Uh-huh.                                                                  |
| 12 |          |                                                                          |
| 13 | GABLER:  | S-E-D.                                                                   |
| 14 |          |                                                                          |
| 15 | STEERS:  | S-E-D, okay.                                                             |
| 16 |          |                                                                          |
| 17 | GABLER:  | Yeah.                                                                    |
| 18 |          |                                                                          |
| 19 | STEERS:  | Just making sure.                                                        |
| 20 |          |                                                                          |
| 21 | GABLER:  | Versed.                                                                  |
| 22 |          |                                                                          |
| 23 | STEERS:  | Versed, so you go out to the Versed and in a couple times you made       |
| 24 |          | the statement I think I think you said "we made the decision", what what |
| 25 |          | who's we?                                                                |
| 26 |          |                                                                          |
| 27 | GABLER:  | So it'd be me and the other medic the the fire medic.                    |
| 28 |          |                               93                                         |

COSB  004908

171909396
H# 2019-106
Typed by: KWalker
Reviewed by:   N. Craig   /   Date: 01/15/2020

| 1 | | |
|---|---|---|
| 2 | STEERS: | So you're holding a conversation you know what I mean or like he says |
| 3 | | "hey get the Versed" or something like I mean what was said? |
| 4 | [1:17:55] | |
| 5 | GABLER: | So as they're about the time that he had been tased, and the deputies |
| 6 | | see the female deputy had taken him to the ground, is when it kind of |
| 7 | | clicked in my head like we need to do something, I looked at him across |
| 8 | | the um living room and I said "Versed". |
| 9 | | |
| 10 | STEERS: | Mmm-huh. |
| 11 | | |
| 12 | GABLER: | He's like "yeah", so I went to go get mine and that's that's the decision |
| 13 | | making right there. |
| 14 | | |
| 15 | STEERS: | Okay. So at that point you run out so when you run out, Escudero is on |
| 16 | | his butt trying to still get up, throw throws five to ten punches toward the |
| 17 | | three deputies now who are all on him, Deputy A is is still on the south |
| 18 | | side, Deputy B the two males, one male is on the south side one male |
| 19 | | is on the north side, and the fe and Deputy C is now moved toward his |
| 20 | | legs or at um on the south side right here, is that correct? |
| 21 | | |
| 22 | GABLER: | Yes. |
| 23 | | |
| 24 | STEERS: | Okay. And then you said "it took" I I remember you give a time estimate |
| 25 | | so I'm not I'm not gonna I don't want you to have to give another time |
| 26 | | estimate. |
| 27 | | |
| 28 | | 94 |

171909396
H# 2019-106
Typed by: KWalker
Reviewed by:   N. Craig   /   Date: 01/15/2020

1   STEERS:       And then where's the other male deputy at, do you know?

2

3   GABLER:       I don't recall.

4

5   STEERS:       Okay, and where's the female deputy at?

6   [1:19:48]

7   GABLER:       I wanna say towards the legs but I don't exactly recall.

8

9   STEERS:       Okay. Toward so but you know the other two deputies are there.

10

11  GABLER:       They were there yes.

12

13  STEERS:       On the body.

14

15  GABLER:       Yes.

16

17  STEERS:       Dealing with him.

18

19  GABLER:       Yes.

20

21  STEERS:       Did do you see ah Mr. Escudero punching or anything at that time?

22

23  GABLER:       At this point he is doing anything he can to get them off of him he

24                doesn't I wouldn't say he was punching them because they had had

25                control of one of his arms but he was still flailing and trying to get up.

26

27  STEERS:       Okay. Which arm did they have control of?

28

                                            97

**171909396**
**H# 2019-106**
**Typed by: KWalker**
**Reviewed by:   N. Craig   /   Date: 01/15/2020**

| | | |
|---|---|---|
| 1 | | |
| 2 | GABLER: | Ah his right arm. |
| 3 | | |
| 4 | STEERS: | His right arm they had control of, okay so the arm on the south side, um |
| 5 | | where's the fire medic? |
| 6 | | |
| 7 | GABLER: | Ah at this point he's standing actually kind of in front of the tv stand |
| 8 | | now. |
| 9 | | |
| 10 | STEERS: | Okay, so he moved. |
| 11 | | |
| 12 | GABLER: | He he had just moved. |
| 13 | | |
| 14 | STEERS: | To a position on the north? |
| 15 | | |
| 16 | GABLER: | Yes. |
| 17 | [1:20:24] | |
| 18 | STEERS: | Where is the fire captain? |
| 19 | | |
| 20 | GABLER: | I don't recall. |
| 21 | | |
| 22 | STEERS: | Fire engineer? |
| 23 | | |
| 24 | GABLER: | I don't recall. |
| 25 | | |
| 26 | STEERS: | Okay. Um and then the other two subjects the other two witnesses' |
| 27 | | could you see them when you come back in the door? |
| 28 | | |

98

COSB  004913

171909396
H# 2019-106
Typed by: KWalker
Reviewed by: N. Craig / Date: 01/15/2020

| 1 | | |
|---|---|---|
| 2 | GABLER: | No. |
| 3 | | |
| 4 | STEERS: | Okay. Um when you came back in that door, your goal was to do what? |
| 5 | | |
| 6 | GABLER: | Um give the patient the medication that I needed to give him that |
| 7 | | hopefully sedate him so that we can stop the. |
| 8 | | |
| 9 | STEERS: | So gain gaining control of him, correct? |
| 10 | | |
| 11 | GABLER: | Yes. |
| 12 | | [1:20:48] |
| 13 | STEERS: | If if if he was handcuffed, and under control at that time, would you |
| 14 | | have given him that medication, do you know? |
| 15 | | |
| 16 | GABLER: | I would've reassessed um. |
| 17 | | |
| 18 | STEERS: | Okay. |
| 19 | | |
| 20 | GABLER: | My comfort level personally with having him in the ambulance, if if he |
| 21 | | was still in that mindset um while handcuffed possibly. Because it's |
| 22 | | again it's can I treat him when he's in that state. |
| 23 | | |
| 24 | STEERS: | Okay. |
| 25 | | |
| 26 | GABLER: | The answer is pretty much no. |
| 27 | | |
| 28 | | 99 |

COSB 004914

171909396
H# 2019-106
Typed by: KWalker
Reviewed by:   N. Craig   /   Date: 01/15/2020

| | | |
|---|---|---|
| 1 | STEERS: | Cause if for your safety treating him, transporting him in the ambulance |
| 2 | | even though it's a real quick drive to the hospital, you you know you |
| 3 | | have to have him ah under somewhat control, correct? |
| 4 | | |
| 5 | GABLER: | Yes. |
| 6 | | |
| 7 | STEERS: | For your safety. |
| 8 | | |
| 9 | GABLER: | Same thing when you get to the hospital too cause you can't rely on |
| 10 | | them to do it. |
| 11 | [1:21:24] | |
| 12 | STEERS: | So speaking of safety, at any time during this incident um did you feel |
| 13 | | safe from Mr. Esc es es Escudero and the way he was acting? |
| 14 | | |
| 15 | GABLER: | No. |
| 16 | | |
| 17 | STEERS: | Did you feel that he was trying to assault the deputies and the other |
| 18 | | people that were trying to help him in there? |
| 19 | | |
| 20 | GABLER: | Yes. |
| 21 | | |
| 22 | STEERS: | Okay. Um did you feel in the actions that you saw the deputy ah |
| 23 | | deputies do, did you feel it was reasonable? |
| 24 | | |
| 25 | GABLER: | Absolutely. |
| 26 | | |
| 27 | | |
| 28 | | |

100

COSB  004915

171909396
H# 2019-106
Typed by: KWalker
Reviewed by:   N. Craig   /   Date: 01/15/2020

| | | |
|---|---|---|
| 1 | STEERS: | Um did you think that they were trying to inflict ah any type of injury on |
| 2 | | Mr. Escudero as like punishment or anything like that? |
| 3 | | |
| 4 | GABLER: | No. |
| 5 | [1:21:57] | |
| 6 | STEERS: | Okay. Um so you come in and which the right arm is under control, |
| 7 | | explain how it's under control. |
| 8 | | |
| 9 | GABLER: | Um one of the deputies. |
| 10 | | |
| 11 | STEERS: | Mmm-huh. |
| 12 | | |
| 13 | GABLER: | Was holding his right arm back and I had came in and said "let me let |
| 14 | | me get an arm so I can give the medication" that's when the left arm |
| 15 | | was kind of di restrained up above his arm. |
| 16 | | |
| 17 | STEERS: | Okay. |
| 18 | | |
| 19 | GABLER: | Or up above his head I'm sorry. |
| 20 | | |
| 21 | STEERS: | Okay. |
| 22 | | |
| 23 | GABLER: | And I was able to give the medication. While giving the medication he |
| 24 | | was still flailing I was having a hard time to even visualize my sight for |
| 25 | | the medication. |
| 26 | | |
| 27 | | |
| 28 | | 101 |

COSB  004916

171909396
H# 2019-106
Typed by: KWalker
Reviewed by:   N. Craig   /   Date: 01/15/2020

| 1 | | |
|---|---|---|
| 2 | STEERS: | What does agonal mean? |
| 3 | | |
| 4 | GABLER: | Very deep and elongated breath. |
| 5 | | |
| 6 | STEERS: | Mmm-huh. |
| 7 | | |
| 8 | GABLER: | But one or two maybe three minute meaning it's like the last breaths |
| 9 | | you take kind of thing. |
| 10 | | |
| 11 | STEERS: | Okay. |
| 12 | | |
| 13 | GABLER: | Um so at that point is when we put him on the gurney, the fire medic |
| 14 | | assessed a pulse, we said "we still have a pulse let's start bagging him" |
| 15 | | via the resp we'll give him rescue breaths via the bag valve mask, we |
| 16 | | took him to the ambulance um set him in the ambulance got that thing |
| 17 | | locked up and we drove to the hospital. |
| 18 | [1:24:06] | |
| 19 | STEERS: | Okay. When you come back in to administer the Versed ah all three |
| 20 | | deputies you said "the two were on the like upper torso and one was |
| 21 | | down on the legs" or well I take that back you said "one was upper torso |
| 22 | | one was the female you believe was down on the legs and the other |
| 23 | | one you didn't quite know exactly where he was" but I think earlier you |
| 24 | | said "they were like all on their knees with Mr. they were all engaging |
| 25 | | Mr. Escudero at the time", correct. |
| 26 | | |
| 27 | GABLER: | Yes sir. |
| 28 | | 104 |

171909396
H# 2019-106
Typed by: KWalker
Reviewed by:  N. Craig  /  Date: 01/15/2020

| 1 | | |
|---|---|---|
| 2 | STEERS: | You know the the third deputy wasn't in the other room or outside just |
| 3 | | just standing watching he was engaging Mr  Escudero at the time, |
| 4 | | correct? |
| 5 | | |
| 6 | GABLER: | Yes. |
| 7 | | |
| 8 | STEERS: | An and I think you said earlier "that they were all down on their knees", |
| 9 | | right? |
| 10 | | |
| 11 | GABLER: | Yes. If not at kneeling position with a foot down knee down kind of |
| 12 | | thing. |
| 13 | [1:24:44] | |
| 14 | STEERS: | Okay. So yeah so maybe one knee up one knee down. |
| 15 | | |
| 16 | GABLER: | Yes sir. |
| 17 | | |
| 18 | STEERS: | Ah did you tell was any of em on top of Mr. Escudero on top of his ah |
| 19 | | back or chest? |
| 20 | | |
| 21 | GABLER: | Not that I could really recall, no. |
| 22 | | |
| 23 | STEERS: | Okay. So they're struggling with the arms trying to gain control of the |
| 24 | | arms, you don't remember if they're on top of the back or chest, ah but |
| 25 | | they're definitely down at least down to one knee um and underneath |
| 26 | | Mr. Escudero um because now he did you notice he had a head |
| 27 | | lacerations at that time? |
| 28 | | 105 |

COSB  004920

171909396
H# 2019-106
Typed by: KWalker
Reviewed by:   N. Craig   /   Date: 01/15/2020

1

2   GABLER:          Yeah.

3

4   STEERS:          Okay.

5

6   GABLER:          That was just me kind of giving him like the eyeball.

7

8   STEERS:          Okay.

9

10   GABLER:          Making sure what it was.

11

12   STEERS:          A quick assessment.

13

14   GABLER:          To see. Yeah.

15   [1:26:17]

16   STEERS:          Alright. And you didn't see any other weapons ah as far as ah a baton

17                          or any anything else?

18

19   GABLER:          No.

20

21   STEERS:          That was in plain in that scene at that time?

22

23   GABLER:          Ah not that recall, no.

24

25   STEERS:          Okay. You guys load him up, you take and you take him out, right?

26

27   GABLER:          Yes sir.

28                                                                108

171909396
H# 2019-106
Typed by: KWalker
Reviewed by:   N. Craig   /   Date: 01/15/2020

| | | |
|---|---|---|
| 2 | STEERS: | And and in this case you you felt like he was acting as if he was excited |
| 3 | | delirium? |
| 4 | | |
| 5 | GABLER: | Absolutely. |
| 6 | [1:27:17] | |
| 7 | STEERS: | Okay. And um in cases of excited delirium that's one of the cases that |
| 8 | | you would that's one of the reasons why you would administer Versed, |
| 9 | | correct? |
| 10 | | |
| 11 | GABLER: | Yes sir. |
| 12 | | |
| 13 | STEERS: | In your training um have you ever heard or been instructed about any |
| 14 | | problems or issues of administering Versed after Narcan's been |
| 15 | | administered? |
| 16 | | |
| 17 | GABLER: | It's always a a thought in the back of your head because the Versed |
| 18 | | can cause um a respiratory decrease or respiratory rate decrease. |
| 19 | | |
| 20 | STEERS: | Okay. |
| 21 | | |
| 22 | GABLER: | Especially with them already being from the or having the issue from |
| 23 | | the heroin it's something that you have to consider |
| 24 | | |
| 25 | STEERS: | Okay. |
| 26 | | |
| 27 | | |
| 28 | | |

COSB  004925

171909396
H# 2019-106
Typed by: KWalker
Reviewed by:   N. Craig   /   Date: 01/15/2020

| 1 | GABLER: | Um especially with the amount given but because of the case and the |
| 2 | | circumstance that was our option. |
| 3 | [1:28:04] | |
| 4 | STEERS: | Okay. I want you to explain a a little bit eh cause I know you say "case |
| 5 | | and circumstance" but um if you could do me a favor explain to me why |
| 6 | | you felt that that the need to administer Versed knowing that Narcan wa |
| 7 | | was already administered, why there was a need to administer the |
| 8 | | Versed. |
| 9 | | |
| 10 | GABLER: | So the Narcan was given to wake him up from the heroin. |
| 11 | | |
| 12 | STEERS: | Mmm-huh. |
| 13 | | |
| 14 | GABLER: | The Versed was given to sedate him and not chemically paralyze not |
| 15 | | chemically anything chemically sedate so that we would be able to do |
| 16 | | our jobs um without that being given we wouldn't of been able to do any |
| 17 | | of that we wouldn't of been able to access his head see what we really |
| 18 | | had to look at access his injuries or do anything um with him simply |
| 19 | | being in restraints I believe he could've broken our restraints on the |
| 20 | | gurney even with him being in handcuffs I didn't feel safe with him in the |
| 21 | | back of the ambulance. The excited delirium, is more it's obviously |
| 22 | | something that we look at we look for but it's a consideration for your |
| 23 | | own personal safety more than anything. Um if you feel then with the |
| 24 | | excited delirium um scope and you feel you can give them medications |
| 25 | | suc successfully and safely you can do it. |
| 26 | | |
| 27 | STEERS: | So if. |
| 28 | | |

COSB  004926

171909396
H# 2019-106
Typed by: KWalker
Reviewed by:   N. Craig   /   Date: 01/15/2020

1

2    GABLER:        If that answers your question.

3

4    STEERS:        If to a degree.

5

6    GABLER:        Okay.

7    [1:29:16]

8    STEERS:        But I I'm trying to simplify it to make sure I'm not misunderstanding

9                   anything, do you believe that if you had not given the Versed that he

10                  would've been able to ah assault you, your partner um or um assault

11                  the ah the deputies that are there and you guys would not have been

12                  able to administer any type of ah aid to him medically for the original

13                  reason why you guys were there?

14

15   GABLER:        Yes.

16

17   STEERS:        Okay. And so the need to administer the Versed was it is it your opinion

18                  that the need to administer the Versed um out weighed the risk of giving

19                  him Versed after the Nar the Narcan?

20

21   GABLER:        Yeah.

22

23   STEERS:        You know what I mean with this.

24

25   GABLER:        Yeah.

26

27

28                                          112

171909396
H# 2019-106
Typed by: KWalker
Reviewed by:   N. Craig   /   Date: 01/15/2020

| | | |
|---|---|---|
| 1 | STEERS: | The need to protect the safety and calm the whole situation down out |
| 2 | | weighed. |
| 3 | | |
| 4 | GABLER: | Yes. |
| 5 | | |
| 6 | STEERS: | Any any risk of giving it after the Narcan? |
| 7 | | |
| 8 | GABLER: | Yes. |
| 9 | [1:30:03] | |
| 10 | STEERS: | Okay. The does AMR have any policy in place or fire department in |
| 11 | | policy in place that in place that you're aware of or procedure that |
| 12 | | you're aware of as far as um restraining ah a patient prior to giving him |
| 13 | | Narcan? |
| 14 | | |
| 15 | GABLER: | No there's not policy in place. |
| 16 | | |
| 17 | STEERS: | Nothing like that. |
| 18 | | |
| 19 | GABLER: | No. |
| 20 | | |
| 21 | STEERS: | Okay. And then I know you're already went through like 90 percent of |
| 22 | | the time is never an issue. Um I think I got I covered all my little notes |
| 23 | | here. |
| 24 | | |
| 25 | MORENO: | You know what just a couple things I forgot, if you could just date ah |
| 26 | | yeah sign and date the photographs and the sketches. |
| 27 | | |
| 28 | | 113 |

COSB  004928

EXHIBIT "6"

171909396
H# 2019-106
Typed by: KWalker
Reviewed by:  N. Craig    /    Date: 1/15/20

1    ALEX GABLER INTERVIEW PART 2

2

3    STEERS:        Alright it is Friday October 25th, 2019, it is approximately 1044 hours,

4                          this is Sergeant Joseph Steers along with Detective ah Jerry Moreno

5                          and fire ah and Paramedic Alex Gabler from AMR. We're in the parking

6                          lot of the Target in Apple Valley on Bear ah Bear Valley Road, doing a

7                          quick initial follow up interview um because ah Mr. Gabler's on duty. Ah

8                          thank you Mr. Gabler for coming and talking with us, um I just had three

9                          follow up questions um after we were conducting in the additional

10                        interviews and investigation. Um your protocol's through AMR

11                        paramedic you guys follow the ICEMA protocol's, correct?

12

13    GABLER:        Yes.

14    [00:41]

15    STEERS:        And in the ICEMA protocol's as to the administration ah the

16                          administering of um Versed, um we spoke previously in the interview

17                          where you said that you administered five milligrams of Versed and

18                          then something to the effect of immediately after ah administered

19                          another five milligrams of Versed, um what was can you define for me

20                          what was immediately after like estimate what your time what the time

21                          period was in between the two.

22

23    GABLER:        Um my estimation between the two periods of administration would be

24                          maybe one to two minutes 30 s in between 30 seconds and two

25                          minutes we'll say that cause I don't recall exactly what it was but in the

26                          term of "immediately after" it was it was under two minutes.

27

28                                                                1

171909396
H# 2019-106
Typed by: KWalker
Reviewed by:  N. Craig    /   Date: 1/15/20

| 1 | STEERS: | Okay. And So you weren't looking at your watch taking a look at taking |
| 2 | | a look at your watch like timing it out or anything like that, correct? |
| 3 | | |
| 4 | GABLER: | No, not at the time, no. |
| 5 | | |
| 6 | STEERS: | Okay. And um what was your reasoning for administering ah the full ten |
| 7 | | milligrams so quickly um I know you touched on it a little on your |
| 8 | | interview, but but to reiterate um as far as um 30 seconds to to two |
| 9 | | minutes after doing it immediately, what was what was the reasoning |
| 10 | | for doing that? |
| 11 | | |
| 12 | GABLER: | Um after the initial dose there was little to no change in his condition as |
| 13 | | to him being um worked up to say the least, he was still fighting still not |
| 14 | | working and complying with what we were trying to do, and I knew that |
| 15 | | if I withheld the second it wouldn't change um so that's why we went I |
| 16 | | went with the second round the second dose. |
| 17 [02:07] | | |
| 18 | STEERS: | So based on the totality of everything that had transpired, the the |
| 19 | | assault on the officers and and on the other medic and and everyone |
| 20 | | else um you felt it was necessary to make sure that the the full dosage |
| 21 | | went through in order to try to sedate and deescalate the situation, is |
| 22 | | that correct? |
| 23 | | |
| 24 | GABLER: | Yes sir. |
| 25 | | |
| 26 | STEERS: | Okay, is there anything else you can think we need to know. |
| 27 | | |
| 28 | | 2 |

EXHIBIT "C"

Risa S. Christensen, Esq. (SBN: 227799)
Dennis E. Wagner, Esq. (SBN: 99190)
**WAGNER ZEMMING CHRISTENSEN, LLP**
1325 Spruce Street, Suite 200
Riverside, CA 92507
Tel.:        (951) 686-4800
Fax:        (951) 686-4801
rsc@wzclawfirm.com
dew@wzclawfirm.com

Attorneys for Defendants, COUNTY OF SAN BERNARDINO; HUMBERTO MIRANDA; JULIAN MATA; and JESSAQUA ATTLESEY

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CECILIA VARGAS; ARIANA SALAS, individually and as a successor-in-interest to RUBEN ESCUDERO, deceased,<br><br>            Plaintiffs,<br><br>vs.<br><br>COUNTY OF SAN BERNARDINO; H. MIRANDA; S. CARTER; Z. VOGEL; J. MATA; Z. PRITCHETT; J. JIMENEZ; A. MATA; T. KAUTZ; J. ATTLESEY; RODRIGUEZ (first initial unknown) and DOES 1-10, inclusive,<br><br>            Defendants. | CASE NO: 5:20-cv-02646-JGB-KK<br><br>**DECLARATION OF SERGEANT NICOLAS CRAIG IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT OR IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT**<br><br>*[Filed concurrently w/ Notice of Motion and Motion for Summary Judgment; Statement of Undisputed Facts; and (Proposed) Judgment]*<br><br>**Date:**       March 6, 2023<br>**Time:**       9:00 a.m.<br>**Courtroom:** 1<br><br>Hon. Jesus G. Bernal<br>United States District Judge |

1

DECLARATION OF SERGEANT NICOLAS CRAIG IN SUPPORT OF DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT

1    I, NICOLAS CRAIG, declare as follows:

2    That I am employed with the San Bernardino County Sheriff's

3    Department. I have been so employed since December 3, 2011. That my current

4    rank is Sergeant and I have held this rank since August 14, 2021. I am currently

5    assigned to the Victorville Station. That I have personal knowledge of the facts as

6    set forth in this declaration and if called to testify I could and would do so

7    competently thereon.

8        1.    That whenever an officer is involved in an incident which results in

9    a lethal force encounter ("LFE"), the homicide department is charged with the

10   investigation which ultimately will result in the completion of a report which

11   shall include the call history, testing of evidence, summaries of witness

12   statements, statements, photographs, diagrams, evidence reports, audio

13   recordings, transcripts if they are made, videos if any exist, as well as hospital

14   information, coroner autopsy report, toxicology information, and any and all

15   evidence that has been located, identified, and obtained.  That this information is

16   compiled by the homicide team that is assigned for the investigation.  The

17   department has a number of teams that are set up to handle homicides.

18   Generally, a member of the team is assigned a case agent and ultimately

19   responsible for coordinating all aspects of the homicide report.  In this case

20   involving Mr. Escudero, I would have been the case agent and had such

21   responsibility.

22       2.    After our report is prepared, it is provided to the office of the district

23   attorney for their review.

24       3.    At some point in time there is a LFE review board, which is

25   convened with legal counsel to review the subject incident.  At this point,

26   homicide makes a detailed presentation of what occurred in the underlying

27   incident as part of its presentation.  After its presentation is concluded, the

28   homicide team is excused, whereas the LFE review board and county counsel

2

1   remain to discuss the presentation.

2       4.    In the Escudero case I was assigned  as the case agent and would

3   have been responsible for handing out assignments to other members of the team

4   to coordinate activities. In this regard, Eric Ogaz and Jerry Moreno assisted me in

5   this investigation.  In this case I participated in all three of the interviews of the

6   involved deputies who were present with Mr. Escudero.  As part of the

7   investigation, it is routine that interviews are conducted with the deputies that are

8   involved in a LFE (lethal force encounter).  That voluntary recorded statements

9   were taken from the three deputies.  All three deputies agreed to voluntarily

10   provide statements. I also attempted to participate in interviews with Mr.

11   Crummel and Ms. Hernandez who were originally cooperative in providing

12   statements on October 19, 2019 to other deputies who were interviewing them,

13   but were later uncooperative and did not participate in providing information for

14   our investigation which started after Escudero passed away on October 22, 2019.

15       5.    That on October 23, 2019 at approximately 9:57 a.m., I conducted

16   an interview of Martin Alcon at headquarters with another member from our

17   department, Detective Souza.  Martin Alcon was an engineer with the City of

18   Victorville Fire Department and was present at the time of the drug overdose

19   involving Ruben Escudero.

20       6.    That the interview with Mr. Alcon was recorded and attached hereto

21   and incorporated herein as **Exhibit 1(f)** is a true and correct copy of the interview

22   with Martin Alcon.  That I have reviewed a transcript of the interview that was

23   conducted with Martin Alcon and have compared the transcript with the audio

24   recording of the interview and find that the transcript fairly and accurately

25   reflects the statements that were made by Mr. Alcon during the interview.  That

26   attached hereto and incorporated herein as **Exhibit 7** is a true and correct of the

27   transcript of the interview of Martin Alcon on the October 23.

28   / / /

1      I declare under penalty of perjury under the laws of the State of California

2  and the United States of America, that the foregoing is true and correct.

3      Executed this 25th day of January 2023 in _VICTORVILLE_____,

4  California, United States of America.

5                                        _Nick_____

6                                        NICOLAS CRAIG, Declarant

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DECLARATION OF SERGEANT NICOLAS CRAIG IN SUPPORT OF DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT

EXHIBIT "7"

Ruben Escudero

Transcription – MARTIN ALCON

[2:02:40 minutes]

| | | |
|---|---|---|
| 1 | **Sousa:** | **Narcie Sousa** |
| 2 | **Craig:** | **Nicholas Craig** |
| 3 | **Alcon:** | **Martin Alcon, Engineer, Victorville Fire Dept.,** |
| 4 | -------------------------------------------------- | |
| 5 | Sousa: | It is October 23, 2019 at approximately 0957 hours. I am in an |
| 6 | | interview room at Headquarters reference case number 171909396, |
| 7 | | H# 106. Meeting with Fire Captain, I'll be with |
| 8 | Craig: | With Detective Craig. Hi Sir. |
| 9 | Sousa: | Sir, how are you? |
| 10 | Alcon: | Hi. Martin. |
| 11 | Sousa: | Narcie Sousa nice to meet you Martin. I'm going to shut this so |
| 12 | | people don't walk by. |
| 13 | Craig: | So, if you don't mind I'm just going to leave ah I'm just going to get |
| 14 | | kind of your basic kind of horse power real quick. |
| 15 | Alcon: | Okay. |
| 16 | Craig: | You first name? |
| 17 | Alcon: | Martin, M-A-R-T-1-N. |
| 18 | Craig: | And you last name? |
| 19 | Alcon: | Alcon, A-L-C-0-N. |
| 20 | Craig: | And Martin your date of birth? |
| 21 | Alcon: | REDACTED -61. |
| 22 | Craig: | You got an employee number with the county? |
| 23 | Alcon: | I do, but I don't know it. |
| 24 | Craig: | Okay. |
| 25 | | 1 |
| 26 | | Alcon – Transcription Sousa and Craig Interview |
| 27 | | |
| 28 | | |

Ruben Escudero

Transcription – MARTIN ALCON

[2:02:40 minutes]

| | | |
|---|---|---|
| 1 | Craig: | Yeah, sometimes you prefer to give out your company's. |
| 2 | Alcon: | Department. |
| 3 | Craig: | Yeah, yeah, um, now what, what is your current employment? |
| 4 | Alcon: | My current employment is a Fire Engineer with Victorville Fire |
| 5 | | Department. |
| 6 | Craig: | Is that technically San Bernardino Fire? |
| 7 | Alcon: | No. |
| 8 | Craig: | That's Victor, Victorville. |
| 9 | Alcon: | That's Victorville, the city of Victorville have their own fire |
| 10 | | department. |
| 11 | Craig: | Okay. |
| 12 | Alcon: | And then they contracted to San Bernardino County, um and they |
| 13 | | had them for ten years and then as of March 30th of this year, |
| 14 | | Victorville took back their Fire Department so now they have their |
| 15 | | own fire department. |
| 16 | Craig: | Oh, okay. |
| 17 | Alcon: | They have San Bernardino· County as well. |
| 18 | **3:15** | |
| 19 | Craig: | So, you technically work for Victorville? |
| 20 | Alcon: | So, I work for the city of Victorville. |
| 21 | Craig: | Got you, all right, cool. And you said you are a fire engineer. |
| 22 | Alcon: | Correct. |
| 23 | Craig: | And what is your like engine number? |
| 24 | Alcon: | Ah medic engine 311. |
| 25 | | |
| 26 | | |
| 27 | | |
| 28 | | |

3

Ruben Escudero

Transcription – MARTIN ALCON

[2:02:40 minutes]

| | | |
|---|---|---|
| 1 | Craig: | Okay. And how long have you been a firefighter for? |
| 2 | Alcon: | Totally, 38 years? |
| 3 | Craig: | 38 years? |
| 4 | Alcon: | I originally started with the city of Corona and then went to Orange |
| 5 | | County Fire, retired went to Disneyland Fire Department and now |
| 6 | | I'm with Victorville. |
| 7 | Craig: | Okay. How long have you been with Victorville? |
| 8 | Alcon: | So Victorville, by employee start date was February 25th of this year |
| 9 | Craig: | Did you say you worked for Disneyland Fire is that what you said? |
| 10 | Alcon: | Yes, I do |
| 11 | Craig: | How long did you do that? |
| 12 | Alcon: | I'm still currently there, 17 years. |
| 13 | Craig: | Oh yeah, okay. Is that like in the park itself? |
| 14 | Alcon: | That's actually in the park. Disneyland has their own fire department |
| 15 | | in the park and we will handle everything in the park unless there is |
| 16 | | an active flames and fire showing then they will dispatch Anaheim |
| 17 | | and us, but I would say 9 time out of 10 we handle it before |
| 18 | | Anaheim gets there. |
| 19 | Craig: | All right, so curiosity ah basic question dude how crazy do those |
| 20 | | rides get, to them ever like, you know shoot out fire, something |
| 21 | | mad? |
| 22 | Alcon: | Umm, no we're there for all so, so we do all fire standbys. Any. |
| 23 | | Disney's policy is there any hot work, grinding, cutting, welding |
| 24 | Craig: | Oh, okay. |
| 25 | | |
| 26 | | |
| 27 | | |
| 28 | | |

4

Alcon – Transcription Sousa and Craig Interview

Ruben Escudero

Transcription – MARTIN ALCON

[2:02:40 minutes]

| | | |
|---|---|---|
| 1 | Craig: | Okay, so. |
| 2 | Alcon: | So, usually everybody gets there between 7 and 7:30. |
| 3 | Craig: | So, you started a 48-hour shift at 8:00 on, on Saturday? |
| 4 | Alcon: | Correct. |
| 5 | Craig: | The 19th? Okay. And you said this was your first call, so. |
| 6 | Alcon: | Um, yes. |
| 7 | Craig: | We're basically going to talk to you a little bit about the call that |
| 8 | | happened at 16927 Monte Vista Street. |
| 9 | Alcon: | Okay. |
| 10 | Craig: | In Victorville. Do you remember that, do you remember getting a |
| 11 | | call there? |
| 12 | Alcon: | Yes, I do. |
| 13 | Craig: | What was the call there? |
| 14 | Alcon: | The call originally came into a possible heroin overdose. So, Engine, |
| 15 | | Medic Engine 311, Medic Squad 311 and AMR were dispatched. |
| 16 | | Um, Engine 311 was first on scene, um with AMR getting on scene |
| 17 | | secondly. Do you just want me to give a narr, a narration of |
| 18 | | everything that? |
| 19 | Craig: | Yeah, just if you want to start off. |
| 20 | Alcon: | Okay, so. |
| 21 | Craig: | Tell me what happened? |
| 22 | **7:43** | |
| 23 | Alcon: | Um so, we grabbed our gear, we went inside, upon entering the |
| 24 | | house, it is a small little house. There were multiple rows, this is like |
| 25 | | |
| 26 | | |
| 27 | | |
| 28 | | |

7

Ruben Escudero

Transcription – MARTIN ALCON

[2:02:40 minutes]

| | | |
|---|---|---|
| 1 | | the time they got there everything was over, they were taking the |
| 2 | | patient. We were asked to standby and we had a different female |
| 3 | | detective, or a different female deputy took our statements. So, we |
| 4 | | remained on scene until we gave our statement on scene and then we |
| 5 | | were released. The ambulance did come back from the hospital with |
| 6 | | our paramedic with them and so they took their statements also |
| 7 | | while they were on scene. While we were waiting we heard that um |
| 8 | | the patient went into a full arrest, just as the ambulance got to the |
| 9 | | hospital. Um, but we heard that they got him back and then we heard |
| 10 | | from one of the deputies that he went into arrest again. He went into |
| 11 | | full arrest again. Ah later on during the day I was in office when our |
| 12 | | paramedic called the hospital and they said he was um stable, he was |
| 13 | | intubated and that were going to be taking him to ICU. |
| 14 | Craig: | Okay. |
| 15 | Alcon: | And that was the last that we heard of the patient or anything like |
| 16 | | that. |
| 17 | Craig: | Okay. So, if, if your cool with-it Martin, I would like to just go back |
| 18 | | and just kind of clarify some questions. |
| 19 | Alcon: | Sure. |
| 20 | Craig: | All right. Um, so who else is in your fire engine? |
| 21 | Alcon: | Um, we had an overtime captain that day, Captain Washington, oh, |
| 22 | | during this time also he was down on the ground and I had his hand |
| 23 | | he was trying to get up. Captain Washington did place a foot on his |
| 24 | | back um just shy of between shoulder blades. To kind of hold him |
| 25 | | |
| 26 | | |
| 27 | | |
| 28 | | |

12

Ruben Escudero

Transcription – MARTIN ALCON

[2:02:40 minutes]

| | | |
|---|---|---|
| 1 | | down because he was trying to get up, so the Captain did help hold |
| 2 | | him down with a foot. |
| 3 | Craig: | Okay. |
| 4 | Alcon: | Um. |
| 5 | Craig: | And, I'll, I'll, we'll go back through it and I will clarify when that |
| 6 | | happened or whatever if that is cool with you. So, I had Captain |
| 7 | | Washington who was working overtime that day and then um my |
| 8 | | Fireman/Paramedic Brett Lever was also working, that was his |
| 9 | | normal shift. So, it was normal shift for myself and the medic and a |
| 10 | | overtime shift for the Captain. |
| 11 | Craig: | Captain Washington and Paramedic Lever? |
| 12 | Alcon: | Correct. |
| 13 | Craig: | Okay. So, when you guys go out on typical calls is the paramedic |
| 14 | | usually the one doing the majority of like kind of the medical? |
| 15 | Alcon: | It's an um combined effort type thing. Usually the Captain has the |
| 16 | | iPad taking down information and stuff, um the medic will do the |
| 17 | | assessment, talk to the patient and then I usually hop in and start |
| 18 | | taking vitals, hooking up EKG patches, doing any wrapping of, if |
| 19 | | there is blood or something like that. |
| 20 | Craig: | What is the device you said the watch, or the captain carries. |
| 21 | Alcon: | Ah, it's an iPad. |
| 22 | Craig: | What's that? Oh, iPad. |
| 23 | Alcon: | It's and iPad. |
| 24 | Craig: | So; he started taking down information? |
| 25 | | 13 |
| 26 | | Alcon – Transcription Sousa and Craig Interview |
| 27 | | |
| 28 | | |

Ruben Escudero

Transcription – MARTIN ALCON

[2:02:40 minutes]

| | | |
|---|---|---|
| 1 | Alcon: | So, yeah. ISOMA which is the county medical has a form and due to |
| 2 | | the paper laws or whatever everything is electronic now. |
| 3 | Craig: | Got you. |
| 4 | Alcon: | So ours is on a iPad. |
| 5 | Craig: | Oh, right. |
| 6 | Alcon: | So he takes down patients' information. |
| 7 | Craig: | Oh, I thought you said something else, l didn't know you said iPad, |
| 8 | | I'm sorry. |
| 9 | **19:47** | |
| 10 | Alcon: | So, we did not get any information of him, um nobody there in the |
| 11 | | house knew who he was. Um, he did not have no identification. Um, |
| 12 | | there was a lady there in the house and she had no idea who he was |
| 13 | | or whatever, but he is laying down. Um, it was suspected that he was |
| 14 | | there doing drugs with somebody and then succumbed on the floor |
| 15 | | there because the woman of the house never knew him, didn't know |
| 16 | | him, wasn't related to him, didn't know who he was. |
| 17 | Craig: | Yeah. |
| 18 | Alcon: | And we didn't have any ID on him. |
| 19 | Craig: | So, um so the three of you were kind of all, are you all on that same |
| 20 | | shift? |
| 21 | Alcon: | Were all on the same. |
| 22 | Craig: | Cool. |
| 23 | Alcon: | Yeah. |
| 24 | Craig: | Cool and you said you got a call of a, of an overdose at that house. |

14

Alcon – Transcription Sousa and Craig Interview

Ruben Escudero

Transcription – MARTIN ALCON

[2:02:40 minutes]

| | | |
|---|---|---|
| 1 | | know who they were? |
| 2 | Alcon: | I, I no. I don't know their names. |
| 3 | Craig: | Okay. |
| 4 | Alcon: | I mean if I saw them again I would recognize them, but I know the |
| 5 | | one that did all had blood all over his shirt and that was the start of |
| 6 | | their shift, because he was saying, hey this is my only uniform and |
| 7 | | that he was going to have to. |
| 8 | Craig: | Okay. |
| 9 | Alcon: | Change into a Class D. |
| 10 | Craig: | Okay. Um, I guessing your saying he said that afterwards? |
| 11 | Alcon: | Yes. |
| 12 | Craig: | Oh, okay. So, when you get there the two deputies where are they |
| 13 | | at? |
| 14 | Alcon: | There were, we came in they were standing one was like standing in |
| 15 | | the kitchen and the other was kind of standing in the doorway from |
| 16 | | the kitchen to the living room. Kind of directing us to where the |
| 17 | | patient was. |
| 18 | Craig: | And, and where was the, the patient exactly? |
| 19 | Alcon: | The patient was in the kitchen, laying face up, head facing north, |
| 20 | | feet facing south and approximately, it's a small kitchen but he was |
| 21 | | approximately in the center of it, the kitchen/hallway type of thing |
| 22 | | there. |
| 23 | Craig: | Okay. And so, when you walk in his laying down like, like you said |
| 24 | | he's um, you said head laying um. |
| 25 | | |

16

| | |
|---|---|
| 26 | |
| 27 | |
| 28 | |

Ruben Escudero

Transcription – MARTIN ALCON

[2:02:40 minutes]

| | | |
|---|---|---|
| 1 | Alcon: | Facing north. |
| 2 | Craig: | Facing north and he is in the middle of the kitchen on his back? |
| 3 | Alcon: | Correct. And it's ah, it's a small narrow hallway, I'm, when I say |
| 4 | | small it's small even from this table to that wall, it was even |
| 5 | | narrower than that. |
| 6 | Craig: | Is it the kind of area where you would typically try to perform like |
| 7 | | CPR or medical areas. Or would you typically try to move him? |
| 8 | Alcon: | We would try to move him just because of the space with somebody |
| 9 | | doing CPR and somebody on the head and someone trying to start |
| 10 | | and IV and all that, we would typically move them to a larger area |
| 11 | | that we can get. |
| 12 | Craig: | And was the kitchen area just to too small? |
| 13 | Alcon: | The kitchen area was too small. |
| 14 | Craig: | So, how did he get moved to the other area? |
| 15 | Alcon: | The deputies asked if they would like him and we said, yes. So, they |
| 16 | | grabbed him by the pants and by the shirt and moved him out into |
| 17 | | the living room. |
| 18 | Craig: | Okay, when you say moved him out, do you mean pick him up or |
| 19 | | drag him or? |
| 20 | Alcon: | They picked him up, ah he was a big guy. They picked him up the |
| 21 | | best they could, but they dragged him. I mean they didn't completely |
| 22 | | get him off the ground, but one had his feet up off the ground the |
| 23 | | other one had his head and shoulders up off the ground so only his |
| 24 | | about his butt would be dragging as they took him into the livening |
| 25 | | |
| 26 | | |

17

Alcon – Transcription Sousa and Craig Interview

Ruben Escudero

Transcription – MARTIN ALCON

[2:02:40 minutes]

1    room.

2  Craig:      Okay. So, when, when they get him, got him into the living room is
3              there more area to work on him there?
4  Alcon:      Yes, there was.
5  Craig:      Okay. And you said that in that area you started to your whole team
6              started kind of work, work on him to try, try to help out right?
7  Alcon:      Correct, correct.
8  Craig:      And what was his condition that you saw then?
9  Alcon:      He was unconscious and unresponsive. He was breathing, shallow,
10             he had a pulse rate, but he didn't respond to any painful stimuli or
11             anything he was unconscious.
12 Craig:      Okay. And so, you said, you said he had, had a pulse did you see any
13             sign of like typical overdose? What would be a sign or an overdose?
14             don't know if you know but?
15 Alcon:      Um, just him being unresponsive. Um, I do remember we, he had a
16             good blood pressure, he had a good pulse rate and he was saturating
17             oxygen well. So, his vitals were good, um but he was just
18             unconscious and unresponsive.
19 Craig:      When you say good, do you recall what that means?
20 Alcon:      Um, within normal limits of, of when you go to school um, you
21             know ah blood pressure between this rate and this rate, you know a
22             pulse rate um, you know in the 70's um oxygen in the, in the 90's
23             area um, I want his blood pressure is one I think like 120 over
24             something. It wasn't unremarkable that would be kind of set vitals
25
                                    18
26                  Alcon – Transcription Sousa and Craig Interview
27
28

Ruben Escudero

Transcription – MARTIN ALCON

[2:02:40 minutes]

| | | |
|---|---|---|
| 1 | | with more experienced medics says that's why we normally don't do |
| 2 | | this. We were allowed to give this much but we will only give him |
| 3 | | enough to keep him alive until we get him to the hospital and let |
| 4 | | them do it because a lot of times in does come into a combative |
| 5 | | issue when they come completely out of it. |
| 6 | **33:21** | |
| 7 | Craig: | Okay. And, and have you seen that before in the past? |
| 8 | Alcon: | Yes. |
| 9 | Craig: | Okay. So, you didn't actually the, the um Narcan? |
| 10 | Alcon: | No. |
| 11 | Craig: | So, is it fair to say that you are kind of speculating about how much |
| 12 | | was given just being based on the word of someone else or is that? |
| 13 | Alcon: | Um, I believe he said he gave the full amount. |
| 14 | Craig: | All right. |
| 15 | Alcon: | And I did see the syringe, um laying on the chair and I looked it up |
| 16 | | and it had all been expelled. |
| 17 | Craig: | All right. Um, and where were the deputies when, when ah the |
| 18 | | Narcan was applied? |
| 19 | Alcon: | Um, we had if the patient was laying down on the floor like we said, |
| 20 | | feet heading west, head north laying there the one deputy was in the |
| 21 | | area on the upper right shoulder, wasn't directly behind him, he was |
| 22 | | off to the side a little bit and the other deputy was on the other side |
| 23 | | of him. |
| 24 | Craig: | Okay. |
| 25 | | |
| 26 | | |
| 27 | | |
| 28 | | |

24

Ruben Escudero

Transcription – MARTIN ALCON

[2:02:40 minutes]

| | | |
|---|---|---|
| 1 | Alcon: | So, when he sat up the deputy was right behind him on his, right |
| 2 | | behind his left shoulder and his back so he had his back. Um, |
| 3 | | holding him there when he was dry-heaving. I couldn't really tell |
| 4 | | the other deputy was on the other side. I know they were both bent |
| 5 | | over at the time. |
| 6 | Craig: | Okay, they were standing up and bent over? |
| 7 | Alcon: | So, they were standing up and when he got up to leave, they bent |
| 8 | | down to help assist him sitting up. Um, gagging and then afterwards |
| 9 | | they tried to get him to lay back down so they tried to assist him in |
| 10 | | laying him back down. |
| 11 | Craig: | How quick do you think the Narcan took effect to where he set up? |
| 12 | Alcon: | Umm, from the time they, shit, probably within a minute or two. |
| 13 | Craig: | Okay. |
| 14 | Alcon: | But it was pretty quick, it didn't take that long. |
| 15 | Craig: | Okay, is that normal? |
| 16 | Alcon: | Yeah. |
| 17 | Craig: | Okay. And so, when he sat up did anybody say anything to him or |
| 18 | | anything or? |
| 19 | Alcon: | Um, yeah, they, they tried to say when he was sitting up, they said |
| 20 | | lay down, you know let us take care of you, he didn't respond |
| 21 | | because he was doing the dry-heave, vomit, dry-heave type of thing. |
| 22 | Craig: | Okay. And do you know who told him to, to lay down do you? |
| 23 | Alcon: | The deputy. |
| 24 | Craig: | Okay. And was he doing anything else besides vomiting or dry- |
| 25 | | |
| 26 | | |
| 27 | | |
| 28 | | |

Ruben Escudero

Transcription – MARTIN ALCON

[2:02:40 minutes]

| | | |
|---|---|---|
| 1 | Craig: | Is he sitting, sitting still kind of on his butt, just sitting there? |
| 2 | Alcon: | Umm. |
| 3 | Craig: | Or what was he doing? |
| 4 | Alcon: | He was sitting on his butt and then that, at that point, you know it |
| 5 | | was kind of hard because things started moving, he started moving |
| 6 | | around, the deputies, the two deputies, so it was all three of them |
| 7 | | that were there trying to move around, but I know he still stayed in |
| 8 | | that central orientation where his feet were to the north and his to the |
| 9 | | south some. |
| 10 | Craig: | Okay. I was going to ask you that because um, I was a little |
| 11 | | confused because now is it just the two deputies there when, when |
| 12 | | he sat up. He's asking what's going on, the deputies are trying to |
| 13 | | grab his arms you said, kind of wrestling. |
| 14 | Alcon: | Um hum. |
| 15 | Craig: | Issue, they are not striking him, and he hasn't struck anybody yet is |
| 16 | | that right? |
| 17 | Alcon: | Correct. |
| 18 | Craig: | Okay. And um is it just the two males deputies still? |
| 19 | Alcon: | Correct. |
| 20 | Craig: | Okay. And is he getting more. |
| 21 | Alcon: | He is getting more agitated. |
| 22 | Craig: | Okay. |
| 23 | Alcon: | I mean he is, he is now physically getting more agitated he is trying |
| 24 | | to push. Um, I have my back, so I don't know if he swung, I know |
| 25 | | |
| 26 | | |
| 27 | | |
| 28 | | |

27

Ruben Escudero

Transcription – MARTIN ALCON

[2:02:40 minutes]

| | | |
|---|---|---|
| 1 | | the dep, the paramedics said a swung almost hit him when he did. I |
| 2 | | know when he finally stood up he was swinging, but when they were |
| 3 | | down wrestling I never saw the female deputy come on scene, I |
| 4 | | never saw her until we heard the pop and people cleared and she was |
| 5 | | tasing and that was the first time that I had noticed we had a third |
| 6 | | deputy on scene. I never saw her arrive or anything, until she tased |
| 7 | | him. |
| 8 | Craig: | Okay. And so, when he is standing up and he is doing this where he |
| 9 | | is just starting now to swing, swing around, where were you at? |
| 10 | Alcon: | I was still on the um east side of the living room. So, I was still east |
| 11 | | of them and once he gets up. |
| 12 | Craig: | By his head or is that by. |
| 13 | Alcon: | He was standing up so, I would have been on his right side and when |
| 14 | | he stood up that's when he actually started swinging and pushing. |
| 15 | | So, the deputies had pushed him against the wall to keep him, the |
| 16 | | wall and they were trying to get him and that's when I saw the first |
| 17 | | deputy hit him in the head. |
| 18 | Craig: | Okay. So, can you explain that to me how he got up, because now, I |
| 19 | | guess we're, we're kind of moving forward, so if you, so if he's |
| 20 | | sitting on his butt and |
| 21 | Alcon: | So. |
| 22 | Craig: | And the deputies are trying to stop him from wrestling and |
| 23 | | something. |
| 24 | Alcon: | So, after they tased him, or while they tased him, everybody moved |

28

Ruben Escudero

Transcription – MARTIN ALCON

[2:02:40 minutes]

| | | |
|---|---|---|
| 1 | | back so nobody had hands on him, he was by himself. Being, when |
| 2 | | he got tased. After it was done they started to come back to subdue |
| 3 | | him and that brief moment when nobody he was able to give him an |
| 4 | | advantage where he could get on his hands or get on. |
| 5 | Craig: | Okay. |
| 6 | Alcon: | Get on his hands or knees or get up? |
| 7 | Craig: | Okay, so let me just clarify. So, he's, the two, the two male deputies |
| 8 | | are there, he is on his butt and the female deputy is not there yet. |
| 9 | | And then you're kind of, are you stepping back and someone tase' |
| 10 | | him or who tase' him? |
| 11 | Alcon: | Oh, I won't say he was on his, I don't know, they were wrestling |
| 12 | | with him. The, I'm stand back, he is on the ground, he is actually |
| 13 | | laying on his, laying on the ground. I won't say he is sitting up, he's |
| 14 | | wrestling with him. I couldn't really see how his body position was |
| 15 | | because it was moving. The two deputies were on top of him, um it |
| 16 | | wasn't until he was tased and they moved back that I saw that he was |
| 17 | | at that completely supine on his back. |
| 18 | Craig: | Okay and was the female deputy there now at this point, or did |
| 19 | | someone else tase him? |
| 20 | Alcon: | It was the female deputy that tased him. |
| 21 | Craig: | Okay. So, |
| 22 | Alcon: | So, l didn't even, I didn't even notice she, she showed up, I didn't |
| 23 | | even know she was there. It wasn't until we heard the popping of the |
| 24 | | tasing and everybody got off, which then you saw her at the |

29

25
26
27
28

Ruben Escudero

Transcription – MARTIN ALCON

[2:02:40 minutes]

| 1 | Craig: | All right. |
|---|---|---|
| 2 | Alcon: | So, probably eleven to twelve feet wide as. |
| 3 | Craig: | The whole room. |
| 4 | Alcon: | The whole room? |
| 5 | **43:13** | |
| 6 | Craig: | Yeah. So, if I'm understanding you right um, when you step back |
| 7 | | away, you heard the popping you see the female deputies has |
| 8 | | arrived, which you hadn't seen her before that. |
| 9 | Alcon: | Correct. |
| 10 | Craig: | And the two male deputies are still kind of wrestling with them. |
| 11 | | Have you seen anybody been punching each other before hand? |
| 12 | Alcon: | No. |
| 13 | Craig: | Okay, have you seen the patient hit anybody beforehand, or before |
| 14 | | the tasing? |
| 15 | Alcon: | Um, no. It was more of just trying to stand up and push away kind |
| 16 | | of. I had his back was towards me for most of the time when this |
| 17 | | was going, and I had a deputy between me and him, so the deputy |
| 18 | | was blocking my view at times also. |
| 19 | Craig: | And are you more by the door or are you more by the kitchen? |
| 20 | Alcon: | I'm more by the kitchen. |
| 21 | Craig: | Okay. |
| 22 | Alcon: | I'm at the kitchen area. |
| 23 | Craig: | Okay. What happens um after you hear um the taser and you look, |
| 24 | | and you see that the female deputy is there and, and did you see the |
| 25 | | |
| 26 | | |

31

Alcon – Transcription Sousa and Craig Interview

Ruben Escudero

Transcription – MARTIN ALCON

[2:02:40 minutes]

| | | |
|---|---|---|
| 1 | | darts hit the, the ah patient? |
| 2 | Alcon: | Um, the darts have already hit, I do see the wires going from the |
| 3 | | patient. |
| 4 | Craig: | Okay. |
| 5 | Alcon: | To the taser. |
| 6 | Craig: | Where did that, where did that ah, ah wires go to, where did they hit |
| 7 | | him? |
| 8 | Alcon: | I want to say they hit him somewhere between the knees and the |
| 9 | | chest down type of thing. |
| 10 | Craig: | Okay. |
| 11 | Alcon: | They hit him in the lower region. |
| 12 | Craig: | And, and did everybody step back from him or? |
| 13 | Alcon: | Yes. Everybody completely stepped back from him while she was |
| 14 | | tasing, so he was laying on his back, arms curled, he was gritting his |
| 15 | | teeth, and everybody had stepped completely back from him. |
| 16 | Craig: | Okay. What happened at that point? |
| 17 | Alcon: | After she stopped, the two deputies went to try to subdue him or cuff |
| 18 | | him and by that time he was fully back into it. Like I said he ended |
| 19 | | up getting up onto his feet. |
| 20 | Craig: | What does back into mean? |
| 21 | Alcon: | He was fully back to where he was before. Conscious, well |
| 22 | | conscious/ orientated as to what was going on enough that he was |
| 23 | | still, he start fighting with them. |
| 24 | **45:37** | |
| 25 | | |
| 26 | | |
| 27 | | |
| 28 | | |

32

Alcon – Transcription Sousa and Craig Interview

Ruben Escudero

Transcription – MARTIN ALCON

[2:02:40 minutes]

| | | |
|---|---|---|
| 1 | | so. |
| 2 | Craig: | What does that look like? |
| 3 | Alcon: | Um they are pushing him, and I couldn't really tell where his arms |
| 4 | | were, but he was up, but he's moving around. He is squiggly and |
| 5 | | trying to move around. |
| 6 | Craig: | Okay, is anybody telling him anything? |
| 7 | Alcon: | Um, the only thing I remember is the female deputy telling him to |
| 8 | | lay down on the ground that they were trying to help him. |
| 9 | Craig: | Okay. And did he seem to comply with anything they were saying or |
| 10 | | was he trying to fight or what was he trying to do? |
| 11 | Alcon: | No. No, he wasn't complying. I do know other talking was going on, |
| 12 | | but he wasn't complying with any of their orders that were given to |
| 13 | | him. |
| 14 | Craig: | Okay. |
| 15 | Alcon: | Throughout the whole thing because they have asked him to lay |
| 16 | | down, they've ask you know, give me your arm, you know they said |
| 17 | | hey, were trying to help you and they he didn't comply with any of |
| 18 | | their orders. |
| 19 | Craig: | And you said that the deputy that was closest to you, the one who |
| 20 | | ended up with most of the blood on him, punched the um |
| 21 | | suspect, the guy who was, had overdosed. Um, so how many times |
| 22 | | did he punch him? |
| 23 | Alcon: | Oh, probably four or five times. |
| 24 | Craig: | Okay. And was that effective, did that do anything? |
| 25 | | |
| 26 | | |
| 27 | | |
| 28 | | |

35

Ruben Escudero

Transcription – MARTIN ALCON

[2:02:40 minutes]

| | | |
|---|---|---|
| 1 | | him to the ground. Kind of like all in one motion at a time. |
| 2 | Craig: | Okay. |
| 3 | Alcon: | Um, while he was on the ground he was still squiggling, fighting I |
| 4 | | was able to get one arm like I said, and he was ah pretty big. His |
| 5 | | bicep must have been that big. I was tough for me just holding the |
| 6 | | one arm. He was strong. |
| 7 | Craig: | Okay. |
| 8 | Alcon: | And they kept trying to get his arm, other arm telling him to comply |
| 9 | | or whatever and he had that tucked back. He would not give him that |
| 10 | | arm up. |
| 11 | Craig: | Was he face down or was he on his back? |
| 12 | Alcon: | He was face down on his stomach. |
| 13 | Craig: | Okay and. |
| 14 | Alcon: | So, he was on top of his arm. |
| 15 | Craig: | And you said you had his left arm? |
| 16 | Alcon: | I had his left arm. |
| 17 | Craig: | Okay. And, at, at this point you hadn't retrieved any handcuffs right, |
| 18 | | because you said earlier, later you retrieved handcuffs, but at this |
| 19 | | point you don't have any right? |
| 20 | Alcon: | Once they, once they got him down on the ground, on his stomach |
| 21 | | and I saw that one arm. I retrieved the handcuffs and cuffed that one |
| 22 | | arm right away. |
| 23 | Craig: | Okay, and so. |
| 24 | Alcon: | I held on to the arm and that cuff, he tried to pull it away and move |
| 25 | | |
| 26 | | |
| 27 | | |
| 28 | | |

37

Ruben Escudero

Transcription – MARTIN ALCON

[2:02:40 minutes]

| 1 | | it around and that's what I said, it was even holding onto the |
| 2 | | handcuff on his arm, he was a strong guy. |
| 3 | Craig: | And so you said, maybe say while, while you were doing that he was |
| 4 | | still kind of, he was still struggling and fighting? |
| 5 | Alcon: | He was still fighting? Yes. |
| 6 | **52:56** | |
| 7 | Craig: | What does that look like, what is he doing? |
| 8 | Alcon: | He's um, I had his arm, he was trying to pull his arm free from me, |
| 9 | | he was on his arm and he's wiggling back and forth and trying to get |
| 10 | | himself up again. |
| 11 | Craig: | Okay. Is he, has he, has ~e hit anybody or you? |
| 12 | Alcon: | At, at this point, on the ground, no. He was just wiggling trying to |
| 13 | | get out. |
| 14 | Craig: | Okay. |
| 15 | Alcon: | Because I had the one arm and he was holding on to the other arm, |
| 16 | | but he was trying to get and push up and that's when are Captain put |
| 17 | | a foot approximately between his shoulder blades to help keep him |
| 18 | | down because he was fighting to try and get up again. |
| 19 | Craig: | Okay. So, tell me a little bit about that. So, he, is he just uses the |
| 20 | | bottom of his foot? |
| 21 | Alcon: | Just the bottom of his foot. |
| 22 | Craig: | And he is just trying to hold the person from? |
| 23 | Alcon: | He's just, he's just. He put his foot on it and just held pressure |
| 24 | | right there. Didn't move his foot around, didn't do anything |
| 25 | | |
| 26 | | |
| 27 | | |
| 28 | | |

38

Ruben Escudero

Transcription – MARTIN ALCON

[2:02:40 minutes]

| | | |
|---|---|---|
| 1 | | just put his foot right there to held pressure. |
| 2 | Craig: | Okay. |
| 3 | Alcon: | Um, the deputy was more still trying to get him um diagonally |
| 4 | | so if the body was here, the deputy was more this way, and |
| 5 | | which exposed his upper back and that's why it allowed the |
| 6 | | Captain to put his foot on his back to help hold him down. |
| 7 | Craig: | And did it appear to you, I mean basically you have two deputy's ah |
| 8 | | two or three deputies there, you're trying to help his hold his left arm |
| 9 | | is he still strong enough to get up and get, get out of there? |
| 10 | Alcon: | He was still able to try and push to get up, yeah. |
| 11 | Craig: | Okay. |
| 12 | Alcon: | Cause, I had the one arm and that's because he was, I want to say all |
| 13 | | the way up, but, but because he was getting that movement that's |
| 14 | | what triggered the Captain to put his foot on him to help hold him |
| 15 | | down. I do not believe the female deputy was involved in the fight, it |
| 16 | | was more of the, the two males officer that were on him trying to get |
| 17 | | his arm. |
| 18 | Craig: | And where were they when you say on him, where were they? |
| 19 | Alcon: | Um, like I said the one that had all the blood was diagonally across |
| 20 | | his body, his knees were on the ground, his upper torso was across |
| 21 | | his butt and part of his back and he is reaching trying to get right |
| 22 | | arm. |
| 23 | Craig: | Okay. |
| 24 | Alcon: | His face is close to the suspect's face also. |
| 25 | | |
| 26 | | |
| 27 | | |
| 28 | | |

39

Ruben Escudero

Transcription – MARTIN ALCON

[2:02:40 minutes]

1   Craig:      Okay, and the other deputy?

2   Alcon:      He was on the other side um I think he was trying to reach in there

3               and grab also.

4   Craig:      Okay. So, at that point, nobody was really on top of the suspect

5               there, they are on the side trying to grab his hand is that right?

6   Alcon:      No, your one deputy was laying on top of him.

7   Craig:      He's got his chest on top of this guy?

8   Alcon:      He was completely laying on top of him, keeping him down.

9   Craig:      Okay.

10   Alcon:      So, his feet, or his knees are on the left side of the patient, he's

11               laying across his lower back and his head is at the upper right, right

12               of the patient's head and so his body is laying across him, on top of

13               him keeping him down and then his arms were trying to grab the

14               suspect's arm to get control.

15   Craig:      Okay.

16   Alcon:      Because the suspect was wouldn't relinquish that arm.

17   Craig:      Okay. And again, and, and you may have said it and I missed it. ls

18               he, is he face up or face down?

19   Alcon:      He is face down.

20   Craig:      He is face down, okay. So that is after your Captain had tried to tried

21               to help control um this guy with his foot?

22   Alcon:      So the Captain, yeah during this time is when they, when he was

23               trying to get up again. I have the one arm, he is trying to get up that's

24               when the Captain put his foot on his back.

25

26

27

28

Ruben Escudero

Transcription – MARTIN ALCON

[2:02:40 minutes]

| | | |
|---|---|---|
| 1 | Alcon: | I was on the patients left side holding the arm and the hand. |
| 2 | Craig: | You're still holding. |
| 3 | Alcon: | He had already been handcuffed and I was still holding. |
| 4 | Craig: | Okay. |
| 5 | Alcon: | I, I never let go of that arm until we finished cuffing him. |
| 6 | Craig: | Okay, all right. What happens after that? |
| 7 | Alcon: | Um, he tells her to stop, um they pull out the collapsible metal |
| 8 | | baton, I don't know whose it is. Um, I believe the other deputy |
| 9 | | then was able to stick it in the nook of his arm. |
| 10 | Craig: | Okay. |
| 11 | Alcon: | Of the elbow and with that they ended up bending that loop, using |
| 12 | | that as a leverage to get his arm out from underneath him, behind. |
| 13 | Craig: | Is that all the RCB, the, the baton was used for? |
| 14 | Alcon: | That's all I saw the baton used for. |
| 15 | Craig: | Okay. And did that, was that effective, did that work? |
| 16 | Alcon: | Yes. |
| 17 | Craig: | Okay, so then his right arm came back towards his back? |
| 18 | Alcon: | So, his right arm came back, um we couldn't get them close enough |
| 19 | | because he was still fighting or because of the, the baton. So that's |
| 20 | | when a second pair of handcuffs came to cuff, cuff that arm and then |
| 21 | | we cuffed them both together. |
| 22 | Craig: | All right. And is, is he saying anything um the suspect, or the, the |
| 23 | | patient, is he saying anything throughout this whole thing? |
| 24 | Alcon: | No, um, during the whole time that he was on the ground, no. |

43

Ruben Escudero

Transcription – MARTIN ALCON

[2:02:40 minutes]

1    He did not say anything. Um, I even want to say from the time that
2    they had him up against the wall he did not say anything. Um, the
3    only time he ever talked was initially when he first got up about the
4    vomiting and what are you doing, leave me alone, that was the only
5    time he talked. Through most of the other stuff he never spoke.

6    **1:01:18**

7    Craig:    Okay. Did he ever, you know look to you like he was cooperating to
8              try to put his hands behind his back or do anything that everybody
9              was telling him.
10   Alcon:    No.
11   Craig:    To lay down or anything?
12   Alcon:    No, he wasn't following directions and he wasn't complying. He
13             wasn't volunteering anything.
14   **1:01:37**
15   Craig:    Okay. And so, using the two handcuffs, you guys were able to
16             control him his arms behind his back. Is that, is that right?
17   Alcon:    Correct.
18   Craig:    Okay.
19   Alcon:    Which simultaneously about that time that we were cuffing
20             him is when the AMR medic shot him with the sedative too. I was
21             just going to ask you about that um you mentioned Versed?
22   Alcon:    Um.
23   Craig:    What's, what's Versed?
24   Alcon:    Um.

25

44

26   ───────────────────────────────────────
     Alcon – Transcription Sousa and Craig Interview
27

28

Ruben Escudero

Transcription – MARTIN ALCON

[2:02:40 minutes]

| | | |
|---|---|---|
| 1 | Alcon: | Yeah, he laid down and it was almost immediately where he sat back |
| 2 | | up and started dry-heaving again. |
| 3 | Sousa: | Okay. How long did he at that second time that he started dry- |
| 4 | | heaving how long did that? |
| 5 | Alcon: | Um, probably about the same amount of time, with, within a few |
| 6 | | second, but then after the he stayed up they tried to get him down |
| 7 | | and that's when the patient did, you know it was like say you know, |
| 8 | | what's going on, leave me alone and you know and they reiterated, |
| 9 | | hey, we're, we're here to help you, but that's probably when all the |
| 10 | | talking stopped. That I, I can recall? |
| 11 | Sousa: | Were you able to patient's face at, at this point? |
| 12 | Alcon: | No. |
| 13 | Sousa: | Um, cause your position. |
| 14 | Alcon: | Cause, I'm, yeah. The back. |
| 15 | Sousa: | Um, so deputies initially were talking having a like con, |
| 16 | | conversation trying to get him, get him to, to relax? |
| 17 | Alcon: | Correct. |
| 18 | Sousa: | And then what, what did the patient do at that point? |
| 19 | Alcon: | Um, that's when the, that's when he tried to push them away and, and |
| 20 | | get control, he wanted to be in control kind of thing. So, but that's |
| 21 | | when he started pushing them away and fighting them and they tried |
| 22 | | to restrain him on the ground and he really didn't want to have any |
| 23 | | of that and that's when they ended up getting into the wrestling |
| 24 | | match because he is trying to push and get and they are trying to |

<div align="center">57</div>

| | |
|---|---|
| 26 | |
| 27 | |
| 28 | |

Ruben Escudero

Transcription – MARTIN ALCON

[2:02:40 minutes]

1  keep him on the ground and that's when they kind of started

2  wrestling with him and grabbing him and tried to subdue him on the

3  ground, but he's moving and all that.

4  Sousa:    How long, did the wrestling go on?

5  Alcon:    Um, that went on for a little, I mean to me it seemed like it, it went a

6            on for a while.

7  Sousa:    Um hum.

8  Alcon:    That was probably at least half of this whole incident was that part

9            there.

10 Sousa:    Okay. And the, and who was in this wrestling match?

11 Alcon:    It would be these two deputies.

12 Sousa:    Those two.

13 Alcon:    With this one still being closest towards me and this one being on

14           the other side, so I didn't see a lot of what.

15 Sousa:    What was going on.

16 Alcon:    What he was doing.

17 Sousa:    And she still not there.

18 Alcon:    She's not even in the picture.

19 Sousa:    And where is AMR at this point?

20 Alcon:    Um, I believe they were at the, the front door. They weren't,

21           they weren't getting in to the... That's not in their job description and,

22           and all that other…

23 Sousa:    Um hum.

24 Alcon:    And so they stood back.

25

26

27

28

58

Ruben Escudero

Transcription – MARTIN ALCON

[2:02:40 minutes]

| | | |
|---|---|---|
| 1 | Sousa: | Okay. And that point. |
| 2 | Craig: | When, when you say ah, let's ah clarify for this, like so, I'll put |
| 3 | | this deputy as Deputy One. |
| 4 | Alcon: | Okay. |
| 5 | Craig: | And this deputy as Deputy Two and we will call her Deputy Three. |
| 6 | Alcon: | So Deputy One. |
| 7 | Sousa: | Um hum. |
| 8 | Alcon: | Was to the right side of the patient. |
| 9 | Sousa: | Okay. |
| 10 | Alcon: | Um and Deputy Two was to the left side of the patient. |
| 11 | Sousa: | Okay. And what's, what's being said at this point? |
| 12 | Alcon: | Um, they're just trying to get control of him. I don't think anything |
| 13 | | and words were being said. |
| 14 | Sousa: | Okay. |
| 15 | Alcon: | They were just trying to get control of him. |
| 16 | Sousa: | And what do you see Deputy One do? |
| 17 | Alcon: | So they are trying to get control of him, he is still pushing, fighting, |
| 18 | | so I know Deputy One started throwing hook punches around |
| 19 | | towards his head or whatever. He throws probably about four or |
| 20 | | five. |
| 21 | Sousa: | Okay. |
| 22 | **1:23:50** | |
| 23 | Alcon: | Um, I then move back a little bit and that's when Deputy |
| 24 | | Three, because they are there, she can't really so she has to lean over |

61

Ruben Escudero

Transcription – MARTIN ALCON

[2:02:40 minutes]

| 1 | | everybody and just starts hitting the suspect on the top of the head |
| 2 | | with the taser. She still had the taser in her hand. |
| 3 | Sousa: | Do you know where Deputy One was, so patient you described as |
| 4 | | head facing to the right, right? |
| 5 | Alcon: | Um hum. |
| 6 | Sousa: | Um, where was Deputy One's punches landing? |
| 7 | Alcon: | Um. |
| 8 | Sousa: | If you were able to, if not than that's fine. |
| 9 | Alcon: | To, to his head, cause I know he was coming around. I couldn't |
| 10 | | exactly see where on the head, but I know he was punching him to |
| 11 | | the head to the face. |
| 12 | Sousa: | Um top, top part, bottom part? |
| 13 | Alcon: | Um, no, it would be to the face facing, facing towards that. |
| 14 | Sousa: | Okay. |
| 15 | Alcon: | Cause he came straight across, so it would have been on the |
| 16 | | side of the face, front of the face, whatever. That way because he |
| 17 | | didn't come from the top, he didn't come from the bottom. |
| 18 | Sousa: | Okay. |
| 19 | Alcon: | He came directly from the side. |
| 20 | Sousa: | Okay. And what is Deputy Two, Two doing at this point? |
| 21 | Alcon: | Um, I couldn't really see him except that his body is also against the |
| 22 | | suspect on the left side. |
| 23 | Sousa: | Um hum. |
| 24 | Alcon: | So, I'm assuming he is trying to get control of that left arm |

62

Ruben Escudero

Transcription – MARTIN ALCON

[2:02:40 minutes]

| | | |
|---|---|---|
| 1 | | holding him down. |
| 2 | Sousa: | Okay. And when you say across his body, so which way, which way |
| 3 | | is Deputy One's legs positioned? |
| 4 | Alcon: | So, the patient's here. |
| 5 | Sousa: | Um hum. |
| 6 | Alcon: | Um, the deputy was laying like this, so his knees are on this side. |
| 7 | Sousa: | Um hum. |
| 8 | Alcon: | He is laying across his head is closer to him and his arms are trying |
| 9 | | to  like get to his. |
| 10 | Sousa: | And how much, how much amount of force is Deputy One applying |
| 11 | | onto the patient? |
| 12 | Alcon: | Um, I would say, I don't know how you want to put the force, it was |
| 13 | | Reasonablw; he was like he was laying across him, he wasn't trying |
| 14 | | to, he wasn't kneeing him he was just laying across him using his |
| 15 | | body weight to keep him down and using his arms to try to get |
| 16 | | control of that left arm. |
| 17 | Sousa: | And, and I guess that's what I was kind of going with, was he |
| 18 | | applying his entire body weight on it, was he kind of up on his |
| 19 | | knees where there is a gap in between the two of them? |
| 20 | Alcon: | No, they were on they were touching. |
| 21 | Sousa: | Okay. |
| 22 | Alcon: | So, yeah, he was laying on them. |
| 23 | Sousa: | Okay. And what's the suspect doing at his, or I'm sorry the patient |
| 24 | | doing at this time? |
| 25 | | |
| 26 | | |
| 27 | | |
| 28 | | |

64

Alcon – Transcription Sousa and Craig Interview

Ruben Escudero

Transcription – MARTIN ALCON

[2:02:40 minutes]

| | | |
|---|---|---|
| 1 | Alcon: | Ah, the patient was still um trying to get up, still moving from |
| 2 | | side to side. I had the one arm, I know he kept trying to pull that arm |
| 3 | | from me to try to get it up closer to his head kind of or whatever. I |
| 4 | | guess to try to get, so l ended up getting his arm and putting it |
| 5 | | behind his back in a lock. I even tried doing the wrist and he was |
| 6 | | still strong enough that he could pull that away from me and |
| 7 | | straighten it out. |
| 8 | **1:28:06** | |
| 9 | Sousa: | When you said you were trying to do the wrist. |
| 10 | Alcon: | They, I had him cuffed, I had his elbow, I had his arm. |
| 11 | Sousa: | Yeah. |
| 12 | Alcon: | I was bending his wrist trying to keep that one arm and he was |
| 13 | | still strong enough that he could pull that away from me and |
| 14 | | get his arm back to the side. |
| 15 | Sousa: | Okay. |
| 16 | Alcon: | Where I ended up having just to go back to holding the cuff um |
| 17 | | because of his strength. |
| 18 | Sousa: | Um, and as Deputy One is laying across the patient what where is |
| 19 | | Deputy Two positioned. |
| 20 | Alcon: | Ah, Deputy Two would, Deputy Two would have been to the |
| 21 | | right of the patient. |
| 22 | Sousa: | Towards the head your pointing to? |
| 23 | Alcon: | Ah, more probably towards the bottom down some. |
| 24 | Sousa: | Down that way? |

65

Ruben Escudero

Transcription – MARTIN ALCON

[2:02:40 minutes]

| | | |
|---|---|---|
| 1 | Sousa: | Okay. |
| 2 | Alcon: | Saying you don't remember, and when I ended up telling the doctors |
| 3 | | what their conversations were they were surprised like, oh crap you |
| 4 | | did hear us and remember what we were saying. So, it is, has a |
| 5 | | different effect on different people. |
| 6 | Sousa: | Okay. |
| 7 | Alcon: | But it is a sedative, calming effect of the pain. |
| 8 | Sousa: | And do you... |
| 9 | Alcon: | And gives you amnesia some. |
| 10 | **1:35:32** | |
| 11 | Sousa: | If, if I were to take it and, and administer too much myself would I |
| 12 | | be able to I guess overdose on, on Versed? |
| 13 | Alcon: | Um, well you can overdose on anything. |
| 14 | Sousa: | Well I guess so. |
| 15 | Alcon: | Um, but I don't know if it's something that would have, what the |
| 16 | | consequences would be. |
| 17 | Sousa: | Okay. |
| 18 | Alcon: | Um, because all the stuff that we give is usually a certain dose. We |
| 19 | | would have to multiple dose or something like that. |
| 20 | Sousa: | Okay and um, and did you note, what injuries I know you talked |
| 21 | | about the gash on the head, the head to the patient did you notice any |
| 22 | | other injuries? |
| 23 | Alcon: | Um, the only injuries that I noticed were, were to the head. I know |
| 24 | | after we had him down and all that, that they did pull out a strap to |
| 25 | | |
| 26 | | |
| 27 | | |
| 28 | | |

71

Ruben Escudero

Transcription – MARTIN ALCON

[2:02:40 minutes]

| 1 | | do is legs, so I did help remove his pants. |
|---|---|---|
| 2 | Sousa: | Um hum. |
| 3 | Alcon: | And all that so they could get the strap on and they held it, but I |
| 4 | | don't believe they even used it because he was subdued, and he |
| 5 | | stopped fighting it all. |
| 6 | Sousa: | Okay. Um, so his pants came off. |
| 7 | Alcon: | I helped take his pants off. |
| 8 | Sousa: | Where did those go? |
| 9 | Alcon: | We left them on scene. |
| 10 | Sousa: | On scene. Okay, what about the rest of the clothing? |
| 11 | Alcon: | Um, it was still on him. |
| 12 | Sousa: | Okay, so the jacket, the shirt that was underneath. |
| 13 | Alcon: | Yeah. |
| 14 | Sousa: | Or the sweatshirt, oh you said the jacket like windbreaker that was |
| 15 | | on him um. |
| 16 | Alcon: | Um, cause I know I took the one arm out whether it came off in the |
| 17 | | fight or whatever, I do not remember, it, yeah, it, it, it came off |
| 18 | | somewhere along this because I do remember when my Captain put |
| 19 | | his foot on there. |
| 20 | Sousa: | Um hum. |
| 21 | Alcon: | It was just on his shirt. |
| 22 | Sousa: | Okay. |
| 23 | Alcon: | So it was just point on his shirt. |
| 24 | Sousa: | Okay, um was he naked when transported to the hospital? |

Alcon – Transcription Sousa and Craig Interview

Ruben Escudero

Transcription – MARTIN ALCON

[2:02:40 minutes]

| | | |
|---|---|---|
| 1 | Sousa: | Okay. Um, when, when what made you think you needed to get |
| 2 | | involved to handcuff this, in this situation? |
| 3 | Alcon: | Ah, I've been involved with other fights like this, um with my 33 |
| 4 | | years with Orange County Fire, we have gotten in, in fights um with |
| 5 | | there with the officers, they needed assistance and there is so, to |
| 6 | | help, again there I ended up helping cuff that patient there and an |
| 7 | | officer broke his hand, you know we had things escalating- so my |
| 8 | | normal nature is were all in this together, you got my back, I got |
| 9 | | your back, they are fighting, they needed help, I got in an helped. |
| 10 | Craig: | So, was the level of resistance that the patient that was giving strong |
| 11 | | enough that you, you felt like. |
| 12 | Alcon: | Yes. |
| 13 | Craig: | The deputies needed your help? |
| 14 | Alcon: | Correct. |
| 15 | Craig: | Did you hear anything, anybody say anything inappropriate |
| 16 | | throughout the whole thing? |
| 17 | Alcon: | No, nothing inappropriate was said. |
| 18 | Craig: | Okay. |
| 19 | Alcon: | By anybody. |
| 20 | Craig: | Um, did the deputies ever get told or did, did I shouldn't say that. |
| 21 | | Did you ever tell the deputies that, that people come to in an |
| 22 | | aggressive or combative manner with, with Narcan? Did that |
| 23 | | conversation did you have before? |
| 24 | Alcon: | Um, not before any of this happened. Um. |
| 25 | | |
| 26 | | |
| 27 | | |
| 28 | | |

74

Ruben Escudero

Transcription – MARTIN ALCON

[2:02:40 minutes]

| | | |
|---|---|---|
| 1 | Craig: | Yeah, go ahead. |
| 2 | Sousa: | Did the deputies at time did you observe anyone searching um for |
| 3 | | any type of weapons or anything on the, on the patient? |
| 4 | Alcon: | No. |
| 5 | Sousa: | Um, did they have an opportunity to that you feel there was an |
| 6 | | opportunity there that they would have while you guys were there? |
| 7 | Alcon: | Um, not while we were there. |
| 8 | Sousa: | Okay |
| 9 | Alcon: | Well they were there prior to us and he un, he was out on the |
| 10 | | kitchen. They would have had an opportunity at that. Once we |
| 11 | | moved him and once they moved him in we started working so the |
| 12 | | deputies stood back and once the Narcan then absolutely, no. |
| 13 | Sousa: | Okay. |
| 14 | Alcon: | Things were just going. |
| 15 | Sousa: | Um and then you had mentioned the strikes with the taser, had zero |
| 16 | | effect on, on the patient. |
| 17 | Alcon: | Had zero effect on the patient. |
| 18 | Sousa: | It didn't slow him down in anyway? |
| 19 | Alcon: | No. |
| 20 | Sousa: | Okay. Um, at that point that Deputy One and Two and they're |
| 21 | | holding him on the wall um did it look like they were struggling |
| 22 | | with him? |
| 23 | Alcon: | Um, they still had their hands full with him. I mean he, wasn't I |
| 24 | | mean is he wasn't backing off or, or loosening his resistance at all. |
| 25 | | |
| 26 | | |
| 27 | | |
| 28 | | |

84

EXHIBIT "D"

Risa S. Christensen, Esq. (SBN: 227799)
Dennis E. Wagner, Esq. (SBN: 99190)
**WAGNER ZEMMING CHRISTENSEN, LLP**
1325 Spruce Street, Suite 200
Riverside, CA  92507
Tel.:          (951) 686-4800
Fax:          (951) 686-4801
*rsc@wzclawfirm.com*
*dew@wzclawfirm.com*

Attorneys for Defendants, COUNTY OF SAN BERNARDINO; HUMBERTO MIRANDA; JULIAN MATA; and JESSAQUA ATTLESEY

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CECILIA VARGAS; ARIANA SALAS, individually and as a successor-in-interest to RUBEN ESCUDERO, deceased,<br><br>         Plaintiffs,<br><br>vs.<br><br>COUNTY OF SAN BERNARDINO; H. MIRANDA; S. CARTER; Z. VOGEL, J. MATA; Z. PRITCHETT; J. JIMENEZ; A. MATA; T. KAUTZ; J. ATTLESEY; RODRIGUEZ (first initial unknown) and DOES 1-10, inclusive,<br><br>         Defendants. | CASE NO: 5:20-cv-02646-JGB-KK<br><br>**DECLARATION OF TIFFANY KAUTZ IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT OR IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT**<br><br>*[Filed concurrently w/ Notice of Motion and Motion for Summary Judgment; Statement of Undisputed Facts; and (Proposed) Judgment]*<br><br>**Date:**      March 6, 2023<br>**Time:**      9:00 a.m.<br>**Courtroom:** 1<br><br>Hon. Jesus G. Bernal<br>United States District Judge |

1

I, TIFFANY KAUTZ, declare as follows:

That I am a deputy sheriff with the San Bernardino Sheriff's Department and have been with the department since December 2016.  I have personal knowledge of the facts as set forth in this declaration, and if called to testify I could do so competently thereon.

1.      That on Saturday, October 19, 2019, during my regular work hours from 8:00 a.m. to 6:00 p.m., I was assigned to the City of Victorville.  At approximately 9:20 a.m. that day, I dispatched myself to assist in an overdose call in the 16000 block of Monta Vista Avenue and arrived at the scene at approximately 9:24 a.m.

2.      Upon arrival I had learned that the person who had overdosed was taken to the hospital.  I was advised by Sgt. John Rodriguez to conduct interviews of persons who were present.  I identified myself to Dorothy Hernandez, who was a resident of the house, and I took her statement outside the residence where the incident occurred where I encountered her.  I took her statement and recorded my interview with her.  That attached hereto and incorporated herein as **Exhibit 1(g)** is a true and correct copy of the audio recording of the interview that I took with Ms. Hernandez.  Additionally, I have reviewed a typed transcript of the belt recorded interview and compared the transcript with the recording of the interview.  That the transcript fairly and accurately reflects what was said in the recorded interview with Ms. Hernandez.  That attached hereto and incorporated herein as **Exhibit 8** is a true and correct copy of the transcript of my belt recorded interview of Ms. Hernandez, pgs. 1, 3, 4, 6, 15-18.

3.      I then identified myself to David Crummel who was also a resident of the house where the incident occurred.  When I took his statement, he was outside the residence, and I recorded my interview with him.  That attached hereto and incorporated herein as **Exhibit 1(h)** is a true and correct copy of the audio recording of the statement that I took from Mr. Crummel.  Additionally, I

2

have reviewed a typed transcript of the recorded interview that I had with Crummel and compared the same with the audio recording.  That the transcript fairly and accurately reflects what was said by Mr. Crummel to me in the recorded interview.  That attached hereto and incorporated herein as **Exhibit 9** is a true and correct copy of the transcript of my belt recorded interview of David Crummel, at pgs. 21, 22, 24-19.

4. That I then contacted Martin Alcon, a fire department engineer with the City of Victorville. I identified myself to Martin Alcon who was outside of the residence where the incident occurred.  I took a statement from him and recorded my interview.  That attached hereto and incorporated herein as **Exhibit 1(i)** is a true and correct copy of the audio recording of the statement that I took from Mr. Alcon.  Additionally, I have reviewed a typed transcript of the recorded interview with Mr. Alcon and compared the transcript with the audio recording of the interview.  That the transcript of the interview fairly and accurately reflects what was said in that recorded interview.  That attached hereto and incorporated herein as **Exhibit 10** is a true and correct copy of the transcript of my recorded interview of Martin Alcon, pgs. 1-4.

5. That I also contacted Dyjuan Washington, a Captain with the Victorville Fire department. I took a statement from him outside the residence and recorded my interview.  That attached hereto and incorporated herein as **Exhibit 1(j)** is a true and correct copy of the audio recording of the statement that I took from Captain Washington as to what occurred.  Additionally, I have reviewed a typed transcript of the recorded interview and compared the same with the written transcript.  That the written transcript fairly and accurately reflects what was said in that interview.  That attached hereto and incorporated herein as **Exhibit 11** is a true and correct copy of the transcript of my recorded interview of Dyjuan Washington, pgs. 1-4, and 6.

6. That I also made contact with Brett Lever, a City of Victorville Fire

3

Department paramedic and spoke with him outside the residence. I took a statement from him and recorded my interview with him.  That attached hereto and incorporated herein as **Exhibit 1(k)** a true and correct copy of the audio recording of the statement that I took from Brett Lever.  Additionally, I have reviewed a typed transcript of the recorded interview with him and compared the same with the audio recording.  That the transcript fairly and accurately reflects what was said in our conversation which was said in the recorded interview. That attached hereto and incorporated herein as Exhibit **12** is a true and correct copy of the transcript of my recorded interview of Mr. Lever, pgs. 1-7.

      7.    That my purpose in conducting the interviews was to assist in the investigation of what happened concerning the drug overdose in addition to what had occurred during the encounter with medical and law enforcement personnel and Mr. Escudero.

      I declare under penalty of perjury under the laws of the State of California and the United States of America, that the foregoing is true and correct.

      Executed this 24th day of January 2023 in San Bernardino, California, United States of America.

TIFFANY KAUTZ, Declarant

DECLARATION OF TIFFANY KAUTZ IN SUPPORT OF DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT

EXHIBITS "8" and "9"

Ruben Escudero

Transcription – Kautz Interview with Hernandez & Crummel

(17:23 Minutes)

**KAUTZ:** **Deputy Tiffany Kautz**
**Dorothy:** **Dorothy Hernandez (Witness)**
**Crummel:** **David Crummel (Witness)**
**RSP:** **Responders, either sheriff or medical**
**Pritchett:** **Det. Zach Pritchett**

---------------------------------------------

RSP: (*Inaudible* – 00:03)
RSP: We don't have any info on (*inaudible* – 00:04)
RSP: No.
RSP: He didn't have a wallet. He didn't have (*inaudible* – 00:06).
RSP: Don't you have any info on 'im?
RSP: Nothing.
RSP: (*Inaudible* – 00:09)
RSP: Can you go in the kitchen and see if (*inaudible* – 00:10).
RSP: (*Inaudible* – 00:10).
RSP: Oh, (*Inaudible* – 00:12)
RSP: Take him outside.

**00:18**

KAUTZ: Hey guys.
Dorothy: That is, uh.
KAUTZ: Are you the only one here?
Dorothy: No. David's right there. This is his-
KAUTZ: David's-
Dorothy: -house.
KAUTZ: -in here?

Ruben Escudero

Transcription – Kautz Interview with Hernandez & Crummel

(17:23 Minutes)

| | | |
|---|---|---|
| 1 | Dorothy: | You know, she's just scared.  She don't like- |
| 2 | KAUTZ: | Yeah. |
| 3 | Dorothy: | -to see that stuff. |
| 4 | KAUTZ: | Okay. |
| 5 | Dorothy: | (*Inaudible-speaking softly*-00:55). |
| 6 | KAUTZ: | I got you. |
| 7 | Dorothy: | She don't wanna see it. |
| 8 | KAUTZ: | Okay. |
| 9 | Dorothy: | So, but she called- |
| 10 | KAUTZ: | So, you don't live here? |
| 11 | Dorothy: | No.  But she called. |
| 12 | KAUTZ: | Okay. |
| 13 | Dorothy: | He's the only one that lives here. |
| 14 | KAUTZ: | I got you. |
| 15 | Dorothy: | And- |
| 16 | **1:02** | |
| 17 | KAUTZ: | Did you see what happened today? |
| 18 | Dorothy: | Right there, right now. |
| 19 | KAUTZ: | Yeah. |
| 20 | Dorothy: | No.  I couldn't.  I was over here and I go, what the fuck?!  I told |
| 21 | | David, try to stop him. If he hears a familiar voice- |
| 22 | KAUTZ: | (*Softly*) Okay. |
| 23 | Dorothy: | -'cause I know that about overdosing, if somebody hears you, they'll |
| 24 | | calm down. |
| 25 | KAUTZ: | Okay. |
| 26 | | |
| 27 | | |
| 28 | | |

3

Ruben Escudero

Transcription – Kautz Interview with Hernandez & Crummel

(17:23 Minutes)

| | | |
|---|---|---|
| 1 | Dorothy: | But he wasn't having it. |
| 2 | KAUTZ: | Okay. |
| 3 | Dorothy: | David goes, he's not listening to me.  I go, but just keep talking to |
| 4 | | him 'cause if he hears a familiar voice he may stop, you know. |
| 5 | KAUTZ: | Yeah. |
| 6 | Dorothy: | And if-I go, just tell him you guys are trying to help him, you know- |
| 7 | KAUTZ: | Right. |
| 8 | Dorothy: | -maybe he'll stop. |
| 9 | KAUTZ: | Yeah.  Okay. |
| 10 | Dorothy: | But- |
| 11 | KAUTZ: | Can I get your first name? |
| 12 | Dorothy: | My name's Dorothy. |
| 13 | KAUTZ: | Dorothy.  D-O-R-O-T-H- |
| 14 | Dorothy: | Oh, my gosh. |
| 15 | KAUTZ: | -Y? |
| 16 | Dorothy: | Someone spelled it right.  Yes, ma'am. |
| 17 | KAUTZ: | Okay. |
| 18 | Dorothy: | Thank you. |
| 19 | KAUTZ: | And uh, your- |
| 20 | Dorothy: | Is it okay? |
| 21 | KAUTZ: | -last name? |
| 22 | | Yeah. |
| 23 | | Your last name? |
| 24 | Dorothy: | Hernandez.  Hernandez. |
| 25 | KAUTZ: | Hernandez? |

4

COSB  004789

Ruben Escudero

Transcription – Kautz Interview with Hernandez & Crummel

(17:23 Minutes)

| | | |
|---|---|---|
| 1 | KAUTZ: | Mm-hmm. |
| 2 | Dorothy: | ███████████ Adelanto, 92301. |
| 3 | [*sound of radio communication*] | |
| 4 | KAUTZ: | What time did you get here today? |
| 5 | Dorothy: | Actually, I got here around 6:00, 6:30 a.m. |
| 6 | **02:15** | |
| 7 | KAUTZ: | Okay. |
| 8 | Dorothy: | 'cause I got-I got a ride this way 'cause I had to do some work |
| 9 | | around the corner on somebody's truck. |
| 10 | KAUTZ: | Gotcha. |
| 11 | | When you got- |
| 12 | Dorothy: | And then I asked him- |
| 13 | KAUTZ: | -when you got here, who was at the house? |
| 14 | Dorothy: | He wasn't here yet. |
| 15 | KAUTZ: | Who wasn't here yet? |
| 16 | Dorothy: | That guy wasn't here yet. |
| 17 | KAUTZ: | What-who's this guy? |
| 18 | Dorothy: | The guy-that guy. |
| 19 | KAUTZ: | Yeah.  Who-do you-what's his name?  Do you know? |
| 20 | Dorothy: | Um, his name is Ruben. |
| 21 | KAUTZ: | Ruben? |
| 22 | Dorothy: | Mm-hmm. |
| 23 | KAUTZ: | Ruben wasn't here? |
| 24 | Dorothy: | No.  Yeah, I don't know his last name though. |
| 25 | KAUTZ: | What time did he get- |
| 26 | | |
| 27 | | |
| 28 | | |

6

**COSB  004791**

Ruben Escudero

Transcription – Kautz Interview with Hernandez & Crummel

(17:23 Minutes)

| | | |
|---|---|---|
| 1 | KAUTZ: | -where was he at in the house? |
| 2 | Dorothy: | He was in his uh, bedroom. |
| 3 | KAUTZ: | Oh, okay. |
| 4 | Dorothy: | He was like right there in that-in that doorway- |
| 5 | KAUTZ: | So, Ru- |
| 6 | Dorothy: | -of the bedroom- |
| 7 | KAUTZ: | -Ruben was in- |
| 8 | Dorothy: | -and the hall- |
| 9 | KAUTZ: | -the bedroom. |
| 10 | Dorothy: | Yeah.  He was right there in the chair.  That's where I seen him |
| 11 | | when he was drooling. |
| 12 | KAUTZ: | Ah.  Okay.  So, the deps- |
| 13 | Dorothy: | And I tried getting him up, but- |
| 14 | KAUTZ: | -so the deps got here and- |
| 15 | Dorothy: | -fucking heavy. |
| 16 | KAUTZ: | -they were able to get him to the couch. |
| 17 | Dorothy: | They were able to get him to the front room. |
| 18 | KAUTZ: | Okay. |
| 19 | Dorothy: | Yeah, they drug him out- |
| 20 | KAUTZ: | And- |
| 21 | Dorothy: | -so the- |
| 22 | KAUTZ: | -what happened- |
| 23 | Dorothy: | -paramedics can work on him. |
| 24 | KAUTZ: | Okay.  And then what happened then? |
| 25 | Dorothy: | And then I stood in the kitchen and then they were just like standing |
| 26 | | |
| 27 | | |
| 28 | | |

15

COSB  004800

Ruben Escudero

Transcription – Kautz Interview with Hernandez & Crummel

(17:23 Minutes)

| | |
|---|---|
| 1 | right there and I could just hear 'em.  First there was no fighting, no |
| 2 | nothing.  And then all of a sudden, I hear Ruben say, you know, let |
| 3 | go of me.  He goes, why'd you hit me?  I heard him say that, why |
| 4 | are you hitting me? and it sounded like he wanted to cry.  So.  I |
| 5 | don't know what happens in an overdose.  I've never overdosed so, I |
| 6 | don't know what happens.  I don't know if you come out of it and |
| 7 | you're scared or- |
| 8 | [*Inaudible background conversation – **07:10**]* |
| 9 | Dorothy:    -but I used to work in treatment before in North Hollywood- |
| 10 | KAUTZ:      Okay. |
| 11 | Dorothy:    -so.  I only know stories of it. |
| 12 | KAUTZ:      Okay. So, there was- |
| 13 | Dorothy:    Yeah. |
| 14 | KAUTZ:      -no fighting or anything like that and then all of a sudden Ruben- |
| 15 | KAUTZ:      -was like, let go of me, why'd you hit me- |
| 16 | Dorothy:    No.  He said, why'd you hit me?  He- |
| 17 | KAUTZ:      Why'd you- |
| 18 | Dorothy:    -goes why- |
| 19 | KAUTZ:      -you hit me? |
| 20 | Dorothy:    -are you hitting me?  And it sounded… he goes, why are you hitting |
| 21 |             me?  And then I heard the taser go off.  Ta, ta, ta, ta, ta, ta, ta- |
| 22 | KAUTZ:      Ah- |
| 23 | Dorothy:    And then I heard-I said, fuck some – I go, David just come and let |
| 24 |             him know they're trying to help him.  I said-he goes, well he's not |
| 25 |             listening to me.  It's not about listening.  I know if he hears a |
| 26 | |
| 27 | |
| 28 | |

16

Ruben Escudero

Transcription – Kautz Interview with Hernandez & Crummel

(17:23 Minutes)

| | | |
|---|---|---|
| 1 | | familiar voice he might stop- |
| 2 | KAUTZ: | Mm. |
| 3 | Dorothy: | -you know, but my brother's not…completely… |
| 4 | KAUTZ: | What e-what-what else happened when- |
| 5 | Dorothy: | -brilliant. |
| 6 | KAUTZ: | -the deputies were there? |
| 7 | Dorothy: | Um, I didn't watch it. |
| 8 | KAUTZ: | What did you- |
| 9 | Dorothy: | To be honest. |
| 10 | KAUTZ: | -hear? |
| 11 | Dorothy: | What did I hear? |
| 12 | KAUTZ: | Um hm. |
| 13 | Dorothy: | I heard 'em tell him to stop fighting.  You know, stop fighting. |
| 14 | KAUTZ: | You heard-who said that? |
| 15 | Dorothy: | The-one of the deputies. |
| 16 | KAUTZ: | Okay. |
| 17 | Dorothy: | It was one of the two voices I first heard when I-when they got here. |
| 18 | KAUTZ: | Okay.  Did you hear anything else? |
| 19 | Dorothy: | Um, I heard the taser go off twice.  And then I heard one of the |
| 20 | | paramedic-female paramedic she said, um, we're just here to help |
| 21 | | you. We're just here to help you.  And then I guess he calmed down |
| 22 | | a little bit and um,- |
| 23 | KAUTZ: | Okay. |
| 24 | Dorothy: | I-h-hopefully they gave him something…to calm him down.  Sedate |
| 25 | | him, you know. |
| 26 | | |
| 27 | | |
| 28 | | |

17

COSB  004802

Ruben Escudero

Transcription – Kautz Interview with Hernandez & Crummel

(17:23 Minutes)

1    KAUTZ:      Did you hear any-or see anything else?

2    **8:23**

3    Dorothy:    I didn't see anything.  Everything I heard and thinking abo-I heard a

4                lot of ruckus in there.  I heard a lot of banging, slamming around,

5                but I never once looked over that way and-and then honestly the um,

6                the African-American gentleman with the hat on, he was kinda like

7                standing right there where the-the eve is, the doorway, I really didn't

8                wanna go see all that.  You know.

9    KAUTZ:      Mm.

10   Dorothy:    I don't like seeing all that shit.

11   KAUTZ:      Yeah.

12   Dorothy:    I don't.  I mean, I had my problem with shit years and years ago, but

13               I was 13, by 18 it was done.

14   KAUTZ:      M'kay.

15   Dorothy:    So, that, I don't wanna see none of that shit.

16   KAUTZ:      Yeah.  Yeah.

17   Dorothy:    I don't know the guy real well, but I don't wanna see anybody get

18               beat up right where I'm standing-

19   KAUTZ:      For sure.

20   Dorothy:    -for God's sakes.

21   KAUTZ:      For sure.  Okay.

22   Dorothy:    But I think that's probably an instinct 'cause I know he's been living

23               in the street for a while.

24   KAUTZ:      Um hm.  Um hm.

25   Dorothy:    So.

Ruben Escudero

Transcription – Kautz Interview with Hernandez & Crummel

(17:23 Minutes)

| | | |
|---|---|---|
| 1 | KAUTZ: | Thank you very much Dorothy. |
| 2 | Dorothy: | Um, thank you ma'am. |
| 3 | KAUTZ: | I appreciate it.  Yes. |
| 4 | Dorothy: | I appreciate you and your time. |
| 5 | KAUTZ: | Thank you. |
| 6 | Dorothy: | Thank you. |
| 7 | **10:03** | |
| 8 | KAUTZ: | Sir, can I borrow you for a minute?  I just wanna talk to ya so I |
| 9 | | know- |
| 10 | Crummel: | Just don't mess with my program. |
| 11 | KAUTZ: | I won't mess with your program. |
| 12 | Crummel: | No, no, not, not you.  This sh-this stuff.  'Cause I'm in a step-up- |
| 13 | KAUTZ: | Yeah. |
| 14 | Crummel: | -program- |
| 15 | KAUTZ: | Yeah. |
| 16 | Crummel: | -and I woke up with him on my-at my chair. |
| 17 | KAUTZ: | Okay.  What's your first name sir? |
| 18 | Crummel: | David. |
| 19 | KAUTZ: | David, your last name? |
| 20 | Crummel: | Crummel.  C-R-U-M-M-E-L. |
| 21 | KAUTZ: | C-R-U-M-M- |
| 22 | Crummel: | -E-L. |
| 23 | KAUTZ: | -E-L.  And date of birth? |
| 24 | Crummel: | ████████ |
| 25 | KAUTZ: | Best phone number for you? |
| 26 | | |
| 27 | | |
| 28 | | |

21

**COSB  004806**

Ruben Escudero

Transcription – Kautz Interview with Hernandez & Crummel

(17:23 Minutes)

| | | |
|---|---|---|
| 1 | Crummel: | Uh, n- ████████ |
| 2 | KAUTZ: | And this is your address? |
| 3 | Crummel: | Yeah, this is my house.  I'm moving out.  That's what she's helping |
| 4 | | me with- |
| 5 | KAUTZ: | I gotcha. |
| 6 | Crummel: | -pack my stuff. |
| 7 | KAUTZ: | All right.  So w- |
| 8 | Crummel: | I'm getting away from all this stuff. |
| 9 | KAUTZ: | -what time-what time did, uh, it's Ruben right? |
| 10 | Crummel: | Yeah.  That's all- |
| 11 | KAUTZ: | Do you know- |
| 12 | Crummel: | -I know. |
| 13 | KAUTZ: | -Ruben's last name? |
| 14 | Crummel: | Nope. |
| 15 | KAUTZ: | What time did he get here today? |
| 16 | Crummel: | I don't know.  I was in b-I was still sleeping when he came to the |
| 17 | | door. |
| 18 | KAUTZ: | Ah, okay. |
| 19 | Crummel: | Comes in with burritos and tossed one at me and-and I shared with |
| 20 | | her and I said, what are you doing here…this early in the morning? I |
| 21 | | wanted somewhere to go uh eat my cer-my uh, burrito and-and…and |
| 22 | | he got-he sh-shut up and stuff. I said, where'd you get these at, |
| 23 | | different wrappers? Oh, Mexico. |
| 24 | KAUTZ: | Yeah.  Did he-did he just come in or did he like knock? |
| 25 | Crummel: | Knocked. |
| 26 | | |
| 27 | | |
| 28 | | |

22

COSB  004807

Ruben Escudero

Transcription – Kautz Interview with Hernandez & Crummel

(17:23 Minutes)

| | | |
|---|---|---|
| 1 | KAUTZ: | Yeah.  Okay.  What happened after he got here? |
| 2 | Crummel: | He-uh, he sat down, he-when he threw the burrito.  I said, wh-uh, |
| 3 | | then he got up, went to the bathroom, then he came back, sat down |
| 4 | | and I was playing on my phone; I look up he's like (*mimics noise* – |
| 5 | | 12:22) ehhhh. |
| 6 | KAUTZ: | Oh, wow. |
| 7 | Crummel: | I yelled for her. |
| 8 | KAUTZ: | How long was he sitting before he did that?  Before he slumped |
| 9 | | over? |
| 10 | Crummel: | Like fi-uh, like 2 minutes…after he came back out of the bathroom. |
| 11 | KAUTZ: | And then he just became slumped over on the chair? |
| 12 | Crummel: | Yeah. |
| 13 | KAUTZ: | Was he – like wh-what happened when he became slumped over? |
| 14 | Crummel: | He started uh, uh, stuff started coming out of his mouth.  That's |
| 15 | | what freaked me out. |
| 16 | KAUTZ: | Okay.  So, he's like drooling? |
| 17 | Crummel: | Yeah, like-like, you know how you die and stuff and shit comes out |
| 18 | | of your mouth, like that. |
| 19 | KAUTZ: | Yeah.  Yeah.  Okay. |
| 20 | Crummel: | I already had one death in uh, with my homegirl's uh, son, over on |
| 21 | | 18th- |
| 22 | KAUTZ: | Um hm. |
| 23 | Crummel: | -June 18 when he got hit- |
| 24 | KAUTZ: | Um hm. |
| 25 | Crummel: | -then we pulled the plug on uh, July. |
| 26 | | |
| 27 | | |
| 28 | | |

24

COSB  004809

Ruben Escudero

Transcription – Kautz Interview with Hernandez & Crummel

(17:23 Minutes)

| | | |
|---|---|---|
| 1 | KAUTZ: | On-okay, so he was sitting on the chair and some shit started coming |
| 2 | | out of his mouth; what happened then? |
| 3 | Crummel: | I called my sister. |
| 4 | KAUTZ: | Okay.  What did she do? |
| 5 | Crummel: | She hit him a couple times in the face; smacked him (*smacking* |
| 6 | | *noise*), see if he'll wake up.  Then he-she said, we need to get him |
| 7 | | in-uh, get him-some ice down his pants.  We did that and then uh, |
| 8 | | they said put him in the shower.  I, pft, I can't pick him up…with |
| 9 | | my shaking; uh, what I'm all, the pills are for, I can't pick that kid |
| 10 | | up. |
| 11 | KAUTZ: | Yeah. |
| 12 | Crummel: | That kid's too heavy. |
| 13 | KAUTZ: | Yeah. |
| 14 | Crummel: | I take all kinds of pills. |
| 15 | KAUTZ: | Yeah.  What happened then? |
| 16 | Crummel: | He was right there at the door when the cops came in.  Oh no, I had |
| 17 | | him laying down.  The-when the cop came in they dragged him out |
| 18 | | of my room in the- |
| 19 | KAUTZ: | Aha. |
| 20 | Crummel: | -wherever they got him at, then I seen him in the front room. |
| 21 | KAUTZ: | Okay.  All right so, they-they- |
| 22 | Crummel: | How long do I have to stay out of my house? |
| 23 | KAUTZ: | Probably not much longer.  I'll-I'll double check for ya. |
| 24 | | Um, okay, so the deputies got here- |
| 25 | Crummel: | Yeah. |

25

**COSB  004810**

Ruben Escudero

Transcription – Kautz Interview with Hernandez & Crummel

(17:23 Minutes)

| | | |
|---|---|---|
| 1 | KAUTZ: | -uh, what happened when the deputies got here? |
| 2 | Crummel: | He-they came in my room and uh, got him out of my room.  They |
| 3 | | tried to wake him up, he won't wake up. |
| 4 | KAUTZ: | Where did they take him? |
| 5 | Crummel: | In the front room. |
| 6 | KAUTZ: | What happened then? |
| 7 | Crummel: | I don't know.  I was in my room.  I didn't go in there. |
| 8 | KAUTZ: | Okay.  So you didn't see anything? |
| 9 | Crummel: | Nope. |
| 10 | KAUTZ: | What did you hear? |
| 11 | Crummel: | Him uh, ramp-uh, rampaging. |
| 12 | [inaudible background conversation – 14:43] | |
| 13 | Crummel: | I don't know. |
| 14 | KAUTZ: | You heard him rampaging? |
| 15 | Crummel: | Yeah. |
| 16 | **14:48** | |
| 17 | Pritchett: | I don't mean to interrupt.  Do you know this guy's name by any |
| 18 | | chance? |
| 19 | Crummel: | Only by his first name.  Ruben. |
| 20 | KAUTZ: | Just Ruben. |
| 21 | Det.: | Okay.  You don't know his last name? |
| 22 | Crummel: | Nope.  I met-see- |
| 23 | Det: | How old is he? |
| 24 | Crummel: | See b-uh, um, 30, 35, something like that.  Before I was- |
| 25 | Det: | All right.  Thank you. |

26

**COSB  004811**

Ruben Escudero

Transcription – Kautz Interview with Hernandez & Crummel

(17:23 Minutes)

| | |
|---|---|
| 1 | **14:58** |
| 2 | Crummel: -before I got this house I was on the streets. |
| 3 | KAUTZ: Yeah. |
| 4 | Crummel: I was on the streets since '84. |
| 5 | KAUTZ: Okay. |
| 6 | Crummel: They gave me a house. |
| 7 | KAUTZ: Yeah. |
| 8 | Crummel: All right. I let some of my friends come and take showers and stuff- |
| 9 | KAUTZ: Um. |
| 10 | Crummel: -and I said, I don't want no drugs in the house- |
| 11 | KAUTZ: Um hm. |
| 12 | Crummel: -all right. He went into the bathroom, then he comes out and sits |
| 13 | down on my cou-on my hair and he passes out. I thought he was- |
| 14 | KAUTZ: Um hm. |
| 15 | Crummel: -overdosing. |
| 16 | KAUTZ: I gotcha. Okay. Um, so, he-he-you heard him rampaging; what do |
| 17 | you m-mean by that? Like, what does that mean? |
| 18 | Crummel: Getting uh, wild, and stuff. Like, they shot him with his uh, gave |
| 19 | him some of that medicine or whatever, what's that, n-spray called? |
| 20 | KAUTZ: Who-who gave him that? |
| 21 | Crummel: I thought somebody did in there 'cause that-my doctor told me, |
| 22 | people get o-have od-od's and shit-they sh- |
| 23 | KAUTZ: Was it the deputies that gave it to him or the AMR people? |
| 24 | Crummel: I don't know. |
| 25 | KAUTZ: Okay, so somebody, you think somebody gave him Narcan? |
| 26 | |
| 27 | |
| 28 | |

27

**COSB  004812**

Ruben Escudero

Transcription – Kautz Interview with Hernandez & Crummel

(17:23 Minutes)

| | | |
|---|---|---|
| 1 | Crummel: | Somebody woke him up.  I know he wouldn't wake up like that on |
| 2 | | his own. |
| 3 | KAUTZ: | Okay. |
| 4 | Crummel: | I know a lot of people- |
| 5 | KAUTZ: | So, did you see them give him Narcan- |
| 6 | Crummel: | No. |
| 7 | KAUTZ: | -or- |
| 8 | Crummel: | I didn't see-I- |
| 9 | KAUTZ: | -you-you think they gave him Narcan? |
| 10 | Crummel: | I think they-that's that stuff, when you spray that up in- |
| 11 | KAUTZ: | Right- |
| 12 | Crummel: | -their nose- |
| 13 | KAUTZ: | -and you put it up there nose it'll- |
| 14 | Crummel: | -walk away 'cause they get w-uh, real wild and shit and- |
| 15 | KAUTZ: | Okay. |
| 16 | Crummel: | -go off.  That- |
| 17 | KAUTZ: | So, you think somebody gave him some Narcan- |
| 18 | Crummel: | that shit.  Yeah. |
| 19 | KAUTZ: | -and then after that, that's when- |
| 20 | Crummel: | He got wild. |
| 21 | KAUTZ: | -he started getting wild- |
| 22 | Crummel: | Yep.  And then not- |
| 23 | KAUTZ: | -did he say anything? |
| 24 | Crummel: | -then my sister came out-came in the bedroom and said, hey, go in |
| 25 | | there and see if he'll listen to you.  I'd be calling his name, |
| 26 | | |
| 27 | | |
| 28 | | |

28

**COSB  004813**

Ruben Escudero

Transcription – Kautz Interview with Hernandez & Crummel

(17:23 Minutes)

| 1 | | everything else, telling him it's all right, but he kept on fighting 'em. |
|---|---|---|
| 2 | KAUTZ: | Yeah. |
| 3 | Crummel: | I can't stop that. |
| 4 | KAUTZ: | Yeah. |
| 5 | Crummel: | She's getting mad at me because I ain't saying nothing.  What can I |
| 6 | | say when he's all rampaging like that? |
| 7 | KAUTZ: | Yeah.  So, um, you heard him rampaging, wild; did-was he saying |
| 8 | | anything? |
| 9 | Crummel: | I don't know. |
| 10 | KAUTZ: | You couldn't hear him say anything? |
| 11 | Crummel: | Nope. |
| 12 | KAUTZ: | Were the deputies saying anything? |
| 13 | Crummel: | Yeah, telling him, calm down, calm down. |
| 14 | KAUTZ: | Did they say anything else? |
| 15 | Crummel: | Um, naw, I wasn't really paying attention.  I tried to get him to stop, |
| 16 | | he wouldn't listen, I walked back towards my room again. |
| 17 | KAUTZ: | Okay.  When you wa-when you walked out, before you walked back |
| 18 | | into your room, what did you see? |
| 19 | Crummel: | Them handcuffing him.  That's it. |
| 20 | KAUTZ: | Okay. |
| 21 | Crummel: | Now I have to call my worker and…hope- |
| 22 | KAUTZ: | Did you see or hear anything else? |
| 23 | Crummel: | No. |
| 24 | KAUTZ: | No?  Okay.  All right David, let me go check and see if your house |
| 25 | | is clear, okay? |
| 26 | | |
| 27 | | |
| 28 | | |

29

**COSB  004814**

EXHIBIT "10"

Ruben Escudero

Transcription – Kautz Interview with Alcon

(07:13 Minutes)

1     **KAUTZ:  Deputy Tiffany Kautz**

2     **ALCON:  Martin Alcon (Engineer, Fire Department, Station**

3              **311)**

4     ------------------------------------------------

5     **0:00**

6     KAUTZ:    All right.  Can I start with your…first name?

7     ALCON:    Martin.  M-A-R-T-I-N.

8     KAUTZ:    And last name?

9     ALCON:    Alcon.  A-L-C-O-N.

10    KAUTZ:    And a date of birth?

11    ALCON:    ▮/61.

12    KAUTZ:    And a phone number?

13    ALCON:    You want the station phone number…or?

14    KAUTZ:    Uh, whatever is the best one to reach you on.

15    ALCON:    Ah, well, 'cause the last time I did this I had people calling me at my

16              house-

17    KAUTZ:    Oh-

18    ALCON:    -'cause it was a fatal TC and they took my number off the-

19    KAUTZ:    I gotcha.

20    ALCON:    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

21    KAUTZ:    Um hm.

22    ALCON:    ▮▮▮▮

23    KAUTZ:    Um hm.

24    ALCON:    ▮▮▮   That's Fire Station 3-11's phone number.

25    KAUTZ:    3-11.  And address?

26                                    1

27    ─────────────────────────────────────────────

28                                    **COSB  004696**

Ruben Escudero

Transcription – Kautz Interviews 2

(07:13 Minutes)

| 1 | ALCON: | We're gonna go with ▮▮▮▮▮▮▮▮▮▮, Victorville.  9 2 |
| 2 | | 3 9 5. |
| 3 | KAUTZ: | All right.  And you are Fire Department.  And uh, your title? |
| 4 | ALCON: | Engineer. |
| 5 | KAUTZ: | All right.  All right.  Can you tell me what happened? |
| 6 | ALCON: | Arrived on scene to find the uh, (*clears throat*) uh, the patient laying |
| 7 | | down inside the kitchen, seemed to be unconscious.  Two officers |
| 8 | | helped carry him out to the front living room.  We took a set of |
| 9 | | vitals on him, started bagging him and we pushed Narcan on him. |
| 10 | | At that time, he started coming to a little bit and started like he was |
| 11 | | vomiting so he sat up to vomit, he did not vomit.  We laid him back |
| 12 | | down.  He got back up because he was gonna vomiting and the more |
| 13 | | he started coming to then he became aggressive.  Th-they tried to get |
| 14 | | him to lay down.  Um, tried to restrain him and then the fight was |
| 15 | | on.  Um, your officers tried to restrain him.  I saw that he was shot |
| 16 | | with a taser, which had an effect, but once they let on, he just |
| 17 | | became more aggressive.  Um, so, you had three officers on him.  I |
| 18 | | grabbed the cuffs off of the first officer, was able to restrain one arm |
| 19 | | and cuff him and held that and he refused to give up the other arm |
| 20 | | while he was laying down on his stomach.  Finally, we were able to |
| 21 | | get the other arm back where I got a second cuff, cuffed him and |
| 22 | | then cuffed the two together. |
| 23 | KAUTZ: | Okay. |
| 24 | ALCON: | The paramedics then sedated him, which put him out, uh, and then |
| 25 | | we rolled him over, put him on the gurney and transported him to |
| 26 | | |
| 27 | | |
| 28 | | |

2

Ruben Escudero

Transcription – Kautz Interviews 2

(07:13 Minutes)

| | | |
|---|---|---|
| 1 | | the hospital.  And he had severe head wounds th-that he got during |
| 2 | | the fight. |
| 3 | KAUTZ: | Okay.  What was he saying?  Did-did he say anything when he was |
| 4 | | fighting? |
| 5 | ALCON: | Um, I-you know, he was saying something, but in the commotion of |
| 6 | | all that, it wasn't relative to anything.  Uh, the officers kept trying to |
| 7 | | tell him, calm down, they were there to help him, um, but he wasn't |
| 8 | | hearing any of that either. |
| 9 | KAUTZ: | And they used the taser on him? |
| 10 | ALCON: | Yeah, one of your officers- |
| 11 | KAUTZ: | What else? |
| 12 | ALCON: | -the-the female officer. |
| 13 | KAUTZ: | Used the-okay.  And then, did they use anything else on him? |
| 14 | ALCON: | Um, she used the taser to hit him- |
| 15 | KAUTZ: | Okay. |
| 16 | ALCON: | -to try to subdue him- |
| 17 | KAUTZ: | Okay. |
| 18 | ALCON: | -and then they ended up pulling out the baton to help force his arm, |
| 19 | | the last remaining arm, behind him so they could finish cuffing him. |
| 20 | KAUTZ: | But no strikes? |
| 21 | ALCON: | Uh, they did strike him to the face with a closed fist- |
| 22 | KAUTZ: | Okay. |
| 23 | ALCON: | -with nothing in their hand; the officers did, they had nothing in their |
| 24 | | hand.  They just hit him while he was-he went from laying on the |
| 25 | | ground to knees to standing up to getting back down. |
| 26 | | 3 |
| 27 | | |
| 28 | | |

Ruben Escudero

Transcription – Kautz Interviews 2

(07:13 Minutes)

| | | |
|---|---|---|
| 1 | KAUTZ: | Oh, wow. |
| 2 | | So, just strikes with their fists? |
| 3 | ALCON: | Correct. |
| 4 | KAUTZ: | No baton strikes? |
| 5 | ALCON: | No. |
| 6 | KAUTZ: | Did you maybe see how many times he was struck…maybe? |
| 7 | ALCON: | Um, all together or whatever- |
| 8 | KAUTZ: | Yeah. |
| 9 | ALCON: | -I-let me see, she s-the female deputy struck him in the head with the |
| 10 | | taser gun, the male deputy hit him, I would say total out of |
| 11 | | everything maybe 10 strikes.  But during all those strikes he was still |
| 12 | | combative and fighting. |
| 13 | KAUTZ: | All right.  Anything else that you can remember?  Seeing, hearing, |
| 14 | | anything like that? |
| 15 | ALCON: | No.  I-I-I-he was talking some, I couldn't remember what he was |
| 16 | | saying.  I don't know if he was, what are you doing, or whatever, |
| 17 | | the-I know the officers kept re-iting to him, get on the ground, get on |
| 18 | | the ground- |
| 19 | KAUTZ: | Um hm. |
| 20 | ALCON: | -we're here to help you and he was just-continue fighting. |
| 21 | KAUTZ: | Um hm.  Um hm.  I got it.  All right.  Is that it? |
| 22 | ALCON: | Yeah. |
| 23 | KAUTZ: | Okay.  Thank you. |
| 24 | ALCON: | Sure.  Yeah.  The reason why I gave you the station is I was-I |
| 25 | | witnessed a fatal TC- |
| 26 | | |
| 27 | | |
| 28 | | |

EXHIBIT "11"

Ruben Escudero

Transcription – Kautz Interview with Washington

(06:34 Minutes)

| | | |
|---|---|---|
| 1 | **KAUTZ:** | **Deputy Tiffany Kautz** |
| 2 | **CAPT.:** | **Dyjuan Washington (Fire Captain)** |

3   ------------------------------------------------

4   **0:00**

5   [*Laughter*]

6   KAUTZ:      All right.  What's your first name, sir?

7   CAPT.:      Uh, Dyjuan.

8   KAUTZ:      Can you spell that?

9   CAPT.:      D-Y-J-U-A-N

10  KAUTZ:      And last name?

11  CAPT.:      Last name is Washington.

12  KAUTZ:      And date of birth?

13  CAPT.:      Uh, [Redacted]

14  KAUTZ:      Best phone number?

15  CAPT.:      626-

16  KAUTZ:      Mm-hmm.

17  CAPT.:      -365-

18  KAUTZ:      Mm-hmm.

19  CAPT.:      [Redacted]

20  KAUTZ:      And address?

21  CAPT.:      Uh, [Redacted]

22  KAUTZ:      Mm-hmm.

23  CAPT.:      [Redacted.]  That's in-

24  KAUTZ:      Mm-hmm.

25  CAPT.:      -Victorville.

26

27

28

Ruben Escudero

Transcription – Kautz Interview with Washington

(06:34 Minutes)

| | | |
|---|---|---|
| 1 | KAUTZ: | Mm-hmm. |
| 2 | CAPT.: | Uh, 92394. |
| 3 | KAUTZ: | All right.  What happened today? |
| 4 | CAPT.: | Uh, so we got dispatched to a overdose call at this address.  Uh, we |
| 5 | | arrive on scene, sheriff deputies were already on scene.  Uh, the |
| 6 | | patient was in the back room so the deputies assisted to um, pull the- |
| 7 | | uh, carry the patient to the living room area.  Uh, as we got to the |
| 8 | | living room area my paramedic uh, got some Narcan in him.  Um, |
| 9 | | and immediately, you know, it takes a while for it to take effect, |
| 10 | | maybe about 2 minutes later he started to come to and as he started |
| 11 | | to come to he wanted to sit up.  Uh, the deputies advised him to stay |
| 12 | | down, we're here to help, we're tr-we're trying to uh, you know, uh, |
| 13 | | get you back conscious again (*clears throat*).  He kept on trying to |
| 14 | | sit back up, deputies kept on pushing him back down.  This probably |
| 15 | | went back and forth 3 or 4 times.  Uh, then eventually he got really |
| 16 | | combative and started throwing punches at the AMR paramedic um, |
| 17 | | which caused the deputies to take action and then they started |
| 18 | | throwing punches back and tried to restrain him, he kept fighting. |
| 19 | | We got uh, he was laying on his stomach uh, and then he kept on |
| 20 | | again trying to get up.  He threw punches at my paramedic, at the |
| 21 | | deputies uh, I'm pretty sure the deputies struck him a few times uh, |
| 22 | | with whatever they could to try to get him down.  Uh, eventually we |
| 23 | | got him on his stomach again and he's still trying to resist.  Um, I |
| 24 | | was in the doorway as all this was going down from the kitchen to |
| 25 | | the living room uh, so I had a pretty good view of everything. |
| 26 | | |

2

**COSB  004712**

Ruben Escudero

Transcription – Kautz Interview with Washington

(06:34 Minutes)

| | | |
|---|---|---|
| 1 | KAUTZ: | Mm-hmm. |
| 2 | **2:10** | |
| 3 | CAPT.: | Uh, they tased him twice um, and he still kept on um, initially after |
| 4 | | he got tased um, he was down, but then as they stopped tasing him |
| 5 | | he got back up.  They tased him again, he was down then he started |
| 6 | | resisting again.  Uh, and then he just kept fighting so, eventually uh, |
| 7 | | we tried to cuff his arms.  Uh, we rolled him to his stomach.  He still |
| 8 | | tried to get up then (phone ringing) I was in the doorway with all my |
| 9 | | weight stepping down on him trying to get him down so they can |
| 10 | | then get his other arm cuffed uh, and eventually I used the door jamb |
| 11 | | as force to help push him down. |
| 12 | KAUTZ: | Ah. |
| 13 | **2:47** | |
| 14 | CAPT.: | I'm-I'm 230 pounds so it-I mean he was exerting a lot of force there. |
| 15 | | Um, so, then finally we got his other uh, handcuffed and then he just |
| 16 | | kind of started to go downhill and they sedated um, with some, I |
| 17 | | can't remember what drug it was they gave him, but they-they |
| 18 | | sedated him and then uh, we were able to get him into the |
| 19 | | ambulance and take him to the hospital. |
| 20 | KAUTZ: | Okay.  All right.  So, you guys were dispatched to the overdose call. |
| 21 | | You arrived 97, patient was in the back room, deputies were here, |
| 22 | | um, they assisted taking him to the front room.  Um, paramedics |
| 23 | | gave him the Narcan.  About 2 minutes later he started coming to- |
| 24 | CAPT.: | Mm-hmm. |
| 25 | KAUTZ: | -tried to sit up, deputies said, hey, lay back down; he-we're to help, |
| 26 | | |
| 27 | | |
| 28 | | |

3

**COSB  004713**

Ruben Escudero

Transcription – Kautz Interview with Washington

(06:34 Minutes)

| | | |
|---|---|---|
| 1 | | tried to sit up again, tried to push him down-like tried to keep him on |
| 2 | | the ground so we could help him; that's when he started throwing |
| 3 | | punches at the um, eh-paramedics- |
| 4 | CAPT.: | Right. |
| 5 | **3:38** | |
| 6 | KAUTZ: | -um, which caused the deputies to have to act- |
| 7 | CAPT.: | Mm-hmm. |
| 8 | KAUTZ: | -um, he began um, becoming combative um, and punching the |
| 9 | | deputies.  That's when they continued um, using uh, strikes- |
| 10 | CAPT.: | Mm-hmm. |
| 11 | KAUTZ: | -to kee-keep him down and detain him. |
| 12 | CAPT.: | They continued to escalate their force as he escalated his- |
| 13 | KAUTZ: | Right. |
| 14 | CAPT.: | -essentially, so. |
| 15 | KAUTZ: | Um, they struck him a few times, he was still resisting.  He was |
| 16 | | tased two times.  Um, he was-it-the-with-the first one was effective, |
| 17 | | but then as soon as it went away- |
| 18 | CAPT.: | Right. |
| 19 | KAUTZ: | -he was combative-he's m-even more combative. |
| 20 | CAPT.: | Even more combative. |
| 21 | **4:06** | |
| 22 | KAUTZ: | Um, they tased him again.  Um, he kept fighting.  They tri-you guys |
| 23 | | tried to cuff him.  Um, attempting to detain him.  You had to |
| 24 | | actually use the door jamb to help, |
| 25 | CAPT.: | Mm-hmm. |
| 26 | | |
| 27 | | |
| 28 | | |

4

**COSB  004714**

Ruben Escudero

Transcription – Kautz Interview with Washington

(06:34 Minutes)

| | | |
|---|---|---|
| 1 | | pressure points to kind of get him to-to lay down- |
| 2 | KAUTZ: | Okay. |
| 3 | CAPT.: | -and none of that stuff worked.  Like, she literally had the baton like |
| 4 | | in his neck, in his-right, trying to get him to stop and he was not |
| 5 | | stopping at all. |
| 6 | KAUTZ: | I gotcha. |
| 7 | **5:25** | |
| 8 | CAPT.: | Um- |
| 9 | KAUTZ: | Okay.  Anything else that you can remember seeing, hearing, |
| 10 | | anything like that? |
| 11 | CAPT.: | Uh, the deputies were really good at just g-giving him instructions, |
| 12 | | hey we're trying to help you, you know, lay down, stop resisting, |
| 13 | | we're trying to take you to the hospital, you know, over and over |
| 14 | | again.  He would come back and say, uh, why are you hitting me |
| 15 | | after he swung at them 50 dozen times, you know.  Um, so, there's |
| 16 | | conversation that was going back-back and forth between the |
| 17 | | deputies uh, and the patient, but um, it seemed like he wasn't |
| 18 | | hearing anything coming in or he didn't realize that he was actually |
| 19 | | being combative 'cause he was asking why he was getting beat up, |
| 20 | | but then he was the one that was fighting, so. |
| 21 | **6:03** | |
| 22 | KAUTZ: | M'kay.  Anything else that you heard…him say or them say? |
| 23 | CAPT.: | Uhhmm, no.  It's just pretty much, hey, we're here to help you, you |
| 24 | | know.  So, s-stop- |
| 25 | KAUTZ: | Yeah. |
| 26 | | |
| 27 | | |
| 28 | | |

6

**COSB  004716**

EXHIBIT "12"

Ruben Escudero

Transcription – Kautz Interview with Lever

(07:46 Minutes)

1    **KAUTZ: Deputy Tiffany Kautz**

2    **LEVER: Brett Lever (Paramedic, Fire Department, Station**

3         **311)**

4    ------------------------------------------------

5    **0:00**

6    [*Coughing*]

7    KAUTZ: All right. Sir, your first name?

8    LEVER: My first name is Brett. B-R-E-T-T

9    KAUTZ: Last name?

10    LEVER: Lever. L-E-V-E-R

11    KAUTZ: And date of birth?

12    LEVER: [Redacted]

13    KAUTZ: Um hm.

14    LEVER: [Redacted]

15    KAUTZ: Um, best phone number?

16    LEVER: 909-

17    KAUTZ: Um hm.

18    LEVER: -477-

19    KAUTZ: Um hm.

20    LEVER: [Redacted]

21    KAUTZ: And address?

22    LEVER: [Redacted]

23    KAUTZ: Um hm.

24    LEVER: [Redacted]

25    KAUTZ: Um hm.

26

27

28

1

**COSB 004702**

Ruben Escudero

Transcription – Kautz Interviews 4

(07:46 Minutes)

| | | |
|---|---|---|
| 1 | LEVER: | Street. |
| 2 | KAUTZ: | Um hm. |
| 3 | LEVER: | Rancho Cucamonga |
| 4 | KAUTZ: | Um hm. |
| 5 | LEVER: | 917- |
| 6 | KAUTZ: | Um- |
| 7 | LEVER: | -30 |
| 8 | KAUTZ: | 730? |
| 9 | LEVER: | Yes, ma'am. |
| 10 | KAUTZ: | All right.  What happened today? |
| 11 | LEVER: | So, we got called out-dispatched to a overdose- |
| 12 | KAUTZ: | Um hm. |
| 13 | LEVER: | -here at this address, 16927 Monte Vista.  Um, we arrived on scene |
| 14 | | prior to AMR, after um, 2 deputies.  We grabbed our cardiac |
| 15 | | monitor, our airway bag as well as our drug box out of the engine |
| 16 | | and I walked into the uh, address here. |
| 17 | KAUTZ: | Okay. |
| 18 | LEVER: | We were greeted by two San Bernardino County Sheriff's |
| 19 | | Department as well as a female, unknown if related to the uh, patient |
| 20 | | or not. |
| 21 | KAUTZ: | Um hm. |
| 22 | LEVER: | Uh, patient was lying supine on his back in the kitchen.  San |
| 23 | | Bernardino County Sheriff's uh, they said, did you want them to |
| 24 | | move him out in the living room; I said, yes, so, he turned around, I |
| 25 | | walked out in the living room along with my Engineer and they |
| 26 | | |

2

Ruben Escudero

Transcription – Kautz Interviews 4

(07:46 Minutes)

| | | |
|---|---|---|
| 1 | | brought him out to the living room. |
| 2 | KAUTZ: | Um hm. |
| 3 | LEVER: | Um, he had snoring respirations.  They said he had a open heroin uh |
| 4 | | needle next to him- |
| 5 | KAUTZ: | Um hm. |
| 6 | LEVER: | -and it would be a heroin overdose.  My engineer began obtaining |
| 7 | | vital signs on him.  I administered a total of uh, 2 mg of Narcan. |
| 8 | KAUTZ: | 2 mg? |
| 9 | LEVER: | 2 mg, yeah.  Total of 2 mg of Narcan throughout the uh,- |
| 10 | KAUTZ: | Um hm. |
| 11 | LEVER: | -the incident.  I uh, began assisting the patient's ventilations 'cause |
| 12 | | they were uh, inadequate; he was not breathing properly, |
| 13 | | approximately 6 times a minute with a BVM, bag mouth vest- |
| 14 | KAUTZ: | Um hm. |
| 15 | LEVER: | -um, that's when AMR arrived on scene. |
| 16 | KAUTZ: | Um hm. |
| 17 | LEVER: | AMR arrived on scene.  I gave 'em a brief rundown of what we |
| 18 | | have, what I've done so far- |
| 19 | KAUTZ: | Um hm. |
| 20 | LEVER: | -and they uh, began to get their uh, Mega-Mover, a big carrying |
| 21 | | tarp- |
| 22 | KAUTZ: | Um hm. |
| 23 | LEVER: | -to load the patient up on to the gurney, get him out of the house. |
| 24 | KAUTZ: | Um hm.  Um hm. |
| 25 | LEVER: | Um, as soon as we got the patient onto the Mega-Mover he began – |
| 26 | | |
| 27 | | |
| 28 | | |

3

COSB  004704

Ruben Escudero

Transcription – Kautz Interviews 4

(07:46 Minutes)

| | | |
|---|---|---|
| 1 | | become more responsive, as well as confused and agitated.  At that |
| 2 | | point in time we kind of tried to uh, calm the patient down, let him |
| 3 | | know who we were, uh, we're the fire department, as well as the |
| 4 | | cops, we're here to help you.  And then obtained some information |
| 5 | | from him and he became uh, very agitated…hostile and began to |
| 6 | | fight.  Uh, at that point in time I stepped back.  I let uh, sheriff's |
| 7 | | deputies uh, try and detain and control the patient. |
| 8 | KAUTZ: | Okay. |
| 9 | LEVER: | That's when I noticed uh, patient began throwing punches at the |
| 10 | | sheriff's deputy, wh-in general, anywhere he could throw a punch he |
| 11 | | was throwing punches.  Uh, sheriff's deputies' kind of fought back |
| 12 | | and made efforts to detain him and tased him twice.  I believe a total |
| 13 | | of 2 times…from what I heard…saw. |
| 14 | KAUTZ: | Um hm.  Okay. |
| 15 | LEVER: | At that point in time the AMR paramedic went to go grab Versed in |
| 16 | | efforts to chemically sedate the patient. |
| 17 | KAUTZ: | Okay. |
| 18 | LEVER: | Um, he grabbed Versed, he administered a total of 10 mg of Versed- |
| 19 | KAUTZ: | 10 mg of Versed? |
| 20 | LEVER: | Yeah.  V-E-R-S-E-D.  He gave a total of 10 mg Versed was given to |
| 21 | | the patient.  Um, sheriffs were still on top of the patient trying to |
| 22 | | detain him, trying to control him.  Uh, that's when we noticed he |
| 23 | | began to calm down and that we were getting ready to transport. |
| 24 | KAUTZ: | Okay. |
| 25 | LEVER: | Um, patient was unresponsive again.  I assessed for a pulse.  I noted |

4

COSB  004705

Ruben Escudero

Transcription – Kautz Interviews 4

(07:46 Minutes)

| | | |
|---|---|---|
| 1 | | the patient had a weak pulse- |
| 2 | KAUTZ: | Okay. |
| 3 | LEVER: | -uh, it was regular; and not breathing adequately again.  We rolled |
| 4 | | the patient over onto the Mega-Mover and got him loaded up onto |
| 5 | | the gurney and began uh, wheeling the gurney to the ambulance. |
| 6 | | We were assisting with ventilations this time with the patient.  Uh, |
| 7 | | he had a lot of blood loss, probably greater than 500 ML's of blood |
| 8 | | loss um, from the incident- |
| 9 | KAUTZ: | Um hm. |
| 10 | LEVER: | -with the sheriffs.  Um, we got him in the back.  We began |
| 11 | | transporting Code 3 to Victor Valley.  The AMR medic um, |
| 12 | | established IO access, li – literally IO access, uh, venus access. |
| 13 | KAUTZ: | Okay. |
| 14 | LEVER: | Um, upon arrival to Victor Valley's emergency department we |
| 15 | | noticed the patient was pulseless; did not have a pulse. |
| 16 | KAUTZ: | Okay. |
| 17 | LEVER: | We began compressions and wheeled him into the ER and they uh, |
| 18 | | continued CPR efforts in there- |
| 19 | KAUTZ: | Um hm. |
| 20 | LEVER: | -where they eventually obtained pulses back. |
| 21 | KAUTZ: | Um hm. |
| 22 | | Anything else? |
| 23 | LEVER: | Not that I can think of right now. |
| 24 | KAUTZ: | M'kay. |
| 25 | | Um, as far as, I know that you guys were dispatched to an overdose- |
| 26 | | |
| 27 | | |
| 28 | | |

5

**COSB  004706**

Ruben Escudero

Transcription – Kautz Interviews 4

(07:46 Minutes)

| | | |
|---|---|---|
| 1 | LEVER: | Yes, ma'am. |
| 2 | KAUTZ: | -here at this address.  You were here – you were here before AMR, |
| 3 | | but um, 2 deputies were 97- |
| 4 | LEVER: | Yes, ma'am. |
| 5 | KAUTZ: | -um, you brought all of your equipment- |
| 6 | LEVER: | Yes, ma'am. |
| 7 | KAUTZ: | -for the cardiac and the airway. |
| 8 | LEVER: | Yes, ma'am. |
| 9 | KAUTZ: | Um, you got here, you were greeted by two deputies and a female, |
| 10 | | you are not sure of her relationship to him. |
| 11 | LEVER: | Yes, ma'am. |
| 12 | KAUTZ: | Uh, he was uh, laying on his back.  Deputies asked if uh, you needed |
| 13 | | him moved, you said, yes; they moved him to the front room.  Uh, |
| 14 | | there was an open heroin needle that was- |
| 15 | LEVER: | (*Inaudible* – 05:34) |
| 16 | KAUTZ: | -next to him- |
| 17 | LEVER: | I did not visually see that, that's what deputies told me. |
| 18 | KAUTZ: | That's what deputy said, okay. |
| 19 | LEVER: | Yes. |
| 20 | KAUTZ: | Um, you administered 2 mg of Narcan and– |
| 21 | LEVER: | (*Inaudible* – 05:41) |
| 22 | KAUTZ: | -and assisted him with some airway uh, ventilations 'cause his uh, |
| 23 | | breathing was inadequate.  Um, AMR was here, you debriefed them |
| 24 | | really fast and uh, he started to come – come to, uh, regained |
| 25 | | consciousness and he was confused, he was agitated, and uh, he |

6

Ruben Escudero

Transcription – Kautz Interviews 4

(07:46 Minutes)

| | | |
|---|---|---|
| 1 | | attempted w-they-you guys attempted to calm him down, you guys |
| 2 | | ID'd yourself; said, hey, there's fire department, there's deputies, |
| 3 | | we're here to help, just calm down- |
| 4 | LEVER: | Yes, ma'am- |
| 5 | KAUTZ: | -um,- |
| 6 | LEVER: | -multiple times. |
| 7 | KAUTZ: | -and he just became very hostile um, (*inaudible* – 06:08) fight. |
| 8 | | Deputies had to–attempted to detain him- |
| 9 | LEVER: | Yes, ma'am. |
| 10 | KAUTZ: | -and in that um, he was throwing punches so they returned punches. |
| 11 | | He was tased 2 times.  AMR ended up giving him 10 mg of Versed |
| 12 | | um, deputies still uh, trying to detain him.  Um, after he was given |
| 13 | | the Versed, he became unresponsive, weak pulse um, again, |
| 14 | | inadequate breathing.  Um, he lost a lot of blood.  You guys |
| 15 | | transported him to Victor Valley Hospital um, where he had no |
| 16 | | pulse there, began CPR, take-took him to the ER where CPR was |
| 17 | | continued, pulse recovered. |
| 18 | LEVER: | Yes, ma'am. |
| 19 | KAUTZ: | Yes? |
| 20 | LEVER: | Yes, ma'am. |
| 21 | KAUTZ: | Um, did you see um, what was being used to strike? |
| 22 | LEVER: | Um, I know uh, fists- |
| 23 | KAUTZ: | Uh huh. |
| 24 | LEVER: | -as well as a taser- |
| 25 | KAUTZ: | Uh huh. |
| 26 | | |
| 27 | | |
| 28 | | |

7

# EXHIBIT "E"

1   Risa S. Christensen, Esq. (SBN: 227799)
2   Dennis E. Wagner, Esq. (SBN: 99190)
    **WAGNER ZEMMING CHRISTENSEN, LLP**
3   1325 Spruce Street, Suite 200
4   Riverside, CA  92507
    Tel.:       (951) 686-4800
5   Fax:       (951) 686-4801
6   rsc@wzclawfirm.com
7   dew@wzclawfirm.com

8   Attorneys for Defendants, COUNTY OF SAN BERNARDINO; HUMBERTO
9   MIRANDA; JULIAN MATA; and JESSAQUA ATTLESEY

10

11              **UNITED STATES DISTRICT COURT**

12              **CENTRAL DISTRICT OF CALIFORNIA**

13

14

| | |
|---|---|
| 15  CECILIA VARGAS; ARIANA SALAS, individually and as a successor-in-interest | CASE NO: 5:20-cv-02646-JGB-KK |
| 16  to RUBEN ESCUDERO, deceased, | **DECLARATION OF ZACHARY** |
| 17        Plaintiffs, | **PRITCHETT IN SUPPORT OF DEFENDANTS' MOTION FOR** |
| 18  vs. | **SUMMARY JUDGMENT OR IN THE ALTERNATIVE, PARTIAL** |
| 19  COUNTY OF SAN BERNARDINO; H. MIRANDA; S. CARTER; Z. VOGEL; J. | **SUMMARY JUDGMENT** |
| 20  MATA; Z. PRITCHETT; J. JIMENEZ; A. MATA; T. KAUTZ; J. ATTLESEY; | *[Filed concurrently w/ Notice of Motion and Motion for Summary* |
| 21  RODRIGUEZ (first initial unknown) and DOES 1-10, inclusive, | *Judgment; Statement of Undisputed Facts; and (Proposed) Judgment]* |
| 22        Defendants. | |
| 23 | **Date:**       March 6, 2023 **Time:**       9:00 a.m. |
| 24 | **Courtroom:** 1 |
| 25 | Hon. Jesus G. Bernal United States District Judge |
| 26 | |

27

28

1

I, ZACHARY PRITCHETT, declare as follows:

That I was formerly a party to this action and have personal knowledge of the facts as set forth in this declaration, and if called to testify I could and would do so competently thereon.

1.     That I am duly employed by the San Bernardino County Sheriff's Department as a deputy sheriff and have been employed with them for approximately ___6___ years. That I was a deputy sheriff on duty within the Victorville area on October 19, 2019 and responded to a drug overdose call involving Ruben Escudero. I arrived after Escudero had been transported from the scene. I was assigned to obtain the statements of AMR personnel who had been present at the scene about what had transpired in the drug overdose calling involving Escudero. I also took some photographs of the scene that day.

2.     That on October 19, 2019, after the encounter I spoke with Alex Gabler who was a paramedic with AMR on the day of the incident. He had been present during the overdose call and a witness to the incident involving the deputy sheriffs and their interactions with Ruben Escudero. That attached hereto as **Exhibit 1(l)** is a true and correct copy of my audio recording of the statement I conducted that day with Alex Gabler. That I have reviewed a written transcript of the statement with Gabler that I conducted and have compared the transcript with the audio recording and find that the transcript fairly and accurately depicts what was said in the statement. That attached hereto as **Exhibit 13** is a true and correct copy of the written transcript of the Gabler statement I conducted, pgs. 1-11.

3.     That on October 19, 2019, after the encounter I spoke with Karla Lugo who was an EMT with AMR on the day of the incident. She had been present during the overdose call and a witness to the incident involving the deputy sheriffs and their interaction with Ruben Escudero. That attached hereto as Exhibit **Exhibit 1(m)** is a true and correct copy of my audio recording of the statement, I conducted that day with Karla Lugo. That I have reviewed a written transcript of

2

1  the statement with Lugo that I conducted and have compared the transcript with the

2  audio recording and find that the transcript fairly and accurately depicts what was

3  said in the statement.  That attached hereto as **Exhibit 14** is a true and correct copy

4  of the written transcript of the Lugo statement I conducted, pgs. 1-6, 8-11.

5

6      I declare under penalty of perjury under the laws of the State of California

7  and the United States of America, that the foregoing is true and correct.

8      Executed this 25 day of January 2023 in _____ BARSTOW _____ ,

9  California, United States of America.

10

11  ZACHARY PRITCHETT, Declarant

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DECLARATION OF ZACHARY PRITCHETT IN SUPPORT OF DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT

# EXHIBIT "13"

Ruben Escudero

Transcription – Pritchett Interview with Alex Gabler

(08:22 Minutes)

| | | |
|---|---|---|
| 1 | **ZP:** | **Zachary Pritchett** |
| 2 | **GABLER:** | **Alex Gabler (AMR Paramedic)** |

3  ----------------------------------------------

4  **0:00**

5  ZP:         Alex, right?

6  GABLER:   Yeah.

7  ZP:         Okay, cool.  Um, can you tell me exactly – start with – wh-what was

8              the call that you guys got?

9  GABLER:   Okay.

10  ZP:        And just from there until you guys got here and we got here and

11             everything.

12  GABLER:   Okay.  You ready?

13  ZP:        Yeah, yeah.

14  GABLER:   So, call came in as a uh, unknown originally.  Uh, got upgraded to a

15             overdose.  We were told to stage.  Before we even got to a staging

16             location, we were cleared in.  Uh, we arrived after Medic Engine

17             311 did.  There's two County Sheriff here originally.  Um, found the

18             patient down, unresponsive, laying supine on the floor.  Uh, Medic

19             Engine 311 stated they gave 2 mg of Narcan IN prior to our arrival -

20  ZP:        Okay.

21  GABLER:   - and were currently bagging the patient, so control an airway so on

22             so forth.  Uh, patient was still unresponsive, pretty poor vital signs.

23             Um, we assessed the patient's blood sugar just to rule that out.

24             Obtained all of our vitals that we could and then uh, were working

25             on moving the patient to a piece of equipment to move him to the

26                                                    1

27  ------------------------------------------------

28                                        **COSB  004718**

Ruben Escudero

Transcription – Pritchett Interview with Alex Gabler

(08:22 Minutes)

| | |
|---|---|
| 1 | gurney was when he woke up.  Uh patient became violent and |
| 2 | started fighting all of us.  Um, took a couple swings at everybody |
| 3 | sitting in there.  At that time um SBSO stood in, handled the |
| 4 | situation, subdued the patient once where we were able to give uh, 5 |
| 5 | mg of Versed.  After the initial dose of the medication, patient |
| 6 | became more combative, gave the medication prior, one more time, |
| 7 | and patient became unresponsive basically at that point. |
| 8 | 1:20 |
| 9 | GABLER:   Um, patient sustained pretty substantial head trauma from the |
| 10 | incident um, that went down accordingly.  Uh, the estimated blood |
| 11 | loss for us is like 500, 700 ML.  Uh, got the patient onto the gurney |
| 12 | after he was subdued in handcuffs.  Uh, patient became apneic or not |
| 13 | breathing.  Once the patient became apneic, we started bagging the |
| 14 | patient with the BVM, controlling his airway, got him in the back of |
| 15 | the ambulance, established a vascular access.  Uh, upon arrival to |
| 16 | Victor Valley Global patient became uh, pulseless so we started |
| 17 | CPR.  I got the patient into the ER, gave the report to the nurses, |
| 18 | they continued CPR, I believe he's got a pulse now, but see what |
| 19 | happens. |
| 20 | ZP:   All right.  Cool.  Um, so, just to reiterate from the beginning.  It was |
| 21 | an overdose; you guys were instructed to stage.  Deputies got here, |
| 22 | fire got here, and they cleared you guys in. |
| 23 | GABLER:   That's affirm. |
| 24 | ZP:   So, you guys got here, two deputies here, along with fire, patient |
| 25 | was down on the ground; where was he at inside the house when you |

Ruben Escudero

Transcription – Pritchett Interview with Alex Gabler

(08:22 Minutes)

| | | |
|---|---|---|
| 1 | | got here? |
| 2 | GABLER: | Uh, right in the living room, right inside the front door. |
| 3 | ZP: | Okay.  And um, when you got here, what did you observe?  Was the |
| 4 | | patient awake at that time or was he still - |
| 5 | GABLER: | Negative.  Patient - |
| 6 | ZP: | - uh, unconscious? |
| 7 | GABLER: | - patient was completely unconscious, - |
| 8 | ZP: | Okay. |
| 9 | GABLER: | - unresponsive. |
| 10 | ZP: | And was he laying on his stomach or on his back, on his side? |
| 11 | GABLER: | He was on his back. |
| 12 | ZP: | On his back? |
| 13 | GABLER: | Yeah. |
| 14 | ZP: | All right.  And – what di-, okay, so, fire let you guys know that he- |
| 15 | | uh, they gave – they administered 2 mg Narcan? |
| 16 | GABLER: | That's affirm. |
| 17 | **2:37** | |
| 18 | ZP: | Okay.  And what did y- what did you do um, after they told you that, |
| 19 | | what was your – what was your role?  What did you start doing? |
| 20 | GABLER: | Uh, my role – because they were handling the patient care aspect of |
| 21 | | it was to get him moved basically to our gurney so that we could get |
| 22 | | 'im transported. |
| 23 | ZP: | Okay. |
| 24 | GABLER: | Um, I knew that they had the – the patient care handled at that point |
| 25 | | so, - |
| 26 | | |
| 27 | | |
| 28 | | |

3

**COSB  004720**

Ruben Escudero

Transcription – Pritchett Interview with Alex Gabler

(08:22 Minutes)

| 1 | ZP: | Okay. |
|---|---|---|
| 2 | GABLER: | - that's when I got our Mega-Mover, which is our piece of |
| 3 | | equipment to move him to the gurney. |
| 4 | ZP: | So, you guys ini – that's the first thing you gra – right – did right |
| 5 | | when you guys got here is get the gurney - |
| 6 | GABLER: | Yes. |
| 7 | ZP: | - wh – wheel it over here so that way you're ready to go? |
| 8 | GABLER: | Yes. |
| 9 | ZP: | Um, okay.  Where'd you guys stage the gurney at? |
| 10 | GABLER: | Uh, gurney was right outside the front door on the asphalt; just off |
| 11 | | the step. |
| 12 | ZP: | Okay.  And um, so they're doing patient care, what did you observe? |
| 13 | GABLER: | Um, they were bagging the patient with a BVM um – |
| 14 | | [*cell phone ringing*] |
| 15 | ZP: | What – what does that mean? |
| 16 | GABLER: | Um, means that they were breathing for him basically. |
| 17 | ZP: | Oh okay, so they put the mask over him – |
| 18 | GABLER: | Yeah. |
| 19 | ZP: | - and was breathing. |
| 20 | GABLER: | Yeah, yeah, yeah. |
| 21 | ZP: | Okay.  Um, and he didn't have a pulse at that point? |
| 22 | GABLER: | He had a pulse at that point. |
| 23 | ZP: | Okay. |
| 24 | GABLER: | Yes. |
| 25 | ZP: | All right.  And uh, okay, and then after that, what happened? |
| 26 | | |
| 27 | | |
| 28 | | |

4

**COSB  004721**

Ruben Escudero

Transcription – Pritchett Interview with Alex Gabler

(08:22 Minutes)

| | | |
|---|---|---|
| 1 | GABLER: | Um, after that, they – we worked on getting him onto the tarp, the |
| 2 | | Mega-Mover, to move 'im – |
| 3 | ZP: | Okay. |
| 4 | GABLER: | - um, we were still bagging him at that point. |
| 5 | ZP: | Okay. |
| 6 | GABLER: | Once we got up to a point where we're ready to move is when he |
| 7 | | woke up.  And he woke up rather violent.  We tried multiple times to |
| 8 | | tell him, hey, you need to calm down. You need to lay down. |
| 9 | ZP: | Okay.  What specifically uh, or, as detailed as you can, how was he |
| 10 | | when he woke up?  You say that he's violent, h- what was he doing |
| 11 | | or what was he saying that made you think that he was being that |
| 12 | | way? |
| 13 | **3:54** | |
| 14 | GABLER: | He wasn't saying anything. |
| 15 | ZP: | Okay. |
| 16 | GABLER: | But he had the – the violent look on his face where, you know, he |
| 17 | | was concerned.  We were – we were trying our hardest to be you |
| 18 | | know, cool, calm, collected with him. |
| 19 | ZP: | Right. |
| 20 | GABLER: | Um, tell him to sit down, relax, we're trying to explain why we're |
| 21 | | here, hey bud, we're here because this happened. You weren't |
| 22 | | breathing we're trying to help you. You need to calm down. |
| 23 | ZP: | Right. |
| 24 | GABLER: | Um, at that point he started taking blows at pretty much anybody |
| 25 | | standing next to him. |
| 26 | | 5 |

Ruben Escudero

Transcription – Pritchett Interview with Alex Gabler

(08:22 Minutes)

| | | |
|---|---|---|
| 1 | ZP: | Okay. |
| 2 | GABLER: | So, we were – we were trying to subdue him onto his stomach to |
| 3 | | kinda put him in a position where he wasn't able to fight us. |
| 4 | ZP: | Was he trying to get up off the – |
| 5 | GABLER: | Yes. |
| 6 | ZP: | - ground? |
| 7 | GABLER: | Yes. |
| 8 | ZP: | Okay.  And um, the deputies that were there, did they tell him |
| 9 | | anything? |
| 10 | GABLER: | They told him multiple times to sit down and relax.  Sit down and |
| 11 | | relax. |
| 12 | **4:28** | |
| 13 | ZP: | Okay.  Did they identify themselves as deputy sheriffs? |
| 14 | GABLER: | Yes. |
| 15 | ZP: | And when they told him to sit down multiple times, was he uh, |
| 16 | | abiding by what they were saying at all? |
| 17 | GABLER: | No.  Not at all. |
| 18 | ZP: | Okay.  How many times did they tell him to – to sit down and relax? |
| 19 | GABLER: | Um – |
| 20 | ZP: | Approximately? |
| 21 | GABLER: | Approximate five to ten times minimum.  We were - |
| 22 | ZP: | Okay. |
| 23 | GABLER: |  - trying for at least two to three minutes to get him to sit down |
| 24 | | before any force was really [*cell phone ringing*] applied. |
| 25 | ZP: | Okay.  And um, tell me what happened after that. |
| 26 | | |
| 27 | | |
| 28 | | |

6

**COSB  004723**

Ruben Escudero

Transcription – Pritchett Interview with Alex Gabler

(08:22 Minutes)

| | | |
|---|---|---|
| 1 | GABLER: | Um, by what I can really remember from the event, they – the three |
| 2 | | sheriff – |
| 3 | ZP: | Um hm. |
| 4 | GABLER: | - pretty much tried to take him down.  Um, I believe he was tased |
| 5 | | once or twice with no submission.  Every time that he would get |
| 6 | | back up, he would start fighting them – they would start fighting him |
| 7 | | again.  I kind of pushed myself back onto the couch 'cause I'm not |
| 8 | | trained in the uh, take – takedowns – |
| 9 | ZP: | Right. |
| 10 | GABLER: | Um – |
| 11 | ZP: | Where were you at when uh, so, the patient was still in the living |
| 12 | | room where the three deputies were at as well – |
| 13 | GABLER: | Yes. |
| 14 | ZP: | - as the fire guys.  Were you s – were you in the living room as well? |
| 15 | GABLER: | I was in the living room.  I pushed myself back up on the couch to |
| 16 | | kind of get out of the way. |
| 17 | ZP: | Okay. |
| 18 | GABLER: | Um, once they kinda had him subdued I went to my ambulance to go |
| 19 | | get my narcotics to get him chemically sedated was our goal. |
| 20 | ZP: | Okay. |
| 21 | GABLER: | Uh, when I came back in, they were still fighting him.  Um, he had |
| 22 | | sustained some head trauma at that point – |
| 23 | ZP: | So, as he's trying to get up and they're trying to t- get him to – to sit |
| 24 | | back down and relax you went back to the truck, you got some |
| 25 | | narcotics and then you ran back and he was still – |
| 26 | | | |
| 27 | | | |
| 28 | | | |

7

Ruben Escudero

Transcription – Pritchett Interview with Alex Gabler

(08:22 Minutes)

| | | |
|---|---|---|
| 1 | GABLER: | Yes. |
| 2 | ZP: | - fighting with them? |
| 3 | GABLER: | Still fighting. |
| 4 | **5:48** | |
| 5 | ZP: | What was it – it was two uh, 5 mg of – what was it called? |
| 6 | GABLER: | Uh, 5 mg of Versed. |
| 7 | ZP: | Versed? |
| 8 | GABLER: | Versed.  Yes. |
| 9 | ZP: | How do you spell that?  V-E-R |
| 10 | GABLER: | V-e-r-s-e-d. |
| 11 | ZP: | And what's that?  What's that do? |
| 12 | GABLER: | It basically – it'll chemically restrain them. |
| 13 | ZP: | Okay. |
| 14 | GABLER: | To sum it up. |
| 15 | ZP: | All right.  And um so, you had a clear view of – of what was going |
| 16 | | on? |
| 17 | GABLER: | Yes. |
| 18 | ZP: | Um, do you know any of the involved parties?  Like do you know |
| 19 | | the deputies personally? |
| 20 | GABLER: | No. |
| 21 | ZP: | Do you know the suspect by any chance? |
| 22 | GABLER: | No. |
| 23 | ZP: | Okay.  Um, and then you already mentioned that the suspect didn't |
| 24 | | uh, respond to the verbal commands that the deputies were giving |
| 25 | | him. |
| 26 | | |
| 27 | | |
| 28 | | |

8

Ruben Escudero

Transcription – Pritchett Interview with Alex Gabler

(08:22 Minutes)

| | | |
|---|---|---|
| 1 | GABLER: | That's affirm. |
| 2 | ZP: | Okay.  Um, one of the deputies you said used a – a taser; did they |
| 3 | | um, make it known?  Did they say, hey, I'm gonna tase you, to the |
| 4 | | suspect or anything like that or did they just administer the taser? |
| 5 | GABLER: | I believe the first time the deputy did say, hey, I'm gonna tase you if |
| 6 | | you don't relax; then he was tased. |
| 7 | ZP: | And he was still – |
| 8 | GABLER: | He was still fighting.  Even - |
| 9 | ZP: | Okay. |
| 10 | GABLER: | - even with the taser he was still fighting. |
| 11 | **6:47** | |
| 12 | ZP: | Um, when they administered the taser, was it just, they put the taser |
| 13 | | against his body or they actually pulled the trigger and – |
| 14 | GABLER: | Pulled the trigger on prongs. |
| 15 | ZP: | Okay.  So, prongs.  Did you see where the prongs went? |
| 16 | GABLER: | That's a negative. |
| 17 | ZP: | Okay. |
| 18 | GABLER: | That was about the time that I had stepped out to go get the |
| 19 | | narcotics. |
| 20 | ZP: | How many times did you see or hear the taser? |
| 21 | GABLER: | Twice. |
| 22 | ZP: | Two times?  Okay. |
| 23 | | Um, did you see which deputy uh, administered the taser? |
| 24 | GABLER: | No. |
| 25 | ZP: | Okay.  Um, did you see if the hu- the uh, suspect had a weapon or |

9

Ruben Escudero

Transcription – Pritchett Interview with Alex Gabler

(08:22 Minutes)

| | | |
|---|---|---|
| 1 | | anything like that? |
| 2 | GABLER: | No. |
| 3 | ZP: | Okay.  Um, do you know if anybody recorded the incident by any |
| 4 | | chance?  Uh, like - |
| 5 | GABLER: | No. |
| 6 | ZP: | - video or anything? |
| 7 | GABLER: | No. |
| 8 | ZP: | Okay.  What was the suspect doing as – as the deputies were – were |
| 9 | | struggling?  Was he uh, did he swing at all…at the deputies? |
| 10 | GABLER: | He was swinging multiple times. |
| 11 | **7:33** | |
| 12 | ZP: | Okay.  At - |
| 13 | GABLER: | He – he – |
| 14 | ZP: | - at the deputies or was – everybody – in the room? |
| 15 | GABLER: | Swinging at everybody in the room? |
| 16 | ZP: | Yeah. |
| 17 | GABLER: | He was swinging at what he could see. |
| 18 | ZP: | Okay.  How many times did he swing? |
| 19 | GABLER: | Multiple. |
| 20 | ZP: | B- |
| 21 | GABLER: | Approximate maybe 30, - |
| 22 | ZP: | Both - |
| 23 | GABLER: | - 40 times. |
| 24 | ZP: | Both – both arms? |
| 25 | GABLER: | Both arms.  Yeah. |
| 26 | | |
| 27 | | |
| 28 | | |

Ruben Escudero

Transcription – Pritchett Interview with Alex Gabler

(08:22 Minutes)

| | | |
|---|---|---|
| 1 | ZP: | Thirty to 40 times.  Um, did he kick at all by any chance or - ? |
| 2 | GABLER: | Maybe not with the effort to actually hit somebody, but more to get |
| 3 | | himself up. |
| 4 | ZP: | Okay.  And um, okay, so he's swinging a bunch of times, they're |
| 5 | | trying to subdue him.  Did you see any of the deputies uh, strike him |
| 6 | | like hands, fist, feet uh, any other weapons? |
| 7 | GABLER: | Um, no. |
| 8 | ZP: | No?  Okay. |
| 9 | GABLER: | Most of what I saw was just them trying to get him down onto the |
| 10 | | ground – |
| 11 | ZP: | Just - |
| 12 | GABLER: | - the taser was the most excessive force I – I noticed. |
| 13 | ZP: | Okay.  All right. Cool.  Do you have your driver's license by any |
| 14 | | chance man? |
| 15 | GABLER: | Yeah. |
| 16 | | *[END OF AUDIO RECORDING]* |
| 17 | | |
| 18 | / / / | |
| 19 | | |
| 20 | / / / | |
| 21 | | |
| 22 | | |
| 23 | | |
| 24 | | |
| 25 | | |
| 26 | | |
| 27 | | |
| 28 | | |

11

COSB  004728

EXHIBIT "14"

Ruben Escudero

Transcription – Pritchett Interview with KARLA LUGO

(09:36 Minutes)

| | | |
|---|---|---|
| 1 | **ZP:** | **Zachary Pritchett** |
| 2 | **LUGO:** | **Karla Lugo (AMR EMT)** |
| 3 | ------------------------------------------------ | . |

**0:00**

5  ZP:      Alex right, so, you're Karla?

6  LUGO:    Yes.

7  ZP:      With AMR?  Okay. Um, can you tell me um, how you got the

8           call…here, initially?

9  LUGO:    Uh, it got dispatched at us as a overdose.

10  ZP:     Okay.

11  LUGO:   We were advised to stage.

12  ZP:     Okay.

13  LUGO:   When we were en route they said that the scene was clear –

14  ZP:     Okay.

15  LUGO:   That it was an accidental overdose.

16  ZP:     Did they say what he overdosed on?

17  LUGO:   No.  We don't get that info.

18  ZP:     Okay.

19  LUGO:   Uh, arrive on scene.  Fire was here first.

20  ZP:     Okay.

21  LUGO:   When we got into the house there were three people and then engine

22          inside and then two sheriff.

23  ZP:     Two sheriffs inside with uh, -

24  LUGO:   Yes.

25  ZP:       - fire?

1

Ruben Escudero

Transcription – Pritchett Interview with KARLA LUGO

(09:36 Minutes)

| | | |
|---|---|---|
| 1 | LUGO: | Yes. |
| 2 | ZP: | Okay. |
| 3 | LUGO: | Uh, once we were inside uh, one of the fire medics was assessing the |
| 4 | | patient, he was on the floor, looked like unconscious or heavy |
| 5 | | breathing. |
| 6 | ZP: | Okay. |
| 7 | LUGO: | So, they were working on his airway.  Uh, then, from what I heard, |
| 8 | | he was uh, they were in the process or they were gonna give Narcan |
| 9 | | and then after that uh, another sheriff showed up. |
| 10 | ZP: | Okay. |
| 11 | LUGO: | Uh, patient was out, he was unconscious still.  After a while, check |
| 12 | | his sugar, we're getting ready to transport and move him from the |
| 13 | | floor to the gurney and then he suddenly woke up.  He woke up |
| 14 | | really uh, aggressively combative.  Uh, he was told multiple times to |
| 15 | | calm down – |
| 16 | **1:24** | |
| 17 | ZP: | Okay. |
| 18 | LUGO: | - stay low.  He didn't He started fighting.  Uh, it went on for a |
| 19 | | while, multiple times they told him to stop, stop fighting, that they |
| 20 | | were – uh, one of the sheriff officers said that they were just here to |
| 21 | | help and uh, he still didn't listen; he kept fighting.  I heard family in |
| 22 | | the background saying, hey, I don't remember his name, uh, hey, |
| 23 | | you need to stop, calm down.  Uh, family was telling him that. |
| 24 | | Sheriff and – |
| 25 | **1:52** | |
| 26 | | |
| 27 | | |
| 28 | | |

2

Ruben Escudero

Transcription – Pritchett Interview with KARLA LUGO

(09:36 Minutes)

| | | |
|---|---|---|
| 1 | ZP: | Was – was – |
| 2 | LUGO: | - I kind of just – |
| 3 | ZP: | - that friend telling him to stop?  Them - |
| 4 | LUGO: | Uh - |
| 5 | ZP: | - right there? |
| 6 | LUGO: | - whoever.  I didn't see 'em 'cause I think they were in the |
| 7 | | back…room – |
| 8 | ZP: | Okay. |
| 9 | LUGO: | - some kind of kitchen kind of thing. |
| 10 | ZP: | Okay. |
| 11 | LUGO: | So, I didn't see 'em, but I heard multiple times throughout the entire |
| 12 | | call telling him that – to calm down. |
| 13 | ZP: | Okay. |
| 14 | LUGO: | I'm guessing that's family. |
| 15 | | Uh, he didn't.  Uh, and then that's where it got very difficult |
| 16 | | between three of the sheriff officer.  They started to uh, kind of |
| 17 | | wrestle with him. |
| 18 | ZP: | Mm-hmm. |
| 19 | **2:19** | |
| 20 | LUGO: | Uh, he still didn't listen.  Started knocking things down around the |
| 21 | | room.  I kind of stepped back at that moment.  I just moved stuff out |
| 22 | | of the way.  Uh, stepped out of the room and I just saw how it just |
| 23 | | went down, you know, they were trying to get him to calm down and |
| 24 | | it didn't work.  He got restrained at some point and then uh, my |
| 25 | | medic uh, I believe he suggested about the uh, some se - sedrative – |
| 26 | | |
| 27 | | |
| 28 | | |

3

**COSB  004731**

Ruben Escudero

Transcription – Pritchett Interview with KARLA LUGO

(09:36 Minutes)

|  |  |  |
|---|---|---|
| 1 |  | sedative to calm him down.  Uh, they work on that.  It went on for a |
| 2 |  | while so – |
| 3 | ZP: | Okay. |
| 4 | LUGO: | - about, more than 5 minutes easily; trying to get him to calm down. |
| 5 | ZP: | Once you guys were cleared in and you guys came over here, you |
| 6 |  | guys brought the gurney with you? |
| 7 | LUGO: | Yes, we did. |
| 8 | ZP: | Okay.  And where were you at when um, when you saw him laying |
| 9 |  | on the ground, initially? |
| 10 | LUGO: | Uh, I was – |
| 11 | ZP: | Where was he laying at, I mean? |
| 12 | LUGO: | He was laying right in the – as soon as we walk in through the door, |
| 13 |  | he was laying right there, next to the couch. |
| 14 | ZP: | So right here in the front – |
| 15 | LUGO: | Right in the middle – |
| 16 | ZP: | - in the little living room area? |
| 17 | LUGO: | - front.  Yes. |
| 18 | ZP: | Okay.  And you said he was on his back and he was unconscious? |
| 19 | LUGO: | Yes. |
| 20 | ZP: | Okay.  And you saw the two deputies and then the f- the fire |
| 21 |  | personnel that were in there, basically trying to treat him? |
| 22 | LUGO: | Yes. |
| 23 | **3:33** |  |
| 24 | ZP: | Okay.  Um, and you mentioned that he woke up and he was very |
| 25 |  | aggressive, tell me like about that.  What was he doing?  Did he say |
| 26 |  |  |
| 27 |  |  |
| 28 |  |  |

4

Ruben Escudero

Transcription – Pritchett Interview with KARLA LUGO

(09:36 Minutes)

| | | |
|---|---|---|
| 1 | | anything?  Or what - ? |
| 2 | LUGO: | Uh, he started saying, what are you doing to me? What are you |
| 3 | | doing to me? Leave me alone.  And that's when, between all of us, |
| 4 | | we started tell him, hey, calm down, we're here to help, blah, blah, |
| 5 | | blah.  And then, all of a sudden, he just started swinging and kicking |
| 6 | | and – |
| 7 | **3:55** | |
| 8 | ZP: | Was he – |
| 9 | LUGO: | - rolling around. |
| 10 | ZP: | - was he still on the ground when he did that? |
| 11 | LUGO: | Yeah, he was still on the ground.  He was trying to get up. |
| 12 | ZP: | Okay. |
| 13 | LUGO: | He was trying to get up by any means he could, but they hold him |
| 14 | | down. |
| 15 | ZP: | Who held him down? |
| 16 | LUGO: | Uh, at first it was between uh, f-f- the two sheriffs or three sheriffs - |
| 17 | ZP: | Okay. |
| 18 | LUGO: | - and then I guess we – I was trying to help too by the legs a little |
| 19 | | bit, try to get the legs down – |
| 20 | ZP: | Okay. |
| 21 | LUGO: | - but at some point, like I said I just – |
| 22 | ZP: | So, he was – |
| 23 | LUGO: | - stepped back. |
| 24 | ZP: | - trying to get up off the ground. |
| 25 | LUGO: | Yes. |
| 26 | | |
| 27 | | |
| 28 | | |

5

COSB  004733

Ruben Escudero

Transcription – Pritchett Interview with KARLA LUGO

(09:36 Minutes)

| | | |
|---|---|---|
| 1 | ZP: | And you guys were telling him to calm down? |
| 2 | LUGO: | Yes. |
| 3 | ZP: | What were – |
| 4 | LUGO: | To try to calm him down. |
| 5 | ZP: | - were the deputies telling him anything…as well? |
| 6 | LUGO: | Like I said uh, the female deputy was telling him like, calm down, |
| 7 | | we're just here to help. |
| 8 | ZP: | Okay.  And so, he uh, you said that he started swinging. |
| 9 | LUGO: | Yes, he started - |
| 10 | ZP: | Wh- |
| 11 | LUGO: | - swinging, kicking. |
| 12 | ZP: | Did you see who he swung at? |
| 13 | LUGO: | It was mostly like whoever he could get. |
| 14 | **4:40** | |
| 15 | ZP: | Just everybody in his – |
| 16 | LUGO: | Everybody – |
| 17 | ZP: | - general vicinity? |
| 18 | LUGO: | Yeah. |
| 19 | ZP: | How many times did you see him swing? |
| 20 | LUGO: | Easily about 7, 8 times…swinging and then trying to get up, while |
| 21 | | kicking too. At some point his clothes came off too, at some point. |
| 22 | ZP: | So, he was, he did have clothes on initially? |
| 23 | LUGO: | He did. |
| 24 | ZP: | And how did his clothes come off?  Do you know? |
| 25 | LUGO: | Uh, trying to hold him down. |
| 26 | | |
| 27 | | |
| 28 | | |

6

Ruben Escudero

Transcription – Pritchett Interview with KARLA LUGO

(09:36 Minutes)

1  **5:50**

2  ZP:          Okay.  And um, do you know any of the deputies personally?

3  LUGO:      No.

4  ZP:          Do you know who the suspect is?

5  LUGO:      No.

6  ZP:          Okay.  Um, were the deputies – okay, so when the deputies gave

7              him commands to like, hey, st – uh, you know, stay on the ground,

8              calm down, all that, did – was he uh, doing what they were telling

9              him to?

10 LUGO:      No.  He was still fighting.

11 ZP:          Okay.  So, he was still continuing to punch, kick –

12 LUGO:      Yes.

13 ZP:            - and all that stuff?

14 LUGO:      Throwing punch, kicking, and everything.

15 ZP:          Um, did you see the – the deputies struggling with him?

16 LUGO:      Yes.  All three of 'em.

17 ZP:          All – they were all three struggling to – to –

18 LUGO:      Yes, calm him down.

19 ZP:            - calm him down.

20              And what was the suspect doing when they were trying to calm him

21              down?

22 LUGO:      He didn't listen.  He was fighting them.

23 **6:32**

24 ZP:          Okay.  Did you see if the deputies used any kind of force toward

25              him?

26

27

28

8

Ruben Escudero

Transcription – Pritchett Interview with KARLA LUGO

(09:36 Minutes)

| | | |
|---|---|---|
| 1 | LUGO: | Uh, tase. |
| 2 | ZP: | They tased him? |
| 3 | LUGO: | Yes. |
| 4 | ZP: | Okay.  Did you see any other type of force? |
| 5 | LUGO: | Uh, just the uh, trying to get him to calm down, like, uh – |
| 6 | ZP: | Did they – did they punch or slap or kick or use the baton or gun or |
| 7 | | – |
| 8 | LUGO: | I – |
| 9 | ZP: | force or any – anything? |
| 10 | LUGO: |  - they got it out.  I don't think they actually used it though. |
| 11 | ZP: | Uh, which one? |
| 12 | LUGO: | The…baton. |
| 13 | ZP: | The baton? |
| 14 | LUGO: | Yeah. |
| 15 | **6:58** | |
| 16 | ZP: | So, you saw one of 'em had a - |
| 17 | LUGO: | And a – |
| 18 | ZP: | - baton? |
| 19 | LUGO: |  - taser. |
| 20 | | Yes. |
| 21 | ZP: | Did you see any of them use a baton to hit him or - |
| 22 | LUGO: | I – I didn't see them use it. |
| 23 | ZP: | Okay.  But you saw the taser. |
| 24 | LUGO: | Yes. |
| 25 | ZP: | Okay.  Did you see which deputy used the taser? |
| 26 | | |
| 27 | | |
| 28 | | |

9

**COSB  004737**

Ruben Escudero

Transcription – Pritchett Interview with KARLA LUGO

(09:36 Minutes)

| | | |
|---|---|---|
| 1 | LUGO: | Female officer. |
| 2 | ZP: | The female? |
| 3 | LUGO: | Yes. |
| 4 | ZP: | And what did she do?  So, did she um, did she just put the taser and |
| 5 | | arc it against their body or did – |
| 6 | LUGO: | No. |
| 7 | ZP: | - she actually use it? |
| 8 | LUGO: | He shoot from far away. |
| 9 | ZP: | She shot – |
| 10 | LUGO: | It wasn't like a body contact – |
| 11 | ZP: | Okay.  So she – |
| 12 | LUGO: | - it was from far. |
| 13 | ZP: | - just shot where the prongs came out? |
| 14 | LUGO: | Yes. |
| 15 | ZP: | Did you see where the prongs hit? |
| 16 | LUGO: | Uh, I believe some in the back. |
| 17 | ZP: | Okay.  So he had – he was on his stomach at this point in - |
| 18 | LUGO: | At this point he was on his uh, he was up prone. |
| 19 | ZP: | Okay.  And uh, so she shot in the back.  What – how did he respond |
| 20 | | to that?  Did he comply? |
| 21 | LUGO: | He did comply for a little bit.  Yes. |
| 22 | ZP: | Okay. |
| 23 | LUGO: | It looked like it worked – |
| 24 | ZP: | Okay. |
| 25 | LUGO: | - but I guess as soon as the – the effect went off he just started |
| 26 | | |
| 27 | | |
| 28 | | |

10

**COSB  004738**

Ruben Escudero

Transcription – Pritchett Interview with KARLA LUGO

(09:36 Minutes)

| | | |
|---|---|---|
| 1 | | swinging and kicking again. |
| 2 | **7:52** | |
| 3 | ZP: | Okay.  So – |
| 4 | LUGO: | And then – |
| 5 | ZP: | - initially – |
| 6 | LUGO: | - like he got – |
| 7 | ZP: | - it – it looked like he was complying and then as soon as it stopped |
| 8 | | arcing – |
| 9 | LUGO: | Yes. |
| 10 | ZP: | he started fighting again? |
| 11 | LUGO: | Yes.  And then he got uh, tased again. |
| 12 | ZP: | Did you see where he got second time? |
| 13 | LUGO: | I did not the second time.  I – that's when I was - |
| 14 | ZP: | So you saw two times with the taser? |
| 15 | LUGO: | Yes. |
| 16 | ZP: | Okay. |
| 17 | LUGO: | The first one like I said, in the back, the second one I don't |
| 18 | | remember.  I didn't see it exactly. |
| 19 | ZP: | Okay. |
| 20 | | Um, and so the suspect was still resisting? |
| 21 | LUGO: | Yes. |
| 22 | ZP: | And kicking, punching, just trying to get up – |
| 23 | LUGO: | Trying get – |
| 24 | ZP: | - and everything? |
| 25 | LUGO: | Yes. |
| 26 | | |
| 27 | | |
| 28 | | |

11

EXHIBIT "F"

Risa S. Christensen, Esq. (SBN: 227799)
Dennis E. Wagner, Esq. (SBN: 99190)
**WAGNER ZEMMING CHRISTENSEN, LLP**
1325 Spruce Street, Suite 200
Riverside, CA  92507
Tel.:          (951) 686-4800
Fax:          (951) 686-4801
*rsc@wzclawfirm.com*
*dew@wzclawfirm.com*

Attorneys for Defendants, COUNTY OF SAN BERNARDINO; HUMBERTO MIRANDA; JULIAN MATA; and JESSAQUA ATTLESEY

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CECILIA VARGAS; ARIANA SALAS, individually and as a successor-in-interest to RUBEN ESCUDERO, deceased,<br><br>           Plaintiffs,<br>vs.<br><br>COUNTY OF SAN BERNARDINO; H. MIRANDA; S. CARTER; Z. VOGEL; J. MATA; Z. PRITCHETT; J. JIMENEZ; A. MATA; T. KAUTZ; J. ATTLESEY; RODRIGUEZ (first initial unknown) and DOES 1-10, inclusive,<br><br>           Defendants. | CASE NO: 5:20-cv-02646-JGB-KK<br><br>**DECLARATION OF HUMBERTO MIRANDA IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT OR IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT**<br><br>*[Filed concurrently w/ Notice of Motion and Motion for Summary Judgment; Statement of Undisputed Facts; and (Proposed) Judgment]*<br><br>**Date:**       March 6, 2023<br>**Time:**       9:00 a.m.<br>**Courtroom:** 1<br><br>Hon. Jesus G. Bernal<br>United States District Judge |

1

I, HUMBERTO MIRANDA, declare as follows:

That I am a party to this action and have personal knowledge of the facts as set forth in this declaration, and if called to testify I could and would do so competently thereon.

1.      That I am duly employed as a Deputy Sheriff for the San Bernardino County Sheriff's Department and have been employed as such for approximately six and a half years.  That I served in the Marine Corp. for four years between 2012 and 2016. That I graduated from the Peace Officer Academy at the Sheriff's Department, which is POST Accredited, in 2016.  Upon completion of the Academy, my initial assignment was working at the West Valley Detention Center. That I completed the P.O.S.T. basic academy for Peace Officer Training in 2016.  That the academy training I received was conducted in accordance with the California State law requirements of P.O.S.T., which is the authority in California for peace officer training requirements. That in addition to this basic training, I regularly complete a minimum of 24 hours of training annually, in accordance with the Sheriff's Department's requirements. That I am required by the Department to keep my use of force training current each year by and do so by taking Advanced Officer training courses, which includes use of force training.  That I have successfully completed the P.O.S.T. mandated training concerning persons with mental illness, as well as the training on controlled substances, which includes addressing situations in which a subject is under the influence of methamphetamines.

2.      That at the time of the subject incident, October 19, 2019, I was assigned to patrol at the Victorville Station. I am a Hispanic male, six-foot three inches tall, and at the time of the incident, my weight was about 230 pounds, and I was 27 years old. That on the date of the subject incident I was working the day shift when I learned of a call for service for a possible heroin overdose. When I arrived at the subject residence on Monte Vista Street, in Victorville, I activated

2

by belt recorder which captured the incident audibly. That in preparing this Declaration I have listened to my recording and recognize it to be a true and accurate recording of the subject incident. I was also provided with a written transcript of the recording which I reviewed and compared to my audio recording. That the transcript accurately reflects my belt recording, which I have authenticated for this motion as **Exhibit 1(n)** That attached to my Declaration as **Exhibit 15** is a true and correct copy of my belt recording transcript, that I have compared the transcript to my belt recording and found that it accurately captures the events, as well as the timing of the events. That the belt recording and transcript of it, is consistent with my declaration of events and of others present. I compared the times to the transcript and believe that they fairly and accurately depict the same. The initial time given for Deputy Mata and my arrival at the residence shown on the transcript to be approximately 09:10 a.m. is consistent with my recollection and the Detailed History Report, commonly referred to as a CAD report.

     3.     That I arrived at the location at approximately 09:10 a.m. and arrived at the same time as Deputy Julian Mata. We were the first responders to arrive at the location. That prior to arrival I was advised that it was reported that a male was overdosing on heroin and would not wake up. I was aware that this was a call for medical assistance and that medical responders would be responding to the scene. That Deputy Mata and I went to the location to offer assistance and back-up to the medical responders. That Deputy Mata and I arrived before the medical responders and when we got to the front door, Deputy Mata announced we were from the Sheriff's Department. We were granted entry by a female at the house, Dorothy Hernandez, who led us to the subject in the back room and told us the subject, identified by Hernandez only as "Ruben" later determined to be Ruben Escudero, had been in the bathroom and then went to sit in a chair and became unresponsive. That a male at the house named David told us that he tried to put ice

down Ruben's pants. Both Hernandez and David advised they did not know Ruben's last name. I observed that Ruben was breathing and observed his breathing sounded like snoring sounds. Deputy Mata tried to arouse Ruben by tapping him on the face and calling his name. Ruben did not respond in any fashion and would not wake up. We asked Hernandez and Crummel what Ruben took and Hernandez indicated it was pills or heroin or something.  David pointed to a spoon near Ruben and indicated he had been using it for drugs. I noticed there were needle caps on the floor indicating there were uncapped needles somewhere nearby. The room that Ruben was in was very small and cluttered and Deputy Mata and I were aware that medical responders were on the way, and I heard the sirens outside indicating the medical responders had arrived so Deputy Mata and I moved Ruben out of the back bedroom to the kitchen where the medical responders would have more access to assist him. We carried Ruben as gently as we could by Mata grabbing Ruben at the back at his shoulders and me grabbing him by his feet and picking him up to move him.  We were not there to arrest Escudero, but only there to serve as back-up for medical personnel.

4.      At approximately two minutes after Mata and I entered the residence, the responders from the City of Victorville Fire Department arrived, including a paramedic, the Captain, and the engineer. That I asked them if they wanted us to bring Ruben to the living room because the kitchen was very small. The living room was also very small, but there was more room for the medical responders to work on Ruben there and one of the fire responders affirmed they wanted him moved to the living room, so Deputy Mata and I moved Ruben as carefully as we could to the living room. The subject, Ruben was a large man, heavy and stocky, and very strong.  The fire paramedic asked us if we knew what Ruben took and we advised him we did not, but we had seen the caps of needles lying around so to be careful.

/ /

DECLARATION OF HUMBERTO MIRANDA IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

5.      Once we got Ruben moved into the living room, Deputy Mata and I backed away so the medical responders could provide medical assistance to Ruben. I told the Fire Department paramedic that I had seen what appeared to a Narcan pen and that Ruben may have had a dose already. The paramedic advised he was going to administer Narcan to Ruben to wake him up. Deputy Mata and I stood back to allow the medical responders to attend to Ruben. That was about four minutes after Deputy Mata and I arrived at the residence. The medical responders had equipment they were using to monitor Ruben's condition and the fire responder was using a device to assist Ruben with his breathing. The paramedic, Brett Lever said that Ruben might be "pissed" when he wakes up because he had given him a lot (of Narcan). That the fire responders were monitoring Ruben and since I was standing back while they attended to Ruben I suggested that I would move nearer in case he tries to fight when he wakes up. That by this, I meant Ruben may resist or struggle or try to push the medical responders away and they may need help at that point. I did not anticipate that Ruben would become violent or assaultive and try to hit the medical responders or anyone else. That I have seen some overdose subjects awaken after Narcan and have not seen anyone become assaultive, only resistive and it was my belief he may resist the medical attention and require some physical prompting to stop him from pushing the medical responders away. The medical responders were at Ruben's side, with at least one of them on the ground next to him providing assistance to him.

6.      That a few minutes after the fire department responders arrived two responders from AMR arrived, a female EMT and a male paramedic. The paramedic and Lever recognized one another, and Lever gave the AMR paramedic, Alex Gabler, a run down of what he did, advising Gabler that he had given Ruben some Narcan. Lever told Gabler he was going to "bag" Ruben, which I believed to mean, using a medical bag device to deliver air to Ruben. I observed Lever

5

perform this function to Ruben, who was still unresponsive. The Fire Captain was asking questions and asked whether Ruben had already taken some Narcan to which I responded that I did not know.

7.     That at about 09:16 a.m., or about five minutes after Deputy Mata and I arrived, the medical responders were trying to move Ruben onto a canvas tarp with handles. The medical responders were monitoring Ruben and providing medical assistance to him. that Deputy Attlesey arrived around this time and stood near the front door, which was only a few feet from where Ruben was being treated on the floor by the medical responders.

8.     That at about seven minutes after Mata and I arrived, the medical responders were still all near Ruben, some of whom were on the ground next to him providing him with medical aid or were otherwise monitoring his condition. That Ruben started waking up and was surrounded by the medical responders. That the medical responders were in uniform and Deputy Mata and Deputy Attlesey and I were all in full Sheriff's Department uniforms with badges. The medical responders tried to reassure Ruben, telling him he is okay and they tried to turn him onto his side because it looked like he might throw up or have some dry heaving, but instead Ruben tried to get up. That the medical responders repeatedly told him to stay down and to lay down and I also told Ruben to stay down. That Ruben threw punches with closed fists at the medical responders and tried to get up to his feet. That when Ruben started throwing punches, the medical responders backed away and Deputy Mata tried to hold Ruben down and I moved in closer to try to help keep Escudero on the ground and to stop him from going after the medical responders. That we still had not gotten Ruben to lie down at this point, but we were struggling with him and trying to hold his arms from hitting us and trying to push his body back down and to get him to lie down. That we were giving him verbal commands telling him to stay down and Mata told Ruben to "chill out." Ruben continued struggling and trying to punch us and

6

Deputy Mata was trying to restrain him punching us and the responders when I heard the pop of a TASER deployment and then Ruben fell to the ground and it appeared the TASER had been deployed by Deputy Attlesey and was effective. That however, within seconds the TASER disengaged and Ruben got back up and started throwing punches. That Deputy Mata and I tried to restrain him and take him to the ground, with me trying to restrain his legs and Mata trying to restrain his upper body, but Ruben was very strong and we were not able to hold on to him and he fought us and we could not get him down. I head another pop from another TASER deployment, but this time it was not effective and Ruben continued to fight and struggle to get up and kicked me as I tried to restrain his legs. That Deputy Attlesey removed my TASER from my duty belt and deployed it toward Ruben, but it too was ineffective, and Ruben continued fighting, trying to punch us and kick us. Deputy Attlesey tried the TASER again, but it was completely ineffective, and Ruben got to his feet and it appeared he was going to assault us. That I expanded my baton and commanded him to get on the ground, but Ruben did not comply and continued throwing punches at us. That I did not use my baton to strike Ruben to try to gain compliance because I did not think it would be effective given Ruben's size and behavior, and the room was too small and with three deputies and five medical responders it was too risky that one of them might get hit inadvertently. That Deputy Mata grabbed Ruben and tried to bring him to the ground and it appeared they fell together to the ground. That Ruben continued struggling and trying to get up. That I tried to restrain his legs. The entire time we continued giving him verbal commands to lay down and get on the ground and Deputy Mata was giving commands to him to "chill out."

9.      That after Mata and Ruben fell to the ground, we tried to restrain Ruben on the ground, but he continued to try to get to his knees and would get to his knees and throw  punches at us and he struggled to keep from being restrained. That I tried to hold Ruben's legs because he was kicking. That Deputy

7

1  Mata and Deputy Attlesey struggled to get Ruben's hands out from under him

2  because he would not comply with commands to give us his hands and kept them

3  tight under his chest as he was on the ground. He was using his hands and knees

4  to try to push off of the ground as we were trying to hold him down and get his

5  hands to handcuff him. That one of the medical responders assisted us in getting

6  Ruben's left arm out from under him and putting a handcuff on that hand. That I

7  handed Deputy Attlesey my baton to try to pry Ruben's right arm out from under

8  him. That they were able to get his right arm out and put another set of handcuffs

9  on his right hand. That Ruben was still struggling and trying to kick and get up as

10  we are trying to get the two handcuffs together. That I was going between

11  holding his legs and trying to help get his left arm out. Ruben continued to resist

12  and struggle and kick his legs and I moved back to try to hold his legs and got

13  kicked a second time. We were still struggling with Ruben and he continued

14  trying to get up when we finally were able to connect the two handcuffs together

15  with another set of handcuffs. That at this time Ruben was still struggling and

16  kicking as we were in this process. I was moving down to his legs to try to hold

17  them down because he was still trying to get up, and I got kicked a second time.

18  That we decided to hobble Ruben's legs, and with the help of one of the medical

19  responders we hobbled his legs using a hobble made of material which goes

20  around the legs like a belt to keep his legs together to limit him from being able

21  to kick us. The hobble was not attached to the handcuffs or any other restraint.

22      10.    That once the hobble was placed on Ruben's legs the medical

23  responders resumed full custody and care of him. Ruben continued struggling

24  until the sedative they gave him took effect. The medical responders put Ruben

25  onto their tarp so they could load him onto the gurney to transport him to the

26  hospital. effect. That Ruben was back in the custody of medical responders at this

27  time.

28  / /

11.     That the entire incident from the time Mata and I arrived to the time the medical responders had complete custody and control of Ruben was about twelve minutes. That our physical altercation with Ruben lasted no more than four minutes, from the time he first tried to punch the medical responders to the time he was contained on the ground and back in the custody of medical responders and Ruben fought and struggled and resisted that entire time.  That even while handcuffed Ruben struggled and tried to get to his feet. Ruben struggled and resisted until the sedative the medical responders gave him took effect and he was back in their custody at the scene by that time.

12.     That at no time did I strike Ruben with my baton, nor did I observe anyone else strike him with a baton. That I did not strike Ruben with my fist, and I did not observe any other deputy strike Ruben with a fist. That I did not use any force on Ruben other than try to hold him to keep him from assaulting me or others and trying to restrain his legs from kicking. That at one point I did observe Deputy Attlesey struck Ruben a couple of times with the taser. That we were giving Ruben commands throughout the incident, but he did not comply with any of them. That at no time did I have my weight on Ruben's back or over the back of his lungs. That at no time did I observe Ruben to have difficulty breathing and I did not hear him say, "I can't breathe" or anything to that effect. I did observe him breathing during the entire incident and he was fighting and struggling and resisting the entire time the deputies were trying to contain him. That my goal and objective during the incident was to stop Ruben from assaulting anyone and get him under control so that the medical responders could resume their medical procedures and get him to the hospital.

13.     That the only deputies involved in the physical altercation with Ruben Escudero were myself, Deputy Julian Mata and Deputy Attlesey. That Mata and I are both Hispanic males and Deputy Attlesey is a blonde Caucasian female. That at the time of the incident were all in our twenties. The fire

9

1  paramedic and engineer were both Caucasian males. The paramedic appeared to
2  be in his 30's and the engineer appeared to be in his 50's. The AMR paramedic
3  was a causation male who appeared to be in his 30's.

4     14.   That attached hereto as **Exhibit 17, Exhibit 18, Exhibit 19, Exhibit**
5  **20**, and **Exhibit 21**, are true and correct copies of photos of the outside of the
6  residence, living room, doorway, kitchen and hall bedroom entrance where
7  Escudero was found in that order. The photos fairly depict the areas shown on
8  the day of the incident for purposes of size and scale.

9     I declare under penalty of perjury under the laws of the State of
10  California and the United States of America, that the foregoing is true and
11  correct.

12     Executed this 24th day of January 2023 in San Bernardino, California,
13  United States of America.

HUMBERTO MIRANDA, Declarant

10

EXHIBIT "15"

Ruben Escudero

Transcription – MIRANDA BELT RECORDING

(13:08 minutes)

1   **Mata:**        **Deputy Julian Mata**

2   **Miranda:**     **Deputy Humberto Miranda**

3   **Hernandez:**   **Dorothy Hernandez (Witness)**

4   **Escudero:**    **Ruben Escudero (Plaintiffs' decedent)**

5   **Crummel:**     **David Crummel**

6   **UID:**         **Unidentified Female at the house**

7   **Fire:**        **Fire Personnel or AMR's Gabler**

8   **Lever:**       **Brett Lever, Fire Paramedic**

9   **Capt.:**       **Captain Washington from Victorville Fire**

10  **Gabler:**      **Alex Gabler, AMR paramedic**

11  **Lugo:**        **Karla Lugo, AMR**

12  -----------------------------------------------

13  *[Per the CAD report, deputies arrive at around 9:10 am.]*

14  **09:10 am approx.**

15  **0:00 min.**

16  Mata:          Sheriff's Department.

17  Hernandez:     *Inaudible.*

18  UID:           Sorry.

19  Mata:          That's fine.

20  UID:           He's in the backroom.

21  Hernandez:     He was in the bathroom, here, he sat down on the

22                 chair- and he fell out.

23  **0:17**

24  Escudero:      [*breathing sounds*]

25  Mata:          Hey bro, you alright?

26                                          1

27

28

Ruben Escudero

Transcription – MIRANDA BELT and TIMELINE OF EVENTS

(13:08 minutes)

| | | |
|---|---|---|
| 1 | Crummel: | I just woke up. |
| 2 | Miranda: | What's his name? |
| 3 | Crummel: | I tried to put ice down his pants. |
| 4 | Hernandez: | Uh... He knows him... Ruben. |
| 5 | **0:27** | |
| 6 | Miranda: | Ruben what? |
| 7 | Mata: | What's his name? |
| 8 | Hernandez: | I don't know his last name sir. |
| 9 | Miranda: | Ruben? |
| 10 | Hernandez: | I- |
| 11 | Miranda: | Do they know his last? |
| 12 | Hernandez: | He knows him. (*Indicating Crummel*) |
| 13 | UID: | No, I don't know. |
| 14 | **0:31** | |
| 15 | Mata: | Hey, Ruben.  Ruben. You wanna pull him out that |
| 16 | | way?  Or, you wanna just leave him here? |
| 17 | Escudero: | Uh. |
| 18 | Mata | See I think this guy's (*inaudible*) |
| 19 | Miranda: | What's his name? |
| 20 | Mata: | Ruben. (*Tapping face*) |
| 21 | Crummel: | Ruben. |
| 22 | Miranda: | Ruben what? |
| 23 | Mata: | Ruben. |
| 24 | Crummel: | I don't know. |
| 25 | Escudero: | *Moaning.* |
| 26 | | |
| 27 | | |
| 28 | | |

2

Ruben Escudero

Transcription – MIRANDA BELT and TIMELINE OF EVENTS

(13:08 minutes)

| | | |
|---|---|---|
| 1 | Mata: | Ruben.  Wake up homie. (*Sound of tapping*). Do we |
| 2 | | know what he took? |
| 3 | **09:11 approx.** | |
| 4 | **1:00 min** | |
| 5 | Crummel: | Nope. |
| 6 | Escudero: | (*Snorts*) |
| 7 | Crummel: | I just now just woke up and he was making noise- |
| 8 | Mata: | Ruben. |
| 9 | Crummel: | that's what woke me up. |
| 10 | Mata: | Hey. (*Tapping face*) Wake up. |
| 11 | Miranda: | What'd he take? |
| 12 | Hernandez: | I'm not sure.  It looks like- |
| 13 | Mata: | Ruben.  (*Tapping face.*) |
| 14 | Hernandez: | -pills, heroin, something. |
| 15 | | Ooh, I'm sorry.  Oh, oh, gosh, scared the hell out |
| 16 | | of me. There's bugs in this place. |
| 17 | Mata: | Ruben. |
| 18 | Hernandez: | Mosquitos. |
| 19 | Escudero: | (*Snorting*) |
| 20 | Mata: | Wake up. |
| 21 | **1:19** | |
| 22 | Mata: | Ruben. |
| 23 | Hernandez: | You guys don't carry Narc – what's that stuff |
| 24 | | called? |
| 25 | Hernandez: | Narc- |

3

Ruben Escudero

Transcription – MIRANDA BELT and TIMELINE OF EVENTS

(13:08 minutes)

| | | |
|---|---|---|
| 1 | Crummel: | Here's that spoon. |
| 2 | Mata: | What? |
| 3 | Crummel: | Here's that spoon he was using. |
| 4 | Hernandez: | Malaxa?  Or- |
| 5 | Mata: | You saw him using the spoon? |
| 6 | **1:25** | |
| 7 | Crummel: | No, I seen it over his body when he-when I woke |
| 8 | | up. |
| 9 | Miranda: | You wanna guide in fire department? |
| 10 | Hernandez: | Yes, sir. |
| 11 | Escudero: | (*Snorting*) |
| 12 | Mata: | Hey, there's uh, it looks like there's possibly an |
| 13 | | uncapped somewhere. |
| 14 | Miranda: | Yeah. |
| 15 | Mata: | So just be careful. |
| 16 | Escudero: | (*Snorting*) |
| 17 | *Sirens in background* | |
| 18 | Mata: | Ruben.  Wake up. |
| 19 | Escudero: | (*Snorting*) |
| 20 | Miranda: | Watch out bro. |
| 21 | [*sound of sirens*] | |
| 22 | Mata: | I know. |
| 23 | **1:56** | |
| 24 | Escudero: | (*Snorting*) |
| 25 | Mata: | Hey.  (*Tapping face*.) Wake up. |
| 26 | | |
| 27 | | |
| 28 | | |

4

Ruben Escudero

Transcription – MIRANDA BELT and TIMELINE OF EVENTS

(13:08 minutes)

| | | |
|---|---|---|
| 1 | Escudero: | (*Snorting*). |
| 2 | Mata: | Ruu-ben. |
| 3 | ***09:12 approx.*** | |
| 4 | **2:13** | |
| 5 | Escudero: | (*Snorting*) |
| 6 | Mata: | He's probably on (*inaudible*). |
| 7 | Miranda: | I don't know.  Yeah, looks like it.  Well let's |
| 8 | | fucking- |
| 9 | Mata: | Want us to pull him out? |
| 10 | Miranda: | Yeah. |
| 11 | ***09:12 a.m. approx.- Fire Responders Enter*** | |
| 12 | Capt.: | What's going on. |
| 13 | Miranda: | Yeah. This way. |
| 14 | (*Moving Ruben to Kitchen*) | |
| 15 | Mata: | Uh, just leave him right here, that's fine. They |
| 16 | | have access to him. |
| 17 | Hernandez: | (*Inaudible*) |
| 18 | ***09:13 approx.*** | |
| 19 | **3:01 min** | |
| 20 | Hernandez: | He's back here in the side room Sir. |
| 21 | Fire: | Alright. |
| 22 | Miranda: | You want us to pull him out here? |
| 23 | Lever: | Yeah, pull him out in the living room. |
| 24 | **3:09** | |
| 25 | Mata: | (*Inaudible*), or? |
| 26 | | |
| 27 | | |
| 28 | | |

5

Ruben Escudero

Transcription – MIRANDA BELT and TIMELINE OF EVENTS

(13:08 minutes)

| | | |
|---|---|---|
| 1 | Lever: | Nah (*inaudible*). |
| 2 | Miranda: | Hey, just be careful, there's caps everywhere. |
| 3 | Fire: | Alright. Do you know what he's taken? |
| 4 | Miranda: | No. |
| 5 | Hernandez: | I don't. |
| 6 | Crummel: | No. |
| 7 | *Simultaneous colloquy* | |
| 8 | Mata: | There's a-there was an uncapped right by the chair |
| 9 | | from where he was at.  So- |
| 10 | Miranda: | Yes. Just be careful. |
| 11 | Fire: | How long he's been down for? |
| 12 | Miranda: | Just be careful with any needles. |
| 13 | Hernandez: | Probably like-four minutes, five minutes. |
| 14 | Capt.: | 4 minutes, 5 minutes about that? |
| 15 | Hernandez: | About 5 minutes.  You guys got here really fast. |
| 16 | Capt.: | All right. |
| 17 | **3:35** | |
| 18 | Escudero: | (*Moaning*). |
| 19 | Miranda: | He had Narcan outside too. So… |
| 20 | Fire: | Okay. |
| 21 | Miranda: | Just saying. I think he might've hit himself with |
| 22 | | the Narcan as well. |
| 23 | Lever: | I'm gonna fuckin slam him again. |
| 24 | Lever: | Wake this mother fucker up. |
| 25 | Mata: | There you go. |
| 26 | | |
| 27 | | |
| 28 | | |

6

COSB  004939

Ruben Escudero

Transcription – MIRANDA BELT and TIMELINE OF EVENTS

(13:08 minutes)

| | | |
|---|---|---|
| 1 | Lever: | Not today Dirt bag. |
| 2 | **3:53** | |
| 3 | ***09:14:55 approx.*** | |
| 4 | Alcon: | Are you still need squad? |
| 5 | Lever: | Uh no. |
| 6 | Alcon: | Hey can you cancel squad? |
| 7 | Capt: | Cancel squad? |
| 8 | Alcon: | Yes. |
| 9 | Fire: | Okay. |
| 10 | Miranda: | Any ID on him? |
| 11 | Mata: | I'm trying to find it, but there's none. |
| 12 | Lever: | He might be pissed when he wakes up. I just gave |
| 13 | | him a lot. |
| 14 | ***09:14 hrs. approx.*** | |
| 15 | Ruben: | *Moaning.* |
| 16 | Lever: | There he goes. |
| 17 | Fire: | Hey. |
| 18 | Fire: | (*Inaudible*) |
| 19 | DH: | (*Inaudible*) What's that stuff called? |
| 20 | **4:28 min.** | |
| 21 | Fire: | (*Inaudible*) |
| 22 | Fire: | (*Inaudible*) Easy two - two thirty. |
| 23 | Fire: | Yeah. |
| 24 | Miranda: | Here. Let me get over whenever you're done. So I |
| 25 | | can... just in case he tries to fight. |
| 26 | | |
| 27 | | |
| 28 | | |

7

**COSB  004940**

Ruben Escudero

Transcription – MIRANDA BELT and TIMELINE OF EVENTS

(13:08 minutes)

| | | |
|---|---|---|
| 1 | Lever: | He might. |
| 2 | **4:51** | |
| 3 | Gabler: | Hey Brett, what's up dude? |
| 4 | Lever: | Heroin overdose. I just planted some Narcan on |
| 5 | | him; gonna bag him a little bit. |
| 6 | Lugo: | I knew I shouldn't 'of rode with Alex today. |
| 7 | Lever: | We'll see what happens. |
| 8 | Escudero: | (*Groaning*) |
| 9 | Capt.: | This guy have a wallet, ID card? |
| 10 | Lever: | Uh, I don't really know anything else other than |
| 11 | | the heroin, found it next to him, some Narcan that |
| 12 | | wasn't used |
| 13 | Gabler: | Okay. |
| 14 | Lever: | Or they- was used? The Narcan was used? |
| 15 | Miranda: | I have no idea. |
| 16 | Lever: | Alright. |
| 17 | Gabler: | That's funny because ours came in as an |
| 18 | | accidental overdose. |
| 19 | Lever: | Tell you what he was tryin to do, I think he was |
| 20 | | trying to get high __. |
| 21 | Lugo: | What do you need... besides the mega mover? |
| 22 | Fire: | Grab that. |
| 23 | Escudero: | *Moaning.* |
| 24 | Hernandez: | (To Captain) *inaudible* |
| 25 | Capt.: | It's uh... uh, no the ambulance is here. |
| 26 | | |
| 27 | | |
| 28 | | |

8

Ruben Escudero

Transcription – MIRANDA BELT and TIMELINE OF EVENTS

(13:08 minutes)

| | | |
|---|---|---|
| 1 | Hernandez: | Oh thank God. |
| 2 | Alcon: | I'll take care of that, whatever else you want to do. |
| 3 | Fire: | We'll get it all in the back, we'll be going to Victor. |
| 4 | Lugo: | Here we go. |
| 5 | ***09:15:49 apprx*** | |
| 6 | **5:49** | |
| 7 | Fire: | Regular sinus rhythm. |
| 8 | Miranda: | Hey, you didn't find anything in his pockets, right? |
| 9 | Fire: | Negative. |
| 10 | Miranda: | Alright. |
| 11 | Lever: | I'm gonna check his sugar real fast, Karla. |
| 12 | Lugo: | Yep. Sure. |
| 13 | Unknown: | Hi, there. |
| 14 | Attlesey: | Hi. |
| 15 | Unknown: | How are you? |
| 16 | ***09:16 a.m. approx.*** | |
| 17 | Fire: | SpO2 is 53. |
| 18 | **6:02 min.** | |
| 19 | Attlesey: | What's up? |
| 20 | Mata: | What's up Chica? |
| 21 | Attlesey: | What's up? |
| 22 | **6:13 min.** | |
| 23 | ***09:16 hrs. approx.*** | |
| 24 | **6:19 min.** | |
| 25 | Capt.: | Brett, how much did you give. |
| 26 | | |
| 27 | | |
| 28 | | |

9

Ruben Escudero

Transcription – MIRANDA BELT and TIMELINE OF EVENTS

(13:08 minutes)

| | | |
|---|---|---|
| 1 | Lever: | 2 M, 2 I.N. |
| 2 | Miranda: | Can you put out Fire and AMR 97? |
| 3 | Fire: | How low is his SP02? |
| 4 | Lever: | Sp02's at 40, it's dropping. |
| 5 | ***09:16.5 a.m. approx.*** | |
| 6 | 6:30 min. | |
| 7 | Fire: | Okay. |
| 8 | Lever: | Alright, get goin. Lets just check his sugar real |
| 9 | | fast. |
| 10 | Fire: | Yep. |
| 11 | Escudero: | *Moaning.* |
| 12 | Lever: | 122 of sugar, 122. |
| 13 | **6:48** | |
| 14 | Fire: | Good with that. |
| 15 | Fire: | I like it. |
| 16 | Alcon: | 169 over 108 on blood pressure, 94 on pulse. |
| 17 | **6:55** | |
| 18 | Fire: | Hold on he's awake. |
| 19 | Fire: | Hey. Hey. |
| 20 | Fire: | Wake up buddy. You're okay, you're okay. On your |
| 21 | | side. |
| 22 | Fire: | Hey, Don't puke on me, Dude. |
| 23 | Fire: | On your side, on your side. |
| 24 | Escudero: | What are you doing to me? |
| 25 | Fire: | No, you're okay, you're okay. |
| 26 | | |
| 27 | | |
| 28 | | |

10

Ruben Escudero

Transcription – MIRANDA BELT and TIMELINE OF EVENTS

(13:08 minutes)

| | | |
|---|---|---|
| 1 | Fire: | What's up Dude? |
| 2 | Fire: | Lay down lay down. |
| 3 | Escudero: | Why? What? |
| 4 | Fire: | Lay down. |
| 5 | Miranda: | Lay down. |
| 6 | Hernandez: | It's alright. It's alright Ruben. |
| 7 | Fire: | Hold on. |
| 8 | **7:12** | |
| 9 | Fire: | Stay down. |
| 10 | Escudero: | What are you doing to me? |
| 11 | Miranda: | Lay down. |
| 12 | Fire: | Stay down. |
| 13 | Fire: | Stay down. |
| 14 | Fire: | What's your name, dude? |
| 15 | Mata: | Lay down homie. Alright. Chill out. |
| 16 | **7:19** | |
| 17 | Attlesey: | I don't know. |
| 18 | Mata: | You understand me? |
| 19 | Fire: | Oh. |
| 20 | Crummel: | Ruben quit. Ruben. |
| 21 | **7:26 min.** | |
| 22 | Mata: | Chill out homie. |
| 23 | Escudero: | What are you doing to me? |
| 24 | Fire: | Bro, just lay down. |
| 25 | Miranda: | Hey. |
| 26 | | |
| 27 | | |
| 28 | | |

11

Ruben Escudero

Transcription – MIRANDA BELT and TIMELINE OF EVENTS

(13:08 minutes)

1    ***09:17:31 approx.***

2    **7:31**

3    Attlesey:         Stop.

4    Miranda:         Lay,

5    Hernandez:      Ruben.

6    Mata:            Hey, chill out.

7    Capt.:            You might want to chill out.

8    Ruben:           No, Homie, I'm not gonna chill.

9    *Beeping from medical equipment*

10   Lever:            Ooh.

11   **07:39 Min.**

12   Escudero:       Who the fuck, are you?

13   **07:44 min.**

14   ***09:17 a.m. approx.***

15   (*Taser sound*).

16   Mata:            Sheriff's department, bro.

17   (*Another Taser deployment*)

18   *Taser sound*

19   Escudero:       Ow

20   Mata:            Chill out.

21   Escudero:       Ow, ow

22   (*Taser sound*)

23   Attlesey:        Stop.

24   Escudero:       What are you doing to me?

25   Miranda:        Watch out.

26

27

28

Ruben Escudero

Transcription – MIRANDA BELT and TIMELINE OF EVENTS

(13:08 minutes)

| | | |
|---|---|---|
| 1 | Attlesey: | Get on your stomach. |
| 2 | Escudero: | What are you doing to me? |
| 3 | Male: | Get on your stomach. |
| 4 | Attlesey: | Get on your stomach. |
| 5 | **7:55** | |
| 6 | Escudero: | *groaning* |
| 7 | Capt.: | You might want to do it. |
| 8 | Mata.: | Do it again, do it again. |
| 9 | *(Sound of Mata's strikes)* | |
| 10 | Crummel: | Ruben! |
| 11 | Escudero: | Well what the fuck are you hitting me for? |
| 12 | Mata: | Get on the fucking ground! |
| 13 | Miranda: | Get on the ground! |
| 14 | Escudero: | What the fucking (inaudible). |
| 15 | Mata: | Get on the ground. |
| 16 | Miranda: | Get on the ground, bro. |
| 17 | *(Taser)* | |
| 18 | Attlesey: | Watch out, watch out. |
| 19 | **8:14** | |
| 20 | *(Another Taser deployment)* | |
| 21 | Escudero: | What did you just sock me in the face for? What |
| 22 | | are you hitting me for? |
| 23 | *(Taser)* | |
| 24 | Escudero: | AGH. |
| 25 | Attlesey: | Trying to help you out. |
| 26 | | |
| 27 | | |
| 28 | | |

13

Ruben Escudero

Transcription – MIRANDA BELT and TIMELINE OF EVENTS

(13:08 minutes)

| | |
|---|---|
| 1 | (*Taser*) |
| 2 | Miranda:      Hey! |
| 3 | (*Sound of RCB extending*) |
| 4 | Escudero:      Dammit. |
| 5 | Miranda:      Get on the ground! |
| 6 | (*Attlesey 4 strikes with Taser*) |
| 7 | Mata:      Watch out, watch out, I got him. |
| 8 | Unknown:      Look out, look out, look out. Hey, hey. |
| 9 | Escudero:      Why you hitting me? |
| 10 | Attlesey:      Stop fighting us! Stop fighting us! |
| 11 | **8:37** |
| 12 | Mata:      Put your hands behind your back. |
| 13 | *Beeping from medical equipment* |
| 14 | Crummel:      Ruben, stop. |
| 15 | **8:41** |
| 16 | Attlesey:      Pull his legs out.  Limit his legs, you'll be good. |
| 17 |      Just sit on him. Just sit on him. |
| 18 | Fire:      Huh? |
| 19 | Fire:      Versed. |
| 20 | Lugo:      You wanna give him five? |
| 21 | ?:      (*Inaudible*). |
| 22 | Attlesey:      Stop fighting us, dude. |
| 23 | Lugo:      It'll calm him down. |
| 24 | **8:51** |
| 25 | Attlesey:      Stop! |
| 26 | |
| 27 | |
| 28 | |

14

Ruben Escudero

Transcription – MIRANDA BELT and TIMELINE OF EVENTS

(13:08 minutes)

| | | |
|---|---|---|
| 1 | Escudero: | *Inaudible* |
| 2 | Miranda: | 17 Paul 22 4-15 with one. |
| 3 | Gabler: | We're giving him some uh Versed right now. |
| 4 | Lever: | (*Joking*) I think he's kinda calm. |
| 5 | **9:11 min.** | |
| 6 | Attlesey: | Where's the- can't get him on the side. |
| 7 | Miranda: | Here use my RCB to get his arm out. |
| 8 | Attlesey: | Yeah, well…Hold on. |
| 9 | Mata: | Chill out, bro, chill out. |
| 10 | **9:18** | |
| 11 | Escudero: | I can't… |
| 12 | Attlesey: | Stop fighting us! We're here to help you, Dude. |
| 13 | | We're here to help. |
| 14 | Escudero: | (*Inaudible*). |
| 15 | Mata: | Give me your hand. |
| 16 | Escudero: | (*inaudible*). |
| 17 | Mata | Give me your hand bro.  Give me your hand. |
| 18 | Crummel: | Ruben, quit. |
| 19 | **9:35** | |
| 20 | Escudero: | Ugh. |
| 21 | *Beeping from medical equipment* | |
| 22 | Escudero: | (*Inaudible*). |
| 23 | *Deputies out of breath* | |
| 24 | Mata: | Got him… Got him, got him, got him. |
| 25 | Miranda: | Here. |
| 26 | | |
| 27 | | |
| 28 | | |

15

**COSB  004948**

Ruben Escudero

Transcription – MIRANDA BELT and TIMELINE OF EVENTS

(13:08 minutes)

| | | |
|---|---|---|
| 1 | Attlesey: | Hurry, hurry. Hurry. |
| 2 | **9:49** | |
| 3 | Mata: | Anybody else? |
| 4 | Attlesey: | Swing. |
| 5 | Mata: | Grab your other cuffs girl. |
| 6 | Miranda: | Here. |
| 7 | Escudero: | (*Inaudible*). |
| 8 | Miranda: | Here, here, here, cuff him. |
| 9 | Attlesey: | (*Inaudible*). |
| 10 | *Sound of handcuff engaging* | |
| 11 | Mata: | Cuff the other hand please. |
| 12 | Escudero: | *Vocal noises* |
| 13 | *Beeping from medical equipment* | |
| 14 | ***09:20 a.m approx.*** | |
| 15 | **10:10** | |
| 16 | Attlesey: | (*Out of breath*) Just slow down, slow down, we're |
| 17 | | good. |
| 18 | *(Sound of handcuff connecting with other handcuff)* | |
| 19 | Escudero: | (*Inaudible*). |
| 20 | *Deputies breathing heavily* | |
| 21 | Attlesey: | Okay. |
| 22 | Escudero: | (*Inaudible*). |
| 23 | Attlesey: | Okay. |
| 24 | Escudero: | (*Inaudible*). |
| 25 | Fire: | Hold him hold him he's getting up. |
| 26 | | |
| 27 | | |
| 28 | | |

16

Ruben Escudero

Transcription – MIRANDA BELT and TIMELINE OF EVENTS

(13:08 minutes)

| | | |
|---|---|---|
| 1 | Unknown | You got these? |
| 2 | Attlesey: | Dude, you gotta |
| 3 | Mata: | Hey can you hobble him? |
| 4 | Attlesey: | ... stop. |
| 5 | Mata: | Grab my hobble, it's gonna be on my pants. |
| 6 | Miranda: | Where?  Which one? |
| 7 | Mata: | See it. |
| 8 | Miranda: | Yeah, hobble. |
| 9 | Attlesey: | Dude, we're here to help you. |
| 10 | Fire: | (*Inaudible*) lock _____. |
| 11 | Lugo: | Yeah, they're coming with the (*inaudible*) |
| 12 | Escudero: | (*Inaudible*). |
| 13 | *Beeping from medical equipment* | |
| 14 | Escudero: | (*Incoherent vocal noises*). |
| 15 | Fire: | They locked____. He kept trying to get out of it |
| 16 | | (*inaudible*). |
| 17 | Escudero: | (*Vocal noises*). |
| 18 | Crummel: | Ruben…. Calm down. |
| 19 | Attlesey: | Dude. |
| 20 | **11:03** | |
| 21 | Gabler: | You want some Versed on him? |
| 22 | Attlesey: | Stop fighting. |
| 23 | Capt.: | Yeah, we're gonna need something to calm him |
| 24 | | down dude.  He's (*inaudible*) |
| 25 | Attlesey: | Stop fighting us. |
| 26 | | |
| 27 | | |
| 28 | | |

17

Ruben Escudero

Transcription – MIRANDA BELT and TIMELINE OF EVENTS

(13:08 minutes)

|     |          |                                                                          |
| --- | -------- | ------------------------------------------------------------------------ |
| 1   | Fire:    | We got it right here.                                                    |
| 2   | Attlesey: | Stop.                                                                   |
| 3   | Gabler:  | We got it right here, Martin.                                            |
| 4   | Fire:    | Hold down.                                                               |
| 5   | Fire:    | Yep.                                                                     |
| 6   | Attlesey: | We're here to help you.                                                 |
| 7   | Alcon:   | This won't work, it's stuck. It's 9-1-1 and it'll pop                    |
| 8   |          | out and then I tried 2-1-1 to see if it's changed.                      |
| 9   | Lever:   | You know what, we'll take a pair of wire cutters                         |
| 10  |          | and I'm gonna cut that fucker                                            |
| 11  | Alcon:   | All right.                                                               |
| 12  | Fire:    | Yep. Looks like *inaudible* a couple minutes out                         |
| 13  | Gabler:  | You guys good for a second?                                              |
| 14  | Attlesey: | Yeah.                                                                   |
| 15  | Fire:    | We got it onboard we're good.                                            |
| 16  | *Beeping from medical equipment* |                                                  |
| 17  | Attlesey: | (*Inaudible*).                                                          |
| 18  | Gabler:  | We got it onboard Martin, we're good.                                    |
| 19  | (*Various people talking*) |                                                        |
| 20  | Gabler:  | Nah, we should be good.                                                  |
| 21  | **11:51** |                                                                         |
| 22  | Attlesey: | Code 4, we have one detained.                                          |
| 23  | (*Various people talking*) |                                                        |
| 24  | Attlesey: | (*Inaudible*)                                                          |
| 25  | Fire:    | Alright. Okay, let's get him to the hospital.                           |
| 26  |          |                                                                          |
| 27  |          |                                                                          |
| 28  |          |                                                                          |

18

**COSB  004951**

Ruben Escudero

Transcription – MIRANDA BELT and TIMELINE OF EVENTS

(13:08 minutes)

| | | |
|---|---|---|
| 1 | **12:10** | |
| 2 | Fire: | So, is he good? |
| 3 | Fire: | Are you sure he's calm now? |
| 4 | Fire: | Yeah, I think he's good. |
| 5 | Fire: | Is he? |
| 6 | Fire: | How much you give, Alex? |
| 7 | Attlesey: | He's still gonna fight. |
| 8 | Fire: | (*Inaudible*). |
| 9 | Gabler: | We sedated him pretty good, he got a lot on board, |
| 10 | | so... |
| 11 | Attlesey: | (*Inaudible*). |
| 12 | Fire: | Someone's gonna hit the showers early. |
| 13 | Mata: | This is my... my only shirt. |
| 14 | (*Sirens*) | |
| 15 | Lugo: | (*Inaudible*). |
| 16 | Fire: | They're coming in hot now. |
| 17 | Unknown: | Just pull, right here, pull here. |
| 18 | Unknown: | (*Inaudible*). |
| 19 | Miranda: | Who didn't, who didn't touch him? |
| 20 | Lugo: | I didn't. |
| 21 | Miranda: | Can you hit my button real quick, right here? |
| 22 | Lugo: | This one? |
| 23 | Miranda: | No, no, hit my button for the radio. |
| 24 | Lugo: | Oh. |
| 25 | Miranda: | 17 Paul 22 units can slow down, Code 4. |
| 26 | | |
| 27 | | |
| 28 | | |

19

Ruben Escudero

Transcription – MIRANDA BELT and TIMELINE OF EVENTS

(13:08 minutes)

| | | |
|---|---|---|
| 1 | Lugo: | Oh. |
| 2 | Miranda: | No, you're good. |
| 3 | Fire: | Alright, are we still gonna use the uh, carrier? |
| 4 | Fire: | Maga mover? |
| 5 | Fire: | Yeah.  Let's use that. |
| 6 | Fire: | If we can.  Is it out here or is it still in here |
| 7 | | somewhere? |
| 8 | Lugo: | Uh, it should be in here somewhere, but... |
| 9 | Unknown: | (*Inaudible*). |
| 10 | Lugo: | Hey can you shove that open? |
| 11 | | |
| 12 | ***End at 13:08*** | |

20

# EXHIBIT "16"

*[Intentionally Omitted]*

EXHIBIT "17"



EXHIBIT "18"



EXHIBIT "19"



EXHIBIT "20"



EXHIBIT "21"



EXHIBIT "G"

Risa S. Christensen, Esq. (SBN: 227799)
Dennis E. Wagner, Esq. (SBN: 99190)
**WAGNER ZEMMING CHRISTENSEN, LLP**
1325 Spruce Street, Suite 200
Riverside, CA  92507
Tel.:         (951) 686-4800
Fax:         (951) 686-4801
*rsc@wzclawfirm.com*
*dew@wzclawfirm.com*

Attorneys for Defendants, COUNTY OF SAN BERNARDINO; HUMBERTO MIRANDA; JULIAN MATA; and JESSAQUA ATTLESEY

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CECILIA VARGAS; ARIANA SALAS, individually and as a successor-in-interest to RUBEN ESCUDERO, deceased,<br><br>          Plaintiffs,<br><br>vs.<br><br>COUNTY OF SAN BERNARDINO; H. MIRANDA; S. CARTER; Z. VOGEL; J. MATA; Z. PRITCHETT; J. JIMENEZ; A. MATA; T. KAUTZ; J. ATTLESEY; RODRIGUEZ (first initial unknown) and DOES 1-10, inclusive,<br><br>          Defendants. | CASE NO: 5:20-cv-02646-JGB-KK<br><br>**DECLARATION OF JESSAQUA ATTLESEY IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT OR IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT**<br><br>*[Filed concurrently w/ Notice of Motion and Motion for Summary Judgment; Statement of Undisputed Facts; and (Proposed) Judgment]*<br><br>**Date:**      March 6, 2023<br>**Time:**      9:00 a.m.<br>**Courtroom:** 1<br><br>Hon. Jesus G. Bernal<br>United States District Judge |

1

I, JESSAQUA ATTLESEY, declare as follows:

That I am a party to this action and have been a Deputy Sheriff with the San Bernardino County Sheriff's Department since 2016.  I have personal knowledge of the facts as set forth in this declaration, and if called to testify I could and would do so competently thereon.

1.     That on October 19, 2019, I was working a regular 12-hour shift that started at 7:00 a.m.  That I am 5'6" tall and at the time of the incident I was 26 years old and weighed 155 lbs. That I was wearing my Sheriff's Deputy uniform including badge, and duty belt which had my firearm, radio, taser, handcuffs and RCB which is an extendable baton.

2.     That on the date of the incident, at approximately 9:07 a.m. I became aware of a call for service for a male subject suffering from a suspected drug overdose. That this was a medical call, but I responded to provide back-up to medical providers and deputies Mata and Miranda. That I arrived at the subject residence in Victorville at approximately 9:15 a.m.   That the front door was open and there was an AMR responder standing near the front door with a gurney just outside the door. I looked inside and saw medical responders providing care to the subject, later identified as Ruben Escudero, on the living room floor. The living room was small and there were already several medical responders providing care to Escudero, so I stood near the front door and observed the scene. That I also observed that deputies Julian Mata and Humberto Miranda were already on scene and in the living room.

3.     That I am familiar with the belt recording that was captured by Deputy Miranda's belt recorder. That I have listened to that recording and read the written transcript of that recording. That the recording and written transcript accurately captures what occurred with Mr. Escudero.  The belt recording itself lasts approximately 13 minutes.  That my arrival at the residence is captured at approximately 5 minutes, forty-five seconds into the recording, which shows that

2

1    time being  approximately 09:15:49 a.m.  I have compared the recording with the

2    transcript and the transcript does fairly and accurately depict the events and times

3    as to what was said during the encounter with Mr. Escudero.

4          4.     That at the time that I arrived, Escudero was lying on the ground

5    with medical responders attending to him. Escudero had an oxygen mask on his

6    face and his eyes were closed and the responders appeared to be monitoring him.

7    That at approximately seven minutes into the recording, it is apparent that

8    Escudero began regaining consciousness and I recall hearing medical responders

9    say something about him regaining consciousness. That I saw Escudero making

10    throwing-up gestures and noises and the responders tried to turn him to his side.

11    As the responders tried to get Escudero to lay back down, he instead rolled over

12    onto his knees and started to get up. That at that time commands were given by

13    the medical responders for him to "stay down." Then Escudero began making

14    hard closed fist punching gestures toward one of the medical responders who was

15    also down on their knees. Then Escudero just started punching with closed fists

16    as if he were going to hit anyone he could reach or that got near to him. That

17    Deputy Mata tried to restrain his arms down and get him back down and he and

18    the medical responders kept telling Escudero to lay down. That Escudero then got

19    to his feet, and I saw that he was very big, much bigger than Deputy Mata and the

20    AMR responders. That Escudero and Mata were struggling with each other and

21    Escudero wasn't following commands to get down and Mata wasn't able to

22    control Escudero because Escudero was too strong. That I yelled the command of

23    "Stop" to Escudero, but he continued fighting. I pulled out my TASER and

24    deployed it at Escudero. That I didn't give him a separate warning about the

25    TASER  because Escudero  hadn't been complying with any other commands

26    and Mata hadn't been able to control him and I didn't want to give him the

27    opportunity to escape the TSER deployment since he was actively fighting.  That

28    the first TASER deployment was briefly effective to stop Escudero from

<center>3</center>

---

<center>DECLARATION OF JESSAQUA ATTLESEY IN SUPPORT OF DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT</center>

1   assaulting the responders because he fell to the ground but the time wasn't
2   sufficient to secure him and as Mata started to approach him Escudero sat back
3   up and started getting up and throwing punches at Mata again. I deployed a
4   second set of darts, but it was ineffective, and Ruben started continued fighting.
5   Then I grabbed Deputy Miranda's TASER and deployed it but it also was
6   ineffective to stop Escudero from trying to assault Mata.

7         5.     That Escudero asked something to the effect of "[w]hat are you
8   doing to me?" and he asked "why are you hitting me?" As he was saying these
9   comments, he was still throwing punches at Mata. At one point Mata was trying
10  to take Escudero to the ground using what appeared to be a headlock technique
11  and Escudero was on his knees and lifted Mata up despite Mata's efforts.
12  Escudero moved toward me with Mata on his back as he started getting to his
13  feet. Escudero had lifted Mata up and overpowered Mata and was moving toward
14  me so I hit Escudero with the plastic TASER in my hand. I was aiming for his
15  face, but he moved and I hit him on the head. I believe that I struck him no more
16  than four times. That Deputy Mata was still trying to get Escudero to the ground
17  and after the TASER strikes Escudero and Mata both fell on their stomachs with
18  Mata falling on top of Escudero. The TASER strikes did not stop Escudero who
19  then resumed trying to get up so Deputy Mata, Miranda and I attempted to
20  restrain Escudero and keep him on the ground and tried to get him into handcuffs.
21  That all during this time Escudero continued fighting and trying to get up and
22  kicking at us and trying to raise up from his position on the ground with his arms
23  underneath him.

24        6.     That I kept telling Escudero we are trying to help him and to stop
25  fighting.  That the three of us were struggling to keep Escudero from getting back
26  up but he was very strong, and we were getting tired and were out of breath.
27  Escudero continued trying to raise up to his knees and had his hands tucked under
28  his chest. I was next to the couch and was pinned against the couch by Escudero.

4

---

I told Deputy Miranda to pull his legs out and try and sit on his legs, to limit his legs because he was using them to try to kick and use his legs to get up.   That we were able get one of Escudero's arms out and we were able to put one arm in handcuffs.  Miranda gave me his baton to pry his other arm out and I used it to try to apply pressure next to his ear to stop him from struggling but he turned his head and the baton went to the ground and was ineffective. Then I used the baton to pry his other arm out.  We were giving commands to him the entire time to stop fighting us and I was telling him we were just trying to help him. Mata was giving commands to Escudero to "chill out." At some point we were finally able to get both hands into handcuffs with the assistance of one of the fire responders and then use another set of cuffs to cuff the handcuffs together. At some point one of the medical responders gave Escudero a shot to sedate him. That Escudero continued to try to kick and use his legs and started to get back up so a hobble was placed on his legs.

7.     That the medical responders resumed control over the situation once the hobble was placed on Escudero's legs. On the recording and transcript, Captain Washington makes a statement that we (medical responders) will need something to calm him down and medical providers decided that another shot of Versed, the sedative they used, would be provided, which was provided at approximately 11:30 into the recording.  At 11:51 on the recording I indicate that it was now Code 4 meaning everything is under control.   At this point, medical responders moved Escudero onto a canvas carrier and took him outside to the gurney and then taken to the ambulance where upon he was taken to the hospital.

8.     That Escudero was a threat to the first responders that were there including the fire department responders and the AMR and to myself and Miranda and Mata until the time that we were able to place the hobble on him. That I used the taser applications on Escudero several times, but it was only effective the first time for a few seconds. Thereafter, no TASER applications

5

were effective to stop him from struggling and trying to fight us. Escudero would not comply with any commands which were given throughout the incident.

9.      That I used the TASER as a direct impact weapon only after nothing else worked. We had tried using verbal commands and verbal prompts, and physical prompts and tried to physically restrain his arms from punching at us and the medical responders but nothing had worked. That we could not use pepper spray in that environment because all the medical responders and deputies would have been subjected to it. The taser deployments and activations did not work to stop the threat and I could see that Escudero was very strong as he had overpowered Mata and I knew my own hands were not strong enough to stop him if I tried to punch him. That using the taser to hit him was the only thing I could think of to use in that situation to protect us from Escudero's assault. That I used the taser as an impact weapon to protect myself and the other deputies from what I reasonably believed would be one of us  receiving  serious bodily injury from Escudero  from the threat he posed.

10.      The only time that Escudero calmed down during this entire event was after he sedated by the paramedics.  That Escudero was actively resisting from the time that he regained consciousness until the sedative took effect. By that time Escudero was back in the control and care of medical responders.

11.      That deputies are trained that we are to utilize force as reasonable to overcome the resistance that is being offered.  In that regard, there was physical presence of uniformed personnel, deputies providing commands, an attempt to simply keep Escudero on the floor using hands and commands to keep him calm and quiet which were ineffective.  I then used the taser device as an attempt to gain compliance which was also unsuccessful.  The baton was pulled out but

/ /

/ /

6

1  could not be used as an impact weapon given the close proximity that everyone
2  was to each other which also prevented the use of pepper spray.  Distraction
3  blows were attempted by Deputy Mata in attempt to again gain compliance so we
4  could control the suspect to ultimately transport him to the hospital.  Escudero
5  seemed to have superhuman strength and in my experience it appeared that it was
6  consistent with someone that was hyped-up on methamphetamines.  I have
7  witnessed such violent behavior with someone having a psychotic episode with
8  methamphetamines in the past.

9       12.    That once we were able to get Escudero off his feet and onto the
10  ground, he was actively resisting any attempt to be handcuffed.  He had both
11  hands under his body, and I had to use the baton to pry one of his arms out.  That
12  Escudero was able to overpower us to the point the medical responders assisted
13  us getting him into handcuffs. Once Escudero was handcuffed, he was still
14  kicking which required the hobble, ultimately, AMR providing sufficient
15  sedatives by injection to calm him down so they could transport him.

16       13.    That at no time did anyone use a baton to strike Escudero. That I did
17  strike Escudero with the TASER  when he had overpowered Mata and I saw there
18  was nothing else to try.  That the only reason I used that force was to stop
19  Escudero from hurting me or someone else. That the goal was to stop the threat
20  he posed and to get him under control so the medical responders could resume
21  medical efforts on his behalf.

22

23       I declare under penalty of perjury under the laws of the State of California
24  and the United States of America, that the foregoing is true and correct.

25       Executed this 23 day of January 2023 in Hesperia Police Department,
26  California, United States of America.

27                                  _____
28                               JESSAQUA ATTLESEY, Declarant

EXHIBIT "H"

Risa S. Christensen, Esq. (SBN: 227799)
Dennis E. Wagner, Esq. (SBN: 99190)
**WAGNER ZEMMING CHRISTENSEN, LLP**
1325 Spruce Street, Suite 200
Riverside, CA  92507
Tel.:        (951) 686-4800
Fax:        (951) 686-4801
rsc@wzclawfirm.com
dew@wzclawfirm.com

Attorneys for Defendants, COUNTY OF SAN BERNARDINO; HUMBERTO MIRANDA; JULIAN MATA; and JESSAQUA ATTLESEY

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CECILIA VARGAS; ARIANA SALAS, individually and as a successor-in-interest to RUBEN ESCUDERO, deceased,<br><br>          Plaintiffs,<br><br>vs.<br><br>COUNTY OF SAN BERNARDINO; H. MIRANDA; S. CARTER; Z. VOGEL; J. MATA; Z. PRITCHETT; J. JIMENEZ; A. MATA; T. KAUTZ; J. ATTLESEY; RODRIGUEZ (first initial unknown) and DOES 1-10, inclusive,<br><br>          Defendants. | CASE NO: 5:20-cv-02646-JGB-KK<br><br>**DECLARATION OF JULIAN MATA IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT OR IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT**<br><br>*[Filed concurrently w/ Notice of Motion and Motion for Summary Judgment; Statement of Undisputed Facts; and (Proposed) Judgment]*<br><br>**Date:**        March 6, 2023<br>**Time:**        9:00 a.m.<br>**Courtroom:** 1<br><br>Hon. Jesus G. Bernal<br>United States District Judge |

1

1    I, JULIAN MATA, declare as follows:

2    That I am a party to this action.  I am a Deputy Sheriff with the San

3    Bernardino County Sheriff's Department and have been with the department

4    since 2016. I have personal knowledge of the facts as set forth in this declaration,

5    and if called to testify I could and would do so competently thereon.

6    1.    That I was involved in an incident concerning a drug overdose call

7    involving Ruben Escudero that took place October 19, 2019.  At that time, I was

8    33 years old, and working the day shift, a twelve-hour shift. That I am  5'10" in

9    height and at the time of the incident I weighed approximately 208 lbs.  I was

10   wearing my deputy sheriff uniform along with my duty belt on that day.

11   2.    That the initial call for service which I responded to involving

12   Ruben Escudero was a call for a drug overdose.  The location was 16927 Monte

13   Vista Street, and it was the back house on the property.  I was dispatched at

14   approximately 9:07:28 by dispatch and arrived on scene at around 9:10 a.m.  I

15   arrived around the same time as Deputy  Humberto Miranda who was also

16   responding to the call.

17   3.    That we were granted entry to the residence by a female who

18   directed us to a back area of the house where Mr. Escudero was on the floor. That

19   we observed some caps from needles which was consistent with the drug

20   overdose call that we had.  That we met David Crummel and Dorothy Hernandez

21   once inside of the house.  Crummel and Hernandez said they did not know

22   Escudero other than by the first name of "Ruben."  They said they did not know

23   his last name.

24   4.    That Miranda and I observed Escudero on the floor and he appeared

25   completely unconscious although he was breathing, and making strange breathing

26   sounds. That I tried to wake him up by calling his name, "Ruben," and tapping

27   / /

28   / /

2

1  him on the face. I also tried a sternum rub, but nothing we did aroused him. We
2  knew that medical responders were on the way so Deputy Miranda and I picked
3  Escudero up and moved him to the kitchen so the medical responders would have
4  more room. Then three responders from the City Fire Department arrived, a
5  paramedic, Brett Lever, Captain Washington, and their engineer, Martin Alcon.
6  The medical responders wanted Escudero moved to the living room so Deputy
7  Miranda and I assisted them by carrying Escudero to the living room so they
8  would have more room to provide medical treatment to him.

9       5.     After moving Escudero to the living room, the medical responders
10  immediately began medical intervention to Ruben. My intention was to maintain
11  a presence as back-up to the medical responders if they needed it until Escudero
12  could be transported safely to the hospital. That I have reviewed a belt recording
13  that was done by Deputy Humberto Miranda which documents our encounter
14  with Escudero that day from the time of our arrival to the time that Escudero was
15  being loaded to transport to the hospital. I have also reviewed a transcript of the
16  belt recording that has been prepared. I have listened to the belt recording and
17  have compared the transcript with it and know that the transcript is a true and
18  correct copy of the recording.

19       6.     That the medical responders were monitoring Escudero and the
20  paramedic, Brett Lever, administered Narcan to him. That two AMR responders
21  arrived, a male paramedic, Gabler and a female ENT, Lugo and started assisting
22  with the medical intervention. That the medical responders were monitoring
23  Escudero for blood pressure and sugar level, and oxygen, and were preparing to
24  move him onto their tarp to take him out to the gurney by the front door. That
25  Deputy Attlesey arrived about five or six minutes after Miranda and I while the
26  medical responders were attending to Escudero and she stood near the front door.
27  The room was very small and already very crowed due to the five medical
28  responders present, and Deputy Miranda and me.

3

7.     That after Miranda and I had been at the residence for close to seven minutes, as the medical responders were getting ready to move Escudero to take him to the hospital he started to regain consciousness. It appeared that Escudero was going to vomit so the medical responders tried to turn him on his side while telling him he was okay. Escudero was asking what they were doing to him, and they told him, you're okay, you're okay, and tried to get him to lay down because he was starting to get up.

8.     That Escudero kept trying to get up and the medical responders kept telling him to stay on the ground. Escudero had gotten up to his knees and started trying to punch the medical responders who were also on the ground next to him. The medical responders quickly moved out of the way, and I tried to hold Escudero's arms down so they could continue to assist him without him hitting them. That Escudero was very strong and struggled away from me and became violent and started trying to punch me and anyone near him. Escudero was trying to get to his feet, and I was trying to hold him down and we were telling him to stay down.  That we continued to talk to Escudero to tell him to lay down, and chill out, but he did not follow any verbal commands and continued trying to assault me with attempted punches, swinging at me and physical struggling. I attempted to use my hands and arms to keep him on the ground and contained, so he wouldn't hurt the medical responders and they would be able to resume helping him. I was not successful in that Escudero was very large and very strong and he was able to ultimately get to his knees while swinging at me. That Deputy Attlesey deployed her TASER darts at him which stopped him briefly and he went to the ground. I ran over to try to keep him from getting back up, but he was too strong, and I could not hold him. Escudero started getting up and taking swings at me and at one point was able to punch me in the jaw. Attlesey tried the TASER again a couple of times, but it was ineffective and Escudero continued trying to hit me. That I used four distraction blows with my fist to his face to try

4

1  to stop him from assaulting us, but they failed to work, and he continued to try to

2  assault me. That I was trying to get him to the ground, but he was able to get up

3  to his knees and started to get to his feet. I tried to get him in a headlock holding

4  my arm around his chin area, but he was able to raise up with me on his back.

5  That I was unable to control him, and he was able to move across the room even

6  with me on his back and as was trying to bring him to the ground he was raising

7  himself up and lifting me up with him. That I was unable to control or contain

8  him Deputy Attlesey struck him with the TASER a couple of times. That

9  Escudero and I toppled to the ground together on our stomachs with me landing

10  on top of him. That at this point I was out of breath and we had finally gotten him

11  in a prone position on the ground so as soon as I caught my breath, Deputy

12  Attlesey, Deputy Miranda, and I tried to get him restrained so we could get him

13  into handcuffs. I moved to his side and shoulder area where I used my knee to try

14  and keep him down while I attempted to gain control of his arms.  His arms were

15  both underneath him and he refused to surrender his arms for purposes of

16  handcuffing.  With has arms and hands underneath him, Escudero was still

17  struggling and trying to get up to his knees and would not follow commands to

18  give us his hands or to stop fighting. That I was finally able to get one of his arms

19  out get it into handcuffs and with the help of one of the fire responders we got the

20  other arm out with using a baton to pry it out from under him. That we were able

21  to get handcuffs on the other wrist and then handcuffed the two handcuffs

22  together. All during this time Escudero was still struggling to get up and trying to

23  bring his knees up and/or kick us away with his legs. Escudero was still

24  struggling and kicking even while in handcuffs, so we decided to put a hobble

25  around his legs to limit him from kicking. During this time the medical

26  responders were trying to sedate him, but Escudero did not stop struggling until

27  the sedative started working.  By that time, he was in the hobble and was

28  handcuffed and the medical responders had resumed custody and care of him.

<center>5</center>

9.     That it was at this time he finally appeared to be calm enough for transport. He was placed onto the carrying tarp by the medical responders where he was taken outside, placed on the gurney, to be loaded in the ambulance. That Escudero was still breathing and was alive at the time the medical responders resumed their custody and control of the scene. That I did get blood on myself from Escudero but I did not know if he was bleeding from his nose from when I hit him with the fist strikes, or from the head from the Taser strikes.

10.     That after the incident was done, Sgt. John Rodriguez arrived on scene and was briefly advised as to what transpired. I and the other deputies that were involved in the incident were photographed and transported back to the station. I learned days later that Mr. Escudero had passed away in the hospital.

11.     That on the day of this incident, Mr. Escudero had superhuman strength in being able to resist, not only myself but the efforts of Deputy Miranda and Deputy Attlesey in terms of not only his resistance but the threat he posed in swinging at us and emergency personnel. I was injured in the incident when I was struck in the face on the right side by Mata on one of his swings. I did not need medical attention as a result of the injuries that I received during the incident.

12.     That I was interviewed sometime later as part of the homicide investigation team and gave a recorded statement to homicide investigators.

13.     That the belt recording documents the total time we spent at the residence from the time of arrival to the time that Escudero is being transported at approximately 13:20. Out of that entire time, the altercation that ensued with Escudero is somewhere between 3 and 4 minutes. During the entirety of that time when Escudero came to after the Narcan was administered, he began fighting, struggling, actively resisting during the entire time up to the time that he received a sedative which seemed to effectively knock him out and sedate him.

14.     That I did not strike Escudero with a baton or any weapon other than

6

1  the few fist strikes to his face to try to distract him and stop the assault. That
2  force was only used to stop Escudero from assaulting us and the medical
3  responders. That the only time I had my weight on Escudero's back was when I
4  fell on top of him during the struggle and until I was able to catch my breath and
5  we had better control of him. During this time he was still struggling and able to
6  start getting up. That he did not stop struggling until after the hobble was placed
7  on him and he was sedated by the paramedic. That Escudero was alive and
8  breathing at the time the medical responders had resumed their efforts to assist
9  him. That my goal was not to injure or hurt Escudero, but to keep him from
10  injuring anyone and to get him controlled enough so the medical responders
11  could get him to the hospital.

      I declare under penalty of perjury under the laws of the State of California
and the United States of America, that the foregoing is true and correct.

      Executed this 21 day of January 2023 in ___Victorville_____,
California, United States of America.

JULIAN MATA, Declarant

7

EXHIBIT "I"

Risa S. Christensen, Esq. (SBN: 227799)
Dennis E. Wagner, Esq. (SBN: 99190)
**WAGNER ZEMMING CHRISTENSEN, LLP**
1325 Spruce Street, Suite 200
Riverside, CA 92507
Tel.:      (951) 686-4800
Fax:      (951) 686-4801
rsc@wzclawfirm.com
dew@wzclawfirm.com

Attorneys for Defendants, COUNTY OF SAN BERNARDINO; HUMBERTO MIRANDA; JULIAN MATA; and JESSAQUA ATTLESEY

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CECILIA VARGAS; ARIANA SALAS, individually and as a successor-in-interest to RUBEN ESCUDERO, deceased,<br><br>        Plaintiffs,<br>vs.<br><br>COUNTY OF SAN BERNARDINO; H. MIRANDA; S. CARTER; Z. VOGEL; J. MATA; Z. PRITCHETT; J. JIMENEZ; A. MATA; T. KAUTZ; J. ATTLESEY; RODRIGUEZ (first initial unknown) and DOES 1-10, inclusive,<br><br>        Defendants. | CASE NO: 5:20-cv-02646-JGB-KK<br><br>**DECLARATION OF BRETT LEVER IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**<br><br>*[Filed concurrently w/ Notice of Motion and Motion for Summary Judgment; Statement of Undisputed Facts; Appendix of Evidence; and (Proposed) Judgment]*<br><br>**Date:**      March 6, 2023<br>**Time:**      9:00 a.m.<br>**Courtroom:** 1<br><br>Hon. Jesus G. Bernal<br>United States District Judge |

1

1    I, BRETT LEVER, declare as follows:

2    That I am a currently working for Los Angeles County Fire Department as

3 a fire fighter. That I have been a paramedic since of 2017. I trained at Crafton

4 Hills College in Yucaipa, California, and obtained my paramedic certificate on

5 May 8, 2017. That on October 19, 2019, the date of the subject incident involving

6 Ruben Escudero and the San Bernardino County Sheriff's Department deputy

7 defendants, I was a Paramedic with the City of Victorville Fire Department. That

8 prior to my hire at the City of Victorville Fire Department I worked as a medic

9 for AMR in Victorville for about two years. Prior to that I was an EMT for

10 around four years prior to obtaining my Paramedic certificate. At the time of the

11 incident, I had close to eight years' experience as a first responder in the medical

12 response field. I have personal knowledge of the facts set forth herein, and if

13 called to testify, could do so competently thereon based upon my own personal

14 knowledge.

15    1.    That on October 19, 2019, I, along with my captain Dyjuan

16 Washington, and engineer Martin Alcon, was dispatched to a 911 call at a house

17 in the City of Victorville on Monte Vista Street, for a suspected heroin overdose.

18 We arrived around 9:00 am or shortly thereafter and shortly before the responders

19 from AMR. That when we entered the house we had our emergency equipment,

20 including our cardiac monitor, our airway bag, and our drug box. That I entered

21 secondary to two male deputies from the San Bernardino County Sheriff's

22 Department. I also observed a female citizen who either lived at the residence or

23 was otherwise present in the house. That I observed the subject who was

24 identified only as "Ruben" appearing unconscious, was unresponsive and lying

25 on his back in the kitchen. That one of the deputies asked if we would like them

26 to move Ruben to the living room. That since the kitchen was very small and

27 there was not sufficient space to attend to Ruben, I responded in the affirmative

28 and the deputies moved Ruben to the living room, which was also very small, but

2

1  afforded a little more space to attend to Ruben. That the subject Ruben was a
2  large, heavy-set male who appeared to me to be close to weighing around 200
3  pounds. One of the deputies was carrying Ruben from under his arms and the
4  other deputy by the feet. That it appeared to me that the deputies made efforts to
5  move Ruben with care to the extent possible, trying to get Ruben off the ground,
6  but his butt and back may have made contact with the floor. They had to move
7  him about ten feet into the living room.

8      2.      That once Ruben was moved to the living room, I observed he had
9  snoring respirations, which indicated insufficient ventilation.  I observed his
10  pupils were pinpoint which is consistent with an opiate/heroin overdose, and his
11  breathing was grossly insufficient at about four to six times per minute, also an
12  indicator of a heroin overdose, so I administered Narcan IN, (via the nose), which
13  is given in suspected heroin overdoses to reverse the effect of heroin which
14  causes respiratory depression. That after administering the Narcan, my engineer
15  began checking Ruben's vital signs and we administered breaths to Ruben via a
16  BVM device, also known as an Ambu bag which is a device used to provide
17  ventilation to patients who are unable to breath sufficiently on their own. That I
18  advised the deputies that the subject may be "pissed" when he wakes up because
19  this is something I have observed before when a subject has been given Narcan
20  following a heroin overdose. I did not tell the deputies to watch out because
21  Ruben may fight, nor did I hear any other medical responder make such a
22  statement, however, after I said Ruben might be pissed when he wakes up, one of
23  the deputies advised he would move closer to Ruben in case Ruben began to fight
24  and I responded that he "may," indicating Ruben may try to physically resist
25  treatment due to confusion and disorientation from the overdose. I indicated this
26  so that everyone on the scene would be alert in case we needed to respond to the
27  confusion and resistance. In my experience it was not uncommon to see a subject
28  become confused, disoriented and upset, and sometimes resist treatment due to

3

1   that confusion and the effects of the heroin and Narcan. That as I was providing

2   ventilations to Ruben via the BVM, two responders from AMR entered the house

3   and I gave a brief run down on what we had done so far.  Around that time a third

4   deputy arrived, a female.

5         3.    That we, (Fire responders), continued to monitor Ruben's vital

6   signs. His blood pressure was high at 169 over 108, and his blood oxygen

7   concentration, which was already dangerously low and dropped to 40 within

8   seconds. That based on my training and experience, the normal blood oxygen

9   saturation, or SpO2, is 100%. That anything below 92% becomes a danger

10   because it means the oxygen in the patient's blood is too low to penetrate the

11   walls of the red blood cells. This is indicative of a patient who is at risk of a heart

12   attack due to respiratory arrest, where all breathing stops, or nearly stops and will

13   lead to death if not remedied quickly. That Ruben's SpO2 was exceedingly, and

14   very dangerously low, and he needed to be taken to the hospital as quickly as

15   possible.

16         4.    That the AMR responders got their carrying tarp, called the Mega-

17   Mover, and placed it next to Ruben so we could move him on to the tarp and get

18   him loaded on the gurney outside. That as soon as we moved Ruben onto the

19   Mega-Mover, he started to regain consciousness and we (myself and the other

20   fire responders) began telling him he was okay and started to attend to him with

21   medical aid. Ruben started to dry heave and appear as though he were going to

22   vomit, which is common in these circumstances, so myself and the other medical

23   responders tried to get Ruben to turn over onto his side to prevent him from

24   aspirating on his vomit. Ruben began questioning what was going on, asking

25   what we were doing to him. We verbally tried to reassure him that he was okay,

26   and we repeatedly told him to lie down because he kept trying to get up. The

27   medical responders and deputies repeatedly gave him verbal instructions to stay

28   down on the ground. We asked Ruben his name, but he would not respond to

<div align="center">4</div>

1    questions. At this point Ruben became resistive and began physically struggling

2    with us to get up.  Ruben increasingly went from resistive to combative and

3    violent. Ruben had gotten up to his knees and took a very powerful swing at me

4    with his fist, which I was able to duck out of the way and avoid being punched.

5    From there on Ruben continued to try to get up while taking violent, powerful

6    swings at anyone and everyone near him. At this point, myself and the other

7    medical responders backed away and let the deputies try to contain and control

8    Ruben, who appeared very strong.

9        5.     That the male deputies tried to get Ruben back on the ground but

10    were unable to do so. Ruben repeatedly took swings at anyone near him, but

11    especially at the deputies. At some point Ruben had gotten to his feet and the

12    female deputy deployed the taser and the taser was used two times without

13    significant success in that even after being tased, Ruben continued to fight and

14    swing at the deputies. That Ruben's swings were wild and forceful and he would

15    cock his arm back to punch rather than just simply flailing his arms about. That in

16    my experience, I had never encountered a patient respond to Narcan and become

17    as assaultive as Ruben did in this incident. Previously I have seen patients fight,

18    but only to the extent they briefly become resistive and may try to push us away

19    or swing their arms in a way to prevent us from taking their vital signs and not

20    allow us to provide treatment to them, but nothing to the extent that Ruben

21    demonstrated by taking swings at responders and physically fighting off the

22    deputies as Ruben did. The deputies attempted to gain control of Ruben, but he

23    was fighting all of them off and continued to throw punches. That one of the

24    deputies returned punches striking Ruben. Ruben tried to cover his head to avoid

25    being punched, but he was also continuing to fight the deputies. At some point

26    while Ruben was actively fighting and trying to hit the deputies, the female

27    deputy hit Ruben on the top or side of his head several times with the taser.

28    Ruben asked why she was hitting him, but even though he was asking that Ruben

<div align="center">5</div>

1    was still fighting the deputies and trying to punch them. The deputies were still

2    trying to get Ruben to the ground, and he was fighting and resisting them and not

3    complying with any commands to stop or to get on the ground. At no time did I

4    see any deputy strike Ruben with a baton.  I did see one deputy punch Ruben

5    several times, and the female deputy strike Ruben with the taser on his head

6    while Ruben had been trying to punch and kick the deputies the entire time.  It

7    appears the deputies struck Ruben to overcome his resistance.

8       6.   That all three deputies struggled to gain control of Ruben, tried to grab

9    his arms and legs and hold him on the ground but Ruben was stronger than all

10    three of them put together. The deputies were by now visibly tired and still did

11    not have control of Ruben who continued fighting and resisting so much so that

12    our fire engineer stepped in to assist in getting Ruben into handcuffs which was

13    done to stop him from punching at us and the deputies and to try to control him

14    so we could take him to the hospital. That the deputies had Ruben partially on his

15    side and partially on his stomach, but not all the way on his stomach as Ruben

16    continued to struggle and could not be held down on his stomach entirely. That

17    while the deputies and our engineer were trying to contain Ruben and put him in

18    handcuffs, the AMR paramedic and I discussed giving Ruben a sedative to try to

19    calm him down because physically restraining Ruben was not working, and it

20    was imperative that we get Ruben to the hospital for treatment. The AMR

21    paramedic, Alex Gabler, gave Versed to Ruben while the deputies and the captain

22    and engineer got him into handcuffs, because we were not going to be able to get

23    Ruben onto the gurney or to the hospital unless he was no longer fighting us.

24    Alex, the paramedic from AMR  gave him two doses of the Versed.  Ruben then

25    calmed down and we were finally able to load him into the Mega-Mover and to

26    the gurney. That Versed (midazolam) is a respiratory depressant, as is heroin and

27    a possible side effect is it can decrease respirations. While Narcan reversed the

28    / /

<div align="center">6</div>

effects of heroin, the Versed acts as a sedative, but also acts as a respiratory depressant. I assessed Ruben's pulse and observed it was weak and again Ruben was not breathing sufficiently. That once we loaded him onto the gurney, I rode to the hospital in the ambulance with AMR. That en route to the hospital I continued to provide ventilations to Ruben. That when we arrived at the emergency department at Victor Valley Hospital, we checked Ruben's pulse and found he did not have a pulse. That we began to perform CPR and wheeled him into the ER where the CPR efforts were continued by hospital staff. At the hospital the AMR personnel and I gave the hospital a rundown of what occurred at the house including the overdose and the altercation with the deputies. I was advised at some point that the hospital was able to regain a pulse for Ruben. That after the hospital personnel assumed care for Ruben, I cleaned myself up and went back to the house where the incident took place.

7.   That prior to this incident I had observed various responses from patients after being administered Narcan. That in my experience, I have witnessed patients not respond at all; some wake up and respond in a calm manner. There have been other situations where the subject woke up and was confused and disoriented or agitated and became combative as demonstrated by flailing their arms in a protective manner to push the responders away or prevent us from treating them. In my experience, I have never witnessed a patient become as violent and assaultive as Ruben did. I had not been involved in an incident where the patient repeatedly attempted to attack the medical or law enforcement responders. That if the deputies had not been with us, I am persuaded that the medical responders would have been injured by Ruben's actions. The deputies' assistance was necessary, or we would not have been able to contain Ruben, or to give him the Versed to calm him down. Ruben physically fought against the deputies with all his might during the entire encounter and did not stop until after the Versed was given. That if the deputies had not been on the scene to assist us,

7

we would not have been able to get Ruben into the ambulance or to the hospital at all and by Ruben's demonstrated efforts, he would have injured one or more of the medical responders. That during the entire encounter, the deputies and medical responders used verbal commands to try to get Ruben to stop fighting, the deputies repeatedly told Ruben to stop fighting and that we were there to help him, but none of the verbal cues had any effect on Ruben whatsoever. That as medical responders, we are not trained to handle violent subjects, which is why it is helpful to have law enforcement officers at the scene in situations where there is any potential of a physical confrontation.  In this case, the deputies protected the medical responders from potentially becoming seriously injured by Ruben's assaultive actions. The deputies did not interfere with the medical responders' efforts, it was Ruben's violent actions that impeded our ability to transport him to the hospital any sooner.

8.   That prior to this incident I had given Narcan an estimated 20 times and had seen it administered by others around 50 times and had not physically restrained a person or seen a person physically restrained prior to the administration of Narcan, for the purpose of administering Narcan. That up to and including the date of this incident there was no formal or written protocol to my knowledge, for first responders to ensure a patient was restrained prior to giving Narcan, or that it was required or even recommended prior to the administration of Narcan. That when responding to an emergency situation a medical responder is required to act quickly and assess the patient and provide the emergency response necessary at that time to try to save a life.  That, furthermore, it was not practicable to restrain Mr. Escudero prior to administering Narcan because his respirations were dangerously low, he was unresponsive, and he needed medical intervention to save his life. In situations where it is practicable to restrain a patient, they are restrained to the gurney, but in this case,

/ / / / /

8

1   AMR had not yet arrived with the gurney and once they arrived, the gurney
2   remained outside due to the small area in which we were working, which is why
3   the Mega-Mover was brought in by AMR instead.  In prior situations where a
4   subject has become combative and resistive, myself and other medical responders
5   are able to hold the patient's arms down, but due to Escudero's violent and
6   assaultive response, neither myself or the other fire or AMR responders would
7   have been able to do that in this case.
8   9.   That for the transport from the location to the hospital, no other medications
9   were provided to the patient other than the Narcan at the scene and the Versed
10  which AMR provided prior to his removal from the house.
11
12       I declare under penalty of perjury, under the laws of the State of California
13  and the United States of America, that the foregoing is true and correct.
14       Executed this _15_ day of November, 2022 in San Bernardino, California.
15
16
17                                        BRETT LEVER, Declarant
18
19
20
21
22
23
24
25
26
27
28

9

EXHIBIT "J"

Risa S. Christensen, Esq. (SBN: 227799)
Dennis E. Wagner, Esq. (SBN: 99190)
**WAGNER ZEMMING CHRISTENSEN, LLP**
1325 Spruce Street, Suite 200
Riverside, CA 92507
Tel.:        (951) 686-4800
Fax:        (951) 686-4801
*rsc@wzclawfirm.com*
*dew@wzclawfirm.com*

Attorneys for Defendants, COUNTY OF SAN BERNARDINO; HUMBERTO MIRANDA; JULIAN MATA; and JESSAQUA ATTLESEY

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CECILIA VARGAS; ARIANA SALAS, individually and as a successor-in-interest to RUBEN ESCUDERO, deceased,<br><br>          Plaintiffs,<br>vs.<br><br>COUNTY OF SAN BERNARDINO; H. MIRANDA; S. CARTER; Z. VOGEL, J. MATA; Z. PRITCHETT; J. JIMENEZ; A. MATA; T. KAUTZ; J. ATTLESEY; RODRIGUEZ (first initial unknown) and DOES 1-10, inclusive,<br><br>          Defendants. | CASE NO: 5:20-cv-02646-JGB-KK<br><br>**DECLARATION OF ROBERT FONZI IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT OR IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT**<br><br>*[Filed concurrently w/ Motion for Summary Judgment; Statement of Undisputed Facts; (Proposed) Order]*<br><br>**Date:**        March 6, 2023<br>**Time:**        9:00 a.m.<br>**Courtroom:** 1<br><br>Hon. Jesus G. Bernal<br>United States District Judge |

1

I, ROBERT FONZI, declare as follows:

That I am the principal with RJF and Associates, Inc., a training and consulting firm that I started after many years of service in law enforcement, primarily with the San Bernardino County Sheriff's Department.  I have personal knowledge of the facts as set forth in this declaration, and if called to testify I could and would do so competently thereon.

1.     I am retired as Undersheriff from the San Bernardino County Sheriff's Department.  As Undersheriff, I was responsible for all administrative and operational commands within the Sheriff's Department while directing day-to-day operations.  In the absence of the Sheriff, I acted on his behalf at all internal and external meetings and events.  Generally, my administrative duties included, but were not limited to, directing, planning, coordinating, and managing all functions within the Sheriff's Department.

2.     Specifically, my responsibilities included directing and supervising subordinate executive and command staff; coordinating and commanding subordinate personnel in the management of administrative support services and criminal operations; interpreting and anticipating implications of proposed legislative/regulatory changes regarding correctional facilities; developing, directing, and implementing policy and procedural changes resulting from legislative changes, procedures, or departmental philosophy.

3.     Prior to my position as Undersheriff, I was an Assistant Sheriff with the San Bernardino County Sheriff's Department.  As the Assistant Sheriff, I was responsible for all support operations within the organization.  My administrative duties included directing, planning, coordinating, and managing all functions within a major area of assigned responsibility for the Sheriff's Department.

/ /

/ /

/ /

2

4.      Prior to my position as Assistant Sheriff, I was a Deputy Chief with the San Bernardino County Sheriff's Department with responsibilities over several bureaus that included Administrative Services, Court Security, Training Division, Detentions, and Corrections.

5.      Prior to my promotion to Deputy Chief, I was the commanding officer for the Sheriff's Employee Resources Division, which provides a broad range of services for the Sheriff's Department.  Under my command, this division conducted background investigations, participated in state-wide recruiting, was responsible for the department's payroll and benefits, coordinated hiring through County Human Resources, and provided services for department personnel through the Sheriff's Employee Assistance Team (SEAT).

6.      In my assignment as commanding officer for the West Valley Detention Center, prior to my Deputy Chief position, I was responsible for various issues involving personnel matters, disciplinary actions, and policies and procedures in adherence with applicable state and federal laws.

7.      I served as the Chief of Police for the City of Yucaipa (a contract city with the San Bernardino County Sheriff's Department).  My responsibilities included station operations, personnel management, criminal investigations, use of force training, and management of support staff.  As the Chief of Police, I served on multiple community projects, and committees, and participated in city events.

8.      I am a 32-year veteran with the San Bernardino County Sheriff's Department and the San Diego Police Department.  I have several years of patrol experience in San Bernardino County and San Diego County.  My experience includes patrol operations, criminal investigations, internal affairs, civil liabilities, training, canine coordinator, and corrections.

9.      I am most recognized in the realm of peace officer training.  With over 19 years of experience, I have trained approximately 10,000 law

3

enforcement officers from all over the country.  My expertise is extensive in the use of force and police procedures.  I have testified as an expert witness in numerous civil and criminal trials in both state and federal courts.

10.  That I have reviewed the following reports, materials, and documents:

    a.  Belt recording of Deputy Miranda

    b.  911 calls concerning the suspected overdose

    c.  Interviews of witnesses David Crummel and Dorothy Hernandez

    d.   Interviews of City of Victorville Fire Department responders

    e.  Interviews of American Medical Response (AMR) responders

    f.  Recorded interviews to homicide by Deputies Attlesey, Miranda, Mata, and Sergeant Rodriguez;

    g.  Recordings made during search of Monte Vista house

    h.  The First Amended Complaint

    i.  The crime/incident report

    j.  Autopsy reports and coroner investigator worksheet

    k.  Toxicology (Bio Tox) reports

    l.  Taser training outline

    m. Photos (scene/injuries)

    n.  Sheriff's Department Policies:

    o.  Use of Force and reporting use of force

    p.  Controlled substances

    q.  First Aid

    r.  Miscellaneous County policies

    s.  Electronic Weapons Update

    t.  City of Victorville Fire Department report

    u.  Deposition transcript of David Crummel

    v.  Deposition transcript of Dorothy Hernandez

    w. Deposition transcript for Captain Dyjuan Washington

DECLARATION OF ROBERT FONZI IN SUPPORT OF DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT

x.  Deposition transcript of Deputy Miranda

y.  Deposition transcript of Deputy Attlesey

11.    Police practices and procedures are the applications of training that involve a variety of topics related to police response(s), communication, resources, use of force, and tactics based on the totality of the circumstances. The application of police practices and procedures may vary depending on the information known or unknown by the officer(s) at the time of the incident.

12.    Additionally, the decision as to the appropriate police practices and/or procedures also depends on the time constraints, the risks presented by a suspect(s), the public, and the tools available to the officer(s).

13.    Based on my review of the listed materials, it is my opinion that a police officer acting consistently with standard police practices and training would conclude that there was reasonable suspicion  for the involved deputies (Mata, Miranda, and Attlesey), to initiate contact with Ruben Escudero (hereinafter referred to as Escudero) pending their investigation into the call for service. The initial call for service was a 911 medical aid regarding Escudero who was unresponsive and who had overdosed on heroin.  The responding deputies were provided the following information:

14.     A resident of 18927 Monte Vista Street in Victorville called to report Escudero had overdosed and was unresponsive.  Medical personnel (fire department, paramedics, and ambulance) were also dispatched.

15.    Deputies Mata and Miranda arrived and were led into the residence by Dorothy Hernandez (hereinafter referred to as Hernandez).  Medical personnel staged a short distance away, waiting for the scene to be safe.

16.    Deputies Mata and Miranda were led to a rear bedroom where Escudero was with David Crummel (hereinafter referred to as Crummel).

17.    Deputies Mata and Miranda noticed signs of drug use (orange needle cap, spoon) and a Narcan pen next to Escudero.

5

18.     Escudero was unconscious and unresponsive.  Hernandez and Crummel informed Deputies Mata and Miranda they thought Escudero used heroin.

19.     Deputies Mata and Miranda moved Escudero into the living room so that medical personnel could provide medical aid to Escudero.

20.     Fire personnel began to treat Escudero while Deputies Mata and Miranda stood by to assist.

21.     A Fire Department paramedic administered Narcan to Escudero.  Escudero began to wake up and tried to stand up.  Fire Department informed Escudero that they were there to help him.

22.     Deputies Mata, Miranda, and Attlesey attempted to restrain Escudero.  Escudero engaged in assaultive behavior that could result in a criminal offense, which included assault on police officers, in violation of California Penal Code, section 243(b).  Because Escudero resisted with force, he was in violation of California Penal Code section 69, every person who attempts by means of a threat or violence, to deter or prevent a police officer from performing any duty.

23.     It is my opinion a police officer acting consistently with standard police practices and training would conclude that the deputies (Mata, Miranda, and Attlesey) response to the situation was reasonable and consistent with standard police practices, and training.

24.     The issue as to whether or not Escudero was under the influence of a controlled substance is relevant to the decisions made by the deputies under the totality of the circumstances.  Deputies Mata and Miranda saw signs of drug use where Escudero was located.  Hernandez and Crummel believed Escudero used heroin.  Based on the information provided by the residents of the location, the deputies did not take any enforcement action on Escudero while the fire department provided medical aid.

/ /

6

25.     It is my opinion a police officer acting consistently with standard police practices and training would conclude that after the deputies attempted to de-escalate the situation, the involved deputies used reasonable force in self-defense, defense of others, and to overcome the active and assaultive behavior of Escudero.

26.     An officer conforming to standard police practices and training would conclude that Ruben Escudero presented an immediate threat based on the totality of the circumstances.  Furthermore, Escudero's deliberate and intentional actions included refusing to comply with repeated commands, performing acts consistent with assaulting the medical personnel and Deputies (Mata, Miranda, and Attlesey), and placing others at risk, all of which enhanced the deputies perceived threat assessment.

27.     Additionally, the use of force by the involved deputies included the following applications, all of which were consistent with standard police practices, de-escalation and were reasonable under the totality of the circumstances by utilizing the following activities to both de-escalate but to protect emergency first responders and the deputies present:

    a.  Uniform presence

    b.  Repeated verbal commands

    c.  Physical control measures or PMC

    d.  Taser (Deputy Attlesey)

    e.  Impact weapon, as a tool of necessity as opposed to a tool of choice

    f.  Use of Hobble  restraint  (cord to prevent kicking)

28.     It is my opinion a police officer acting consistently with standard police practices and training would conclude that the multiple Taser deployments and activations were consistent with standard police practices and training given the totality of the circumstances (TOC) as Ruben Escudero had overdosed and was unconscious and unresponsive. Deputies responded to the medical aid and saw

7

items associated with drug use.  Deputies Mata and Miranda moved Escudero to the living room so that fire personnel and paramedics had room to treat Escudero. When paramedics administered Narcan, Escudero woke up and began to assault (punches & kicks) Fire Department personnel and Deputies Mata, Miranda, and Attlesey.  In response to the attack, Deputy Attlesey deployed a Taser to overcome Escudero's assault and to gain control. The Taser was not effective as Escudero continued to actively resist and fight the Fire personnel and deputies. Shortly thereafter, Escudero was placed in handcuffs. While handcuffed, Escudero tried to kick the deputies and a shot of verset was given and a leg restraint (hobble) was placed on Escudero's ankles.

29.     Once Escudero was secured, a Fire Department paramedic gave Escudero another sedative, which appeared to calm him down.  Escudero was then placed in an ambulance and transported to a hospital.

30.     It is my opinion a police officer acting consistently with standard police practices and training would conclude that the Escudero's deliberate and intentional acts of resisting contributed to escalation of the incident.  Because Escudero's actions were consistent with an attempt to assault a police officer and medical/Fire personnel, it clearly contributed to the Deputy Attlesey's perceived threat assessment.

31.     There are a number of factors to take into consideration when determining the reasonableness of an officer's use of force, including Officer versus suspect factors include relative size and strength; influence of drugs, alcohol, or mental capacity; degree to which the subject has been effectively restrained and the subject's  ability to resist; other exigent circumstances, i.e. active assault and self-defense

32.     It is recognized that police officers are expected to make split-second decisions and that the amount of time available to an officer to evaluate and respond to changing circumstances may impact his decision.  It is also recognized

8

that circumstances may occur in which an officer reasonably believes that it would be impractical or ineffective to use a standard tool, method, or weapon when under attack.  An officer may find it necessary or more effective and/or practical to improvise his response to rapidly unfolding conditions that he is confronted with under the totality of the circumstances (split-second decision). In such circumstances, the use of an improvised tool or method must nonetheless be objectively reasonable and utilized in self-defense and/or defense of others.   This concerns the imminent or exigent circumstances that led Deputy Attlesey to believe that it was reasonable to use an improvised means of force, such as a Taser, as an impact weapon in self-defense and to overcome the active/assaultive behavior included but not limited to:

      a.  Escudero was assaulting deputies and medical/fire personnel;

      b.  Escudero refused to comply with repeated commands to stop resisting;

      c.  it appeared to Deputy Attlesey that the others (deputies and Fire) were winded and tired because of the protracted struggle / fight with Escudero;

      d.  Deputy Attlesey deployed her Taser twice on Escudero;

      e.  The initial Taser deployment caused Escudero to fall, but he (Escudero) immediately got up and continued to assault the deputies;

      f.  Deputy Attlesey deployed the Taser a second time, but it was not effective;

      g.  Deputy Attlesey used the end of the Taser as an impact weapon and struck Escudero in the face; and

      h.  The distraction strikes were not effective.

      33.    Fire department personnel assisted the deputies, and they were able to place two handcuffs on Escudero.

/ /

9

34.     Despite being restrained in handcuffs, Escudero tried to kick the deputies and fire department personnel. Deputies placed a leg restraint (hobble) around Escudero's ankles, which helped prevent him from kicking and injuring the medical staff.

35.     Because of the following factors: 1) their close proximity to each other (Escudero, other deputies, and medical/fire personnel); 2) Escudero's large size; 3) Escudero continued to fight and resist; and 4) with little to no time to react, Deputy Attlesey reacted to the attack in self-defense by utilizing a Taser as an impact weapon to strike Escudero.

36.     Pursuant to standard police practices and training, it is recognized that circumstances may arise in which an officer reasonably believes that it would be impractical or ineffective to use any of the standard tools, weapons, or methods provided by the Department.  An officer may find it more effective or practical to improvise (unconventional use of force as a "tool of necessity") his response to rapidly unfolding conditions that he is confronted with.  In such circumstances, the use of any improvised device or method must nonetheless be objectively reasonable and utilized only to the degree that is reasonably necessary to accomplish a legitimate law enforcement purpose.

37.      It is my opinion, as determined by standard police practices and training, that the involved deputies (Mata, Miranda, and Attlesey) utilized physical restraints and control measures in an effort to gain control and to secure Escudero.  The placement of weight on extremities and momentarily on the back by the deputies was reasonable and consistent with standard police practices and training.

38.     The allegations that, "Deputy Defendants placed weight and pressure on Decedent's body for a significant amount of time during this incident, including sitting on his body while Escudero was in a prone position," is not supported by evidence and in particular the belt recording of the entire event

10

which from when Escudero wakes up and is actively resisting to the time he has been restrained is just over 3-31/2 minutes. The use of body weight by police officers on extremities and momentarily on the back of a subject who is actively resisting in order to gain and/or establish control is a common and accepted police practice but the belt recording shows a fluid event such that any prolonged restraint upon the back of Escudero did not occur.

39.    It is my opinion, as determined by standard police practices and training, that the involved deputies (Mata, Miranda, and Attlesey) followed appropriate state law, departmental policies, tactics, de-escalation/escalation of force principles, and the training guidelines taught statewide by P.O.S.T.

40.    It is my opinion that there is no indication in the San Bernardino County Sheriff's Department policies, procedures, or training that suggests the existence of a custom, policy, or practice that encourages or condones poor police tactics, procedures, or the use of excessive force (deadly or non-deadly) by any member of the San Bernardino County Sheriff's Department.  I am familiar with those policies and over the years had input into their development and the policies are adequate to meet the needs of the public and the training sufficient and in line with what occurred in this incident.

41.    That I have based my opinions on the materials and evidence reviewed herein and in particular the belt recording of what transpired with the statements of the deputies and their progression of escalation of use of force in compliance with first using no force (commands) or low levels of force to meet the resistance and force being applied by the suspect and escalating in response to the actions of Escudero. The policies and practices are consistent with the holding of *Tennessee v Gardner* and progeny of cases that the use of force was reasonable based upon the totality of the circumstances presented.

/ /

/ /

1     I declare under penalty of perjury under the laws of the State of California

2   and the United States of America, that the foregoing is true and correct.

3     Executed this 20 day of January 2023 in Yucaipa, California, United

4   States of America.

5   _____

6   ROBERT FONZI, Declarant

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DECLARATION OF ROBERT FONZI IN SUPPORT OF DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT

EXHIBIT "K"

Dennis E. Wagner, Esq. (SBN: 99190)
**WAGNER ZEMMING CHRISTENSEN, LLP**
1325 Spruce Street, Suite 200
Riverside, CA  92507
Tel.:        (951) 686-4800
Fax:        (951) 686-4801
*rsc@wzclawfirm.com*
*dew@wzclawfirm.com*

Attorneys for Defendants, COUNTY OF SAN BERNARDINO; HUMBERTO MIRANDA; JULIAN MATA; and JESSAQUA ATTLESEY

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CECILIA VARGAS; ARIANA SALAS, individually and as a successor-in-interest to RUBEN ESCUDERO, deceased,<br><br>         Plaintiffs,<br>vs.<br><br>COUNTY OF SAN BERNARDINO; H. MIRANDA; S. CARTER; Z. VOGEL, J. MATA; Z. PRITCHETT; J. JIMENEZ; A. MATA; T. KAUTZ; J. ATTLESEY; RODRIGUEZ (first initial unknown) and DOES 1-10, inclusive,<br><br>         Defendants. | CASE NO: 5:20-cv-02646-JGB-KK<br><br>**DECLARATION OF KEVIN FRIES IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT OR IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT**<br><br>*[Filed concurrently w/ Notice of Motion and Motion for Summary Judgment; Statement of Undisputed Facts; and (Proposed) Judgment]*<br><br>**Date:**       March 6, 2023<br>**Time:**       9:00 a.m.<br>**Courtroom:** 1<br><br>Hon. Jesus G. Bernal<br>United States District Judge |

I, KEVIN FRIES, declare as follows:

That I am employed by the San Bernardino County Sheriff's Department and am currently in the position of Sergeant and assigned to the Sheriff's Department Training Division.  I have personal knowledge of the facts as set forth herein and if called to testify could do so competently thereon.

1.     That my current assignment is the Sheriff's Department's Training Division. I have held this assignment in different capacities since 2013. That by virtue of my years with the Department, my training and experience, and my assignment at the Training Division, I am familiar with the training program and training materials that are provided for deputy sheriffs for the County of San Bernardino. That the Sheriff's Department uses POST training materials and curriculum for both its basic academy training and ongoing continuing training. That POST is the acronym for the Commission on Peace Officer Standards and Training, which is the peace officer training authority for the State of California and sets the minimum training standards for California law enforcement. The Sheriff's Department Training Division is a POST-certified training center and is accredited by San Bernardino Valley College. The POST training curriculum is extensive and comprehensive and covers 43 separate categories of training, or "learning domains." The Sheriff's Department's academy program exceeds the standards set forth by POST.  I have taught and/or supervised the instruction of these training materials for our academy and employees. Among the subjects of mandated training are leadership, professionalism and ethics, policing in the community, search and seizure, and laws of arrest, which include laws of detainments. That POST has set the minimum number of hours a peace officer candidate must successfully complete to graduate from the basic academy at 664 hours. Supervisors must complete an additional 80 hours of training, including subjects of ethical decision-making, counseling, accountability, evaluating employees, and training employees.

2

2.     That once an officer has successfully passed the basic training, he or she must also successfully complete a field training program. All new deputies, under POST, are required to complete a minimum ten-week field officer training program. The County of San Bernardino Sheriff's Department exceeds this requirement by having deputies complete between 12-16 weeks, depending on the station to which he or she will be assigned and the individual's progress in training. These programs are supervised by experienced deputies who have completed the required 40-hour Field Training Officer Program. Field officer training pursuant to POST is training above and beyond the basic training and is required for all officers before being assigned to perform general law enforcement uniformed patrol duties without direct and immediate supervision. This training curriculum includes subjects such as California codes and law, Department policies, control of persons, ethics, and the use of force. Both POST and the Sheriff's Department require continuing training for officers. POST requires an additional 24 hours of continued professional training every two years for peace officers. The Sheriff's Department (or "Department") exceeds this by requiring deputies to take 24 hours of continued training each year, instead of every two years. That included in their training, the Department requires its deputies to update their use of force training every trimester. The Department provides twice the minimum required training set forth by POST for continuing, ongoing training of its officers.

3.     That our deputies are taught they must act with a high degree of professionalism in carrying out their duties, and that a violation of a person's civil rights is a violation of the law as well as a violation of the Sheriff's Department's own policies and procedures. The deputies are taught that unethical and unprofessional behavior is unacceptable. They are taught that violations of a person's civil rights and the Department's policies can result in disciplinary action, regardless of rank. Disciplinary action may include

3

1   reprimand, suspension, termination, and/or criminal prosecution. The San

2   Bernardino County Sheriff's Department adheres to these policies and

3   procedures to prevent conduct which could result in the violation of a person's

4   constitutional rights.

5         4.     That I am also familiar with the San Bernardino County Sheriff's

6   Department's policies, customs and practices concerning the use of force and the

7   training deputies receive on the use of force. That the San Bernardino County

8   Sheriff's Department's customs, policies, and practices on the use of force are

9   constitutional and comply with state and federal guidelines. The Sheriff's

10   Department does not tolerate employee acts which fail to follow laws, policies

11   and procedures. Failure to follow policies and procedures subjects the officer to

12   consequences such as counseling, reprimands, suspension, and/or termination.

13   The Sheriff's Department follows guidelines outlining when Sheriff's deputies

14   may resort to the use of force. Deputies are taught they have the authority to use

15   reasonable force to effect an arrest, prevent escape, or overcome resistance as

16   authorized by the California Penal Code section 835a and Federal law. Deputies

17   are instructed to use only that degree of force which is reasonable to protect

18   themselves or others or to overcome resistance to their lawful authority. The

19   deputies are taught the consequences of using unreasonable force, as well as

20   their own legal and ethical responsibilities to intervene if the force being used by

21   another peace officer is unreasonable or unlawful. Deputies are trained in a range

22   of methods for when the use of force is necessary and what type of force is

23   appropriate. Deputies are taught reasonable force is analyzed under an objective

24   standard as recognized by case law *Graham v. Conner*, *Tennessee v. Garner*, and

25   other cases that govern the use of force under the Fourth Amendment. The

26   Sheriff's Department teaches these cases and statutes.  Further, deadly force can

27   be used when the threat is an imminent danger of SBI to the officers or others.

28   / / /

DECLARATION OF KEVIN FRIES IN SUPPORT OF DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT

5.     That I am familiar with the training deputies receive regarding defensive tactics and responses deputies may use when confronted with a combative and/or resistant subject. The San Bernardino County Sheriff's Department deputies are taught that it is a violation of the Fourth Amendment to use excessive force, or to use physical force when a situation does not warrant or justify it. Deputies are taught techniques such as the use of verbal commands, OC spray, batons, arrest/control pressure points, physical holds, and personal weapons including hand strikes and force generated from the deputy's body and applied to a suspect. Deputies are also taught the proper use of TASER applications. The deputies receive this training in the academy as well as in refresher courses during their ongoing training. That deputies are not taught to use the TASER as a direct impact weapon, they are taught to use the TASER in a manner consistent with other use of force applications concerning the objectively reasonable standard. Deputies are trained to give verbal commands whenever feasible, which is a less restrictive technique than physical force. Deputies are taught and trained to give warnings when feasible prior to using physical force and prior to using the TASER if feasible.

6.     That the San Bernardino County Sheriff's Deputies are taught excessive force is not tolerated. That deputies are instructed throughout their training excessive force by a deputy can lead to suspension, termination, civil liability and possibly criminal prosecution.  The Department also requires complete, and honest reporting of the use of force. The Department does not tolerate false reporting, or covering-up of the use of force, or falsifying reports. The Department does not condone, or tolerate deputies to commit perjury, or engage in dishonesty while conducting investigations or in reporting. There is nothing within Department policy known as a "code of silence." The Department does not approve of deputies using or abusing their police powers or position to interfere with the rights of citizens. The Department requires and expects

5

1   deputies to be truthful while investigating and reporting incidents regarding

2   detention and the use of force. Anything less than complete and truthful

3   investigating and reporting is not tolerated and will subject deputies to discipline

4   including suspension, or termination.

5        7.    That I am familiar with the Department's policies concerning

6   supervision of deputies. That the policy regarding supervision of a patrol

7   deputies is that deputies may work patrol without having a direct supervisor

8   present if the deputy has completed the requirements so set forth by POST and

9   the Department for field officer training. That even though a deputy may not

10   always have a supervisor with him when he responds to a call, there is always a

11   supervisor on duty and supervisors are mandated to respond to certain calls, such

12   as when there has been a use of force, or when otherwise requested by a deputy.

13   Supervisors, such as watch commanders are required to take specialized training

14   above the regular training required for field deputies. This training is designated

15   as Advanced Officer Training, and includes use of force update training and

16   other training. Supervisors complete a minimum of four hours of Advanced

17   Officer Training on a quarterly basis. This training exceeds that which is

18   required by P.O.S.T.

19        8.    That when the Department receives a citizen's complaint

20   concerning a claim of excessive force or unlawful seizure against a deputy, this

21   complaint is thoroughly investigated. If, after the investigation, it is determined

22   that a deputy used excessive force, he or she is disciplined, which can include re-

23   training, suspension, termination, and possible criminal or civil prosecution.

24        9.    That our department has trained both pre and post-death of George

25   Floyd on the dangers of positional asphyxiation and restraints if improperly used

26   and how to handle encounters with suspects under the influence of drugs.  Our

27   deputies are trained that in handcuffing a suspect who is uncooperative and/or

28   combative, that obtaining control of the suspect on the ground is important for

DECLARATION OF KEVIN FRIES IN SUPPORT OF DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT

safety and to be able to resolve the situation quickly and place the suspect in handcuffs.  In that regard, when a suspect is on the ground, the deputies are taught that in handcuffing you try and utilize your knee and a portion of your body weight on the shoulder of the suspect.  Generally, force used to the neck or sheer force upon someone's back for an extended period of time could lead to medical issues.

10.   That our department teaches in accordance with POST standards as set forth in Learning Domain 33 regarding the use of force.  We provide, in addition to academy training, trimester training involving the deputies where topics such as these are addressed in addition to range qualifications and other training provided.

11.   That our deputies are generally taught that direct pressure over an extended period to someone's neck should not be utilized since it could cause medical issues or difficulty breathing.  Additionally, they are taught that some suspects who have pre-existing medical conditions, and/or are under the influence of drugs can display superhuman strength and because of actively resisting arrest and directives from the deputy sheriffs the suspect can sometimes go into cardiac arrest.  In those situations, deputies are advised to quickly restrain the suspect for safety and to ensure that medical personnel are called for a medical issue. POST teaches prone positioning and handcuffing to the back and there is no training from POST that a subject should not be restrained in handcuffs to the back while facing down on the ground. That this is a position that is trained to provide the safest method of containing a violent subject. The act of handcuffing an actively resisting subject who is prone on the ground is a fluid event and sometimes the deputy can end up on the back for example, briefly but deputies are taught they should never position themselves on someone's back for an extended period of time which could compress the lungs to cause difficulty breathing.

7

12.     That whether the term is positional asphyxiation, asphyxiation, restraint or, however phrased, deputies are trained to assess the totality of the situation, to restrain and handcuff quickly to minimize time spent where a suspect's ability to breathe could be compromised. Deputies are trained to place their weight on the upper back for example, but typically it is relatively brief and is not on the back directly over the lungs but in the shoulder area to keep the suspect in a position where he cannot injure the deputies or others present and still allow the deputies to handcuff the suspect.

13.     That for instance, a suspect who is prone, lying on the ground, on their stomach, after being handcuffed, is generally rolled on their side in a "recovery position" to allow easier breathing. Our deputies have been taught this for years.

14.     That our officers use a hobble restraint, which can be utilized to fasten around a suspect's ankles or calves and secured to prevent a suspect from kicking.  The use of a hobble restraint is generally done in cases where even though a suspect may be handcuffed, the suspect continues to struggle and is kicking as a form of resistance that such a restraint being placed around the ankles or lower leg area is necessary for protection of first responders.

15.     That I am familiar with Narcan and how it can counter the effects of someone who is suffering from an overdose of heroin or an opiate-type narcotic. POST does not require that our deputy sheriffs be trained to administer Narcan as this is considered a medical issue and the law does not require deputies to be trained in the administration of Narcan and its effects upon a person who is overdosing.  POST leaves Narcan administration training up to the local law enforcement agencies whether they choose to train on Narcan. POST gives each law enforcement agency the discretion whether to train on Narcan or not, it is not mandated training in this state. The San Bernardino County law enforcement personnel are taught to contact medical providers in response to overdose issues

8

so that a medical response is provided by emergency personnel who have specific training and medical knowledge.

     16.   That I am familiar with how the department teaches deputies on issues involving mental illness involving members of the public. The training provided is consistent with POST in trying to identify persons that need medical attention and resources versus an encounter with law enforcement only.  Law enforcement personnel oftentimes are present when emergency medical providers or first responders are trying to provide medical intervention and generally law enforcement's focus is to keep the peace and maintain order. Deputies do not lose the right of self-defense or defense of others by reason of encounters with someone who is mentally ill and having a violent psychotic episode.

     I declare under penalty of perjury under the laws of the State of California and the United States of America, that the foregoing is true and correct.

     Executed this 26th day of January 2023 in San Bernardino, California, United States of America.

_____
KEVIN FRIES, Declarant

9

EXHIBIT "L"

Risa S. Christensen, Esq. (SBN: 227799)
Dennis E. Wagner, Esq. (SBN: 99190)
**WAGNER ZEMMING CHRISTENSEN, LLP**
1325 Spruce Street, Suite 200
Riverside, CA  92507
Tel.:          (951) 686-4800
Fax:          (951) 686-4801
*rsc@wzclawfirm.com*
*dew@wzclawfirm.com*

Attorneys for Defendants, COUNTY OF SAN BERNARDINO; HUMBERTO MIRANDA; JULIAN MATA; and JESSAQUA ATTLESEY

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CECILIA VARGAS; ARIANA SALAS, individually and as a successor-in-interest to RUBEN ESCUDERO, deceased,<br><br>        Plaintiffs,<br>vs.<br><br>COUNTY OF SAN BERNARDINO; H. MIRANDA; S. CARTER; Z. VOGEL; J. MATA; Z. PRITCHETT; J. JIMENEZ; A. MATA; T. KAUTZ; J. ATTLESEY; RODRIGUEZ (first initial unknown) and DOES 1-10, inclusive,<br><br>        Defendants. | CASE NO: 5:20-cv-02646-JGB-KK<br><br>**DECLARATION OF AL HUFF IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT OR IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT**<br><br>*[Filed concurrently w/ Notice of Motion and Motion for Summary Judgment; Statement of Undisputed Facts; Declarations; and (Proposed) Judgment]*<br><br>**Date:**        March 6, 2023<br>**Time:**        9:00 a.m.<br>**Courtroom:** 1<br><br>Hon. Jesus G. Bernal<br>United States District Judge |

1

I, AL HUFF, declare as follows:

That I am presently employed as a Lieutenant for the County of San Bernardino Sheriff's Department and have been employed with the Sheriff's Department since _January 3RD, 1998_ . I have personal knowledge of the facts set forth herein and if called to testify could do so competently thereon.

1.     That I previously oversaw the Employee Resources Division, and I am familiar with the policies, practices, and customs that I address in this Declaration. I have extensive knowledge of the Department's policies and procedures concerning the hiring and retention of deputies and other employees. The Sheriff's Department believes in maintaining high professional standards of integrity, ethics, and behavior for all employees. To maintain this standard, the Sheriff's Department has established stringent procedures for the hiring and retention of deputies and adheres to no less than the state standards for hiring and retaining peace officers that are set by the Commission on Peace Officers Standards and Training (POST), which is the authority in the State of California for setting the minimum standards for hiring and retention of peace officers.

2.     That California Penal Code section 13510 establishes the authority for POST to set the minimum standards for recruitment and training of peace officers in this state. The standards for hiring or disqualifying peace officers in the State of California is set by statute in the Government Code, including Government Code sections 1029 and 1031. The minimum requirements set by statute include that the candidate may not have sustained any felony conviction; the candidate must be at least 18 years old and be a high school graduate (or equivalent), or higher. The candidate must be fingerprinted to disclose whether he or she has a criminal record. POST requires the applicant to be competent in reading and writing. POST mandates the applicant undergo an oral interview and POST provides the interview guidelines for this process and publishes and

2

1   provides an oral interview question bank with questions specifically for assessing

2   the six mandated interview factors: experience, problem solving ability,

3   communication skills, interest/motivation, interpersonal skills, and community

4   involvement/awareness. The Sheriff's Department interviews each deputy

5   applicant regarding these specific factors. The candidate must be of good moral

6   character as determined by a thorough background investigation. That POST also

7   publishes and provides online the guidelines for the investigator to conduct the

8   background check on potential candidates. The candidate must be free from

9   physical, emotional, or mental condition, including any bias against race or

10   ethnicity, gender, nationality, sexual orientation. The candidate must be

11   physically able to perform the duties of a deputy and must pass a physical

12   conducted by a licensed surgeon or physician. The Sheriff's Department adheres

13   to all of these mandated and requirements.

14       3.       That POST requires each peace officer candidate to be free from any

15   emotional or mental condition which might adversely affect the exercise of the

16   powers of a peace officer. In compliance with POST mandates the County

17   requires all deputy applicants to submit to a psychological screening conducted

18   by a qualified, licensed, and experienced psychologist or psychiatrist who has

19   met the POST continuing professional education requirements. POST also

20   publishes a psychological screening manual for the professional to make a

21   suitable determination on each candidate. This manual is also available online at

22   the POST website. The screening is extensive and includes a review of the

23   applicant's health history and history of medication, history of emotional or

24   mental issues, and military service. The candidate is administered a personal

25   history questionnaire, and written tests, a psychological interview. The screening

26   professional compiles all the data and information, reviews and analyzes the

27   information and then makes a determination whether the candidate is suitable for

28   hiring as a peace officer. The Sheriff's Department must receive notice that the

3

1  applicant has passed the screening before the applicant can be offered
2  employment. If instead, the Sheriff's Department receives a recommendation that
3  the applicant is not suitable as a peace officer or has not passed the screening or
4  background check, the County will not hire the candidate. The County of San
5  Bernardino adheres to all the requirements for hiring set by POST.

6          4.      That in addition to the hiring standards set by POST, the applicant
7  must pass the POST training academy. If the candidate is unable to pass the
8  academy he or she will not be hired or retained as a deputy. That the County
9  further requires above and beyond the POST minimal standards for hiring, that
10 the applicants pass a drug and alcohol screening, and a driving record review.
11 That the County's goal is to screen out candidates who may pose a potential
12 health and safety risk to members of the public and community. That in
13 maintaining the high standards of integrity of its deputies the Sheriff's
14 Department does not hire or retain deputies who have demonstrated brutality,
15 dishonesty, or bigotry, or a propensity for violence, or other dangerous
16 propensity. That the moral character requirement is a continuing requirement of
17 Deputies. That deputies who fail to demonstrate good moral character or have
18 propensities against Department policies are not hired, and if they were
19 previously hired and later demonstrate such characteristics, he or she can be
20 terminated from their employment. All personnel hired by the Department must
21 pass all the requirements of POST and those employed by San Bernardino
22 Sheriff's Department have done so.

23         I declare under penalty of perjury under the laws of the State of California
24 and the United States of America, that the foregoing is true and correct.

25         Executed this 25st day of January 2023 in   SAN BERNARDINO         ,
26 California, United States of America.

27                                          _____
                                            AL HUFF, Declarant
28

4

EXHIBIT "M"

Risa S. Christensen, Esq. (SBN: 227799)
Dennis E. Wagner, Esq. (SBN: 99190)
**WAGNER ZEMMING CHRISTENSEN, LLP**
1325 Spruce Street, Suite 200
Riverside, CA  92507
Tel.:          (951) 686-4800
Fax:          (951) 686-4801
rsc@wzclawfirm.com
dew@wzclawfirm.com

Attorneys for Defendants, COUNTY OF SAN BERNARDINO; HUMBERTO MIRANDA; JULIAN MATA; and JESSAQUA ATTLESEY

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CECILIA VARGAS; ARIANA SALAS, individually and as a successor-in-interest to RUBEN ESCUDERO, deceased,<br><br>          Plaintiffs,<br>vs.<br><br>COUNTY OF SAN BERNARDINO; H. MIRANDA; S. CARTER; Z. VOGEL, J. MATA; Z. PRITCHETT; J. JIMENEZ; A. MATA; T. KAUTZ; J. ATTLESEY; RODRIGUEZ (first initial unknown) and DOES 1-10, inclusive,<br><br>          Defendants. | CASE NO: 5:20-cv-02646-JGB-KK<br><br>**DECLARATION OF TYSON NILES IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT OR IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT**<br><br>*[Filed concurrently w/ Motion for Summary Judgment; Separate Statement; Declarations; (Proposed) Order and (Proposed) Judgment]*<br><br>**DATE:**     March 6, 2023<br>**TIME:**     9:00 a.m.<br>**CRTRM:**  1<br><br>Hon. Jesus G. Bernal<br>United States District Judge |

1

I, TYSON NILES, declare as follows:

That I am presently employed with the San Bernardino County Sheriff's Department as a Sergeant assigned to our Internal Affairs Division. I have been employed by the County of San Bernardino Sheriff's Department as a sworn officer for 23 years.  I have spent 3½ years with the Office of Internal Affairs and am familiar with how the department conducts itself concerning complaints of misconduct.  I have personal knowledge of the facts as set forth in this declaration, and if called to testify I could and would do so competently thereon.

1.     That the Internal Affairs division is responsible for investigating misconduct of employees of the department.  The Internal Affairs division may receive a complaint from the outside coming into the department by a citizen and making a complaint against an officer, an internal complaint, or at times, referrals that come from the investigation of a lethal force encounter.  Our office is responsible for conducting interviews and providing a complete investigation concerning any alleged misconduct.

2.     That the department investigates any and all complaints of employee misconduct in accordance with California law.  The purpose is to ensure that the department maintains the highest levels of professionalism by the members of our department.  At any given time, there are multiple employee investigations ongoing concerning issues ranging from auto accidents, up to and including abuse of authority by officers.

3.     Historically, the department has terminated employees for serious episodes of misconduct.  Anyone terminated is allowed their administrative appeal rights that include a Skelly hearing and potentially a hearing before the Civil Service Commission.  The form of discipline can run the gamut from a verbal warning, written warning, days off, lengthy suspensions up to termination depending upon the misconduct.

/ /

2

4.     That the investigation is presented to the deputy chief who oversees the region where the subject employee works.  If any discipline is up to and including 5 days or less, the deputy chief can make this decision as discipline in accordance with the concurrence of an assistant sheriff.  If the chief believes the allegations and believes 5 days or more, or termination is warranted, then the employee is ordered to appear before a board of chiefs.  At that point, there is no recommendation regarding what the discipline might be.  A full board is chaired by an assistant sheriff, there are three deputy chiefs, county counsel, human resources, and internal affairs at the board.  At the conclusion of the hearing, the assistant sheriff, along with the three deputy chiefs, determine the findings and make recommendations for discipline.  Those recommendations are compared to past practice and discussed.

5.     The department is required under state law to report uses of force with the state effective January 2023.  Our department is current on its reporting obligations into the DOJ database monitoring incidents of use of force.  The department is always attempting to meet transparency with regard to investigations and for those matters that can be made public versus those for which officers are subject to privacy protections under the Peace Officer Bill of Rights or POBAR.

6.     There is no policy of covering up misconduct as our department and its existence belies such a claim.  Our department conducts investigations of claims of misconduct or abuse of authority to ensure our sheriff's department meets the highest standards of professionalism which the public expects from our law enforcement.

/ /

/ /

/ /

/ /

3

1     I declare under penalty of perjury under the laws of the State of California

2   and the United States of America, that the foregoing is true and correct.

3     Executed this _25th_ day of January 2023 in San Bernardino                ,

4   California, United States of America.

5                                          _____

6                                          TYSON NILES, Declarant

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

4

# EXHIBIT "N"

Risa S. Christensen, Esq. (SBN: 227799)
Dennis E. Wagner, Esq. (SBN: 99190)
**WAGNER ZEMMING CHRISTENSEN, LLP**
1325 Spruce Street, Suite 200
Riverside, CA  92507
Tel.:         (951) 686-4800
Fax:         (951) 686-4801
*rsc@wzclawfirm.com*
*dew@wzclawfirm.com*

Attorneys for Defendants, COUNTY OF SAN BERNARDINO; HUMBERTO MIRANDA; JULIAN MATA; and JESSAQUA ATTLESEY

### UNITED STATES DISTRICT COURT

### CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CECILIA VARGAS; ARIANA SALAS, individually and as a successor-in-interest to RUBEN ESCUDERO, deceased,<br><br>        Plaintiffs,<br>vs.<br><br>COUNTY OF SAN BERNARDINO; H. MIRANDA; S. CARTER; Z. VOGEL, J. MATA; Z. PRITCHETT; J. JIMENEZ; A. MATA; T. KAUTZ; J. ATTLESEY; RODRIGUEZ (first initial unknown) and DOES 1-10, inclusive,<br><br>        Defendants. | CASE NO: 5:20-cv-02646-JGB-KK<br><br>**DECLARATION OF MILES KOWALSKI IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT OR IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT**<br><br>*[Filed concurrently w/ Notice of Motion and Motion for Summary Judgment; Statement of Undisputed Facts; and (Proposed) Judgment]*<br><br>**Date:** March 6, 2023<br>**Time:** 9:00 a.m.<br>**Courtroom:** 1<br><br>Hon. Jesus G. Bernal<br>United States District Judge |

1

I, MILES KOWALSKI, declare as follows:

I am an attorney duly licensed to practice before the state courts of California and have personal knowledge of the facts set forth in the instant declaration and if called to testify could do so competently thereon.

1. That my background as an attorney involves six years as a deputy district attorney, 3 years of which were with the District Attorney's Office for the County of San Bernardino.  After my period of time spent with the District Attorney's Office, I came to the office of County Counsel in March 2015 where I was assigned to the San Bernardino Sheriff's Department as a legal advisor.  In my capacity as legal advisor to the Sheriff's Department, I have worked with the Sheriff's Department on a number of issues, including policies and regularly advise the Board of Deputy Chiefs and Office of the Sheriff as it concerns officer involved lethal force encounters and uses of force and cases where there is a death and there was involvement of deputies from the department.

2. That in preparation of Defendants' motion for summary judgment I was asked to find out whether any employees were disciplined in connection with the incidents subject of the lawsuits listed in the plaintiffs' First Amended Complaint. These include:

(a) *Estate of Merlin Factor v. County of San Bernardino, et. al*. case number 5:14-CV-01289-DMG-AGR(x);

(b) Archibald v. County of San Bernardino, No. 5:16-CV-1128, C.D. Cal. Mar. 2018;

(c) *Phillips v. County of San Bernardino*, No. 5:18-CV-2532, C.D. Cal. June 2019;

(d) *Ranero v. County of San Bernardino*, No. 5:16-CV-2655, C.D. Cal. Aug. 2018;

//

2

(e)  *Young v. County of San Bernardino*, case number 5:15-CV-01102-JGB-SP;

(f)  *Gomez v. County of San Bernardino*, No. 5:13-CV-2185, C.D. Cal. Aug. 2015;

(g)  *Estate of Allen Kephart v. County of San Bernardino*, CIVDS1110314;

(h)  *Elio Carrion v. County of San Bernardino*, No. 2:06-CV-8210, C.D. Cal. Aug. 2009;

(i)  *Stofflet v. County of San Bernardino*, No. 5:18-CV-279, Feb. 2018;

(j)  Jail taser cases of: *Alcala v. County of San Bernardino*, No. 5:15-CV-2515, C.D. Cal.; *Bishop v. County of San Bernardino*, No. 5:14-CV-1085, C.D. Cal.; *Camacho v. County of San Bernardino*, No. 5:16-CV-1244, C.D. Cal.; *Hanson v. County of San Bernardino*, No. 5:14-CV-911, C.D. Cal.; *Smith v. County of San Bernardino*, No. 5:15-CV-2513, C.D. Cal., July 2017; and

(k)  ACLU class action concerning the treatment of LGBT inmates at West Valley Detention Center, Case number 14-2171-JGB-SP.

That as to lawsuits, (a)-(k), I am generally familiar with the cases listed and these cited cases have no bearing on any of the issues raised in the FAC which is a use of force concerning a medical aid subject who was fighting with first responders.  Most of the above cases were settled without a finding of any liability from a jury as to liability for the underlying claims.  Most of the above referenced cases also concern an officer involved shooting which is not part of this case.   Seven of the cases involve an OIS, and one is an inmate custody death. The jail taser cases relate to inmates agreeing to having a taser used and there were no inmate deaths.  The only alleged death from a taser involves a failure to render medical aid claim in the Kephart Case.  This case was resolved without a trial and is factually different as medical providers were not present

3

1  unlike the instant case.  Simply put this list of cases does not show a pattern or

2  practice given the literally thousands of contacts that occur over a year's time

3  with personnel from the Sheriff's Department.  Nevertheless, no less than ten

4  deputies and a nurse, were disciplined by way of termination, resignation in lieu

5  of termination, probation termination, suspension, voluntary resignation, a letter

6  of reprimand, and mandatory retraining as a result of the incidents and the

7  investigations conducted by the department into said incidents.

8      Simply put, there is no policy which condones any illegal conduct of

9  deputy sheriff's while serving in the course and scope of their duties.  The

10  policies used by the SBSD are consistent with POST guidelines and the

11  department is active in regard to investigations of employees for alleged

12  misconduct.  An event can be deemed to be within policy of SBSD but the same

13  case before a civil jury could find based upon a preponderance of evidence that

14  there was a violation of a civil rights; compare that with a criminal case against a

15  deputy sheriff where he or she could be acquitted of wrongdoing as the evidence

16  failed to reach the standard of being beyond a reasonable doubt.  The cases cited

17  do not show any custom of condoning excessive force.

18

19      I declare under penalty of perjury under the laws of the State of California

20  and the United States of America, that the foregoing is true and correct.

21      Executed this 24th day of January 2023, in San Bernardino, California.

22

23

24                          MILES KOWALSKI, Declarant

25

26

27

28

4

EXHIBIT "O"

1 | Risa S. Christensen, Esq. (SBN: 227799)
2 | Dennis E. Wagner, Esq. (SBN: 99190)
3 | **WAGNER ZEMMING CHRISTENSEN, LLP**
  | 1325 Spruce Street, Suite 200
4 | Riverside, CA  92507
5 | Tel.:        (951) 686-4800
  | Fax:        (951) 686-4801
6 | *rsc@wzclawfirm.com*
7 | *dew@wzclawfirm.com*

8 | Attorneys for Defendants, COUNTY OF SAN BERNARDINO; HUMBERTO MIRANDA; JULIAN MATA; and JESSAQUA ATTLESEY

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CECILIA VARGAS; ARIANA SALAS, individually and as a successor-in-interest to RUBEN ESCUDERO, deceased, | CASE NO: 5:20-cv-02646-JGB-KK |
| Plaintiffs, | **DECLARATION OF RISA S. CHRISTENSEN IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT OR IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT** |
| vs. | |
| COUNTY OF SAN BERNARDINO; H. MIRANDA; S. CARTER; Z. VOGEL, J. MATA; Z. PRITCHETT; J. JIMENEZ; A. MATA; T. KAUTZ; J. ATTLESEY; RODRIGUEZ (first initial unknown) and DOES 1-10, inclusive, | *[Filed concurrently w/ Notice of Motion and Motion for Summary Judgment; Statement of Undisputed Facts; and (Proposed) Order]* |
| Defendants. | **Date:** March 6, 2023 **Time:** 9:00 a.m. **Courtroom:** 1 |
| | Hon. Jesus G. Bernal United States District Judge |

1

I, RISA S. CHRISTENSEN, declare as follows:

I am an attorney at law duly licensed to practice before the courts of the State of California and the before the United States District Court for the Central District of California and am a partner in the firm of Wagner Zemming Christensen, attorneys for defendants, County of San Bernardino; Humberto Miranda; Julian Mata; and Jessaqua Attlesey. I make this declaration of my own personal knowledge and if called as a witness I could and would competently testify as to the truth of the matters set forth as follows:

1.     That on November 17, 2021, the defense took the deposition of David Crummel was taken via videoconferencing. That plaintiffs' counsel attended and participated. That attached to my Declaration as **Exhibit 22** is a true and correct copy of the relevant pages of Mr. Crummel's testimony concerning the subject incident, which is cited in the defendants' Statement of Undisputed Facts (SUF). That for purposes of laying a foundation are pages 1-3, 6, and the Reporter's Certificate at page (107). That attached for substantive evidence are pages 14, 15, 21, 22, 30, 31, 33, 37, 38, 40-41, 44-45, 54-58, 69, 73-79, 83, 84, 85, 87, 88, 90, 92, 96-101.

2.     That on November 16, 2021, the deposition of Dorothy Hernandez was taken via Zoom Video Conferencing. That attached to my Declaration as **Exhibit 23** is a true and correct copy of the relevant pages of Ms. Hernandez's testimony concerning the subject incident, which is cited in the defendants' Statement of Undisputed Facts (SUF). That for purposes of laying a foundation are pages 1, 3-4, 7, and Reporter's certificate. That attached for substantive evidence are pages 16, 42- 47, 56, 58, 59, 62, 65-76, 99, 100, 117-118, 123, 128, 129 and 135.

3.     That on February 8, 2022, the deposition of Djuan Washington was taken via Zoom. That attached to my Declaration as **Exhibit 24** is a true and

DECLARATION OF DENNIS E. WAGNER IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT OR IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT

correct copy of the relevant pages of Battalion Chief Washington's testimony concerning the subject incident, which is cited in the defendants' Statement of Undisputed Facts (SUF). That for purposes of laying a foundation are pages 1, 2, 3, 5, and the Reporter's certificate (55). That attached for substantive evidence are pages 10-13, 15-29, 33-38, 40-46, 48-50.

4.       That on December 15, 2022, the defense took the deposition of Alex Gabler via Zoom. That counsel on behalf of the plaintiffs attended and participated.  That attached to my Declaration as **Exhibit 25** is a true and correct copy of the relevant pages of Mr. Gabler's testimony concerning the subject incident, which is cited in the defendants' Statement of Undisputed Facts (SUF). That for purposes of laying a foundation are pages 1-3, 5, the and Reporter's certificate (78). That attached for substantive evidence are pages 8-25, 28-32, 34-42, 44-56, 59-66, 69-70-73. That also attached to Exhibit 25, is Gabler's AMR report, which was marked as Exhibit 58 to his deposition. Gabler authenticated and testified to this report at 44:18 to 45:5 of his deposition. This report follows the deposition pages.

5.       That on September 21, 2022, the defendants took the deposition of Dr. Mark A. Fajardo, Forensic Pathologist for the County of Riverside, via videoconference technology. That plaintiffs' counsel attended and participated. That certain portions of that testimony is referenced in the defendants' Statement of Undisputed Facts. That attached to my Declaration as **Exhibit 26** is a true and correct copy of the relevant pages of Dr. Fajardo's testimony concerning the subject incident, which is cited in the defendants' Statement of Undisputed Facts (SUF). That for purposes of laying a foundation are pages 1-2, 4-5, and Reporter's certificate, (page 47). That attached for substantive evidence are pages 8, 10-17, 19, 20, 23-28-30, and 44, as well as the relevant pages of Dr. Fajardo's Autopsy Protocol, which includes the Bio-Tox laboratory report. These documents were authenticated by Dr. Fajardo, at page 13. The Autopsy Protocol

3

was  marked as Exhibit "45" to Dr. Fajardo's deposition, and contains Dr. Lwin's separate report on Dr. Lwin's examination of Escudero's brain and spinal cord.

6.     That on October 12, 2022, the deposition of Dr. Cho Lwin was taken via videoconference. That attached to my Declaration as **Exhibit 27** is a true and correct copy of the relevant pages of Dr. Lwin's testimony concerning the subject incident, which is cited in the defendants' Statement of Undisputed Facts (SUF). That for purposes of laying a foundation are pages 1, 2, 4, 5, and Reporter's certificate, page 38. That attached for substantive evidence are pages 7-19, 21-22, and 30. Dr. Lwin's report is contained in Dr. Fajardo's autopsy Protocol, pages 15-17, which is attached to my Declaration in Exhibit 26.


I declare under penalty of perjury, under the laws of the State of California and the United States of America, that the foregoing is true and correct.

Executed this 27th day of January 2023, in Riverside, California.


 /s/ *Risa S. Christensen*
RISA S. CHRISTENSEN, Declarant

4

EXHIBIT "22"

**Crummel, David**
**Vargas v. County of San Bernardino**

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA


CECILIA VARGAS, ARIANA SALAS,        )
individually and as a                )
successor-in-interest to RUBEN       )
ESCUDERO, deceased,                  )
                                     )
          Plaintiffs,                )
                                     )          Case No.
     vs.                             )     5:20-cv-02646-JGB-KK
                                     )
COUNTY OF SAN BERNARDINO; H.         )
MIRANDA; S. CARTER; Z. VOGEL; J.     )
MATA; Z. PRITCHETT; J. JIMENEZ;      )
A. MATA; T. KAUTZ; J. ATTLESEY;      )
RODRIGUEZ (first initial             )
unknown) and DOES 1-10,              )
inclusive,                           )
                                     )
          Defendants.                )
_____)


REMOTE VIDEOTAPED DEPOSITION OF DAVID CRUMMEL

Wednesday, November 17, 2021


Reported by:
CAROL JEAN ZURBORG, CCRR, RMR
CSR No. 7921

Job No. 105360


1

1                    UNITED STATES DISTRICT COURT

2                    CENTRAL DISTRICT OF CALIFORNIA

3

4

5    CECILIA VARGAS, ARIANA SALAS,     )
     individually and as a            )
6    successor-in-interest to RUBEN   )
     ESCUDERO, deceased,              )
7                                     )
              Plaintiffs,             )
8                                     )          Case No.
         vs.                          )    5:20-cv-02646-JGB-KK
9                                     )
     COUNTY OF SAN BERNARDINO; H.     )
10   MIRANDA; S. CARTER; Z. VOGEL; J. )
     MATA; Z. PRITCHETT; J. JIMENEZ;  )
11   A. MATA; T. KAUTZ; J. ATTLESEY;  )
     RODRIGUEZ (first initial         )
12   unknown) and DOES 1-10,          )
     inclusive,                       )
13                                    )
              Defendants.             )
14   _____)

15

16

17          Videotaped deposition of DAVID CRUMMEL,

18   taken remotely on behalf of Defendants, commencing at

19   10:07 a.m., and concluding at 12:31 p.m., on Wednesday,

20   November 17, 2021, before CAROL JEAN ZURBORG, CCRR, RMR,

21   Certified Shorthand Reporter No. 7921.

22

23

24

25

2

```
 1   APPEARANCES:

 2

 3   For Plaintiffs:

 4         LAW OFFICE OF JAMES S. TERRELL
           BY:  JAMES S. TERRELL
 5         Attorney at Law
           15411 Anacapa Road
 6         Victorville, California 92392
           (760) 951-5850
 7         jim@talktoterrell.com
           (Remote Zoom appearance)
 8
     For Defendants:
 9
           WAGNER ZEMMING CHRISTENSEN, LLP
10         BY:  DENNIS E. WAGNER
           Attorney at Law
11         1325 Spruce Street, Suite 200
           Riverside, California 92507
12         (951) 686-4800
           dew@wzclawfirm.com
13         (Remote Zoom appearance)

14   Also Present:

15         GIGI FADICH, Videographer
           AUTUMN GARRISON
16         KIMBERLY ROSS

17

18

19

20

21

22

23

24

25
```

3

```
 1    County of San Bernardino defendants.
 2            MR. TERRELL:  Good morning.  Attorney Jim
 3    Terrell on behalf of the plaintiff, Cecilia Vargas.
 4            THE VIDEOGRAPHER:  Would the court reporter
10:09  5    administer the oath.
 6
 7                    DAVID CRUMMEL,
 8    having been administered an oath, was examined and
 9    testified as follows:
10:09 10
11            MR. WAGNER:  Is that your right -- sir, is that
12    your right hand or left hand?
13            THE WITNESS:  Left hand.
14            MR. WAGNER:  Let's do it again.
10:09 15            THE COURT REPORTER:  I didn't know if he was a
16    mirror image or not, so --
17
18                    DAVID CRUMMEL,
19    having been administered an oath, was examined and
20    testified as follows:
21
22                    EXAMINATION
23    BY MR. WAGNER:
24        Q    Okay.  Mr. Crummel, again, my name is Dennis
10:10 25    Wagner.  I'm here to ask you some questions.  There's a
```

6

```
 1    stuff.
 2         Q    All right.  Now on October 19th, 2019, the date
 3    of the incident involving Mr. Escudero, you were moving
 4    from that residence?
10:17  5        A    No, I wasn't.
 6         Q    Were you packing up to move?
 7         A    No, I wasn't.
 8         Q    Okay.  We took the deposition of Dorothy
 9    Hernandez yesterday.  Do you know who she is?
10:17 10        A    No.
11         Q    You don't know a Dorothy Hernandez?
12         A    Who's that?
13              MS. ROSS:  That's Dee.
14              THE WITNESS:  Oh, yeah, yeah, that's Dee.
10:18 15   BY MR. WAGNER:
16         Q    What do you call her?
17         A    She goes under the name of Dee.
18         Q    Oh, Dee.  Okay.  So you know Dee, correct?
19         A    Yeah.
10:18 20        Q    How long have you known Dee?
21         A    Probably --
22              Huh?
23              MS. ROSS:  Probably about six months.
24              THE WITNESS:  Six months, seven months.
10:18 25   BY MR. WAGNER:
```

14

**Crummel, David**
**Vargas v. County of San Bernardino**

1        Q    Six, seven months from back in October of 2019?

2        A    Yep.

3        Q    So you've known her about two and a half years,

4     then?

10:18 5        A    Yeah.

6        Q    Okay.  Did you ever refer to her as your sister

7     from time to time?

8        A    Once in a while.

9        Q    Okay.  And how is it that you met Dee?

10:18 10       A    Through my sister.

11       Q    Okay.  Is that Kimberly?

12       A    No.

13       Q    Is that another sister, then?

14       A    My other sisters.

10:18 15       Q    And what's -- what sister did you meet Dee

16    through?

17            MS. ROSS:  Cheryl.

18            THE WITNESS:  Cheryl.

19    BY MR. WAGNER:

10:19 20       Q    Okay.  And so knowing Dee for two and a half

21    years, do you know what she does for a living?

22       A    No.

23       Q    Do you know if she works?

24       A    She fixes up houses.  That's all I know.

10:19 25       Q    Okay.  Did she ever help you at your house

15

|     |     |
| --- | --- |
| 1 | A    No. |
| 2 | Q    Were you ever contacted by an investigator with |
| 3 | T. Lay Investigations? |
| 4 | A    At the beginning, yes, I have. |
| 10:25 5 | Q    Okay.  All right.  And so that's what I was |
| 6 | asking.  Basically -- from the date of the incident to |
| 7 | today, how many times have you been interviewed? |
| 8 | A    Two times.  That's it. |
| 9 | Q    Okay.  And one was the FBI? |
| 10:25 10 | A    FBI was when I moved in this house, the |
| 11 | investigator in the other house. |
| 12 | Q    Okay.  And the investigator -- the investigator |
| 13 | came by, did he tell you -- did he or she tell you who |
| 14 | they were working for? |
| 10:26 15 | A    Yes, some lawyer for the Vargas. |
| 16 | Q    Okay.  And did they tell you they were going to |
| 17 | tape record you? |
| 18 | A    No, they didn't tell me none of that. |
| 19 | Q    Okay.  Do you know if he was tape recording |
| 10:26 20 | you? |
| 21 | A    No, I don't. |
| 22 | Q    Was the investigator a man or a woman? |
| 23 | A    It was a woman. |
| 24 | Q    Okay.  And the woman investigator, do you |
| 10:26 25 | recall how many days or weeks it was after the incident |

21

1     with Escudero you were interviewed?

2          A    A week later.

3          Q    Okay.  A week later.  All right.

4               Okay.  The one thing that you may have picked

10:26  5   up on a deposition, which is what we're doing here, is

6     that because of the Zoom, sometimes you can sort of tell

7     what my question's going to be and you want to start

8     your answer.  It makes it sort of difficult for our

9     court reporter.  And I think I do the same thing; I

10:27 10  think you may be done with your answer, and I start to

11    jump into the next question.  So just take a breath or

12    something between question and answer and then we won't

13    be stepping on each other, and we'll make the court

14    reporter's job a little easier.  Okay?  It happens all

10:27 15  the time, very common.

16               All right.  So when did you first meet

17    Ruben Escudero?

18         A    I've known him for years out on the streets.

19         Q    Years, like how many years?

10:27 20       A    Like five years.

21         Q    How long had Ruben Escudero been on the

22    streets?

23         A    Around -- around about that same time, around

24    five, six years --

10:27 25       Q    Okay.

22

Crummel, David
Vargas v. County of San Bernardino

```
         1          Q   All right.  How long have you been -- well, I
         2    take it you're not working now; is that correct?
         3          A   No.  I'm trying to get back on SSI.
         4          Q   Okay.  And how long have you not worked?
10:35    5          A   All my life.
         6          Q   Okay.  Have you been convicted of a felony?
         7          A   A long time ago.
         8          Q   Okay.  More than ten years ago?
         9          A   2010 is when I discharged.
10:35   10          Q   Okay.  And what was the felony for?
        11          A   The first one was for forgery, and then the
        12    rest was petty theft.
        13          Q   Okay.  And what about Dee, do you know if she
        14    had any felony convictions?
10:35   15          A   I don't know.  I don't know.
        16          Q   All right.  And you said that it ended in 2011?
        17          A   '10.
        18          Q   2010.
        19              So you were on probation for a period of time?
10:36   20          A   Parole.
        21          Q   Parole.  Okay.
        22              Okay.  Now, Dee, when I talked to her yesterday
        23    during her deposition, she said Escudero had been to the
        24    house on Thursday, two days before the incident
10:36   25    occurred.  Do you recall that?
```

30

**Jilio-Ryan Court Reporters**
**ph. 714.424.9902  info@jilioryan.com**

```
    1        A    Yeah, and he got -- he got some shit -- stuff
    2    from her, and then when he came back the next day, she
    3    went into the bathroom with him, and then he came out,
    4    and then she was in there, and then he went in there,
10:36 5  and I don't know what happened after that.  I don't know
    6    what happened.
    7        Q    Okay.  And did you understand that Dee had
    8    given him the drugs that he took that morning?
    9        A    I didn't know about it until after it was all
10:37 10 over with, but there wasn't nothing I could do.
   11        Q    Okay.  I understand, but what did you learn
   12    afterwards about what had happened?
   13            (Simultaneous speakers.)
   14            THE COURT REPORTER:  I'm sorry, there was
10:37 15 overtalk.
   16            THE WITNESS:  I hated her, all that.
   17            THE COURT REPORTER:  Mr. Terrell, did you have
   18    an objection?
   19            MR. TERRELL:  Yeah, for speculation.
   20    BY MR. WAGNER:
   21        Q    All right.  So on the Thursday -- the incident
   22    occurred on a Saturday.  Do you recall that?
   23        A    Yeah.
   24        Q    Okay.  And so a day or two before, are you
10:37 25 aware of Dee providing drugs to him?
```

31

**Crummel, David**
**Vargas v. County of San Bernardino**

1       Q   Okay.  And that was the Saturday of the
2   incident, they both went into the bathroom?
3       A   Yes.
4       Q   Okay.  And at some point in time did you see
10:39 5   the residual of drug use in your bathroom --
6       A   No, I didn't.
7       Q   -- or in your house?
8       A   No, I didn't.
9       Q   Did you ever see a spoon or a needle?
10:39 10      A   No, I didn't.
11      Q   Now, I take it that to be in the step-up
12   program you would probably lose your privilege if you
13   were doing drugs.
14      A   Yep.
10:39 15      Q   Okay.  So one of the requirements is is that
16   you cannot do illegal drugs?
17      A   Yep.
18      Q   Okay.  Prior to this Saturday, had you ever
19   been aware that -- that Escudero had ever used drugs in
10:40 20   your house before?
21      A   No, I didn't.
22      Q   Okay.  That day, after the incident occurs with
23   Mr. Escudero, did you show the cops a spoon or a needle?
24      A   No, not me.  I don't like that shit.
10:40 25      Q   Okay.  Now, if the incident's on a Saturday,

33

Crummel, David
Vargas v. County of San Bernardino

```
          1        A    No, I was in bed.  Sleeping, yeah, but I got up
          2   before he got in.  I don't stay up when nobody's there.
          3        Q    Okay.
          4             (Simultaneous speakers.)
10:43     5             THE COURT REPORTER:  One at a time, please.
          6             MR. WAGNER:  Okay did you get all of his
          7   answer?
          8             THE COURT REPORTER:  The last part I have is "I
          9   don't stay up when nobody's there."
10:43    10             THE WITNESS:  I stay in my room all the time.
         11   BY MR. WAGNER:
         12        Q    Okay.  So on the Saturday morning, you'd gotten
         13   up before Escudero came to your house?
         14        A    5:00 in the morning, yes.
10:44    15        Q    Okay.  And got something to eat, went back to
         16   bed?
         17        A    Went back, laid down in my room, but I don't
         18   go -- I don't go to sleep.  I go in there, on my phone
         19   or whatever.
10:44    20        Q    Okay.  All right.  So when he comes in and sits
         21   down in the chair, do you have a conversation about
         22   anything?
         23        A    No, not really.
         24        Q    Okay.  And at what point does he go into the
10:44    25   bathroom with Dee?
```

37

1        A    I don't know what time it was.

2        Q    Okay.  Do you know how long they were in the

3    bathroom together?

4        A    Two minutes, three minutes.

10:44 5        Q    Okay.  Could you hear anything being said

6    between the two of them --

7        A    No.

8        Q    -- while they were in the bathroom?

9        A    No.

10:44 10        Q    Okay.  Did they both come out of the bathroom

11    at the same time?

12        A    No, he stayed in.  She got out.

13        Q    Okay.  And then at some point in time did he

14    leave the bathroom and come into your room again?

10:45 15        A    Yeah.  He sat down on the chair.

16        Q    Okay.  And was there a difference in his

17    physical well-being the second time he came in and sat

18    down in your chair?

19        A    Not right away.

10:45 20        Q    Okay.  Did he say anything the second time --

21        A    Yeah, he said he don't feel right, and he rolls

22    his head over one way and came back and passed out.

23        Q    Okay.  So what did you do?

24        A    I called the paramedics.

10:45 25        Q    Okay.  Is that the first thing you did?

38

Crummel, David
Vargas v. County of San Bernardino

```
      1    recording?
      2         A    Yes.
      3         Q    And could you recognize your voice on the
      4    recording?
10:49 5         A    Yes, it's me in the voice.
      6         Q    Okay.  And at the time you called in, you were
      7    trying to give them the best information that you could
      8    about what was going on at your house, right?
      9         A    Yes.
10:49 10        Q    Okay.  And at the time you called in, do you
     11    have any idea how long Mr. Escudero had been at your
     12    house?
     13         A    No, I don't exactly know how long.
     14         Q    Okay.  Do you recall what time it was when you
10:49 15   called for medical aid?
     16         A    No, I don't remember what time it was.
     17         Q    Okay.  And at the time that you're essentially
     18    hanging up on that 911 call with the dispatcher, is
     19    Mr. Escudero in the chair?
10:50 20        A    No, he's on the floor.
     21         Q    Okay.  He's on the floor.
     22              How did he get to the floor?
     23         A    We had to put him down because he's falling
     24    over.
10:50 25        Q    Okay.  So when you say "we," who was the "we"?
```

40

**Jilio-Ryan Court Reporters**
**ph. 714.424.9902  info@jilioryan.com**

Crummel, David
Vargas v. County of San Bernardino

1    A    Dee.

2    Q    Okay.  Dee put him on the floor?

3    A    Helped me put him on the floor, yeah.

4    Q    Okay.  Now, on the phone call, there was -- or

10:50 5    the dispatch call that you had, I thought there was a

6    reference that said you were asked if there was anybody

7    else in the house that's calling 911, do you know?

8    A    Yeah, my girlfriend.  And it wasn't -- it

9    wasn't the one you guys trying to say it was, Harley.

10:50 10    It was another girl.

11    Q    Okay.  Who was there?  We're just trying to

12    find out who was there.

13    A    At that time my girlfriend, that was -- I can't

14    remember her name because it was so long ago, and I go

10:51 15    through girls like I go through fucking socks.

16    Q    Okay.  All right.  So --

17    A    She wasn't there after -- after we got him on

18    the floor whatever, whatever happened, she was gone when

19    I came up out of my room.  But when I came out of my

10:51 20    room, the cops wouldn't let me go past the kitchen.

21    Q    Okay.  Do you know if she said she was leaving?

22    A    No, she didn't say nothing to me.

23    Q    Okay.  And do you know if she had warrants or

24    anything like that?

10:51 25    A    No, I don't remember if she had warrants or

41

**Crummel, David**
**Vargas v. County of San Bernardino**

```
 1   laying there and run out to the front room and shit.
 2   Stay right there with him.
 3        Q    That's what I'm asking.  Do you recall anything
 4   being said by anyone during this four or five minutes?
10:55   5        A    No, nobody was back there when I was back
 6   there.
 7        Q    Did you hear anything being said in the living
 8   room?
 9        A    No, I don't.
10:56  10        Q    Now, at some point in time did you and Dee try
11   to make arrangements to wake him up?
12        A    I tried to figure out what to do, try to get
13   him to wake up, but I don't have nothing to do, make him
14   wake up and stuff.  Ice wasn't doing nothing.
10:56  15        Q    Okay.  So somebody decided to do something with
16   some ice.
17        A    Right.
18        Q    Who was that?
19        A    Dee did.
10:56  20        Q    Okay.  And what did -- what did Dee suggest or
21   what did she do?
22        A    She said, "Why don't you get some ice, put it
23   down his pants.  It will wake him up."
24        Q    And did you do that?
10:56  25        A    We tried everything -- I tried everything.
```

44

1    Nothing was doing nothing.

2         Q    Okay.  But you did that yourself, you put ice

3    on his --

4         A    Yes.

10:56  5         Q    And it didn't work?

6         A    No.

7         Q    Okay.  What other types of things were you

8    doing to try to wake him up?

9         A    I do nothing else.  Right after I did the ice,

10:56  10    the cops showed up.

11         Q    Okay.  Do you recall anyone slapping him in the

12    face?

13         A    No.  Probably the cops, but none of us.

14         Q    Okay.  Do you recall ever making a statement

10:57  15    later that day that Dee was striking him in the face

16    trying to see if that would revive him?

17         A    No.

18         Q    Okay.  So when you were there, neither

19    yourself, the other female, or Dee engaged in any

10:57  20    physical --

21         A    No.

22         Q    -- force?  Okay.

23              All right.  When the emergency personnel

24    arrived, do you know what agency came first?

10:57  25         A    The cops.

45

```
     1        Q    Okay.

     2        A    Because it seemed like for hours, but it wasn't

     3   hours.  We was there for hours before I got to go back

     4   in my house.

11:06 5        Q    Okay.  All right.  Now, what I'm going to do is

     6   we're going to play Exhibit 7 from yesterday, and that's

     7   the recording that took place.

     8            (Defendants' Exhibit 7 was previously

     9            marked for identification and was retained

    10            by counsel.)

    11   BY MR. WAGNER:

    12        Q    And what we'll do is we will start it at the

    13   beginning because you're on the tape originally, and

    14   then it looks like the female deputy speaks with Dorothy

11:07 15   Hernandez, and then she later speaks to you.  Do you

    16   recall that?

    17        A    When she talked to me, there was two of them

    18   outside.  They -- one was with her, and one was with me,

    19   a guy and a girl.  One was with me, and one was with her

11:07 20   talking out back.

    21        Q    Okay.  All right.  Let's go to Exhibit 7, and

    22   we're going to start it at 10 minutes into the tape.

    23            (Audio recording played in the deposition

    24            proceeding.)

11:15 25   BY MR. WAGNER:
```

54

1          Q    Okay.  Mr. Crummel, were you able to hear that

2     recording?

3          A    Yes.

4          Q    And -- and when you listened to the recording,

11:15  5     could you tell that was you speaking on the recording?

6          A    Yes.

7          Q    And were you trying to be as accurate as you

8     could in providing responses to the deputy?

9          A    Yes.

11:15 10         Q    Would you agree that your recollection of

11     events was better at the time you spoke to the deputy

12     than perhaps --

13         A    No.

14         Q    You have to wait for me to finish my question,

11:15 15     sir.

16              Do you believe that your memory is better at

17     the time you spoke to the deputy versus now, two years

18     later?

19         A    No.

11:16 20         Q    Okay.  You would agree that some of the things

21     you said today are inconsistent with what you told

22     deputies; is that correct?

23         A    Yes.

24         Q    And were you untruthful then speaking to the

11:16 25     deputies?

| | | |
|---|---|---|
| | 1 | A    I don't know.  I don't know.  I was all |
| | 2 | frustrated. |
| | 3 | Q    Why were you frustrated that day? |
| | 4 | A    Because it happened in my house.  All this |
| 11:16 | 5 | stuff went down in my house.  And anybody would be all |
| | 6 | frustrated or whatever they call this stuff -- |
| | 7 | Q    Okay. |
| | 8 | A    -- be all -- |
| | 9 | Q    Are you saying the frustration -- |
| 11:16 | 10 | A    I was out of my house for hours. |
| | 11 | Q    Okay.  Are you saying the frustration of having |
| | 12 | this at your house interfered with your ability to tell |
| | 13 | the truth to the deputy sheriffs? |
| | 14 | (Simultaneous speakers.) |
| 11:17 | 15 | THE WITNESS:  I wasn't lying about nothing. |
| | 16 | THE COURT REPORTER:  Can you repeat your |
| | 17 | answer, please. |
| | 18 | THE WITNESS:  I wasn't lying about nothing. |
| | 19 | BY MR. WAGNER: |
| 11:17 | 20 | Q    All right.  So when you told the police he was |
| | 21 | rampaging, you're referring to Mr. Escudero, correct? |
| | 22 | A    Yeah, when they shot that stuff up his nose, |
| | 23 | anybody would get up and start rampaging, throwing their |
| | 24 | arms and stuff.  That's when everything went down, blood |
| 11:17 | 25 | flying everywhere in my house and everything else.  My |

56

1      whole front room was blood.

2          Q    The rampaging, is that something you saw or you

3      heard?

4          A    I seen -- seen parts of it and everything else,

11:17  5      then all that blood all over my house, my front room.

6          Q    And what parts of the rampaging did you see?

7               (Technical interference.)

8               THE COURT REPORTER:  He's breaking up.  He's

9      breaking up.

11:17 10               THE WITNESS:  Right before the cops pulled me

11      outside.

12      BY MR. WAGNER:

13          Q    Mr. Crummel, hold on a second.  For whatever

14      reason, the Zoom distorted your voice and we couldn't

11:18 15      understand what you were saying.

16               Do you want to take a short break for five

17      minutes?

18          A    I don't care because it's pissing me off.  You

19      guys keep on asking me the same questions.  I tried

11:18 20      telling you guys -- I know, but I'm getting frustrated.

21               MS. ROSS:  I know.

22      BY MR. WAGNER:

23          Q    Do you want to take a short break?

24          A    Yeah.

11:18 25          Q    Let's take a five- or ten-minute break.

Crummel, David
Vargas v. County of San Bernardino

```
        1         A    Okay.

        2              MR. TERRELL:  Can we make it ten minutes?

        3              MR. WAGNER:  Ten minutes.  Okay.  Ten-minute

        4    break.

11:18   5              THE VIDEOGRAPHER:  Video deposition off the

        6    record at 11:18 a.m.

        7              (Recess taken from 11:18 a.m. to 11:28 a.m.)

        8              THE VIDEOGRAPHER:  Video deposition returning

        9    to the record at 11:28 a.m.

11:28  10              MR. WAGNER:  Okay.  I think I had a question

       11    pending that we'll read back right now.

       12              (The record was read.)

       13              THE WITNESS:  When he got hit in the head.

       14    BY MR. WAGNER:

11:28  15         Q    Okay.  When you use the term "rampaging," you

       16    refer to "him," meaning Mr. Escudero, correct?

       17         A    Yes, when he woke up.

       18         Q    Okay.  And what was he doing?

       19         A    I don't know exactly what he was doing.  All I

11:29  20    know, he sat up and started throwing his arms and stuff,

       21    trying to keep everybody away from him.

       22         Q    Okay.  All right.  And what I would like to do

       23    is, if I can, I want to show you some photographs that

       24    we used for Dee's deposition yesterday, and just shoot

11:29  25    through these.  Let's pull up Exhibit 3.
```

58

Crummel, David
Vargas v. County of San Bernardino

1        A    No, I don't.  No, I don't.

2        Q    Okay.  Now, on the day of this incident, did

3   you know his last name?

4        A    No, I didn't.

11:43  5        Q    When did you learn Escudero's last name?

6        A    When his dad came over to talk to me.

7        Q    All right.  And his dad came over when?

8        A    The next day.

9        Q    All right.  And that's the day before Cecilia

11:43  10  and Ariana came over?

11        A    No, I think they came over after that.

12        Q    Okay.  So Vargas came over first, and then the

13  other two came later?

14        A    Yes.

11:44  15        Q    Okay.  Now, did you actually see someone give

16  him Narcan through his nose?

17        A    All I know is the paramedics said it, and I

18  seen something go, and that's all I seen.

19        Q    Now, if we go back to Exhibit -- let's go to

11:44  20  Exhibit 4.

21            (Defendants' Exhibit 4 was previously

22        marked for identification and is attached

23        hereto.)

24  BY MR. WAGNER:

11:44  25        Q    I don't think I showed you that one.  Okay.

69

Crummel, David
Vargas v. County of San Bernardino

1    Q    And did the investigator just come that one
2  time?
3    A    As far as I know, yeah.
4    Q    Okay.  And on that one occasion, that's when
11:48  5  the investigator took the sheet?
6    A    Yep.
7    Q    And as you sit here today, you don't recall
8  whether the investigator took anything else?
9    A    No, I don't recall it.
11:48  10    Q    Do you know if the investigator took
11  photographs of the house?
12    A    Yes, she -- I know she took photographs, but I
13  don't -- I don't know what else.  After all that
14  happened, when all that happened, I stayed away from my
11:48  15  house.
16    Q    Okay.  Other than you giving an interview, are
17  you aware of anyone else that was giving an interview to
18  the investigator?
19    A    Yeah, it was Dee.
11:49  20    Q    Okay.  Was Dee there at the time you gave your
21  interview?
22    A    Yes, she was.
23    Q    Okay.  So who was interviewed first, you or
24  Dee?
11:49  25    A    Both of us.  I don't recall it.

73

```
         1        Q    Okay.
         2        A    I'm just -- I left.  I wasn't staying there for
         3    a while.
         4        Q    Okay.  Where did you go live?
11:49    5        A    I went on the streets.  I didn't want to stay
         6    at that house after my homeboy got killed in it.
         7        Q    Okay.  So how long did you live on the streets
         8    before coming back to the house?
         9        A    Like a week.
11:49   10        Q    Okay.  And when you left the house to live on
        11    the streets for a week, was anyone staying at your
        12    house?
        13        A    Dee was.
        14        Q    Okay.  All right.  Now, at some point in time
11:50   15    that day when Escudero was in the living room, did Dee
        16    come into your bedroom and ask you to go out and speak
        17    to Ruben to try and calm him down?
        18        A    Yeah, but the cops wouldn't let us go in the
        19    front room.
11:50   20        Q    Okay.  And how was it that you tried to get
        21    into the front room?
        22        A    I yelled it to them.
        23        Q    What did you yell at them?
        24        A    Yelled to Ruben to calm down, he will be all
11:50   25    right, but he wouldn't listen.
```

                                                                    74

Crummel, David
Vargas v. County of San Bernardino

| | | |
|---|---|---|
| 1 | Q | All right.  You were yelling to Mr. Escudero to |
| 2 | calm down? | |
| 3 | A | Yeah. |
| 4 | Q | Okay.  And it wasn't calming him down, was it? |
| 11:50 5 | A | No. |
| 6 | Q | In fact, Dee was mad at you because you weren't |
| 7 | doing enough; is that right? | |
| 8 | A | Yep. |
| 9 | Q | And did you hear the deputies telling Ruben |
| 11:50 10 | Escudero anything? | |
| 11 | A | No.  I don't recall it. |
| 12 | Q | Well, on the recording it says you recall that |
| 13 | the deputies were telling him to calm down.  Does that | |
| 14 | refresh your memory? | |
| 11:51 15 | A | I was telling him to calm down, but he ain't |
| 16 | listening.  Nobody will listen when they coming out of | |
| 17 | that stuff. | |
| 18 | Q | Okay.  Now, in the statement that you gave, you |
| 19 | go:  "I tried to get him to stop.  He wouldn't listen, | |
| 11:51 20 | and I walked back towards my room again." | |
| 21 | | And then they go, "Well, what happened, you |
| 22 | know, next before you walked back into your room?"  And | |
| 23 | you said something about you saw him handcuffing him. | |
| 24 | A | Yeah, they was trying to handcuff him, but he |
| 11:51 25 | wasn't going to let him do that either. | |

75

**Crummel, David**
**Vargas v. County of San Bernardino**

```
        1        Q    Okay.  Did you see the handcuffs placed on him?
        2        A    I see the handcuffs -- I hear the click click,
        3   and he wouldn't let it go and fell on the floor.
        4        Q    Okay.
11:52   5        A    He hit the floor.
        6        Q    Are you hearing this, or are you seeing this?
        7        A    I heard him hit the floor, yes.
        8        Q    Okay.  You heard him hit the floor or the
        9   handcuffs hit the floor?
11:52  10        A    The handcuffs hit the floor first, and then he
       11   hit the floor.  That's when I seen his head hit the
       12   ground.
       13        Q    Okay.  Do you know how he went to the floor?
       14        A    No, I don't.
11:52  15        Q    Okay.  Did you actually see anyone strike --
       16        A    I seen the one officer sitting right there by
       17   his head hit him in the back of the head, and then the
       18   lady had the TASER in her ear -- by his ear.
       19        Q    Okay.  So who's the deputy that you saw --
11:52  20             (Simultaneous speakers.)
       21             THE COURT REPORTER:  One at a time.
       22   BY MR. WAGNER:
       23        Q    Mr. Crummel, just wait.  It's very simple.  I
       24   just ask the question, and then if you understand it,
11:52  25   give me an answer as best you can.
```

                                                                         76

1          Can you describe the deputy who you saw struck

2     Mr. Escudero?

3          A   He's an older white guy.  That's all I know.

4          Q   Okay.  An older white guy.  And then you said

11:53 5    another deputy had a TASER next to his ear?

6          A   A female, blonde female.

7          Q   Okay.  All right.  And did you hear either the

8     deputy, the old white guy, or the female deputy say

9     anything to him?

11:53 10        A   I don't remember what they said.

11        Q   Okay.

12        A   Somebody said something to him.  I don't know

13    who it was, what deputy or what lady, what guy, what

14    girl, whatever.  I don't know who said it.

11:53 15        Q   When you saw the old white deputy hit him in

16    the back of the head, did he use a hand?  Did he use an

17    object?

18        A   No.

19             (Technical interference.)

11:53 20        THE COURT REPORTER:  I didn't hear that.

21        THE WITNESS:  His fist, his fist.

22    BY MR. WAGNER:

23        Q   Okay.  His fist.

24             Okay.  And since the curtain was down, you were

11:53 25    able to see that through a sliver of a portion?

77

**Crummel, David**
**Vargas v. County of San Bernardino**

```
        1          A   The curtain was over this way.  It was pushed
        2    over a little bit.
        3          Q   Pushed which way looking at the --
        4          A   Towards the window, towards the window.
11:54   5          Q   Well, in looking at the photograph, Exhibit 4
        6    that's on the screen, is it --
        7          A   Right.
        8          Q   Is it to the right, or is it to the left?
        9          A   To the right, toward the window, not towards
11:54  10    the picture, towards the other side.
       11          Q   Okay.  So you were able to see that from your
       12    room?
       13          A   I wasn't in my room at that time.  I was right
       14    there in front of the refrigerator.
11:54  15          Q   Okay.  Originally when this started, weren't
       16    you in your room?
       17          A   I was in my room.  I was in my room when it all
       18    started, and I came out to the kitchen.
       19          Q   Okay.  And then while you were in the kitchen,
11:54  20    is that when you voiced some comments about telling
       21    Ruben to calm down?
       22          A   That's when I told him to calm down; it will be
       23    all right, and he didn't listen.
       24          Q   And at some point in time did you go back to
11:54  25    your bedroom?
```

78

Crummel, David
Vargas v. County of San Bernardino

```
 1          A    Yes, I did, and then I came back out.
 2          Q    So the second time you came back out, is that
 3     when you saw --
 4          A    That's when I saw the TASER.
11:55 5     Q    Is that when you saw the fist and the TASER
 6     then?
 7          A    Yes.
 8          Q    Okay.  Did you ever see any deputy sheriff on
 9     his person, meaning on his body?
11:55 10    A    No, I didn't.
11          Q    Okay.  Did you actually see him handcuffed at
12     the end of that process?
13          A    No, I didn't see him handcuffed at all.
14          Q    Did you see them remove him from the house?
11:55 15    A    No, I didn't see that either.
16          Q    Okay.  And when he was --
17          A    I didn't see --
18               (Technical interference.)
19               THE COURT REPORTER:  I didn't hear that.
11:55 20         THE WITNESS:  When the deputies had me in the
21     backyard, how could I see through the walls?
22     BY MR. WAGNER:
23          Q    Okay.  So at the time you were giving your
24     statement, he was being removed from the front of the
11:56 25   house?
```

79

1        A    Yes, before he went to work.

2        Q    Do you know what Steve does for a living?

3        A    He sells cars.

4        Q    He sells cars?

12:00 5   A    Yep.

6        Q    Do you know what car dealership?

7        A    No.

8        Q    All right.  And I think it's Steve Varela.  Is

9   that it?

12:00 10  A    Something like that.

11       Q    I'm just going through my notes.  I'm just

12   about done.

13            If you had to describe Ruben Escudero, his

14   height and weight on that Saturday morning, what would

12:00 15  you give us?

16       A    Six foot, probably 250.

17       Q    Okay.  250, that's a big boy to put on the

18   ground.

19       A    Yes, it is for one person.

12:00 20  Q    When you were able to see in the living room, I

21   think you were able to see in there on two occasions,

22   can you describe where anyone was standing in

23   relationship to the vantage point that you had?

24       A    The old man was right there by the -- going

12:01 25  into the kitchen area.  I could see that.  And then the

83

1    rest of them, I don't know.  The lady came out from
2    nowhere.  I don't know where she came from.
3          Q    Okay.
4          A    That was the first.
12:01 5          Q    That was the first time, and then the second
6    time --
7          A    The lady and the guy, that's it.
8          Q    Okay.  And they were next to Escudero near the
9    couch?
12:01 10         A    Yes.
11         Q    Okay.  And at the time you saw them, was he
12   laying down on the ground?
13         A    He was on the ground.  He was on the ground,
14   not moving.
12:01 15         Q    Okay.  All right.  So at the time you saw the
16   fist, was the deputy standing and then --
17         A    He was kneeling down.
18         Q    Okay.  So the deputy that hit him with the
19   fist, the old white guy, was that guy on his knees when
12:02 20   he hit him in the head?
21         A    Yes, he was.
22         Q    Okay.  And then the lady deputy who had the
23   TASER next to his ear, was she standing, or was she also
24   kneeling?
12:02 25         A    No, she was standing over him.

84

1    Q    Okay.  And do you know if she activated the

2    TASER?

3    A    No, I don't.

4    Q    How many people, if you had to estimate, based

12:02 5    upon what you were able to see that day, were in the

6    living room?

7    A    Only seen the two.

8    Q    Okay.  Do you believe there were more than two

9    people in the living room?

12:02 10    A    I think there was.

11    Q    Okay.  So at the time the female deputy has the

12    TASER, she is standing and holding it next to his ear?

13    A    On the right side.

14    Q    Okay.  And he's on the ground at that point?

12:03 15    A    Yep.

16    Q    Okay.

17    A    Not moving.

18    Q    If Dee said that you had the spoon and the

19    needle and you were showing it to the police that day,

12:03 20    would she be accurate?

21    A    No, because I don't fuck -- I don't mess with

22    that stuff.  I don't know nothing about that stuff.

23    She's the only one that knows about that stuff.

24    Q    Okay.  So on that day, you never saw a needle

12:03 25    or a spoon?

85

```
 1          A    I don't remember calling that.  I don't
 2    remember.  That's a long time ago.  I don't remember
 3    half of this stuff.
 4          Q    Okay.
12:05  5    A    I don't remember.
 6               I'm starting to get a headache.
 7          Q    Do you recall making arrangements with the
 8    sheriff's department to speak with them the day after,
 9    October 22nd, on the 23rd of October, where you were
12:05 10    going to go down to the station?
11          A    No, I don't recall that either.
12          Q    Okay.  All right.  Other than seeing Ruben
13    swinging his arms, can you describe any other movements
14    that he had?
12:05 15    A    No.
16          Q    Could you see if he was kicking?
17          A    No.
18          Q    Do you recall ever hearing anything discussed
19    in that living room about him kicking?
12:06 20    A    No.
21          Q    All right.
22          A    All I recall is the lawyer -- the private
23    investigator told me straight out, "If anybody wants to
24    talk to you, they have to go through the lawyer."
12:06 25    Q    Okay.  Well, did the private investigator give
```

87

Crummel, David
Vargas v. County of San Bernardino

1    you any information at the start of your interview?

2         A    She gave me -- she gave me a card for the

3    lawyer, but I don't know what happened to it.  My wallet

4    got ripped off.

12:06  5        Q    Okay.  But, I mean, the investigator told you

6    why she was there, correct?

7         A    Yeah, for my homeboy.

8         Q    Okay.  And did she tell you that -- that they

9    were going to sue the sheriff's department?

12:06 10       A    No, she didn't tell me that.

11        Q    Okay.  And why is it that the sheet was taken,

12    if you know?

13        A    There was blood all over it.

14        Q    There was blood all over it?

12:06 15       A    Yep.

16        Q    Okay.  Do you know if the sheet was used to

17    clean up any blood on the floor?

18        A    I don't know.

19        Q    Okay.  Now, within a few hours of this

12:07 20   incident, Dee was cleaning the place up, wasn't she?

21        A    After -- afterwards, yes.

22        Q    I mean, the same day, correct?

23        A    The same day, yes.

24        Q    Okay.  And -- and you were packing up that day

12:07 25   because you had to move out because of a floor problem?

88

Crummel, David
Vargas v. County of San Bernardino

1    I think I'm done, and then I will pass you as a witness

2    to Mr. Terrell, and he'll be able to ask you a few

3    questions, and then pretty much we'll be done with this.

4         A    All right.

12:08  5          MR. WAGNER:  So let's just go off the record

6    for a couple of minutes.

7          THE VIDEOGRAPHER:  Video deposition off the

8    record at 12:08 p.m.

9          (Recess taken from 12:08 p.m. to 12:14 p.m.)

12:14 10         THE VIDEOGRAPHER:  Video deposition returning

11   to the record at 12:15 p.m.

12   BY MR. WAGNER:

13         Q    Okay.  Now, the investigator that came over who

14   said she was working for a lawyer, she told you that you

12:15 15   shouldn't talk to anybody but go through the attorney?

16         A    Yes.

17         Q    Okay.  And then how is it that you learned the

18   FBI wanted to speak with you?

19         A    They was looking for me.

12:15 20         Q    How did you learn they were looking for you?

21         A    They came to my front door.

22         Q    Okay.  And were those the female deputies?

23         A    Yes, it was.

24         Q    Or female agents?

12:15 25         A    Yes, it was.

90

Crummel, David
**Vargas v. County of San Bernardino**

```
        1              (Simultaneous speakers.)

        2              THE COURT REPORTER:  What?  I didn't get it.

        3              THE WITNESS:  Way after.

        4    BY MR. WAGNER:

12:16   5         Q   Okay.  All right.  So before the incident with

        6    Escudero, you had never been to the residence of Ruben

        7    Vargas?

        8         A   No, I haven't.

        9         Q   Okay.  And the last time that you would have

12:16  10    talked to Dee would have been within a few weeks or so

       11    of this incident?

       12         A   Yep.

       13         Q   Okay.  Is there some reason as to why you don't

       14    speak with her?

12:17  15         A   No.  I don't know where the hell she's at.

       16         Q   Okay.  All right.  The separation between the

       17    two isn't related to this incident?

       18         A   Then she's trying to blame me -- she's trying

       19    to blame for everything.  I'm not the one who gave him

12:17  20    drugs.  She was.

       21         Q   Okay.  So you're saying that she was blaming

       22    you for what happened?

       23         A   Yes.

       24         Q   And you resented that?

12:17  25         A   What's that mean?
```

92

Crummel, David
Vargas v. County of San Bernardino

1        Q    At some point you saw deputies come back and
2    look underneath that couch?
3        A    Yes.  We said, "The TASER is under the couch a
4    little bit right there."  They came in and grabbed it
12:21  5    and left.
6        Q    Okay.  And when you came in and you saw the
7    older white gentleman with a fist and striking the head
8    of the decedent right there, where -- where on that
9    couch was his head, if you can recall?
12:21 10        A    Towards the kitchen.
11        Q    Okay.  On the photograph?
12        A    Toward the feet, toward the picture -- see
13    where the pillow is?  The other side of the pillow.
14        Q    Okay.  On the other side of that pillow at the
12:21 15    far end, right?
16        A    Yeah.
17        Q    But he was on the ground, correct?
18        A    Yep.
19        Q    Okay.  Now, I'm not going to show any other
12:21 20    photographs, but do you think it would be fair to say
21    that there was blood splatter in other areas of the
22    house?
23        A    Yeah, the heater, the plug-ins, the table, the
24    couch, the chair, the walls, the curtain, everything.
12:22 25        Q    Okay.

96

Crummel, David
Vargas v. County of San Bernardino

```
     1        A    They splattered it everywhere.
     2        Q    All right.  And my final question to you here
         is that you don't recall ever hearing --
     4        A    No.
12:22 5        Q    -- Escudero crying for help at all?
     6        A    No, I didn't hear nothing.
     7        Q    Did you hear smacking or striking?
     8        A    I heard striking.  That's it.  I didn't hear
         nothing, no moaning, no grunting, none of that.
12:22 10        Q    Okay.  And how many strikes do you think you
    11   heard?
    12        A    Four or five --
    13        Q    Okay.
    14        A    -- before he went down.
12:22 15        Q    Okay.  When you say "down" --
    16        A    When he went down to the ground and stopped
    17   moving.
    18        Q    Was he sitting up or on his feet?
    19        A    I don't know what he was -- I couldn't see past
12:23 20   the door.
    21        Q    Okay.
    22        A    I seen when he was laying down or when he was
    23   starting to get up.  That's all I seen.
    24        Q    Okay.  The officer -- the female officer had
12:23 25   the TASER by his ear, he was on the ground, correct?
```

97

Crummel, David
Vargas v. County of San Bernardino

1       Q   Do you remember on your tape recorded statement
2   that you had said was the last thing you saw was them
3   trying to handcuff him?
4       A   Trying to handcuff him.  I heard him try to
12:24  5   handcuff him.  I didn't say I seen it.
6       Q   Okay.  Well, I'm trying to figure out what you
7   see and what you hear because it's changing a little
8   bit.
9       A   Look how long ago it was.  I'm losing my mind
12:24 10   and everything over all this.
11       Q   Okay.
12       A   I'm afraid to go out my house now.
13       Q   Why are you afraid to go out of your house?
14       A   The cops will come get me and beat me up.  I
12:24 15   stay in my house.
16       Q   Why do you think the cops want to come by and
17   beat you up?
18       A   Because I testified against them.
19       Q   Okay.  Well, earlier you said that you saw an
12:24 20   old white deputy hit him in the back of the head with
21   his fist, and you saw --
22           (Simultaneous speakers.)
23           THE COURT REPORTER:  One at a time.
24   BY MR. WAGNER:
12:25 25       Q   Okay.  You said that, correct?

99

1         A    Yes, when he was down.

2         Q    Okay.  And are you saying that when he was down

3    you saw the same deputy hit him more than that one time?

4         A    No, I only seen him that one time.

12:25 5   Q    Okay.  And then the female deputy who was

6    standing with the TASER pointed at his head?

7         A    The only time I seen him with the TASER.

8         Q    Okay.  And is that all the physical force that

9    you saw applied to him?

12:25 10       A    Yes.

11        Q    Okay.  So anything else, like when you said you

12   thought there were other strikes that were done, that's

13   something that you think you heard?

14        A    I heard.  That's all I heard.

12:25 15       Q    Okay, okay.  And as best you recall it, do you

16   have any idea how many deputy sheriffs showed up and

17   were in the house --

18        A    No.

19        Q    -- in the living room at the time of the events

12:26 20   occurring with Mr. Escudero?

21        A    I don't know.  I don't know.

22        Q    Okay.  Do you know how many people from the

23   fire department were there?

24        A    I don't know.

12:26 25       Q    Do you know how many people from the ambulance

100

1    were there?

2         A    No.

3              MR. TERRELL:  It exceeds the scope.  Go ahead.

4    BY MR. WAGNER:

12:26  5         Q    Okay.  All right.  The photograph that you were

6    shown, Exhibit 16, that shows blood, and it shows blood

7    smeared on the floor; is that correct?

8         A    Yes.

9         Q    And the smearing of the blood would be based

12:26 10    upon body movements in the blood, pushing it around,

11    correct?

12         A    Yep.

13              MR. WAGNER:  All right.  No further questions.

14              MR. TERRELL:  Can I just ask one more?

12:26 15              MR. WAGNER:  Sure, ask away.

16

17                        EXAMINATION

18    BY MR. TERRELL:

19         Q    Okay.  Just one more question, and that is just

12:26 20    now Mr. Wagner asked you some questions about being

21    fearful.  When you testified -- when you were

22    interviewed by the FBI, were you afraid of the FBI?

23         A    Yeah.  That's why I had somebody else with me.

24         Q    Okay.  Were you truthful to the FBI?

12:27 25         A    Yes.

101

Crummel, David
Vargas v. County of San Bernardino

```
 1          I, the undersigned, a Certified Shorthand

 2   Reporter of the State of California, do hereby certify:

 3          That the foregoing proceedings were taken

 4   before me at the time and place herein set forth; that

 5   any witnesses in the foregoing proceedings, prior to

 6   testifying, were duly sworn; that a record of the

 7   proceedings was made by me using machine shorthand,

 8   which was thereafter transcribed under my direction;

 9   that the foregoing transcript is a true record of the

10   testimony given.

11          Further, that if the foregoing pertains to the

12   original transcript of a deposition in a federal case,

13   before completion of the proceedings, review of the

14   transcript [X] was [ ] was not requested.

15          I further certify I am neither financially

16   interested in the action nor a relative or employee of

17   any attorney or party to this action.

18

19          IN WITNESS WHEREOF, I have this date subscribed

20   my name.

21

22   Dated:   December 6, 2021

23          _____

24          CAROL JEAN ZURBORG, CCRR, RMR
            CSR No. 7921

25
```

107

EXHIBIT "23"

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CECILIA VARGAS; ARIANA SALAS, INDIVIDUALLY AND AS A SUCCESSOR-IN-INTEREST TO RUBEN ESCUDERO, DECEASED, | ) ) ) ) |
| PLAINTIFFS, | ) CASE NO. ) 5:20-CV-02646-JGB-KK ) |
| VS. | ) ) |
| COUNTY OF SAN BERNARDINO; H. MIRANDA; S. CARTER; Z. VOGEL, J. MATA; Z. PRITCHETT; J. JIMENEZ; A. MATA; T. KAUTZ; J. ATTLESEY; RODRIGUEZ (FIRST INITIAL UNKNOWN) AND DOES 1-10, INCLUSIVE, | ) ) ) ) ) ) ) ) |
| DEFENDANTS. | ) ) |
| _____ | ) |

DEPOSITION OF:

DOROTHY HERNANDEZ

NOVEMBER 16, 2021, 9:59 A.M.

Jilio-Ryan Court Reporters
ph. 714.424.9902  info@jilioryan.com

```
1    APPEARANCES OF COUNSEL:

2         FOR THE PLAINTIFFS:

3              LAW OFFICES OF JAMES S. TERRELL

4              By:  Jim Terrell,

5                   Attorney-at-Law

6              15411 Anacapa Road

7              Victorville, California  92392

8              (760)561-2699

9              jim@talktoterrell.com

10

11        FOR THE PLAINTIFFS:

12             LAW OFFICES OF DALE K. GALIPO

13             By:  Renee V. Masongsong,

14                  Attorney-at-Law

15             21800 Burbank Boulevard

16             Suite 310

17             Woodland Hills, California  91367

18             (818)347-3333

19             rvalentine@galipolaw.com

20

21

22

23

24

25
```

1    FOR THE PLAINTIFFS:

2         LAW OFFICE OF SHARON J. BRUNNER

3         By:  Sharon J. Brunner,

4              Attorney-at-Law

5         14393 Park Avenue

6         Suite 101

7         Victorville, California  92392

8         (760)243-9997

9         sharonjbrunner@yahoo.com

10        (Not Present)

11

12   FOR THE DEFENDANTS:

13        WAGNER ZEMMING CHRISTENSEN, LLP

14        By:  Dennis Wagner, Esq.

15        1325 Spruce Street

16        Suite 200

17        Riverside, California  92507

18        (951)686-4800

19        dew@wzclawfirm.com

20

21   ALSO PRESENT:

22        Cecilia Vargas

23        Ariana Salas

24        Austin Terrell

25        Autumn Garrison

|   |   |
|---|---|
| 1 | Tuesday, November 16, 2021, 9:59 a.m. |
| 2 | Via Zoom Video Conferencing |
| 3 | |
| 4 | (Whereupon, an off-the-record discussion was |
| 5 | had in which counsel stipulated to waive the reading of |
| 6 | Rule 30(b)(4) into the record by the court reporter.) |
| 7 | |
| 8 | DOROTHY HERNANDEZ, |
| 9 | having been first duly sworn, |
| 10 | was examined and testified as follows: |
| 11 | |
| 12 | EXAMINATION |
| 13 | BY MR. WAGNER: |
| 14 | Q.    Okay.  Since we're doing this via video -- or |
| 09:59:32 15 | not video -- via Zoom and we are in different locations, |
| 16 | I'll identify myself.  My name is Dennis Wagner.  I |
| 17 | represent some members of the sheriff's department and |
| 18 | the County of San Bernardino in a federal lawsuit that's |
| 19 | been brought by the heirs of Mr. Escudero. |
| 09:59:57 20 | Do you understand that? |
| 21 | A.    Yes, I do. |
| 22 | MR. WAGNER:  Okay.  And then what we should do |
| 23 | is have everybody in the room identify themselves. |
| 24 | Jim, do you want to just go through that? |
| 10:00:11 25 | MR. TERRELL:  Certainly. |

7

1    A.    Yes.

2    Q.    All right.  Maybe what we'll do at a break --

3    you know, the deposition will probably be done in a

4    couple of hours or so, but we'll take a break from time

10:09:18   5    to time to give our court reporter a rest, and maybe

6    during a break you can just see if you have that number,

7    and we can get it later.

8         Fair enough?

9    A.    Okay.

10:09:28  10    Q.    Okay.  All right.  So the day of this incident

11    was October 19th, 2019?

12    A.    That's correct.

13    Q.    And do you know what day of the week it was?

14    A.    Saturday.

10:09:43  15    Q.    A Saturday.

16         Okay.  And the day before on Friday, had you

17    seen David Crummel or Ruben Hernandez or anyone who was

18    at the house the next day?

19    A.    Ruben Hernandez?

10:10:00  20         MR. TERRELL:  Object to the --

21         MR. WAGNER:  Oh, yeah.  Ruben Hernandez.

22    Sorry.  Wrong name.

23    Q.    Ruben Escudero.  Let me start over.  See, that

24    would be one of those crummy questions that I said that

10:10:12  25    could be asked.

16

1      A.      Regarding that day?

2      Q.      Yes.    Saturday.

3      A.      Yes.

4      Q.      Okay.   And what is it?   What happened that

10:39:32  5  brought to your attention that he was having a health

6   problem?

7      A.      David brought it to my attention.   He asked for

8   my help.

9      Q.      Okay.   What did David tell you?

10:39:41  10   A.      He didn't know what was wrong with Ruben, but

11   he needed my help.

12      Q.      Okay.   And so when he asked you, does he come

13   out of the living room and ask you --

14      A.      Yes.

10:39:49  15   Q.      -- or just yell it from --

16      A.      He's yelling it to me --

17      Q.      Okay.

18      A.      -- to get me up -- to make sure I'm getting up,

19   and I got right up.

10:40:00  20   Q.      Where do you go?   Do you go back to

21   Mr. Crummel's bedroom?

22      A.      It's the hallway between the bedroom and the

23   bathroom.

24      Q.      And what's going on in the hallway between the

10:40:13  25   bedroom and the bathroom?

42

Hernandez, Dorothy
**Vargas v. County of San Bernardino**

1    A.    Well, I see Ruben.  Harley gets up at that

2  point as well.  She's right behind me.  I seen Ruben in

3  distress.

4    Q.    Okay.  What do you see in terms of distress?

10:40:29  5    A.    Some of these things are hard to say because

6  his family is here, but I could tell you it looked like

7  he was overdosing.

8    Q.    Okay.  And was he on the floor?

9    A.    David had put him partially in a chair in his

10:40:55  10  room, pulled it close to the hallway, and so when I got

11  up to Ruben, I tried opening his eyes, and we could

12  see -- I could see that there was definitely something

13  wrong.

14    Q.    Okay.  And what did you observe about his eyes

10:41:10  15  when you opened them?

16    A.    They rolled back a little.

17    Q.    All right.  His eyes were rolled back in his

18  head?

19    A.    Right.  But he was making these sounds too like

10:41:22  20  he was trying to fight it, like, come back.  Then

21  David -- David was right there as well.

22    Q.    Okay.

23    A.    You know, it's a scary thing to see.

24    Q.    Right.

10:41:35  25          So he's in this chair.  You've checked on him.

1    He's obviously having a medical issue.  Did you believe

2    it was drug-related at this point?

3        A.    Well, yes, because when you looked in the

4    bathroom, you could see -- you could see the stuff

10:41:53  5    sitting there.

6        Q.    What was the stuff sitting there?

7        A.    There was a -- there was a needle sitting

8    there.  There was a spoon on the floor.

9        Q.    Okay.  And when did you observe that?  Was it

10:42:13  10    after this event had all taken place?

11        A.    It happened -- it happened so fast.  He was in

12    the chair.  I looked, and I asked David, "What did he

13    take?  What do you think he took?"  And then that's when

14    we saw that.

10:42:25  15        Q.    And did David respond to you as to what he

16    thought had been taken?

17        A.    Yes.  Yes.

18        Q.    What did he say?

19        A.    He said, "I think he did that."  He goes, "I

10:42:37  20    think it's heroin."

21        Q.    Okay.  And so did you try and do anything to --

22        A.    Help him?

23        Q.    -- make Mr. Escudero more attentive?

24        A.    Yes.

10:42:51  25        Q.    What did you do?

44

Hernandez, Dorothy
Vargas v. County of San Bernardino

1          A.      Well, Harley got the ice out of the fridge, and
2     I know that's a way -- I grew up around a bunch of
3     heroin addicts.   Okay?   And I knew that it had to be put
4     underneath his scrotum, and I asked David to do it;
10:43:08  5     David couldn't do it.   David had no experience with it.
6     So I did it.   I mean, there was no response is what
7     Harley told me.
8          She mentioned the word fentanyl, and I had no
9     idea, didn't even think about that.   She goes, "I'm
10:43:25  10    calling 911."
11          Q.      Okay.   So did he have any clothing on?
12          A.      Yes.
13          Q.      All right.   What clothing was he wearing?
14          A.      He was wearing a gray, like, sweat suit.   It
10:43:35  15    was either Adidas -- I believe it was Adidas.
16          Q.      Did he have shoes on?
17          A.      Yeah.   He had some white shoes on.
18          Q.      Like, tennis shoes?
19          A.      Yeah.
10:43:46  20          Q.      Okay.   To get the ice onto his scrotum, how did
21    you do that?
22          A.      Sorry, but I reached open, pulled his sweats
23    back and went under there and put it there.
24          Q.      Okay.   And Crummel was unwilling to do that --
10:44:03  25          A.      No.

45

Hernandez, Dorothy
Vargas v. County of San Bernardino

1    Q.    -- or he didn't know what to do?

2    A.    He didn't know what to do.

3    Q.    Okay.  All right.  And did Harley offer any

4    advice to you as to what to do?

10:44:13    5    A.    Yes.

6    Q.    What did she say?

7    A.    She also said we need to put it under his --

8    under his scrotum.

9    Q.    Okay.  Did anybody hit him in the face to see

10:44:27   10    if you could bring him to?

11    A.    Not really hard.  It was more like a little tap

12    like this (indicating).

13    Q.    All right.  So the answer is somebody hit him,

14    and the issue is --

10:44:39   15    A.    I wouldn't call it hitting him.

16    Q.    I'm sorry?

17    A.    I wouldn't call it hitting him.

18    MR. TERRELL:  Misstates the testimony.

19    THE WITNESS:  It was a tap.

10:44:46   20    BY MR. WAGNER:

21    Q.    Are you saying that somebody touched his face?

22    A.    Thank you.  Yes.

23    Q.    Okay.  Who touched his face?

24    A.    I did.

10:44:54   25    Q.    How many times did you touch his face?

46

1        A.     Tapped him twice.  Tapped him twice on both

2    sides.  We continued to talk to him, call his name.

3        **Q.     What were you saying to him?**

4        A.     We called his name, and we let him know that we

10:45:12  5    were right there, to stay with us, stay with us.

6        **Q.     Did he respond?**

7        A.     In a way he did.  He made these gruntle noises

8    like he could hear us.  So I asked David to keep talking

9    to him, to keep talking to him.

10:45:26  10        **Q.     Okay.  And then who called 911?**

11        **A.     Harley did.**

12        **Q.     Harley did.**

13            **Okay.  Harley called 911, and about how long**

14    **after you become aware of Mr. Escudero being in distress**

10:45:45  15    **that the 911 call was made?**

16        **A.     About a minute, minute and a half at most.**

17        **Q.     Okay.  All right.  And on the 911 call,**

18    **sometimes you're offering information in the background?**

19        **A.     Yes.**

10:45:58  20        **Q.     Okay.  And then after Harley finished the 911**

21    **call, did somebody else call?**

22        **A.     I don't remember anybody else calling.**

23        **Q.     Do you remember David Crummel calling 911?**

24        A.     Like I said, I don't remember anybody else

10:46:16  25    calling.  At this point I'm trying to keep Ruben --

47

**Hernandez, Dorothy**
**Vargas v. County of San Bernardino**

1   Q.   How many people come into the house?  Is it

2   just that one person?

3   A.   That I remember, yes.

4   Q.   Okay.

10:56:18 5   A.   And he had a laptop in his hand.

6   Q.   Okay.

7   A.   Not a laptop.  A tablet.  A tablet.

8   Q.   A tablet.

9        Okay.  And did that person provide any medical

10:56:27 10   attention at that time?

11   A.   Well, the ambulance people pulled up at the

12   same time, I assume, because I seen them coming in.

13   Q.   All right.  So they -- the ambulance people --

14   the ambulance people come in after the fire department

10:56:42 15   person comes in?

16   A.   Yes.

17   Q.   Okay.  The person from the fire department, can

18   you describe that person.

19   A.   He was an African American.

10:56:51 20   Q.   Okay.

21   A.   About five-seven, five-eight.

22   Q.   Okay.  Does he ask you any questions?

23   A.   Yes.

24   Q.   What did he ask you?

10:57:06 25   A.   He asked if we knew his name.

56

Hernandez, Dorothy
Vargas v. County of San Bernardino

```
          1      Q.    Did she say anything about having warrants?

          2      A.    No.  She didn't mention no warrants.

          3      Q.    Okay.  Did you know she was going to leave

          4   before she left?

10:58:32  5      A.    I don't recall.

          6      Q.    I mean, did she say, "Goodbye.  I'm leaving"?

          7      A.    I think she had somewhere to be.

          8      Q.    Okay.  And what did she tell you where she had

          9   to be?

10:58:45 10      A.    She didn't say where.  If she did, I don't

         11   remember.  I was focused on Ruben.

         12      Q.    Okay.  And then where was Mr. Crummel when

         13   Mr. Escudero is laying in front of the couch?

         14      A.    In the kitchen.

10:58:59 15      Q.    All right.  So he's with you?

         16      A.    Yes.  He's standing by the sink.

         17      Q.    Okay.  Is he having a conversation with the

         18   fire department person also?

         19      A.    They asked him if it was his home.  Basic

10:59:11 20   question.

         21      Q.    Okay.  All right.  Now, you said that the

         22   ambulance personnel were coming in around the same time?

         23      A.    They came in very shortly after the fireman,

         24   yes.

10:59:21 25      Q.    All right.  Do you know how they're dressed,
```

58

```
 1    went all the way to the end of the couch, and then the
 2    coffee table was just pushed up against it.
 3        Q.    Okay.  So the coffee table ended up next to the
 4    end table?
 5        A.    Yes.
 6        Q.    Okay.  All right.  Now, at the time the
 7    emergency personnel were in the living room, are you
 8    still at the kitchen table?
 9        A.    I wasn't even sitting at the kitchen table.
10    I was standing there.
11        Q.    I said were you at the kitchen table?
12        A.    I'm, like, closer to where the opening is
13    towards the living room --
14        Q.    Okay.
15        A.    -- like, almost behind the firefighter.
16        Q.    All right.  So you're behind the
17    African American gentleman from the fire department?
18        A.    Yes.
19        Q.    Okay.  All right.  What do you see, as best you
20    recall?
21        A.    See, that's where -- that's where -- there was
22    a partition hanging there to separate for privacy the
23    kitchen and the living room.
24        Q.    Okay.
25        A.    And they pulled it down.
```

Time stamps:
11:03:23  5
11:03:42  10
11:03:51  15
11:04:04  20
11:04:19  25

62

1    on?

2        A.    Yes.

3        Q.    Okay.  And you hear that, and then after the

4    Narcan is administered, what, if anything, do you

11:06:51  5    observe in shadows, or what do you hear?

6        A.    I can hear Ruben, like, coughing.  He starts to

7    choke, tried to come out of it.

8        Q.    Okay.  And what do you recall happening next in

9    terms of what you heard or were able to see?

11:07:10  10        A.    What I heard was him come out of it, and I hear

11    the officers start to yell at him.

12        Q.    Okay.  Well, what officer -- what are the

13    officers yelling at him?

14        A.    The officers starts to yell at him not to fight

11:07:28  15    it, you know.  Nobody was ever telling him that they

16    were there to help him, not till the very end.  In that

17    moment the officers were telling him, "Stop fighting us.

18    Stop fighting us."

19        Q.    Okay.  Could you see shadows that seemed to

11:07:48  20    indicate that Escudero was fighting?

21        A.    He wasn't fighting.  He was coming out of an

22    overdose.

23        Q.    Was he moving?

24        A.    Yeah.  He, like, sat up halfway and probably

11:08:02  25    tried to gather his bearings is the way I describe it.

65

**Hernandez, Dorothy**
**Vargas v. County of San Bernardino**

 1      Q.      Okay.  I want to know what you're able to see.
 2   Were you able to see him actually sitting up?
 3      A.      I could see his shadow.
 4      Q.      Okay.  Do you see the arms or legs of that
11:08:15  5   shadow moving?
 6      A.      No.  I just see, like, the body sit up
 7   partially, and then I could see a shadow of a man going,
 8   like, near him.
 9      Q.      A shadow of a what man?
11:08:27 10      A.      Of a man going near him.
11      Q.      Okay.  All right.  And from your vantage point,
12   does the shadow that's sitting on the ground -- does
13   that shadow ever move?
14      A.      Yes, it is moving.
11:08:44 15      Q.      Okay.  And what can you describe about that
16   shadow?
17      A.      The way I describe it, it looked like trying to
18   figure out what's going on.  Just, like, the head moves
19   a little, and then I see an arm move a little bit, and
11:09:02 20   then the ambulance driver -- well, not the driver, but
21   the female personnel -- she's trying to talk to him, but
22   then I start hearing all these officers -- I started
23   hearing male voices just take over the whole
24   conversation.
11:09:17 25      Q.      Okay.  And what do you recall being said?

66

1    A.    To me they were sounding like he was fighting,

2    but I don't see it that way.

3    Q.    Okay.

4    A.    What I heard was them asking him to stop

11:09:32  5    fighting with them.

6    Q.    Okay.  Are you saying that you hear the

7    deputies saying "stop fighting" to Ruben, but you're not

8    actually seeing any fighting on Ruben's part?

9    A.    No, I wasn't.

11:09:50  10    Q.    Well, were you seeing movements on Ruben's

11    part?

12    A.    Movements of coming out of a heroin overdose.

13    Q.    Okay.  But you saw him moving?

14    A.    Well, yeah.

11:10:01  15    Q.    Okay.  All right.  And at some point in time do

16    you leave the location that you're at in the kitchen and

17    come back into the living room?

18    A.    They wouldn't allow me to go into the living

19    room.

11:10:23  20    Q.    Okay.  Well, did you ever at any point in time

21    leave your location in the kitchen and go into the

22    living room?

23    A.    They wouldn't allow me to go into the living

24    room.

11:10:35  25    Q.    So you stayed in the kitchen for the entire

67

1    time?

2        A.    I was made to stay in the kitchen.

3        Q.    Okay.  All right.  There's no need to be

4    hostile about it.  It is what it is.

11:10:47  5        Did you stay -- so when you exited the

6    residence, you went out the back door of the kitchen?

7        A.    The back door.

8        Q.    Yes.

9        A.    Yes.

11:10:57  10       Q.    Okay.  All right.  From the time you were in

11   the kitchen, how long were you in the kitchen before you

12   left out the back door of the kitchen of the house?

13       A.    Well, I was asked outside by a different deputy

14   named Kautz who came in through the back door while this

11:11:22  15   was happening in the front room.  She took me outside.

16   She asked me a few questions.  I went back inside.

17       Q.    Okay.

18       A.    Then she took David out there for a few

19   minutes -- for a few questions.  Not even a few minutes,

11:11:39  20   probably.  He comes back in.

21       Q.    All right.

22       A.    Then she comes back in.

23       Q.    And where was David when you were at the

24   kitchen table looking through the shadows in the sheet?

11:11:53  25       A.    He was standing in the kitchen.

1    Q.    Okay.

2    A.    And he's much taller than I.

3    Q.    Who's much taller than you?

4    A.    David is.

11:12:01  5    Q.    Okay.  All right.  At some point in time do you

6    hear anything else that's said between Ruben Escudero

7    and the deputies or fire department or AMR?

8    A.    Yes.

9    Q.    What do you hear?

11:12:18  10   A.    I hear fighting, like -- like, scuffling.  You

11   could hear shoes.  I hear like a -- like an electronic

12   device.

13   Q.    Okay.  Do you recall anything else being said

14   by anybody?

11:12:38  15   A.    I also remember more -- more officers showed

16   up, and I just didn't understand that.

17   Q.    Well, how do you know more officers showed up

18   if there's a sheet preventing you from looking into the

19   room?

11:12:56  20   A.    Because they yelled, and one officer had

21   stated -- you could just see it.  You could hear the

22   feet.  You could see them.  You could see the shadow.

23   I saw the shadow.  I didn't see them.

24   Q.    Okay.  So if you saw a shadow, how is it that

11:13:14  25   you knew that anybody new has come into the living room

69

1    versus somebody changing position?

2        A.    Because somebody had said they didn't need

3    their help.

4        Q.    Okay.  You heard somebody say they didn't need

11:13:26  5    any further help?

6        A.    They didn't need their assistance.

7        Q.    Okay.  All right.  What else do you recall

8    being said that day by -- between the emergency

9    personnel and Mr. Escudero?

11:13:41 10        A.    Before they take him out, Mr. Escudero asked

11    them why they were hitting him.

12        Q.    Okay.  And did anybody respond?

13        A.    Not with words.

14        Q.    Well, how did somebody respond if not with

11:14:10 15    words?

16        A.    Because you could see the arm go up, and I

17    could hear it.  I could just hear what sounded like just

18    somebody -- like, he's being hit.  He got silenced.

19        Q.    Okay.  How many times did you hear the sound of

11:14:24 20    him getting hit?

21        A.    Before he was quiet, eight.

22        Q.    Eight strikes.

23              Okay.  And do you know if they were using a

24    fist or an object?

11:14:46 25        A.    I'm not sure.  Both, I believe.  It -- because

                                                                    70

Hernandez, Dorothy
Vargas v. County of San Bernardino

1        the shadow appeared to have -- it looked like a stick.

2            Q.    Okay.

3            A.    The other shadow didn't.

4            Q.    Okay.  So one shadow appears to be striking

11:15:06  5    Mr. Escudero with a stick?

6            A.    Yeah.

7            Q.    And then one shadow appears to be striking

8        Mr. Escudero with no weapon, just a hand?

9            A.    The hands, yeah.

11:15:18 10          Q.    Okay.  Okay.  How is your memory of this

11       incident today?  Is it -- is it pretty good?

12           A.    For the most part, yeah.

13           Q.    Okay.  And when you talked to the sheriff's

14       deputies about what you observed, were you trying to be

11:15:38 15    truthful and accurate with them?

16               MR. TERRELL:  Vague as to time of the

17       interviews.

18       BY MR. WAGNER:

19           Q.    That day when you spoke to Officer K. --

11:15:50 20          A.    Kautz.

21           Q.    I'm looking at the name right now.

22           A.    K-a-u-t-z.

23           Q.    Kautz, yeah, K-a-u-t-z.

24               When you were talking to Tiffany Kautz, did you

11:16:04 25    try and be truthful and accurate with her?

71

1        A.        Yes.

2        Q.        Okay.  Do you recall anything else that was

3    said that you recall during the time period in which

4    emergency personnel were in the living room with

11:16:23 5    Mr. Escudero other than what you've already testified

6    to?

7        A.        Yes.

8        Q.        What else do you recall being said?

9        A.        The female ambulance personnel had asked the

11:16:32 10   officer if he had any identification, and they said no.

11       Q.        Okay.  Anything else you recall being said that

12   you heard?

13       A.        She said that we had to get him out of here

14   now.

11:16:46 15       Q.        Okay.  Did you see him in handcuffs?

16       A.        No.

17       Q.        Did you see handcuffs being placed on him?

18       A.        No.

19       Q.        Did you see anyone administer another shot to

11:17:05 20   him?

21       A.        No.

22       Q.        Did anybody say to you that they had given him

23   a shot of Versed?

24       A.        No.

11:17:16 25       Q.        Do you know what Versed is?

72

            1          But basically the deposition notice and the

            2     subpoena, Exhibit 1, indicated to bring any photographs

            3     or videos of the scene or incident, and, as I

            4     understand, you brought approximately a dozen

11:43:16    5     photographs, and they've just been uploaded into a

            6     Dropbox for us to look at.

            7          A.    That's correct.

            8          Q.    Okay.  And so they're only photos, no video?

            9          A.    No, sir.

11:43:29   10          Q.    Okay.  And when you spoke to the FBI, did they

           11     give you a copy of your statement?

           12          A.    No, sir.

           13          Q.    Did they show you any documents?

           14          A.    No, sir.

11:43:43   15          Q.    Did they play any recordings for you?

           16          A.    No, sir.

           17          Q.    All right.  And then I take it you haven't -- I

           18     think you said you haven't given any other statements.

           19     So no investigator or anything like that?

11:43:59   20          A.    In regards to the FBI?

           21          Q.    No.  No.  No.

           22                The FBI -- you already told us about

           23     Michael Meyer -- Morgan -- Michael Morgan.

           24          A.    Yeah.

11:44:09   25          Q.    But you haven't spoken to any investigator or

                                                                        74

```
 1    anything like that?
 2         A.    Yes.  I had -- I did.
 3         Q.    Oh, what investigator did you speak to?
 4         A.    I believe her name was -- I have a card.
11:44:26  5    Sorry.
 6         Q.    That's okay.
 7         A.    T. Lay Investigations.
 8         Q.    I'm sorry?
 9         A.    Capital T, dot -- I think it's the initial for
11:44:44 10    her first name, and then the last name is L-a-y.
11         Q.    T. Lay Investigations?
12         A.    Yes.
13         Q.    And did you meet with that person?
14         A.    They came to me.
11:44:53 15         Q.    Okay.  And when did you speak with T. Lay
16    Investigations?
17         A.    I believe it was several days after.  I'm not
18    quite sure the date.  It might have been a week -- no
19    longer than that -- after the incident.
11:45:09 20         Q.    Okay.  And about how long was that interview?
21         A.    Could have been as long as ten days after that.
22    I'm sorry.
23         Q.    No.  No.  No.
24               How long was the actual interview?
11:45:20 25         A.    About an hour-and-a-half.
```

75

Hernandez, Dorothy
Vargas v. County of San Bernardino

1    Q.    Okay.  And was it tape-recorded?

2    A.    I'm not sure.  I believe it was.

3    Q.    Okay.  And have you seen a transcript from that

4    interview?

11:45:33  5    A.    No, sir.

6    Q.    Have you listened to any recording of that

7    interview?

8    A.    No, sir.

9    Q.    All right.  Has anyone played any recording for

11:45:42  10   you?

11   A.    No, sir.

12   Q.    Okay.  And did the investigator from T. Lay

13   Investigations tell you who they were working on behalf

14   of?

11:45:53  15   A.    I believe so, yes.

16   Q.    What did they say?

17   A.    On behalf of Sharon Brunner --

18   Q.    Okay.

19   A.    -- for the family of the Vargases.

11:46:05  20   Q.    Okay.  And I take it they asked you questions

21   about this incident sort of like what I'm doing here

22   today?

23   A.    Yeah.

24   Q.    Okay.  And did they have any documents or

11:46:18  25   photographs to show you at that time?

76

1            MR. WAGNER:  Okay.  Let me stop for a moment.

2        Q.    Now, the first part appeared to be some people

3    talking.  I'm not even sure who.  But then it starts

4    with somebody going, "Hey, guys" and there's a response,

12:16:04    5    "No.  David's right here."  Do you recognize your voice?

6        A.    Yeah, I do.

7        Q.    Okay.  And do you recall that the other female

8    that was speaking -- that was Tiffany Kautz?

9        A.    Yes.

12:16:16   10        Q.    Okay.

11        A.    I believe so.  I can't remember what she sounds

12    like.

13        Q.    Okay.  I'm going to play the tape-recording all

14    the way straight through.

12:16:26   15        A.    Oh, gosh.  Okay.

16        Q.    All right.

17            (Whereupon, an audio recording was played.)

18            MR. WAGNER:  Okay.  Stop the tape at this

19    point.

12:26:17   20        Q.    And I think we're getting into the interview.

21    It sounds like Mr. Crummel was coming in, but at least

22    the portion of the recording that you heard, that was

23    you speaking to Deputy Kautz?

24        A.    Kautz.

12:26:36   25        Q.    Kautz, right.  I keep saying it wrong.  I want

99

1    to call her kraut or something.  Kautz.  Okay.

2         A.    Kautz.

3         Q.    Okay.  And does that refresh your recollection

4    of the conversation that you had with her?

12:26:50   5         A.    Yeah, it does.

6         Q.    And would the events of this day have been

7    fresh -- fresher in your mind at the time you spoke to

8    her that day versus what they are now?

9         A.    To be fair, yes.  It was a scary thing.  I

12:27:07  10    don't like talking to officers, law.  I was kind of

11    confused, you know, and I'm confused right now that --

12    yeah.

13         Q.    Why don't you like talking to police officers?

14         A.    It does refresh my memory a little bit.

12:27:22  15         Q.    Okay.  Why do you not like talking to police

16    officers?

17         A.    Just growing up as a child, I mean, I seen a

18    lot of things happen.  I'm not from up here.  I grew up

19    in LA.  Big difference.  Just the interaction was

12:27:36  20    always -- it wasn't always good interactions, if that

21    makes -- you know, it just wasn't.

22         Q.    So you've had negative experiences with law

23    enforcement?

24         A.    As a kid, yeah.

12:27:48  25         Q.    Okay.  As an adult have you had further

100

1    worked with heroin addicts or something in the past?

2        A.     I said heroin addicts ran in my family.

3        Q.     Okay.   So you've never seen anyone come out of

4    an overdose with Narcan?

12:52:10  5        A.     Not with Narcan.

6        Q.     Do you recall telling the deputy that, "I said,

7    well, he's not listening to me.   It's not about what" --

8    let me read the whole thing.

9             Now, you told David to go try and help him;

12:52:34 10   right?

11       A.     No.   I said, "David, try calling his name,"

12   because if you hear a familiar voice, it helps calm

13   somebody.

14       Q.     Okay.   Now, do you recall telling the deputy

12:52:49 15   that you didn't watch it?

16       A.     I couldn't watch it.   They wouldn't let me

17   past.

18       Q.     Okay.   Well, you're saying that you saw

19   silhouettes; right?

12:52:59 20       A.     Yeah.   You could see the silhouettes because

21   the front door was open, and at that time in the morning

22   the light comes in very bright.

23       Q.     All right.   But you told the deputy you

24   couldn't see anything; right?

12:53:09 25       A.     I did say that.

117

Hernandez, Dorothy
Vargas v. County of San Bernardino

1        Q.    Okay.  Did you tell the deputy that, "I

2   couldn't see anything, but I could see silhouettes"?

3        A.    You know, at the time I didn't think to say

4   that, no.

12:53:23  5        Q.    And you could hear the deputy saying to stop

6   fighting?

7        A.    Well, yeah, but -- yeah.  There was -- he did

8   say that.

9        Q.    And you heard them say that on more than one

12:53:39  10   occasion; right?

11        A.    Twice, I believe.

12        Q.    Okay.  And you knew they were talking to Ruben;

13   correct?

14        A.    That's what it seemed like, yes.

12:53:48  15        Q.    All right.  Now, in terms of the emergency

16   personnel that was there, it was all men and one woman?

17        A.    Yeah.  She was very young, though.

18        Q.    All right.  How would you describe the woman?

19        A.    I just told you she was very young.  She was

12:54:05  20   the ambulance driver.  She was part of the ambulance

21   personnel.

22        Q.    Okay.  How would you describe her besides being

23   young?  I mean, blond?  Brunette?

24        A.    Brunette.  Brunette.  She had her hair up in a

12:54:19  25   ponytail or a bun, something like that.

118

1    Q.    All right.  And did it appear to you that the
2    Taser had any effect on Mr. Escudero?
3    A.    I couldn't tell.  I wasn't on that side.
4    Q.    Okay.  You couldn't see; right?

12:59:41  5    A.    I couldn't see the silhouette.  And let me tell
6    you this back and forth trying to get past that
7    African American firefighter, it was -- I would try to
8    get there; he wouldn't let me pass.
9    Q.    How many times did you try to enter the living

12:59:57  10   room and were prevented by the African American fireman?
11   A.    About four times.
12   Q.    Okay.
13   A.    I kind of felt like if I went in there to be,
14   like, close to him, that it would help.  They wouldn't

01:00:15  15   let me in there.
16   Q.    Did you say anything to the fireman about
17   wanting to come into the room?
18   A.    He knows 'cause at one point he put his arm up
19   to prevent from -- from going past.

01:00:25  20   Q.    Did you say anything to the fireman about
21   wanting to enter the room?
22         MR. TERRELL:  Asked and answered.
23         MR. WAGNER:  She didn't say whether she spoke.
24         THE WITNESS:  I did ask if I can go in there.

01:00:37  25   I said, "Just let me by."  That's what I said.

123

1    statements were made?

2        A.    I don't believe he was fighting.  I believe he

3    came out trying to figure out why he was being hit on.

4        Q.    Okay.  And in terms of him coming out, do you

01:10:27  5    believe that he may have been flailing his arms or legs

6    in some fashion?

7        A.    His arms probably.  Yes, I do believe that.

8        Q.    All right.  Now, so when you come back in after

9    speaking to the deputy, Crummel goes out and speaks, and

01:10:47  10    then he comes back in; correct?

11        A.    Yes.

12        Q.    All right.  And I think you indicated that

13    several times you tried to get into the living room area

14    and you were prevented by the African American fire

01:11:01  15    department gentleman?

16        A.    Yes.  That's correct.

17        Q.    All right.  I mean, was he physically blocking

18    you from coming in?

19        A.    The ruckus was happening in the living room,

01:11:14  20    and he put, like, an arm out to prevent me from going

21    in.

22        Q.    Okay.

23        A.    Now mind you, he was observing.

24        Q.    Okay.  So he put his arm out --

01:11:23  25        A.    Yes.

128

Hernandez, Dorothy
Vargas v. County of San Bernardino

1    Q.    -- to block the doorway?

2    A.    Yes.

3    Q.    Okay.  Did you actually try and push up against

4    his arm?

01:11:30  5    A.    Once.

6    Q.    Okay.  And did he say anything to you at that

7    time?

8    A.    He turned around, he looked at me, and he shook

9    his head no; so I respected that.

01:11:41  10    Q.    I'm trying to read a note.

11          When you tapped Ruben on the face as you've

12    described it, you couldn't get a response; correct?

13    A.    No.

14    Q.    Do you know if the deputies were doing

01:12:10  15    something similar to his face at or about the time you

16    heard him say, "Why are you hitting me," "why are you

17    touching me," whatever he was saying?

18    A.    From the silhouette, I knew they were hitting

19    on him.

01:12:24  20    Q.    Okay.

21    A.    And that's when he had started to say that

22    stuff, "Why are you hitting me?"  And you could hear --

23    Q.    Okay.  Hitting on him with hands or the stick?

24    A.    The silhouettes I saw or what I described are

01:12:40  25    true, and then he started to say, "Why are you hitting

129

```
 1        A.    -- supposedly.  It doesn't always work.

 2        Q.    Okay.  Okay.  Did you actually leave and go to

 3   the house where you were supposed to do the work that

 4   day, or did you call that person?

 5        A.    I left and went over there.

 6        Q.    Did David Crummel work that day?

 7        A.    No.

 8        Q.    Did he have a job?

 9        A.    No.

10        Q.    All right.  Okay.  What I'll do is I'll attach

11   as Exhibit 8 the transcription of the recording, which

12   was Exhibit 7.

13             (Defendants' Exhibit 8 was marked

14             for identification and attached hereto.)

15             MR. WAGNER:  Exhibit 7 has been produced in the

16   case, the recording.

17             (Defendants' Exhibit 7 was identified

18             for the record.)

19             MR. WAGNER:  And with that, I don't have any

20   further questions at this time.

21             MR. TERRELL:  And I don't have any follow-up

22   questions.

23             MR. WAGNER:  Okay.  So what we'll do, ma'am, is

24   we will -- the court reporter will make arrangements to

25   get you to be able to review the electronic transcript
```

Timestamps: 01:18:16 (line 5), 01:18:27 (line 10), 01:18:41 (line 15), 01:18:47 (line 20), 01:19:03 (line 25)

135

1               CERTIFICATION

2                    OF

3          CERTIFIED SHORTHAND REPORTER

4

5          The undersigned certified shorthand reporter

6   of the state of California does hereby certify:

7          That the foregoing deposition was taken before

8   me at the time and place therein set forth, at which

9   time the witness was duly sworn by me;

10          That the testimony of the witness and all

11   objections made at the time of the deposition were

12   recorded stenographically by me and thereafter

13   transcribed, said transcript being a true copy of my

14   shorthand notes thereof.

15          In witness whereof, I have subscribed my name

16   this date December 3, 2021.

17

18

19          _Sandra I. Schoettlin_

    Sandra I. Schoettlin

20          Certifcate No.: 8308

21

22

23

24

25

EXHIBIT "24"

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

CECILIA VARGAS; ARIANA SALAS,      )
individually and as a successor-   )
in-interest to RUBEN ESCUDERO,     )
deceased,                          )
                                   )
        Plaintiffs,                )
                                   )
vs.                                ) Case No.
                                   ) 5:20-cv-02646-JGB-KK
COUNTY OF SAN BERNARDINO; H.       )
MIRANDA; S. CARTER; Z. VOGEL;      )
J. MATA; Z. PRITCHETT; J. JIMENEZ; )
A. MATA; T. KAUTZ; J. ATTLESEY;    )
RODRIGUEZ (first initial unknown)  )
and DOES 1-10; inclusive,          )
                                   )
        Defendants.                )
_____)

DEPOSITION OF DYJUAN WASHINGTON

TUESDAY, FEBRUARY 8, 2022

TAKEN REMOTELY VIA ZOOM

Reported by:

RAMONA LUX
CSR No. 12846

1

```
 1                  UNITED STATES DISTRICT COURT

 2                 CENTRAL DISTRICT OF CALIFORNIA

 3

 4   CECILIA VARGAS; ARIANA SALAS,      )
     individually and as a successor-  )
 5   in-interest to RUBEN ESCUDERO,     )
     deceased,                          )
 6                                      )
             Plaintiffs,               )
 7                                      )
     vs.                                ) Case No.
 8                                      ) 5:20-cv-02646-JGB-KK
     COUNTY OF SAN BERNARDINO; H.       )
 9   MIRANDA; S. CARTER; Z. VOGEL;      )
     J. MATA; Z. PRITCHETT; J. JIMENEZ; )
10   A. MATA; T. KAUTZ; J. ATTLESEY;    )
     RODRIGUEZ (first initial unknown)  )
11   and DOES 1-10; inclusive,          )
                                        )
12           Defendants.               )
     _____)

13

14

15

16         DEPOSITION OF DYJUAN WASHINGTON, taken remotely

17   via Zoom, on behalf of the Defendants, beginning at

18   3:43 p.m. and ending at 5:15 p.m. on Tuesday,

19   February 8, 2022 before Ramona Lux, Certified Shorthand

20   Reporter, CSR 12846.

21

22

23

24

25
```

```
 1                    A P P E A R A N C E S

 2

 3     FOR THE PLAINTIFFS:

 4          LAW OFFICE OF JAMES S. TERRELL
            BY:   JAMES S. TERRELL, ESQ.
 5                (Appearing via Zoom)
            15411 Anacapa Road
 6          Victorville, California  92392
            760.951.5850
 7          jim@talktoterrell.com

 8

       FOR THE DEFENDANTS:
 9
            WAGNER ZEMMING CHRISTENSEN, LLP
10          BY:   DENNIS E. WAGNER, ESQ.
                  (Appearing via Zoom)
11          1325 Spruce Street, Suite 200
            Riverside, California  92507
12          951.686.4800
            dew@wzclawfirm.com
13

14     FOR THE DEPONENT:

15          GREEN DE BORTNOWSKY, LLP
            BY:   KEVIN SPAULDING, ESQ.
16                (Appearing via Zoom)
            30077 Agoura Court, Suite 210
17          Agoura Hills, California  91301
            818.704.4729
18          kevin@gdblawoffices.com

19

       ALSO PRESENT:
20
            AUTUMN GARRISON,
21          Paralegal with Wagner, Zemming Christensen

22

23

24

25
```

3

```
 1                        I N D E X

 2


 3


 4     WITNESS:  DYJUAN WASHINGTON

 5
       EXAMINATION                              PAGE
 6
       BY MR. WAGNER                               5
 7
       BY MR. TERRELL                             50
 8

 9                     E X H I B I T S

10     NUMBER                                   PAGE

11     Exhibit 2       Crime Report Diagram       13

12     Exhibit 19      Interview Transcription     34

13     Exhibit 20      Interview Audio             34

14     Exhibit 23      Miranda Belt Transcription  30

15     Exhibit 24      Miranda Belt Audio          30

16

17

18

19

20

21

22

23

24

25
```

4

```
 1                  TUESDAY, FEBRUARY 8, 2022

 2                   3:43 P.M. - 5:15 P.M.

 3

 4                   DYJUAN WASHINGTON,

 5      having been first duly sworn, testified as follows:

 6

 7                      EXAMINATION

 8   BY MR. WAGNER:

 9      Q.   Okay.  Good afternoon.  Is it Captain

10   Washington?

11      A.   It is Chief Washington now, sir.

12      Q.   All right.  Congratulations on your promotion.

13      A.   Thank you.

14      Q.   So are you a battalion chief, deputy chief,

15   chief chief?

16      A.   Battalion chief.

17      Q.   Fire departments have lots of chiefs.

18      A.   This is true.

19      Q.   What kind of chief -- I'm sorry, you're what

20   kind of chief?

21      A.   A battalion chief.

22      Q.   Okay.  Have you ever given a deposition before?

23      A.   Not like this, no, sir.

24      Q.   Okay.  All right.  Well, really there's no

25   mystery to this.  You've got counsel for the city with
```

5

```
 1    and was also an assistant fire chief there.  From there,
 2    I went to RAF Lakenheath, which is in England, and I
 3    started off as an assistant chief there, progressed up
 4    into deputy fire chief while I was in England.  And then
 5    they transitioned me out of there to a more HR role and
 6    then I did some HR work in conjunction with some fire
 7    department consulting when I went to Edwards Air Force
 8    Base in about 2014, and I did those two roles until I
 9    retired in 2018 and then came right over to Victorville
10    Fire.
11        Q.   Well, you've been to some interesting places and
12    now you're at Victorville.
13        A.   Right.
14        Q.   So -- all right.
15        A.   Victorville's interesting.
16        Q.   It's an interesting place.  Okay.  So anyway,
17    you've been with Victorville Fire from 2018, and do you
18    recall an incident in October of 2019 when there was a
19    call for someone needing medical aid due to some
20    overdose?
21        A.   Yes, sir.
22        Q.   Okay.  And on that call, where were you
23    responding from, what station?
24        A.   Fire station 311.
25        Q.   Okay.  I'm not sure where fire station 311 is.
```

10

1   Where was that?

2        A.   That's right by the San Bernardino Fair Grounds

3   off Desert Knoll and La Paz.

4        Q.   Okay.  About how long did it take for your unit

5   then to transition from the station to the location where

6   the overdose was occurring?

7        A.   It -- I'm not sure exactly.  I mean, it's in the

8   CAD notes, so I'm not -- I don't want to guess how long.

9        Q.   You can give me an estimate.  Obviously the CAD

10  is probably going to be a little more accurate, so I

11  mean, no one's going to go, oh, my God, you said 15

12  minutes and it was 10 minutes or something like that.

13       A.   Usually it take us anywhere from three to five

14  minutes to get somewhere.

15       Q.   How many engines or units rolled?

16       A.   Just one.

17       Q.   Okay.  And who assisted you in that unit?

18       A.   So I have an engineer driver and I have a

19  firefighter paramedic.

20       Q.   All right.  So who was with you that day?

21       A.   You want names or just --

22       Q.   Yeah, names.

23       A.   I had -- the fire engineer was Martin Alcon and

24  the firefighter paramedic was Brett Lever.

25       Q.   All right.  Now, are they still both with the

11

1    department?

2        A.    Martin Alcon is still with the department.

3    Brett Lever is not.

4        Q.    Okay.  And you mentioned, I guess, Lever was

5    the -- Lever was the firefighter, slash, paramedic.  Do

6    you have any background as a paramedic?

7        A.    I do not.

8        Q.    Okay.  Now, when you arrived on scene, who was

9    present that day?

10       A.    So we arrived on scene pretty much the same time

11   as AMR, which is American Medical Response.  They are the

12   ambulance company in the area and the sheriff deputies

13   were there.

14       Q.    The AMR people that arrived on scene, was it two

15   people?

16       A.    Two people.  A paramedic and an EMT.

17       Q.    Okay.  And do you recall who they were?

18       A.    I do not.

19       Q.    Okay.  And then for the sheriff's department, do

20   you recall how many members of the department were

21   present when you arrived?

22       A.    I remember seeing two when I arrived, but by the

23   time that everything was done, there was probably three

24   or four there.

25       Q.    Okay.

12

1    A.   I believe there was three there for

2    predominantly most of the incident.

3    Q.   And out of the three, one of them was a female?

4    A.   Yes, sir.

5    Q.   So two males, one female for the sheriff's

6    department?

7    A.   Yes, sir.

8    Q.   All right.  The -- when you arrived on scene, do

9    you recall if it was the front house or the back house

10   that the -- the incident occurred in?

11   A.   I'm pretty sure it was the back house.

12   Q.   Right.  All right.  I've got a paralegal on the

13   line.  What we'll do is we'll pull up Exhibit 2.  I think

14   it's 2.  Okay.

15        Let's see, Autumn, can you make this just a

16   little bigger, the drawing anyway.

17        (Deposition Exhibit 2 marked.)

18   BY MR. WAGNER:

19   Q.   All right.  This is a document that is contained

20   in the sheriff's department report that was prepared out

21   of this incident.  And if you could, just take a moment

22   to look at this and then I'll ask you some questions

23   about the diagram.  From a foundational standpoint,

24   Chief, you actually entered the house that day; correct?

25   A.   Yes, sir.

13

1    position.

2        Q.   Okay.  Chief, are you able to access, like, the

3    crayon that's up on the tool bar?

4        A.   I cannot access the crayon.

5        Q.   All right.  So then what we can do is try and

6    guide my paralegal.  So was the person needing medical

7    attention, was he in the living room?

8        A.   He was -- they were moving him.  So he started

9    off in the bedroom.  That's where they found him.

10       Q.   Okay.  But where did you see him first?

11       A.   So I saw him -- because I tried to stay out of

12   the way.  They were moving him from the bedroom into the

13   living room, so when I first caught eyes on him as they

14   were moving him, like, through the kitchen into the

15   living room area.  So like at the threshold is where I

16   first saw him.

17       Q.   Okay.  So the threshold between the kitchen area

18   and the living room area that's depicted on the diagram?

19       A.   Yes, sir.

20       Q.   All right.  And when they laid him down, did

21   they lay him down towards the end table or towards the

22   couch?

23       A.   Actually, when they finished moving him, he was

24   more, like, parallel with the love seat.

25       Q.   Parallel with the love seat, okay.  Like in the

15

1    middle of the room?

2       A.   Yes.

3       Q.   All right.

4       A.   We kind of moved things out of way.  We moved

5    the end table -- both end tables to kind of give some

6    space.

7       Q.   Right.  So he's essentially in the middle of the

8    room.  Was his head facing towards the kitchen and his

9    feet towards the front?

10       A.   No.  It was the opposite.  His head was facing

11    towards the door and his feet towards the kitchen.

12       Q.   Okay.  Perfect.  And -- I mean, again, this is a

13    little crude doing it on a diagram, but the X would

14    indicate where he came through and you first observed

15    him; is that fair?

16       A.   That's fair.

17       Q.   And then, generally, the location between the

18    love seat and couch is where he was located for purposes

19    of rendering aid?

20       A.   Yes, sir.

21       Q.   Okay.  And when he was placed in this position,

22    what, if anything, did you observe about him?

23       A.   He was unconscious when I observed him.  He was

24    not moving.  We didn't know -- we were checking to see if

25    he was breathing and what his vital signs were at that

1    time.

2         Q.    Okay.   Who would have been checking?   Would that

3    have been AMR or your paramedics?

4         A.    It would have been both of them.

5         Q.    Okay.

6         A.    They were assessing the patient at this time.

7         Q.    So if there's three people with your unit, two

8    people with AMR and anywhere from two to maybe three

9    deputies, that's a lot of people in this room.   Is there

10   any way, at least at the time before Narcan was provided

11   to him, to generally describe where everyone was in the

12   room?

13        A.    Yes.   So what happens usually is -- so my

14   paramedic is doing the assessment along with the other

15   paramedic.   The other EMT has a gurney, he's by the front

16   door.   He's there with one of the sheriff's deputies at

17   the front door.   The other two deputies are in the back

18   because there are two people in this back room, and

19   they're interviewing those two people in the back room.

20        Q.    Okay.

21        A.    I am in the threshold between the kitchen and

22   the living room.   And my engineer is -- he has a monitor

23   in this hand and he's helping with patient assessment and

24   he's hooking up the monitor to the patient at this time.

25        Q.    Okay.   So there's essentially three people

1   around the patient and you're actually in the area where

2   the X was designated where you saw him being brought

3   through to the living room?

4        A.   Yes, sir.

5        Q.   Okay.  Where you were standing, was there a

6   sheet separating the kitchen from the living room?

7        A.   No.

8        Q.   Okay.  Do you recall anything hanging in that

9   area that may have been pulled to the side?

10       A.   No.

11       Q.   All right.  From your vantage point, you could

12   look into the kitchen, into the living room without any

13   obstruction from the doorway?

14       A.   For me to look into the kitchen, I had to lean

15   back a little bit because it was kind of a weird set up.

16   Because that fridge and the oven was kind of blocking the

17   view.  You can see where the fridge and the oven was, so

18   I had to kind of lean back a little bit because at one

19   point the two people that were in this back room, they

20   were just kind of trying to figure out with was going.

21   And my number one priority is the safety of my crew, so

22   I'm just keeping an eye on them to make sure they're

23   staying where they're supposed to be, staying so we're

24   all safe.

25       Q.   I mean, but for you to look, say, in the

1    direction of the kitchen table if you were standing in

2    the threshold, was there anything blocking your view that

3    way?

4         A.   No.

5         Q.   And then, if you were looking towards the front

6    door of the residence, was there anything blocking your

7    view that way?

8         A.   No.

9         Q.   All right.  So you're saying that the oven and

10   fridge sort of blocked your view, generally, down the

11   hallway area?

12        A.   Yes, sir.

13        Q.   Okay.  All right.  Fair enough.  All right.  So

14   who made the decision that he needed Narcan?

15        A.   The paramedics.

16        Q.   Okay.  And who administered the Narcan?

17        A.   I am not sure who actually administered the

18   Narcan.  It was one of them.

19        Q.   So you're not sure if it was Lever or if it was

20   AMR?

21        A.   That's correct.

22        Q.   Okay.  Narcan, how is it administered?  Orally,

23   nasal spray, shot?

24        A.   Usually it's administered through a shot.

25        Q.   Okay.  Now --

1        A.   It's through IV, actually.

2        Q.   Okay.  So was an IV set up where he was hooked

3    to an IV?

4        A.   An IV was set up, yes, sir.

5        Q.   All right.  So Narcan is administered.  Did

6    anyone at or about the time the Narcan is administered,

7    indicate that it would be better to handcuff him at that

8    time before he comes to?

9        A.   Well, it's not standard practice to handcuff

10   someone before administering Narcan.

11       Q.   Did anybody say that?

12       A.   That it's not standard practice?

13       Q.   No.  No, I'm sorry.  Did anybody state, oh,

14   maybe we should handcuff him because he might be

15   combative?

16       A.   I don't recall that.

17       Q.   All right.  Prior to this day, how many times

18   have you seen Narcan administered in a similar overdose

19   situation?

20       A.   I have no idea.

21       Q.   Well, if you had to make an estimate?

22       A.   I don't know -- 20 to 50 times.

23       Q.   All right.  Prior to this day, had you ever seen

24   anyone respond after coming to from Narcan in the way

25   that Escudero did?

20

1      A.   No.

2      Q.   All right.  And what was different between how

3   he came to and what you had seen in the past?

4      A.   Usually what I've seen in the past when someone

5   comes to with Narcan, they're a little grumpy because --

6   for whatever reason and they talk a lot of crap to us,

7   you know, but it doesn't usually extend beyond them

8   running their mouth.  This guy really didn't say

9   anything, and he just wanted to -- he was confused at

10  first and wondering why we were here and we were

11  explaining to him, hey, this is what happened.  This is

12  why we're here.  We're trying to help you.  You weren't

13  breathing, you know, and go down the list of things that

14  we normally tell someone that was not breathing.  So he

15  was calm for a little bit, and after that, he didn't want

16  to be there anymore and he tried to get up.

17     Q.   Okay.  Well, why wouldn't you let him get up?

18     A.   Because we want him to relax, actually, after

19  giving Narcan.  So we were not trying to restrain him at

20  the time.  We didn't have any restraints on him.  He was

21  just laying on the back board with an IV on.  He was

22  trying to pull the IV out and we were trying to explain

23  to him, we're trying to help you.  We're trying to do

24  these things, and at one point, we did let him sit up.

25  He sat up.

21

1     Q.   Did -- wasn't the intention to provide him

2  medical aid?

3     A.   Yes.

4     Q.   Okay.  Was it the intention to remove him and

5  take him to a hospital?

6     A.   Yes.

7     Q.   All right.  Now, the two people that were in the

8  residence, did you have any conversation at all with

9  either of them?

10    A.   Not back and forth.  The only thing I told them

11 was to stay in the room.

12    Q.   Okay.  Did -- did you learn prior to the Narcan

13 being administered what kind of drug may have been taken?

14    A.   I did not learn what was taken, but I know the

15 sheriffs had -- were talking to them, so they may have

16 had information.  I know my paramedic had asked questions

17 about what was taken, you know, to see if that was the

18 right call to make.

19    Q.   Did anybody indicate that they believed he had

20 taken heroin?

21    A.   I wasn't aware of what he took.

22    Q.   Okay.  The decision to use Narcan, is that a

23 drug that you use for any drug overdose?

24    A.   I can't -- I'm not the paramedic, so they're the

25 lead medic and that's their decision to use Narcan or

22

1    something else.

2        Q.   Or something else, okay.  So you don't know

3    specifically if Narcan is solely used for heroin

4    overdoses, for instance?

5        A.   I do not know that.

6        Q.   Okay.  And then do you have an estimate as to

7    about how long it was from the time that he was

8    administered the Narcan to when he became combative?

9        A.   Probably --

10            MR. TERRELL:  Assumes facts not in evidence that

11   he was combative at this point.

12   BY MR. WAGNER:

13       Q.   That's fair.  I'll ask.  Did he become combative

14   at some point?

15       A.   He did become combative at some point, yes.

16       Q.   Did he become the first person to attempt to

17   fight anyone in the room?

18       A.   Yes.

19       Q.   Did he actually start swinging at personnel in

20   the room?

21       A.   Yes.

22       Q.   Did it appear that he was swinging easy or hard,

23   or how would you describe it?

24       A.   Very hard.

25       Q.   All right.  Can you describe approximately his

23

1    height and weight?

2        A.   He was a big guy.  I would say 6 -- between 6'1"

3    and 6'2", 250 pounds.

4        Q.   Okay.  And yourself, it's hard to tell from a

5    little bitty screen, but, you know, generally, what's

6    your height and weight?

7        A.   My height and weight is 6'1", 220.

8        Q.   Okay.  So when he became combative, did he get

9    up off the floor?

10        MR. TERRELL:  Misrepresents the -- misrepresents

11    the statements made by the witness.

12        MR. WAGNER:  Well, he said he got combative.

13    I'm just asking if he ever got up.

14        MR. TERRELL:  I did not hear combative.

15    BY MR. WAGNER:

16        Q.   I'm sorry.  What I'm trying to find out is, at

17    the point that he becomes combative, does he get to his

18    feet?

19        A.   I'm pretty sure he gets to his feet.

20        Q.   Okay.  For instance, I mean, when he's in the

21    living room, he's laying, what, on his back or stomach?

22        A.   He's laying on his back.

23        Q.   Okay.  And then when the Narcan is administered,

24    sometimes someone will have a reaction to it and maybe

25    feel ill.  Do you recall that?

24

1     A.   Sometimes they feel ill, yes.

2     Q.   All right.  And did that happen here?  Did he

3   appear as if he was going to vomit?

4     A.   I don't remember him appearing that he was going

5   to vomit.

6     Q.   Okay.  Did he change position from his back

7   after he came to to another position?

8     A.   I'm pretty sure we allowed him to sit up.

9     Q.   Okay.

10          MR. TERRELL:  Pretty sure -- objection.  "Pretty

11   sure" is speculation.

12          MR. WAGNER:  Okay.

13          MR. TERRELL:  And move to strike.

14   BY MR. WAGNER:

15     Q.   All right.  Do you have a recollection of him at

16   some point sitting up?

17     A.   I'm sorry, what was the question, sir.

18     Q.   Do you have a recollection of him at some point

19   after Narcan was administered of him sitting up?

20     A.   Yes, he was sitting up.

21     Q.   All right.  And at that time, is anyone talking

22   to him?

23     A.   Yes.

24     Q.   Who, generally, was conversing with him?  I

25   mean, was it everyone or was it just one or two people?

Washington, Dyjuan
**Vargas v. County of San Bernardino**

1          A.   So while medical care is going on, the

2     paramedics are talking to him.   As we were trying to get

3     him to calm down and to stop fighting, then it's a

4     combination between the sheriffs and the paramedics.

5          Q.   Okay.  Do you recall whether he was able to

6     strike anyone, that you observed?

7          A.   I know he threw lots of punches.  I don't know

8     if he actually connected with anything.

9          Q.   Okay.  In terms of -- of the actual altercation

10    that was ongoing, I take it the AMR personnel, they did

11    not strike him, Mr. Escudero?

12         A.   No.

13         Q.   All right.  I take it you and -- and the

14    engineer and your paramedic that was with you, you did

15    not strike him?

16         A.   No.

17         Q.   Okay.  And at some point, did you see any member

18    of the sheriff's department strike Mr. Escudero?

19         A.   I know there was a scuffle back and forth.  I

20    don't really remember if punches were actually thrown by

21    the sheriff.  I think they were trying to retain him most

22    of the time versus trying to throw punches.

23         Q.   Okay.  All right.  The living room area, are you

24    able to describe how big the living room area was?

25         A.   It would be -- it's small.  It's not very big.

26

1    Q.   All right.  With all the people that were there,
2    including him on the ground, there wasn't a lot of room?
3        A.   So when he was on the ground, everyone wasn't in
4    the room.  The only people that were predominantly in the
5    room was one sheriff getting information, we had the two
6    paramedics and my engineer and I'm in the doorway, that's
7    it.
8        Q.   Okay.  Now, when you arrived, the female deputy,
9    was she present or did she arrive mid Narcan or
10   something?
11       A.   I have no idea when she got there.
12       Q.   All right.  But you don't recall her being
13   present when you arrived?
14       A.   I don't know which ones were present and which
15   ones were not.
16       Q.   Okay.  All right.  Do you recall whether a taser
17   was used?
18       A.   A taser was used.
19       Q.   Okay.  And was it used more than one time?
20       A.   I'm not 100 percent sure.
21       Q.   Do you know if it was effective?
22       A.   It was not effective.
23       Q.   All right.  Did it appear to you that the
24   sheriff's personnel were able to control him physically,
25   Mr. Escudero?

27

1    A.   When are we talking?

2    Q.   When trying to place Mr. Escudero on the ground

3  for control purposes, were they able to do so?

4    A.   Not initially.

5    Q.   Okay.  At some point in time, did you actually

6  participate in helping to handcuff Mr. Escudero?

7    A.   Yes.

8    Q.   And the purpose of handcuffing him was to what,

9  transport him?

10   A.   I'm sorry, sir, you were broken up.

11   Q.   I'm sorry.  Was the purpose in handcuffing him,

12 your understanding, so that he could be transported to

13 the hospital?

14   A.   Yes, sir.

15   Q.   Did it appear that he could be transported to

16 the hospital without some type of restraint?

17   A.   No.  He could not because he was actively

18 fighting all the way up to the point where we got him

19 handcuffed.

20   Q.   Okay.  Now, I'll just take some of the ending

21 part here.  After he was handcuffed, was the gurney then

22 brought in?

23   A.   The gurney was at the door the whole time.

24   Q.   Okay.  But the gurney then is brought into the

25 living room and he's placed on the gurney?

28

1    A.    At some point, yes.

2    Q.    Okay.  And was he breathing at that time?

3    A.    He was breathing, yes, sir.

4    Q.    Okay.  Did anybody indicate that he was having

5    difficulty breathing?

6    A.    I wasn't part of the medical assessment, but we

7    did have both paramedics monitoring his condition the

8    whole time.

9    Q.    Okay.  The IV that he had in his person, did

10   that get ripped out during the attempts at fighting?

11   A.    I'm not sure if it got ripped out.  And if it

12   did get ripped out, I know that when he was put on the

13   gurney, it was reestablished.

14   Q.    Okay.  And then he was taken to the hospital by

15   AMR?

16   A.    Yes.

17   Q.    Okay.  And when he was transported from the

18   scene, did any member of your department accompany the

19   plans?

20   A.    Yes, Brett Lever.

21   Q.    Okay.  The paramedic, okay.  He went in the

22   ambulance?

23   A.    Yes, sir.

24   Q.    Okay.  So then that would have left you and the

25   engineer at the scene?

1    additional help?

2         A.   That's correct.

3              MR. WAGNER:  Okay.  All right.  Let's go back on

4    tape.

5              (Audio recording played.)

6    BY MR. WAGNER:

7         Q.   All right.  So Chief, after listening to the

8    belt recording, does that help refresh the events of what

9    was transpiring at the time?

10        A.   Yeah.

11        Q.   Okay.  All right.  And at the point where

12   they're attempting to handcuff Mr. Escudero, and he's on

13   the ground, can you tell me which deputy was trying to

14   put handcuffs on him?

15        A.   So at the point -- well, so the first attempt,

16   Deputy, I want to say, Mata, was trying to handcuff him,

17   him and Miranda.  But he had made his way over to

18   Attlesey, and he had positioned himself -- she was

19   trapped.  She was between the couch and him with no where

20   to go.  So -- and that's when Mata had one of his hands

21   handcuffs and that's when he asked her for her other pair

22   so then he can get the other arm.

23        Q.   Okay.  And in terms of Deputy Attlesey, the lady

24   deputy, did she strike him that you observed when she was

25   in the area pinned near the couch by Escudero?

33

1   A.   I don't remember her striking him.  So she had

2   her bar out and she was using the bar and she would take

3   the bar and she would, like, put it in his trap, you

4   know, or something like that to make him stop.  She also

5   was using her bar for leverage to try and get him arm

6   behind his back, but I don't remember her using that as a

7   weapon to strike him with.

8   Q.   Okay.  Now, do you recall giving a statement

9   then to the homicide team?

10   A.   Yes.

11   Q.   Okay.  And, actually, what we'll do is, we'll --

12   I'll ask you a few more questions.

13        Autumn, if you could put the transcript, Exhibit

14   19, into the chat box, and then what we'll do is we'll

15   play Exhibit 20, which is the audio of this recording.

16        (Exhibits 19 and 20 marked.)

17   BY MR. WAGNER:

18   Q.   While she's doing that before we get to any of

19   those things, let me ask you a few questions.  Based upon

20   what you observed that day, did the deputies get involved

21   after Escudero became combative?

22   A.   Yes.

23   Q.   And when he got combative, what do you recall

24   him first doing?

25   A.   Taking a swing at Brett Lever.

34

1    Q.   Okay.  And do you recall referring to that as a

2  haymaker -- "haymaker swing"?

3    A.   Haymaker swing.

4    Q.   All right.  And I'm assuming Brett was able to

5  dodge or miss the swing?

6    A.   Yes.

7    MR. TERRELL:  Calls for speculation.

8    THE WITNESS:  He was not hit.

9  BY MR. WAGNER:

10   Q.   He was not hit, okay.  And at that point, did

11  the call change in nature in terms of, we're here to

12  render medical aid and take him to the hospital and now

13  it appears that the subject is trying to fight us?

14   A.   It just postponed care, I would say.  It didn't

15  really change the nature.  Now the sheriffs have to get

16  involved to try to, you know, either calm him down by

17  talking to him or restrain him so we can finish rendering

18  care.

19   Q.   Okay.  Do you recall at any point in time that

20  the engineer, Martin Alcon, whether he was trying to hold

21  down Escudero's legs?

22   A.   I don't recall Martin Alcon getting too

23  involved.

24   Q.   Okay.  And how would you describe your

25  involvement in terms of whatever assistance you provided

35

1    to the deputy sheriffs based upon what Escudero was

2    doing?

3        A.   My involvement -- I was not involved at all

4    until the very, very end, and that was to get his second

5    hard around his back to get him handcuffed.

6        Q.   Okay.  What did you do in that regard?

7        A.   I just held his shoulders to the ground so they

8    can grab his arms and put them to this back.

9        Q.   Okay.  And how did you hold his shoulder to the

10   ground?

11       A.   I held his shoulder to his ground -- I think I

12   had my foot on his shoulder, to be exact.

13       Q.   Okay.  And you were braced in the doorway --

14       A.   Yes.

15       Q.   -- going to the kitchen and living room and

16   using your foot to press down on him to help control him?

17       A.   Yes, sir.

18       Q.   Okay.  And do you recall whether they were

19   trying to use a baton at that time to pull the other arm

20   out underneath him?

21       A.   They were using the baton to pull the other arm

22   out.

23       Q.   Okay.  Did you ever see the baton used as a

24   strike weapon?

25       A.   No.

1    Q.   All right.   After he was in handcuffs, did he

2    calm down?

3    A.   No.

4    Q.   Did he calm down after the Versed was

5    administered?

6    A.   Yes.

7    Q.   The Versed, was that administered by AMR?

8    A.   I believe so.   Listening to the audio, it sounds

9    like it was administered by AMR.

10        MR. TERRELL:   Calls for speculation.   If he's

11   relying on the audio instead of his memory, I would

12   object.

13   BY  MR. WAGNER:

14   Q.   On the transcript there's a reference to an Alex

15   Gabler.   Do you remember an Alex Gabler?

16   A.   Well, I don't know who he is.   I know he's not

17   one of our guys.

18   Q.   Okay.   Did you ever have a discussion with any

19   of your personnel about the administration of the Narcan,

20   which may be a stimulant of some kind, to bring somebody

21   out of a heroin overdose and then administering a

22   sedative to essentially calm him down?

23        MR. TERRELL:   I would object to that as compound

24   and also it exceeds his expertise.

25        MR. WAGNER:   I'm asking if he had a

37

Washington, Dyjuan
**Vargas v. County of San Bernardino**

1    conversation.

2            THE WITNESS:  No conversation.

3    BY MR. WAGNER:

4        Q.   Okay.  When Escudero left on the gurney, I guess

5    being cared out or wheeled out to the ambulance to go to

6    the hospital, was he breathing?

7        A.   He was breathing.

8        Q.   He was alive?

9        A.   He was alive.

10       Q.   All right.  Was he bleeding?

11       A.   He was bleeding.

12       Q.   Do you know where he was bleeding from?

13       A.   I do not.

14       Q.   Okay.  At any point in time, did you ever speak

15   to the man and woman that were in the residence, other

16   than observing them?

17       A.   Only to tell them to stay in the room.

18       Q.   Okay.  Did they provide any information that you

19   recall that was assistive in any way?

20       A.   I did not speak to them.

21       Q.   All right.  There was a reference on the tape

22   about this won't work, it's stuck, it's 911 and it pops

23   out.  Do you know what they're referring to?

24       A.   They're referring to AMR's lock box, so the 911

25   is the combo on the lock.

**Jilio-Ryan Court Reporters**
**ph. 714.424.9902  info@jilioryan.com**

1       A.    Yes.

2       Q.    Okay.  Is there anything that you recall saying

3   in that interview that was critical of any of the deputy

4   sheriffs?

5            MR. TERRELL:  I would object to the term

6   "critical" as being vague and overbroad.

7   BY MR. WAGNER:

8       Q.    You can still answer if you understand.

9       A.    I don't remember referencing the deputies in

10  that interview too much.

11      Q.    Is there anything that you observed that day

12  that seemed out of line by the deputies?

13      A.    No.

14      Q.    All right.  If the deputies weren't there, do

15  you have any reason to doubt that Escudero would not have

16  tried to hurt any one of you?

17            MR. TERRELL:  Objection.  Calls for speculation.

18  BY MR. WAGNER:

19      Q.    You can answer.

20      A.    I don't have anything to say about that.

21      Q.    All right.  Well, were you glad the deputy

22  sheriffs were there?

23      A.    Very.

24            MR. WAGNER:  All right.  Let's -- what we'll do

25  is -- has everyone been able to access the other

40

1    transcript?

2         MR. SPAULDING:  Yes.

3         MR. WAGNER:  Okay.  Jim, were you able to print

4    it off?

5         MR. TERRELL:  Yes, I was.

6         MR. WAGNER:  I'm not going to play the whole

7    thing, because I'll tell you, it's an hour-long tape and

8    there's no need to go through it.  But I am going to play

9    a portion of the tape up front and then I'll ask you some

10   questions about some of that.  And so, Chief, you've got

11   the ability to look at the transcript?

12        THE WITNESS:  Yes, sir.

13        MR. WAGNER:  All right.  Great.  So the

14   transcript is Exhibit 19 and then Exhibit 20 will be the

15   audio.

16        And, Autumn, if you could, let's start the

17   audio.

18        (Audio recording played.)

19   BY MR. WAGNER:

20        Q.   Let me ask you a few questions.  Do you

21   recognize your voice in that interview?

22        A.   Yes.

23        Q.   And do you recall giving that interview?

24        A.   Yes.

25        Q.   All right.  And at least listening to that

41

1    portion of the recording, does that appear to be the

2    questions and answers that you were given in that -- that

3    you were giving to them in that interview?

4        A.   Yes.

5        Q.   Okay.  Do you recall that at least from the belt

6    recording, your memory, your interview, whatever you were

7    listening -- what we just listened to, that Escudero was

8    saying why are you hitting me as he's swinging at people

9    in the room?

10           MR. TERRELL:  Calls for speculation.

11   BY MR. WAGNER:

12       Q.   Chief, do you understand the question?

13       A.   No, sir, I don't understand the question.

14       Q.   Let me try to rephrase it.  Did it appear to you

15   that at times where Escudero would say, "Why are you

16   hitting me," when he's saying that, he's actually

17   swinging at either deputies or fire personnel?

18       A.   Yeah.

19           MR. TERRELL:  Assumes facts not in evidence that

20   he was swinging while he was saying those words.

21   BY MR. WAGNER:

22       Q.   I'm asking him.

23       A.   While he was saying those words, he was

24   fighting.

25       Q.   Okay.  When did he stop fighting from the time

1   he started fighting and was combative?

2       A.   He stopped fighting when we gave him Versed.

3   When the paramedics gave him Versed.

4       Q.   All right.  Now, someone had to handle his legs

5   because he was kicking also?

6       A.   Yes.

7       Q.   When the cuffs were applied to him, was Versed

8   applied -- strike that.

9           Was the Versed administered before he was in

10  handcuffs or did the Versed -- was it administered, which

11  allowed you to get the last handcuff on?

12      A.   Versed was administered after he was completely

13  handcuffed.

14      Q.   Okay.  When he was handcuffed, he was still

15  fighting?

16      A.   He was.

17      Q.   Okay.  But he was on his stomach or back?

18      A.   He's like on his side.

19      Q.   Okay.  But his hands would have been cuffed

20  behind him; correct?

21      A.   Yes, sir.

22      Q.   Was somebody holding his feet or legs?

23      A.   Somebody was on his feet.

24      Q.   Okay.  And what I at least played initially for

25  you on the audio statement that you gave to the homicide

1  detectives, do you recall if that's similar to what you

2  advised the FBI?

3      A.   Yes.

4      Q.   Without the assistance of Alcon on his legs and

5  you using your foot to bring his shoulder down to help

6  get his arm out, did it appear the three deputies were

7  able to handcuff him without your assistance?

8      A.   No.

9      Q.   Now, I had asked you earlier about whether he

10 ever got to his feet in a standing position.  As you

11 think back and after you've listened to some of the

12 recordings, do you recall that he did in fact reach his

13 feet?

14     A.   I'm still -- I'm not 100 percent whether he

15 reached his feet or not.  I'm pretty sure he got all the

16 way up.

17         MR. TERRELL:  I would object.  Calls for

18 speculation.  He said he was unsure.  Move to strike.

19 BY MR. WAGNER:

20     Q.   Your best recollection as you sit here is that

21 he was able to get to his feet?

22     A.   Best recollection, yes.

23         MR. TERRELL:  That misstates his testimony.

24 BY MR. WAGNER:

25     Q.   Okay.  And your answer was what, sir?

44

1      A.    Yes.

2      Q.    All right.  Were you able to make a

3  determination as to whether or not Escudero even knew he

4  was fighting with deputies?

5          MR. TERRELL:  I would object that it exceeds his

6  scope and expertise, calls for expert opinion.

7          MR. SPAULDING:  I would also add it calls for

8  speculation.

9  BY MR. WAGNER:

10     Q.    Well, despite all those objections, you can

11  still answer if you have a response.

12     A.    I can't answer that question, sir.

13     Q.    All right.  Bear with me.  I'm just going

14  through my notes here and making sure I've covered

15  everything.  At some point in time, when you indicated

16  that deputies -- the female deputy was trapped near the

17  couch, can you describe the position of Escudero when she

18  was in that position?

19     A.    So he had pushed her to where she was almost

20  seated on the couch, so he had her in a position of

21  disadvantage.

22     Q.    All right.  And was he on his knees, his hands

23  and knees?

24     A.    He's like -- he's leaning on her.  So he's not

25  totally on his feet but he's not totally on his knees

45

1    either.

2        Q.   Okay.

3        A.   His weight is on her.

4        Q.   Do you know if he was able to strike her?

5        A.   I'm not sure.

6        Q.   Okay.

7            MR. TERRELL:   Misstates his testimony that he

8    didn't strike anyone.

9    BY MR. WAGNER:

10       Q.   Well, when you were in the doorway, from time to

11   time would you look away to see what the other people

12   were doing?

13       A.   Yes.

14       Q.   So obviously any time you looked away, if

15   something had happened in your line of vision that you

16   used to have before you looked away, you didn't see it?

17           MR. TERRELL:   Calls for speculation.

18   BY MR. WAGNER:

19       Q.   Well, if you're looking one way and something is

20   happening behind you, you don't see it; correct?

21       A.   If I'm looking one way and something happens

22   behind me, I don't see it.

23       Q.   Okay.  Did it appear that any punches that

24   landed on Mr. Escudero had any effect?

25           MR. TERRELL:   Objection.  Vague as to "effect,"

1  there's been a -- the issue that's arisen is excited

2  delirium?

3       MR. TERRELL:  Objection as to the term "excited

4  delirium."  It's not recognized by AMA and exceeds his

5  scope of expertise to testify on excited delirium.

6       MR. WAGNER:  I'm not asking that I'm just asking

7  if he's ever gone to a call where that's been an issue.

8       MR. TERRELL:  That -- the term is a term of art

9  for experts.

10      MR. WAGNER:  And I'll follow-up with some more

11 questions, Jim, but your objections are well taken.

12      THE WITNESS:  So explain excited delirium.  What

13 do you mean by that?

14 BY MR. WAGNER:

15      Q.   Have you ever heard that term?

16      A.   Not in my daily duties.

17      Q.   Okay.  Have you ever had training in the issue

18 of excited delirium?

19      A.   No.

20      Q.   Okay.  After he was transported to the hospital,

21 what did you do?

22      A.   After he was transported to the hospital, then I

23 went outside and stood by for the deputies to -- the

24 sheriff and the captain -- not the captain but for the

25 sergeant to arrive to do interviews.

48

**Washington, Dyjuan**
**Vargas v. County of San Bernardino**

1    Q.   Okay.  Did you speak to a sergeant who arrived?

2    A.   Yes.

3    Q.   Do you remember who that was?

4    A.   No.

5    Q.   Okay.  Do you recall speaking to a Tiffany

6    Kautz, K-a-u-t-z?

7    A.   I do not remember who I talked to that day.

8    Q.   Okay.  You don't remember speaking to a female

9    deputy?

10   A.   It may have been a female.

11   Q.   All right.  Do you recall saying anything about

12   the deputy struck him a few times trying to get him back

13   down?

14   A.   I do not recall, sir.

15   Q.   All right.  So your recollection of the events

16   today -- did the recordings help your -- your

17   recollection of the events?

18   A.   A little.

19   Q.   Okay.  I mean, would you say that the statement

20   you gave October 23rd, 2019 probably has more detail and

21   perhaps accuracy than, say, your recollection today,

22   February 8th, 2022?

23   A.   Yes.

24   Q.   Okay.  Is there anything that you recall about

25   the day that in hindsight you thought should have been

49

1    done differently?

2         A.   No.

3              MR. WAGNER:  All right.  I'll pass the witness.

4         Jim, if you need anything, I've got the

5    recording here and we can play it.

6              MR. TERRELL:  I only have -- I just have one or

7    two quick questions.

8              MR. WAGNER:  Sure.  No problem.

9              MR. TERRELL:  Okay.

10                       EXAMINATION

11   BY MR. TERRELL:

12        Q.   Do you remember when you were being interviewed,

13   making a statement that you never saw the -- any of the

14   punches that were thrown by my client ever strike anyone?

15        A.   I'm sorry, sir, who is your client?

16        Q.   Mr. Ruben Escudero.

17        A.   Okay.  Yeah.

18        Q.   Okay.  Thank you.  I have no other questions.

19             MR. WAGNER:  Okay.  All right.  So what we'll do

20   is, I will ensure that the audio files are provided to

21   the court reporter for purposes of the record.

22             Kevin, if you want the audio, we'll make sure

23   you get a copy of the two statements that were used.

24   Everybody has the transcript.

25             With that, Chief, we appreciate your time.  What

50

1    I, the undersigned, a Certified Shorthand Reporter

2  of the State of California, do hereby certify:

3    That the foregoing proceedings were taken before me

4  at the time and place herein set forth; that any

5  witnesses in the foregoing proceedings, prior to

6  testifying, were administered an oath; that a record of

7  the proceedings was made by me using machine shorthand

8  which was thereafter transcribed under my direction;

9  further, that the foregoing transcript is a true record

10  of the testimony given.

11    Further, that if the foregoing pertains to the

12  original transcript of a deposition in a Federal Case,

13  before completion of proceedings, review of the

14  transcript [  ] was [  ] was not requested.

15    I further certify I am neither financially

16  interested in the action nor a relative or employee of

17  any attorney or any party to this action.

18    IN WITNESS WHEREOF, I have this date subscribed my

19  name.

20

21  Dated: February 17, 2022            *Ramona Lux*

22                          _____

23                          RAMONA M. LUX
                            CSR No. 12846

24

25

EXHIBIT "25"

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA


CECILIA VARGAS; ARIANA SALAS,     )
individually and as a            )
successor-in-interest to RUBEN   )
ESCUDERO, deceased,              )
                                 )
          Plaintiffs,            ) Case No.
                                 ) 5:20-cv-02646-JGB-KK
      vs.                        )
                                 )
COUNTY OF SAN BERNARDINO; H.      )
MIRANDA; S. CARTER; Z. VOGEL; J. )
MATA; Z. PRITCHETT; J. JIMENEZ;  )
A. MATA; T. KAUTZ; J. ATTLESEY;  )
RODRIGUEZ (first initial         )
unknown); and DOES 1-10,         )
inclusive,                       )
                                 )
          Defendants.            )
_____)


DEPOSITION OF ALEX GABLER

THURSDAY, DECEMBER 15, 2022

TAKEN REMOTELY VIA ZOOM



Reported by:

SUSAN H. CAIOPOULOS
CSR No. 8122

1

```
 1                UNITED STATES DISTRICT COURT

 2               CENTRAL DISTRICT OF CALIFORNIA

 3

 4

 5   CECILIA VARGAS; ARIANA SALAS,    )
     individually and as a           )
 6   successor-in-interest to RUBEN  )
     ESCUDERO, deceased,             )
 7                                   )
              Plaintiffs,            ) Case No.
 8                                   ) 5:20-cv-02646-JGB-KK
          vs.                        )
 9                                   )
     COUNTY OF SAN BERNARDINO; H.    )
10   MIRANDA; S. CARTER; Z. VOGEL; J.)
     MATA; Z. PRITCHETT; J. JIMENEZ; )
11   A. MATA; T. KAUTZ; J. ATTLESEY; )
     RODRIGUEZ (first initial        )
12   unknown); and DOES 1-10,        )
     inclusive,                      )
13                                   )
              Defendants.            )
14   _____ )

15

16

17

18

19          DEPOSITION OF ALEX GABLER, taken remotely via

20   Zoom, on behalf of Defendants, beginning at 1:04 p.m.

21   and ending at 4:45 p.m. on Thursday, December 15, 2022,

22   before SUSAN H. CAIOPOULOS, Certified Shorthand Reporter

23   No. 8122.

24

25
```

2

Gabler, Alex
Vargas v. County of San Bernardino

```
 1    APPEARANCES:

 2

 3    For Plaintiffs:

 4         LAW OFFICES OF DALE K. GALIPO
           BY:  RENÉE V. MASONGSONG, ESQ.
 5         BY:  EUGENIA BAGDASSARIAN, ESQ.
           21800 Burbank Boulevard, Suite 310
 6         Woodland Hills, California 91367
           (818) 347-3333
 7         rvalentine@galipolaw.com
           ebagdassarian@galipolaw.com
 8

 9    For Defendants:

10         WAGNER ZEMMING CHRISTENSEN, LLP
           BY:  DENNIS E. WAGNER, ESQ.
11         1325 Spruce Street, Suite 200
           Riverside, California 92507
12         (951) 686-4800
           dew@wzclawfirm.com
13

14

15    Also Present:

16         AUTUMN GARRISON, Paralegal

17

18

19

20

21

22

23

24

25
```

3

```
1                    I N D E X

2    WITNESS                           EXAMINATION

3    ALEX GABLER

4
                    BY MR. WAGNER            6, 69
5
                    BY MS. MASONGSONG          49
6

7

8

9

10                 E X H I B I T S

11   NUMBER            DESCRIPTION            PAGE

12   Exhibit 52   Audio interview, 01:32:05        40

13   Exhibit 53   Audio interview, 00:02:33        46

14   Exhibit 54   Transcription of Alex Gabler     40
                  Interview conducted 10/24/19;
15                 (COSB 004816 - COSB 004933

16   Exhibit 55   Audio interview, 00:08:22        37

17   Exhibit 56   Transcription of Alex Gabler     37
                  Interview, 08:22;
18                 (COSB 004718 - COSB 004728)

19   Exhibit 57   Hand-drawn diagram dated 10/24/19;  35
                  (COSB Rule 26 001134)
20
     Exhibit 58   AMR document entitled, "Complete   24
21                 ePCR w/attachments"; 6 pages

22

23

24

25
```

4

1                    THURSDAY, DECEMBER 15, 2022

2                      1:04 P.M. - 4:45 P.M.

3

4           THE REPORTER:  Good afternoon.  Today's date is

5    December 15, 2022, and the time is approximately

6    1:04 p.m.

7           This is the deposition of Alex Gabler, taken in

8    the matter of Cecilia Vargas, et al., versus County of

9    San Bernardino, et al., Case No. 5:20-cv-02646-JGB-KK.

10          My name is Susan Caiopoulos, a court reporter

11   affiliated with Jilio-Ryan Court Reporters located in

12   Tustin, California.

13          Would all present please state your name and

14   whom you represent, beginning with the noticing

15   attorney.

16          MR. WAGNER:  Dennis Wagner, Wagner Zemming

17   Christensen.  I represent the defendants in the lawsuit.

18          MS. MASONGSONG:  Renée Valentine Masongsong.

19   I'm with the Law Offices of Dale Galipo, and I'm one of

20   the attorneys for the plaintiffs in this matter.

21

22                           ALEX GABLER,

23          having been administered an oath, was

24          examined and testified as follows:

25   //

1          I believe my office may have provided some

2     materials for you to review.  I don't know, did you

3     receive materials from my office?

4          A    I did receive some materials, yes.

5          Q    Okay.  Did you have a chance to review those?

6          A    Some of it, yes, I did.

7          Q    Okay.  And I believe that our office provided

8     you, what, the transcripts of your interviews with the

9     sheriff's homicide or deputies?

10         A    Yes.

11         Q    Okay.  And let me see.  Is there any reason why

12    you can't give your best testimony today as to what

13    happened back in October of 2019?

14         A    No.

15         Q    All right.  I take it as of the date of this

16    incident you worked for AMR?

17         A    I do not anymore.  I did, obviously, at the

18    time.

19         Q    Okay.  And when did you leave AMR?

20         A    Officially, probably three months ago.

21         Q    Oh, okay.  So that would be like, what, maybe

22    September of 2022?

23         A    Correct.  I went to a part-time status in March

24    of 2020, and just resigned within the last two to three

25    months.

8

1      Q   Okay.  One of my friends, his son just started

2   working for AMR in Riverside.  He's a brand-new EMT, and

3   I think he's getting ready to go to paramedic school or

4   something.

5      A   Good for him.

6      Q   Anyway, on the day of the incident what were

7   your qualifications?  Were you an EMT or a paramedic?

8      A   I was a paramedic.

9      Q   All right.  So the paramedic is the lead person

10  in terms of the vehicle that arrived that day, correct?

11     A   Correct.

12     Q   All right.  And so it's you and, what, one

13  other person, the EMT?

14     A   Correct.

15     Q   All right.  And who was the EMT?

16     A   Karla Lugo.

17     Q   Okay.  And how long had you been working at AMR

18  as of the date of this incident, approximately?

19     A   Approximately three years.

20     Q   Okay.  I take it that -- for this incident did

21  you recognize anybody that was at the scene that day,

22  whether it was Mr. Escudero, any of the fire people, any

23  of the deputies?

24     A   I recognized the fire department crew, just

25  based off of how many incidents I had ran with them in

1    the past.

2        Q    Okay.  And who do you recall being there from

3    the fire department?

4        A    Brett Lever was the firefighter/paramedic.  And

5    I don't recall the names of the two other crew members.

6        Q    All right.  Prior to coming to AMR, had you

7    worked in the medical field at all as an EMT or a

8    paramedic?

9        A    Yes.  I worked for IFT, just interfacility

10   transport companies and event companies as an EMT prior.

11       Q    Okay.  Event companies like concerts, and

12   you're just --

13       A    Correct, yes.

14       Q    -- handling people that do too much of

15   something at a concert?

16       A    For lack of better terms, yes.

17       Q    Okay.  All right.

18            Now, if you've got the call sheet there, you

19   know, in my opinion, just if you need to refer to it for

20   a time or something like that to refresh your memory,

21   that's fine.  For purposes of my questions I'm not here

22   to trick you into saying anything or to necessarily do a

23   complete memory test of you.

24            But do you recall generally when you received

25   the call that day?

10

1     A    It was in the morning time, because we had just

2  come on shift.

3     Q    **All right.  And when did your shift start?**

4     A    My memory would tell me either 0800 or 0900.

5     Q    **All right.  8:00 or 9:00 in the morning?**

6     A    Correct.

7     Q    **And where would you report to to go to work?**

8     A    The AMR main located off of 7th Street in

9  Victorville.

10    Q    **All right.  And so that day you show up for**

11 **work.  Your assignment is to, what, I guess stay at the**

12 **facility until there's a call of some kind?**

13    A    So somewhat.  On the assigned unit that was on

14 that day, it's a 12-hour-shift assignment.  And in that

15 12 hours we move our ambulances around strategically so

16 that we can be within range of calls.

17         So we do what's called system status posting.

18 So you get like 10 minutes to check your unit out to

19 make sure your gear is good to go from the time that you

20 started your shift, and then after that you get sent out

21 to random posts within the coverage area throughout the

22 day.

23    Q    **Okay.  So this day do you recall that you were**

24 **actually sent to an area to I guess stage and wait for a**

25 **call?**

11

Gabler, Alex
Vargas v. County of San Bernardino

```
 1        A    Yes.  Referencing where the call is, I would
 2   say our post was -- our post is where we go, Palmdale
 3   and the 15 Freeway.
 4        Q    All right.  And so that's where you were that
 5   morning?
 6        A    When the call came out?
 7        Q    Yeah.
 8        A    Correct.
 9        Q    All right.  And when you're stationed at a
10   destination such as Palmdale and the 15 Freeway, are you
11   just sitting in your vehicle?
12        A    Correct.
13        Q    All right.  So the call comes in, and how does
14   the call come in to you?
15        A    How do they dispatch the call?
16        Q    Yeah.  I mean, I'm assuming it's a dispatch
17   coming from your company, correct?
18        A    Correct.
19        Q    All right.  So your company is dispatching you.
20   What information do they give you?
21        A    Initially they'll give us the call type.  So if
22   the organization that they receive the call from
23   dictates it's a traffic accident, if it's an overdose,
24   whatever it may be, they'll dictate that information to
25   us just basically.  So the call type that morning would
```

12

1    have come in as an overdose.

2         Q    Okay.

3         A    Overdose, poisoning, or ingestion.

4         Q    All right.  So I take it as the paramedic

5    you're not the driver?

6         A    Correct.

7         Q    All right.  So Lugo was driving?

8         A    Correct.

9         Q    Any idea approximately how long it was from the

10   time you got the call till when you arrive on scene?

11        A    I'm referencing the form from AMR.

12        Q    Sure.  That's fine.

13        A    Our dispatch time was 09:08:24 seconds, and our

14   at scene time was 09:13:18 seconds.

15        Q    Okay.  So maybe about four minutes to get

16   there?

17        A    Correct.

18        Q    And did you travel lights and siren?

19        A    Yes.

20        Q    Okay.  When you got to the area where you turn

21   onto the street where the scene would be located, did

22   you see other emergency vehicles present in the street?

23        A    Yes, Medic Engine 311 from the City of

24   Victorville was already on scene.

25        Q    All right.  Any police cars?

1       A    I don't recall.

2       Q    Okay.  And when you arrived, I take it that you

3  and Lugo exit your vehicle and go to the residence?

4       A    Correct.  We grab whatever gear that we may

5  need and load it onto our gurney, and then take the

6  gurney up there with us.

7       Q    Okay.  And the gurney you're referring to is

8  just the -- does it have wheels on it of some kind?

9       A    Wheeled stretcher, yes.

10      Q    Okay.  And were you able to determine where you

11  were going to be going?  As I understand, there may have

12  been a backhouse or a back unit.

13      A    Yeah.  Yes, we're able to determine just based

14  on which door was open at the time, and kind of being

15  able to hear the crews inside talking.

16      Q    All right.  And when you arrived and actually

17  came inside the residence that day, what did you

18  observe?

19      A    So I observed the patient lying on his back,

20  with the fire department providing respirations via bag

21  valve mask, which is just the big mask that we use to

22  breathe for people.

23           The firefighter/paramedic on the engine that

24  day gave me just a quick run-down as to what had

25  happened.  He stated that it was a potential overdose.

                                                                14

1    They believed that they saw some kind of para --

2    paraphernalia.  I cannot pronounce that word.  They

3    believe they saw some kind of thing that would identify

4    that in our case and were treating it as such.

5        They had given Narcan, or naloxone, the

6    medication that we use to reverse a heroin overdose or

7    suspected opiate overdoses, and just kind of gave me

8    that quick pass-down.  So that's where we were at right

9    there.

10       Q   Okay.  And did they tell you how much Narcan

11   was administered?

12       A   Off the top of my head I don't recall.

13   Referencing the form, I know I wrote that in there, a

14   total of 2 milligrams of Narcan prior to my arrival.

15       Q   Okay.  And do you know how the Narcan had been

16   administered?  Did they tell you?

17       A   Via the nasal cavity, so IN.

18       Q   All right.  Some type of nasal dispenser, you

19   squeeze it?

20       A   Correct.  So it's -- the medication is set in

21   what we call a preload, and then you can attach the

22   device that we use to spray it in the nose.  So it

23   atomizes it to get it to spread and then be absorbed

24   appropriately.

25       Q   Okay.  And so when you arrived the Narcan had

1    already been administered?

2         A    Correct.

3         Q    All right.  And in terms of the person that was

4    there on their back being bagged, was there anything

5    else that you recall about that person, other than

6    they're just on the ground in that condition?

7         A    Nothing I could recall that would stand out.

8         Q    Okay.  All right.

9              And in terms of the events that day,

10   essentially what happened next that was significant in

11   some fashion?

12        A    So from the point that I was given the

13   pass-down, me as the second on-scene paramedic, I know

14   my job is now to kind of focus on how we're going to

15   move this patient.

16             My apologies.  My phone just went off.

17             My job becomes facilitating moving the patient

18   to the ambulance.

19             So I talked with my partner.  We formulated a

20   plan to set the gurney up a certain way.  I grabbed our

21   patient-moving device, which we refer to as a MegaMover.

22   It's just a tarp with handles on it.  We utilize it all

23   the time to move patients.

24             So grabbed all that, went inside, and then we

25   had started maneuvering the patient so that we could get

16

Gabler, Alex
Vargas v. County of San Bernardino

1    him onto the MegaMover.  And then that's when he had

2    woke up basically from the Narcan and just immediately

3    became violent with us.

4         Q    What do you mean he immediately became violent

5    with you?

6         A    So in these circumstances a lot of the times

7    we'll see people wake up -- kind of like if we were to

8    wake you up from a dead sleep -- very confused,

9    sometimes agitated, but more or less confused.  So we

10   always try to talk and explain what's going on and help

11   them understand.

12         And as we were trying to do that, he just

13   continued to be combative is what we refer to it as.  So

14   not following our command to just, "Hey, let us just

15   help you out.  We're trying to help."

16         He rolled over towards me and grabbed my leg

17   and then started swinging like he was trying to punch me

18   in the legs, as we're again trying to calm him down to

19   explain what we're doing.

20         Q    Now, in terms of AMR and you being a paramedic,

21   and the fire department having a paramedic, is everyone

22   trying to communicate with him at the same time, or does

23   somebody take a lead role of some kind?  How does that

24   work?

25         A    So a lot of the times it will kind of be

17

1   everybody at once, and then we kind of can filter down

2   to just one person.  It really just depends on who the

3   patient is looking at or paying attention to or what

4   have you in that instance.

5         Because he was kind of focused towards me, I

6   was trying to kind of be the stern but also supportive

7   voice to just get him to understand that we were just

8   trying to help.

9       Q   Okay.  So when he's on his back and he rolls

10  over to you, is he on his side at that point?

11      A   So he -- I just want to just clarify that.  He

12  was on his side because we were trying to maneuver him

13  to put the tarp under him, and he happened to be facing

14  me on his side.

15      Q   Okay.

16      A   He didn't individually target me in that

17  instance.

18      Q   Okay.  And so as you're getting ready to put

19  him onto the tarp he comes to essentially, and he's

20  trying to grab you and starts to swing at you?

21      A   Correct.

22      Q   And so essentially what happens next in terms

23  of this event?

24      A   So one of the sheriff's deputies had arrived

25  either prior to us getting there or in this instance.

Gabler, Alex
Vargas v. County of San Bernardino

1   Like I said, I genuinely don't recall exactly when the
2   first deputy arrived.
3          Sorry, my dog is going crazy because my wife
4   just got home.  Give me just one second.  I don't want
5   to yell at the dog on Zoom.
6       Q   Sure.
7       A   Sorry about that.  One of my dogs just had
8   surgery.  So my apologies.
9       Q   No problem.
10      A   The question being referenced was what happened
11  after that?
12      Q   Yeah, essentially what was the next thing after
13  he's grabbing you and grabs your leg and starts
14  swinging?
15      A   So the sheriffs or the deputy had been there
16  that instance and kind of pulled him back to the side to
17  try and restrain and detain him so that we could
18  continue our care, so we can continue doing our job.
19      Q   Do you remember how many deputies were present
20  when you arrived?
21      A   I don't recall.  Like I had mentioned, I don't
22  know if he was there prior or if he had showed up after
23  we did.
24      Q   Okay.  Do you remember a female deputy being
25  present?

Gabler, Alex
Vargas v. County of San Bernardino

1      A    At the end of the incident, yes.

2      Q    All right.  And as a deputy started to attend

3   to him, can you describe that person?

4      A    Just a deputy wearing the uniform, not any

5   specifics.

6      Q    Okay.  And what did you see happen?

7      A    I saw the patient and him become kind of -- I

8   don't want to say kind of -- the patient and him were

9   going back and forth with trying to have the patient

10  restrained and subdued so that we could move the patient

11  to the gurney to be able to transport.

12          Again, the deputy at the time was trying to

13  explain and talk him through, "Just relax.  Just calm

14  down.  Let us help you."  And the patient just wasn't

15  able to -- wasn't following that command.  So he

16  continued to try and fight the deputy at the time.

17     Q    And how would you describe what you observed in

18  trying to fight the deputy?

19     A    So the deputy was doing what he could to keep

20  him down on the ground, and the patient just continued

21  to swing and kick and do anything he could to stop what

22  was happening.

23     Q    And the positioning of the person on the

24  ground, Mr. Escudero, was he seated?  On his side?  On

25  his butt?  On his back?  How was he positioned?

20

1      A   So he was on his back and continuing to try to

2   get up.  So every time that he would go to stand up, the

3   deputy was able to keep him down, and then it would just

4   return with him kicking the deputy or punching the

5   deputy, what have you.

6      Q   All right.  And then what essentially happens

7   next in terms of the events that day?

8      A   So to what I recall, a second deputy had

9   arrived, and they -- the both of them were again trying

10  to subdue him, the patient, to get him restrained so

11  that we could do our job.

12        I don't recall precisely the events that

13  unfolded at that moment, but I remember seeing the

14  patient be able to stand up, and then go back to the

15  ground via them trying to restrain him.  And it kind of

16  went back and forth like that for a short amount of

17  time, until the third deputy had arrived, which was the

18  female deputy.

19        And at that point it kind of didn't seem like

20  it was going to go anywhere, that -- it didn't seem like

21  it was going to go anywhere, and we wanted -- we, and

22  I'd say me, wanted to kind of step in and see if we

23  could help, but obviously not in a physical aspect.

24        So I made a verbal kind of contact across the

25  room with the firefighter/paramedic, and we had kind of

1     went back and forth on if we could administer Versed, or

2     midazolam is the medication, to chemically sedate him in

3     this instance.

4          So we had just received the protocol for

5     behavioral emergency for -- if we felt we were unsafe or

6     if the patient was doing more damage to themselves, we

7     could use the medication to -- I don't like to use the

8     word chemically restrain, because that's not the exact

9     verbiage, but that's what we're trying to do, is put

10    them in a place where we're able to do our job safely.

11         Q    Okay.  And I think you said when you had the

12    gurney with you -- the gurney, was that in the residence

13    or outside?

14         A    It was just outside of the front door.

15         Q    Okay.  And the tarp or the canvas bag with

16    handles, did you bring that in or was that also outside

17    the residence?

18         A    That was now on the floor, because we were

19    trying to manipulate him onto it.

20         Q    Okay.  And at some point in time did you see

21    anyone strike Mr. Escudero?

22         A    Oh, yes.  Yes.

23         Q    What did you observe?

24         A    I saw the two initial deputies striking him

25    with closed fists and hands.  And then I believe at one

22

1    point I saw one of the deputies using the baton that

2    they carry.

3        Q    What did you see them do with the baton?

4        A    Just hit him to try and restrain him.

5        Q    Okay.  Did you observe the baton being used to

6    try and pry his arm out from underneath him when they

7    were trying to handcuff him?

8        A    I don't recall.

9        Q    Do you recall mentioning that you saw a baton

10   used to strike him in any statement that you gave to any

11   deputy sheriff after this incident?

12       A    I don't recall.

13       Q    All right.  Now, were you provided the audio

14   portion of your interview?

15       A    Yes.

16       Q    Did you listen to both of your interviews?

17       A    I got through I want to say about half of the

18   first one.  I have a very busy personal life right now,

19   so I haven't been able to sit down too much and

20   reference it, but I did try to read through them to

21   refresh myself on it.

22       Q    You read through the transcripts then?

23       A    Correct.

24       Q    All right.  Now, you had an interview that day

25   at the scene with a deputy sheriff, correct?

23

```
 1        A    Correct.
 2        Q    And so this would have been after you returned
 3   from the hospital?
 4        A    Correct.
 5        Q    Okay.  And then there was another interview
 6   that you did, what, days later?
 7        A    Correct.
 8        Q    And that interview was much longer?
 9        A    Correct.
10        Q    All right.  And do you recall that second
11   interview was with members of the homicide team?
12        A    Correct.
13             (Exhibit 58 marked for identification.)
14   BY MR. WAGNER:
15        Q    Okay.  Now, I guess since we've got your report
16   up, and I think we've marked that as Exhibit 58 for the
17   deposition.  Yeah, it's marked as Exhibit 58.  So what
18   I'd like to do is just go through some stuff with you.
19             Now, you had mentioned that you were on scene
20   at 10/19/2019 at 09:13:18 seconds, correct?
21        A    Correct.
22        Q    And do you advise dispatch that you're at the
23   scene at that time then?
24        A    Correct.
25        Q    All right.  And then it has a time that you're
```

1   at the patient at basically 09:09:14?

2       A   At patient was 09:14:00 seconds.

3       Q   Oh, right.  9:14.  I said that wrong.  Okay.

4           And then it says you departed at 9:27.

5       A   Correct.

6       Q   All right.  So approximately 13 minutes or so

7   from when you're at the patient to when you're actually

8   leaving in the ambulance itself?

9       A   Correct.

10      Q   And then it looks like the hospital was pretty

11  close, because you actually arrived there at

12  approximately 09:28:44?

13      A   Correct.

14      Q   All right.  Did you obtain any oxygen

15  saturation level of him during transport?

16      A   I don't recall.  I'm looking at my PCR, the

17  form that you're looking at too, to see if it's

18  documented here.

19      Q   All right.  For instance --

20      A   But --

21      Q   Oh, go ahead.  I didn't mean to cut you off.

22      A   You're okay.

23          But in the instance -- let me look really quick

24  at something just to see if I can clarify.

25          Usually in the instance that the fire

25

```
 1   trauma with multiple lacerations on head and face, with

 2   uncontrolled bleeding.  EBL," and that's estimated blood

 3   loss, "was approximately 500 to 750 milliliters.

 4   Patient respirations were maintained with BVM during

 5   transport."

 6           What is BVM?

 7      A   BVM is the bag valve mask that I referred to.

 8      Q   Okay.

 9      A   What we saw the fire department using when we

10   first showed up.

11      Q   All right.  And so, what, you were using your

12   bag when he was in the ambulance?

13      A   Correct, yeah.  It's the same equipment all

14   around.

15      Q   Okay.  And then it says, "Upon arrival to

16   VVGMC," Victor Valley General Medical Center I guess,

17   "patient became pulseless and CPR was initiated."  Is

18   that right?

19      A   Correct.

20      Q   Did you initiate CPR?

21      A   Correct.

22      Q   Okay.  And then, "Patient was taken into ER on

23   gurney and moved to ER bed 4 where report was given to

24   receiving staff."  And then it says, "ROSC was achieved

25   by VVGMC staff."  What is ROSC?
```

28

Gabler, Alex
Vargas v. County of San Bernardino

1      A    Return of spontaneous circulation, meaning that
2   they got pulses back.  So his heart started beating on
3   its own again.
4      Q    All right.  And do you have an estimate as to
5   how long his heart had stopped from when you noticed
6   there was no pulse?
7      A    From the time that I noticed there was no pulse
8   until I initiated CPR, or --
9      Q    Well, that's a good point.  And so we'll break
10  it down in that fashion.
11         From the time that you noticed there was no
12  pulse and you initiate CPR, what was that timeframe,
13  approximately?
14     A    It's immediate.  So I wasn't performing -- I
15  was obviously performing the IO, as mentioned.  So the
16  person sitting in the other seat of the ambulance, which
17  was Brett Lever, is the one providing the respirations
18  and confirming a pulse at the carotid site.  So it's a
19  simultaneous thing.  So we're paying attention to both
20  of these things, the respirations being provided and
21  then the pulse at the carotid site.
22         So if you look in the PCR, there is a
23  portion -- I'm reading through this as we're talking, so
24  just excuse me.  Where is that?  I'll find it in a
25  second.  His pulse was becoming weaker, and we had

29

1   noticed that, but he had not become pulseless until we

2   had arrived at the hospital.

3       Q   Right.

4       A   So from the time that Firefighter Lever told

5   me, "Hey, we lost a pulse," until the time I started

6   CPR, it's immediate.

7       Q   Seconds?

8       A   Second, yes.

9       Q   All right.  And then about how long from when

10  you're notified that there's no pulse till when staff at

11  Victor Valley was able to obtain a pulse?

12      A   I don't recall a precise time.

13      Q   An estimate.

14      A   An estimate, 15 minutes.

15      Q   All right.  Now, you go on to say that "No

16  staff members were available to sign for patient care."

17  What are you referring to?

18      A   So in our documentation they request, if we're

19  able to get it, a signature verifying transfer of care

20  at the hospital.  In this instance, Victor Valley Global

21  Medical Center is a small hospital and a small ER with a

22  short staff, so it was all hands on deck.

23          So I was able to give my verbal report to the

24  receiving staff, and for them to carry on patient care.

25  But I never was able to obtain a signature from them

30

 1    that just formulates for the documentation portion.

 2         So it just says basically that the hospital

 3    received the report.  But in this instance, with all

 4    hands on deck, it was obvious that they did.

 5         **Q   Okay.  And then underneath your name and**

 6    **presumably your ID of some kind it says, "Patient was**

 7    **not connected to AMR monitor during transport and no**

 8    **arrest rhythm was noted, but patient was pulseless**

 9    **at" --**

10         A   "Carotid site."

11         **Q   -- "carotid site."**

12         A   Correct.

13         **Q   And what are you referring to here?**

14         A   So in the instance that we have what we refer

15    to as a four lead or the AED pad like you see on the TV,

16    it will show us what kind of cardiac rhythm that the

17    patient is in.  So that's one way that we can confirm

18    pulselessness or some kind of funky cardiac rhythm.

19         We didn't have him on those pads, but we were

20    able to formulate that he was pulseless via the carotid

21    site, so just manually doing it.

22         **Q   Okay.  And so you said Lever was in the**

23    **ambulance with you?**

24         A   Correct.

25         **Q   So you and Lever were attending to the patient**

1    in the back, and Lugo was driving?

2         A    Correct.

3         Q    All right.  And just going to the next page of

4    Exhibit 58, it looks like there's a reference to

5    medications, and the Versed is noted, correct?

6         A    Correct, yes.

7         Q    All right.  And the times that you provided the

8    Versed, 9:19 and 9:25, correct?

9         A    Correct.

10        Q    Is there a protocol for the timing of Versed,

11   when you administer it between doses?

12        A    At the time there was not.  There is now.

13        Q    And what is the time now?

14        A    I don't work in the same county, but I can pull

15   it up and reference it for you.

16        Q    Well, you don't need to.  I mean, if you know

17   generally what it was -- or what it is now versus not

18   having any time reference back then.

19             Are you trying to determine the time sequence

20   that is in place now?

21        A    I'll look it up right now.

22             So per reference number 11010R5 of the ICEMA

23   protocol manual.

24        Q    Okay.

25        A    So Versed for adults, behavioral emergencies,

```
1              I'll either write it -- I'm left-handed.  So
2    I'll write it on my glove, write it on my hand.  So
3    usually when I would come home from work, I'd have
4    numbers written all over my hand, but it was based off
5    reference of incidences.
6         Q    All right.  The next page, 9:24 there's a
7    Glasgow score of 15.  Is that right?
8         A    Correct, yeah.  I'm looking at it right now.
9         Q    And 15 means that the patient is awake?
10        A    Awake, alert, and following commands or
11   appropriate response to stimulation.
12        Q    Okay.  Now, 9:24, that is about three minutes
13   before you depart, correct?
14        A    Correct.
15        Q    All right.  And at 9:24, at least according to
16   the Versed, at least one dose had been administered
17   minutes earlier, correct?
18        A    Correct.
19        Q    All right.  And then it looks like
20   approximately a minute or so after this 9:24 reference
21   another Versed dose is administered.
22        A    Correct.
23        Q    All right.  And, in fact, I note on Exhibit 58,
24   at the front, you didn't have any information regarding
25   his name.  You just have him as a John Doe, correct?
```

1      A    Correct.

2      Q    Now, what I would like to do is show you

3 Exhibit 57.  And Autumn will put that up on the screen

4 for you.

5           Maybe we can turn it.  Other way.  There we go.

6           (Exhibit 57 marked for identification.)

7 BY MR. WAGNER:

8      Q    And I believe this is a drawing that is in the

9 homicide report.  And just sort of take a moment to take

10 a look at the drawing.  Obviously it's not to scale, but

11 it's, I think, trying to generally represent certain

12 people in the residence.

13           So my question to you is:  It looks like

14 there's a reference to you, "Gabler," like somewhere

15 near the couch area.

16      A    Mm-hmm.

17      Q    And do you recall at some point that was your

18 location in the residence?

19      A    Yes.

20      Q    All right.  Then it looks like there's

21 somebody, a fire captain, near some doorway of some

22 kind?

23      A    Yes.

24      Q    All right.  And do you recall that being the

25 approximate location of one of the fire captains?

1      A    Yes.

2      Q    Of the fire captain.

3           And then I think there's a location for the

4    fire engineer and the fire medic.  Do you recall if

5    those approximate locations were where they were that

6    day?

7      A    Correct, yes.

8      Q    All right.  And Mr. Escudero, that's generally

9    how he was on the ground?

10     A    Correct.

11     Q    His head was facing towards the fire captain

12   opening, and his feet towards the front door or at least

13   that side of the house?

14     A    Correct.

15     Q    All right.  Now, after he was in handcuffs he

16   was placed on the tarp?

17     A    I don't recall exactly.

18     Q    Do you recall he was placed on the tarp and

19   then taken out and put onto the gurney?

20     A    Yes.

21     Q    Okay.

22     A    Yes, he was.  Yeah, he was put onto the tarp

23   and then taken to the gurney.

24     Q    All right.  What I'd like to do now is --

25          Autumn, what we're going to do is we're going

1    to play the audio of the first interview.  This would be
2    the day of the incident interview, Exhibit 55.
3              (Exhibit 55 marked for identification.)
4              MR. WAGNER:  And if we haven't already done the
5    transcript, put it in the chat room.  That's Exhibit 56.
6              (Exhibit 56 marked for identification.)
7              MS. GARRISON:  All right.  Let me drop that
8    real quick, and then make sure everybody got it so they
9    can follow along.
10             MR. WAGNER:  Sure.
11             MS. GARRISON:  All right.  It's been sent.
12   Give me a second.
13   BY MR. WAGNER:
14        Q   All right.  Anyway, while we're waiting, Alex,
15   or Mr. Gabler, you can, if you want, get into the chat
16   room and pull up Exhibit 56, that's the transcript, if
17   you want to follow along.
18             Okay.  So we're going to play that then?
19             MS. GARRISON:  Yeah, just give me a second.
20             (Audio played.)
21             MS. GARRISON:  Can everybody hear that?  Can
22   anybody hear it?  Because I can't hear it.
23             MS. MASONGSONG:  We can hear it now.
24             MR. WAGNER:  Could we stop it?
25             Why don't we do this.  While we work on our

37

Gabler, Alex
Vargas v. County of San Bernardino

```
 1    technical difficulties here for a second, why don't we
 2    take a five-minute break, Mr. Gabler.  We've been going
 3    for pretty much almost an hour.  It's 1:55.  And so take
 4    five, and we'll all jump back on?
 5              MS. MASONGSONG:  Okay.  Sounds good.
 6              MR. WAGNER:  Okay.  Thanks, Renée.
 7              (Recess.)
 8              MR. WAGNER:  All right.  So let's go back on
 9    the record.
10              And what we're going to do again is Exhibit 55
11    is the audio of what I believe to be an interview that
12    was done the day of the incident, and we're going to
13    play that right now.
14              (Audio played.)
15              MS. GARRISON:  Can everybody hear it?
16              THE WITNESS:  Yes.
17              MS. MASONGSONG:  Yes.
18              MR. WAGNER:  Yes.
19              (Audio played, 00:08:22.)
20    BY MR. WAGNER:
21         Q    Okay.  And sir, do you recall that that was an
22    interview you gave the day of the incident?
23         A    Yes.
24         Q    And were you trying to be truthful and accurate
25    in your statement to the deputy sheriff?
```

                                                                    38

Gabler, Alex
Vargas v. County of San Bernardino

```
 1        A    Absolutely.
 2        Q    All right.  And the voice that you hear on the
 3   tape, one of those voices, is that your voice?
 4        A    Correct.
 5        Q    All right.  Is there any reason to believe that
 6   what you heard on the tape recording was not said that
 7   day?
 8        A    No reason.
 9        Q    Okay.  And would it be fair to say that at
10   least at the time you gave that statement, events were
11   more clear in your mind than perhaps they may be today?
12        A    That would be fair to say.
13        Q    Is there anything in the statement that was
14   just played that you recall being inaccurate as you sit
15   here today?
16        A    No.
17        Q    All right.  Then there was another interview,
18   it looks like it was done January 15th, 2020, with
19   members of the homicide team.  Do you recall that
20   interview?
21        A    Yes.
22        Q    And do you know where that interview took
23   place?
24        A    That was the 15th.  That was either the
25   Victorville main or the parking lot behind the Target.
```

39

1   I don't remember which one was on the 15th.

2        Q   All right.  The 15th.  Victorville main, were

3   you referring to your office?

4        A   Correct, yes.

5            MR. WAGNER:  Okay.  What we'll do is we'll put

6   Exhibit 54, the transcript, in the chat room and send

7   that to everybody.  I'm assuming Counsel has probably

8   already got it.

9            (Exhibit 54 marked for identification.)

10           MR. WAGNER:  And then what we're going to do is

11   we're going to start playing the audio, Exhibit 52.

12           So Autumn, if you can put that in the chat

13   room, and then we'll gear up Exhibit 52.

14           MS. GARRISON:  It's pretty big, Dennis.

15           All right.  It told me it sent successfully.

16   So it should be in there and ready for you guys to

17   download.

18           (Exhibit 52 marked for identification.)

19           MR. WAGNER:  Okay.  Then let's cue up the

20   audio, Exhibit 52.

21           (Audio played.)

22           MS. GARRISON:  Can everybody hear it?

23           THE WITNESS:  Yes.

24           MS. GARRISON:  Okay.

25           MS. MASONGSONG:  Yes, I can hear it.

```
 1              (Audio played, 01:32:05.)
 2   BY MR. WAGNER:
 3        Q   Okay.  That's a pretty long interview.  It's
 4   about an hour and a half.  And let me just ask a couple
 5   questions.  We'll take another little short bathroom
 6   break for everybody, and then hopefully we can -- I'll
 7   finish my questioning, Counsel will finish, and we'll
 8   get this thing over with.
 9              Now, that was you on tape responding to
10   questions, correct?
11              THE REPORTER:  Oh, you're muted.
12              THE WITNESS:  Correct.
13   BY MR. WAGNER:
14        Q   Okay.  And Mr. Gabler, you listened to the
15   whole thing, did you not?
16        A   Correct.
17        Q   Did you follow along on the transcript that was
18   provided?
19        A   Yes.
20        Q   And would it be fair to say that the
21   transcript, Exhibit 54, accurately reflects the
22   conversation on the audio tape?
23        A   Yes.
24        Q   All right.  And that was your best testimony on
25   October 24th when you gave your statement?
```

41

Gabler, Alex
Vargas v. County of San Bernardino

```
 1        A    Yes.
 2        Q    Okay.  And you had been provided the tape
 3   beforehand, but you'd not had a chance to review the
 4   entirety of that tape; is that fair?
 5        A    That's fair.
 6        Q    All right.  So that's essentially the first
 7   time you've heard it?
 8        A    All the way through, yes.
 9        Q    All the way through.  Okay.
10             And what you told the deputies that day that is
11   on the tape, was it truthful and accurate at the time
12   you were giving it?
13        A    Yes.
14        Q    Okay.  And you would agree that that statement
15   was given closer in time to the incident than today's
16   deposition?
17        A    That is correct.
18        Q    All right.  And between today's deposition and
19   the time you gave the statement, would you consider your
20   prior statement, the one earlier in time, to be more
21   accurate?
22        A    Yes.
23        Q    Okay.  Why don't we take a short five-minute
24   break, and then we'll come back and hopefully -- I won't
25   have too much longer.  Renée will have some questions.
```

42

```
 1          Q    I mean, would you describe it as a fluid
 2    situation?
 3          A    Absolutely.
 4          Q    Okay.  Now, Exhibit 55, the tape recording of
 5    the interview the day of the incident, did you have a
 6    chance to go along with that interview, that audio
 7    recording, with the transcript, Exhibit 56?
 8          A    When -- I'm sorry, ask the question again.
 9          Q    Yeah, it was probably a very poor question.
10          When I played the first interview for you, that
11    was actually Exhibit 55, the audio, did you follow along
12    on the transcript, Exhibit 56?
13          A    Yes.
14          Q    All right.  And would it be fair to say that
15    the transcript is accurate as it concerns the
16    transcription of the information on the audio interview?
17          A    Yes.
18          Q    All right.  And then let me ask you about
19    Exhibit 58, which is the AMR document.  Now, that's a
20    document that you prepared?
21          A    Correct.
22          Q    And you prepared that in the ordinary course of
23    business for AMR?
24          A    Correct.
25          Q    And you prepared it at or about the time of the
```

44

1    events that took place?

2         A    Correct.

3         Q    And your attempt to do so was to accurately

4    record those issues, correct?

5         A    Correct.

6         Q    All right.  Now, earlier in the deposition I

7    had asked you about the administration of the Versed.

8    And one was at 9:19, and one was at 9:25, as reflected

9    in the AMR document.  It would appear on the tape

10   recording that you indicate that actually the two shots

11   were much closer in time.  Do you recall hearing that?

12        A    I recall hearing something to that nature, yes.

13        Q    All right.  And would you agree that the two

14   Versed shots could have been in a very short period of

15   time, within a minute or so?

16        A    I would verify or vouch for what's on my

17   documentation.

18        Q    Okay.

19        A    The situation being fluid, obviously times can

20   feel a lot faster.

21        Q    Okay.  Well, listen, what I want to do is ask

22   you a few more questions.  But there's one small tape

23   recording that was done the following day, I think it's

24   three pages in length.

25        A    Yes.

45

Gabler, Alex
Vargas v. County of San Bernardino

1        Q   So if you go to the end of Exhibit 54, the last
2   three pages appear to be a second interview.   And what
3   I'd like to do is to play that audiotape, which is
4   certainly not as long as the one we just played.
5           The audiotape is Exhibit 53, for the record.
6           (Exhibit 53 marked for identification.)
7               MR. WAGNER:   And Autumn, this should already be
8   part of the chat box, right?
9               MS. GARRISON:   The transcript, no.   But I will
10  drop that in there real quick.
11              MR. WAGNER:   Oh, the three pages?
12              MS. GARRISON:   Oh, no, no.   Yeah, it will be
13  part of Exhibit 54.
14              MR. WAGNER:   All right.   So the three pages are
15  part of the Exhibit 54.   So let's play the audio,
16  Exhibit 53.
17              MS. GARRISON:   Okay.   And it's two minutes and
18  33 seconds.   It's not very long.
19          (Audio played, 00:02:33.)
20  BY MR. WAGNER:
21      Q   Okay.   And Mr. Gabler, were you able to follow
22  along on the transcript with that small audio recording?
23      A   Yes.
24      Q   And does the transcript accurately reflect what
25  was said in that interview?

46

1    A    Yes.

2    Q    And as you sit here today, if you were looking

3    at the AMR report that seems to have about a six-minute

4    timeframe between the two shots versus what you said on

5    the tape recording, would you be more inclined to think

6    the tape recording is more accurate?

7    A    I usually would go off of what my report says.

8    Q    Okay.  Now, when we started the deposition I'd

9    asked you some questions, and at one point you indicated

10   that you thought you saw a baton used.  Do you recall

11   that?

12   A    I do recall that, yes.

13   Q    For purposes of reviewing those two interviews,

14   you would agree with me that you did not describe any

15   baton usage in your interview, correct?

16   A    Correct.

17   Q    All right.  Were you mistaken perhaps when you

18   said that today?

19   A    Very well, yes.

20   Q    Okay.  The bag that was utilized, the bag was

21   assisting Escudero in breathing, correct?

22   A    The bag, yes, the bag valve mask.

23   Q    Right.  Right.  So the idea being that if he's

24   having some type of labored breathing, the bag is

25   assisting?

1       A    Correct, or if he is not breathing, it will

2    breathe for him.

3       Q    All right.  The first time that you believe

4    that he was in cardiac arrest, meaning that there was no

5    pulse, that was when you were advised by Paramedic Lever

6    at the hospital on arrival?

7       A    Correct.

8       Q    Okay.  Prior to that, are you aware of any

9    facts or information that his heart had stopped before

10   that?

11      A    No.

12      Q    Now, in the interviews it appears that other

13   than perhaps referencing the use of a taser as being

14   used to strike Mr. Escudero, that you did not reference

15   any of the deputies striking Mr. Escudero; is that fair?

16      A    Correct.

17      Q    All right.  And if, in fact, any of the

18   deputies had actually struck Mr. Escudero, would you

19   have been blocked perhaps because you would have had the

20   deputies in front of you with their backs towards you?

21      A    Correct.

22      Q    All right.  At one point, let me see, I think

23   it's in the first interview the day of the incident, I

24   think you estimate a blood loss at --

25      A    500 to 750.

48

1      Q    500 to 750.  And then I think in the second

2    interview five days later, you estimate it was perhaps

3    1,500 or, you know, double the blood loss.

4         A    Yeah.

5         Q    Okay.  And in listening to the tapes today and

6    going back over things in your mind, what's the best

7    estimate you have as to the blood loss?

8         A    750.

9         Q    All right.

10        Okay.  At this point I think I'm going to pass

11    the witness.  Renée?

12        MS. MASONGSONG:  All right.  Thank you.

13

14                    EXAMINATION

15    BY MS. MASONGSONG:

16        Q    Good afternoon, sir.

17        A    Good afternoon.

18        Q    I just have a few follow-up questions for you.

19        When you first observed the patient, who I'm

20    going to refer to as Mr. Escudero, did you see any

21    injuries on him at that time when you first saw him?

22        A    No, I did not.

23        Q    And when you first observed Mr. Escudero, was

24    he being given some medical aid?

25        A    Yes.

Gabler, Alex
Vargas v. County of San Bernardino

1     Q   And as far as you are aware, was this generally

2  a call for medical attention?

3     A   Yes.

4     Q   When you first arrived did you observe

5  individuals from the fire department giving CPR to

6  Mr. Escudero?

7     A   No.

8     Q   And you described earlier the use of a bag.

9  Could you please describe for me how that would be

10  different from giving CPR to the patient.

11     A   CPR is provided via chest compressions, and the

12  bag valve mask is just to assist or provide

13  respirations.  So the bag is for the breaths.

14     Q   Got it.  Thank you.

15       So I take it that Mr. Escudero was not

16  breathing at that time when the bag was being used?

17     A   Correct.

18     Q   Did Mr. Escudero appear to be unresponsive at

19  that time?

20     A   Yes.

21     Q   Do you know one way or the other whether he was

22  conscious at that time?

23     A   He was unconscious.

24     Q   And just an estimate, about how much time, from

25  your perspective, passed between you first seeing

1   Mr. Escudero on the scene and you administrating the

2   Versed?

3       A   Let me reference the chart.

4       Q   That's fine.  Yeah, you can reference the run

5   sheet.

6       A   Approximately five minutes.

7       Q   And within those approximate five minutes, you

8   think it was about 45 seconds that you stepped away from

9   the scene to go retrieve the Versed?

10       A   Approximately, yes.

11       Q   When you arrived on scene were you informed

12   that Narcan had been administered to Mr. Escudero?

13       A   Yes.

14       Q   And who told you that?

15       A   Firefighter/Paramedic Brett Lever.

16       Q   Based on your training, can Narcan cause a

17   person to become combative?

18       A   No, not Narcan itself.

19       Q   Okay.  Based on your training, can Narcan cause

20   a person to become violent?

21       A   No.

22       Q   Based on your training, if a person is

23   overdosing on heroin and then Narcan is administered to

24   that person, could that cause the person to become

25   combative or violent?

51

Gabler, Alex
Vargas v. County of San Bernardino

1     A    Yes.

2     Q    Based on your training, if you're going to

3  administrator Narcan to somebody who has some heroin in

4  their system, should you warn the other people in the

5  room that the person might get combative as a result of

6  being given Narcan with heroin in their system?

7     A    Are you referencing to bystanders or the

8  professionals on scene?

9     Q    Let's do it both ways.  So let me reask the

10 question.

11          So based on your training, if you're going to

12 administrator Narcan to somebody who you think was

13 overdosing on heroin, should you warn the other medical

14 professionals in the room that the Narcan in that

15 situation could cause the person to become violent?

16     A    Yes, but it's pretty well known that it could

17 happen.

18     Q    Okay.  What about same question as to deputies,

19 not necessarily medical professionals.  If you're in a

20 situation where there are deputies in the room and

21 medical professionals are going to give Narcan to

22 somebody who might be under the influence of heroin,

23 should the medical professionals who are administrating

24 the Narcan warn the deputies in that situation that the

25 patient could potentially become combative or violent?

52

Gabler, Alex
Vargas v. County of San Bernardino

1      A   They could, yes.

2      Q   Is that something that you've been trained to

3   do?

4      A   No.

5      Q   In this case are you aware one way or the other

6   whether any of the medical professionals told the

7   deputies on scene that Mr. Escudero could become

8   combative or violent after the Narcan was administered?

9      A   I'm unaware.

10      Q   So in other words, I take it you didn't hear

11   anybody on scene tell the deputies, "Hey, Mr. Escudero

12   might want to fight you when he wakes up"?

13      A   Correct.

14      Q   Do you have any training, as a medical

15   professional, on how to properly position a person who

16   is being given Narcan?

17      A   No.

18      Q   Do you have any training on how to address the

19   potential of a patient becoming violent or combative

20   after being given Narcan?

21      A   No.

22      Q   After Mr. Escudero woke up after he was

23   administered the Narcan in this case, did the deputies

24   generally try to keep Mr. Escudero down on the ground?

25      A   Yes.

53

Gabler, Alex
Vargas v. County of San Bernardino

1    Q   And what did you observe the deputies do to
2    keep Mr. Escudero down on the ground?  And let's just
3    take it in between the time that you observed
4    Mr. Escudero wake up after being given the Narcan and
5    the time that you observed the first taser deployment.
6    A   Initially it was just trying to keep kind of
7    the hand on the shoulder, not in a forceful or violent
8    stance, but just to kind of keep him down on the ground,
9    until he began becoming violent with the deputies
10   involved.
11   Q   And as you describe him becoming violent with
12   the deputies involved, did that occur prior to the first
13   taser deployment?
14   A   Yes.
15   Q   And other than what you've told me about the
16   hand on the shoulder prior to the first taser
17   deployment, what did you observe the deputies do to try
18   to keep Mr. Escudero down on the ground?
19   A   Verbally just try to explain that we're there
20   to help him.  And -- sorry.  Carry on.
21   Q   So other than the hand on the shoulder, you
22   didn't observe any physical force by any of the three
23   deputies up until the first taser deployment?
24   A   There was physical force.
25   Q   And tell me what you observed in that regard

54

Gabler, Alex
Vargas v. County of San Bernardino

1    prior to the first taser deployment.
2         A    So like I had mentioned in the initial
3    interviews, there was the moment of trying to explain to
4    him why we were there, which is when he then became
5    violent and started throwing punches at the deputies and
6    those around.
7              So the deputies were trying to deescalate the
8    situation, obviously not trying to cause harm, but it
9    came into a point where they were fighting with one
10   another.  And it's not something that I witnessed direct
11   and can recall all the events purposefully, but there
12   was punches thrown by both parties, Escudero and the
13   deputies.
14        Q    So prior to the first taser deployment you
15   observed one or more deputies throwing punches; is that
16   correct?
17        A    That is correct.
18        Q    How many deputies did you observe throwing
19   punches prior to the first taser deployment?
20        A    Two.
21        Q    I'm sorry, did you --
22        A    Two.  Sorry.
23        Q    Okay.  Sorry.  I didn't hear you.
24             Were those the two male deputies, if you
25   recall?

55

1     A   Correct.

2     Q   And approximately how many punches did you

3   observe the deputies throw toward Mr. Escudero?

4     A   Maybe 15 to 30.  I know he was throwing more.

5     Q   Did you observe some blood on Mr. Escudero's

6   face prior to the first taser deployment?

7     A   I don't recall.

8     Q   You testified toward the beginning of the

9   deposition that you observed the baton being used during

10   this incident; is that correct?

11     A   That is correct, I did say that.

12     Q   And is there a reason that you told us that a

13   baton was used?  Is that something you recall as you sit

14   here today?

15     A   I don't recall exactly.

16     Q   Prior to us listening to your interviews during

17   today's deposition, did you believe that you observed a

18   deputy using a baton against Mr. Escudero during this

19   incident?

20     A   Yes.

21     Q   You stated in your first interview that the

22   deputies were trying to subdue Mr. Escudero.  Do you

23   remember that?

24     A   Yes.

25     Q   Other than what you just told me, what did you

```
 1        A    I recall him attempting to get to his feet,
 2   yes.
 3        Q    And do you recall whether he actually got up
 4   onto his feet, or was he more trying to get onto his
 5   knees?  How would you describe it?
 6        A    If I had to describe it, I would say getting up
 7   to his knees with one foot down, but that was also the
 8   same time that I was trying to get out of the room.
 9        Q    Okay.  And you were trying to get out of the
10   room, was that to get the Versed?
11        A    Correct.
12        Q    Okay.  And then you observed the female deputy
13   tase Mr. Escudero in drive-stun mode; is that correct?
14        A    Correct.
15        Q    And would that be pretty shortly before you
16   were leaving the room to get the Versed?
17        A    That was as I was leaving the room.
18        Q    After Mr. Escudero was tased, did you observe
19   deputies take Mr. Escudero to the ground?
20        A    No.  I wasn't in there when that was happening.
21        Q    You described in your statement, and I'm
22   looking at the second statement, at page 18, you
23   described that the deputies pushed their elbows into
24   Mr. Escudero to try to keep him down on the ground.  Do
25   you remember that?
```

59

1        A    I remember the statement, yes.

2        Q    And can you explain to me where in the sequence

3    of events that occurred?  Was that before or after you

4    went to go get the Versed?

5        A    That would have been before and after.

6        Q    And was Mr. Escudero generally down on the

7    ground at that time, where you described the deputies

8    pushing their elbows into Mr. Escudero to try to keep

9    him on the ground?

10       A    No, he was still making an attempt to stand up.

11       Q    And was he on his feet or his knees or

12   something else?

13       A    Abdomen and knees.  So knees and elbows, and

14   then back down, and then knee and elbow, and then back

15   down.

16       Q    So generally Mr. Escudero was trying to push

17   his abdomen up off the ground, and the deputies were

18   trying to push him back on the ground?

19       A    Correct.

20       Q    And they were using their elbows to do that?

21       A    Elbows and hands.

22       Q    And in relation to the tasing, did that happen

23   in between the dart-mode usage and the drive-stun usage,

24   or how would you describe where that fell in the

25   sequence of events?

1    A    It was before the dart sequence, and after when

2    I had walked back in the room with the Versed.

3    Q    So in other words, you observed Mr. Escudero on

4    the ground, trying to get up off the ground, the

5    deputies push him back on the ground using their elbows,

6    then the taser was deployed, and then you go get the

7    Versed, and then you come back and you make the same

8    observation with the elbows?

9    A    Correct, yes.

10   Q    And I'm still looking around page 18.  Did you

11   observe at some point a deputy at Mr. Escudero's torso

12   trying to hold him down on the ground?

13   A    If I recall, he was either on his abdomen or on

14   his knees like I had mentioned.

15   Q    Mr. Escudero was on his abdomen or on his

16   knees?

17   A    Correct.  He was able to get over a couple

18   times, but predominantly they were trying to keep him

19   subdued to his abdomen.

20   Q    And while they were doing that, did you observe

21   a deputy at Mr. Escudero's torso?

22   A    I don't recall.

23   Q    Do you recall observing a deputy holding

24   Mr. Escudero's shoulders at that time?

25   A    I don't recall.

61

1      Q    Would you agree on page 18 of your statement

2   you described that a deputy was holding Mr. Escudero's

3   shoulders down?

4      A    Yes.  Yes.

5      Q    And at some point did you also observe a deputy

6   holding Mr. Escudero's legs so that he could not bend

7   his knees to get up?

8      A    Yes.

9      Q    At some point did you observe the deputies

10  using their body weight to attempt to keep Mr. Escudero

11  on the ground?

12          MR. WAGNER:  Objection.  Vague.

13          THE WITNESS:  Yes.

14  BY MS. MASONGSONG:

15     Q    And would that be during the same sequence of

16  events that we're discussing here, where Mr. Escudero

17  was on his abdomen or knees attempting to lift his chest

18  up, and the deputies were pushing him back down on the

19  ground?

20     A    Correct.

21     Q    Did you ever specifically see Mr. Escudero make

22  physical contact with the female deputy?

23     A    I don't recall.

24     Q    And as you sit here today, do you recall

25  observing any deputies strike Mr. Escudero with the

1    taser as an impact weapon?

2        A    I don't recall.

3        Q    Do you recall seeing some blood coming from

4    Mr. Escudero's head at some point?

5        A    During the altercation, yes.

6        Q    And did you also make that observation in the

7    ambulance?

8        A    Yes.

9        Q    After you went to go get the Versed and then

10   you returned to the room, what was Mr. Escudero's body

11   position from your perspective?

12       A    From my perspective he was on his abdomen,

13   still in the same attempt to try and get onto his elbows

14   and knees, with the three deputies, to the best of my

15   recollection, trying to keep him down.

16       Q    And at some point did you observe the deputies

17   handcuff Mr. Escudero?

18       A    Not before the Versed administration.

19       Q    About how much time passed between you

20   returning with the Versed and the Versed being

21   administered?

22       A    It was relatively immediate.

23       Q    And after that did you observe the deputies

24   handcuff Mr. Escudero?

25       A    After the second dose was administered.

63

1      Q    Was Mr. Escudero on his chest when he was being

2  handcuffed?

3      A    Yes.

4      Q    Was Mr. Escudero attempting to lift his chest

5  up off the ground when he was being handcuffed?

6      A    Yes.

7      Q    Approximately how long did it take for the

8  deputies to get him in handcuffs?

9      A    From what point?

10     Q    From them starting to try to put the handcuffs

11  on.

12     A    I mean, the whole incident was five to seven

13  minutes.

14     Q    Okay.  How long did it take them to get the

15  handcuffs on between the time that the second dose of

16  Versed was administered and the time that the handcuffs

17  were on?

18     A    If I had to formulate, I would say 45 seconds

19  to a minute.

20     Q    And was Mr. Escudero chest down during that

21  time?

22     A    Yes.

23     Q    At some point did you hear some agonal

24  breathing from Escudero?

25     A    After the handcuffs were placed.

64

1     Q   Was that the first time that you heard that

2  during this incident?

3     A   Correct.

4     Q   Did you yourself ever take Mr. Escudero's

5  pulse?

6     A   Yes.

7     Q   And when was that?

8     A   As soon as he was on the gurney.

9     Q   And did he have a pulse at that time?

10     A   Yes.

11     Q   And when was the first time that --

12     MR. WAGNER:  I'm sorry, what was the answer?

13     THE WITNESS:  It was yes.

14     MR. WAGNER:  Oh, okay.

15  BY MS. MASONGSONG:

16     Q   And when was the first time that you became

17  aware that Mr. Escudero did not have a pulse?

18     A   Upon arrival to the hospital.

19     Q   At some point after Mr. Escudero was given the

20  Narcan and then woke up, at some point after that you

21  realized that Mr. Escudero was unresponsive, correct?

22     A   Correct.

23     Q   And at what point was that?

24     A   It was after the application of the handcuffs,

25  as we were positioning to move to the gurney.

65

Gabler, Alex
Vargas v. County of San Bernardino

1    Q    And how did you become aware that Mr. Escudero

2    was unresponsive?

3    A    By just performing my physical assessment.  By

4    looking at him, and as we were positioning him to get

5    onto the gurney.

6    Q    Did you ever check to see whether Mr. Escudero

7    was still breathing during the time that the handcuffs

8    were being applied?

9    A    After the administration, before the handcuffs?

10   Q    Yes, that's the timeframe I have in mind,

11   between the administration of the second administration

12   of the Versed to the time that the handcuffs were

13   finally attached to Mr. Escudero.  Between that time did

14   you ever do anything to check if he was still breathing?

15   A    I could hear him breathing at that point.

16   Visually I could not see.

17   Q    When you were in the ambulance with

18   Mr. Escudero did you notice some significant trauma to

19   his face and head?

20   A    Yes.

21   Q    Would you describe that as lacerations?

22   A    Yes

23   Q    Was Mr. Escudero given CPR in the ambulance?

24   A    Only as soon as we arrived to the hospital.

25   Q    And similar to my question that I asked you

66

```
 1        A    Yes.

 2        Q    Did you ever see Mr. Escudero actually land a

 3   kick on any person?

 4        A    I don't recall.

 5        Q    Did you ever see Mr. Escudero land a punch on

 6   any of the personnel from the fire department?

 7        A    I don't recall.

 8        Q    Did you speak to an attorney prior to giving

 9   your first statement regarding this incident?

10        A    The original with the homicide detectives?

11        Q    Yes.

12        A    No.

13        Q    And what about your second interview, did you

14   speak to an attorney prior to giving your second

15   interview?

16        A    No.

17             MS. MASONGSONG:  All right.  I'll turn it back

18   over to Dennis if he has any follow-up questions.

19             MR. WAGNER:  I've got a few.

20

21                       FURTHER EXAMINATION

22   BY MR. WAGNER:

23        Q    The respiratory slowdown that had taken place

24   after he was in handcuffs, do you have any idea whether

25   it may have been related to the Versed that had been
```

1    administered?

2         A    No, I don't.

3         Q    You don't know what the cause of the

4    respiratory slowdown was?

5         A    He was a multisystems is what we refer to it as

6    with the trauma.  So yes, the Versed can cause the

7    respiratory depression, which I had mentioned in my --

8    one of my interviews.

9         Q    Right.

10        A    But I don't know if that was the exact cause of

11   the respiratory depression.

12        Q    Okay.  Now, you indicated that, and correct me

13   if I'm wrong, that you saw both the male deputies

14   throwing punches?

15        A    Correct.

16        Q    Okay.  Now, you didn't mention that in any of

17   the interviews; is that right?

18        A    Yes.

19        Q    And is there some reason why you didn't mention

20   it in those interviews?

21        A    I genuinely thought it was in there.

22        Q    Okay.  And you indicated, what, the deputies

23   threw 15 to 30 punches, or are you saying that's what

24   the plaintiff was throwing?  Or Mr. Escudero rather.

25        A    Yeah, yeah, yeah.  Mr. Escudero threw multiple

70

1    punches.  I think I referenced 30 to 40 in the original

2    interview.

3        **Q**   **Okay.**

4        A   If I -- just looking at it from my

5    recollection, if I had to make a number, I'd say 15 to

6    30, 15 being -- like on the lower end being more

7    accurate.

8        **Q**   **All right.  15 punches from the two deputies**?

9        A   Yeah.  It wasn't like a boxing match, if that

10    makes sense.

11        **Q**   **Right.**

12        A   It was more of them just trying to -- they were

13    trying to restrain him more than injure him.

14        **Q**   **All right.  And you would agree that there's no**

15    **reference in either interview where you indicate that**

16    **there's any 15 estimated blows from the deputies to**

17    **Mr. Escudero, correct?**

18        A   Correct.

19        **Q**   **All right.  And today you mentioned the baton,**

20    **and you think that you recall a baton, but at least you**

21    **acknowledge it's not in your statement, correct?**

22        A   Correct, I -- yeah.

23        **Q**   **But there is some testimony in the case that a**

24    **baton was used to pry an arm out.**

25        A   Okay.

71

Gabler, Alex
Vargas v. County of San Bernardino

1    Q    Do you have any recollection of seeing a baton
2  used to pry one of the arms out from underneath him?
3    A    To my recollection, that might be my thought of
4  the baton use.  I don't recall exactly what had happened
5  in the entire incident.  I'm going off the best of my
6  recollection here.
7    Q    Right.  Well, three years have now passed.
8  Would you agree that your memory is somewhat hazy today?
9    A    Yes.
10   Q    All right.  You're saying at the time the taser
11 was applied, that both male deputies had their hands on
12 him when she fired the taser?
13   A    Yes.
14   Q    Okay.  You would agree that the deputies had
15 trouble restraining Mr. Escudero?
16   A    Yes.
17   Q    That three deputies could not control
18 Mr. Escudero?
19   A    Correct.
20   Q    That but for the administration of the Versed,
21 they could not handcuff Mr. Escudero?
22   A    Correct.
23   Q    You actually saw Mr. Escudero make it to his
24 feet; is that correct?
25   A    Correct.

72

1    Q   You did not see any of the deputies basically

2    throwing entire bodyweight on the back of Mr. Escudero;

3    is that true?

4    A   Not to my recollection.  That would be true.

5    Q   He had a pulse when he was on the gurney,

6    because you took the pulse, correct?

7    A   Correct.

8    Q   Okay.  And on the ride to the hospital Lever

9    had his hand on his carotid artery to continue a

10   determination of him having a pulse?

11   A   Correct.

12   Q   And he was the one, upon arrival, indicating

13   they'd lost the pulse?

14   A   Correct.

15           MR. WAGNER:  All right.  I don't think I have

16   anything else.

17           MS. MASONGSONG:  All right.  Nothing else for

18   me.

19           MR. WAGNER:  Okay.  What we'll do is -- Renée,

20   you've got all this stuff, all the exhibits, don't you?

21           MS. MASONGSONG:  I do, yeah.

22           MR. WAGNER:  All right.  And so they should all

23   be in the chat room for the court reporter.

24           Why don't we go off the record for a moment.

25           MS. MASONGSONG:  Okay.

```
 1          I, the undersigned, a Certified Shorthand
 2   Reporter of the State of California, do hereby certify:
 3          That the foregoing proceedings were taken
 4   before me at the time and place herein set forth; that
 5   any witnesses in the foregoing proceedings, prior to
 6   testifying, were placed under oath; that a verbatim
 7   record of the proceedings was made by me using machine
 8   shorthand which was thereafter transcribed under my
 9   direction; further, that the foregoing transcript is an
10   accurate transcription thereof.
11          I further certify that I am neither financially
12   interested in the action nor a relative or employee of
13   any attorney of any of the parties.
14          IN WITNESS WHEREOF, I have this date subscribed
15   my name.
16
17   Dated: December 27, 2022
18
19
20   _____
21          SUSAN H. CAIOPOULOS
             CSR No. 8122
22
23
24
25
```



**Patient Name:** Doe, John                                          **EMS Agency Name:** AMR - Victorville

Complete ePCR w/attachments

## Patient Information

| | |
|---|---|
| **Name:** Doe, John | **Age:** 34 Hours | **D.O.B.:** Unable to Complete |
| **Address:** 16927 MONTE VISTA ST VVCC, CA 92392 | **Gender:** Male | **Race:** Black or African American; Hispanic or Latino |
| **Is Patient Homeless?:** No | **Weight:** 124.7 kg | |
| | **SSN#:** 999999999 | |

| **Agency Identifier** | **Patient's Phone Number** | **Type** |
|---|---|---|
| [7746] | (999) 999-9999 | |

## Call Type/Location/Disposition

| | |
|---|---|
| **Call Type:** Overdose/Poisoning/Ingestion | **Disposition:** Patient Treated, Transported |
| **Resp. Mode:** Emergent (Immediate Response) | **Primary Role of the Unit:** ALS Ground Transport |
| | **Transport Mode:** Non-Emergent |
| **Response:** 911 Response (Scene) | **Destination:** Victor Valley Global Medical Center 15248 Eleventh Street Victorville, CA 92395 |
| **Location:** Private Residence/Apartment | **Dest. Determ.:** Closest Facility |
| **Incident Address:** 16927 MONTE VISTA ST VVCC, CA 92392 | |
| **Response Delay:** None/No Delay | **Transport Delay:** None/No Delay |

## Response Times and Mileage

| | | |
|---|---|---|
| **PSAP:** 10/19/2019 09:08:09 | **Incident Number:** 5884388 | |
| **Disp. Notified:** 10/19/2019 09:08:09 | **Call Sign:** 7746 | **To Dest:** 1.0 |
| **Unit Disp.:** 10/19/2019 09:08:24 | **Veh. #:** 7746 | |
| **Enroute:** 10/19/2019 09:08:31 | | |
| **At Scene:** 10/19/2019 09:13:18 | **Scene Odom:** 0 | |
| **At Patient:** 10/19/2019 09:14:00 | **Dest. Odom:** 1 | |
| **Depart:** 10/19/2019 09:27:20 | | |
| **Arrive Dest.:** 10/19/2019 09:28:44 | | |
| **Destination PT Transfer of Care:** 10/19/2019 10:01:00 | **EMS Transport Method:** Ground-Ambulance | |
| **In Service:** 10/19/2019 11:32:42 | | |

## Unit Personnel

| **Agency Identifier** | **Crew Member** | **Level of Certification** | **Role** |
|---|---|---|---|
| [7746] | Orduno Lugo, Karla | EMT-Basic | Other Patient Caregiver-At Scene ; Pilot |
| [7746] | Gabler, Alex | EMT-Paramedic | Primary Patient Caregiver-At Scene ; Primary Patient Caregiver-Transport |

## Other Agencies On Scene

| | **Other Agencies On Scene** | |
|---|---|---|
| **Agency Identifier** | **Other EMS or Public Safety Agencies at Scene** | **Other EMS or Public Safety Agency ID Number** | **Type of Other Service at Scene** |
| [7746] | Victorville Fire Department | S62-51915 | Fire |

## Provider Impression

**Primary Impression:** Overdose/Poisoning/Ingestion

## Patient Condition

| **Agency Identifier** | **Complaint Type** | **Complaint** | **Duration** |
|---|---|---|---|
| [7746] | Chief (Primary) | Overdose | 5 Minutes |

| | |
|---|---|
| **Primary Symptom:** Altered Mental Status | **Possible Injury:** Yes |
| **Alcohol/Drug Use:** Drug Paraphernalia at Scene | |
| **Chief Complaint Organ System:** CNS/Neuro | **Barriers to Patient Care:** Unconscious; Uncooperative |
| | **Chief Complaint Anatomic Location:** General/Global |
| **Mechanism of Injury:** Blunt | **Initial Patient Acuity:** Critical (Red) |
| **Cause of Injury:** Injury from Blunt Object (assault) | **Final Patient Acuity:** Critical (Red) |

## Narrative

**Unit Notified:** 10/19/2019 09:08:24
**Incident #:** 5884388

**Patient Name:** Doe, John
**Patient Care Report Number:** c2c95f71ab4c497b9e7e7c0d3636e248

**Call #:** 5884388
**Date Printed:** 12/07/2022 09:27

Page 1 of 6

**Patient Name:** Doe, John                                    **EMS Agency Name:** AMR - Victorville

**Narrative:** AOS to find ME311 assessing mid 30's male found down unresponsive in middle of living room secondary to heroin overdose. Pt was found on ground w. needle and syringe on ground next to him by SBSO. ME311 gave total or 2MG Narcan IN PTA w. no change and were currently bagging pt. Physical assessment showed no signs of trauma. Pt was moved to megamover where he suddenly became responsive and started fighting. SBSO stepped in and tazed pt multiple times. Pt returned punches on deputy multiple times and was attempting to hit anyone in the room. Pt was pinned by SBSO and was given 5MG Versed IM. Multiple lacerations were noted on head w. uncontrolled bleeding. Pt became more violent and started fighting deputies again and was held to ground by SBSO. Pt was given additional 5MG Versed IM. Pt was again pinned by SBSO and put in handcuffs. Pt had multiple lacerations on head that were profusely bleeding from fight and was now unresponsive. Pt was moved to gurney. Pt respirations were controlled w. BVM. Pulse was in tact at carotid site that was weak and regular.

Once in ambulance IO was attempted in right Tibia but was unsuccessful due to dead IO Drill. IO was successfully established in left tibia w. good flow. Vitals were unobtainable due to pt position w. handcuffs still on. Secondary assessment showed severe head trauma w. multiple lacerations on head and face w. uncontrolled bleeding. EBL was approx. 500-750ML. Pt respirations were maintained w. BVM during transport.

Upon arrival to VVGMC pt became pulseless and CPR was initiated. Pt was taken into ER on gurney and moved to ER bed 4 where report was given to receiving staff. ROSC was achieved by VVGMC staff. No staff members were available to sign for pt care.

Alex Gabler
P39391

\*\*\*Pt was not connected to AMR monitor during transport and no arrest rhythm was notedbut pt was pulseless at carotid site.

| Past Medical History |
|---|

| Patient Medications |
|---|
| **Agency Identifier** | **Medication** |
| [7746] | Unable to Complete |

| Medication Allergies |
|---|
| **Agency Identifier** | **Medication Allergies** |
| [7746] | Unable to Complete |

**Medical History:** None Reported

| Assessment Exam |
|---|

**Unit Notified:** 10/19/2019 09:08:24     **Patient Name:** Doe, John                    **Call #:** 5884388
**Incident #:** 5884388       **Patient Care Report Number:** c2c95f71ab4c497b9e7e7c0d3636e248     **Date Printed:** 12/07/2022 09:27

Page 2 of 6

**Patient Name:** Doe, John            **EMS Agency Name:** AMR - Victorville

| Agency Identifier | Date/Time of Assessment |
|---|---|
| [7746] | 09:16:00 |
| [7746] | 09:22:00 |

### Assessment Summary

**[7746]**
**10/19/2019 09:16:00**

**Detailed Findings**

| Location | Description | Details |
|---|---|---|
| Skin | Diaphoretic Hot | |
| Mental Status | Combative | |

**Normal Findings**

Head ;  Face ;

**Not Done**

### Assessment Summary

**[7746]**
**10/19/2019 09:22:00**

**Detailed Findings**

| Location | Description | Details |
|---|---|---|
| Mental Status | Unresponsive | |
| Head | Laceration Bleeding Uncontrolled | |
| Face | Laceration Bleeding Uncontrolled | |

**Normal Findings**

**Not Done**

### Interventions

#### Medications

| Agency Identifier | Time | Crew | Medication | Route | Dosage | Response | PTA | Medication Comments |
|---|---|---|---|---|---|---|---|---|
| [7746] | 09:19:00 | Gabler, Alex | Midazolam (Versed) | Intramuscular (IM) | 5 Milligrams (mg) | Unchanged | No | |
| [7746] | 09:25:00 | Gabler, Alex | Midazolam (Versed) | Intramuscular (IM) | 5 Milligrams (mg) | Improved | No | |

#### Procedures

| Agency Identifier | Procedure Performed Prior to this Units EMS Care | Time | Crew | Name | Location | Size of Equipment | Attempts | Response | Success | Procedure Comments |
|---|---|---|---|---|---|---|---|---|---|---|
| [7746] | No | 09:27:11 | Gabler, Alex | Venous Access - Intraosseous | | adult | 1 | | No | |
| [7746] | No | 09:27:55 | Gabler, Alex | Venous Access - Intraosseous | | adult | 1 | | Yes | |
| [7746] | No | 09:28:00 | Gabler, Alex | Cardiac arrest | | | | Unchanged | Yes | |
| [7746] | No | 09:28:01 | Gabler, Alex | CPR - Cardiopulmonary resuscitation | | | | Unchanged | Yes | |

### Vitals

**Unit Notified:** 10/19/2019 09:08:24
**Incident #:** 5884388

**Patient Name:** Doe, John
**Patient Care Report Number:** c2c95f71ab4c497b9e7e7c0d3636e248

**Call #:** 5884388
**Date Printed:** 12/07/2022 09:27

Page 3 of 6

Patient Name: Doe, John

EMS Agency Name: AMR - Victorville

## Vitals

| Agency Identifier | Time | PTA | Response (AVPU) | BP | B/Press ure | Patient Position | Airway | Pulse Rate | Method Heart Rate | Pulse Quality | Pulse Rhythm | Resp Rate | Resp Reg | Effort | SpO2 | QualCO2 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| [7746] | 09:24:00 | No | Alert | Unable to Complete / | | | Patent | Unable to Complete | | Normal | | 20 | | Normal | | |
| [7746] | 09:29:00 | No | Unresponsive | Not Applicable / | | | Mask/Non-Rebreather Mask | Not Applicable | | Weak | | 16 | | Mechanically Assisted (BVM, CPAP, etc.) | Not Applicable | |

## Vitals

| Agency Identifier | Date/Time | Mean Arterial Pressure | Temperature | Temperature Method | Pain Scale Score | Pain Scale Type | Blood Glucose Level |
|---|---|---|---|---|---|---|---|
| [7746] | 09:24:00 | | | | | | |
| [7746] | 09:29:00 | | | | | | |

## PQRST

| Agency Identifier | Date/Time Vital Signs Taken | Provoked | Quality | Region | Pain Scale Score | Duration | Duration Units | PQRST Narrative |
|---|---|---|---|---|---|---|---|---|
| [7746] | 09:24:00 | | | | | | | |
| [7746] | 09:29:00 | | | | | | | |

## Stroke

| Agency Identifier | Date/Time Vital Signs Taken | Stroke Scale Score | Stroke Scale Type | Stroke Scale Speech | Stroke Scale Facial Droop | Stroke Scale Arm Drift | Stroke System Triage | Possible Stroke |
|---|---|---|---|---|---|---|---|---|
| [7746] | 09:24:00 | | | | | | | |
| [7746] | 09:29:00 | | | | | | | |

## ECG

| Agency Identifier | Date/Time Vital Signs Taken | Cardiac Rhythm / Electrocardiography (ECG) | ECG Type | Method of ECG Interpretation |
|---|---|---|---|---|
| [7746] | 09:24:00 | | | |
| [7746] | 09:29:00 | | | |

## GCS

| Agency Identifier | Time | Total Glasgow Coma Score | Eye | Motor | Verbal | Score Qualifier |
|---|---|---|---|---|---|---|
| [7746] | 09:24:00 | 15 | 4 - Opens Eyes spontaneously (All Age Groups) | 6 - Obeys commands (>2Years); Appropriate response to stimulation | 5 - Oriented (>2 Years); Smiles, oriented to sounds, follows objects, interacts | Initial GCS has legitimate values without interventions such as intubation and sedation |
| [7746] | 09:29:00 | 3 | 1 - No eye movement when assessed (All Age Groups) | 1 - No Motor Response (All Age Groups) | 1 - No verbal/vocal response (All Age Groups) | Initial GCS has legitimate values without interventions such as intubation and sedation |

## Cardiac Arrest

| | | | | | |
|---|---|---|---|---|---|
| Cardiac Arrest: | Yes, After EMS Arrival | Date/Time of Cardiac Arrest (if not know, please estimate): | 10/19/2019 09:28:00 | | |
| | | | | Arrest Witnessed By: | Witnessed by Healthcare Provider |
| AED Use Prior to EMS Arrival: | No | | | Cardiac Arrest Etiology: | Trauma |
| Resuscitation Attempted By EMS: | Attempted Ventilation; Initiated Chest Compressions | | | | |
| First Monitored Arrest Rhythm of the Patient: | Asystole | | | | |
| Any Return of Spontaneous Circulation: | No | | | | |
| End of EMS Cardiac Arrest Event: | ROSC in the ED | | | Cardiac Rhythm on Arrival at Destination: | Other |
| Resuscitation Attempted by 911 Responder: | Yes | | | Reason CPR/Resuscitation Discontinued: | Not Applicable |
| Who Initiated CPR?: | Responding EMS Personnel | | | Who First Defibrillated the Patient: | Not Applicable |

## Trauma Detail

| | |
|---|---|
| Cause of Injury: | Injury from Blunt Object (assault) |
| Mechanism of Injury: | Blunt |
| Trauma Center Criteria: | Glasgow Coma Score <= 13 |
| Vehicular, Pedestrian, or Other Injury Risk Factor: | Not Applicable |
| Work-Related Illness/Injury: | No |

## Billing Information

| | | | |
|---|---|---|---|
| Payment: | Insurance | Work Related?: | No |
| ALS Assessment Performed and Warranted: | Yes | | |

## Signatures

Unit Notified:  10/19/2019 09:08:24
Incident #:  5884388

Patient Name:  Doe, John
Patient Care Report Number:  c2c9Sf71ab4c497b9e7e7c0d3636e248

Call #:  5884388
Date Printed:  12/07/2022 09:27

Page 4 of 6

**Agency Identifier:** [7746]

**Patient Name:** Doe,John

**EMS Agency Name:** AMR - Victorville

**Type of Person Signing:** Healthcare Provider

**Signature Reason:** Transfer of Patient Care

**Paragraph Text:** I acknowledge that the above patient was transferred to my care.

**Status:** Not Signed - Due to Distress Level

**Signature Graphic:**

**Printed Name:**

**Date/Time Signature Locked:** 10/19/2019 10:00:08

**Signature Date:**

---

**Agency Identifier:** [7746]

**Type of Person Signing:** Patient

**Signature Reason:** HIPAA acknowledgement/Release; Permission to Transport; Permission to Treat; Release for Billing

**Paragraph Text:**
I acknowledge that I am legally responsible for the ambulance services provided to me. I request payment of authorized Medicare benefits and/or other insurance benefits be made on my behalf to AMR for any ambulance services and supplies furnished to me by AMR, whether in the past, now or in the future. I authorize any holder of medical information about me or other relevant documentation about me to release to the Centers for Medicare and Medicaid Services and its agents and contractors, any and all appropriate third party payers and their respective agents and contractors, as well as AMR, any information or documentation in their possession needed to determine these benefits and/or the benefits payable for related services, whether in the past, now or in the future. I acknowledge that I have been provided with a copy of AMR's Notice of Privacy Practices on this date.

**Status:** Not Signed - Transferred Care/No Access to Obtain Signature

**Signature Graphic:**

**Printed Name:** John Doe

**Date/Time Signature Locked:**

**Signature Date:**

---

**Agency Identifier:** [7746]

**Type of Person Signing:** EMS Primary Care Provider (for this event)

**Signature Reason:** EMS Provider

**Paragraph Text:** I acknowledge that I have provided or that my partner has provided the above assessments/treatments for this patient.

**Status:** Signed

**Signature Graphic:**

**Printed Name:** Alex Gabler

**Date/Time Signature Locked:** 10/19/2019 11:23:29

**Signature Date:**

**MCI**

**Number of Patients at Scene:** Single

**Valuables**

**Patient Belongings:** None

Unit Notified: 10/19/2019 09:08:24
Incident #: 5884388

Patient Name: Doe, John
Patient Care Report Number: c2c95f71ab4c497b9e7e7c0d3636e248

Call #: 5884388
Date Printed: 12/07/2022 09:27

EXHIBIT "26"

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CECLIA VARGAS; ARIANA SALAS, )<br>individually and as )<br>successor-in-interest to )<br>RUBEN ESCUDERO, )<br>deceased, )<br> )<br>       Plaintiff, )<br> )<br>vs. )<br> )<br>COUNTY OF SAN BERNARDINO; H. )<br>MIRANDA; S. CARTER; Z. )<br>VOGEL, J. MATA; Z. )<br>PRITCHETT; J. JIMENEZ; A. )<br>MATA; T.KAUTZ; J. ATTLESEY; )<br>RODRIGUEZ (first initial )<br>unknown) and DOES 1-10, )<br>inclusive )<br> )<br>       Defendants. )<br>_____) | Case No.<br>5:20-cv-02646-JGB-KK |

VIDEOCONFERENCE DEPOSITION OF MARK FAJARDO, M.D.

WEDNESDAY, SEPTEMBER 21, 2022

REPORTED BY: JACLYN D. KINSBURSKY, CSR No. 13858

1

1          The videoconference deposition of MARK

2    FAJARDO, M.D., taken on behalf of the Defendants,

3    Wednesday, September 21, 2022, at 1:04 p.m., before

4    Jaclyn D. Kinsbursky, CSR No. 13858, pursuant to

5    NOTICE.

6

7    APPEARANCES OF COUNSEL:

8

9    FOR THE PLAINTIFF:

10           LAW OFFICES OF DALE K. GALIPO
             BY:   DALE K. GALIPO, ESQ.
11           21800 Burbank Boulevard
             Suite 310
12           Woodland Hills, California 91367
             818.347.3333 dalekgalipo@galipolaw.com
13
     FOR THE DEFENDANTS:
14
             WAGNER ZEMMING CHRISTENSEN, LLP
15           BY:   DENNIS WAGNER, ESQ.
             1325 Spruce Street
16           Suite 200
             Riverside, California 92507
17           951.686.4800 dew@wzclawfirm.com

18   ALSO PRESENT:   Autumn Garrison

19

20

21

22

23

24

25

2

```
 1                    I N D E X

 2

 3   WITNESS              EXAMINATION              PAGE

 4   MARK FAJARDO, M.D.

 5                    BY MR. WAGNER              4

 6

 7

 8

 9                 E X H I B I T S

10   NUMBER              DESCRIPTION              PAGE

11   EXHIBIT 45   Autopsy protocol              13

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

3

```
 1                    WEDNESDAY, SEPTEMBER 21, 2022

 2                         1:04 P.M.

 3

 4                    MARK FAJARDO, M.D.,

 5      having been first duly sworn by a court reporter,

 6   was examined and testified as follows:

 7

 8                         EXAMINATION

 9   BY MR. WAGNER:

10       Q     Okay.  Doctor, would you state your name,

11   please.

12       A     Mark Fajardo, M-A-R-K F-A-J-A-R-D-O.

13       Q     And how are you employed?

14       A     I am a forensic pathologist working for the

15   Riverside Sheriff Coroner.

16       Q     How long have you been in that position?

17       A     I came back in '16 after being the chief

18   medical examiner in Los Angeles for two and a half

19   years, and I started my employment here in 2000.

20       Q     All right.

21             You started in 2000 and then at some point

22   went to LA?

23       A     Correct.

24       Q     How long were you in LA as the chief medical

25   examiner?
```

1    A    Two and a half years.

2    Q    And your title with Riverside County, are you

3    also the chief medical examiner?

4    A    I was a chief forensic pathologist until

5    Wednesday of last week, and then I stepped down.  We

6    got a new doctor coming in pathology.

7    Q    All right.  I don't know if that's

8    congratulations or what, but --

9    A    Yes, it is.

10    Q    All right.

11         So as a pathologist, you performed I presume

12    hundreds of autopsies?

13    A    Over 7500 as it stands today.

14    Q    All right.  And you understand that we're here

15    for a case involving Ruben Escudero.

16         You performed an autopsy of him?

17    A    That's correct.

18    Q    Okay.  And you've had a chance to review your

19    autopsy protocol?

20    A    I did.

21    Q    Okay.  You know, I don't know if I've got your

22    current CV or not.  Do you have a CV that you'd be able

23    to provide to the court reporter --

24    A    Not right now, again just because I stepped

25    down, all my CVs are not available currently.  We can

5

Fajardo, Mark
Vargas v. County of San Bernardino

1    do it afterwards.

2        Q    That would be fine.  Okay.  Okay.

3             The autopsy that you performed on Ruben

4    Escudero, what was the date of the autopsy?

5        A    October 29th, year 2019, at 9:45 here in our

6    facility.

7        Q    All right.

8             And you understand what the date and time of

9    death was?

10       A    No, I do not.

11       Q    Okay.  Now, there were a number of people

12   present for the autopsy; is that right?

13       A    Correct.

14       Q    All right.

15            And you had a sign-in sheet?

16       A    Correct.

17       Q    All right.  It looks like Steven Sherman was

18   there for the Riverside Sheriff's Department as

19   counsel?

20       A    Correct.

21       Q    All right.

22            And then you had representatives of Riverside

23   Sheriff, San Bernardino Sheriff and various lawyers?

24       A    That is correct, including Dr. Bennett Omalu.

25       Q    Looks like he had another person with him,

6

Fajardo, Mark
Vargas v. County of San Bernardino

1      Q     For the protocol, what was the cause of death

2  you determined for Ruben Escudero?

3      A     My cause of death that I determined was acute

4  methamphetamine, heroin and phencyclidine toxicity with

5  other significant conditions being hypertensive

6  cardiovascular disease, multiple blunt force trauma

7  associated with restraint maneuvers.

8      Q     Are you familiar with a term referred to as

9  positional affixation?

10     A     Absolutely.

11     Q     Do you know if positional affixation played

12  any role of any kind in the death of Mr. Ruben

13  Escudero?

14     A     Yes, I do, and the answer would be no.  It

15  played no role in why he died.

16     Q     Okay.  I guess I should ask you:  What's your

17  understanding of whatever the events may have been that

18  went up to?

19          (Brief recess taken.)

20  BY MR. WAGNER:

21     Q     I think the question generally was:  Do you

22  have any predicate information about what had

23  transpired concerning Mr. Escudero that ultimately led

24  to him being hospitalized and to his ultimate death?

25     A     The answer unfortunately is -- and I have to

8

**Fajardo, Mark**
**Vargas v. County of San Bernardino**

1    A    That's correct.  He's our neuropathologist at

2    the time who examined the brain.

3    **Q    Okay.  Is he a Riverside employee or is he**

4    **working elsewhere?**

5    A    He was a Riverside employee for a while for a

6    period of time, then he left and came back.  He's

7    working in Los Angeles as it stands currently.

8    **Q    Okay.  And his involvement in the case, was**

9    **that while he was employed with LA or with Riverside?**

10   A    I don't know the answer to that.  I don't know

11   whether he was actually doing work for us here or

12   whether we asked a favor of him when he was in LA.  I

13   don't know the answer.

14   **Q    Okay.  But you've seen a copy of his report?**

15   A    Correct.

16   **Q    Excited delirium, are you familiar with that**

17   **particular topic?**

18   A    Yes.

19   **Q    What do you understand that generally to mean?**

20   A    Not to be derogatory, but it's garbage.  It's

21   a diagnosis of people who feel -- I mean the cause of

22   death is some nebulous mechanism by which people die.

23   No.  The reality is in most circumstances you can fare

24   it out why somebody died.  In this particular case, we

25   have absolute, you know, causality as to why this

10

1    person died.  I never would resort to that anyway.  I'm

2    not a believer in it.

3         Q    Okay.  And what do you understand the concept

4    to be, though, excited delirium?

5         A    It's a concept in which someone dies a fatal

6    cardiac event usually while under the effects of some

7    elicit drugs in combination while being taken into

8    custody.  Obviously those individual items have been

9    fared out, so again, why put a label on something that

10   doesn't need a label?

11        Q    Okay.  Now, the autopsy itself, how long did

12   it take?  I think it started at 9:45?

13        A    I don't really put an end time to my cases

14   just out of habit.  I would imagine a case like this

15   would probably take a couple hours.

16        Q    All right.  And --

17        A    Although -- not to interrupt you -- that end

18   time would be reflected.  We take a picture of the

19   board.  It would be reflected on one of our

20   photographs.

21        Q    Okay.  And I don't know if I've got that

22   particular photograph.

23             That would be one of the photographs that are

24   taken just during the course of the autopsy, but the

25   ending photograph?

1       A    Correct.

2       Q    **The photographs, are they still maintained by**

3   **your office?**

4       A    Yes.

5       Q    **Any samples, are they still maintained at your**

6   **office?**

7       A    The reason again I'm kind of laughing is

8   because historically we used to when we were doing the

9   San Bernardino cases.  I think we have made effort to

10  return those samples since we stopped performing those

11  autopsies.  I don't believe they're in our custody

12  anymore.

13      Q    **Do you know the arrangement where Riverside**

14  **would perform these autopsies for San Bernardino, when**

15  **that stopped?**

16      A    It was in the middle of the COVID pandemic, so

17  a year and a half ago, maybe even two years ago.

18      Q    **So to the best of your knowledge, without**

19  **getting up to go look for samples, is that the samples**

20  **are now with San Bernardino, their coroner office?**

21      A    Correct.

22      Q    **Were you ever provided toxicology results from**

23  **Bio-Tox?**

24      A    Yes, absolutely.

25      Q    **All right.**

12

Fajardo, Mark
Vargas v. County of San Bernardino

1          Did you rely upon those findings of Bio-Tox as
2    it returns cause of death?
3        A    Yes.
4        Q    Now, there were --
5             MS. GARRISON:  Dennis, it did it again.
6             (Brief recess taken.)
7    BY MR. WAGNER:
8        Q    As I understand it, Doctor, there were wounds,
9    marks, cuts, abrasions, whatever we want to refer to to
10   the head of Mr. Escudero?
11       A    That is correct.
12       Q    All right.  And I think on page 11 of your
13   report -- and I guess what we'll do is we'll just refer
14   to it -- I think it's been marked as Exhibit 45.
15            (Exhibit 45 was marked for
16            identification and was attached
17            hereto.)
18   BY MR. WAGNER:
19       Q    Based on your report, I've got it at page 11,
20   and there's the drawing of the skull, and it shows --
21   or what appears to show some wounds.
22            You see that?
23       A    That's correct.
24       Q    Okay.  And if we go to the Escudero -- the
25   right side of his forehead, there's two wounds?

13

1     A     Correct.

2     Q     Can you describe those wounds?

3     A     Sure.  Based on my diagram, one appears to

4  be -- one closer to the ear is located

5  one-and-three-quarters of an inch from the top of the

6  head and five inches right of the anterior midline

7  measuring one-and-one-quarter of an inch.  The one

8  that's closer to the eyebrow is located two inches from

9  the top of the head, four inches around from the right

10  midline.  It also measures one-and-three-quarters of an

11  inch.

12     Q     Were there staples you could observe?

13     A     Correct.

14     Q     All right.

15           Do you know how many staples were observed?

16     A     I do not.

17     Q     Could you tell the depth of those particular

18  wounds?

19     A     Yes.

20     Q     How would you describe the depth of the wound?

21     A     They go all the way through the scalp soft

22  tissues, basically to the bone underneath, but not into

23  the bone itself.

24     Q     The bottom portion, which shows the head -- it

25  would be the left side of the head.  It appears to show

14

Fajardo, Mark
Vargas v. County of San Bernardino

1   two additional abrasions or wounds of some kind.

2          Do you see those?

3   A    Yes.

4   Q    Can you describe those?

5   A    Those are also lacerations -- in other words,

6   breaking of the skin from blunt force.  There's one

7   that's very close to the very stop of the head.  It's

8   three-quarters of an inch from the top of the head

9   measuring one-and-one-quarter of an inch.  A similar

10  injury more towards the ear is located one-and-one-half

11  inches from the top of the head and

12  four-and-one-quarters of an inch left of the midline

13  measuring one-and-one-quarter of an inch in dimension.

14  Q    Were those wounds similar to the ones on the

15  right side that you described in terms of the depth?

16  A    Yes.

17  Q    Okay.  Was there a skull fracture?

18  A    No.

19  Q    Did you take an X-ray?

20  A    Yes.

21  Q    All right.

22          So I take it the X-ray did not show any

23  fracture?

24  A    That is correct, but my eyes are actually

25  better than the X-ray and my eyes and the X-ray showed

15

1   no signs of skull fracture.

2       Q   Okay.  Now, typically is it common for you to

3   send the -- for instance, the brain to a

4   neuropathologist for an examination?

5       A   In a case like this, yes, very common.  The

6   reason being is the high profile nature of the case and

7   the death and custody component of this case, we

8   usually send those reigns to a neuropathologist.

9       Q   And the purpose in sending it to the

10  neuropathologist is what?

11      A   They're better -- I mean, there's no making

12  light of it.  They're better at looking at the brains

13  than I am.  We have a better set of pathologists

14  looking at that.

15      Q   And examining the brain is for what purpose?

16      A   To document any trauma that might be there or

17  any natural disease that might be there, anything that

18  might explain why somebody had passed away.

19  BY MR. WAGNER:

20      Q   In terms of sending the brain, for instance,

21  to Dr. Lynn, ultimately you receive a report from

22  Dr. Lynn concerning his analysis; correct?

23      A   Correct.

24      Q   All right.

25      In terms of his report, you've reviewed that?

16

Fajardo, Mark
Vargas v. County of San Bernardino

1    A    Yes.

2    Q    Okay.  In terms of his examination of the

3    brain of Mr. Escudero, did he determine whether or not

4    there was some type of brain damage that could be

5    associated with trauma?

6    A    Yes, he did and no, there was not.

7    Q    So in terms of Dr. Lynn's examination, what,

8    if anything, did he conclude from his report concerning

9    his examination of the brain?

10   A    That the decedent, Ruben Escudero, did suffer

11   anoxic injury.  What that means is he didn't get enough

12   blood flow and/or oxygen to his brain for a period of

13   time that resulted in the findings that we see.

14   Q    All right.

15        Was there any estimate of the amount of time

16   provided that there was no oxygen or sufficient oxygen

17   to the brain?

18   A    No.

19   Q    Generally, are you familiar with the range of

20   times in which that becomes a problem then for someone

21   to end up in the condition such as Mr. Escudero?

22   A    Yes, absolutely.

23   Q    What's the range, generally?

24        MR. GALIPO:  I'm going to object.  Sorry.  I'm

25   going to object as lacking foundation and incomplete

17

Fajardo, Mark
**Vargas v. County of San Bernardino**

1      Q    In terms of your physical examination of the

2  body --

3           MR. GALIPO:  Okay.  We have reached that point

4  again.

5           MR. WAGNER:  All right.  Let me call in the

6  number.

7           (Brief recess taken.)

8  BY MR. WAGNER:

9      Q    I think I said I was going to go through the

10  report with you.  In terms of internal trauma, other

11  than the strikes to the head, did it appear there was

12  any internal trauma you were able to observe during the

13  autopsy of Mr. Escudero?

14     A    Again --

15          MR. GALIPO:  Objection.  Vague.  Vague and

16  ambiguous.  Are you just speaking about the head or the

17  entire body?

18          MR. WAGNER:  The entire body.

19          THE WITNESS:  There was one little hemorrhage

20  to the thyroid cartilage on the right side that was not

21  contemporaneous with the purported injury.  Probably it

22  was a result of medical intervention.  What do I mean

23  by that?  Probably in placing the endotracheal tube, a

24  little trauma was associated with that.  Other than

25  that, no internal trauma.

19

Fajardo, Mark
**Vargas v. County of San Bernardino**

```
 1    BY MR. WAGNER:
 2         Q    Okay.  I note that in going through the
 3    autopsy, you weighed various organs that were moved as
 4    part of the procedure.
 5              Was there anything significant about the
 6    weight of any organ that was removed?
 7         A    Yes.
 8         Q    What was significant?
 9         A    Well, the heart specifically, it weighed
10    660 grams, almost twice the amount of what it should
11    usually weigh presumably from hypertension, an enlarged
12    heart.
13         Q    Okay.  What effect, if any, does an enlarged
14    heart have with respect to drug usage?
15         A    It's possible that prolonged stimulant use,
16    whether methamphetamine or cocaine could also produce a
17    state of hypertension, which would also enlarge the
18    heart.  So it's difficult for me to say which came
19    first or which one is more important.
20         Q    All right.
21              It would appear there was a difference in the
22    weight between the two lungs that he had.
23              Was there any significance of that?
24         A    No.  They're both heavy.  As you can expect,
25    someone who's been on the respirator for a period of
```

20

Fajardo, Mark
**Vargas v. County of San Bernardino**

```
 1            MR. GALIPO:  I don't think it was terrible.
 2   It's just that I don't know if you're giving Mark
 3   enough information with that one.
 4            MR. WAGNER:  Yeah.  I don't think so either.
 5   BY MR. WAGNER:
 6        Q    It would appear that -- assume that Narcan two
 7   milligrams was provided to him upon arrival seeing him
 8   in a state of some type of unconsciousness as a result
 9   of the drugs.
10            What would you expect to occur with the
11   administration of Narcan?
12        A    In this particular individual, he has --
13   again, he has three separate drugs on board, including
14   methamphetamine, heroin and phencyclidine.  Now, the
15   Narcan is really good at reversing the effets of
16   opiates, which would include heroin, fentanyl being the
17   main that's occurring now with our fentanyl pandemic
18   that we're facing.
19            It's miraculous.  You can give somebody Narcan
20   and it revives them.  Unfortunately, our decedent Ruben
21   Escudero had methamphetamine and phencyclidine and the
22   Narcan wouldn't touch those drugs at all.
23        Q    Okay.  And then sometime after the Narcan is
24   administered, there's a physical altercation that takes
25   place with members of the sheriff's department, and at
```

23

Fajardo, Mark
Vargas v. County of San Bernardino

1   some point near the end of that altercation, it appears
2   that a shot of Versed was applied, five milligrams, and
3   then I think after he was restrained further with
4   handcuffs, he was provided another five milligrams of
5   Versed.
6           Are you familiar with Versed?
7   A     Yes.
8   Q     And what is that?
9   A     It is in a class of drugs called
10  benzodiazepines.  It's basically a minor tranquilizer.
11  It relaxes the human body.  It's a muscle relaxant.  It
12  calms people down at the very end of the day.  We use
13  it extensively in the emergency room setting to calm
14  people under the effects of methamphetamine, and again,
15  with Ruben's case, phencyclidine with as well.
16  Q     I mean, are you familiar with emergency room
17  procedures -- for instance, the administration of ten
18  milligrams of Versed with the level of drugs in this
19  person's system, whether or not that would have some
20  type of negative connotation with respect to his
21  health?
22  A     Well I worked in the ER for a period of time.
23  I was going to be an emergency room physician, so I
24  actually spent quite a bit of time in the ER during
25  medical school.  Again, we use midazolam frequently.

24

1    We wouldn't know what those levels were at the time

2    that they come in the emergency room just based on the

3    physiology and perhaps the circumstances surrounding

4    somebody's death.  Again, midazolam is a very safe drug

5    for the most part.  That's why it's used extensively.

6        Q    Okay.  All right.  So if, in fact, he was

7    given ten milligrams of Versed, you don't believe that

8    would have any potential negative effect in his

9    ultimate outcome?

10           MR. GALIPO:  I'm going to object.  It's vague

11   and ambiguous as phrased and lacks foundation.  I don't

12   think there's enough information for the doctor to

13   answer that.

14           THE WITNESS:  I would have to agree with Dale.

15   It's difficult for me to say -- what do you mean by

16   negative effect?  It's a benzodiazepine for the most

17   part.  Obviously too much is not a good thing.  We use

18   it in these circumstances, but that's about as far as I

19   could go with it.

20   BY MR. WAGNER:

21       Q    All right.

22       But the Versed would amplify the effect of the

23   heroin again, would it not, the opiate?

24       A    Yes, that is correct.  They both are -- yes,

25   that is true.  The main concern is respiratory

25

1    depression -- is the drive that allows us to breathe

2    affected both by the heroin and the midazolam.  But

3    then you have to take that into consideration that it's

4    also working under the umbrella of methamphetamine as

5    well.  It's a tough thing to try and figure out which

6    one is, you know, more important at this point.

7        Q    Okay.  All right.

8             The SPO2, are you familiar with that

9    reference?

10       A    Yes.

11       Q    And that's referring to what?

12       A    The amount of oxygen basically in the

13   bloodstream.

14       Q    All right.

15            Generally, a healthy person is between 75 and

16   100?

17       A    That's different.  That's a saturation.  The

18   O2 sat is different than doing an arterial blood stick.

19   But yeah, the normal saturation is, like you said,

20   between 95 and 98 for a young healthy individual.

21       Q    Assume for the moment that after he was given

22   Narcan and before his altercation with the sheriff's

23   deputies, he has SPO2 ratings of 64 dropping to 53,

24   dropping to 40.

25            Would that have any significance in terms of

**Fajardo, Mark**
**Vargas v. County of San Bernardino**

1   your autopsy findings?

2        A    No.  At the end of the day, the answer to that

3   question is now.  I mean, we know that he suffered an

4   anoxic insult.  This is probably just documentation of

5   that occurring.

6        Q    All right.

7             Now, when you write your report and you list

8   the other significant conditions, did the blunt force

9   trauma to the head, did that cause his death?

10       A    No, it did not, otherwise it would be under

11  cause of death.  It did in my opinion play a role, and

12  what role was that?  The impacts to the head added to

13  the adrenalin surge that he was experiencing, which led

14  to the presumptive cardiac arrythmia and then the

15  anoxic insult.

16       Q    All right.

17            Do you have any information as to what his

18  information was when he was placed in the ambulance

19  prior to his transportation to the hospital?

20       A    Again, we weren't provided hardly any

21  information at all.  The answer is no.

22       Q    What would be the contribution of his

23  hypertensive cardiovascular disease to the cause of

24  death?

25       A    Again, the presumption is that he suffered a

27

1    fatal arrythmia and an enlarged heart.  Again, his was

2    almost twice what it should normally be, an

3    electrically unstable heart.  It's prone to developing

4    arrhythmias.  That's why we call hypertension the

5    silent killer.  You basically will suffer an arrythmia

6    just from having an enlarged heart.  This heart being

7    electrically unstable in combination with the drugs

8    resulted in the presumptive arrythmia.

9        Q    All right.

10            Are you familiar with ranges of toxicity as it

11    concerns methamphetamine, heroin, phencyclidine?

12       A    Yes, absolutely.

13       Q    In what levels are considered toxic for

14    purposes of someone who has an overdose of that leading

15    to death?

16       A    The toxic level and then there's the fatal

17    level.  So most of my forensic community agrees that

18    toxic levels for methamphetamine is part of probably .1

19    or 2.  Heroin is toxic at any level.  And the same

20    thing can be said with phencyclidine.

21       Q    All right.

22            What about fatal levels?

23       A    Fatal levels in and -- here's the problem.

24    Individually methamphetamine you're looking at .2 and

25    above.  Heroin, again, unsafe at any level.

1    Phencyclidine, unsafe at any level.

2          Q      All right.

3                 Do you have the Bio-Tox results available to

4    you, Doctor?

5          A      I do.

6          Q      I guess I'd be looking at hospital -- it would

7    be the levels showing methamphetamine at .485

8    milligrams per liter.

9                 Do you see that page?

10         A      Yes, absolutely.

11         Q      All right.

12                And would that be a toxic level?

13         A      That would be a lethal level.  Again, anything

14   above .2 would be considered potentially lethal

15   considering that he's got almost a .5 definitely within

16   the lethal range individually.  Again, he's got three

17   drugs on board.

18         Q      Right.  And then the opiates that are in his

19   system, which includes the phencyclidine in addition to

20   the heroin, heroin breaks down into what substances?

21         A      Morphine primarily.  The codeine that you see

22   is a byproduct usually of the manufacturing of the

23   heroin, so it's just a tip off that, in fact, heroin

24   was used, but we have that confirmed with the

25   monophenol morphine.  So at a .079, again any amount

Fajardo, Mark
Vargas v. County of San Bernardino

1    would be potentially fatal.   In this case, that's also

2    true.

3         Q    All right.

4              What about the phencyclidine?

5         A    So he barely has a PCP on board.   Again, any

6    amount of PCP can be fatal resulting in that fatal

7    arrythmia.   Even at .001, it is potentially fatal,

8    individually.

9         Q    Okay.  And then we've got the next page that's

10   got hospital blood, and it relates to the Myazoam

11   (sic) --

12        A    Midazolam --

13        Q    Exactly.

14        A    Versed.

15        Q    That's the Versed, is it not?

16        A    Correct.

17        Q    Okay.  Is there anything significant about

18   this level?

19        A    No, not at all.   This is what you would expect

20   when someone has given a dose in the emergency room

21   setting.

22        Q    All right.

23             And typically when you're looking at

24   toxicology results, you're looking at hospital blood

25   versus urine for a more accurate representation?

30

Fajardo, Mark
Vargas v. County of San Bernardino

1    staples introduced too much artifact.  I would probably
2    stand -- you know, if I was put on the stand, I would
3    say that these are consistent with baton strikes, but I
4    couldn't definitively say that these are baton strikes
5    given again the artifact and the period of healing, the
6    time interval between the impact and when I did the
7    autopsy.
8         Q    There may be evidence at the trial that the
9    blows to the head came from the use of a TASER --
10   actually using the TASER as a striking device.
11            Do you know if whether or not those wounds
12   have been consistent with such an event?
13        A    It would be consistent with that, absolutely.
14        Q    Typically a baton strike, you'd expect to see
15   more damage than perhaps a skull fracture?
16        A    Not necessarily.  Again, it depends on the
17   amount of force, but what I'm usually looking for more
18   is the degree of tissue bridging and then there's
19   tram-tracking surrounding -- I mean, there's a lot of
20   things I'm looking for that I can't see at this point.
21        Q    All right.
22            And those things that you can't see would be
23   more consistent with batons; right?
24        A    I couldn't say either way.  Again, that's why
25   it's not in my report.

44

1   STATE OF CALIFORNIA            )

2                                  ) ss.

3   COUNTY OF LOS ANGELES          )

4

5          I, JACLYN D. KINSBURSKY, C.S.R. No. 13858 in

6   and for the State of California do hereby certify:

7          That prior to being examined, the witness,

8   named in the foregoing deposition was by me duly sworn

9   to testify to the truth, the whole truth, and nothing

10  but the truth;

11         That said deposition was taken down by me in

12  shorthand at the time and place therein named and

13  thereafter reduced to typewriting under my direction,

14  and the same is a true, correct, and complete

15  transcript of said proceedings;

16         I further certify that I am not interested in

17  the event of the action.

18

19         Witness my hand this 7th day of October, 2022.

20

21

22

23

24  _____

25          JACLYN D. KINSBURSKY, CSR NO. 13858

47

701907203



# Riverside County Sheriff's Department
## *Chad Bianco, Sheriff-Coroner-Public Administrator*

### Coroner-Public Administrator
800 South Redlands Avenue • Perris • California • 92570
www.riversidesheriff.org

**Mark A. Fajardo, M.D.**
Chief Forensic Pathologist

## AUTOPSY PROTOCOL

**NAME OF DECEDENT:** ESCUDERO JR., RUBEN          **FILE NUMBER:** 2019-12696

**FINAL DIAGNOSES:**

I.   Decedent status post death in custody with reports of decedent being under the influence of drugs and subsequent law enforcement encounter with cardio-respiratory arrest resultant and subsequent anoxic insult; death occurring days after incident:

    A.   Approximately four impact injuries to the parietal aspects/vertex of the scalp with concomitant subgaleal hemorrhage; no intracranial hemorrhage appreciated.

II.  Layered anterior and posterior neck demonstrating no pathology with the exception of presumptive artifactual hemorrhage to the cornu of the right thyroid cartilage; hyoid bone noted to be intact.

III. Please refer to formal toxicology report.

IV.  Cardiomegaly with concomitant left ventricular hypertrophy; hypertensive type.

V.   Please refer to formal toxicology report.

**CAUSE OF DEATH:   ACUTE METHAMPHETAMINE, HEROIN AND PHENCYCLIDINE TOXICITY**

**OTHER SIGNIFICANT CONDITIONS:     HYPERTENSIVE CARDIOVASCULAR DISEASE, MULTIPLE BLUNT FORCE TRAUMA ASSOCIATED WITH RESTRAINT MANEUVERS**

"I hereby certify that I, Mark A. Fajardo, M.D., Chief Forensic Pathologist, have performed an autopsy on the body of Ruben Escudero Jr., on the 29th day of October 2019, commencing at 9:45 a.m., in the Perris mortuary of the Office of the Riverside County Sheriff-Coroner."

ESCUDERO JR., RUBEN/2019-12696 (2)

**External Examination:**  The body is received in a sealed body bag bearing the San Bernardino seal number 0427844 which is subsequently broken at 9:45 a.m.  Upon opening the body bag, the body is found to be that of a well-developed, well-nourished, Hispanic appearing male, measuring 72" in length and weighing 204 pounds.  The subject's general appearance is consistent with the stated age.  The decedent is unclothed.  The body has been refrigerated and is cool to the touch.  Rigor mortis is 2+ in the jaws, neck, and upper and lower extremities.  Livor mortis is present in a posterior dependent distribution, with relative sparing of the weight-bearing areas, and does not blanch to palpation.  The body is unembalmed.  The decedent is identified by a Coroner's tag affixed to the left great toe bearing the decedent's name.  There is also a toe tag present to the right great toe bearing the San Bernardino case number 701907203 and the tag number 43964.

The subject is normocephalic.  There are injuries to the head to be described further below.  The scalp hair is shortly trimmed, black, measuring up to 1/4" in length.  There is stubble in a normal facial hair distribution.  The facial features appear symmetrical and normally formed.  The corneae are clear.  The irides are brown.  The pupils are round and regular measuring 0.4 cm bilaterally.  The conjunctivae are pink and moist and there are no conjunctival petechial hemorrhages.  There is no scleral icterus.  Arcus senilis is not seen.  The nose is normally formed and has an apparently intact bony and cartilaginous structure although mild crepitus is elicited upon mobilization.  The nostrils are patent.  The ears are symmetrical and show no hemorrhage or discharge.  The teeth are natural and are in a good state of repair.  The oral mucus membranes are pink and moist and show no evidence of trauma of petechial hemorrhage.  There is a tattoo present to the inner lower lip.  No foreign material or blood is present in the mouth.  The neck is symmetrical, normally formed and atraumatic.  There is no palpable crepitance or hypermobility of the neck.

The chest is symmetrical and normally formed.  There is no visible external chest trauma.  No palpable crepitance or bony deformity is present over the chest wall.  The abdomen is relatively flat.  No abdominal trauma is noted externally.  No masses are palpated.  The external genitalia are those of a normally developed apparently circumcised adult male.  Both testicles are present within the scrotal sac.  The pubic hair pattern is normal.  The anus is closed and atraumatic.

The upper extremities are symmetrical, normally formed and involved with traumatic injuries to be described further below.  No needle tracks or needle marks are noted with the exception of medical intervention.  Upon receipt of the body the hands are not enclosed in paper or plastic bags.  Examination of the fingernails reveal them to be thin and translucent and are neatly trimmed and closely kept.

The lower extremities are symmetrical, normally formed, and relatively atraumatic.  The toenails are thickened but otherwise neatly trimmed and closely kept.  The soles of the feet are calloused.

701907203

ESCUDERO JR., RUBEN/2019-12696 (3)

The posterior trunk shows a normal symmetrical external contour.  There are two possible puncture wounds to be described further below.

**SCARS AND DISTINGUISHING MARKS:**  Multiple tattoos adorn the body surfaces.

**EVIDENCE OF THERAPEUTIC INTERVENTION:**  There are four lacerations to the head which have been previously stapled closed.  Multiple EKG pads are present overlying the anterior and lateral body surfaces.  There is a central line present to the right lateral neck region.  There is an IV site present to the right antecubital fossa.  A Foley catheter is present within the urethra.

**EVIDENCE OF EXTERNAL TRAUMA:**  Present to the right parietal aspects of the scalp, located 2" from the top of the head and 4" right of the anterior midline, is an obliquely oriented laceration. The injury proper measures 1 3/4" in linear length by up to 3/16" in width with definitive tissue bridging noted within the depths of the injury.  The laceration does not extend into the underlying subgaleal soft tissues.  Present immediately posterior is a similar laceration, located 1 3/4" from the top of the head and 5" right of the anterior midline, measuring 1 1/4" in linear dimension.  Several small macro lacerations emanate from the midportion of the injury on either side.  Definitive tissue bridging is also identified.  The injury does not extend into the underlying subgaleal soft tissues. Present to the left parietal aspects of the scalp, located 1 1/2" from the top of the head and 4 1/4" left of the anterior midline, is a similar obliquely oriented laceration.  The injury measures 1 1/4" in length by up to 3/16" in width and small macro lacerations emanate primarily from the midportion of the injury.  This injury also has definitive tissue bridging.  Likewise, it does not extend into the underlying subgaleal soft tissues.  A similar laceration is noted located inferior and superior on the left side, located 3/4" from the top of the head and primarily involving the left vertex aspects.  The injury proper measures 1 1/4" in a primarily sagittal orientation with minimal micro lacerations which emanate from the midportion.  Definitive tissue bridging is also identified and this injury likewise does not extend into the underlying subgaleal soft tissues.

Present above the right supraorbital ridge is an area of vague contusional injury measuring 1 x 2" in dimension.  There is periorbital ecchymoses of the right soft tissues.  Multiple minute abrasions are noted to the nose primarily, randomly distributed, measuring from 3/16" to 3/8" in dimension. Similarly, there are two abrasions noted to the left malar area, individually measuring from 3/16" to 3/8" in dimension.  Examination of the right ulnar extensor wrist reveals a small parallel linear abrasion measuring up to 1/4" in dimension possibly consistent with the application of a restraining devices (handcuffs).  There is an area of "old" trauma with a scabbed injury to the inner pretibial surfaces of the right lower extremity measuring 1/2".  Examination of the flexor aspects of the radial portion of the left wrist reveals parallel abrasions measuring up to 1 3/4" in linear dimension also consistent possibly with the application of a restraining device (handcuffs).  This extends to involve the extensor aspects for a distance of approximately 1/2".  There is a larger region of abrasion noted to the PIP joint of the fifth digit of the left hand measuring up to 3/4".

ESCUDERO JR., RUBEN/2019-12696 (4)

Present to the right midback region inferior to the scapula, located 21" from the top of the head, 4 1/2" and 6 3/4" right of the posterior midline respectively, is a pair of small punctate possible puncture wounds. The injuries proper measures less than 1/8" in dimension and are located 2 1/4" in distance away from one another. This paired set of injuries may possibly be secondary to the application of an electroconductive device, although due to the interval from the possible application, healing has occurred obscuring the definitive determination. (Please refer to photograph for further detail.)

**EVIDENCE OF INTERNAL TRAUMA:** Upon reflection of the scalp, areas of subgaleal hemorrhage are appreciated. There is an area located to the right supraorbital soft tissues as previously described measuring up to 8 cm in dimension corresponding to the aforementioned external injuries. There are also areas of subgaleal hemorrhage corresponding to the aforementioned impact injuries for distances up to 5 to 7 cm individually (please refer to photograph for further detail). Upon opening the bony calvarium, no hemorrhages are appreciated, and the brain is markedly edematous with marked flattening of the gyri and narrowing of the sulci. A layered anterior and posterior neck are performed revealing no definitive injuries. The hyoid bone and laryngeal cartilages are intact. However, the superior cornu of the right laryngeal cartilage has a 0.7 cm area of hemorrhage with laxity of the joint which is presumed to be artifactual in nature. (Please refer to photograph for further detail.) No other evidence of internal trauma is appreciated.

**Internal Examination:**

**OPENING INCISION AND BODY CAVITIES:** The standard Y-shaped thoracoabdominal incision reveals a subcutaneous fat thickness of 3/8" at midabdominal level. The pleural, pericardial, and peritoneal cavities are smooth and shiny and reveal no accumulation of excess fluid or blood. The internal organs are normally arranged.

**NECK ORGANS:** The hyoid bone and laryngeal cartilages are intact and normally formed. No fractures are identified. There is no evidence of hemorrhage in the strap muscles or soft tissues of the neck. The carotid sheaths and anterior cervical spine are without obvious abnormalities.

**CARDIOVASCULAR SYSTEM:** The heart weighs 660 grams. It is normally formed. The epicardial surface is smooth and shiny. There is a normal distribution of epicardial fat. The myocardium is firm, red-brown without focal softening, discoloration, or fibrosis. The chambers are not dilated, and the ventricular walls are thicker than that which would normally be appreciated (left ventricle 1.8 cm, right ventricle 0.2 cm, septum 2.0 cm). The endocardial surfaces show a typical trabecular pattern and are free of fibrosis or mural thrombus. The valves are normally formed, thin, and pliable. The coronary ostia are patent. The coronary arteries are normal in origin and distribution. The right coronary artery is dominant. The coronary arteries show minimal atherosclerotic narrowing. There is no thrombotic occlusion. The aorta is patent and follows a normal course. There is minimal aortic atherosclerosis.

ESCUDERO JR., RUBEN/2019-12696 (5)

**RESPIRATORY SYSTEM:** The right lung weighs 950 grams. The left lung weighs 780 grams. The lungs are similar in appearance. The pleural surfaces are smooth, shiny, light purple-tan with minimal scattered anthracotic mottling. Sectioning reveals dense and congested, purple-tan parenchyma. There is no localized consolidation or infarction. No parenchymal mass lesions or abscesses are present. The larynx, trachea, and bronchi are normally formed. The mucosal surfaces of the airways are unremarkable. There is no airway obstruction. The pulmonary arteries are normally formed and free of thromboemboli.

**GASTROINTESTINAL SYSTEM:** The esophagus is normally formed, patent and shows a smooth, pink-tan mucosa. The stomach is normally formed. It contains 50 cc of brown liquid gastric contents with no readily identifiable particulate food matter or pill residue appreciated. No ethanol-like odor is noted. The gastric mucosa is pink-tan and shows a typical rugal pattern. No localized erosion, ulceration, or mass lesion is evident. The duodenum, small intestine, appendix, and colon are grossly normal.

**PANCREAS:** The pancreas is normal in size and configuration. Sectioning reveals a uniform, tan, lobulated parenchyma.

**HEPATOBILIARY SYSTEM:** The liver weighs 2690 grams. It is normally formed. The capsule is thin, smooth, and shiny. The cut surface is firm, red-brown and displays a typical lobular pattern. No parenchymal mass lesion is noted. The gallbladder is normally formed. It contains 30 cc of amber bile. There are no calculi. The gallbladder mucosa shows a typical finely reticulated appearance. The bile ducts are patent and of normal caliber.

**GENITOURINARY SYSTEM:** The right kidney weighs 250 grams. The left kidney weighs 270 grams. The kidneys are similar in appearance. The capsules strip with ease. The cortical surfaces are smooth, red-tan. Sectioning reveals a normal pattern of internal architecture. Corticomedullary demarcation is distinct. No cysts or mass lesions are present. The pelves and ureters are patent and are of normal caliber. The bladder is devoid of urine with a urine sample obtained from the Foley catheter bag. The bladder mucosa is smooth, light pink-tan. The prostate and testes are unremarkable to inspection and palpation.

**LYMPHORETICULAR SYSTEM:** The spleen weighs 270 grams. It is normally formed. The capsule is thin, smooth, and shiny. The cut surface is firm, red-purple and shows a typical follicular pattern without evidence of fibrosis or neoplasia. The thymus is atrophic. Lymph nodes throughout the body are small and inconspicuous.

**ENDOCRINE SYSTEM:** The thyroid is symmetrical and normally formed. Sectioning reveals a uniform, firm, red-brown, colloid parenchyma. The adrenals are grossly unremarkable. The pituitary is grossly unremarkable.

ESCUDERO JR., RUBEN/2019-12696 (6)

**SKELETAL SYSTEM:** There is no gross evidence of skeletal fracture or deformity.

**HEAD:** Reflection of the scalp does reveals the subgaleal hemorrhage as previously described. The skull is intact and normal in thickness. The dura is smooth and shiny. There is no dural neomembrane or sinus thrombosis. No subdural hemorrhage is present. Removal of the dura reveals no evidence of skull fracture.

The brain weighs 1540 grams. The leptomeninges are thin and transparent. There is no subarachnoid hemorrhage or exudate. The superficial blood vessels are fine and patent. The vessels at the base of the brain are free of atherosclerosis. The circle of Willis is normally formed. The cranial nerves are intact. The dorsal surface of the brain presents a symmetrical appearance with a normal convolutional pattern, although there is marked flattening of the gyri and narrowing of the sulci as previously described. There is no evidence of subfalcial herniation. The base of the brain shows no evidence of uncal or tonsillar herniation although the cerebellar tonsils are accentuated. The brainstem and cerebellum show the usual external configuration. There is no localized external softening or contusion of the brain, although the brain is moderately softened in general secondary to "respirator brain".

The spinal cord is extracted from an anterior approach and is artifactually torn at the T1-T2 region during extraction secondary to the softening of the cord in its entirety. The cord and brain are submitted for formal neuropathologic consultation.

**ASSISTANTS:** Ivy Zandoval

**SPECIMENS FOR PATHOLOGY:** Representative sections of all major organs are retained including the hyoid bone and laryngeal cartilages.

**SPECIMENS FOR TOXICOLOGY:** Heart blood, vitreous, gastric, liver, bile, and urine (from Foley catheter bag).

**POSTMORTEM RADIOGRAPHS:** Postmortem radiographs are obtained.

**PHOTOGRAPHS:** Photographs are by Kristen Morrow.

**DIAGRAMS:** Diagrams are by Dr. Fajardo.

**POLICE WITNESSES:** Steven Sherman from RSD, Joshua Head from RSO, Nicolas Craig from San Bernardino Sheriff's Department, Sharon Brunner Attorney, Jim Terrell Attorney, A. Martinez from San Bernardino Sheriff's Department and Tristan Pecayes from San Bernardino Sheriff's Department, Bennet Omalu and Michelle Hernandez.

701907203

ESCUDERO JR., RUBEN/2019-12696 (7)

**MICROSCOPIC DESCRIPTION:**  Sections of the major organs examined confirm the gross
pathologic findings.  No diagnostic histopathology is seen.

_____
Mark A. Fajardo, M.D.
Chief Forensic Pathologist

MAF/cm
MAF  7/23/2020

_____
7/28/20
Date

007

701907203

NAME OF DECEDENT: Escudero Jr, Ruben          CORONER FILE # 2019-12696

PATHOLOGIST: _____ Fajardo _____  DATE: 10/29/19



Name: Escutero, Ruben    Date: 10/29/19    Case Number: 2019-12696



**Forensic Pathologist:** _____, M.D.

701907203



# BIO-TOX LABORATORIES

1987

| Laboratory Director | Toxicologist | Toxicologist |
| Erin Crabtrey, M.S., D-ABFT-FT | Ola Bawardi, M.S. | Kristen Steward, M.S., D-ABFT-FT |

```
RIVERSIDE CORONER                                    2019-12696
800 S. REDLANDS                               ESCUDERO, RUBEN J.
PERRIS, CA  92570
```

```
            PATIENT NAME                     SEX    DATE OF DEATH
---------------------------------            ---    -------------
  ESCUDERO, RUBEN J.                                  10/23/19

BTL NUMBER      REQUESTING AGENCY        REQUESTED BY      AGENCY NUMBER
----------      -----------------        ------------      -------------
9-28491-2       7400                      ALBERT            2019-12696

SPECIMEN        DATE COLLECTED   TIME TAKEN   DATE RECEIVED    DATE REPORTED
----------      --------------   ----------   -------------    -------------
 HOSP BLD        10/19/19         10:45        10/30/19         11/07/19
```

```
------------------------------------------------------------------------------
COMPREHENSIVE DRUG PANEL:
METHODOLOGIES TO INCLUDE IMMUNOASSAY AND LIQUID CHROMATOGRAPHY/MASS
SPECTROMETRY (LC/MS/MS).  SAMPLE SCREENED FOR A MINIMUM 150 COMMON
ACIDIC, BASIC AND NEUTRAL DRUGS.
```

```
      TEST                             RESULTS

   ETHYL ALCOHOL                      SEE BTL #9-28492-4 FOR ANALYSIS

   AMPHETAMINES                       DETECTED

     METHAMPHETAMINE, LC/MS/MS        0.485 mg/L

     AMPHETAMINE, LC/MS/MS            0.053 mg/L

   ANALYSIS BY: S. GALLARDO,

   KRISTEN STEWARD & OLA BAWARDI

   NOTE: NAME ON SAMPLE IS

       DOE, RUBEN
```



701907203



# BIO-TOX LABORATORIES

| Laboratory Director | Toxicologist | Toxicologist |
|---|---|---|
| Erin Crabtrey, M.S., D-ABFT-FT | Ola Bawardi, M.S. | Kristen Steward, M.S., D-ABFT-FT |

```
RIVERSIDE CORONER                              2019-12696
800 S. REDLANDS                        ESCUDERO, RUBEN J.
PERRIS, CA  92570
```

| PATIENT NAME | | SEX | DATE OF DEATH |
|---|---|---|---|
| ESCUDERO, RUBEN J. | | | 10/23/19 |

| BTL NUMBER | REQUESTING AGENCY | REQUESTED BY | AGENCY NUMBER |
|---|---|---|---|
| 9-28491-3 | 7400 | ALBERT | 2019-12696 |

| SPECIMEN | DATE COLLECTED | TIME TAKEN | DATE RECEIVED | DATE REPORTED |
|---|---|---|---|---|
| HOSP BLD | 10/19/19 | 10:45 | 10/30/19 | 11/07/19 |

```
    TEST                                 RESULTS

    OPIATES                              DETECTED

      MORPHINE, LC/MS/MS                 0.079 mg/L

      CODEINE, LC/MS/MS                  0.005 mg/L

      MONOACETYLMORPHINE, LC/MS/MS       0.020 mg/L

    PHENCYCLIDINE, LC/MS/MS              0.001 mg/L

    BENZODIAZEPINES                      DETECTED*

    ANALYSIS BY: S. GALLARDO,

    OLA BAWARDI & KRISTEN STEWARD

    *NOTE: SEE BTL #9-28492-4 FOR

         QUANTITATIVE ANALYSIS
```

701907203



# BIO-TOX LABORATORIES

1987

| Laboratory Director | Toxicologist | Toxicologist |
|---|---|---|
| Erin Crabtrey, M.S., D-ABFT-FT | Ola Bawardi, M.S. | Kristen Steward, M.S., D-ABFT-FT |

RIVERSIDE CORONER                                        2019-12696
800 S. REDLANDS                                    ESCUDERO, RUBEN J.
PERRIS, CA  92570

```
        PATIENT NAME                          SEX      DATE OF DEATH
------------------------------------          ---      -------------
  ESCUDERO, RUBEN J.                                     10/23/19

BTL NUMBER      REQUESTING AGENCY        REQUESTED BY      AGENCY NUMBER
----------      -----------------        ------------      -------------
9-28492-4       7400                      ALBERT            2019-12696

SPECIMEN        DATE COLLECTED   TIME TAKEN   DATE RECEIVED   DATE REPORTED
--------        --------------   ----------   -------------   -------------
 HOSP BLD        10/19/19         10:45        10/30/19        11/06/19
```

--------------------------------------------------------------------------

```
    TEST                            RESULTS

    ETHYL ALCOHOL                   0.000% (W/V)

    MIDAZOLAM, LC/MS/MS             0.015 mg/L

    ANALYSIS BY: KRISTEN STEWARD

    AND OLA BAWARDI

    NOTE: NAME ON SAMPLE IS

          DOE, RUBEN
```

701907203



# BIO-TOX LABORATORIES

1987

| Laboratory Director | Toxicologist | Toxicologist |
| Erin Crabtrey, M.S., D-ABFT-FT | Ola Bawardi, M.S. | Kristen Steward, M.S., D-ABFT-FT |

```
RIVERSIDE CORONER                               2019-12696
800 S. REDLANDS                          ESCUDERO, RUBEN J.
PERRIS, CA  92570
```

```
        PATIENT NAME                        SEX    DATE OF DEATH
------------------------------------        ---    -------------
  ESCUDERO, RUBEN J.                                  10/23/19

BTL NUMBER     REQUESTING AGENCY         REQUESTED BY     AGENCY NUMBER
----------     -----------------        ------------      -------------
9-28494-8      7400                      ALBERT            2019-12696

SPECIMEN       DATE COLLECTED   TIME TAKEN   DATE RECEIVED   DATE REPORTED
----------     --------------   ----------   -------------   -------------
HOSP UR        10/19/19         10:48        10/30/19        11/07/19
```

```
-----------------------------------------------------------------------
COMPREHENSIVE DRUG PANEL:
METHODOLOGIES TO INCLUDE IMMUNOASSAY AND LIQUID CHROMATOGRAPHY/MASS
SPECTROMETRY (LC/MS/MS).  SAMPLE SCREENED FOR A MINIMUM 150 COMMON
ACIDIC, BASIC AND NEUTRAL DRUGS.
```

```
    TEST                             RESULTS

    ETHYL ALCOHOL                    0.000% (W/V)

    AMPHETAMINES                     DETECTED

      METHAMPHETAMINE, LC/MS/MS      19.500 mg/L

      AMPHETAMINE, LC/MS/MS          1.770 mg/L

    ANALYSIS BY: KRISTEN STEWARD,

    SEBASTIAN GALLARDO,

    AND OLA BAWARDI

    NOTE: NAME ON SAMPLE IS

          DOE, RUBEN
```



1965 Chicago Avenue, Suite C • Riverside, California 92507 • **951/341-9355** • FAX 951/341-9359

021



# BIO-TOX LABORATORIES



| Laboratory Director | Toxicologist | Toxicologist |
| --- | --- | --- |
| Erin Crabtrey, M.S., D-ABFT-FT | Ola Bawardi, M.S. | Kristen Steward, M.S., D-ABFT-FT |

RIVERSIDE CORONER
800 S. REDLANDS
PERRIS, CA  92570

2019-12696
ESCUDERO, RUBEN J.

| PATIENT NAME | | | SEX | DATE OF DEATH |
| --- | --- | --- | --- | --- |
| ESCUDERO, RUBEN J. | | | | 10/23/19 |

| BTL NUMBER | REQUESTING AGENCY | REQUESTED BY | AGENCY NUMBER |
| --- | --- | --- | --- |
| 9-28494-9 | 7400 | ALBERT | 2019-12696 |

| SPECIMEN | DATE COLLECTED | TIME TAKEN | DATE RECEIVED | DATE REPORTED |
| --- | --- | --- | --- | --- |
| HOSP UR | 10/19/19 | 10:48 | 10/30/19 | 11/07/19 |

| TEST | RESULTS |
| --- | --- |
| PHENCYCLIDINE, LC/MS/MS | 0.011 mg/L |
| PSEUDOEPHEDRINE/EPHEDRINE, LC/MS/MS | DETECTED |
| PHENYLPROPANOLAMINE, LC/MS/MS | DETECTED |

ANALYSIS BY: KRISTEN STEWARD,

OLA BAWARDI & ERIN CRABTREY

EXHIBIT "27"

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA


CECLIA VARGAS; ARIANA SALAS,  )
individually and as           )
successor-in-interest to      )
RUBEN ESCUDERO, deceased,     )
                              )  Case No.
          Plaintiff,          )  5:20-CV-02646-JGB-KK
                              )
vs.                           )
                              )
COUNTY OF SAN BERNARDINO; H.  )
MIRANDA; S. CARTER; Z.        )
VOGEL, J. MATA; Z.            )
PRITCHETT; J. JIMENEZ; A.     )
MATA; T.KAUTZ; J. ATTLESEY;   )
RODRIGUEZ (first initial      )
unknown) and DOES 1-10,       )
inclusive                     )
                              )
          Defendants.         )
                              )
_____)



VIDEOCONFERENCE DEPOSITION OF CHO LWIN, M.D.

WEDNESDAY, OCTOBER 12, 2022




REPORTED BY: JACLYN D. KINSBURSKY, CSR No. 13858


1

1          The videoconference deposition of CHO LWIN,

2    M.D., taken on behalf of the Defendants, Wednesday,

3    October 12, 2022, at 2:00 p.m., before Jaclyn D.

4    Kinsbursky, CSR No. 13858, pursuant to NOTICE.

5

6    APPEARANCES OF COUNSEL:

7    FOR THE PLAINTIFF:

8          LAW OFFICES OF DALE K. GALIPO
           BY:  DALE K. GALIPO, ESQ.
9          21800 Burbank Boulevard
           Suite 310
10         Woodland Hills, California 91367
           818.347.3333
11         Dalekgalipo@galipolaw.com

12         LAW OFFICE OF SHARON J. BRUNNER
           BY:  SHARON J. BRUNNER, ESQ.
13         14393 Park Avenue
           Suite 101
14         Victorville, California 92392
           760.243.9997
15         Sharonjbrunner@yahoo.com

16         LAW OFFICE OF JAMES S. TERRELL
           BY:  JAMES TERRELL, ESQ.
17         15411 Anacapa Road
           Victorville, California 92392
18         760.951.5850
           Jim@talktoterrell.com
19

20   FOR THE DEFENDANTS:

21         WAGNER ZEMMING CHRISTENSEN, LLP
           BY:  DENNIS WAGNER, ESQ.
22         1325 Spruce Street
           Suite 200
           Riverside, California 92507
23         951.686.4800
           Dew@wzclawfirm.com
24

25   ALSO PRESENT:  Autumn Garrison

2

```
 1                        I N D E X

 2

 3    WITNESS                EXAMINATION              PAGE

 4    CHO LWIN, M.D.

 5                      BY MR. WAGNER          4, 36
                       BY MR. GALIPO             30
 6

 7

 8

 9                      E X H I B I T S

10    NUMBER               DESCRIPTION             PAGE

11    EXHIBIT 45   Autopsy protocol                 6

12    EXHIBIT 51   Death certificate               28

13

14

15

16

17

18

19

20

21

22

23

24

25
```

3

```
 1                    WEDNESDAY, OCTOBER 12, 2022

 2                         2:00 P.M.

 3

 4                    CHO LWIN, M.D.,

 5        having been first duly sworn by a court reporter,

 6   was examined and testified as follows:

 7

 8                       EXAMINATION

 9   BY MR. WAGNER:

10        Q    Doctor, would you state your name?

11        A    Sure.  Cho Lwin, L-W-I-N.

12        Q    And where are you employed?

13        A    I am working at Los Angeles medical examiner.

14        Q    How long have you worked at the LA County

15   medical examiner?

16        A    Fifty years.

17        Q    Do you have a relationship of some kind with

18   Riverside County and their coroner office?

19        A    Yes.

20        Q    And how would you describe the relationship?

21        A    I am the contract forensic neuropathology

22   consultant.

23        Q    Okay.  You personally have a contract then

24   with Riverside County to do neuropathology?

25        A    Yes.
```

Lwin, Cho
Vargas v. County of San Bernardino

1    Q    How long have you had such a contract with
2  Riverside County?
3    A    At least five, six years.
4    Q    Okay.  Do you have a CV that discusses your
5  education and employment history?
6    A    I can send you that.
7    Q    Great.  Maybe you can e-mail it to the court
8  reporter afterwards.
9    A    Yes.  I can e-mail that.
10   Q    Okay.  That's fine.
11        You understand we're here today to take your
12  deposition on a case entitled Vargas versus County of
13  San Bernardino, et al, concerning the death of Ruben
14  Escudero?
15   A    Yes.
16   Q    And as I understand it, your involvement with
17  this case was an examination of the brain?
18   A    Correct.
19   Q    Okay.  Did you examine anything other than the
20  brain?
21   A    No.
22   Q    Okay.  And at the time you performed your
23  examination, did you have available to you the report
24  that was prepared by Dr. Fajardo?
25   A    I don't recall.  Usually I -- people -- the

5

1   BY MR. WAGNER:

2       Q   It'll be page 11.

3           Okay.  So, Doctor, are you able to see this

4   drawing that's on the screen?

5       A   Yes.

6       Q   All right.

7           You didn't have this available to you at the

8   time you performed your examination?

9       A   Yes.

10      Q   You did have it; correct?

11      A   I did not have it, yes.

12      Q   All right.

13          What did you understand your role was with

14   respect to the examination you were to perform of the

15   brain?

16      A   They asked me to examine the brain.  That's my

17   job.

18      Q   Right.

19      A   Yeah.

20      Q   Okay.  And how long had you been a

21   neuropathologist?

22      A   Fifteen years.

23      Q   And in terms of the examination that you

24   performed on the Escudero case, about how many times

25   had you performed similar examinations?

7

1        A      Many times.

2        Q      Don't be shy.   Hundreds?   Whatever it is.

3        A      Thousands.

4        Q      Okay.   Was there anything in particular that

5    you're looking to find in the brain or is it just the

6    general examination of what it is that you see?

7        A      I'm interested in really looking at any brain

8    trauma.

9        Q      Okay.   We can take the drawing down.

10              Okay.   You're interested in brain trauma

11    determining if it's visible; correct?

12        A      Correct.

13        Q      And whether it's visible to the naked eye or

14    looking under a microscope and some tissue?

15        A      Yes.

16        Q      All right.

17              And you did both, meaning you visually

18    examined the brain and you also looked under a

19    microscope and certain sections?

20        A      Correct.

21        Q      Okay.   Now, it would appear that your

22    examination of the brain was May 16th, 2020?

23        A      Yes.

24        Q      And do you have any idea how long the

25    procedure or the examination took place?

1     A    Within two hours I can finish.

2     Q    **Now, do you have notes of any kind that you**

3  **maintain that you used to make up your report?**

4     A    I do write down my findings.

5     Q    **Okay.  Are they still available or are they**

6  **disposed of after you've finished writing your report?**

7     A    I dispose after the completion of the final

8  report.

9     Q    **Okay.  So would it be fair to say in your**

10  **file, the only thing you have is your report?**

11     A    Correct.

12     Q    **All right.**

13          **Are there samples of any kind that are**

14  **maintained by your office?**

15     A    Yes.

16     Q    **And what samples do you maintain if you**

17  **recall?**

18     A    Sections of brain tissue.

19     Q    **Were these sections that were taken out and**

20  **put on a slide?**

21     A    Correct.

22     Q    **All right.**

23          **And then the balance of the material that was**

24  **not placed on a slide, was that sent back to Riverside?**

25     A    Yes.

9

Lwin, Cho
Vargas v. County of San Bernardino

1    Q   Do you have any idea how many slides you have?

2    A   Ten.

3    Q   Is there any index that you possess that

4 indicates what slide pertains to whatever it may be?

5    A   Yes.

6    Q   Okay.  And is that index separate from your

7 report?

8    A   It is included in the report.

9    Q   Okay.  So you referenced the various slides in

10 the report?

11    A   Yes.

12    Q   Okay.  All right.

13    So on May 16th, 2020, when you did the

14 examination, was anyone present with you?

15    A   No.

16    Q   Okay.  Well, I guess generally what was your

17 overall opinion regarding the examination; then we'll

18 get into specifics.

19    A   The brain has no evidence of trauma.

20    Q   Okay.  Is that one of the things you were

21 looking for?

22    A   Yes.  This is very important in my practice.

23    Q   Why is that important?

24    A   We have to be looking at real trauma.  We are

25 trained like that.

10

Lwin, Cho
Vargas v. County of San Bernardino

1      Q    Okay.  No evidence of trauma.

2           So in looking at the brain, it was noted to

3  have swollen or shown evidence of swelling; correct?

4      A    Correct.

5      Q    Okay.  What do you attribute that to?

6      A    That brain is showing the swelling lack of

7  oxygen supply.

8      Q    And it would appear that when the incident was

9  occurring with the patient with law enforcement and

10  other personnel present, that he had an SPo level

11  before waking up after Narcan was administered that had

12  dropped to 40.

13           Are you familiar what the SP o2 level is?

14      A    Yes.  That's level of saturations.

15      Q    Okay.  If you had a level at 40, do you have

16  an estimate as to how long a period of time a patient

17  could suffer or -- well, let me ask it this way.

18           Would it be fair to say that a prolonged

19  duration of time an SPO 40 or below would have adverse

20  consequences to the health of the patient?

21      A    Minutes.

22      Q    Okay.  Generally, the SP o2 levels you want

23  about 95 percent or more, is that correct, for a

24  healthy person?

25      A    Yes.

Lwin, Cho
**Vargas v. County of San Bernardino**

1      Q    Okay.  All right.

2           So in determining that there was no evidence

3      of trauma, the only thing it appears you may have seen

4      that was significant was just simply the swelling which

5      indicates the brain at some point had no oxygen?

6      A    Correct.

7      Q    If your heart stops, no oxygen is going to the

8      brain?

9      A    Yes.

10     Q    Okay.  Now, in looking at your report -- and

11     I'll just look at the first page of your report.  At

12     the bottom at least on the document I'm using, it's

13     referring to page 15 because it's part of the Riverside

14     pathology report of Dr. Fajardo.  You have examination

15     of the subdural surface showed no hemorrhage or

16     neomembrane.  Epidural surface is unremarkable.  Dural

17     sinus is patent without thrombosis.

18          And you're just simply referring to the fact

19     that there's no trauma in this area you're looking at?

20     A    Yes.

21     Q    Now, it said the fresh brain at removal

22     weighed 1,540 or 1,540 grams.

23          Is that consistent with what you would expect

24     for a normal person?

25     A    It's still, yes, within the normal range.

12

1   Q    Okay.  The cerebral hemispheres were

2   symmetrical swollen with flat gyral an effacement of

3   sulci.

4        What are you referring to here?

5   A    That is the indication of brain swelling

6   inside the confined cranium of -- so that space is

7   limited when the brain becomes larger or swollen, it

8   has to push against the bone.  That's --

9   Q    That accounts for the flattening?

10  A    Yes.

11  Q    Now, you also go into -- all right.  The next

12  sentence, he had -- interhemispheric fissure is tight,

13  leptomeningeal vessels show congestion.  Acute

14  subarachnoid hemorrhage or acute cortical contusion is

15  not present on any area of the brain.

16        What are you referring to here?

17  A    I'm looking at any brain contusion or trauma.

18  I don't see that in this brain.

19  Q    Okay.  Did you have any knowledge that had

20  been provided to you at the time of the examination

21  that the patient had been struck in the head several

22  times with an object?

23  A    No, I don't have knowledge of that.

24  Q    Okay.  Have you done a neuropathology exam in

25  cases where someone has suffered blows to the head and

13

Lwin, Cho
**Vargas v. County of San Bernardino**

1    then during your examination you're able to correlate

2    the blows with evidence from the brain?

3         A     Yes.

4         Q     And in those cases, you're able to see some

5    type of visual trauma?

6         A     Yes.

7         Q     All right.  And frontal, temporal and

8    occipital poles are unremarkable.  Gyral formation

9    showed no congenital malfunction -- or actually, no

10   congenital malformation.

11            So you're just indicating, what, that there's

12   no genetic or -- no genetic problems that you're able

13   to see?

14        A     Yes.

15        Q     Now, it says traumatic hemorrhage is absent

16   from the base of the brain, including orbital cortices.

17        A     Yes.

18        Q     If you had head strikes that were causing some

19   type of injury to the brain, would you expect that

20   there could be hemorrhage in the base of the brain?

21        A     Yes.

22        Q     And that's something you've seen before?

23        A     Yes.

24        Q     The orbital cortices, what are you referring

25   to?

1      A     That is the brain surface touching the bony

2  roof of the eye.  So the eyeball is present in the bone

3  cavity.  Above the eye, there's a partition of the

4  bone.  After that, brain sitting on that.

5      Q     Okay.  So there was no evidence of trauma in

6  that area -- the orbital area?

7      A     Yes.

8      Q     All right.  Going on to the next page, page 2

9  of your report, page 16 on the document I'm looking at,

10  you have mamillary bodies are obscured by brain

11  swelling.

12         The brain swelling is what happens when no

13  blood is going to the brain?

14      A     Correct.

15      Q     All right.

16         Do you have an estimate as to how long it

17  takes for a brain to swell once your heart stops?

18      A     I don't have accurate time frame for that.

19      Q     All right.

20         Are you aware of some type of estimate that

21  you'd be able to provide based upon your medical

22  experience and training?

23         MR. GALIPO:  Lacks -- objection.  Lacks

24  foundation.

25  ///

15

1    BY MR. WAGNER:

2        Q    Doctor, you can answer it if you can provide

3    the answer.

4        A    I don't have an estimate.

5        Q    Okay.  Okay.  Going into a little further down

6    on page 2, it says cerebral hemispheres are cut in

7    coronal plane.  Coronal sections to the brain show

8    symmetrical cerebral hemispheres.  Cortical ribbon is

9    traced and shows no evidence of trauma or malformation.

10            What are you referring to here?

11       A    I kept fully looking at the surface of the

12   brain sections to pick up any trauma hemorrhage.

13       Q    Okay.  And you didn't find any evidence?

14       A    Yes.

15       Q    Going down in the paragraph, before you get to

16   the ten items that you submit for microscopic

17   examination, there's a reference to cerebral folia or

18   swollen cerebral white matter and dentate nuclei are

19   unremarkable.  Cerebellar vermis is grossly

20   unremarkable.  Leptomeninges are clear.  Biventral

21   lobules are markedly swollen.

22            What are you referring to in those several

23   sentences as to what your observations were?

24       A    I'm describing about the small brain that is

25   located behind the larger brain.  That condition shows

16

1    brain swelling.

2         MR. GALIPO:  Dennis, may I offer a suggestion?

3    Since you're reading from parts of the doctor's report,

4    it might be helpful for the court reporter later if we

5    attach a copy of the report as an exhibit.

6         MR. WAGNER:  Absolutely.

7         MR. GALIPO:  Yes, there are --

8         MR. WAGNER:  Yeah.  You don't need to worry

9    about the spellings.  It'll all be on the report.

10        (Reporter interruption.)

11   BY MR. WAGNER:

12     Q    So when you have the biventral lobules are

13   markedly swollen, do you have an opinion as to why they

14   were swollen?

15     A    Because of the brain swelling, brain has to

16   look for the available spaces.  That's below the small

17   brain.  That's in the bony opening.

18     Q    Okay.  Now, you now have the ten areas on the

19   report referenced.  Number one is spinal cord.  Number

20   ten is cerebellum.

21          And these are sections you took and examined

22   under the microscope?

23     A    Yes.

24     Q    All right.

25          And did those ten slides correlate with what

17

1    you put in as gross impression of your examination?

2        A    Yeah.  I put it as brain swelling.  No

3    hemorrhage.

4        Q    Right.  But the ten slides, did they correlate

5    with the findings that you had with the gross

6    impression?

7        A    Yes.

8        Q    Okay.  And the gross impression was brain

9    swelling, and you note the flatness.  And then there's

10   a reference to type interhemispheric fissure.

11            What are you referring to?

12       A    Brain has two lobes, left and right really

13   pushing each other.

14       Q    Okay.  And then you have tight cerebral

15   peduncles, compression of mid-brain and posterior

16   cerebral arteries with acute cortical infarction of

17   occipital lobes.

18            What are you referring to here?

19       A    That is the condition of brain swelling below

20   the brain, so we are talking about the pressure on the

21   structures under the brain.

22       Q    Okay.  And then the second finding, no

23   hemorrhage or trauma noted?

24       A    Yes.

25       Q    All right.

18

1          And then you go on to say concerning the

2    microscopic description that you don't see any evidence

3    in the tissue samples that you took of any hemorrhage

4    or trauma?

5          A    Yes.

6          Q    All right.

7               Now, you also examined the spinal cord?

8          A    Correct.

9          Q    All right.

10              So you had the spinal cord and the brain for

11   the examination?

12         A    Yes.

13         Q    All right.

14         A    Complete.

15         Q    Okay.  Now let's go to your last page of your

16   report.  Let's pull up page 17.  It would be, like, the

17   second paragraph, five, six lines into that where it

18   starts, "Acute hypoxic neuronal change is present in

19   the pontine nuclei."

20              Do you see that sentence?

21         A    Yes.

22         Q    All right.

23              What are you referring to?

24         A    That's the indication of left hypoxic in the

25   pons, part of the brain stem.

19

1    abnormalities that affect brain and potential swelling?

2        A    Yes.

3        Q    All right.

4             And then you have cerebral trauma is absent?

5        A    Yes.

6        Q    Okay.  And so your final neuropathic diagnosis

7    that you have is acute hypoxic ischemic encephalopathy,

8    global, and that just means he had a heart attack?

9             MR. GALIPO:  I'm going to object as lacks

10   foundation.  Vague and ambiguous as phrased.

11   BY MR. WAGNER:

12       Q    I'll rephrase it.

13            Final neuropathic diagnosis:  Heading A, what

14   are you referring to?

15       A    This is the brain lack of oxygen supply.

16       Q    Did you have any evidence or knowledge before

17   you did your examination as to whether the decedent had

18   ingested drugs of any kind?

19       A    Yes.  I know he used drugs in the past.

20       Q    Okay.  Have you done neuropathology

21   examinations of brains that you've examined after a

22   drug overdose?

23       A    Yes.

24       Q    Did the brain that you examined in this

25   case -- did it have similarities to the exams that

21

Lwin, Cho
**Vargas v. County of San Bernardino**

1    you've done in other cases in which there was a drug

2    overdose?

3             MR. GALIPO:  Objection.  Lacks foundation.

4    Vague and ambiguous as phrased.

5    BY MR. WAGNER:

6         Q    You can answer.

7         A    Can I answer?

8         Q    Yes.

9         A    Yes.

10        Q    All right.  Your second finding, no evidence

11   of trauma, I think we've gone over that.

12             You found nothing on your visual exam or

13   microscopic exam indicating that there was some type of

14   forced trauma to the brain?

15        A    Yes.

16        Q    And then lastly -- I think we covered it a few

17   minutes ago -- no evidence of meningitis or

18   encephalitis, which would be some type of preexisting

19   condition?

20        A    Yes.

21        Q    All right.  Did you have any information

22   regarding drug levels --

23        A    No.

24        Q    Apparently the blood was at some point

25   examined by Bio-Tox.

22

1     Q     So you do specialized examinations in addition

2     to, I guess lack of better word, regular autopsies?

3     A     Yes.

4     Q     If, in fact, there were four blows to the head

5     to the decedent, and as you saw the description on

6     page 4 as to, I guess, the depth of those wounds and

7     based upon your examination of the brain, would -- or

8     do you reach the conclusion that those blows were

9     superficial?

10          MR. GALIPO:  Objection.  Lacks foundation.

11     Incomplete hypothetical.  Vague and ambiguous as

12     phrased.

13          THE WITNESS:  Yes.

14     BY MR. WAGNER:

15     Q     Okay.  Do you have any reason to believe that

16     any blows to the head were responsible for his death?

17          MR. GALIPO:  Objection.  Lacks foundation.

18          THE WITNESS:  No.

19          MR. WAGNER:  All right.  I will now pass the

20     witness.  I'm assuming Mr. Galipo will have a few

21     questions for you.

22

23                         EXAMINATION

24     BY MR. GALIPO:

25     Q     Not too many, but I must say as I thought

30

**Lwin, Cho**
**Vargas v. County of San Bernardino**

1   STATE OF CALIFORNIA            )

2                                  ) ss.

3   COUNTY OF LOS ANGELES          )

4

5          I, JACLYN D. KINSBURSKY, C.S.R. No. 13858 in

6   and for the State of California do hereby certify:

7          That prior to being examined, the witness,

8   named in the foregoing deposition was by me duly sworn

9   to testify to the truth, the whole truth, and nothing

10  but the truth;

11         That said deposition was taken down by me in

12  shorthand at the time and place therein named and

13  thereafter reduced to typewriting under my direction,

14  and the same is a true, correct, and complete

15  transcript of said proceedings;

16         I further certify that I am not interested in

17  the event of the action.

18

19         Witness my hand this 21st day of October, 2022.

20

21

22

23

24  _____

25         JACLYN D. KINSBURSKY, CSR NO. 13858

**Jilio-Ryan Court Reporters**
**ph. 714.424.9902  info@jilioryan.com**

EXHIBIT "P"

Risa S. Christensen, Esq. (SBN: 227799)
Dennis E. Wagner, Esq. (SBN: 99190)
**WAGNER ZEMMING CHRISTENSEN, LLP**
1325 Spruce Street, Suite 200
Riverside, CA  92507
Tel.:          (951) 686-4800
Fax:          (951) 686-4801
rsc@wzclawfirm.com
dew@wzclawfirm.com

Attorneys for Defendants, COUNTY OF SAN BERNARDINO; HUMBERTO MIRANDA; JULIAN MATA; and JESSAQUA ATTLESEY

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CECILIA VARGAS; ARIANA SALAS, individually and as a successor-in-interest to RUBEN ESCUDERO, deceased,<br><br>          Plaintiffs,<br>vs.<br><br>COUNTY OF SAN BERNARDINO; H. MIRANDA; S. CARTER; Z. VOGEL; J. MATA; Z. PRITCHETT; J. JIMENEZ; A. MATA; T. KAUTZ; J. ATTLESEY; RODRIGUEZ (first initial unknown) and DOES 1-10, inclusive,<br><br>          Defendants. | CASE NO: 5:20-cv-02646-JGB-KK<br><br>**DECLARATION OF BINH T. LY, M.D. IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT OR IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT**<br><br>*[Filed concurrently w/ Motion for Summary Judgment; Separate Statement; Declarations; (Proposed) Order and (Proposed) Judgment]*<br><br>**DATE:**   March 6, 2023<br>**TIME:**     9:00 a.m.<br>**CRTRM:**  1<br><br>Hon. Jesus G. Bernal<br>United States District Judge |

1

I, BINH T. LY, declare as follows:

That I am a Board-Certified physician in emergency medicine and medical toxicology. I attended medical school at UCLA and from there did my internship at Valley Medical Center as part of the UCSF-Fresno Medical Education program. Thereafter, I performed a residency in emergency medicine at UCSF-Fresno Medical Education program. I then completed a medical toxicology fellowship during which I worked at UCSD Medical Center in San Diego, California. I am presently a clinical professor of emergency medicine at UCSD. I have attached a true and correct copy of my CV (**Exhibit 28**) to show my qualifications as a medical and research expert in the subject areas which address the drug overdose and death of Ruben Escudero that are referenced in this declaration. I am familiar with the treatment of patients under the influence of drugs and familiar with behaviors associated with drugs such as methamphetamine, heroin, PCP and other illegal narcotics and have treated innumerable drug intoxicated patients in Emergency Room, hospital settings and through consultations with the California Poison Control System.

That I have personal knowledge of the matters set forth in this declaration and could testify competently based upon my knowledge of the events provided herein.

1. That I am familiar with the subject case involving the death of Ruben Escudero and have reviewed the following materials in regard to the subject case:

    A. Plaintiff's First Amended Complaint

    B. Dr. Bennett Omalu's (plaintiffs' expert) report

    C. Ruben Escudero's Navy records

    D. Deposition transcripts of:

        1) Deputy Julian Mata and his revisions/corrections

        2) Deputy Jessaqua Attlesey and her revisions/corrections

3)    Deputy Tiffany Kautz and her corrections

4)    Deputy Humberto Miranda

5)    David Crummel

6)    Dorothy Hernandez

7)    Dr. Mark Fajardo exhibits 45 and 50

8)    Dr. Cho Lwin

9)    Capt. Dyjuan Washington

10)  Alex Gabler, AMR paramedic

E. Medical records for Ruben Escudero:

1)    Medical Victor Valley Global

2)    St. Mary's Medical

3)    Desert Valley Medical

F. Interviews, statements, and recordings:

1)    Deputy Miranda's belt recording of the incident and Transcript at BS 4934-4953

2)    Transcript of Miranda's interview with Det. Ogaz & Craig

3)    Transcript of Julian Mata interview with Det. Craig & Moreno

4)    Transcript of interview of Deputy Attlesey with Craig & Moreno

5)    BS 4696-4701 Transcript of Kautz interview with Martin Alcon (Fire engineer)

6)    BS 4702-4710 Transcript of Kautz interview with Brett Lever (Fire paramedic)

7)    BS 4711-1717 Transcript of Kautz interview with Capt. Washington

8)    Transcript of Kautz interview with Hernandez & Crummel

9)    BS 4718-4718-Transcript of Pritchett interview with Alex Gabler

10)  BS 4729-4741-Transcript of Pritchett interview with Karla Lugo

11)  Recordings of Gabler (AMR paramedic) with Moreno & Steers (parts 1 & 2) and BS 4816-4933 Transcript of Gabler interview with Detectives Moreno & Steers, parts 1 & 2

12) Recording and Transcript of Capt. Washington interview with Det. Ogaz and Moreno

13) Recording and Transcript of recording of interview of Brett Lever (Fire paramedic) with Det. Moreno & Steers

14) Recording and Transcript of recording of interview of Brett Lever with Ogaz and Moreno

15) Deputy Mata's belt recording transcript

G. Reports concerning the incident:

1) Crime Report BS 1-1142

2) BS 3779-3807-City of Victorville Fire Dept. Report

3) CAD

4) AMR -John Doe report

5) Dr. Cho Lwin's Neuropathology report of Escudero's brain & spinal cord examination BS 1157-1159

6) Dr. Mark Fajardo's Autopsy Protocol report & worksheets, sign-in sheets BS 1143-1156

7) Bio-Tox reports, BS 1160-1164, and litigation package, BS 3663-3778

8) BS 2457-2989-Photos, autopsy and other

9) BS 4954-4983-Pritchett's photos of the Monte Vista house

10) Dr. Vina Spiehler's expert report

H. Autopsy and death certificates

1) BS 4984-4985-Death Certificates, pending and corrected.

2. That based upon my review of the documents and my expertise in the field of emergency medicine and medical toxicology, I can offer the following opinion, that the subject Ruben Escudero, at the time of the incident, had a potentially lethal level of methamphetamine in his system as well as PCP. That the Versed that was administered by AMR personnel at the time Mr. Escudero was handcuffed as a method to calm him down, did not counter the toxic level of methamphetamine in his system.  The Versed acts as sedative to

1   essentially sedate the subject and in this case, to sedate him from the effects of

2   the methamphetamine and PCP which had provided him with great physical

3   strength and endurance.  It is not uncommon that persons under the influence of

4   methamphetamine and/or PCP may experience psychosis, and engage in

5   assaultive, aggressive behavior for which the strength seemingly takes on greater

6   significance.  Versed is a central nervous system depressant and is administered

7   to calm agitated individuals.

8        3.     That in the subject case, according to statements made by the fire

9   department paramedic, Brett Lever, Escudero was given four doses of 0.5 mg. of

10  Narcan for a total of 2 mg.  The Narcan is designed to counter the effects of the

11  heroin overdose which was the reason for the emergency call as it was suspected

12  he had overdosed on heroin. Narcan blocks the receptors and allows the patient to

13  "awaken" from the effects of the heroin or other opioid overdose.  Narcan lasts

14  about 60 minutes in duration.  The Narcan does not reduce the amount of heroin in

15  Escudero's system.  It would only counter his physical reaction to the heroin and

16  reverse the effects of his respiratory downward spiral with his decreased oxygen

17  levels prior to interaction with law enforcement.

18       4.     Narcan reverses the manifestations of the heroin overdose.  Narcan

19  does not treat or reverse the effects of methamphetamine or PCP. So, the Narcan

20  stopped the respiratory depression due to heroin but had no effect upon the

21  methamphetamine in his system.  Versed may be used to mitigate the effects of

22  the methamphetamine but may worsen respiratory depression due to heroin. That

23  there is risk involved in giving someone Versed after Narcan was given in a

24  heroin overdose because Versed itself may have respiratory depressant effects,

25  and death from a heroin overdose typically results from respiratory failure. The

26  high levels of methamphetamine in Mr. Escudero's system led to his aggressive

27  behavior upon reversal of heroin intoxication after the Narcan was administered.

28  PCP may have had a contribution to his behavior as well. That simply put, the

5

drugs that were administered by firefighters (Narcan) and by AMR (Versed) counter the manifestations but did not sufficiently counter the toxic level of methamphetamine in Mr. Escudero's system prior to being transported in the ambulance.

5.      The toxicology analysis that was performed by Bio-Tox Lab on blood drawn from Mr. Escudero on October 19, 2019 when Escudero was still alive at the hospital revealed the following results:

        1. Amphetamines detected

           a. Methamphetamine 0.485 mg/L

           b. Amphetamine 0.053 mg/L

        2. Opiates detected

           a. Morphine 0.079 mg/L

           b. Codeine 0.005 mg/L

           c. Monoacetylmorphine 0.020 mg/L

        3. Benzodiazepines detected

           a. Midazolam 0.015 mg/L

        4. Phencyclidine 0.001 mg/L

The toxicology analysis performed by Bio-Tox Laboratories on hospital urine obtained on 10/19/2019 at 10:48 AM revealed the following results:

        1.  Amphetamines detected

           a. Methamphetamine 19.5 mg/L

           b. Amphetamine 1.77 mg/L

        2.   Phencyclidine 0.011 mg/L

6.      The methamphetamine level within Mr. Escudero was potentially lethal and the medical literature shows that the median postmortem methamphetamine level of 0.25 mg/L and in a range of 0.01-2.9 were present in a group of 35 adults who died of methamphetamine induced stroke. CT Scans of Mr. Escudero during the time he was in the hospital showed he had evolving strokes on

his brain scans. Postmortem samples can yield lower or higher drug concentrations due to redistribution of drug to and from surrounding organs and tissues. In this case, Mr. Escudero's methamphetamine level was 0.485 mg/L and was not a postmortem sample. This pre-mortem sample also provides the best available approximation of the drug levels around the time of Mr. Escudero had a cardiac arrest on October 19, 2019.

7.     The effects of the methamphetamine on board for Escudero were exhibited in his fighting and violent and aggressive behavior that he engaged in. This was witnessed by first responders that were present who noted that his skin was hot, and his behavior after being provided Narcan was aggressive and violent. That the level of methamphetamine in Escudero's system would not have dissipated to a point that he would be able to calm down on his own for several hours.

8.     That Escudero suffered a myocardial infarction, type 2.  This is a sudden event. Escudero according to the autopsy report, had an abnormally large heart, almost 50% greater in size than what would normally be expected for a comparably sized individual.  A large heart, toxic levels of methamphetamine, and his fighting and physical exertion are all consistent with being a catalyst for his sudden cardiac arrest.


I declare under penalty of perjury under the laws of the State of California and the United States of America, that the foregoing is true and correct.

Executed this 24th day of January 2023 in San Diego, California, United States of America.


BINH T. LY, M.D., Declarant

EXHIBIT "28"

*CURRICULUM VITAE*

<u>*BINH T. LY, M.D.*</u>

<u>EDUCATION</u>:

| | |
|---|---|
| Academic:<br>1987-91 | B.S., Biomedical Sciences, UC Riverside<br>Riverside, California |
| Medical School:<br>1991-95 | M.D., UCLA School of Medicine<br>Los Angeles, California |
| Internship:<br>1995-96 | Transitional<br>Valley Medical Center<br>UCSF-Fresno Medical Education Program |
| Residency:<br>1996-99 | Emergency Medicine<br>University Medical Center<br>UCSF-Fresno Medical Education Program |
| Fellowship:<br>1999-01 | Medical Toxicology<br>UCSD Medical Center, San Diego, California |

<u>EMPLOYMENT</u>:

| | |
|---|---|
| 7/98 - 6/99 | Emergency Physician, Kaiser Permanente Medical Center, Fresno, California |
| 1/99 - 12/00 | Emergency Physician, California Emergency Physicians, Selma, California |
| 7/99 - 10/04 | Faculty Attending Physician, University Medical Center, Fresno, California |
| 7/99 - 10/04 | Clinical Instructor of Medicine (Emergency Medicine)<br>University of California, San Francisco (UCSF) School of Medicine |
| 7/99 - 6/05 | Assistant Clinical Professor of Medicine, UCSD School of Medicine |
| 7/99 - Present | Faculty Attending Physician, Department of Emergency Medicine,<br>UCSD Medical Center |
| 7/05 - 6/11 | Associate Clinical Professor of Medicine, UCSD School of Medicine |
| 7/11 – 7/12 | Clinical Professor of Medicine<br>University of California, San Diego (UCSD) School of Medicine |
| 7/11 - Present | Clinical Professor of Emergency Medicine<br>University of California, San Diego (UCSD) School of Medicine |

Curriculum Vitae
Binh T. Ly, M.D., FACMT, FACEP

PROFESSIONAL ACTIVITIES:

| | |
|---|---|
| 1996 - 1997 | Assistant Director, National Park Service Parkmedic Certification Training, University Medical Center, Fresno, California |
| 1997 – 1999 | Director, National Park Service Parkmedic Recertification Training, University Medical Center, Fresno, California |
| 1997 - 1999 | Staff Member, Emergency Medical Services, Fresno County, California |
| 1998 - 1999 | Director, Parkmedic Certification Training, University Medical Center, Fresno, California |
| 1998 - 1999 | Director, Parkmedic and EMT-Basic Continuing Education, Sequoia and Kings Canyon National Park, California |
| 1999 - 2000 | Soccer Team Physician, Southwestern College, Chula Vista, California |
| 2001 - Present | Consultant, California Poison Control System - San Diego Division |
| 2001 - Present | Consultant, Veterans Administration Medical Center, San Diego, California |
| 2001 - Present | Consultant, Scripps Mercy Hospital, San Diego, California |
| 2001 - Present | Consultant, Rady Children's Hospital, San Diego, California |
| 2001 - Present | Consultant, UCSD Division of Medical Toxicology, San Diego, California |
| 2001 - 2020 | Assistant Medical Director, California Poison Control System - San Diego Division, UCSD Medical Center |
| 2001 - 2005 | Associate Director, Medical Toxicology Fellowship Program, Division of Medical Toxicology, Dept of Emergency Medicine, UCSD Medical Center |
| 2002 - 2008 | Associate Director, Emergency Medicine Residency Program Department of Emergency Medicine, UCSD Medical Center |
| 2005 - 2014 | Director, Medical Toxicology Fellowship Program, Division of Medical Toxicology, Department of Emergency Medicine, UCSD Medical Center |
| 2008 - 2017 | Director, Emergency Medicine Residency Program Department of Emergency Medicine, UCSD Medical Center |
| 2013 - Present | Vice Chair for Education Department of Emergency Medicine |
| 2015 - 2017 | Visiting Team Medical Liaison, National Football League, New York, NY |

Curriculum Vitae
Binh T. Ly, M.D., FACMT, FACEP

| 2017 - Present | Director, Careers in Medicine Course (MED 240)<br>UCSD School of Medicine |

## AWARDS:

Outstanding Teaching Award, UCSF-Fresno Medical Education Program, 1998-99

Golden Apple Faculty Teaching Award, UCSD Emergency Medicine Residency, 2002-03

Golden Apple Faculty Teaching Award, UCSD Emergency Medicine Residency, 2005-06

Top 10 Reviewer, *Journal of Emergency Medicine*, 2006

Top 10 Reviewer, *Journal of Emergency Medicine*, 2007

Top 10 Reviewer, *Journal of Emergency Medicine*, 2008

Top 10 Reviewer, *Journal of Emergency Medicine*, 2009

Outstanding Reviewer, *Journal of Emergency Medicine*, 2010

Top Doctor in San Diego (Emergency Medicine), *San Diego Magazine,* 2012

American Association of Clinical Chemistry Outstanding Speaker Award, 2015

Top Doctor in San Diego (Emergency Medicine/Medical Toxicology), *San Diego Magazine,* 2018

## LICENSURE:

California Medical License Number A-61597

American Board of Emergency Medicine (ABEM) Number 28869:
- Emergency Medicine
- Medical Toxicology

## CERTIFICATION:

Diplomate, American Board of Emergency Medicine, Specialty Recertification, 2020-Present

Diplomate, American Board of Emergency Medicine, Specialty Recertification, 2010-2020

Diplomate, American Board of Emergency Medicine, Specialty Certification, 2000-2010

American Board of Emergency Medicine, Subspecialty Recertification in Medical Toxicology, 2012-present

American Board of Emergency Medicine, Subspecialty Certification in Medical Toxicology, 2002-2012

Advanced Cardiac Life Support Provider, 1996-2002

Advanced Trauma Life Support Provider, 1996-2004

Curriculum Vitae
Binh T. Ly, M.D., FACMT, FACEP

Base Hospital Physician, Fresno County EMS, 1996-99

Base Hospital Physician, San Diego County EMS, 1999-present

PROFESSIONAL SOCIETY MEMBERSHIPS:

American College of Emergency Physicians, 1996-present

American Academy of Clinical Toxicology, 2000-present

American College of Medical Toxicology, 2000-present

Society for Academic Emergency Medicine, 2001-present

Council of Emergency Medicine Residency Directors, 2002-present

Fellow, American College of Medical Toxicology, 2009-present

Fellow, American College of Emergency Physicians, 2007-present

Fellow, American Academy of Emergency Medicine, XXXX-present

San Diego County Medical Society, 2015-present

COMMITTEES:

Member, Graduate Medical Education Committee, UCSF-Fresno Medical Education Program, 1995-96

Member, Residency Advisory Committee, UCSD/SDSU General Preventive Medicine Residency Program, 2002-2015

Member, Emergency Medicine Research Committee, UCSD Medical Center, 2002-present

Member, UCSD Human Research Protections Program, 2003-08

Member, UCSD Graduate Medical Education Committee, 2003-present

Vice Chair, Residency Advisory Committee, UCSD Emergency Medicine Residency Program, 2002-08

Chair, Residency Advisory Committee, UCSD Emergency Medicine Residency Program, 2008-2017

Member, UCSD Graduate Medical Education Internal Review Committee, 2010-2019

Member, Educational Planning Committee, Medical Toxicology Fellowships Conference, 2010-2015

Vice Chair, Fellowship Advisory Committee, National Council of Emergency Medicine Residency Directors (CORD), 2013-2016

Curriculum Vitae
Binh T. Ly, M.D., FACMT, FACEP

Member, Executive Committee, UCSD Department of Emergency Medicine, 2013-present

Member, Clinical Competency Committee, UCSD Emergency Medicine Residency Program. 2013- 2020

Member, Department of Emergency Medicine, Executive Committee, 2013 – present

Member, Task Force on Treatment of Alcohol Withdrawal, UCSD Health, 2018 - 2020


CURRENT ACTIVITIES:

Reviewer, *Undersea and Hyperbaric Medicine*, 1999

Reviewer, *Annals of Emergency Medicine*, 2001

Reviewer, *Journal of Emergency Medicine*, 2001

Reviewer, *Pharmacotherapy*, 2001

Member, Editorial Board, *Journal of Emergency Medicine*, Elsevier Science, Inc., 2004

Reviewer, *Journal of Medical Toxicology*, 2008

Section Editor, Pharmacology of Emergency Medicine, *Journal of Emergency Medicine*, Elsevier Science, Inc., 2008

Editor, "Call Us" - California Poison Control System Newsletter, 2011

Senior Oral Examiner, Certifying Examination, American Board of Emergency Medicine, 2018

PREVIOUS ACTIVITIES:

Base Hospital Physician, Fresno County EMS, 1996

Reviewer, *Western Journal of Medicine*, 2000-02

CPC Case Discussant, North American Congress of Clinical Toxicology, Montreal, Canada, October 2001

Reviewer, *Journal of Toxicology-Clinical Toxicology*, Abstract Review Committee, 2001-04

Moderator for Oral Presentations of Toxicology Research, Society for Academic Emergency Medicine, Boston, Massachusetts, May 2003

Section Editor, Visual Diagnosis in Emergency Medicine, *Journal of Emergency Medicine*, Elsevier Science, Inc., 2004-11

Course Director, "Medical Toxicology Fellowship Conference", San Diego, California, April 2005

Course Director, "Hot Topics in Toxicology", San Diego, California, November 2005

Oral Examiner, Certifying Examination, American Board of Emergency Medicine, 2007-2017

Residency Director Panel Discussant, Western Regional Medical Student Symposium, UC Irvine School of Medicine, Irvine, California, February 2009

Course Director, "Medical Toxicology Fellowship Conference", San Diego, California, April 2009

Visiting Professor, Northwestern University Department of Emergency Medicine, Evanston, Illinois, May 2010

Visiting Professor, Stanford University Division of Emergency Medicine, Palo Alto, California, September 2010

Visiting Professor, University of California San Francisco Department of Emergency Medicine, California, August 2011

Visiting Professor, New York-Presbyterian/Weill Cornell Department of Emergency Medicine, New York, New York, September 2011

Associate Editor, "Call Us" - California Poison Control System Newsletter, 2001-2011
Editor, Toxicology Wed-based Educational Modules, California Poison Control System, 2001-2011

Chair, Ad Hoc Committee appointed by UCSD Associate Dean for Graduate Medical Education, May-August 2011

Member, Program Director Panel, American Academy of Emergency Medicine Scientific Assembly, Irvine, California; February 2012

Visiting Professor, University of California Irvine Department of Emergency Medicine, California, April 2012

Member , Program Director Panel, American Academy of Emergency Medicine Scientific Assembly, San Diego, California; February 2012

Vice Chair, Fellowship Advisory Committee, National Council of Emergency Medicine Residency Directors (CORD), 2013-2015

Member, Program Director Panel, Society of Academic Emergency Scientific Assembly, San Diego, California: May 2015

Member, Program Director Panel, Society of Academic Emergency Scientific Assembly, Orlando, Florida: May 2017

Member, Program Director Panel, Society of Academic Emergency Scientific Assembly, Indianapolis, Indiana: May 2018

Member, Program Director Panel, Society of Academic Emergency Scientific Assembly, Las Vegas, Nevada: May 2019

Curriculum Vitae
Binh T. Ly, M.D., FACMT, FACEP

Primary Investigator, "Surveillance of the RADARS-7 by Poison Control Centers: A Pilot Study" - National multi-poison center study surveying the abuse, diversion, and addiction of selected opioid medications - Sponsored by Purdue Pharma, October 2002 – June 2015

GRANTS:

UCSD Academic Senate Committee on Research Grant, from February 2001 through March 2002, $10,000.

Co-Investigator, "GHB Abuse: Motivations, Risk Factors and Medical Consequences" - California Poison Control System - Funded by National Institute on Drug Abuse (NIDA), from July 2002 through June 2007, $27,589.

Co-investigator, "Poison Control Stabilization and Enhancement Program" - Funded by Health Resources & Services Administration (HRSA), from September 2001 through August 2010, $625,120.

Co-investigator, "California Bridge Program Opioid Use Disorder" – Funded by Public Health Institute (PHI), from 2019 – July 2020, $260,000.

Primary Investigator, "Cal Med Force Program" – Funded by Physicians for Healthy Connections (PHC), from July 2019 – June 2023, $600,000.

Primary Investigator, "Cal Med Force Program" – Funded by Physicians for Healthy Connections (PHC), from July 2020 – June 2024, $480,000.

Primary Investigator, "Cal Med Force Program" – Funded by Physicians for Healthy Connections (PHC), from July 2021 – June 2025, $200,000.

Co-Investigator, "Cal Med Force Program" – Funded by Physicians for Healthy Connections (PHC), from July 2022 – June 2026, $200,000.

CURRENT STUDENT ACTIVITIES:

Instructor, Elective in Medical Toxicology, SOM 423, 2001

Instructor, Subinternship in Emergency Medicine, SOM 420, 2001

Instructor, Introduction to Emergency Medicine, SOMI 225, 2005

Faculty Advisor, Emergency Medicine Interest Group UCSD School of Medicine, 2006

Faculty Mentor Program, UCSD School of Medicine, 2008

Instructor, Multi-organ System, SOMC 240, 2012

Instructor, Wilderness Medicine, EMED 275, 2015

Instructor, Careers in Medicine, MED 240, 2017

Course Director, Careers in Medicine, MED 240, 2017

Curriculum Vitae
Binh T. Ly, M.D., FACMT, FACEP

PUBLICATIONS:

Book Chapters

1. Ly BT: Mushroom Poisoning. In: Toxicology Secrets. Ling L, Erickson T, Clark R, Trestrail J (Eds.); Philadelphia: Hanley & Belfus, Inc., 2001, pp.245-250.

2. Ly BT: Ankle Fracture/Dislocation. In: Rosen & Barkin's 5-Minute Emergency Medicine Consult (second edition). Schaider J, Hayden SR, Wolfe R, Barkin RM, Rosen P (Eds.); Philadelphia: Lippincott Williams & Wilkins, 2003, pp 72-73.

3. Ly BT: Tibial Plateau Fracture. In: Rosen & Barkin's 5-Minute Emergency Medicine Consult (second edition). Schaider J, Hayden SR, Wolfe R, Barkin RM, Rosen P (Eds.); Philadelphia: Lippincott Williams & Wilkins, 2003, pp 1130-1131.

4. Schneir AB, Ly BT: Beta-blocker Overdose. In: Emergency Medicine On Call. Keim SM, Gomella LG (Eds.); New York: Lange Medical Books/McGraw-Hill, 2004, pp 332-334.

5. Ly BT: Hydrogen Fluoride and Hydrofluoric Acid. In: Poisoning & Drug Overdose (fourth edition). Olson KR (Ed.); New York: Lange Medical Books/McGraw-Hill, 2004, pp 221-224.

6. Ly BT: Methylene Chloride. In: Poisoning & Drug Overdose (fourth edition). Olson KR (Ed.); New York: Lange Medical Books/McGraw-Hill, 2004, pp 265-267.

7. Ly BT: Calcium. In: Poisoning & Drug Overdose (fourth edition). Olson KR (Ed.); New York: Lange Medical Books/McGraw-Hill, 2004, pp 424-426.

8. Offerman SR, Ly BT: Calcium Channel Antagonists. In: ECG in Emergency Medicine and Acute Care. Chan TC, Brady WJ, Harrigan RA, Ornato JP, Rosen P (Eds.); Philadelphia; Elsevier Mosby, 2005, pp 263-265.

9. Tong TC, Ly BT: Ethanol. In: Harwood-Nuss' Clinical Practice of Emergency Medicine (fourth edition). Wolfson AB (Ed.); Philadelphia: Lippincott Williams & Wilkins, 2005, pp 1450-1453.

10. Ly BT, Clark RF, Williams SR: Hallucinogens. In: Rosen's Emergency Medicine: Concepts and Clinical Practice (sixth edition). Marx J, Hockberger R, Walls R, et al (Eds.); Philadelphia: Mosby Elsevier, 2006, pp 2406-2418.

11. Vohra R, Cook M, Ly BT: Drugs of Abuse. In: Emergency Medicine Handbook: Critical Concepts for Clinical Practice. Roppolo LP, Davis D, Kelly SP, Rosen P (Eds.); Philadelphia: Mosby Elsevier, 2007, pp 984-991.

12. Matteucci MJ, Ly BT, Clark RF: Seafood Toxidromes. In: Wilderness Medicine (fifth edition). Auerbach PS (Ed.); Philadelphia: Mosby Elsevier, 2007, pp 1531-1559.

Curriculum Vitae
Binh T. Ly, M.D., FACMT, FACEP

13. Ly BT:  Ankle Fracture/Dislocation.  In: Rosen & Barkin's 5-Minute Emergency Medicine Consult (third edition).  Schaider J, Hayden SR, Wolfe R, Barkin RM, Rosen P (Eds.); Philadelphia: Lippincott Williams & Wilkins, 2007, pp 70-71.

14. Ly BT:  Tibial Plateau Fracture.  In: Rosen & Barkin's 5-Minute Emergency Medicine Consult (third edition).  Schaider J, Hayden SR, Wolfe R, Barkin RM, Rosen P (Eds.); Philadelphia: Lippincott Williams & Wilkins, 2007, pp 1120-1121.

15. Hannum J, Ly BT:  Hydrogen Fluoride and Hydrofluoric Acid.  In: Poisoning & Drug Overdose (fifth edition).  Olson KR (Ed.), Anderson IB, Benowitz NL, Blanc PD, Clark RF, Kearney TE, Osterloh JD (Associate Eds.); New York: Lange Medical Books/McGraw-Hill, 2007, pp 222-224.

16. Ly BT, Hannum J:  Methylene Chloride.  In: Poisoning & Drug Overdose (fifth edition).  Olson KR (Ed.), Anderson IB, Benowitz NL, Blanc PD, Clark RF, Kearney TE, Osterloh JD (Associate Eds.); New York: Lange Medical Books/McGraw-Hill, 2007, pp 266-267.

17. Ly BT, Hannum J:  Calcium.  In: Poisoning & Drug Overdose (fifth edition).  Olson KR (Ed.), Anderson IB, Benowitz NL, Blanc PD, Clark RF, Kearney TE, Osterloh JD (Associate Eds.); New York: Lange Medical Books/McGraw-Hill, 2007, pp 428-431.

18. Miller AD, Ly BT:  Ethanol.  In: Harwood-Nuss' Clinical Practice of Emergency Medicine (fifth edition).  Wolfson AB, Hendey GW, Ling LJ, Rosen CL, Schaider J, Sharieff GQ (Eds.); Philadelphia: Lippincott Williams & Wilkins, 2010, pp 1364-1370.

19. Ly BT, Clark RF, Williams SR:  Hallucinogens.  In: Rosen's Emergency Medicine: Concepts and Clinical Practice (seventh edition).  Marx JA, Hockberger RS, Walls RM, et al (Eds.); Philadelphia: Mosby Elsevier, 2010, pp 2010-2018.

20. Patel H, Ly BT:  Phalangeal Injuries, Hand.  In: Rosen & Barkin's 5-Minute Emergency Medicine Consult (fourth edition).  Schaider J, Hayden SR, Wolfe R, Barkin RM, Rosen P (Eds.); Philadelphia: Lippincott Williams & Wilkins, 2011, pp 848-849.

21. Ly BT:  Hydrogen Fluoride and Hydrofluoric Acid.  In: Poisoning & Drug Overdose (sixth edition).  Olson KR (Ed.), Anderson IB, Benowitz NL, Blanc PD, Clark RF, Kearney TE, Kim-Katz SY, Wu AHB (Associate Eds.); New York: McGraw-Hill, 2012, pp 238-240.

22. Ly BT:  Methylene Chloride.  In: Poisoning & Drug Overdose (sixth edition).  Olson KR (Ed.), Anderson IB, Benowitz NL, Blanc PD, Clark RF, Kearney TE, Kim-Katz SY, Wu AHB (Associate Eds.); New York: McGraw-Hill, 2012, pp 286-287.

23. Ly BT, Nogar J:  Calcium.  In: Poisoning & Drug Overdose (sixth edition).  Olson KR (Ed.), Anderson IB, Benowitz NL, Blanc PD, Clark RF, Kearney TE, Kim-Katz SY, Wu AHB (Associate Eds.); New York: McGraw-Hill, 2012, pp 463-465.

24. Minns AB, Matteucci MJ, Ly BT, Clark RF:  Seafood Toxidromes.  In: Wilderness Medicine (sixth edition).  Auerbach PS (Ed.); Philadelphia: Mosby Elsevier, 2012, pp 1444-1469.

Curriculum Vitae
Binh T. Ly, M.D., FACMT, FACEP

25. Thornton S, Ly BT: Over-the-Counter Medications. In: Emergency Medicine Clinical Essentials (second edition). Adams JG (Ed.), Barton ED, Collings JL, DeBlieux PMC, Gisondi MA, Nadel ES (Associate Eds.); Philadelphia: Elsevier-Saunders, 2013, pp. 1334-1342.

26. Ly BT, Williams SR:  Hallucinogens.  In: <u>Rosen's Emergency Medicine: Concepts and Clinical Practice</u> (eighth edition).  Marx JA, Hockberger RS, Walls RM, et al (Eds.); Philadelphia: Mosby Elsevier, 2014, pp 2015-2023.

27. Coyne, CJ, Ly BT, Vilke GM: Excited Delirium Syndrome. In:<u> Guidelines for Investigating Officer-involved Shootings, Arrest-related Deaths, and Deaths in Custody</u>. Ross DA, Vilke GM (Eds.); New York: Routledge, 2018, pp. 201-206.

28. Thornton SL, Darracq MA, Ly BT: Amphetamines, Cathinones (Bath Salts), and Cocaine. In: <u>Guidelines for Investigating Officer-involved Shootings, Arrest-related Deaths, and Deaths in Custody.</u> Ross DA, Vilke GM (Eds); New York: Routledge, 2018, pp. 201-216.

29. Darracq MA, Thornton SL, Ly BT: Central Nervous System Depressants. In: <u>Guidelines for Investigating Officer-involved Shootings, Arrest-related Deaths, and Deaths in Custody</u>. Ross DA, Vilke GM (Eds.); New York: Routeledge, 2018, pp. 217-227.

30. Corbett B, Ly BT: Disorders of the Central Nervous System. <u>Karch's Drug Abuse Handbook, (3rd edition)</u>. Karch S, Goldberger BA (Eds.); Westborough, MA: Taylor & Francis, (accepted for publication).

31. Coyne CJ, Vilke GM, Ly BT: Excited Delirium Syndrom. <u>Karch's Drug Abuse Handbook, (3rd edition)</u>. Karch S, Goldberger BA (Eds.); Westborough, MA: Taylor & Francis, (accepted for publication).

32. Darracq M, Ly BT: Sedative-Hypnotics. <u>Karch's Drug Abuse Handbook, (3rd edition)</u>. Karch S, Goldberger BA (Eds.); Westborough, MA: Taylor & Francis, (accepted for publication).

33. Koch RA, Ly BT: Cardiac Effects. <u>Karch's Drug Abuse Handbook, (3rd edition)</u>. Karch S, Goldberger BA (Eds.); Westborough, MA: Taylor & Francis, (accepted for publication).

34. Koch, RA, Ly BT: Vascular Effects. <u>Karch's Drug Abuse Handbook, (3rd edition)</u>. Karch S, Goldberger BA (Eds.); Westborough, MA: Taylor & Francis, (accepted for publication).

35. Koh C, Ly BT: Opioids. <u>Karch's Drug Abuse Handbook, (3rd edition)</u>. Karch S, Goldberger BA (Eds.); Westborough, MA: Taylor & Francis, (accepted for publication).

36. Lasoff DR, Ly BT: Hallucinogens. <u>Karch's Drug Abuse Handbook, (3rd edition)</u>. Karch S, Goldberger BA (Eds.); Westborough, MA: Taylor & Francis, (accepted for publication).

37. Sun C, Ly BT: Cannabinoids. <u>Karch's Drug Abuse Handbook, (3rd edition)</u>. Karch S, Goldberger BA (Eds.); Westborough, MA: Taylor & Francis, (accepted for publication).

38. Thornton SL, Ly BT: Medical Aspects of Drug Abuse. <u>Karch's Drug Abuse Handbook, (3rd edition)</u>. Karch S, Goldberger BA (Eds.); Westborough, MA: Taylor & Francis, (accepted for publication).

<u>Articles:</u>

1. Schneir AB, Ly BT, Clark RF:  A case of withdrawal from the GHB precursors gamma-butyrolactone and 1,4-butanediol.  J Emerg Med 2001;21(1):31-33.

2. Ly BT:  Case discussion.  Int J Med Toxicol 2001;4(5):34.

3. Ly BT, Williams SR, Clark RF:  Mercuric oxide poisoning treated with whole-bowel irrigation and chelation therapy.  Ann Emerg Med 2002;39(3):312-315.

4. Schneir AB, Vadeboncoeur TF, Offerman SR, Barry JD, Ly BT, Williams SR, Clark RF:  Massive OxyContin ingestion refractory to naloxone therapy.  Ann Emerg Med 2002;40(4): 425-428.

5. Schneir AB, Offerman SR, Ly BT, Davis JM, Baldwin RT, Williams SR, Clark RF:  Complications of diagnostic physostigmine administration to emergency department patients.  Ann Emerg Med 2003;42(1):14-19.

6. Ly BT, Schneir AB, Clark RF:  Effect of whole bowel irrigation on the pharmacokinetics of an acetaminophen formulation and progression of radiopaque markers through the gastro-intestinal tract.  Ann Emerg Med 2004;43(2):189-195.

7. Clark RF, Williams SR, Fung F, Schneir AB, Ly BT, Tanen DA, Munday SW:  A reassess-ment of topical organic phosphorus insecticide exposures and permanent paralysis (Letter to the editor).  J Toxicol Clin Toxicol 2004;42(7):991-992.

8. Ly BT, Olson KR:  Management of acute carbon monoxide poisoning.  Pulmonary and Critical Care Update, 2005, Volume 19, Lesson 8.  (online article) http://www.chestnet.org/education/online/pccu/vol19/lessons07_08/index.php

9. Cook MD, Matteucci MJ, Lall R, Ly BT:  Stingray envenomation. J Emerg Med 2006;30(3): 345-347.

10. Clark RF, Heister RG, Rao D, Ly BT, Davis DP:  Stingray envenomation: A retrospective review of clinical presentation and treatment in 119 cases.  J Emerg Med 2007;33(1):33-37.

11. Clark RF, Ly B, Schneir A, Cantrell FL, Tomaszewski C, Tanen DA:  More discussion of over the counter cough and cold preparations (Letter to the editor).  Ann Emerg Med 2009;54(2):309-310.

12. Minns AB, Ebrahimi S, Te L, Ly B, Clark RF, Cantrell FL:  A retrospective review of California poison control system data of sibutramine exposures.  Clin Toxicol 2009;47(8): 814-817.

Curriculum Vitae
Binh T. Ly, M.D., FACMT, FACEP

13.   Kreshak AA, Clark AK, Clark RF, Ly BT, Cantrell FL:  A retrospective poison center review of varenicline-exposed patients.  Ann Pharmacother 2009;43(12):1986-1991.

14.   Kreshak AA, Ly BT, Edwards WC, Carson SH: A 3-year-old boy with fever and oral lesions. Diagnosis: methemoglobinemia. Pediatr Ann. 2009 Nov;38(11):613-6.

15.   Carstairs SD, Fujinaka MD, Keeny GE, Ly BT: Prolonged coma in a child due to hashish ingestion with quantitation of THC metabolites in urine. J Emerg Med. 2011 Sep; 41(3):e69-71.

16.   Miller AD, Young MC, DeMott MC, Ly BT, Clark RF: Recurrent coagulopathy and thrombocytopenia in children treated with crotalidae polyvalent immune fab: a case series. Pediatr Emerg Care. 2010 Aug; 26(8): 576-82.

17.   Schneir AB, Cullen J, Ly BT:  "Spice" girls: Synthetic cannabinoid intoxication.  J Emerg Med 2011;40(3):296-299.

18.   Nordt SP, Minns A, Carstairs S, Kreshak A, Campbell C, Tomaszewski C, Hayden SH, Clark RF, Joshua A, Ly BT:  Mass sociogenic illness initially reported as carbon monoxide poisoning.  J Emerg Med 2012;42(2):159-161.

19.   Ly BT, Thornton SL, Buono C, Stone JA, Wu AH: False-positive urine phencyclidine immunoassay screen result caused by interference by tramadol and its metabolites. Ann Emerg Med 2012:59(6):545-7.

20.   Darracq MA, Ly BT: Gastric aspirate fluorescence in ethylene glycol poisoning. J Emerg Med 2012:43(6):e457-818.   Chindarkar NS, Rentmeester LL, Ly BT, Fitzgerald RL: Black urine due to urobilinogen in a patient with alcoholic pellagra. Clin Biochem. 2014 Apr 5. pii: S0009-9120(14)00158-1.

21.   Chindarkar NS, Rentmeester LL, Ly BT, Fitzgerald RL: Black urine due to urobilingogen in a patient with alcoholic pellagra. Clin Biochem. 2014 Apr 5. pii: S0009-9120(14)00158-1

22.   Darracq MA, Cullen J, Rentmesster L, Cantrell FL, Ly BT. Orbeez: the magic water absorbing bead—risk of pediatric bowel obstruction? Pediatr Emerg Care. 2015: 31 (6) 416-8.

23.   Clark RF, O'Connell CW, Villano JH, Kim A, Ly BT, Minns AB: Severe recurrent coagulopathy following crotaline envenomation refractory to maintenance dosing of antivenom. J Emerg Med 2015; 33(6): 865.

24.   Villano J, O'Connell C, Ly BT, Schneir A: Case Files from the University of California San  Diego Health System Fellowship Coma and Severe Acidosis: Remember to Consider acetaminophen. J Medical Toxicology 2015: 11(3): 368-376.

25.   O'Connell C, Sadler C, Tolia V, Ly BT, Saitman A, Fitzgerald R: Overdose of etizolam: the abuse and rise of a benzodiazepine analog. Ann Emerg Med 2015: 65(4): 465-466.

Curriculum Vitae
Binh T. Ly, M.D., FACMT, FACEP

26.    Clark RF, O'Connell C, Villano JH, Kim A, Ly BT, Minns AB: Severe recurrent coagulopathy following crotaline envenomation refractory to maintenance doing of antivenom. J Emerg Med. 2015; 33(6): 865.

27.    O'Connell C, Gerona RR, Friesen MW, Ly BT: Internet-purchased ibogaine toxicity confirmed with serum, urine, and product content levels. J Emerg Med 2015; 33(7): 985.

28.    Pokrajac N, Corbett-Detig J, Ly BT: Computer tomography imaging and risk factors for clinically important diagnoses in patients presenting with flank pain. J Emerg Med. 2017; 52(1): 98-100.

39.    Anderson, RJ, Corbett B, Ly BT: A case of acute pericarditis following intravenous injection of crushed morphine tablets. J Psychoactive Drugs. 2016; 48 (5): 355-358.

40.    Li K, Lasoff DR, Smollin CG, Ly BT: Perampanel overdoes causing prolonged coma. Clin Toxicol. 2018; 56(7): 677-678.

41.    Lasoff DR, Cantrell FL, Ly BT: Death associated with intravenous turmeric (Curcumin) preparation. Clin Toxicol. 2018; 56(5): 384-385.

42.    Li K, Lasoff DR, Smollin CG, Ly BT: Perampanel overdoes causing prolonged coma. Clin Toxicol. 2018; 56(7): 677-678.

43.    Bassell T, Aminlari A, Hayden S, Del Rosso J, Ly BT: Phenytoin Toxicity After Transjungular Intrahepatic Portosystemic Shunt (TIPS). J. Emerg. Med. 2021 60(1): 54-57

Abstracts

1.    Ingels M, Kelner M, Ly B, Clark RF:  GHB: Effect on serum osmolality.  J Toxicol Clin Toxicol 2000;38(5):539.

2.    Ly BT, Rangan C, Ingels M, Williams SR, Clark RF:  Ingestion of mercuric oxide without clinical toxicity.  J Toxicol Clin Toxicol 2000;38(5):550.

3.    Ly BT, Schneir AB, Williams SR, Clark RF:  Effect of whole bowel irrigation on the pharmacokinetics of Tylenol Extended Relief.  Acad Emerg Med 2002;9(5):529.

4.    Schneir AB, Offerman SR, Ly BT, Davis JM, Baldwin R, Williams SR, Clark RF: Complications of diagnostic physostigmine administration to emergency department patients. Acad Emerg Med 2002;9(5):535.

5.  Schneir AB, Munday S, Ly BT, Williams SR, Clark RF:  Diphenhydramine-induced wide
    complex tachycardia shown by exercise treadmill testing not to be entirely rate related.
    J Toxicol Clin Toxicol 2003;41(5):656.

6.  Richardson WH, Tong TC, Ly BT, Williams SR, Clark RF:  Neurotoxic-induced respiratory
    deterioration refractory to CroFab after rattlesnake envenomation.  J Toxicol Clin Toxicol
    2003;41(5):700.

7.  Goto CS, Gutglass DJ, Richardson WH, Ly BT, Offerman SR, Clark RF:  Pediatric
    rattlesnake envenomation with neurotoxicity refractory to treatment with crotaline Fab
    antivenom.  J Toxicol Clin Toxicol 2003;41(5):702.

8.  Tong T, Schneir AB, Williams SR, Ly BT, Richardson WH:  Sage tea related convulsions in a
    pediatric patient.  J Toxicol Clin Toxicol 2003;41(5):727-728.

9.  Vohra R, Hannum J, Nordt SP, Ly BT, Clark RF:  Electrolyte changes from fluoride toxicity
    in a mouse model.  J Toxicol Clin Toxicol 2006;44(5):687.

10. Cook MD, Schwarz KA, Ly BT:  Fatal outcome after ingestion of concentrated calcium
    polysulfide-containing fungicide.  J Toxicol Clin Toxicol 2006;44(5):770.

11. Young MC, DeMott MC, Hannum JL, Ly BT, Clark RF, Schneir AB:  Accidental intrathecal
    gadolinium poisoning treated with serial CSF drainage.  J Toxicol Clin Toxicol 2007;45(6):637.

12. Miller AD, Young MC, DeMott MC, Ly BT, Schneir AB, Clark RF:  Delayed coagulopathy
    secondary to crotaline envenomation following initial control with crotalidae polyvalent
    immune fab: A retrospective case series.  J Toxicol Clin Toxicol 2008;46(7):597-598.

13. Drew B, Miller AD, DeMott MC, Young MC, Clark RF, Ly BT, Schneir AB, Tanen DA:
    Delayed severe cardiotoxicity and prolonged mental status changes associated with chronic
    lithium toxicity.  J Toxicol Clin Toxicol 2008;46(7):619.

14. Ly BT, Stone J, Buono C, Wu AH:  False-positive phencyclidine urine immunoassay screen
    due to tramadol.  J Toxicol Clin Toxicol 2008;46(7):620.

15. Miller AD, Ly BT, Clark RF:  Neonatal hemolysis associated with nursing mother ingestion of
    arnica tea.  J Toxicol Clin Toxicol 2009;47(7):726.

16. Ly BT, NOGAR J:  Severe Sodium Channel blockade and cardiovascular collapse due to a
    massive lamotrigine overdose.  J Toxicol Clin Toxicol 2011, submitted.

17. Schneir A, Ly BT, Smollin C, Thornton S, Darracq M, Rangan C, Offerman SR, Vohra R,
    Tomaszewski C, Gerona RR: Comprehensive drug analysis of "bath salts" purchase din the
    United States. Clinical Toxicology 2012:50, 574.

18. Darracq MA, Sadler C, Ly, BT: Nattokinase: A novel anticoagulant. Clinical Toxicology
    2012:50, 656.

19. O'Connell CW, Gerona R, Ly BT: A case of acute ibogaine toxicity confirmed with serum
    and urine levels and product contents. J Toxicol Clin Toxicol 2013; 51 (7): 132.

Curriculum Vitae
Binh T. Ly, M.D., FACMT, FACEP

20. Rentmeester L, D Burton, R Fitzgerald, BT Ly, R Clark: Immunoglobulin concentration & venom binding activity of expired snake antivenoms. 2014 Annual Meeting of the North American Congress of Clinical Toxicology (NACCT), Clinical Toxicology, 52:7, 695.

21. Corbett B, Anderson R, Lasoff L, Koh C, Ly BT: Pulmonary talcosis and pericarditis in a patient with intravenous drug abuse. 2016 North American Congress of Clinical Toxicology (NACCT) Abstracts 2016, Clinical Toxicology, 54:8.

22. Li K, Lasoff D, Smollin C, Ly BT: Perampanel overdose causing a prolonged dissociated state. 2017 North American Congress of European Association of Poisons Centres and Clinical Toxicologists (EAPCCT), Clinical Toxicology, 55:7.

23. Lasoff D, Ly BT, Cantrell L: A bit too spicy? A fatality associated with intravenous tumeric infusion. 2017 North American Congress of Clinical Toxicology (NACCT) Clinical Toxicology, 55:7.

24. Srihari, P, Ly, BT: Phenibut withdrawal requiring large doses of backlofen and phenobarbital. 2020 North American Congress of Clinical Toxicology (NACCT) Clinical Toxicology, 58:11.

25. Gao HT, McGlone SEM, Ly BT. Refractory vasoplegic shock after sodium azide ingestion treated with hemodialysis. J Med Toxicol 2020;16:116.

POSTER PRESENTATIONS:

1. Ingels M, Kelner M, Ly B, Clark RF:  GHB: Effect on serum osmolality.  North American Congress of Clinical Toxicology Annual Meeting, Tucson, Arizona; September 13-18, 2000.

2. Ly BT, Rangan C, Ingels M, Williams SR, Clark RF:  Ingestion of mercuric oxide without clinical toxicity.  North American Congress of Clinical Toxicology Annual Meeting, Tucson, Arizona; September 13-18, 2000.

3. Ly BT, Schneir AB, Williams SR, Clark RF:  Effect of whole bowel irrigation on the pharmacokinetics of Tylenol Extended Relief.  Society for Academic Emergency Medicine Annual Meeting, St. Louis, Missouri; May 19-22, 2002.

4. Schneir AB, Offerman SR, Ly BT, Davis JM, Baldwin R, Williams SR, Clark RF: Complications of diagnostic physostigmine administration to emergency department patients. Society for Academic Emergency Medicine Annual Meeting, St. Louis, Missouri; May 19-22, 2002.

5. Schneir AB, Munday S, Ly BT, Williams SR, Clark RF:  Diphenhydramine-induced wide complex tachycardia shown by exercise treadmill testing not to be entirely rate related. North American Congress of Clinical Toxicology Annual Meeting, Chicago, Illinois; September 4-9, 2003.

6.  Richardson WH, Tong TC, Ly BT, Williams SR, Clark RF:  Neurotoxic-induced respiratory deterioration refractory to CroFab after rattlesnake envenomation.  North American Congress of Clinical Toxicology Annual Meeting, Chicago, Illinois; September 4-9, 2003.

7.  Goto CS, Gutglass DJ, Richardson WH, Ly BT, Offerman SR, Clark RF:  Pediatric rattlesnake envenomation with neurotoxicity refractory to treatment with crotaline Fab antivenom.  North American Congress of Clinical Toxicology Annual Meeting, Chicago, Illinois; September 4-9, 2003.

8.  Tong T, Schneir AB, Williams SR, Ly BT, Richardson WH:  Sage tea related convulsions in a pediatric patient.  North American Congress of Clinical Toxicology Annual Meeting, Chicago, Illinois; September 4-9, 2003.

9.  Heister RR, Ly BT, Clark RF:  Stingray envenomations: A retrospective review of 120 cases treated in Southern California.  Second Mediterranean Emergency Medicine Congress, Sitges/Barcelona, Spain; September 15-17, 2003.

10. Reilly IH, Ly BT:  Tube thoracostomy: Comparison of a method utilizing a newly designed forceps vs. conventional technique in a cadaver model.  Second Mediterranean Emergency Medicine Congress, Sitges/Barcelona, Spain; September 15-17, 2003.

11. Ly BT, Hayden SR:  Academic development pathway.  CORD Best Practices in Residency Training Conference, Washington DC; March 6-7, 2004.

12. Ly BT, Hayden SR:  Using faculty advisors to monitor resident fatigue and progress. CORD Academic Assembly, New Orleans, Louisiana; March 5-6, 2005.

13. Hayden SR, Ly BT:  EM residents as integrated flight crew: beyond the "ride-along" experience.  CORD Academic Assembly, New Orleans, Louisiana; March 5-6, 2005.

14. Vohra R, Hannum J, Nordt SP, Ly BT, Clark RF:  Electrolyte changes from fluoride toxicity in a mouse model.  North American Congress of Clinical Toxicology, San Francisco, California; October 5-10, 2006.

15. Cook MD, Schwarz KA, Ly BT:  Fatal outcome after ingestion of concentrated calcium polysulfide-containing fungicide.  North American Congress of Clinical Toxicology, San Francisco, California; October 5-10, 2006.

16. Young MC, DeMott MC, Hannum JL, Ly BT, Clark RF, Schneir AB:  Accidental intrathecal gadolinium poisoning treated with serial CSF drainage.  North American Congress of Clinical Toxicology, New Orleans, Louisiana; October 18-23, 2007.

17. Miller AD, Young MC, DeMott MC, Ly BT, Schneir AB, Clark RF:  Delayed coagulopathy secondary to crotaline envenomation following initial control with crotalidae polyvalent immune fab: A retrospective case series.  North American Congress of Clinical Toxicology Annual Meeting, Toronto, Canada; September 11-16, 2008.

18. Drew B, Miller AD, DeMott MC, Young MC, Clark RF, Ly BT, Schneir AB, Tanen DA: Delayed severe cardiotoxicity and prolonged mental status changes associated with chronic

Curriculum Vitae
Binh T. Ly, M.D., FACMT, FACEP

lithium toxicity.  North American Congress of Clinical Toxicology Annual Meeting, Toronto, Canada; September 11-16, 2008.

19.   Ly BT, Buono C, Stone J, Wu A:  False-positive phencyclidine urine immunoassay screen due to tramadol.  North American Congress of Clinical Toxicology Annual Meeting, Toronto, Canada; September 11-16, 2008.

20.   Miller AD, Ly BT, Clark RF:  Neonatal hemolysis associated with nursing mother ingestion of arnica tea.  North American Congress of Clinical Toxicology Annual Meeting, San Antonio, Texas; September 21-26, 2009.

21.   Ly BT, Nogar J:  Severe Sodium Channel Blockade and Cardiovascular Collapse Due to a Massive Lamotrigine Overdose.  North American Congress of Clinical Toxicology Annual Meeting, Washington, DC; September 22-26, 2011.

22.   Schneir A, Ly BT, Smollin C, Thornton S, Darracq M, Rangan C, Offerman SR, Vohra R, Tomaszewski C, Gerona RR: Comprehensive drug analysis of "bath salts" purchased in the United States. North American Congress of Clinical Toxicology Annual Meeting, Las Vegas, Nevada; October 1-6, 2012.

23.   Darracq MA, Sadler C, Ly, BT: Nattokinase: A novel anticoagulant. North American Congress of Clinical Toxicology Annual Meeting, Las Vegas, Nevada; October 1-6, 2012.

24.   O'Connell CW, Gerona R, Ly BT: A case of acute ibogaine toxicity confirmed with serum and urine levels and product contents. North American Congress of Clinical Toxicology Annual Meeting, Atlanta, Georgia; September 27-October 2, 2013.

25.   Rentmeester L, D Burton, R Fitzgerald, BT Ly, R Clark: Immunoglobulin concentration & venom binding activity of expired snake antivenoms. North American Congress of Clinical Toxicology Annual Meeting, New Orleans, Louisiana; October 17-21, 2014.

26.   Corbett B, Anderson R, Lasoff L, Koh C, Ly BT: Pulmonary talcosis and Pericarditis in a patient with intravenous drug abuse. (2016) North American Congress of Clinical Toxicology (NACCT), Boston, MA; September 12-16, 2016.

27.   Li K, Lasoff D, Smollin C, Ly BT: Perampanel overdose causing a prolonged dissociated state. (2017) 37th International Congress of the European Association of Poisons Centres and Clinical Toxicologists (EAPCCT), Basel, Switzerland; May 16-19, 2017.

28.   Lasoff D, Ly BT, Cantrell L: A bit too spicy? A fatality associated with intravenous tumeric infusion. (2017) North American Congress of Clinical Toxicology (NACCT), Vancouver, Canada, October 13-15, 2017.

29.   Srihari, P, Ly, BT: Phenibut withdrawal requiring large doses of backlofen and phenobarbital. (2020) North American Congress of Clinical Toxicology (NACCT) San Francisco, CA, September 10-14, 2020 (converted to virtual event due to COVID-19 pandemic).

30. Gao HT, McGlone SEM, Ly BT. Refractory vasoplegic shock after sodium azide ingestion treated with hemodialysis. (2020) American College of Medical Toxicology Annual Scientific Meeting, New York, NY, March 13-15.

SPEAKING ENGAGEMENTS:

1. Ly B. Ocular Trauma. Oral Presentation at Emergency Medicine Core Curriculum Conference at UCSF-Fresno University Medical Center; October 1997; Fresno, CA.

2. Ly B. Wounds and Burns. Oral Presentation at Emergency Medicine Departmental Conference at UCSF-Fresno University Medical Center; October 1998; Fresno, CA.

3. Ly B. Biliary Disorders. Oral Presentation at the Emergency Medicine Core Curriculum Conference at UCSF-Fresno University Medical Center; June 1998; Fresno, CA.

4. Ly B. Biliary Disorders. Oral Presentation at the Emergency Medicine Core Curriculum Conference at UCSF-Fresno University Medical Center; June 1998; Fresno, CA.

5. Ly B. Carbon Monoxide Poisoning. Oral Presentation at the Emergency Medicine Departmental Conference at UCSF-Fresno University Medical Center; June 1998; Fresno, CA.

6. Ly B. Carbon Monoxide Poisoning. Oral Presentation at the Emergency Medicine Departmental Conference at UCSF-Fresno University Medical Center; June 1998; Fresno, CA.

7. Ly B. Ectopic Pregnancy. Oral Presentation at Emergency Medicine Departmental Conference at UCSF-Fresno University; October 1998; Fresno, CA.

8. Ly B. Wound Management. Oral Presentation at Emergency Medicine Core Curriculum Conference at UCSF-Fresno University Medical Center; January 1999; Fresno, CA.

9. Ly B. Cyclic Antidepressant Poisoning. Oral Presentation at Emergency Medicine Departmental Conference at UCSF-Fresno University; June 1999; Fresno, CA.

10. Ly B. Salicylate Poisoning. Oral Presentation at California Poison Control System at San Diego Division; March 2000; San Diego, CA.

11. Ly B. Insecticides. Oral Presentation at the Medical Toxicology Board Review at the Good Samaritan Regional Medical Center; June 2000; Phoenix, Arizona.

12. Ly B. Toxic Alcohol Poisoning. Oral Presentation at California Poison Control System at San Diego Division; August 2000; San Diego, CA.

13. Ly B. Hypoglycemia. Oral Presentation at the Pediatrics Departmental Conference at Children's Hospital; August 2000; San Diego, CA.

14. Ly B. Salicylate Poisoning. Oral Presentation at Emergency Medicine Conference at UCSD Medical Center; September 2000; San Diego, CA.

Curriculum Vitae
Binh T. Ly, M.D., FACMT, FACEP

15. Ly B. GHB. Oral Presentation at the North American Congress of Clinical Toxicology; September 2000; Tucson, Arizona.

16. Ly B. Iron Poisoning. Oral Presentation at the Pediatrics Departmental Conference at the Children's Hospital; October 2000; San Diego, CA.

17. Ly B. Date Rape Drugs. Oral Presentation at Internal Medicine Departmental Conference at Scripps Mercy Hospital; October 2000; San Diego, CA.

18. Ly B. Date Rape Drugs. Oral Presentation at Internal Medicine Departmental Conference at UCSD Medical Center; October 2000; San Diego, CA.

19. Ly B. Date Rape Drugs. Oral Presentation at Internal Medicine Departmental Conference at VA Medical Center; October 2000; San Diego, CA.

20. Ly B. Date Rape Drugs. Oral Presentation at Pediatrics Departmental Conference at Children's Hospital; October 2000; San Diego, CA.

21. Ly B. Isoniazid and Hydrazine (INH) Poisoning. Oral Presentation at Internal Medicine Departmental Conference at Scripps Mercy Hospital; November 2000; San Diego, CA.

22. Ly B. Isoniazid and Hydrazine (INH) Poisoning. Oral Presentation at Internal Medicine Departmental Conference at UCSD Medical Center; November 2000; San Diego, CA.

23. Ly B. Isoniazid and Hydrazine (INH) Poisoning. Oral Presentation at Internal Medicine Departmental Conference at VA Medical Center; November 2000; San Diego, CA.

24. Ly B. Isoniazid and Hydrazine (INH) Poisoning. Oral Presentation at Pediatrics Departmental Conference at Children's Hospital; November 2000; San Diego, CA.

25. Ly B. Date Rape Drugs. Oral Presentation at Emergency Medicine Departmental Conference at Naval Medical Center; December 2000; San Diego, CA.

26. Ly B. Substance Abuse. Oral Presentation at Mira Mesa College; December 2000; San Diego, CA.

27. Ly B. Date Rape Drugs. Oral Presentation at Emergency Medicine Grand Rounds at UCSF-Fresno University; January 2001; Fresno, CA.

28. Ly B. Date Rape Drugs. Oral Presentation at Internal Medicine Departmental Conference at UCSD Medical Center; February 2001; San Diego, CA.

29. Ly B. Date Rape Drugs. Oral Presentation at Internal Medicine Departmental Conference at VA Medical Center; February 2001; La Jolla, CA.

30. Ly B. Date Rape Drugs. Oral Presentation at Pediatrics Departmental Conference at Children's Hospital; February 2001; San Diego, CA.

Curriculum Vitae
Binh T. Ly, M.D., FACMT, FACEP

31. Ly B. Psychoactive Drugs. Oral Presentation at Internal Medicine Departmental Conference; February 2001; San Diego, CA.

32. Ly B. Gastrointestinal Decontamination: Where is the Science?. Oral Presentation at the Internal Medicine Departmental Conference at Scripps Mercy Hospital; September 2001; San Diego, CA.

33. Ly B. Gastrointestinal Decontamination: Where is the Science?. Oral Presentation at the Internal Medicine Departmental Conference at UCSD Medical Center; September 2001; San Diego, CA.

34. Ly B. Gastrointestinal Decontamination: Where is the Science?. Oral Presentation at the Internal Medicine Departmental Conference at VA Medical Center; September 2001; San Diego, CA.

35. Ly B. Gastrointestinal Decontamination: Where is the Science?. Oral Presentation at the Pediatrics Departmental Conference at Children's Hospital; September 2001; San Diego, CA.

36. Ly B. Serotonin Syndrome. Oral Presentation at the Internal Medicine M&M Conference at VA Medical Center; November 2001; La Jolla, California.

37. Ly B. Date Rape Drugs. Oral Presentation at San Diego State University Preventive Medicine; November 2001; La Jolla, CA.

38. Ly B. Effect of Whole Bowel Irrigation on the Pharmacokinetics of Tylenol Extended Relief. Oral Presentation at SAEN Western Regional Research Forum; April 2002; San Diego, CA

39. Ly B. Gastrointestinal Decontamination in Toxicology: Science or Science Fiction?. Oral Presentation at the Emergency Medicine Grand Rounds at UCSD Medical Center; July 2002; San Diego, CA.

40. Ly B. Toad Stools. Oral Presentation at Internal Medicine Departmental Conference at Scripps Mercy Hospital; November 2002; San Diego, CA.

41. Ly B. Toad Stools. Oral Presentation at Internal Medicine Departmental Conference at UCSD Medical Center; November 2002; San Diego, CA.

42. Ly B. Toad Stools. Oral Presentation at Internal Medicine Departmental Conference at VA Medical Center; November 2002; La Jolla, CA.

43. Ly B. Toad Stools. Oral Presentation at Pediatrics Departmental Conference at Children's Hospital; November 2002; San Diego, CA.

44. Ly B. Chemical Weapons of Mass Destruction. Oral Presentation at the Internal Medicine Departmental Conference at Scripps Mercy Hospital; February 2003; San Diego, CA.

45. Ly B. Chemical Weapons of Mass Destruction. Oral Presentation at the Internal Medicine Departmental Conference at UCSD Medical Center; February 2003; San Diego, CA.

Curriculum Vitae
Binh T. Ly, M.D., FACMT, FACEP

46. Ly B. Chemical Weapons of Mass Destruction. Oral Presentation at the Internal Medicine Departmental Conference at VA Medical Center; February 2003; La Jolla, CA.

47. Ly B. Chemical Weapons of Mass Destruction. Oral Presentation at the Pediatrics Departmental Conference at Children's Hospital; February 2003; San Diego, CA.

48. Ly B. Cardiovascular Toxicology. Oral Presentation at the Internal Medicine Departmental Conference at Scripps Mercy Hospital; March 2003; San Diego, CA.

49. Ly B. Cardiovascular Toxicology. Oral Presentation at the Internal Medicine Departmental Conference at UCSD Medical Center; May 2003; San Diego, CA.

50. Ly B. Cardiovascular Toxicology. Oral Presentation at the Toxicology Conference at UCSD and Naval Emergency Medicine Conference; May 2003; San Diego, CA.

51. Ly B. Cardiovascular Toxicology. Oral Presentation at the Pediatrics Department Conference at Children's Hospital; May 2003; San Diego, CA.

52. Ly B. Date Rape Drugs. Oral Presentation at San Diego State University Preventive Medicine; September 2003; La Jolla, CA.

53. Ly B. Toxicology Board Review. Oral Presentation at Emergency Medicine Residents' Toxicology Conference at UCSD Medical Center; February 2004; San Diego, CA.

54. Ly B. Toxicology Board Review. Oral Presentation at Emergency Medicine Residents' Toxicology Conference at Balboa Naval Medical Center; February 2004; San Diego, CA.

55. Ly B. Date Rape Drugs. Oral Presentation at Emergency Medicine Residents' Toxicology Conference at UCSD Medical Center; February 2004; San Diego, CA.

56. Ly B. Cellular Asphyxiants. Oral Presentation at the Internal Medicine Departmental Conference at Scripps Mercy Hospital; February 2004; San Diego, CA.

57. Ly B. Cellular Asphyxiants. Oral Presentation at the Internal Medicine Departmental Conference at UCSD Medical Center; February 2004; San Diego, CA.

58. Ly B. Cellular Asphyxiants. Oral Presentation at the Internal Medicine Departmental Conference at UCSD Medical Center; February 2004; San Diego, CA.

59. Ly B. Cellular Asphyxiants. Oral Presentation at Pediatrics Departmental Conference at Children's Hospital; February 2004; San Diego, CA.

60. Ly B. Mushroom Poisoning. Oral Presentation at Pediatric Grand Rounds at the Children's Hospital; July 2004, San Diego, CA.

61. Ly B. Toxicology Board Review. Oral Presentation at Emergency Medicine Residents' Toxicology Conference at UCSD Medical Center; February 2005; San Diego, CA.

Curriculum Vitae
Binh T. Ly, M.D., FACMT, FACEP

62. Ly B. Poisonous Mushrooms. Oral Presentation at Nature Poisons: Science vs. Myth Course; February 2005; Torrance, CA.

63. Ly B. Hyperinsulinemia Euglycemia for Cardiotoxins. Oral Presentation at Medical Toxicology Fellowship Conference; April 2005; San Diego, CA.

64. Ly B. New Drugs of Abuse. Oral Presentation at Internal Medicine Departmental Conference at Scripps Mercy Hospital; August 2005; San Diego, CA.

65. Ly B. New Drugs of Abuse. Oral Presentation at Internal Medicine Departmental Conference at UCSD Medical Center; August 2005; San Diego, CA.

66. Ly B. New Drugs of Abuse. Oral Presentation at Pediatrics Departmental Conference at Children's Hospital; August 2005; San Diego, CA.

67. Ly B. Hyperinsulinemia Euglycemia for Cardiotoxins. Oral Presentation at "Hot Topics in Toxicology" Conference; November 2005; San Diego, CA.

68. Ly B. New Drugs of Abuse. Oral Presentation at Emergency Medicine Departmental Conference at Naval Medical Center; February 2006; San Diego, CA.

69. Ly B. New Drugs of Abuse. Oral Presentation at Emergency Medicine Departmental Conference at VA Medical Center; February 2006; La Jolla, CA.

70. Ly B. Chemical Weapons of Mass Destruction. Oral Presentation at the Internal Medicine Departmental Conference at Scripps Mercy Hospital; February 2006; San Diego, CA.

71. Ly B. Chemical Weapons of Mass Destruction. Oral Presentation at the Internal Medicine Departmental Conference at UCSD Medical Center; February 2006; San Diego, CA.

72. Ly B. Chemical Weapons of Mass Destruction. Oral Presentation at the Pediatrics Departmental Conference at Children's Hospital; February 2006; San Diego, CA.

73.  Ly B. Toxicology Board Review. Oral Presentation at the Emergency Medicine Residents' Toxicology Conference at UCSD Medical Center; February 2006; San Diego, CA.

74.  Ly B. Toxicology Board Review. Oral Presentation at the Emergency Medicine Residents' Toxicology Conference at Balboa Naval Medical Center; February 2006; San Diego, CA.

75. Ly B. Mushroom Poisoning. Oral Presentation at Internal Medicine Departmental Conference at Scripps Mercy Hospital; August 2006, San Diego, CA.

76. Ly B. Mushroom Poisoning. Oral Presentation at Internal Medicine Departmental Conference at VA Medical Center; August 2006, La Jolla, CA.

77. Ly B. Mushroom Poisoning. Oral Presentation at Internal Medicine Departmental Conference at UCSD Medical Center; August 2006, San Diego, CA.

78. 46. Ly B. Mushroom Poisoning. Oral Presentation at Pediatrics Departmental Conference; August 2006, San Diego, CA.

79. Ly B. Carbon Monoxide Poisoning. Oral Presentation at the Emergency Medicine Grand Rounds at UCSF-Fresno University Medical Center; September 2006; Fresno, CA.

80. Ly B. Date Rape Drugs. Oral Presentation at Preventive Medicine Residency Program at UCSD Medical Center; October 2006; San Diego, CA.

81. Ly B. Toxicology Board Review. Oral Presentation at the Emergency Medicine Residents' Toxicology Conference at UCSD Medical Center; February 2007; San Diego, CA.

82. Ly B. Hyperinsulinemia Euglycemia for Cardiotoxins. Oral Presentation at Internal Medicine Departmental Conference at UCSD Thornton Hospital; February 2007; La Jolla, CA.

83. Ly B. Hyperinsulinemia Euglycemia for Cardiotoxins. Oral Presentation at Internal Medicine Departmental Conference at Scripps Mercy Hospital; February 2007; San Diego, CA.

84. Ly B. Hyperinsulinemia Euglycemia for Cardiotoxins. Oral Presentation at Internal Medicine Departmental Conference at UCSD Medical Center; February 2007; San Diego, CA.

85. Ly B. Hyperinsulinemia Euglycemia for Cardiotoxins. Oral Presentation at Internal Medicine Departmental Conference at VA Medical Center; February 2007; La Jolla, CA.

86. Ly B. Hyperinsulinemia Euglycemia for Cardiotoxins. Oral Presentation at Pediatrics Departmental Conference at Children's Hospital; February 2007; San Diego, CA.

87. Ly B. Carbon Monoxide Poisoning. Oral Presentation at the Internal Medicine Departmental Conference at Scripps Mercy Hospital; March 2007; San Diego, CA.

88. Ly B. Carbon Monoxide Poisoning. Oral Presentation at the Emergency Medicine Departmental Conference at VA Medical Center; March 2007; San Diego, CA.

89. Ly B. Carbon Monoxide Poisoning. Oral Presentation at the Internal Medicine Departmental Conference at UCSD Medical Center; March 2007; San Diego, CA.

90. Ly B. Carbon Monoxide Poisoning. Oral Presentation at the Internal Medicine Departmental Conference at UCSD Medical Center; March 2007; San Diego, CA.

91. Ly B. Cellular Mechanisms of Carbon Monoxide Poisoning. Oral Presentation at the Medical Toxicology Fellowship Conference; April 2007; San Diego, CA.

92. Ly B. Hot Topics in Toxicology. Oral Presentation at Internal Medicine Departmental Conference at Scripps Mercy Hospital; August 2007; San Diego, CA.

93. Ly B. Hot Topics in Toxicology. Oral Presentation at Internal Medicine Departmental Conference at VA Medical Center; August 2007; La Jolla, CA.

Curriculum Vitae
Binh T. Ly, M.D., FACMT, FACEP

94. Ly B. Hot Topics in Toxicology. Oral Presentation at CAL/ACEP Annual Scientific Assembly; June 2007; Newport Beach, CA.

95. Ly B. Hot Topics in Toxicology. Oral Presentation at Emergency Medicine Core Curriculum Conference at UCSD Medical Center; August 2007; San Diego, CA.

96. Ly B. Toxicology Board Review. Oral Presentation at Emergency Medicine Residents' Toxicology Conference at UCSD Medical Center; February 2008; San Diego, CA.

97. Ly B. Toxicology Board Review. Oral Presentation at Emergency Medicine Residents' Toxicology Conference at Balboa Naval Medical Center; February 2008; San Diego, CA.

98. Ly B. Date Rape Drugs. Oral Presentation at Western States Winter Conference on Emergency Medicine; February 2008; Park City, UT.

99. Ly B. Hot Topics in Toxicology. Oral Presentation at Western States Winter Conference on Emergency Medicine; February, 2008; Park City, UT.

100. Ly B. Hot Topics in Toxicology. Oral Presentation at Emergency Medicine Core Curriculum Conference at UCSD Medical Center; August 2007; San Diego, CA.

101. Ly B. Cellular Asphyxiants. Oral Presentation at Internal Medicine Departmental Conference at Scripps Mercy Hospital; February 2008; Oakland, CA.

102. Ly B. Cellular Asphyxiants. Oral Presentation at Internal Medicine Departmental Conference at UCSD Medical Center; February 2008; San Diego, CA.

103. Ly B. Cellular Asphyxiants. Oral Presentation at Pediatrics Departmental Conference at VA Medical Center; February 2008; San Diego, CA.

104. Ly B. Cellular Asphyxiants. Oral Presentation at Pediatrics Departmental Conference at Rady Children's Hospital; February 2008; San Diego, CA.

105. Ly B. Poisonous Mushrooms. Oral Presentation at Internal Medicine Departmental Conference at Scripps Mercy Hospital; August 2008; Torrance, CA.

106. Ly B. Poisonous Mushrooms. Oral Presentation at Emergency Medicine Residents' Toxicology Conference at UCSD Medical Center; August 2008; San Diego, CA.

107. Ly B. Poisonous Mushrooms. Oral Presentation at Internal Medicine Departmental Conference at UCSD Thornton Hospital; August 2008; San Diego, CA.

108. Ly B. Poisonous Mushrooms. Oral Presentation at Internal Medicine Departmental Conference at UCSD Medical Center; August 2008; San Diego, CA.

109. Ly B. Poisonous Mushrooms. Oral Presentation at Internal Medicine Departmental Conference at VA Medical Center; August 2008; La Jolla, CA.

110.    Ly B. Poisonous Mushrooms. Oral Presentation at Pediatrics Departmental Conference at UCSD Medical Center; August 2008; San Diego, CA.

111.    Ly B. Toxicology Board Review. Oral Presentation at Emergency Medicine Residents' Toxicology Conference at UCSD Medical Center; February 2009; San Diego, CA.

112.    Ly B. Cocaine, Amphetamines, Tryptamines. Oral Presentation at Internal Medicine Departmental Conference at Scripps Mercy Hospital; February, 2009; San Diego, CA.

113.    Ly B. Cocaine, Amphetamines, Tryptamines. Oral Presentation at Internal Medicine Departmental Conference at UCSD Thornton Hospital; February, 2009; San Diego, CA.

114.    Ly B. Cocaine, Amphetamines, Tryptamines. Oral Presentation at Internal Medicine Departmental Conference at UCSD Medical Center; February 2009; San Diego, CA

115.    Ly B. Cocaine, Amphetamines, Tryptamines. Oral Presentation at Internal Medicine Departmental Conference at VA Medical Center; February 2009; San Diego, CA

116.    Ly B. Cocaine, Amphetamines, Tryptamines. Oral Presentation at Pediatrics Departmental Conference at Rady Children's Hospital; February 2009; San Diego, CA

117.    Ly B. Acing Your EM Rotations. Oral Presentation at Western Regional Medical Student Symposium at the University of Southern California Keck School of Medicine; September 2009; Los Angeles, CA.

118.    Ly B. Cellular Asphyxiants. Oral Presentation at Pediatrics Departmental Conference at Rady Children's Hospital; October 2009; La Jolla, CA.

119.    Ly B. Cellular Asphyxiants. Oral Presentation at Internal Medicine Departmental Conference at UCSD Medical Center; October 2009; San Diego, CA.

120.    Ly B. Cellular Asphyxiants. Oral Presentation at Internal Medicine Departmental Conference at VA Medical Center; October 2009; La Jolla, CA.

121.    Ly B. Emergency Medicine Application Process. Oral Presentation at UCSD School of Medicine; November 2009; La Jolla, CA.

122.    Ly B. Toxicology Board Review. Oral Presentation at Emergency Medicine Residents' Toxicology Conference at UCSD Medical Center; February 2010; San Diego, CA.

123.    Ly B. Novel Therapeutic Interventions in Toxicology. Oral Presentation at Internal Medicine Departmental Conference at Scripps Mercy Hospital; February 2010; San Diego, CA.

124.    Ly B. Novel Therapeutic Interventions in Toxicology. Oral Presentation at Internal Medicine Departmental Conference at UCSD Medical Center; February 2010; San Diego, CA.

125.    Ly B. Novel Therapeutic Interventions in Toxicology. Oral Presentation at Internal Medicine Departmental Conference VA Medical Center; February 2010; San Diego, CA.

126.    Ly B. Novel Therapeutic Interventions in Toxicology. Oral Presentation at Pediatric Departmental Conference at Rady Children's Hospital; April 2010; San Diego, CA.

127.    Ly B. Novel Therapeutic Interventions in Toxicology. Oral Presentation at Preventative Medicine Residency Program at UCSD Medical Center; February 2010; San Diego, CA.

128.    Ly B. Evaluation of the Altered Patient. Oral Presentation at UCSD School of Medicine; April 2010; San Diego, CA.

129.    Ly B. Novel Therapeutic Interventions in Toxicology. Oral Presentation at Emergency Medicine Grand Rounds at Northwestern University; May 2010; San Diego, CA.

130.    Ly B. Mycotoxins. Oral Presentation at Medical Toxicology Fellowship Conference; April 2010; Denver, CO.

131.    Ly B. Introduction to Toxicology. Oral Presentation at UCSD School of Medicine; April 2010; San Diego, CA.

132.    Ly B. The Anatomy of a Poison Center. Oral Presentation at Preventive Medicine at UCSD Medical Center; April 2010; San Diego, CA.

133.    Ly B. Hot Topics in Toxicology. Oral Presentation at Emergency Medicine Grand Rounds at Northwestern University; May 2010; Chicago, Illinois.

134.    Ly B. Evaluation of the Altered Patient. Oral Presentation at UCSD School of Medicine; July 2010; San Diego, CA.

135.    Ly B. Introduction to Toxicology. Oral Presentation at UCSD School of Medicine; July 2010; San Diego, CA.

136.    Ly B. Pesky Pesticides. Oral Presentation at Internal Medicine Departmental Conference at UCSD Medical Center; August 2010; La Jolla, CA.

137.    Ly B. Evaluation of the Altered Patient. Oral Presentation at UCSD School of Medicine; August 2010; San Diego, CA.

138.    Ly B. Introduction to Toxicology. Oral Presentation at UCSD School of Medicine; August 2010; San Diego, CA.

139.    Ly B. Methamphetamines: The Need for Speed. Oral Presentation at Internal Medicine Departmental Conference at Scripps Mercy Hospital; August 2010; San Diego, CA.

140.    Ly B. Methamphetamines: The Need for Speed. Oral Presentation at Internal Medicine Departmental Conference at UCSD Medical Center; August 2010; San Diego, CA.

141.    Ly B. Methamphetamines: The Need for Speed. Oral Presentation at the Pediatrics Departmental Conference at Children's Hospital; August 2010; San Diego, CA.

142.     Ly B. Emergency Medicine Application Process. Oral Presentation at UCSD School of Medicine; August 2010; La Jolla, CA.

143.     Ly B. Evaluation of the Altered Patient. Oral Presentation at UCSD School of Medicine; September 2010; San Diego, CA.

144.     Ly B. Introduction to Toxicology. Oral Presentation at UCSD School of Medicine; September 2010; San Diego, CA.

145.     Ly B. Introduction to Toxicology. Oral Presentation at UCSD School of Medicine; October 2010; San Diego, CA.

146.     Ly B. Evaluation of the Altered Patient. Oral Presentation at UCSD School of Medicine; October 2010; San Diego, CA.

147.     Ly B. Alcohol Withdrawal: Beyond the Hair of the Dog. Oral Presentation at North American Congress of Clinical Toxicology at ACMT Pre-Meeting Symposium; October 2010; Denver, Colorado.

148.     Ly B. Alcohol Withdrawal: Beyond the Hair of the Dog. Oral Presentation at Grand Rounds for the Department of Emergency Medicine at University of California, Irvine; October 2010; Orange, CA.

149.     Ly B. Toxicology Board Review. Oral Presentation at Emergency Medicine Residents' Toxicology Conference at UCSD Medical Center; February 2011; San Diego, CA.

150.     Ly B. Methamphetamines: The Need for Speed. Oral Presentation at Internal Medicine Departmental Conference at the VA Medical Center; February 2011, La Jolla, CA.

151.     Ly B. [Appropriate] Use of Toxicology Laboratory. Oral Presentation at Pediatrics Departmental Conference at Children's Hospital; February 2011, San Diego, CA.

152.     Ly B. [Appropriate] Use of Toxicology Laboratory. Oral Presentation at Internal Medicine Departmental Conference at Scripps Mercy Hospital; February 2011, San Diego, CA.

153.     Ly B. Terrorism: The Biology and Chemistry. Oral Presentation at Medical Toxicology Fellowship Conference; April 2011; San Francisco, CA.

154.     Ly B. Emergency Medicine Application Process. Oral Presentation at UCSD School of Medicine; April 2011; La Jolla, CA.

155.     Ly B. Hot and Bothered: The Agitated Patient. Oral Presentation at Pediatrics Departmental Conference at Children's Hospital; August 2011; San Diego, CA

156.     Ly B. Introduction to Toxicology. Oral Presentation at Preventative Medicine at UCSD/SDSU; November 2011; San Diego, CA.

157.    Ly B. Evaluation of the Altered Patient. Oral Presentation at Preventive Medicine at UCSD/SDSU; November 2011; San Diego, CA.

158.    Ly B. Toxicology Board Review. Oral Presentation at Emergency Medicine Residents' Toxicology Conference at UCSD Medical Center; February 2012; San Diego, CA.

159.    Ly B. Evaluation of the Altered Patient. Oral Presentation at UCSD School of Medicine; March 2012; San Diego, CA.

160.    Ly B. Introduction to Toxicology. Oral Presentation at UCSD School of Medicine; March 2012; San Diego, CA.

161.    Ly B. Emergency Medicine Application Process. Oral Presentation at UCSD School of Medicine; May 2012; La Jolla, CA.

162.    Ly B. Toxicology Board Review. Oral Presentation at Emergency Medicine Residents' Toxicology Conference at UCSD Medical Center; February 2013; San Diego, CA.

163.    Ly B. Pesky Pesticides. Oral Presentation at Internal Medicine Departmental Conference at UCSD Medical Center; March 2013; San Diego, CA.

164.    Ly B. Evaluation of the Altered Patient. Oral Presentation at UCSD School of Medicine; March 2013; San Diego, CA.

165.    Ly B. Hot and Bothered: The Agitated Patient. Oral Presentation at Internal Medicine Department Conference at Scripps Mercy Hospital; March 2013; San Diego, CA.

166.    Ly B. Methamphetamines: The Need for Speed. Oral Presentation at Internal Medicine Departmental Conference at the Scripps Mercy Hospital; March 2013, San Diego, CA.

167.    Ly B. Emergency Medicine Application Process. Oral Presentation at UCSD School of Medicine; May 2013; La Jolla, CA.

168.    Ly B. Introduction to Toxicology. Oral Presentation at UCSD School of Medicine; March 2014; San Diego, CA.

169.    Ly B. Excited Delirium: Drug Culprits. Oral Presentation at the Western States Medical Toxicology Fellowship Conference; April 2014, Portland, Oregon.

170.    Ly B. Approach to the Evaluation and Management of the Poisoned Patient. Oral Presentation at the University of California, San Diego School of Medicine; June 2014, San Diego, CA.

171.    Ly B. Approach to the Evaluation and Management of the Poisoned Patient. Oral Presentation at the University of California, San Diego School of Medicine; July 2014, San Diego, CA.

172.    Ly B. Approach to the Evaluation and Management of the Poisoned Patient. Oral Presentation at the University of California, San Diego School of Medicine; August 2014,

San Diego, CA.

173.    Ly B. Partners in Poisoning: Clinicians and the Clinical Laboratory. Oral Presentation at American Academy of Clinical Chemistry; May 2015; San Diego, CA.

174.    Ly B. Hot Topics in Toxicology. Oral Presentation at Pediatrics Departmental Conference at Rady Children's Hospital; August 2015; San Diego, CA.

175.    Ly B. Hot Topics in Toxicology. Oral Presentation at Scripps Mercy Hospital Departmental Conference; August,2015; San Diego, CA.

176.    Ly B. Approach to the Evaluation and Management of the Poisoned Patient. Oral Presentation at the University of California, San Diego School of Medicine; September 2014, San Diego, CA.

177.    Ly B. Approach to the Evaluation and Management of the Poisoned Patient. Oral Presentation at the University of California, San Diego School of Medicine; October 2014, San Diego, CA.

178.    Ly B. Toxidromes, Toxicology, Pharmacology Board Prep. Oral Presentation at Emergency Medicine Residents' Toxicology Conference at UCSD Medical Center; March 2015; San Diego, CA.

179.    Ly B. Pitfalls in Management of the Alcohol Intoxicated Patient. Oral Presentation at Western States Medical Toxicology Fellowship Conference; April 2015; San Diego, CA.

180.    Ly B. Approach to the Evaluation and Management of the Poisoned Patient. Oral Presentation at the University of California, San Diego School of Medicine; June 2015 San Diego, CA.

181.    Ly B. Approach to the Evaluation and Management of the Poisoned Patient. Oral Presentation at the University of California, San Diego School of Medicine; July 2015, San Diego, CA.

182.    Ly B. Approach to the Evaluation and Management of the Poisoned Patient. Oral Presentation at the University of California, San Diego School of Medicine; July 2015, San Diego, CA.

183.    Ly B. Managing the Acutely Agitated Poisoned Patient. Oral Presentation at the Pediatrics Departmental Conference at Children's Hospital; September 2015, San Diego, CA.

184.    Ly B. Managing the Acutely Agitated Poisoned Patient. Oral Presentation at the Internal Medicine Departmental Conference at Scripps Mercy Hospital; September 2015, San Diego, CA.

185.    Ly B. Approach to the Evaluation and Management of the Poisoned Patient. Oral Presentation at the University of California, San Diego School of Medicine; September 2015, San Diego, CA.

186. Ly B. Approach to the Evaluation and Management of the Poisoned Patient. Oral Presentation at the University of California, San Diego School of Medicine; October 2015, San Diego, CA.

187. Ly B. Careers in Medicine. Oral Presentation at the University of California San Diego School of Medicine; March 2016; San Diego, CA.

188. Ly B. Approach to the Evaluation and Management of the Poisoned Patient. Oral Presentation at the University of California, San Diego School of Medicine; June 2016, San Diego, CA.

189. Ly B. Approach to the Evaluation and Management of the Poisoned Patient. Oral Presentation at the University of California, San Diego School of Medicine; July 2016, San Diego, CA.

190. Ly B. Excited Delirium Syndrome. Oral Presentation at the Pediatrics Department Conference at Rady Children's Hospital; August 2016, San Diego, CA.

191. Ly B. Excited Delirium Syndrome. Oral Presentation at the Internal Medicine Departmental Conference at Scripps Mercy Hospital; August 2016, San Diego, CA.

192. Ly B. Approach to the Evaluation and Management of the Poisoned Patient. Oral Presentation at the University of California, San Diego School of Medicine; August 2016, San Diego, CA.

193. Ly B. Deciphering the Urine Toxicology Screen. Oral Presentation at the Pediatrics Departmental Conference at Children's Hospital; August 2016, San Diego, CA.

194. Ly B. Deciphering the Urine Toxicology Screen. Oral Presentation at the Internal Medicine Departmental Conference at Scripps Mercy Hospital; August 2016, San Diego, CA.

195. Ly B. Residency Match Process. Oral Presentation at Emergency Medicine Core Curriculum Class – MED 240; June 2016; San Diego, CA.

196. Ly B, Career Pathways in Medicine. Oral Presentation at the University of California, San Diego School of Medicine; October 2017, San Diego, CA.

197. Ly B, Residency Recruitment Process. Oral Presentation at the University of California, San Diego School of Medicine; October 2017, San Diego, CA.

198. Ly B. Excited Delirium Syndrome. Oral Presentation at the Pediatrics Department Conference at Rady Children's Hospital; March 2018, San Diego, CA.

199. Ly B. Excited Delirium Syndrome. Oral Presentation at the Internal Medicine Departmental Conference at Scripps Mercy Hospital; March 2018, San Diego, CA.

200. Ly B, Career Pathways in Medicine. Oral Presentation at the University of California, San Diego School of Medicine; April 2018, San Diego, CA.

201.    Ly B, Residency Recruitment Process. Oral Presentation at the University of California, San Diego School of Medicine; April 2018, San Diego, CA.

202.    Ly B. Interpretation of Drugs of Abuse Testing. Oral Presentation at the Pediatrics Departmental Conference at Rady Children's Hospital; July 2018, San Diego, CA.

203.    Ly B. Interpretation of Drugs of Abuse Testing. Oral Presentation at Scripps Mercy Hospital; September 2018, San Diego, CA.

204.    Ly B, Choosing a Medical Specialty: Competitiveness, Training Pathways, and Resource Integration. Oral Presentation at the University of California, San Diego School of Medicine; October 2018, San Diego, CA.

205.    Ly B, Residency Recruitment Process. Oral Presentation at the University of California, San Diego School of Medicine; October 2018, San Diego, CA.

206.    Ly B, Choosing a Medical Specialty: Competitiveness, Training Pathways, and Resource Integration. Oral Presentation at the University of California, San Diego School of Medicine; January 2019, San Diego, CA.

207.    Ly B, Residency Recruitment Process. Oral Presentation at the University of California, San Diego School of Medicine; January 2019, San Diego, CA.

208.    Ly B, Choosing a Medical Specialty: Competitiveness, Training Pathways, and Resource Integration. Oral Presentation at the University of California, San Diego School of Medicine; April 2019, San Diego, CA.

209.    Ly B, Residency Recruitment Process. Oral Presentation at the University of California, San Diego School of Medicine; April 2019, San Diego, CA.

210.    Ly B, Self M. Acute Respiratory Failure. Oral Presentation at Emergency Medicine Core Curriculum Conference at UCSD Medical Center; July 2019; San Diego, CA.

211.    Ly B. Coping with the Death of a Neonatal Patient. Oral Presentation at Emergency Medicine Case Conference at UCSD Medical Center; October 2019; San Diego, CA.

212.    Ly B, Choosing a Medical Specialty: Competitiveness, Training Pathways, and Resource Integration. Oral Presentation at the University of California, San Diego School of Medicine; October 2019, San Diego, CA.

213.    Ly B, Residency Recruitment Process. Oral Presentation at the University of California, San Diego School of Medicine; October 2019, San Diego, CA.

214.    Ly B. Kaiser Permanente Medical Group EM Residency Jobs Panel. Oral Presentation at Kaiser Permanente Emergency Medicine; December 2019; San Diego, CA.

215.    Ly B, Correia M. Bony Abnormalities. Oral Presentation at Emergency Medicine Core Curriculum Conference at UCSD Medical Center; January 2020; San Diego, CA.

216.   Ly B, Montilla H. Approach to Seizure. Oral Presentation at Emergency Medicine Core Curriculum Conference at UCSD Medical Center; March 2020; San Diego, CA.

217.   Ly B, Choosing a Medical Specialty: Competitiveness, Training Pathways, and Resource Integration. Oral Presentation at the University of California, San Diego School of Medicine; April 2020, San Diego, CA.

218.   Ly B, Residency Recruitment Process. Oral Presentation at the University of California, San Diego School of Medicine; April 2020, San Diego, CA.

219.   Ly B, Grover I. Lemiere Syndrome. Oral Presentation at Emergency Medicine Case Conference at UCSD Medical Center; August 2020; San Diego, CA.

220.   Ly B, Casas T, Tilford S. Preeclampsia. Oral Presentation at Emergency Medicine Case Conference at UCSD Medical Center; September 2020; San Diego, CA.

221.   Ly B, Choosing a Medical Specialty: Competitiveness, Training Pathways, and Resource Integration. Oral Presentation at the University of California, San Diego School of Medicine; October 2020, San Diego, CA.

222.   Ly B, Residency Recruitment Process. Oral Presentation at the University of California, San Diego School of Medicine; October 2020, San Diego, CA.

223.   Ly B, Mandel J. Tales from the Frontline of the COVID-19 Pandemic. Oral Presentation at the University of California, San Diego School of Medicine; November 2020, San Diego, CA.

224.   Ly B, Choosing a Medical Specialty: Competitiveness, Training Pathways, and Resource Integration. Oral Presentation at the University of California, San Diego School of Medicine; February 2021, San Diego, CA.

225.   Ly B, Residency Recruitment Process. Oral Presentation at the University of California, San Diego School of Medicine; February 2021, San Diego, CA.

226.   Ly B, Stone J. Alcohol Intoxication, Abuse Withdrawal. Oral Presentation at Emergency Medicine Core Curriculum Conference at UCSD Medical Center; April 2021; San Diego, CA.

227.   Ly B, Holdaway B. Approach to Psychosis. Oral Presentation at Emergency Medicine Core Curriculum Conference at UCSD Medical Center; April 2021; San Diego, CA.

228.   Ly B, Schneir, A. Procedural Sedation. Oral Presentation at Emergency Medicine Core Curriculum Conference at UCSD Medical Center; July 2021; San Diego, CA.

229.   Ly B. Kaiser Permanente Medical Group EM Residency Jobs Panel. Oral Presentation at Kaiser Permanente Emergency Medicine; August 2021; San Diego, CA.

230.   Ly B. Alcohol Withdrawal in the Critically Ill. Oral Presentation at Emergency Medicine Combined Critical Care Curriculum Conference at UCSD Medical Center; September 2021; San Diego, CA.

Curriculum Vitae
Binh T. Ly, M.D., FACMT, FACEP

231.    Ly B, Choosing a Medical Specialty: Competitiveness, Training Pathways, and Resource
Integration. Oral Presentation at the University of California, San Diego School of Medicine;
October 2021, San Diego, CA.

232.    Ly B, Residency Recruitment Process. Oral Presentation at the University of California, San
Diego School of Medicine; October 2021, San Diego, CA.

Revised October 2021

EXHIBIT "Q"

Risa S. Christensen, Esq. (SBN: 227799)
Dennis E. Wagner, Esq. (SBN: 99190)
**WAGNER ZEMMING CHRISTENSEN, LLP**
1325 Spruce Street, Suite 200
Riverside, CA  92507
Tel.:          (951) 686-4800
Fax:          (951) 686-4801
rsc@wzclawfirm.com
dew@wzclawfirm.com

Attorneys for Defendants, COUNTY OF SAN BERNARDINO; HUMBERTO MIRANDA; JULIAN MATA; and JESSAQUA ATTLESEY

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CECILIA VARGAS; ARIANA SALAS, individually and as a successor-in-interest to RUBEN ESCUDERO, deceased,<br><br>         Plaintiffs,<br><br>vs.<br><br>COUNTY OF SAN BERNARDINO; H. MIRANDA; S. CARTER; Z. VOGEL; J. MATA; Z. PRITCHETT; J. JIMENEZ; A. MATA; T. KAUTZ; J. ATTLESEY; RODRIGUEZ (first initial unknown) and DOES 1-10, inclusive,<br><br>         Defendants. | CASE NO: 5:20-cv-02646-JGB-KK<br><br>**DECLARATION OF GARY M. VILKE, M.D. IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT OR IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT**<br><br>*[Filed concurrently w/ Motion for Summary Judgment; Separate Statement; (Proposed) Order and (Proposed) Judgment]*<br><br>**DATE:** March 6, 2023<br>**TIME:** 9:00 a.m.<br>**CRTRM:** 1<br><br>Hon. Jesus G. Bernal<br>United States District Judge |

1

I, GARY M. VILKE, declare as follows:

That I am a Board-Certified emergency department physician with substantial experience in cardiac arrest and sudden death.  I am also an independent researcher on the physiologic effects of TASER devices, neck holds restraint procedures, and positional asphyxiation.  I have attached a true and correct copy of my CV (**Exhibit 29**) to show my qualifications as a medical and research expert in the subject areas which address the drug overdose and death of Ruben Escudero that are referenced in this declaration.  I have personal knowledge of the facts set forth in this declaration and if called to do so could testify competently thereon.

1.     That I have reviewed a number of materials for the subject case involving the death of Ruben Escudero, including the following:

Hospital Records:

- Victor Valley Global
- St. Mary's Medical
- Desert Valley Medical

Interviews, Statements & Recordings:

- Deputy Miranda's belt recording of the incident and Transcript at BS 4934-4953;
- Transcript of Miranda's interview with Det. Ogaz & Craig;
- Transcript of Julian Mata interview with Det. Craig & Moreno;
- Transcript of interview of Deputy Attlesey with Craig & Moreno;
- BS 4696-4701 Transcript of Kautz interview with Martin Alcon (Fire engineer);
- BS 4702-4710 Transcript of Kautz interview with Brett Lever (Fire paramedic);
- BS 4711-1717 Transcript of Kautz interview with Capt. Washington;
- Transcript of Kautz interview with Hernandez & Crummel;
- BS 4718-4718-Transcript of Pritchett interview with Alex Gabler;

2

- BS 4729-4741-Transcript of Pritchett interview with Karla Lugo;
- Recordings of Gabler (AMR paramedic) with Moreno & Steers (prts 1 & 2) and BS 4816-4933
- Transcript of Gabler interview with Detectives Moreno & Steers, parts 1 & 2;
- Recording and Transcript of Capt. Washington interview with Det. Ogaz & Moreno;
- Recording and Transcript of recording of interview of Brett Lever (Fire paramedic) with Det. Moreno & Steers;
- Recording and Transcript of recording of interview of Brett Lever with Ogaz & Moreno;
- Deputy Mata's belt recording transcript

Reports Concerning the Incident:

- Crime Report BS 1-1142;
- BS 3779-3807-City of Victorville Fire Dept. Report;
- CAD;
- AMR -John Doe report

Photos:

- BS 2457-2989-Photos, autopsy and other;
- BS 4954-4983-Pritchett's photos of the Monte Vista house

Autopsy & Death Certificates:

- BS 4984-4985-Death Certificates, pending and corrected
- Dr. Cho Lwin's Neuropathology report of Escudero's brain & spinal cord examination BS 1157-1159
- Dr. Mark Fajardo's Autopsy Protocol report & worksheets, sign-in sheets BS 1143-1156;
- Bio-Tox report, BS 1160-1164

Depositions:

- Deputy Julian Mata (and his revisions/corrections)
- Deputy Jessaqua Attlesey (and her revisions/corrections)

3

- Deputy Tiffany Kautz (and her corrections)
- Deputy Humberto Miranda
- David Crummel
- Dorothy Hernandez
- Dr. Mark Fajardo, forensic pathologist, with EX. 45 and 50
- Dr. Cho Lwin, Neuropathologist
- Dyjuan Washington, Fire Dept. Captain
- Alex Gabler, AMR paramedic

Other Materials:

- Plaintiff's First Amended Complaint
- Dr. Bennett Omalu's (plaintiffs' expert) expert report

2.     That my review of the case materials, included deposition testimony of eyewitnesses and persons involved.  I have been able to use that information and in reviewing the belt recording of the encounter with Escudero and the transcript find the following timeline of events as significant. The times shown are from the belt recording transcript from the time lapsing from the time the deputies arrive at the location:

4:51   PM gave Narcan

6:02   O2 sat 53%

6:19   O2 sat 40%

6:30   FSG 122

6:48   BP 169/108

6:55   Wake up buddy

7:12   Stay down

7:26   Chill out homie

7:31   Chill out

7:39   Who the fuck are you?

7:44   TASER sound

4

7:55   Fighting/TASER sound

8:14   TASER deployment

8:37   Put your hands behind the back

8:41   Want to give versed

8:51   Giving versed right now

11:03  You want some versed on him

11:03  Stop fighting us

11:35  We got it on board

11:51  Code 4 – we have one detained

The timeline shows a number of events including prior to and from the time of providing Narcan and noting Escudero's oxygen levels which now are dangerously low and crashing and then Escudero wakes up with commands given to him to stay down on the ground and to "chill out," at approximately 7 minutes into the belt recording. Notations are made as to when the TASER deployment occurs trying to control Escudero and then the attempt to get his hands behind his back to handcuff him. There is the administration of the first Versed shot and then the second Versed shot. There is a reference that Escudero is still fighting at 11:03 minutes into the recording.

3.    The timeline of the belt recording shows that the actual physical altercation took place over a span of 3+ minutes, but less than four minutes in total. In listening to the belt recording, you can determine that it was a fluid event. Reports noted at this time that Escudero is attempting to get up off the ground and is standing on his knees and is actively moving. As a result, there is absolutely no evidence that any deputy was ever sufficiently upon Mr. Escudero's back or body for any appreciable amount of time to provide a loss of oxygen by positional asphyxiation.

4.    That I am familiar with the use of TASER devices. The TASER had no effect in the subject case for this outcome. The TASER (which is made of hard

5

plastic) was used, but at the time it was activated and discontinued, Escudero was still fighting and resisting. The real issue with Escudero was that at the beginning of the event well before deputies have involvement, his oxygen level was dangerously low and continuing to go lower. The oxygenation level should be at a level of 92% or more. Someone who has an oxygenation level in this case of 53% at (6:02) recording time on the belt recording and then at (6:19) recording time at 40% is consistent with him being in physiologic distress. The lack of oxygen is significant because it effects the amount of oxygen going to Escudero's brain and heart. Ultimately, after Versed was administered by AMR personnel at 8:51 and then again at 11:35 the belt recording shows that Escudero was still struggling and fighting with deputies and first responders. It is only after his departure from the scene in the ambulance and upon his arrival at the hospital ER several minutes later that he had gone into cardiac arrest. Eventually, Escudero's heart was started due to CPR and resuscitative measures at the hospital, but ultimately it was determined that Escudero was "brain dead." The cardiac arrest occurred at or about the time of arrival at the hospital. His overall distress started prior to any involvement of the deputies with him when Escudero's oxygenation levels were showing that he was not receiving sufficient oxygen in his system and was a patient in distress.

5.      There is no evidence that the use of a TASER or the attempts to restrain Escudero and place him into handcuffs resulted in any type of positional asphyxiation. This is not borne out by the tape-recording which documents Escudero's continuous fighting up to the time that the second Versed shot is administered.

6.      Positional asphyxiation is basically the placement of bodyweight or some type of weight upon a person for a sufficient period of time such that the person is no longer able to breathe and goes into cardiac arrest. The belt recording defies that this event ever occurred. The recording documents continuous

6

resistance by Escudero with deputies up to the time of the second Versed shot. There is a reference to the use of a chin restraint by Deputy Mata. This likewise had no effect on the outcome because it was used for a short duration of time and the suspect continued to fight well after that event occurred as deputies tried to get the patient to the ground and under control to secure him for transport to the hospital. There is no indication that Escudero's breathing was affected by Mata's use of the chin restraint. It was very brief, Escudero does not choke as a result, and he continues to resist and struggle with the deputies during and after, as described in the statement transcripts and depositions.

7. The medical examiner determined that Escudero had a type 2 myocardial infarction (heart attack) which resulted in a cardiac arrest (heart not pumping blood) which means that at some point in time, his brain was not receiving any oxygen causing injury that caused the brain to swell. This was evident in the neuropathology examination that was performed by Dr. Lwin who documented swelling of the brain which was consistent with a heart attack which stopped blood flow to the brain of Escudero. That further, Escudero's heart was more than twice the size of a normal heart, which would also increase his risk of him having a sudden cardiac arrest, especially in light of the drugs (methamphetamine) on board his person for which the original call was concerned and his physical struggle in which he engaged the deputies. Methamphetamine is a cardiac irritant, which can cause a cardiac arrest as well.

I declare under penalty of perjury under the laws of the State of California and the United States of America, that the foregoing is true and correct.

Executed this 20 day of January 2023 in SAN DIEGO, California, United States of America.

GARY M. VILKE, M.D., Declarant

7

EXHIBIT "29"

*CURRICULUM VITAE*

*GARY MICHAEL VILKE, M.D., FACEP, FAAEM*

HOME ADDRESS:

11582 Normanton Way
San Diego, CA  92131
Phone: (619) 666-8643

OFFICE ADDRESS:

Department of Emergency Medicine
UCSD Medical Center
200 W. Arbor Drive
San Diego, CA  92103-8676
Phone:  (619) 543-6210
Fax:     (619) 543-3115
E-mail: gmvilke@ucsd.edu

PERSONAL:    Born September 12, 1966 in Cleveland, Ohio

EDUCATION:

| | |
|---|---|
| Academic:<br>  1983-88 | B.S. in Zoology, University of California, Berkeley<br>Berkeley, California |
| Medical School:<br>  1988-92 | M.D., University of California, San Diego School of Medicine<br>La Jolla, California |
| Internship:<br>  1992-93 | Department of Surgery<br>University of California, San Diego Medical Center<br>San Diego, California |
| Residency:<br>  1993-96 | Department of Emergency Medicine<br>University of California, San Diego Medical Center<br>San Diego, California   (Chief Resident: 1995-96) |
| Physician Leadership<br>Academy:<br>  2007-09 | University of California, San Diego Medical Center<br>San Diego, California |

LICENSURE:   California Medical License Number G-78057

BOARD CERTIFICATIONS:

National Board of Medical Examiners, 1993

American Board of Emergency Medicine, 1997, renewed 2007 and 2017

Curriculum Vitae
Gary M. Vilke, M.D., FACEP, FAAEM

APPOINTMENTS:

| | |
|---|---|
| 9/11 - Present | Professor of Clinical Emergency Medicine and Medicine, University of California, San Diego (UCSD) School of Medicine |
| 12/20–Present | Emergency Medicine Medical Staff Service Chief |
| 7/19-Present | Medical Director, North County Dispatch Joint Powers Authority |
| 1/17-Present | Vice-Chair of Clinical Operations, UC San Diego Department of Emergency Medicine |
| 2/14- Present | Assistant Director, Division of Emergency Medical Services (EMS)/Disaster Medicine, UCSD Medical Center, Department of Emergency Medicine |
| 7/12 – Present | Medical Director, Risk Management, UC San Diego Health System |
| 7/94 - Present | Base Hospital Physician, University of California Medical Center |

Curriculum Vitae
Gary M. Vilke, M.D., FACEP, FAAEM

PREVIOUS  EXPERIENCE/APPOINTMENTS:

| | |
|---|---|
| 4/21-8/21 | Interim Medical Director, California State Department of Parks and Recreation |
| 1/13 – 6/19 | Medical Director, Carlsbad Fire Department |
| 10/09 – 6/19 | UCSD Department of Emergency Medicine Clinical Research Scholar Fellowship Director |
| 10/15 – 5/19 | Medical Director, AirLinkUSA Air Ambulance Service |
| 1/18-7/18 | Medical Director, Chula Vista Fire Department |
| 2/06 – 6/18 | Director, Division of Clinical Research, UCSD Medical Center, Department of Emergency Medicine |
| 1/16 – 6/18 | Co-Medical Director, Department of Emergency Medicine, UCSD Medical Center |
| 9/15- 9/17 | Staff Physician, El Centro Regional Medical Center Department of Emergency Medicine |
| 6/12 – 6/17 | Associate Director, Department of Emergency Medicine Behavioral Emergencies Research (DEMBER) Lab |
| 1/16 – 1/17 | Emergency Medicine Clinical Service Chief, UC San Diego Health System |
| 4/07 – 12/16 | Medical Director of the American Heart Association Training Center at the UCSD Center for Resuscitation Science |
| 7/96 – 12/15 | Assistant Director, Department of Emergency Medicine, UCSD Medical Center |
| 7/13 – 9/15 | Chief, Division of Custody Medicine, UCSD Medical Center, Department of Emergency Medicine |
| 4/99 – 9/15 | Director, Custody Services, UCSD Medical Center (Co-Director 1999-2013) |
| 3/13 – 9/15 | Medical Director, AviaMedix Air Ambulance Service |
| 10/11- 2/14 | Chief, Division of Emergency Medical Services (EMS)/Disaster Medicine, UCSD Medical Center, Department of Emergency Medicine |
| 4/12 – 3/13 | Medical Director, Aeromedevac Air Ambulance Service |
| 7/09 – 6/12 | Chief of Staff, UCSD Medical Center |

- 3 -

Curriculum Vitae
Gary M. Vilke, M.D., FACEP, FAAEM

## PREVIOUS  EXPERIENCE/APPOINTMENTS (cont.):

| | |
|---|---|
| 7/07 - 6/09 | Vice Chief of Staff UCSD Medical Center |
| 7/04 – 6/09 | EMS/Disaster Medicine Fellowship Director, Department of Emergency Medicine. |
| 3/02 - 2/06 | Medical Director, San Diego County Emergency Medical Services |
| 3/03 - 12/05 | Medical Consultant, San Diego Chapter Red Cross Disaster Health Services |
| 6/04 - 2/05 | Interim Chief, San Diego County Emergency Medical Services |
| 1/01 - 2/04 | Medical Director, Southwestern College Paramedic Training Program |
| 7/00 - 2/04 | Medical Director, Palomar College Paramedic Training Program |
| 7/97 - 1/03 | Director, Prehospital Services, UCSD Medical Center |
| 6/97 - 1/03 | Medical Director, Paramedic Base Hospital, UCSD Medical Center |
| 7/96 - 1/03 | Medical Director, Mercy Air Medical Transport Service, San Diego, California |
| 4/99 - 3/01 | Medical Co-Director, San Diego Central Jail Medical Services |
| 1/96 - 7/96 | Flight Physician, Mercy Air Medical Transport Service, San Diego, California |
| 7/95 - 7/96 | Associated Emergency Physicians Medical Group, San Diego, California |
| 12/94 - 7/96 | Kaiser Permanente Emergency Department, San Diego, California |
| 10/94 - 7/96 | Med America Health Resource Company, San Diego, California |
| 4/94 - 7/95 | Sharp-Rees-Stealy Urgent Care, San Diego, California |
| 7/93 - 12/95 | Flight Physician, Life Flight Air Medical Transport Service |

## PREVIOUS ACADEMIC APPOINTMENTS

| | |
|---|---|
| 7/05 – 9/11 | Professor of Clinical Medicine, UCSD School of Medicine |
| 7/01 - 6/05 | Associate Professor of Clinical Medicine, UCSD School of Medicine |
| 7/96 - 6/01 | Assistant Clinical Professor of Medicine, UCSD School of Medicine |

Curriculum Vitae
Gary M. Vilke, M.D., FACEP, FAAEM

HONORS AND AWARDS:

| | |
|---|---|
| 1990 | Random House Medical Student Award |
| 1996 | American College of Emergency Physicians, California Chapter Challenge Bowl Winner |
| 1996 | Council of Residency Directors (CORD) Resident Academic Achievement Award |
| 1996 | Outstanding Emergency Medicine Resident |
| 1996 | UCSD Emergency Department Staff Support Award |
| 1996 | *Journal of Emergency Medicine* Outstanding Contribution Award |
| 1999 | "Golden Apple" Teaching Award, UCSD Emergency Medicine Residency Graduating Class of 1999 |
| 2000 | Faculty of the Year, UCSD Emergency Medicine Residency Graduating Class of 2000 |
| 2000 | Best Research Poster Presentation, California Chapter of the American College of Emergency Physicians (CAL/ACEP) Scientific Assembly, Dana Point, California |
| 2000 | Outstanding Scientific Abstract, State of California EMS Authority Annual Emergency Medical Services for Children Conference, San Diego, California, November 2000 |
| 2001 | Best Oral Presentation, CAL/ACEP Scientific Assembly, Santa Clara, California |
| 2004 | Academy of Clinician Scholars, University of California San Diego |
| 2004 | Top Doctor in San Diego County, San Diego Magazine |
| 2004 | Top Peer Reviewer, *Annals of Emergency Medicine* |
| 2005 | Top Doctor in San Diego County, San Diego Magazine |
| 2005 | Clinical Investigation Institute, University of California San Diego |
| 2006 | Top Doctor in San Diego County, San Diego Magazine |
| 2007 | Finalist San Diego Business Journal Health Care Champion Award |
| 2007 | Top Doctor in San Diego County, San Diego Magazine |
| 2007 | Top Peer Reviewer, *Annals of Emergency Medicine* |
| 2008 | Top Doctor in San Diego County, San Diego Magazine |
| 2008 | UCSD Undergraduate Campus Outstanding Faculty Mentor of the Year |
| 2009 | Clinical and Translational Research Institute, Charter member |
| 2009 | Top Doctor in San Diego County, San Diego Magazine |
| 2010 | Top Doctor in San Diego County, San Diego Magazine |
| 2011 | Top Doctor in San Diego County, San Diego Magazine |

Curriculum Vitae
Gary M. Vilke, M.D., FACEP, FAAEM

HONORS AND AWARDS, continued:

2012 Top Doctor in San Diego County, San Diego Magazine

2013 Top Doctor in San Diego County, San Diego Magazine

2014 Top Doctor in San Diego County, San Diego Magazine

2015 "25 Emergency Medicine & EMS Professors You Should Know" From Medical Technology Schools at: http://www.medicaltechnologyschools.com/emt/emergency-medicine-ems-professors-to-know

2018 Top Doctor in San Diego County, San Diego Magazine

2019 Top Doctor in San Diego County, San Diego Magazine

PROFESSIONAL SOCIETY MEMBERSHIPS:

American Medical Association, 1988-97

California Alumni Association, 1988

American College of Emergency Physicians, 1991

Fellow, American College of Emergency Physicians, 2000

California Chapter of the American College of Emergency Physicians, 1991

Society for Academic Emergency Medicine, 1995

Society for Academic Emergency Medicine, EMS Interest Group, 2019

National Association of EMS Physicians, 1998

Fellow, American Academy of Emergency Medicine, 2000

California Chapter of the American Academy of Emergency Medicine, 2000

American Association of University Professors, 2002

California Conference of the American Association of University Professors, 2002

San Diego Faculty Association, 2002

San Diego County Medical Society, 2003

American Association of Emergency Psychiatry, 2014-2017

California Chapter National Association of EMS Physicians, 2021

Curriculum Vitae
Gary M. Vilke, M.D., FACEP, FAAEM

PATENTS:

# WO 2010/011976 A2: Medication Delivery Devices Having Penetrable Sterility Barriers and Alignment Features (January 28, 2010)

# WO 2010/011976 A2: Medication Delivery Devices Having Penetrable Sterility Barriers and Alignment Features (January 28, 2010)

# US 2010/011966 A2: Medication Delivery System (January 28, 2010)

# US 2010/0022987 A1: Medication Delivery System (January 28, 2010)

# US 61476836 Medication Delivery Apparatus (April 19, 2011)

Content Expert

Reviewer, Practical Summaries in Acute Care, Thomson American Health Consultants, 2006

Expert Editorial Advisor, *Managing the Ankylosing Spondylitis Patient in an Emergency Setting for the* Spondylitis Association of America (SAA).  2008

Content Expert for Cable News Network (CNN), 2009

Content Expert for ABC News, 2011

Journals

Editor-in-Chief, *Journal of Emergency Medicine Reports*, Elsevier Science, Inc., 2022

Editor-in-Chief, *Advances in Legal Medicine*, Longdom Publishing, 2014-2015.

Senior Associate Editor/Editorial Board, *Journal of Emergency Medicine*, Elsevier Science, Inc., 2013 (Associate Editor since 2007, Editorial board since 2000; reviewer since 1994)

Editorial Board, *Prehospital Emergency Care,* Taylor & Francis Group, 2006 (Reviewer since 2004)

Editorial Board, *Journal of Forensic and Legal Medicine*, Elsevier Science, Inc. 2012 (Reviewer since 2011)

Editorial Board, *Emergency Medicine and Healthcare*, Herbert Publications, 2013

Editorial Board, *Saudi Journal of Emergency Medicine*, 2019

Senior Reviewer, *Annals of Emergency Medicine*, Mosby, 2007 (Reviewer since 1998)

Curriculum Vitae
Gary M. Vilke, M.D., FACEP, FAAEM

Journals (cont.)

Reviewer, *European Journal of Epidemiology*, Kluwer Academic Publishers, 1996-97

Reviewer, *Western Journal of Emergency Medicine*, 2001

Reviewer, *American Journal of Emergency Medicine*, Elsevier Science, Inc., 2005

Reviewer, *Emergency Medicine Journal*, BMA House, 2006

Reviewer, *Forensic Science International*, 2007

Reviewer, *California Journal of Emergency Medicine*, 2007

Reviewer, *Journal of the American Medical Association (JAMA)*, 2009

Reviewer, *BioMedical Engineering OnLine*, 2009

Reviewer, *Bioelectromagnetics*, 2010

Reviewer, *Forensic Science, Medicine and Pathology*, 2010

Reviewer, *Psychology Research and Behavior Management*, 2010

Reviewer, *Academic Emergency Medicine*, 2010

Reviewer, *Medicina*, 2012

Reviewer, *Injury Prevention*, 2013

Reviewer, *Therapeutics and Clinical Risk Management*, 2013

Reviewer, *Pediatrics,* 2013

Reviewer, *Journal of Forensic Toxicology and Pharmacology*, 2014

Reviewer, *Journal of Injury and Violence Research*, 2014

Reviewer, *International Journal of Molecular Sciences*, 2015

Reviewer, *Emergency Medicine International,* 2015

Reviewer, *Policing: A Journal of Policy and Practice,* 2016

Reviewer, *International Journal of Law and Psychiatry,* 2017

Reviewer, *Journal of Correctional Health Care*, 2019

Reviewer, *Clinical Toxicology,* 2019

Reviewer, *Medicine, Science and the Law*, 2019

Reviewer, *International Journal of Legal Medicine,* 2019

Curriculum Vitae
Gary M. Vilke, M.D., FACEP, FAAEM

CURRENT UCSD COMMITTEE MEMBERSHIPS:

   Research Committee, Department of Emergency Medicine, 1997

   UCSD Faculty Association, 2002

   Quality Improvement/Peer Review Committee, Department of Emergency Medicine, 1999

   UCSD Academy of Clinician Scholars Executive Committee, 2005

   UCSD Medical Staff Executive Committee, 2007

   Chair, UCSD Medical Risk Management Committee, 2012

   Chair, UCSD Allocation Committee, 2012

   UCSD Significant Events Committee, 2012

   Co-Chair, UCSD/Rady Children's Joint Risk Management Committee (JRMC), 2013

   UCSD Patient Experience Executive Committee, 2013

   UCSD Faculty Leadership Group, 2014

   Patient Advocacy Reporting System (PARS) Oversight Team, 2014

   UCSD Leadership Council, 2015

   UCSD Department of Emergency Medicine Clinical Operations Committee, 2016

   UCSD Department of Emergency Medicine Executive Committee, 2016

   UCSD Department of Emergency Medicine Management Committee, 2016

   UCSD Department of Emergency Medicine/Psychiatric Committee, 2016

   UCSD Hillcrest Emergency Department Patient Flow Task Force, 2016

   UCSD Health System Patient Grievance Review Committee, 2016

   UCSD Threat Assessment Management Committee, 2016

   UCSD Department of Emergency Faculty Search Committee 2018

   UCSD Medical Staff Professionalism Committee, 2019

   UCSD Academic Assembly alternative representative, 2019

   UCSD Ligature Prevention Task Force, 2019

   UCSD Emergency Medicine Workplace Violence Initiative Committee, 2019

   UCSD Urgent Care Leadership Committee, 2019

   UCSD Department of Emergency Medicine Staff Research Associate Interview Committee, 2019

   UCSD Department of Emergency Medicine Residency Interview Committee, 2019

   UCSD Flu Capacity Task Force, 2019

   UCSD Urgent Care Pharmacy Committee, 2020

   UCSD Health Novel Coronavirus Planning and Response Workgroup, 2020

   UCSD Emergency Department and Security Safety Committee, 2020

Curriculum Vitae
Gary M. Vilke, M.D., FACEP, FAAEM

CURRENT UCSD COMMITTEE MEMBERSHIPS:

    UCSD Emergency Department Security Committee, 2020

    High Utilizers of Emergency Services Committee, 2020


CURRENT COMMITTEE MEMBERSHIPS:

    San Diego County Base Station Physicians' Committee, Chair 2021

    American Academy of Emergency Physicians, Clinical Practice Committee, 2011

    San Diego County Base Station Physicians' Committee, 2013

    San Diego County Prehospital Audit Committee, 2013

    EMS Directors Association of California, 2019

    San Diego County North Zone EMS Committee, 2019

    San Diego County Health Services Capacity Task Force, 2019

    San Diego County EMS Protocol Task Force, 2019

    Oceanside Fire Department CQI Committee, 2019

    San Diego North Zone Dispatch Protocol Task Force, 2019

    San Diego County Fire Chief Association, EMS Section, 2019

    San Diego Health Connect, EMS Workgroup, 2019

    San Marcos Fire Department EQIP Committee, 2021

Curriculum Vitae
Gary M. Vilke, M.D., FACEP, FAAEM

PREVIOUS UCSD COMMITTEE MEMBERSHIPS:

UCSD Department of Emergency Medicine Academic Affairs Committee, 2013-15

President, UCSD Academy of Clinician Scholars, 2013-15

UCSD Board of Governor's Committee, 2013-15

UCSD Academic Senate Representative Assembly, Alternate, 2011-13

UCSD Sheriff Managed Care Oversight Committee

Ladder Rank Recruitment Committee, UCSD Department of Emergency Medicine, 2013

UCSD Medical Staff Bylaws Work Group, 2014

Chair, Emergency Department Staffing Committee of Process Action Team, 1994-95

Hospital Infection Control Committee, 1994-95

Emergency Medicine Housestaff Association Representative, 1994-96

Emergency Department Clinical Practices Committee, 1994-96

Emergency Department Peer Review/Quality Assurance Committee, 1995-96

Emergency Department Critical Care Room Process Action Team, 1996

Paramedic/Emergency Department Interface Task Force, 1998-99

Emergency Department Staffing Committee, Department of Emergency Medicine, 1999

Credentials Committee, 1997-2000

Faculty Search Committee, Department of Emergency Medicine, 1999, 2000, 2002

Medical Director's Group, 1997-2002

Patient Care Review Committee, 2003

Medical Risk Management Committee, 2002-07

Patient Improvement and Outcome Committee, 2003-05

Medical Staff Executive Committee Reorganization Ad Hoc Committee, 2005-2006

UCSD Phasing Strategy Ad Hoc Committee, 2005-06

Clinical Representative, Trauma Quality Assurance Program, 1998-2006

Vice Chief of Staff, UCSD Medical Center, 2007-2009

UCSD/San Diego Sheriff Security Working Group, 2003-10

Chief of Staff, UCSD Medical Center, 2009-2012

Vice-Chair, Quality Council Committee, 2009-2012 (member since 2003)

Chair, Medical Staff Executive Committee, 2009-2012

UCSD Governance Advisory Committee, 2009-2012

Curriculum Vitae
Gary M. Vilke, M.D., FACEP, FAAEM

PREVIOUS UCSD COMMITTEE MEMBERSHIPS, continued:

UCSD Department of Medicine Clinical Operations Redesign Enterprise (CORE) Initiative Team, 2009-2012

Director of Risk Management Selection Committee, 2007

Chair, Medical Risk Management Committee, 2003-07 (member since 2002)

Medical Risk Management Executive Committee, 2003-07

UCSD Medical Center Allocation Committee 2005-07

Patient Safety Committee, 2003-07

Vice Chair, Medical Staff Executive Committee, 2007-09

Chair, Patient Care and Peer Review Committee, 2007-09 (member since 2005)

Trauma Multidisciplinary Committee, 2000-09

Department of Medicine Committee on Advancement and Promotions (DOMCAP), 2007-09

Vice Chair, Quality Council Committee, 2009-2012

UCSD Medical Center Syncope Task Force, 2010-11

LIFESHARING, A Donate Life Organization Advisory Board, 2010-2014

UCSD Director of Risk Management Selection Committee, 2012

Secretary-Treasurer, UCSD Academy of Clinician Scholars, 2005-12

UCSD Root Cause Analysis Committee, 2013

UCSD Department of Emergency Medicine Chair Selection Committee, 2012-13

UCSD Department of Emergency Medicine Faculty Coverage Committee, 2012-13

UCSD Integrated Delivery Network Design Team, 2012-13

UCSD Department of Emergency Medicine Patient Satisfaction Committee, 2012-13

UCSD Department of Emergency Medicine Faculty Search Committee, 2013-14

Rady Children's Root Cause Analysis Committee, Ad hoc, 2012-15

Rady Children's Emergency Department Faculty Search Committee, 2015-16

UCSD Medical Staff Bylaws Committee, 2018-20

Curriculum Vitae
Gary M. Vilke, M.D., FACEP, FAAEM

PREVIOUS MEMBERSHIPS/ACTIVITIES:

Vice-President, California Chapter of Emergency Medicine Residents Association, 1994-95

Editor-in-Chief, California Chapter of Emergency Medicine Residents Association Newsletter, 1994-95

Co-Director, School of Medicine 225: Introduction to Emergency Medicine, UCSD School of Medicine, 1994-95

Strike Team Leader, DMAT Olympics 1996 Biological & Chemical Antiterrorist Medical Support

Director, Mercy Air Medical Transport Services Continuing Clinical Education, 1996-2003

Member, San Diego County 911 Dispatch Quality Review Board, 1997-98

Co-Director, University of California, San Diego School of Medicine, Course SOM 224I, 1997-2002

Pediatric Advanced Life Support Course Director, 1997-2002

Editor-in-Chief, UCSD Medical Center EMS Run Review, 1997-2003

Sponsor, Palomar College Emergency Medical Education Department Paramedic Training, 1997-2003

Medical Support Physician, Super Bowl XXXII, San Diego, California, January 25, 1998

Medical Support Physician, Suzuki Rock-n-Roll Marathon, San Diego, California, June 21, 1998

Marketing Director, California Chapter of the American College of Emergency Physicians (CAL/ACEP) Scientific Assembly, 1998-99

Member, Program Committee, CAL/ACEP Scientific Assembly, 1998-99

Howard Hughes Foundation Undergraduate Preceptor, 1998, 1999

Co-editor, Pearls from PAC Newsletter, 1998-2000

Preceptor, Introduction to Clinical Medicine 201-B, UCSD School of Medicine, 1999

EMS Team Leader, San Diego County Metropolitan Medical Strike Team, 1999

Co-Chair, Program Committee, CAL/ACEP Scientific Assembly, 1999-2000 and 2000-01

Member, San Diego County Bio-Terrorism Planning Group, 1999-2003

Moderator, EMS Poster Section, Western Regional Society for Academic Emergency Medicine Conference, Portland, Oregon, April 2000

Preceptor, California State University Dominguez Hills Statewide Nursing Program, 2000

Affiliate Faculty, Southwestern College Paramedic Training Program, 2000-03

Curriculum Vitae
Gary M. Vilke, M.D., FACEP, FAAEM

PREVIOUS MEMBERSHIPS/ACTIVITIES, continued:

Medical Director, EPIC "Eliminate Preventable Injuries of Children" Medics, San Diego County, 2000-03

San Diego Port District AED (Automated External Defibrillator) Program RPF Panel, 2001

Peer Reviewer, *Pediatric Emergency Medicine Reports*, 2001

Reviewer, Scientific Abstract Presentations, CAL/ACEP Scientific Assembly, 2001-02

Member, Board of Directors, CAL/ACEP, 2001-03

Moderator, Western Regional SAEM Research Presentations, San Diego, California, April 2002

Clinical Coordinator, Southwestern College Emergency Medical Technician Program, 2001-03

Santa Clara County/Regional Medical Center Trauma Designation Review Committee, 2004

San Diego County Health Services Capacity Issues Task Force, 2002-06

San Diego Regional Safety Consortium Inter-facility Transfer Protocol Task Force, 2004-06

San Diego Regional Fire Prevention Emergency Preparedness Task Force, 2004-2006

San Diego County Task Force on Fire Prevention, 2004-06

President-Elect, EMS Medical Director's Association of California, 2005-06

Medical Director, San Diego County Metropolitan Medical Strike Team, 1998-2008

American College of Emergency Physicians (ACEP) Task Force on Excited Delirium Syndrome 2009-10

Objective Structured Clinical Examiner, UCSD School of Medicine, 1997-10

Evaluator, UCSD Physician Assessment and Clinical Evaluation (PACE) Program, 2000-06

Tactical EMS Care Provider for San Diego Sheriff's Special Enforcement Detail (SED), 2007-10

San Diego State Pre-Med Preceptor, SDSU, 2008-13

Phi Delta Epsilon Faculty Mentor, UCSD, 2008-12

National Institute of Justice Task Force on Excited Delirium, 2011

Member, Disaster Medical Assistance Team (CA-4), 1994-2011

Operations Committee, San Diego County Metropolitan Medical Strike Team, 1998-2010

Physician Member, San Diego County Metropolitan Medical Strike Team, 1998-07

Curriculum Vitae
Gary M. Vilke, M.D., FACEP, FAAEM

PREVIOUS COMMITTEE MEMBERSHIPS:

Practice Management Committee, CAL/ACEP, 1994-95

Committee on Prehospital Stroke Triage, San Diego County Medical Society, 1998

Research Subcommittee, San Diego County Prehospital Audit Committee, 1997-99

Prehospital RSI Task Force, San Diego County Prehospital Audit Committee, 1997-99

Chair, San Diego County Prehospital Audit Committee, 1998-2000

San Diego County Pediatric CPR Task Force, 1999-2000

San Diego Sheriff's Source Selection Committee, 2000

Steering Committee, San Diego County Metropolitan Medical Strike Team, 1998-2001

Program Committee, CAL/ACEP Scientific Assembly, 1998-2001 (Co-Chair for 1999-2001)

Awards Committee, CAL/ACEP Scientific Assembly, 1999-2001

EMS Committee, San Diego County Metropolitan Medical Strike Team, 1999-2001

San Diego Metropolitan Medical Response System Bio-Terrorism Planning Group, 1999-2001

San Diego County EMS QA Net Prehospital Design Steering Committee, 2000-01

Chair, CPR Subcommittee, San Diego County Prehospital Audit Committee, 1998-2002

San Diego County SIPs (Serial Inebriate Program) Task Force, 2000-02

Task Force Leader, CAL/ACEP Scientific Assembly, 2001-02

Chair, Training Committee, San Diego County Metropolitan Medical Strike Team, 2001-02

Co-Chair, EMS Committee, CAL/ACEP, 2001-02

Policy Committee, CAL/ACEP, 2001-02

Chair, Research Subcommittee, San Diego County Prehospital Audit Committee, 2000-02

Governmental Affairs Committee, CAL/ACEP, 2001-02

Didactic Subcommittee, SAEM Program Committee, 2001-02

Program Mgmt Committee, San Diego County Metropolitan Medical Strike Team, 2001-03

Air Medical Transport Section, American College of Emergency Physicians, 2001-03

San Diego County Sheriff's Mortality Review Committee, 2001-03

San Diego County Sheriff's Pharmacy and Therapeutics Committee, 2001-03

City of San Diego EMS Physicians' Advisory Committee, 1998-2006

City of San Diego Prehospital Cardiac Advisory Committee, 1998-2006

Education Committee, CAL/ACEP, 2000-03

SAEM EMS Interest Group, 2001-2006 (Co-chair 2003-04)

Curriculum Vitae
Gary M. Vilke, M.D., FACEP, FAAEM

PREVIOUS COMMITTEE MEMBERSHIPS, continued:

San Diego County EMS for Children (EMSC) Advisory Committee, 2002-05

Scientific Subcommittee, SAEM Program Committee, 2002-05

Police Executive Research Forum Task Force on Conductive Energy Weapons Use, 2005

San Diego County EMS for Children (EMSC) Advisory Committee, 2002-05

Scientific Subcommittee, SAEM Program Committee, 2002-05

Member-at-large, EMDAC Officer Board, 2004-05

San Diego County Fire Chief's Association, 2004-06

San Diego County Sheriff's Helicopter Program Ad Hoc Advisory Committee, 2004-06

Chair, San Diego County HRSA Work Group, 2004-06

San Diego County Regional Helicopter Advisory Committee, 2004-06

San Diego County HRSA Executive Steering Committee, 2004-06

San Diego County Critical Care Transport Working Group, 2005-06

San Diego County Prehospital Patient Record IT Steering Committee, 2005-06

San Diego County Cardiac Advisory Committee, 2005-06

San Diego County Stroke Advisory Committee, 2005-06

San Diego County Emergency Medical Care Committee, 2006

Co-Chair, San Diego County Medical Society EMS Medical Oversight Committee, 2002-2006

Chair, EMS Committee, American Academy of Emergency Medicine California Chapter, 2000-06

EMS Medical Director's Association of California, 2002-06

San Diego County Trauma Administrators Committee, 2002-06

Chair, San Diego County EMS Research Committee, 2002-06

Chair, San Diego County Paramedic Protocol Revision Committee, 2002-06

San Diego County Public Health Services Physicians Group, 2003-06

SAEM EMS Interest Group, 2001-2006 (Co-chair 2003-04)

San Diego County Healthcare Advisory Committee on Terrorism, 2003-06

San Diego County Paramedic Training Joint Advisory Committee, 2000-06

San Diego County Public Health Preparedness Team, 2001-06

EMS Section, American College of Emergency Physicians, 2001-06

Chair, San Diego County Aeromedical Protocol Committee, 1998-2006

San Diego County Committee on Pediatric Emergency Medicine, 1998-2006

Curriculum Vitae
Gary M. Vilke, M.D., FACEP, FAAEM

PREVIOUS COMMITTEE MEMBERSHIPS, continued:

San Diego County Base Hospital Physicians Committee, 1997-2006

San Diego County Trauma Audit Committee, 1997-2006

San Diego County Prehospital Audit Committee, 1997-2006

EMS Medical Director's Association of California, 2002-06

SAEM Program Committee, 2001-2007

Chair, Photography Subcommittee, SAEM Program Committee, 2002-2007

Training Committee, San Diego County Metropolitan Medical Strike Team, 2001-09

San Diego BEACON/EMS Hub Technical Committee, 2012-13

San Diego Central Jail Quality Assurance Committee, 1999-2013

San Diego Central Jail Medical Oversight Committee, 1999-2013

Resuscitative Outcomes Consortium (ROC) Executive Committee, 2014-15

Resuscitative Outcomes Consortium (ROC) EMS Operations Committee, 2014-15

Resuscitative Outcomes Consortium (ROC) Management Committee, 2014-15

Resuscitative Outcomes Consortium (ROC) Hospital Practices Cardiac Committee, 2014-15

Resuscitative Outcomes Consortium (ROC) Publications Committee, 2014-15

Resuscitative Outcomes Consortium (ROC) Cardiac Committee, 2014-15

Resuscitative Outcomes Consortium (ROC) Trauma Committee, 2014-15

Carlsbad Fire Department EMS Oversight Committee, 2013-17

Curriculum Vitae
Gary M. Vilke, M.D., FACEP, FAAEM

CURRENT FUNDED RESEARCH:

1. Co-Investigator with Chris Coyne for study entitled, "FOCUS program (On the Frontlines of Communities in the United States): Routine Screening for HCV Infection at the UCSD Hillcrest and Thornton Emergency Departments". Funded by Gilead, 2018-present. Amount: $306,770.

2. Principal Investigator for study entitled, "A hospital-based retrospective chart review to assess the management of acute agitation in adult patients with schizophrenia and related disorders, and bipolar disorder presenting to the emergency department (ED) in the US." Funded by BioXcel, 2021-present.  Amount: $58,151.15.

3. Co-Investigator with Chris Coyne for study entitled, "HIGH NOTE: High Sensitivity Near Patient Cardiac Troponin." Funded by Quidel.  2021-present.  Amount: pending

Curriculum Vitae
Gary M. Vilke, M.D., FACEP, FAAEM

PREVIOUS FUNDED RESEARCH:

1.  Co-Investigator with Tom Neuman (PI) for evaluation of positional asphyxia in the hobble restraint position, funded by the County of San Diego, 1995--$33,900

2.  Co-Investigator, with Theodore Chan (PI), for evaluation of the Melker percutaneous cricothyrotomy kit in human cadavers, funded by Cook Medical Products, 1997--$10,000

3.  Co-Investigator with John Eisele (PI) for the evaluation of positional asphyxia in the hobble restraint position with weight on subjects' backs, funded by the American Academy of Forensic Sciences, 1998--$2,500

4.  Co-Investigator, with Theodore Chan (PI), for study entitled, "The Impact of Oleoresin Capsicum Spray on Respiratory Function in Human Subjects in the Sitting and Prone Maximal Restraint Positions." Study funded by the National Institute of Justice, U.S. Department of Justice, 1998-99.  UCSD No. 98-7107; USDOJ Federal Award #98-IJ-CX-0079.  Amount: $128,176

5.  Principle Investigator (PI) for study entitled "Evaluation of Hurricaine anesthetic in patients with dyspepsia" funded by Beutlich Pharmaceuticals for, 2001.  Amount: $1,500

6.  Co-Investigator, with Theodore Chan (PI), for evaluation of the Melker percutaneous cricothyrotomy kit in human cadavers, funded by Cook Medical Products, 2003.  Amount: $12,000

7.  Co-Investigator, with David Hoyt (PI) for the Resuscitation Outcomes Consortium: UCSD / San Diego Resuscitation Research Center, funded by the NIH, 9/1/04 to 6/30/09.  UO1 HL077908.  Amount: $2,250,522

8.  Co-Principal Investigator (Co-PI), with Theodore Chan, for study entitled, "The effect of Taser on Cardiac, Respiratory and Metabolic Physiology in Human Subjects." Study funded by the National Institute of Justice, U.S. Department of Justice, 10/1/2005 to 9/30/2007.  UCSD No. 2006-0846; USDOJ Federal Award #98-IJ-CX-0079.  Amount: $213,941.4

9.  Co-Investigator, with Daniel Davis (PI) for the study entitled, "ROC Interventional Trials: Hypertonic Resuscitation for Traumatic Injury, Trauma Epistry, PRIMED", funded by the NIH, 7/1/06 to 6/30/08. UO1 HL077863. Amount:  $331,320

10.  Co-Investigator, with Daniel Davis (PI) for the, "ROC Cardiac Epistry", funded by the AHA, 7/1/06 to 6/30/08. Amount:  $133,427

11.  Co-Investigator, with Theodore Chan (PI) for study entitled, "Multi-Center Study of the Impact of Nurse-Patient Ratios on Emergency Department Overcrowding." funded by the Emergency Medicine Foundation, 7/1/07 to 6/30/08.  Amount:  $50,000

12.  Principal Investigator (PI) for study entitled, "Evaluation of the Ventilatory and Respiratory Effects of a Restraint Chair on Human Subjects."  Funded by the Institute for the Prevention of In-Custody Deaths, Inc, 1/1/07 to 12/31/07.  Amount:  $11,658

Curriculum Vitae
Gary M. Vilke, M.D., FACEP, FAAEM

PREVIOUS FUNDED RESEARCH (cont):

13.  Co-Investigator, with Edward Castillo (PI) for study entitled, "California ED Diversion Project Evaluation." funded by the California Healthcare Foundation, 5/15/08 to 10/15/08.  Amount: $50,990

14.  Principal Investigator (PI) for study entitled, "Ventilatory Effects of Prone Restraint on Obese Human Subjects." Funded by the Institute for the Prevention of In-Custody Deaths, Inc, 1/1/09 to 12/31/09. Amount:  $13,423

15.  Principal Investigator (PI) for study entitled, "FAST TRAC: Finding ACS with Serial Troponin Testing for Rapid Assessment." Funded by the Nanosphere, Inc. 2/1/09 to 2/1/11.   Amount:  $85,000

16.  Principal Investigator (PI) for study entitled, "CHOPIN: Copentin Helps in the Early Detection of Patients with Acute Myocardial Infarction." Funded by Brahms AG, 8/1/09 to 8/1/12.   Amount: $103,950

17.  Co-Investigator, with Christine Hall for the study titled, "RESTRAINT - Risk of dEath in Subjects That Resisted: Assessment of Incidence and Nature of faTal events", funded by the Vancouver Island Health Authority. 7/1/09 to 6/30/11. Amount $50,000

18.  Co-Investigator for study titled "STAT MERCURY: Studying the Treatment of Acute HyperTension: A Multicenter EmeRgency Department Clevidipine Utilization RestrY" funded by the Medicines Company, 7/27/10 to 11/1/11. Amount $1400

19.  Co-Investigator for study titled "A Phase II, Randomized, Double-blind, Placebo-controlled Study to Evaluate the Safety and Efficacy of MN-221 when Administered Intravenously as an Adjunct to Standard Therapy to Adults with an Acute Exacerbation of Asthma."  Study funded by MediciNova, Inc. 1/1/11 to 1/31/12. Amount $50,000

20.  Principle Investigator for study titled "AKINESIS: Acute Kidney Injury N-gal Evaluation of Symptomatic heart failure." Study funded by Alere and Abbott, 4/1/11 to 6/30/12. Amount $32,000

21.  Principle Investigator for study titled "Evaluation of Ecallantide (DX-88) for the Acute Treatment of Angiotensin Converting Enzyme Inhibitor Induced Angioedema, a Phase II, double-blind study.  Study funded by Dyax Corporation. 4/1/11 to 6/30/12.  Amount $20,000

22.  Principle Investigator for study titled "REAL:  Rapid Evaluation of Acute Kidney Injury with NGAL in Acutely Ill Patients in the ICU." Study funded by Alere, 5/1/11 to 6/30/12. Amount $74,435

23.  Principle Investigator for study titled "A Mulit-Center, Open-Label, Surveillance Trial to Evaluate the Safety and Efficacy of a Shortened Infusion Time of Intravenous Ibuprofen Protocol CPI-CL-015." Study funded by Cumberland Pharmaceuticals, Inc., 6/1/11 to 6/30/12. Amount $50,000

Curriculum Vitae
Gary M. Vilke, M.D., FACEP, FAAEM

PREVIOUS FUNDED RESEARCH (cont):

24.  Co-Investigator, with Edward Castillo (PI) for the study titled, "Restraint Chair Literature Review and Policy Gap Analysis", funded by the Ontario Ministry of Community Safety and Correctional Services, 7/1/13 to 9/30/13.  COS-0010.  Amount: $15,000

25.  Co-Investigator, with Daniel Davis (PI) for the study titled, "Resuscitation Outcomes Consortium (ROC) Regional Clinical Center, San Diego", funded by the NIH, 3/1/10 to 6/30/14.  U01 HL077908-09.  Amount: $1,389,389

26.  Co-Investigator with Edward Castillo (PI) for study entitled, "Diagnostic Evaluation using ClearView in Decision Making in the Emergency Room". Funded by EPIC Research and Diagnostics, Inc, 2012-2014. Amount: $650,840.10 (based on 570 total participants).

27.  Co-Investigator with Edward Castillo (PI) for study entitled, "Point-of-Care Testing for Illicit Drugs and Alcohol Intoxication in an Emergency Room". Funded by the National Institute on Drug Abuse through Seacoast Science, Inc., 2013-2015. Amount: $50,163.

28.  Co-Investigator with Edward Castillo (PI) for study entitled, "Evaluation of downward force placed onto prone subjects." Funded by the Institute for the Prevention of In-Custody Deaths, Inc., 2014-2015.  Awarded, contract in process. Amount: $7,500.

29.  Co-Investigator with Edward Castillo (PI) for study entitled, "Acute Bacterial Skin and Skin Structure Infection (abSSSI) Practice Pattern Assessment." Funded by Durata Therapeutics International B.V., 2014-2015. Amount: $15,000.

30.  Co-Investigator with Edward Castillo (PI) for study entitled, "Exploring emergency room physician's knowledge and attitudes concerning the use of appropriate and safe home care as an alternative to hospital admission." Funded by the Gary and Mary West Health Institute, 2014-2015. Amount: $118,021.

31.  Co-Investigator with Allyson Kreshak (PI) for study entitled, "Telephone, Text or Type? Comparing Tools for Improving Physician-Patient Communication Beyond the Walls of the Emergency Department after Discharge.   Funded by the UCSD Academy of Clinician Scholars, 2014-2015.  Amount: $10,000.

32.  Principal Investigator (PI) for the study titled, "Resuscitation Outcomes Consortium (ROC) Regional Clinical Center, San Diego", funded by the NIH, 7/1/14 to 12/31/15.  U01 HL077908-09.  Amount: NCE

33.  Principal Investigator (PI) for study entitled, "EXCITATION Study: Unexplained In-Custody Deaths:  Evaluating Biomarkers of Stress and Agitation."  Study funded by the National Institute of Justice, U.S. Department of Justice, 11/1/2012 to 6/30/2016.  USDOJ Federal Award # 2012-R2-CX-K006.  Amount: $431,943

34.  Principal Investigator (PI) for the study titled, "Resuscitation Outcomes Consortium (ROC) Protocol -ALPS", funded by the NIH, 7/1/13 to 12/31/15.  5U01HL077863-11 subaward 758500.  Amount: $289,003

Curriculum Vitae
Gary M. Vilke, M.D., FACEP, FAAEM

PREVIOUS FUNDED RESEARCH (cont):

35.   Co-Investigator with Edward Castillo (PI) for study entitled, "Acute Home Care as an Alternative to Inpatient Admission from the Emergency Department". Funded by the Gary and Mary West Health Institute, 2015 – 2016. Amount: $499,125.

36.   Co-Investigator with Theodore Chan (PI) for study entitled, "The Gary and Mary West Geriatric Center of Excellence (West COE): Phase 1 Research Development". Funded by the Gary and Mary West Health Institute, 2015-2016. Amount: $243,610.

37.   Co-Investigator with Chris Coyne (Co-PI) for study entitled, "A blinded non-randomized comparison of inhaled loxapine (ADASUVE®) versus IM haloperidol/lorazepam". Funded by Teva Pharmaceuticals, 2015-2019. Amount: $28,300.

38.   Co-Principal Investigator with Susan Little for study entitled, "FOCUS program (On the Frontlines of Communities in the United States): Routine Screening for HIV Infection at the UCSD Hillcrest and Thornton Emergency Departments". Funded by Gilead, 2016-2018. Amount: $490,937.41.

Curriculum Vitae
Gary M. Vilke, M.D., FACEP, FAAEM

PUBLICATIONS:

Texts/Books

1.  Atlas of Emergency Procedures.  Rosen P, Chan TC, Vilke GM, Sternbach G (Eds.); St. Louis: Mosby, Inc., 2001.

2.  Atlas of Emergency Procedures. (Edition translated into Spanish) Rosen P, Chan TC, Vilke GM, Sternbach G (Eds.); St. Louis: Mosby, Inc., 2005.

3.  Guidelines for Investigating Officer-Involved Shootings, Arrest-Related Deaths and Deaths in Custody.  Ross DL, Vilke GM (Eds.); New York and London: Routledge. 2017.

Book Chapters

1.  Vilke GM:  Head Trauma, Blunt.  In: The 5 Minute Emergency Medicine Consult. Rosen P, Barkin RM, Hayden SR, Schaider JJ, Wolfe R (Eds.); Philadelphia: Lippincott Williams & Wilkins, 1999, pp 472-473.

2.  Vilke GM:  Head Trauma, Penetrating.  In: The 5 Minute Emergency Medicine Consult. Rosen P, Barkin RM, Hayden SR, Schaider JJ, Wolfe R (Eds.); Philadelphia: Lippincott Williams & Wilkins, 1999, 474-475.

3.  Vilke GM:  Urethral Catheterization.  In: Atlas of Emergency Procedures.  Rosen P, Chan TC, Vilke GM, Sternbach G (Eds.); St. Louis: Mosby, Inc., 2001, pp 124-127.

4.  Vilke GM:  Cystostomy.  In: Atlas of Emergency Procedures.  Rosen P, Chan TC, Vilke GM, Sternbach G (Eds.); St. Louis: Mosby, Inc., 2001, pp 128-129.

5.  Vilke GM:  Bladder Aspiration.  In: Atlas of Emergency Procedures.  Rosen P, Chan TC, Vilke GM, Sternbach G (Eds.); St. Louis: Mosby, Inc., 2001, pp 130-131.

6.  Vilke GM:  Dorsal Slit in Phimosis.  In: Atlas of Emergency Procedures.  Rosen P, Chan TC, Vilke GM, Sternbach G (Eds.); St. Louis: Mosby, Inc., 2001, pp 132-133.

7.  Vilke GM:  Manual Paraphimosis Reduction.  In: Atlas of Emergency Procedures.  Rosen P, Chan TC, Vilke GM, Sternbach G (Eds.); St. Louis: Mosby, Inc., 2001, pp 134-135.

8.  Vilke GM:  Zipper Removal.  In: Atlas of Emergency Procedures.  Rosen P, Chan TC, Vilke GM, Sternbach G (Eds.); St. Louis: Mosby, Inc., 2001, pp 136-137.

9.  Hayden SR, Silfvast T, Deakin CD, Vilke GM:  Surgical Procedures.  In: Prehospital Trauma Care.  Soreide E, Grande CM (Eds.); New York: Marcel Dekker, Inc., 2001, pp 323-354.

10. Hayden SR, Thierbach A, Vilke GM, Sugrue M:  Patient Turnover: Arriving and Interacting in the Emergency Department.  In: Prehospital Trauma Care.  Soreide E, Grande CM (Eds.); New York: Marcel Dekker, Inc., 2001, pp 737-751.

Curriculum Vitae
Gary M. Vilke, M.D., FACEP, FAAEM

PUBLICATIONS, continued:

Book Chapters

11.  Vilke GM:  Cervical Spine Injury, Adult.  In: <u>Rosen and Barkin's 5-Minute Emergency Medicine Consult</u> (second edition).  Schaider J, Hayden SR, Wolfe R, Barkin RM, Rosen P (Eds.); Philadelphia: Lippincott Williams & Wilkins, 2003, pp 1048-1049.

12.  Vilke GM:  Extremity Trauma, Penetrating.  In: <u>Rosen and Barkin's 5-Minute Emergency Medicine Consult</u> (second edition).  Schaider J, Hayden SR, Wolfe R, Barkin RM, Rosen P (Eds.); Philadelphia: Lippincott Williams & Wilkins, 2003, pp 394-395.

13.  Vilke GM:  Head Trauma, Blunt.  In: <u>Rosen and Barkin's 5-Minute Emergency Medicine Consult</u> (second edition).  Schaider J, Hayden SR, Wolfe R, Barkin RM, Rosen P (Eds.); Philadelphia: Lippincott Williams & Wilkins, 2003, pp 476-477.

14.  Vilke GM:  Head Trauma, Penetrating.  In: <u>Rosen and Barkin's 5-Minute Emergency Medicine Consult</u> (second edition).  Schaider J, Hayden SR, Wolfe R, Barkin RM, Rosen P (Eds.); Philadelphia: Lippincott Williams & Wilkins, 2003, pp 478-479.

15.  Vilke GM:  Ring/Constricting Band Removal.  In: <u>Rosen and Barkin's 5-Minute Emergency Medicine Consult</u> (second edition).  Schaider J, Hayden SR, Wolfe R, Barkin RM, Rosen P (Eds.); Philadelphia: Lippincott Williams & Wilkins, 2003, pp 980-981.

16.  Vilke GM:  Warts.  In: <u>Rosen and Barkin's 5-Minute Emergency Medicine Consult</u> (second edition).  Schaider J, Hayden SR, Wolfe R, Barkin RM, Rosen P (Eds.); Philadelphia: Lippincott Williams & Wilkins, 2003, pp 1222-1223.

17.  Vilke GM:  Fournier's Gangrene.  In: <u>Rosen and Barkin's 5-Minute Emergency Medicine Consult</u> (second edition).  Schaider J, Hayden SR, Wolfe R, Barkin RM, Rosen P (Eds.); Philadelphia: Lippincott Williams & Wilkins, 2003, pp 430-431.

18.  Vilke GM:  Variants of Normal.  In: <u>ECG in Emergency Medicine and Acute Care.</u>  Chan TC, Brady WJ, Harrigan RA, Ornato JP, Rosen P (Eds.); Philadelphia: Elsevier Mosby, 2005, pp 12-15.

19.  Vilke GM:  Keloid Formation. In: <u>Greenberg's Text-Atlas of Emergency Medicine</u>. Greenberg MI, Hendrickson RG, Silverberg M (Eds.); Philadelphia: Lippincott Williams and Wilkins, 2005, p 684.

20.  Vilke GM:  Distal Digital Amputation. In: <u>Greenberg's Text-Atlas of Emergency Medicine</u>. Greenberg MI, Hendrickson RG, Silverberg M (Eds.); Philadelphia: Lippincott Williams and Wilkins, 2005, p 685.

21.  Vilke GM:  Painful Syndromes of the Hand and Wrist.  In: <u>Harwood-Nuss' Clinical Practice of Emergency Medicine</u> fourth edition.  Editor-in-chief: AB Wolfson. Philadelphia: Lippincott Williams and Wilkins, 2005, pp 536-540.

PUBLICATIONS, continued:

Book Chapters

22.   Vilke GM:  Neck Holds.  In: Sudden Deaths in Custody.  Ross DL, Chan TC (Eds.);
       New Jersey: Humana Press, 2006, pp 15-38.

23.   Sloane C, Vilke GM:  Riot Control Agents, Tasers and Other Less Lethal Weapons.
       In: Sudden Deaths in Custody.  Ross DL, Chan TC (Eds.); New Jersey: Humana Press, 2006,
       pp 113-138.

25.   Vilke GM:  *Clostridium botulinum* Toxin (Botulism) Attack.  In: Disaster Medicine.
       Ciottone GR (Ed.); Boston: Elsevier Mosby, 2006, pp 701-704.

26.   Vilke GM:  Viral Agents (Section 10, Part 2).  Section Editor.  In: Disaster Medicine.
       Ciottone GR (Ed.); Boston: Elsevier Mosby, 2006, pp 661-697.

27.   Patel R, Reynoso J, Vilke GM:  Genitourinary Trauma. In:  Emergency Medicine Handbook.
       Clinical Concepts for Clinical Practice.  Roppolo LP, Davis D, Kelly SP, Rosen P (Eds.);
       Philadelphia: Elsevier Mosby, 2007, pp 164-173.

28.   Vilke GM:  Extremity Trauma, Penetrating. In: Rosen & Barkin's 5-Minute Emergency
       Medicine Consult (third edition).  Schaider JJ, Hayden SR, Wolfe RE, Barkin RM, Rosen P
       (Eds.); Philadelphia: Lippincott Williams & Wilkins, 2007, pp 392-393.

29.   Vilke GM:  Fournier's Gangrene. In: Rosen & Barkin's 5-Minute Emergency Medicine
       Consult (third edition).  Schaider JJ, Hayden SR, Wolfe RE, Barkin RM, Rosen P (Eds.);
       Philadelphia: Lippincott Williams & Wilkins, 2007, pp 428-429.

30.   Vilke GM:  Head Trauma, Blunt. In: Rosen & Barkin's 5-Minute Emergency Medicine
       Consult (third edition).  Schaider JJ, Hayden SR, Wolfe RE, Barkin RM, Rosen P (Eds.);
       Philadelphia: Lippincott Williams & Wilkins, 2007, pp 474-475.

31.   Vilke GM:  Head Trauma, Penetrating. In: Rosen & Barkin's 5-Minute Emergency Medicine
       Consult (third edition).  Schaider JJ, Hayden SR, Wolfe RE, Barkin RM, Rosen P (Eds.);
       Philadelphia: Lippincott Williams & Wilkins, 2007, pp 476-477.

32.   Vilke GM:  Spine Injury: Cervical, Adult. In: Rosen & Barkin's 5-Minute Emergency
       Medicine Consult (third edition).  Schaider JJ, Hayden SR, Wolfe RE, Barkin RM, Rosen P
       (Eds.); Philadelphia: Lippincott Williams & Wilkins, 2007, pp 1040-1041.

33.   Vilke GM:  Warts. In: Rosen & Barkin's 5-Minute Emergency Medicine Consult (third
       edition).  Schaider JJ, Hayden SR, Wolfe RE, Barkin RM, Rosen P (Eds.); Philadelphia:
       Lippincott Williams & Wilkins, 2007, pp 1224-1225.

Curriculum Vitae
Gary M. Vilke, M.D., FACEP, FAAEM

PUBLICATIONS, continued:

Book Chapters

34.   Vilke GM, Sloane CM, Chan TC.  Accelerated Triage for Medical Evaluations Following CED Activations.  In:  Critical Issues in Policing Series:  Strategies for Resolving Conflict and Minimizing Use of Force.  Ederheimer JA (Ed); Washington DC, Police Executive Research Forum, 2007, pp 108-109.

35.   Christensen EF, Deakin C, Vilke GM: Prehospital Care and Trauma Systems.  In: Trauma: Emergency Resuscitation, Perioperative Anesthesia, Surgical Management, Volume I. Wilson WC, Grande CM, Hoyt DB (Eds.); New York: Informa Healthcare USA, Inc, 2007, pp 43-58.

36    Chan TC, Vilke GM.  CEW Research Models: Animal and Human Studies. In: TASER® Conducted Electrical Weapons:  Physiology, Pathology, and Law.  Kroll MW, Ho JD (Eds.); New York: Springer, 2009, pp 109-118.

37.   Vilke GM:  Hand and Wrist Pain.  In: Harwood-Nuss' Clinical Practice of Emergency Medicine fifth edition.  Editor-in-chief: AB Wolfson. Philadelphia: Lippincott Williams and Wilkins, 2010, pp 711-714.

38.   Wilson MP, Vilke GM. Not all ear pain is acute otitis media…and not all require antibiotics! In: Avoiding Common Errors in the Emergency Department. Mattu A, Chanmugam AS, Swadron SP, Tibbles CD, Woolridge DP (Eds) Philadelphia: Lippincott Williams and Wilkins, 2010, pp 520-522.

39.   Oyama LC, Vilke GM. In:  Emergency Medicine Review Preparing for the Boards.  Harrigan RA, Ufberg JW, Tripp ML (Eds) St. Louis: Elsevier Saunders, 2010, pp 303-315.

40.   Vilke GM:  Extremity Trauma, Penetrating. In: Rosen & Barkin's 5-Minute Emergency Medicine Consult (fourth edition).  Schaider JJ, Barkin RM, Hayden SR, Wolfe RE, Barkin RE, Shayne P, Rosen P (Eds.); Philadelphia: Lippincott Williams & Wilkins, 2011, pp 392-393.

41.   Vilke GM:  Fournier's Gangrene. In: Rosen & Barkin's 5-Minute Emergency Medicine Consult (fourth edition).  Schaider JJ, Barkin RM, Hayden SR, Wolfe RE, Barkin RE, Shayne P, Rosen P (Eds.); Philadelphia: Lippincott Williams & Wilkins, 2011, pp 428-429.

42.   Vilke GM:  Head Trauma, Blunt. In: In: Rosen & Barkin's 5-Minute Emergency Medicine Consult (fourth edition).  Schaider JJ, Barkin RM, Hayden SR, Wolfe RE, Barkin RE, Shayne P, Rosen P (Eds.); Philadelphia: Lippincott Williams & Wilkins, 2011, pp 476-477.

43.   Vilke GM:  Head Trauma, Penetrating. In: In: Rosen & Barkin's 5-Minute Emergency Medicine Consult (fourth edition).  Schaider JJ, Barkin RM, Hayden SR, Wolfe RE, Barkin RE, Shayne P, Rosen P (Eds.); Philadelphia: Lippincott Williams & Wilkins, 2011, pp 478-479.

Curriculum Vitae
Gary M. Vilke, M.D., FACEP, FAAEM

PUBLICATIONS, continued:

Book Chapters

44.  Vilke GM:  Spine Injury: Cervical, Adult. In: In: Rosen & Barkin's 5-Minute Emergency Medicine Consult (fourth edition).  Schaider JJ, Barkin RM, Hayden SR, Wolfe RE, Barkin RE, Shayne P, Rosen P (Eds.); Philadelphia: Lippincott Williams & Wilkins, 2011, pp 1044-1045.

45.  Vilke GM:  Warts. In: In: Rosen & Barkin's 5-Minute Emergency Medicine Consult (fourth edition).  Schaider JJ, Barkin RM, Hayden SR, Wolfe RE, Barkin RE, Shayne P, Rosen P (Eds.); Philadelphia: Lippincott Williams & Wilkins, 2011, pp 1226-1227.

46.  Heegaard WG, Vilke GM: Factitious Conducted Electrical Weapons Wounds: Injuries and Considerations. In: Atlas of Conducted Electrical Weapon Wounds and Forensic Analysis. Ho JD, Dawes DM, Kroll MW (Eds.)  New York: Springer, 2012, pp 131-142.

47.  Wilson MP, Vilke GM. The patient with excited delirium in the emergency department. In Zun LS, Chepenik LG, Mallory MNS editors. Behavioral Emergencies: A handbook for emergency physicians. Cambridge: Cambridge University Press; 2013.

48.  Vilke GM:  Extremity Trauma, Penetrating. In: Rosen & Barkin's 5-Minute Emergency Medicine Consult (fifth edition).  Schaider JJ, Barkin RM, Hayden SR, Wolfe RE, Barkin RE, Shayne P, Rosen P (Eds.); Philadelphia: Lippincott Williams & Wilkins, 2015, pp 398-399.

49.  Vilke GM:  Fournier Gangrene. In: Rosen & Barkin's 5-Minute Emergency Medicine Consult (fifth edition).  Schaider JJ, Barkin RM, Hayden SR, Wolfe RE, Barkin RE, Shayne P, Rosen P (Eds.); Philadelphia: Lippincott Williams & Wilkins, 2015, pp 434-435.

50.  Vilke GM:  Head Trauma, Blunt. In: Rosen & Barkin's 5-Minute Emergency Medicine Consult (fifth edition).  Schaider JJ, Barkin RM, Hayden SR, Wolfe RE, Barkin RE, Shayne P, Rosen P (Eds.); Philadelphia: Lippincott Williams & Wilkins, 2015, pp 486-487.

51.  Vilke GM:  Head Trauma, Penetrating. In: Rosen & Barkin's 5-Minute Emergency Medicine Consult (fifth edition).  Schaider JJ, Barkin RM, Hayden SR, Wolfe RE, Barkin RE, Shayne P, Rosen P (Eds.); Philadelphia: Lippincott Williams & Wilkins, 2015, pp 488-489.

52.  Vilke GM:  Spine Injury: Cervical, Adult. In: Rosen & Barkin's 5-Minute Emergency Medicine Consult (fifth edition).  Schaider JJ, Barkin RM, Hayden SR, Wolfe RE, Barkin RE, Shayne P, Rosen P (Eds.); Philadelphia: Lippincott Williams & Wilkins, 2015, pp 1054-1055.

53.  Vilke GM:  Warts. In: Rosen & Barkin's 5-Minute Emergency Medicine Consult (fifth edition).  Schaider JJ, Barkin RM, Hayden SR, Wolfe RE, Barkin RE, Shayne P, Rosen P (Eds.); Philadelphia: Lippincott Williams & Wilkins, 2015, pp 1240-1241.

Curriculum Vitae
Gary M. Vilke, M.D., FACEP, FAAEM

PUBLICATIONS, continued:

Book Chapters

54.    Vilke GM:  Hand and Wrist Pain.  In: Harwood-Nuss' Clinical Practice of Emergency Medicine sixth edition.  Editor-in-chief: AB Wolfson. Philadelphia: Lippincott Williams and Wilkins, 2015, pp 707-710.

55.    Vilke GM: The Question of Positional and Compression Asphyxia. In:  The Thin Blue Line. Amdur E and Hutchings J (eds.) Edgework, 2015, pp 287-290.

56.    Vilke GM: The Question of Positional and Compression Asphyxia. In:  Safe Behind Bars. Amdur E, Blake M, De Villeneuve C (eds.) Edgework, 2015, pp 321-324.

57.    Vilke GM: The Question of Positional and Compression Asphyxia. In:  Cooling the Flames Amdur E, Murphy JK (eds.) Edgework, 2015, pp 247-250.

58.    Castillo EM, Vilke GM. Road Traffic Accidents: Air Bag-Related Injuries and Deaths. Encyclopedia of Forensic and Legal Medicine (Second Edition), 2016, pp 162-174.

59.    Vilke GM, Castillo EM. Restraint Techniques, Injuries, and Death: Use of Force Techniques. Encyclopedia of Forensic and Legal Medicine (Second Edition), 2016, pp 142-147.

60.    Roberts EE, Vilke GM. Restraint Techniques, Injuries, and Death: Conducted Energy Devices.  Encyclopedia of Forensic and Legal Medicine (Second Edition), 2016, pp 118-126.

61.    Castillo EM, Vilke GM. How to design a study that everyone will believe. In: Doing Research in Emergency and Acute Care: Making Order Out of Chaos. Wilson MP, Guluma KZ, Hayden SR (Eds.); Hoboken: Wiley-Blackwell, 2015 pp 79-84.

62.    Vilke GM, Castillo EM. Privacy in research: How to collect data safely and confidentially. In: Doing Research in Emergency and Acute Care: Making Order Out of Chaos. Wilson MP, Guluma KZ, Hayden SR (Eds.); Hoboken: Wiley-Blackwell, 2015, pp 155-160.

63.    Wilson MP, Vilke GM. Mental Illness and Substance Abuse. In: Cooney D. EMS Medicine. New York: McGraw-Hill, 2015, pp 362-366.

64.    DeMers G, Vilke GM. International Deployment. In: Cooney D. EMS Medicine. New York: McGraw-Hill, 2015, pp 531-538.

65.    Vilke GM. Payne-James JJ. Excited Delirium Syndrome: aetiology, identification and treatment.  In: Current Practice in Forensic Medicine Volume 2. Gall JAM, Payne-James JJ (Eds.) West Sussex: Wiley, 2016, pp 97-117.

66.    Villano J, Vilke GM:  Clostridium botulinum Toxin (Botulism) Attack.  In: Disaster Medicine. (second edition) Ciottone GR (Ed.); Philadelphia: Elsevier Mosby, 2016, pp 790-793.

Curriculum Vitae
Gary M. Vilke, M.D., FACEP, FAAEM

PUBLICATIONS, continued:

Book Chapters

67.   Nakajima Y, Vilke GM, Use of Force in the Prehospital Environment. In: The Diagnosis and Management of Agitation. Zeller SL, Nordstrom KD and Wilson MP (Eds.) Cambridge: Cambridge University Press, 2017. pp 173-188.

68.   Holman M, Vilke GM. Neck Holds. In: Guidelines for Investigating Officer-Involved Shootings, Arrest-Related Deaths and Deaths in Custody. Ross DL, Vilke GM (Eds.); New York and London: Routledge. 2017.

69.   Coyne CJ, Ly BT, Vilke GM. Excited Delirium Syndrome (ExDS). In: Guidelines for Investigating Officer-Involved Shootings, Arrest-Related Deaths and Deaths in Custody. Ross DL, Vilke GM (Eds.); New York and London: Routledge. 2017.

70.   Sloane C, Vilke GM. Less Lethal Weapons, Not Including TASER. In: Guidelines for Investigating Officer-Involved Shootings, Arrest-Related Deaths and Deaths in Custody. Ross DL, Vilke GM (Eds.); New York and London: Routledge. 2017.

71.   Childers R, Chan TC, Vilke GM.  TASER Conducted Electrical Weapons. In: Clinical Forensic Medicine. (Fourth Edition). Stark (Ed.); Springer Nature Switzerland AG. 2020. pp 279-312.

72.   Vilke GM, Solomon PHD:  Extremity Trauma, Penetrating. In: Rosen & Barkin's 5-Minute Emergency Medicine Consult (sixth edition).  Schaider JJ, Barkin RM, Hayden SR, Wolfe RE, Barkin RE, Shayne P (Eds.); Philadelphia: Wolters Kluwer, 2019. pp 396-397.

73.   Vilke GM, Solomon, PHD:  Fournier Gangrene. In: Rosen & Barkin's 5-Minute Emergency Medicine Consult (sixth edition).  Schaider JJ, Barkin RM, Hayden SR, Wolfe RE, Barkin RE, Shayne P (Eds.); Philadelphia: Wolters Kluwer, 2019. pp 432-433.

74.   Vilke GM, Boynton HE:  Head Trauma, Blunt. In: Rosen & Barkin's 5-Minute Emergency Medicine Consult (sixth edition).  Schaider JJ, Barkin RM, Hayden SR, Wolfe RE, Barkin RE, Shayne P (Eds.); Philadelphia: Wolters Kluwer, 2019. pp 484-485.

75.   Vilke GM, Shastry S:  Head Trauma, Penetrating. In: Rosen & Barkin's 5-Minute Emergency Medicine Consult (sixth edition).  Schaider JJ, Barkin RM, Hayden SR, Wolfe RE, Barkin RE, Shayne P (Eds.); Philadelphia: Wolters Kluwer, 2019.  pp 486-487.

76.   Vilke GM, Shastry S:  Spine Injury: Cervical, Adult. In: Rosen & Barkin's 5-Minute Emergency Medicine Consult (sixth edition).  Schaider JJ, Barkin RM, Hayden SR, Wolfe RE, Barkin RE, Shayne P (Eds.); Philadelphia: Wolters Kluwer, 2019. pp 1056-1057.

77.   Vilke GM:  Spine Injury: Thoracic, Adult. In: Rosen & Barkin's 5-Minute Emergency Medicine Consult (sixth edition).  Schaider JJ, Barkin RM, Hayden SR, Wolfe RE, Barkin RE, Shayne P (Eds.); Philadelphia: Wolters Kluwer, 2019. pp 1065-1066.

Curriculum Vitae
Gary M. Vilke, M.D., FACEP, FAAEM


PUBLICATIONS, continued:

Book Chapters

78.   Alfaraj DN, Vilke GM:  Spine Injury: Lumbar, Adult. In: Rosen & Barkin's 5-Minute Emergency Medicine Consult (sixth edition).  Schaider JJ, Barkin RM, Hayden SR, Wolfe RE, Barkin RE, Shayne P (Eds.); Philadelphia: Wolters Kluwer, 2019. pp 1062-1063.

79.   Alfaraj DN, Vilke GM:  Spine Injury: Coccyx, Adult. In: Rosen & Barkin's 5-Minute Emergency Medicine Consult (sixth edition).  Schaider JJ, Barkin RM, Hayden SR, Wolfe RE, Barkin RE, Shayne P (Eds.); Philadelphia: Wolters Kluwer, 2019. pp 1060-1061.

80.   Childers R, Vilke GM:  Spine Cord Syndromes. In: Rosen & Barkin's 5-Minute Emergency Medicine Consult (sixth edition).  Schaider JJ, Barkin RM, Hayden SR, Wolfe RE, Barkin RE, Shayne P (Eds.); Philadelphia: Wolters Kluwer, 2019. pp 1054-1055.

81.   Childers R, Vilke GM:  Colon Trauma. In: Rosen & Barkin's 5-Minute Emergency Medicine Consult (sixth edition).  Schaider JJ, Barkin RM, Hayden SR, Wolfe RE, Barkin RE, Shayne P (Eds.); Philadelphia: Wolters Kluwer, 2019. pp 248-249.

82.   Allehyani MF, Vilke GM:  Bladder Injury. In: Rosen & Barkin's 5-Minute Emergency Medicine Consult (sixth edition).  Schaider JJ, Barkin RM, Hayden SR, Wolfe RE, Barkin RE, Shayne P (Eds.); Philadelphia: Wolters Kluwer, 2019. pp 146-147.

83.   Vilke GM, Nene RV:  Warts. In: Rosen & Barkin's 5-Minute Emergency Medicine Consult (sixth edition).  Schaider JJ, Barkin RM, Hayden SR, Wolfe RE, Barkin RE, Shayne P (Eds.); Philadelphia: Wolters Kluwer, 2019. pp 1246-1247.

84.   Vilke GM:  Hand and Wrist Pain.  In: Harwood-Nuss' Clinical Practice of Emergency Medicine seventh edition.  Editor-in-chief: AB Wolfson. Philadelphia: Wolters Kluwer, 2019.

85.   Wilson M.P., Vilke G.M. (2021) Excited Delirium Syndrome: Diagnosis and Treatment. In: Zun L.S., Nordstrom K., Wilson M.P. (eds) Behavioral Emergencies for Healthcare Providers. Springer, Cham. https://doi.org/10.1007/978-3-030-52520-0_16

86.   Childers R, Chan T, Vilke G: TASER Conducted Electrical Weapons.  In: Clinical Forensic Medicine Editor-in-chief: MS Stark.  Switzerland: Springer Nature, 2020, pp 279-312

Curriculum Vitae
Gary M. Vilke, M.D., FACEP, FAAEM

VIDEOS:

1.  Vilke GM, Davis DP, Robinson A:  "Glasgow Coma Scale and the Field Neurological Exam" Instructional Video, San Diego County Emergency Medical Services, Copyright 1997.

2.  Vilke GM, Chan TC: "Excited Delirium" Instructional Video, San Diego County Sheriff's Department, 2007.

3.  Morris B, Vilke GM: "Ankylosing Spondylitis" Educational Video. Bill Morris Production Group for the Ankyslosing Spondylitis Association of America, 2009.

4.  Peace Officer Standards and Training: "LTP3: Under the Influence" Training Video, 2022.

5.  Peace Officer Standards and Training: "NWS3: Positional Asphyxia" Training Video, 2022.

Curriculum Vitae
Gary M. Vilke, M.D., FACEP, FAAEM


PUBLICATIONS, continued:

Articles

1.  Vilke GM, Hoyt DB, Epperson M, Fortlage D, Hutton KC, Rosen P:  Intubation techniques in the helicopter.  J Emerg Med 1994;12(2):217-224.

2.  Rockwell E, Jackson E, Vilke G, Jeste DV:  A study of delusions in a large cohort of Alzheimer's disease patients.  Am J Geriatric Psychiatry 1994;2(2):157-164.

3.  Chan T, Vilke GM, Williams S:  Bi-directional ventricular tachycardia in a patient with digoxin toxicity.  J Emerg Med 1995;13(1):89.

4.  Vilke GM:  Misplaced intravascular catheters in a patient with acute renal failure.  J Emerg Med 1995;13(3):379.

5.  Vilke GM, Vilke TS, Rosen P:  The completeness of MEDLINE for papers published in the *Journal of Emergency Medicine*.  J Emerg Med 1995;13(4):457-460.

6.  Bauman BH, Vilke G, Chan T:  Dexamethasone use in croup.  West J Med 1996;164(1):66.

7.  Vilke GM, Hayden SR:  Intraorbital air in a patient status post-facial trauma.  J Emerg Med 1996;14(1):77.

8.  Vilke GM, Jacoby I, Manoguerra AS, Clark R:  Disaster preparedness of poison control centers.  Clin Toxicol 1996;34(1):53-58.

9.  Vilke GM:  "No worries."  J Emerg Med 1996;14(5):641-642.

10. Vilke GM, Honingford EA:  Cervical spine epidural abscess in a patient with no predisposing risk factors.  Ann Emerg Med 1996;27(6):777-780.

11. Vilke GM, Honingford EA:  Diabetes and neck pain (Letter to the editor).  Ann Emerg Med 1996;28(6):731.

12. Vilke GM, Wulfert EA:  Case reports of two patients presenting with pneumothorax following acupuncture.  J Emerg Med 1997;15(2):155-157.

13. Vilke GM:  Chest pain in an elderly patient.  J Emerg Med 1997;15(4):523.

14. Chan TC, Vilke GM, Neuman T, Clausen JL:  Restraint position and positional asphyxia.  Ann Emerg Med 1997;30(5):578-586.

15. Moss ST, Chan TC, Buchanan J, Dunford JV, Vilke GM:  Outcome study of prehospital patients signed out against medical advice by field paramedics.  Ann Emerg Med 1998; 31(2):247-250.

Curriculum Vitae
Gary M. Vilke, M.D., FACEP, FAAEM

PUBLICATIONS, continued:

Articles

16.  Chan TC, Vilke GM, Neuman T:  Reexamination of custody restraint position and positional asphyxia.  Am J Forensic Med Pathol 1998;19(3):201-205.

17.  Howard JD, Reay DT [32(1):116-117] / Chan TC, Vilke GM, Neuman T, Clausen J:  Positional asphyxia (Reply to letter to the editor).  Ann Emerg Med 1998;32(1):117-118.

18.  Vilke GM, Mahoney G, Chan TC:  Postpartum coronary artery dissection.  Ann Emerg Med 1998;32(2):260-262.

19.  Rosa CM, Schwartz BL, Vilke GM:  The prehospital electrocardiogram: Future standard of care?  Top Emerg Med 1998;20(3):23-29.

20.  Davis DP, Bramwell KJ, Vilke GM, Cardall TY, Yoshida E, Rosen P:  Cricothyrotomy technique: Standard versus the rapid four-step technique.  J Emerg Med 1999;17(1):17-21.

21.  Davis DP, Stephen KAC, Vilke GM:  Inaccuracy in endotracheal tube verification using a Toomey syringe.  J Emerg Med 1999;17(1):35-38.

22.  Friedman L, Vilke GM, Chan TC, Hayden SR, Guss DA, Krishel SJ, Rosen P:  Emergency department airway management before and after an emergency medicine residency.  J Emerg Med 1999;17(3):427-431.

23.  Bramwell KJ, Davis DP, Cardall TY, Yoshida E, Vilke GM, Rosen P:  Use of the Trousseau dilator in cricothyrotomy.  J Emerg Med 1999;17(3):433-436.

24.  Cardall TY, Chan TC, Brady WJ, Perry JC, Vilke GM, Rosen P:  Permanent cardiac pacemakers: Issues relevant to the emergency physician, Part I.  J Emerg Med 1999;17(3):479-489.

25.  Cardall TY, Brady WJ, Chan TC, Perry JC, Vilke GM, Rosen P:  Permanent cardiac pacemakers: Issues relevant to the emergency physician, Part II.  J Emerg Med 1999;17(4):697-709.

26.  Vilke GM, Buchanan J, Dunford JV, Chan TC:  Are heroin overdose deaths related to patient release after prehospital treatment with naloxone?  Prehosp Emerg Care 1999;3(3):183-186.

27.  Roppolo LP, Vilke GM, Chan TC, Krishel S, Hayden SR, Rosen P:  Nasotracheal intubation in the emergency department, revisited.  J Emerg Med 1999;17(5):791-799.

28.  Vilke GM:  FOOSH injury with snuff box tenderness.  J Emerg Med 1999;17(5):899-900.

29.  Chan TC, Neuman T, Vilke GM, Clausen J, Clark RF:  Metabolic acidosis in restraint-associated cardiac arrest (Letter to the editor).  Acad Emerg Med 1999;6(10):1075-1076.

PUBLICATIONS, continued:

Articles

30. Chan TC, Vilke GM, Bramwell KJ, Davis DP, Hamilton RS, Rosen P:  Comparison of wire-guided cricothyrotomy versus standard surgical cricothyrotomy technique.  J Emerg Med 1999;17(6):957-962.

31. Reay DT, Howard JD [20(3):300-301] / Chan TC, Vilke GM, Neuman T:  Restraint position and positional asphyxia (Reply to letter to the editor).  Am J Forensic Med Pathol 2000; 21(1):93.

32. Vilke GM, Chan TC, Guss DA:  Use of a complete neurological examination to screen for significant intracranial abnormalities in minor head injury.  Am J Emerg Med 2000;18(2): 159-163.

33. Sloane CM, Vilke G:  The other olive associated with vomiting.  J Emerg Med 2000; 18(3):375.

34. Vilke GM, Chan TC, Neuman T, Clausen JL:  Spirometry in normal subjects in sitting, prone, and supine positions.  Respir Care 2000;45(4):407-410.

35. Ma G, Vilke GM:  Amoebic abscess.  J Emerg Med 2000;18(4):465-466.

36. Davis DP, Bramwell KJ, Hamilton RS, Chan TC, Vilke GM:  Safety and efficacy of the rapid four-step technique for cricothyrotomy using a Bair Claw.  J Emerg Med 2000;19(2):125-129.

37. Sloane C, Vilke GM, Chan TC, Hayden SR, Hoyt DB, Rosen P:  Rapid sequence intubation in the field versus hospital in trauma patients.  J Emerg Med 2000;19(3):259-264.

38. Gerling MC, Davis DP, Hamilton RS, Morris GF, Vilke GM, Garfin SR, Hayden SR:  Effects of cervical spine immobilization technique and laryngoscope blade selection on an unstable cervical spine in a cadaver model of intubation.  Ann Emerg Med 2000;36(4):293-300.

39. Ochs M, Vilke GM, Chan TC, Moats T, Buchanan J:  Successful prehospital airway management by EMT-Ds using the Combitube.  Prehosp Emerg Care 2000;4(4):333-337.

40. Vilke GM, Marino A, Iskander J, Chan TC:  Emergency department patient knowledge of medications.  J Emerg Med 2000;19(4):327-330.

41. Chan TC, Vilke GM, Clausen J, Clark R, Schmidt P, Snowden T, Neuman T:  The impact of oleoresin capsicum spray on respiratory function in human subjects in the sitting and prone maximal restraint positions, final report.  NCJ 182433.  Washington, DC: United States Department of Justice, National Institute of Justice, 2000, 68 pages.

42. Gerling MC, Davis DP, Hamilton RS, Morris GF, Vilke GM, Garfin SR, Hayden SR:  Effect of surgical cricothyrotomy on the unstable cervical spine in a cadaver model of intubation.  J Emerg Med 2001;20(1):1-5.

Curriculum Vitae
Gary M. Vilke, M.D., FACEP, FAAEM

PUBLICATIONS, continued:

Articles

43.  Vilke GM, Chan TC:  Physician effect on out of hospital patients signing out against medical
     advice.  Pre-hospital Immediate Care 2001;5(1):38-40.

44.  Davis DP, Kimbro TA, Vilke GM:  The use of midazolam for prehospital rapid-sequence
     intubation may be associated with a dose-related increase in hypotension.  Prehosp Emerg
     Care 2001;5(2):163-168.

45.  Patel RJ, Vilke GM, Chan TC:  The prehospital electrocardiogram.  J Emerg Med 2001;
     21(1):35-39.

46.  Davis DP, Videen JS, Marino A, Vilke GM, Dunford JV, Van Camp SP, Maharam LG:
     Exercise-induced hyponatremia in marathon runners: A two-year experience.  J Emerg Med
     2001;21(1):47-57.

47.  Seltzer AG, Vilke GM, Chan TC, Fisher R, Dunford JV:  Outcome study of minors after
     parental refusal of paramedic transport.  Prehosp Emerg Care 2001;5(3):278-283.

48.  Vilke GM, Marino A, Fisher R, Chan TC:  Estimation of pediatric patient weight by EMT-Ps.
     J Emerg Med 2001;21(2):125-128.

49.  Chan TC, Vilke GM, Pollack M, Brady WJ:  Electrocardiographic manifestations: Pulmonary
     embolism.  J Emerg Med 2001;21(3):263-270.

50.  Morgan J / Sloane C, Vilke GM:  Rapid sequence intubation in the field versus hospital in
     trauma patients (Reply to letter to the editor).  J Emerg Med 2001;21(4):443-444.

51.  Chan TC, Vilke GM, Clausen J, Clark R, Schmidt P, Snowden T, Neuman T:  Pepper spray's
     effects on a suspect's ability to breathe.  Research in Brief (NCJ 188069), December 2001.
     Washington, DC: United States Department of Justice, National Institute of Justice.

52.  Vilke GM, Steen PJ, Smith AM, Chan TC:  Out-of-hospital pediatric intubation by paramedics:
     The San Diego experience.  J Emerg Med 2002;22(1):71-74.

53.  Chan TC, Vilke GM, Clausen J, Clark RF, Schmidt P, Snowden T, Neuman T:  The effect of
     oleoresin capsicum "pepper" spray inhalation on respiratory function.  J Forensic Sci 2002;
     47(2):299-304.

54.  Vilke GM, Sharieff GQ, Marino A, Gerhart AE, Chan TC:  Midazolam for the treatment of
     out-of-hospital pediatric seizures.  Prehosp Emerg Care 2002;6(2):215-217.

55.  Vilke GM, Chan TC:  Agitated delirium and sudden death (Letter to the editor).  Prehosp
     Emerg Care 2002;6(2):259-260.

Curriculum Vitae
Gary M. Vilke, M.D., FACEP, FAAEM

PUBLICATIONS, continued:

Articles

56.   Vilke GM, Fisher R, Chan TC:  An evaluation of the risk for latex allergy in prehospital EMS providers.  J Emerg Med 2002;22(4):345-348.

57.   Vilke GM:  Food-dependent exercise-induced anaphylaxis.  Prehosp Emerg Care 2002; 6(3):348-350.

58.   Vilke GM, Snyder B:  High pressure paint spray gun injury.  J Emerg Med 2002;23(2): 203-204.

59.   Chew GS, Vilke GM, Davis DP, Chan TC:  Toomey[TM] syringe aspiration may be inaccurate in detecting esophageal intubation following gastric insufflation.  J Emerg Med 2002;23(4): 337-340.

60.   Vilke GM:  Aeromedical Emergencies:  Intro to the section.  J Emerg Med 2002;23(1):49.

61.   Vilke GM, Sardar W, Fisher R, Dunford JD, Chan TC:  Follow-up of elderly patients who refuse transport after accessing 9-1-1.  Prehosp Emerg Care 2002;6(4):391-395.

62.   Vilke GM:  Great toe pain.  J Emerg Med 2003;24(1):59-60.

63.   Davis JM, Vilke GM:  An elderly patient with intussusception. J Emerg Med 2003;24(2):221.

64.   Austin T, Vilke GM, Nyheim E, Kelly D, Chan TC:  Safety and effectiveness of methohexital for procedural sedation in the emergency department.  J Emerg Med 2003;24(3):315-318.

65.   Chan TC, Vilke GM, Smith S, Sparrow W, Dunford JV:  Impact of an after-hours on-call emergency physician on ambulance transports from a county jail.  Prehosp Emerg Care 2003; 7(3):327-331.

66.   Vilke GM, Chan TC, Neuman T:  Patient Restraint in EMS:  Prehosp Emerg Care 2003; 7(3):417.

67.   Deitch S, Davis DP, Schatteman J, Chan TC, Vilke GM:  The use of etomidate for prehospital rapid-sequence intubation.  Prehosp Emerg Care 2003;7(3):380-383.

68.   Vilke GM, Sloane C, Smith AM, Chan TC:  Assessment for deaths in out-of-hospital heroin overdose patients treated with naloxone who refuse transport.  Acad Emerg Med 2003; 10(8):893-896.

69.   Davis DP, Valentine C, Ochs M, Vilke GM, Hoyt DB:  The Combitube as a salvage airway device for paramedic rapid sequence intubation.  Ann Emerg Med 2003;42(5):697-704.

70.   Calkins T, Chan TC, Clark RF, Stepanski B, Vilke GM:  Review of prehospital sodium bicarbonate use for cyclic antidepressant overdose.  Emerg Med J 2003;20:483-486.

Curriculum Vitae
Gary M. Vilke, M.D., FACEP, FAAEM

PUBLICATIONS, continued:

Articles

71.  Vilke GM, Brown L, Skogland P, Simmons C, Guss DA:  Approach to decreasing emergency department ambulance diversion hours.  J Emerg Med 2004;26(2):189-192.

72.  Vilke GM, Smith AM, Chan TC:  Leaving against medical advice after out-of-hospital naloxone:  a closer look is needed.  Acad Emerg Med 2004;11(3):323-324.

73.  Vilke GM, Harrigan RA, Ufberg JW, Chan TC:  Emergency evaluation and treatment of priapism.  J Emerg Med 2004;26(3):325-329.

74.  Davis DP, Wold RM, Patel RJ, Tran AJ, Tokhi RN, Chan TC, Vilke GM:  The clinical presentation and impact of diagnostic delays on emergency department patients with spinal epidural abscess.  J Emerg Med 2004;26(3):285-291.

75.  Vilke GM, Harrigan RA, Ufberg JW:  Technical Tips: Intro to the section.  J Emerg Med 2004;26(3):323.

76.  Doney MK, Vilke GM:  Large osteosarcoma not apparent on conventional radiography. J Emerg Med 2004;26(3):351-352.

77.  Chan TC, Ufberg J, Harrigan RA, Vilke GM:  Nasal foreign body removal.  J Emerg Med 2004;26(4):441-445.

78.  Vilke GM, Smith AM, Upledger Ray L, Steen PJ, Murrin PA, Chan TC:  Airway obstruction in children aged less than 5 years: The prehospital experience.  Prehosp Emerg Care 2004; 8(2):196-199.

79.  Vilke GM, Jin A, Davis DP, Chan TC:  Prospective randomized study of viscous lidocaine versus benzocaine in a GI cocktail for dyspepsia.  J Emerg Med 2004;27(1):7-9.

80.  Poste JC, Davis DP, Ochs M, Vilke GM, Castillo EM, Stern J, Hoyt DB:  Air medical transport of severely head-injured patients undergoing paramedic rapid sequence intubation. Air Medical Journal 2004;23(4):36-40.

81.  Chan TC, Neuman T, Clausen J, Eisele J, Vilke GM:  Weight force during prone restraint and respiratory function.  Am J Forensic Med Pathol 2004;25(3):185-189.

82.  Ufberg JW, Vilke GM, Chan TC, Harrigan RA:  Anterior shoulder dislocations: Beyond traction-countertraction.  J Emerg Med 2004;27(3):301-306.

83.  Vilke, GM:  San Diego County wildfires: Perspective of county officials.  Disaster Manag Response 2004 Oct-Dec;2(4):99.

Curriculum Vitae
Gary M. Vilke, M.D., FACEP, FAAEM

PUBLICATIONS, continued:

Articles

84.  Vilke, GM, Castillo EM, Metz MA, Upledger Ray L, Murrin PA, Lev R, Chan TC: Community trial to decrease ambulance diversion hours: The San Diego County patient destination trial.  Ann Emerg Med 2004;44(4):295-303.

85.  Vilke GM, Stepanski BM, Ray LU, Lutz MW, Murrin PA, Chan TC:  9-1-1 responses for shopping cart and stroller injuries.  Pediatr Emerg Care 2004;20(10):660-663.

86.  Vilke GM, Castillo EM, Ray LU, Murrin PA, Chan TC:  Evaluation of pediatric glucose monitoring and hypoglycemic therapy in the field.  Pediatr Emerg Care 2005;21(1):1-5.

87.  Vilke GM, Chan TC, Dunford JV, Metz M, Ochs G, Smith A, Fisher R, Poste JC, McCallum-Brown L, Davis DP:  The three-phase model of cardiac arrest as applied to ventricular fibrillation in a large, urban emergency medical services system.  Resuscitation 2005;64(3):341-346.

88.  Davis DP, Peay J, Sise MJ, Vilke GM, Kennedy F, Eastman AB, Velky T, Hoyt DB: The impact of prehospital endotracheal intubation on outcome in moderate to severe traumatic brain injury.  J Trauma 2005;58(5):933-939.

89.  Davis DP, Grossman K, Kiggins DC, Vilke GM, Chan TC:  The inadvertent administration of anticoagulants to ED patients ultimately diagnosed with thoracic aortic dissection.  Am J Emerg Med 2005;23(4):439-442.

90.  Davis DP, Pettit K, Rom CD, Poste JC, Sise MJ, Hoyt DB, Vilke GM:  The safety and efficacy of prehospital needle and tube thoracostomy by aeromedical personnel.  Prehosp Emerg Care 2005;9(2):191-197.

91.  Davis DP, Peay J, Serrano JA, Buono C, Vilke GM, Sise MJ, Kennedy F, Eastman AB, Velky T, Hoyt DB:  The impact of aeromedical response to patients with moderate to severe traumatic brain injury.  Ann Emerg Med 2005;46(2):115-122.

92.  Davis DP, Vadeboncoeur TF, Ochs M, Poste JC, Vilke GM, Hoyt DB:  The association between field glasgow coma scale score and outcome in patients undergoing paramedic rapid sequence intubation.  J Emerg Med 2005;29(4):391-397.

93.  Davis DP, Wiesner C, Chan TC, Vilke GM:  The efficacy of nebulized albuterol/ipratropium bromide versus albuterol alone in the prehospital treatment of suspected reactive airways disease.  Prehosp Emerg Care 2005;9(4):386-390.

94.  Davis DP, Douglas DJ, Smith W, Sise MJ, Vilke GM, Holbrook TL, Kennedy F, Eastman AB, Velky T, Hoyt DB:  Traumatic brain injury outcomes in pre- and post-menopausal females versus age-matched males.  J Neurotrauma 2006;23(2):140-148.

PUBLICATIONS, continued:

Articles

95.   Davis DP, Idris AH, Sise MJ, Kennedy F, Brent Eastman A, Velky T, Vilke GM, Hoyt DB:
      Early ventilation and outcome in patients with moderate to severe traumatic brain injury.
      Crit Care Med 2006;34(4):1202-1208.

96.   Dunford JV, Castillo EM, Chan TC, Vilke GM, Jenson P, Lindsay SP:  Impact of the San
      Diego Serial Inebriate Program on use of emergency medical resources.  Ann Emerg Med
      2006;47(4):328-336.

97.   Vadeboncoeur T,  Davis DP, Ochs M, Poste JC, Hoyt DB, Vilke GM:  The ability of
      paramedics to predict aspiration in patients undergoing prehospital rapid sequence intubation.
      J Emerg Med 2006;30(2):131-136.

98.   Davis DP, Serrano JA, Vilke GM, Sise MJ, Kennedy F, Eastman AB, Velky T, Hoyt DB:
      The predictive value of field versus arrival Glasgow Coma Scale Score and TRISS calculations
      in moderate-to-severe traumatic brain injury.  J Trauma 2006;60(5):985-990.

99.   Ramanujam P, Vilke GM:  Prehospital management of the difficult airway.  Clinical
      Foundations 2006;7-11.

100.  Vilke GM, Tornabene SV, Stepanski B, Shipp HE, Upledger Ray L, Metz MA, Vroman D,
      Anderson M, Murrin PA, Davis DP, Harley J:  Paramedic self-reported medication errors.
      Prehosp Emerg Care 2006;10(4):457-462.

101.  Goldstein EH, Hradecky G, Vilke GM, Chan TC:  Impact of a standardized protocol to address
      methicillin-resistant *staphylococcus aureus* skin infections at a large, urban county jail system.
      J Correctional Health Care 2006;12(3):181-188.

102.  Chappell S, Vilke GM, Chan TC, Harrigan RA, Ufberg JW:  Peripheral venous cutdown.
      J Emerg Med 2006;31(4):411-416.

103.  Lev R, Vilke G, Dunford J. San Diego Regional STEMI Summit. San Diego Physician.
      2006;4:11-13.

104.  Vilke GM, Smith AM, Stepanski B, Shipp HE, Upledger Ray L, Murrin PA, Chan TC.
      Impact of the San Diego County firestorm on Emergency Medical Services.  Prehosp Dis Med
      2006;21(5):353-358.

105.  Soroudi A, Shipp HE, Stepanski BM, Ray LU, Murrin PA, Chan TC, Davis DP, Vilke GM.
      Adult foreign body airway obstruction in the prehospital setting.  Prehosp Emerg Care. 2007
      Jan-Mar;11(1):25-9.

106.  Michalewicz BA, Chan TC, Vilke GM, Levy SS, Neuman TS, Kolkhorst FW.  Ventilatory
      and metabolic demands during aggressive physical restraint in healthy adults.  J Forensic Sci
      2007;52(1):171-175.

Curriculum Vitae
Gary M. Vilke, M.D., FACEP, FAAEM

<u>PUBLICATIONS, continued</u>:

<u>Articles</u>

107. Vilke GM, Tornabene SV, Stepanski B, Shipp HE, Upledger Ray L, Metz MA, Vroman D, Anderson M, Murrin PA, Davis DP, Harley J:  Paramedic self-reported medication errors. Prehosp Emerg Care 2007;11(1):80-84.

108. Dolkas L, Stanley C, Smith AM, Vilke GM. Deaths associated with choking in San Diego county.  J Forensic Sci. 2007;52(1):176-9.

109. Harrigan RA, Chan TC, Moonblatt S, Vilke GM, Ufberg JW.  Temporary transvenous pacemaker placement in the Emergency Department.  J Emerg Med 2007;32(1):105-111.

110. Davis DP, Kene M, Vilke GM, Sise MJ, Kennedy F, Eastman AB, Velky T, Hoyt DB. Head-Injured Patients Who "Talk and Die": The San Diego Perspective.  J Trauma. 2007 Feb;62(2):277-281.

111. Ma G, Davis DP, Schmitt J, Vilke GM, Chan TC, Hayden SR.  The sensitivity and specificity of transcricothyroid ultrasonography to confirm endotracheal tube placement in a cadaver model.  J Emerg Med  2007;32(4):405-414.

112. Davis DP, Fisher R, Aguilar S, Metz M, Ochs G, McCallum-Brown L, Ramanujam P, Buono C, Vilke GM, Chan TC, Dunford JV. The feasibility of a regional cardiac arrest receiving system.  Resuscitation. 2007;74(1):44-51.

113. Levine SD, Sloane CM, Chan TC, Dunford JV, Vilke GM. Cardiac monitoring of human subjects exposed to the taser. J Emerg Med. 2007;33(2):113-7.

114. Firestone D, Wos A, Killeen JP, Chan TC, Guluma K, Davis DP, Vilke GM. Can urine dipstick be used as a surrogate for serum creatinine in emergency department patients who undergo contrast studies? J Emerg Med. 2007;33(2):119-22.

115. Khaleghi M, Loh A, Vroman D, Chan TC, Vilke GM. The effects of minimizing ambulance diversion hours on emergency departments. J Emerg Med. 2007;33(2):155-9.

116. Davis DP, Graydon C, Stein R, Wilson S, Buesch B, Berthiaume S, Lee D, Rivas J, Vilke GM, Leahy DR.  The positive predictive value of paramedic versus emergency physician interpretation of the prehospital 12-lead electrocardiogram.  Prehosp Emerg Care 2007;11(4):399-402.

117. Vilke GM, Chan TC. Less lethal technology: medical issues. Policing 2007;30(3):341-357.

118. Vilke GM, Sloane CM, Bouton KD, Kolkhorst FW, Levine SD, Neuman TS, Castillo EM, Chan T Physiological Effects of a Conducted Electrical Weapon on Human Subjects. Ann Emerg Med. 2007;.50(5):569-75.

Curriculum Vitae
Gary M. Vilke, M.D., FACEP, FAAEM

PUBLICATIONS, continued:

Articles

119. Conroy C, Eastman AB, Stanley C, Vilke GM, Vaughan T, Hoyt DB, Pacyna S. Fatal Positional Asphyxia Associated With Rollover Crashes. Am J Forensic Med Pathol. 2007;28(4):330-332.

120. Vilke GM, Sloane C, Levine S, Neuman T, Castillo E, Chan TC.  Twelve-lead electrocardiogram monitoring of subjects before and after voluntary exposure to the Taser X26.Am J Emerg Med. 2008;26(1):1-4.

121. Sloane CM, Chan TC, Vilke GM. Thoracic Spine Compression Fracture after TASER Activation. J Emerg Med. 2008:34(3):283-5.

122. Sloane C, Vilke GM. Death by Tasercution Rare.  *Emergency Medicine News*. 2008;30(3):7.

123. Chan TC, Harrigan RA, Ufberg J, Vilke GM. Mandibular Reduction. J Emerg Med. 2008;34(4):435-40.

124. Tornabene SV, Deutsch R, Davis DP, Chan TC, Vilke GM. Evaluating the use and timing of opioids for the treatment of migraine headaches in the emergency department. J Emerg Med. 2009 May;36(4):333-7. Epub 2008 Feb 14.

125. Vilke GM, Ufberg JW, Harrigan RA, Chan TC. Evaluation and Treatment of Acute Urinary Retention. J Emerg Med. 2008;35(2):193-8.

126. Sloane CM, Chan TC, Levine SD, Dunford JV, Neuman T, Vilke GM. Serum Troponin I Measurement of Subjects Exposed to the Taser X-26(R). J Emerg Med. 2008;35(1):29-32

127. Tornabene S, Vilke GM. Gradenigo's Syndrome. J Emerg Med. 2010;38(4):449-51. Epub 2008 Feb 23.

128. Vilke GM, Sloane CM, Neuman T, Castillo EM, Chan TC, Kolkhorst F. In reply to Taser safety remains unclear.  Ann Emerg Med. 2008 Jul;52(1):85-86.

129. Sloane CM, Vilke GM.  Medical Aspects of Less-Lethal Weapons. Law Enforcement Executive Forum. 2008;8(4):81-94.

130. Conroy C, Stanley C, Eastman AB, Vaughn T, Vilke GM, Hoyt DB, Pacyna S, Smith A. Asphyxia: A Rare Cause of Death for Motor Vehicle Crash Occupants. Am J Forensic Med Pathol. 2008;29:14-18.

131. Ramanujam P, Castillo E, Patel E, Vilke G, Wilson MP, Dunford JV.  Prehospital transport time intervals for acute stroke patients. J Emerg Med. 2009 Jul;37(1):40-5. Epub 2008 Aug 23.

Curriculum Vitae
Gary M. Vilke, M.D., FACEP, FAAEM

PUBLICATIONS, continued:

Articles

132. Chan TC, Killeen JP, Castillo EM, Vilke GM, Guss DA, Feinberg R, Friedman, L. Impact of an Internet-Based Emergency Department Appointment System to Access Primary Care at Safety Net Community Clinics.  Ann Emerg Med 2009;54(2):279-84. Dec. Epub 2008 Dec 13.

133. Vilke GM, Johnson WD 3rd, Castillo EM, Sloane C, Chan TC. Tactical and subject considerations of in-custody deaths proximal to use of conductive energy devices.  Am J Forensic Med Pathol. 2009;Mar;30(1):23-5.

134. Firestone DN, Band RA, Hollander JE, Castillo E, Vilke GM.  Use of a Urine Dipstick and Brief Clinical Questionnaire to Predict an Abnormal Serum Creatinine in the Emergency Department.  Acad Emerg Med. 2009;16(8):699-703.

135. Vilke GM, Sloane CM, Suffecool A, Kolkhorst FW, Neuman TS, Castillo EM, Chan TC.  Physiologic Effects of the TASER After Exercise.  Acad Emerg Med. 2009;16(8):704-710.

136. Vilke GM, Wilson MP. Agitation: What every emergency physician should know. EM Reports. 2009 30(19):1-8.

137. Doney MK, Vilke GM.  Case Report: Aortoenteric Fistula Presenting as Repeated Hematochezia. J Emerg Med. 2012;43(3):431-34. Epub 2010 Jan 23.

138. Vilke GM, Sloane C, Castillo EM, Kolkhorst FW, Neuman TS, Chan TC. Evaluation of the Ventilatory Effects of a Restraint Chair on Human Subjects. J Emerg Med. 2011;40(6):714-8. Epub 2010 Jan 13.

139. Chan TC, Killeen JP, Vilke GM, Marshall JB, Castillo EM.  Effect of Mandated Nurse–Patient Ratios on Patient Wait Time and Care Time in the Emergency Department. Acad Emerg Med.  2010; 17:545–552

140. Vilke GM, Chan TC.  Evaluation and Management for Carotid Dissection in Patients Presenting after Choking or Strangulation. J Emerg Med. 2011;40(3):355-8.  Epub 2010 Apr 2.

141. Wilson, MP, MacDonald KS, Vilke GM, Feifel D.  Potential complications of combining intramuscular olanzapine with benzodiazepines in emergency department patients.  J Emerg Med. 2012;43(5):889-96 Epub 2010 Jun 12.

142. Castillo EM, Vilke GM, Williams M, Turner P, Boyle J, Chan TC.  Collaborative to Decrease Ambulance Diversion: The California Emergency Department Diversion Project. J Emerg Med. 2011;40(3):300-7. Epub 2010 Apr 10.

Curriculum Vitae
Gary M. Vilke, M.D., FACEP, FAAEM

PUBLICATIONS, continued:

Articles

143. Hostler D, Thomas EG, Emerson SS, Christenson J, Stiell IG, Rittenberger JC, Gorman KR, Bigham BL, Callaway CW, Vilke GM, Beaudoin T, Cheskes S, Craig A, Davis DP, Reed A, Idris A, Nichol G; The Resuscitation Outcomes Consortium Investigators. Increased survival after EMS witnessed cardiac arrest.  Observations from the Resuscitation Outcomes Consortium (ROC) Epistry-Cardiac arrest.  Resuscitation. 2010 Jul;81(7):826-30. Epub 2010 Apr 18.

144. Macdonald K, Wilson MP, Minassian A, Vilke GM, Perez R, Cobb P, Tallian K, Becker O, Feifel D.  A retrospective analysis of intramuscular haloperidol and intramuscular olanzapine in the treatment of agitation in drug- and alcohol-using patients. Gen Hosp Psychiatry. 2010 July - August;32(4):443-445. Epub 2010 Jun 12.

145. Schranz CI, Castillo EM, Vilke GM. The 2007 San Diego wildfire impact on the emergency department of the University of California, San Diego Hospital system. Prehosp Disaster Med. 2010 Sep-Oct;25(5):472-6.

146. Vilke GM, Bozeman WP, Chan TC.   Emergency Department Evaluation after Conducted Energy Weapon Use:  Review of the Literature for the Clinician.  J Emerg Med 2011;40(5):598-604. Epub 2011 Jan 4.

147. Vilke GM, Douglas DJ, Shipp H, Stepanski B, Smith A, Ray LU, Castillo EM. Pedatric poisonings in children younger than five years responded to by paramedics. J Emerg Med. 2011;41(3):265-9 Epub 2011 Jan 5.

148. Vilke GM, DeBard ML, Chan TC, Ho JD, Dawes DM, Hall C, Curtis MD, Costello MW, Mash DC, Coffman SR, McMullen MJ, Metzger JC, Roberts JR, Sztajnkrcer MD, Henderson SO, Adler J, Czarnecki F, Heck J, Bozeman WP. Excited Delirium Syndrome (ExDS): Defining Based on a Review of the Literature.  J Emerg Med. 2012;43(5):897-905. Epub 2011 Mar 24.

149. Davis DP, Salazar A, Chan TC, Vilke GM. Prospective evaluation of a clinical decision guideline to diagnose spinal epidural abscess in patients who present to the emergency department with spine pain. J Neurosurg Spine. 2011;14(6):765-70. Epub 2011 Mar 18.

150. Vilke GM. Pathophysiologic changes due to TASER devices versus excited delirium: Potential relevance to deaths-in-custody? J Forens and Legal Med. 2011:18(6):291. Epub 2011 May 24.

151. Wilson MP, Macdonald K, Vilke GM, Feifel D. A Comparison of the Safety of Olanzapine and Haloperidol in Combination with Benzodiazepines in Emergency Department Patients with Acute Agitation. J Emerg Med. 2012;43(5):790-7. Epub 2011 May 19.

PUBLICATIONS, continued:

Articles

152.   Stiell IG, Nichol G, Leroux BG, Rea TD, Ornato JP, Powell J, Christenson J, Callaway CW, Kudenchuk PJ, Aufderheide TP, Idris AH, Daya MR, Wang HE, Morrison LJ, Davis D, Andrusiek D, Stephens S, Cheskes S, Schmicker RH, Fowler R, Vaillancourt C, Hostler D, Zive D, Pirallo RG, Vilke GM, Sopko G, Weisfeldt M.  Early versus Later Rhythm Analysis in Patients with Out-of-Hospital Cardiac Arrest.  N Eng J Med 2011;365(9):787-97.

153.   Wilson MP, Vilke GM, Ramanujam P, Itagaki MW. Emergency physicians research commonly encountered patient-oriented problems in the proportion with which they are encountered in the emergency department. West J Emerg Med. 2012 Sep;13(4):344-50. Epub 2012 Feb 6.

154.   DeMers G, Lynch C, Vilke GM.  Retail store-related traumatic injuries in paediatric and elderly populations.  J of Paramed Pract 2012;3(11):632-636.

155.   Vilke GM, Payne-James J, Karsch SB.  Excited Delirium Syndrome (ExDS):  Redefining an Old Diagnosis.  J Forens Legal Med. 2012;19:7-11. Epub 2011 Nov 2.

156.   Vilke GM, Bozeman WP, Dawes DM, DeMers, G, Wilson MP.  Excited delirium syndrome (ExDS): Treatment options and considerations.  J Forens Legal Med. 2012;19:117-121. Epub 2012 Jan 24.

157.   Kroening-Roche JC, Soroudi A, Castillo EM, Vilke GM. Antibiotic and Bronchodilator Prescribing for Acute Bronchitis in the Emergency Department. J Emerg Med. 2012;43(2):221-7. Epub 2012 Feb 16.

158.   Nordt SP, Vilke GM, Clark RF, Lee Cantrell F, Chan TC, Galinato M, Nguyen V, Castillo EM.  Energy Drink Use and Adverse Effects Among Emergency Department Patients. J Community Health. 2012: Oct;37(5):976-81.  Epub 2012 Feb 25.

159.   Vilke GM, Sloane CM, Chan TC. Funding source and author affiliation in TASER research are strongly associated with a conclusion of device safety.  Am Heart J. 2012 Mar;163(3):e5. Epub 2012 Feb 2.

160.   Vilke GM, Sloane CM, Chan TC. Clarification of Funding Sources in "Electronic Control Device Exposures: A Review of Morbidity and Mortality".  Ann Emerg Med 2012;59(4):336.

161.   Gault TI, Gray SM, Vilke GM, Wilson MP.  Are oral medications effective in the management of acute agitation?  J Emerg Med. 2012;43(5):854-9. Epub 2012 Apr 26.

Curriculum Vitae
Gary M. Vilke, M.D., FACEP, FAAEM

PUBLICATIONS, continued:

Articles

162.    Macdonald KS, Wilson MP, Minassian A, Vilke GM, Becker O, Tallian K, Cobb P, Perez R, Galangue B, Feifel D. A naturalistic study of intramuscular haloperidol versus intramuscular olanzapine for the management of acute agitation. J Clin Psychopharm. 2012;32(3):317-22. Epub 2012 Apr 26.

163.    Repanshek ZD, Ufberg JW, Vilke GM, Chan TC, Harrigan RA. Alternative treatments of pneumothorax.  J Emerg Med 2013;44(2):457-66. Epub 2012 May 21.

164.    Wilson MP, Chen N, Vilke GM, Castillo EM, Macdonald KS, Minassian A.  Olanzapine in ED patients: differential effects on oxygenation in patients with alcohol intoxication.  Am J Emerg Med 2012;30(7):1196-201. Epub 2012 May 23.

165.    Almazroua FY, Vilke GM.  The captain morgan technique for the reduction of the dislocated hip.  Ann Emerg Med 2012;60(1):135-6.

166.    Hall CA, Kader AS, McHale AMD, Stewart L, Fick GH, Vilke GM.  Frequency of signs of excited delirium syndrome in subjects undergoing police use of force: Descriptive evaluation of a prospective, consecutive cohort.  J Foresn and Leg Med 2013;20:102-7. Epub 2012 June 22.

167.    Perkins J, Perkins K, Vilke GM, Almazroua FY.  Is culture-positive urinary tract infection in febrile children accurately identified by urine dipstick or microanalysis?  J Emerg Med 2012;43(6):1155-9. Epub 2012 July 13.

168.    Demers G, Meurer WJ, Shih R, Rosenbaum, S, Vilke GM.  Tissue plasminogen activator and stroke: Review of the literature for the clinician.  J Emerg Med 2012;43(6):1149-54. Epub 2012 July 18

169.    Ronquillo L, Minassian A, Vilke GM, Wilson MP.  Literature-based Recommendations for Suicide Assessment in the Emergency Department:  A Review.  J Emerg Med. 2012;43(5):836-42. Epub 2012 Oct 2.

170.    Vilke GM, Chan TC, Karch S. Letter by Vilke et al Regarding Article, "Sudden cardiac arrest and death following application of shocks from a TASER electronic control device". Circulation. 2013 Jan 1;127(1):e258. Epub 2013 Jan 1.

171.    Wilson MP, Vilke GM. Why all the yelling and screaming? Dealing with agitation in the ED setting. Cyberounds. 2013 Feb 09.

Curriculum Vitae
Gary M. Vilke, M.D., FACEP, FAAEM

PUBLICATIONS, continued:

Articles

172. Ali SS, Wilson MP, Castillo EM, Witucki P, Simmons TT, Vilke GM.  Common hand sanitizer may distort readings of breathalyzer tests in the absence of acute intoxication.  Acad Emerg Med 2013; 20(2):212-5.

173. Maisel A, Mueller C, Neath SX, Christenson RH, Morgenthaler NG, Nowak RM, Vilke G, Daniels LB, Hollander JE, Apple FS, Cannon C, Nagurney JT, Schreiber D, Defilippi C, Hogan C, Diercks DB, Stein JC, Headden G, Limkakeng AT Jr, Anand I, Wu AH, Papassotiriou J, Hartmann O, Ebmeyer S, Clopton P, Jaffe AS, Frank Peacock W.  Copeptin Helps "Copeptin Helps in the Early Detection of Patients with Acute Myocardial Infarction": the primary results of the CHOPIN Trial.  J Am Coll Cardiol.2013; 62(2):150-30. Epub 2013 Apr 30.

174. Minassian A, Vilke GM, Wilson MP.  Frequent Emergency Department Visits are More Prevalent in Psychiatric, Alcohol Abuse, and Dual Diagnosis Conditions than in Chronic Viral Illnesses Such as Hepatitis and Human Immunodeficiency Virus.  J Emerg Med. 2013;45(4):520-5. Epub 2013 Jul 8.

175. Darracq MA, Clark RF, Jacoby I, Vilke GM, Demers G, Cantrell FL.  Disaster Preparedness of Poison Control Centers in the USA: A 15-year Follow-up Study.  J Med Toxicol. 2014;10(1):29-25. Epub 2013 Jul 12.

176. Winters ME, Rosenbaum S, Vilke GM, Almazroua FY.  Emergency Department Management of Patients with ACE-Inhibitor Angioedema.  J Emerg Med 2013;45(5):775-80. Epub 2013 Aug 26.

177. Savaser DJ, Campbell C, Castillo EM, Vilke GM, Sloane C, Neuman T, Hansen AV, Shah S, Chan TC.  The effect of the prone maximal restrained position with and without weight force on cardiac output and other hemodynamic measures.  J Forens Leg Med. 2013 Nov;20(8):991-5. Epub 2013 Aug 30.

178. Wilson MP, Macdonald K, Vilke GM, Ronquillo L, Feifel D. Intramuscular Ziprasidone: Influence of alcohol and benzodiazepines on vital signs in the emergency setting.  J Emerg Med 2013:45(6):901-8. Epub 2013 Sep 24.

179. Perkins J, McCurdy MT, Vilke GM, Al-Marshad AA.  Telemetry Bed Usage for Patients with Low-risk Chest Pain: Review of the Literature for the Clinician.  J Emerg Med 2014;46(2):273-7. Epub 2013 Nov 22.

180. Del Portal DA, Horn AE, Vilke GM, Chan TC, Ufberg JW.  Emergency department management of shoulder dystocia. J Emerg Med 2014;46(3):378-82. Epub 2013 Dec 18.

Curriculum Vitae
Gary M. Vilke, M.D., FACEP, FAAEM

PUBLICATIONS, continued:

Articles

181.    Vilke GM, Bozeman WP, Chan TC.  Re: Emergency Department Evaluation of Conducted Energy Weapon (CEW)-Injured Patients. J Emerg Med 2014;46(4):533-4. Epub 2014 Jan 9.

182.    Jalali N, Vilke GM, Korenevsky M, Castillo EM, Wilson MP.  The Tooth, the Whole Tooth, and Nothing But the Tooth: Can Dental Pain Ever Be the Sole Presenting Symptom of a Myocardial Infarction? A Systematic Review.  J Emerg Med. 2014;[Epub 2014 Jan 25].

183.    Sloane C, Chan TC, Kolkhorst F, Neuman T, Castillo EM, Vilke GM.  Evaluation of the Ventilatory Effects of the Prone Maximum Restraint Position (PMR) on Obese Human Subjects. Forens Sci Int 2014;237:86-9. Epub 2014;46(6):865-72. Epub 2014 Feb 14.

184.    Wilson MP, Minassian A, Bahramzi M, Campillo A, Vilke GM. Despite expert recommendations, second-generation antipsychotics are not often prescribed in the emergency department. J Emerg Med. 2014;46(6):808-83. Epub 2014 Mar 19.

185.    Vilke GM, Chan TC, Savaser D, Neuman T.  Response to letter by Michaud Regarding Article, "Hemodynamic consequences of restraints in the prone position in excited delirium syndrome" J Forens Legal Med 2014;27:82-4.

186.    Davis DP, Aguilar SA, Smith K, Husa RD, Minokadeh A, Vilke G, Sell R, Fisher R, Brainard C, Dunford JV.  Preliminary Report of a Mathematical Model of Ventilation and Intrathoracic Pressure Applied to Prehospital Patients with Severe Traumatic Brain Injury. Prehosp Emerg Care. 2015 Apr-Jun;19(2):328-35. Epub 2014 Oct 7.

187.    Wilson MP, Minassian A, Ronquillo L, Vilke GM.  Wilson reply to Ryan.  J Emerg Med. 2015 Mar;48(3):336.  Epub 2014 Nov 20.

188.    Rowh AD, Ufberg JW, Chan TC, Vilke GM, Harrigan RA. Lateral Canthotomy and Cantholysis: Emergency Management of Orbital Compartment Syndrome. J Emerg Med. 2015 Mar;48(3):325-30.  Epub 2014 Dec 15.

189.    Hall C, Votova K, Heyd C, Walker M, MacDonald S, Eramian D, Vilke GM, Restraint in police use of force events: Examining sudden in custody death for prone and not-prone positions, J Forens Legal Med. 2015;31:29-35. Epub 2015 Jan 5

190.    Wilson MP, Brennan JJ, Modesti L, Deen J, Anderson L, Vilke GM, Castillo EM. Lengths of stay for involuntarily held psychiatric patients in the ED are affected by both patient characteristics and medication use. Am J Emerg Med. 2015 Apr;33(4):527-30. Epub 2015 Jan 20.

191.    Warren SA, Prince DK, Huszti E, Rea TD, Fitzpatrick AL, Andrusiek DL, Darling S, Morrison LJ, Vilke GM, Nichol G; the ROC Investigators.  Volume versus Outcome: More Emergency Medical Services Personnel On-scene and Increased Survival after Out-of-Hospital Cardiac Arrest. Resuscitation.  2015 Sep;94:40-8. Epub 2015 Feb 24.

Curriculum Vitae
Gary M. Vilke, M.D., FACEP, FAAEM

PUBLICATIONS, continued:

Articles

192.    Nakajima Y, Vilke GM. Editorial: Ambulance Diversion: the Con Perspective. Am J Emerg Med. 2015 Jun;33(6):818-9. Epub 2015 Mar 10.

193.    Perkins J, Ho JD, Vilke GM, DeMers G. Safety of Droperidol Use in the Emergency Department. J Emerg Med. 2015 Jul;49(1):91-7.  Epub 2015 Mar 30.

194.    Hopper AB, Vilke GM, Castillo EM, Campillo A, Davie T, Wilson MP. Ketamine Use for Acute Agitation in the Emergency Department. J Emerg Med. 2015 Jun;48(6):712-9. Epub 2015 Apr 2.

195.    Vilke GM, DeMers G, Patel N, Castillo EM. Safety and Efficacy of Milk and Molasses Enemas in the Emergency Department. J Emerg Med. 2015 Jun;48(6):667-70. Epub 2015 Apr 4.

196.    Shah KS, Marston NA, Mueller C, Neath SX, Christenson RH, McCord J, Nowak RM, Vilke GM, Daniels LB, Hollander JE, Apple FS, Cannon CM, Nagurney J, Schreiber D, deFilippi C, Hogan CJ, Diercks DB, Limkakeng A, Anand IS, Wu AH, Clopton P, Jaffe AS, Peacock WF, Maisel AS.  Midregional Proadrenomedullin Predicts Mortality and Major Adverse Cardiac Events in Patients Presenting With Chest Pain: Results From the CHOPIN Trial.  Acad Emerg Med. 2015 May;22(5):554-63.  Epub 2015 Apr 23.

197.    Shi E, Vilke GM, Coyne CJ, Oyama LC, Castillo EM.  Clinical outcomes of ED patients with bandemia. Am J Emerg Med. 2015 Jul;33(7):876-81. Epub 2015 Mar 18.

198.    Castillo EM, Coyne CJ, Chan TC, Hall CA, Vilke GM.  Review of the medical and legal literature on restraint chairs.  J Forens Legal Med. 2015;33:91-97. Epub 2015 May 1.

199.    Vilke GM, Kass P. Retroperitoneal Hematoma After Femoral Arterial Catheterization. J Emerg Med. 2015 Sep;49(3):338-9. Epub 2015 July 4.

200.    Campillo A, Castillo E, Vilke GM, Hopper A, Ryan V, Wilson MP. First-generation Antipsychotics Are Often Prescribed in the Emergency Department but Are Often Not Administered with Adjunctive Medications. J Emerg Med. 2015 Dec;49(6):901-6. Epub 2015 Sep 30.

201.    Wilson MP, Nordstrom K, Vilke GM.  The Agitated Patient in the Emergency Department. Curr Emerg Hosp Med Rep. 2015 Oct 12. [Epub ahead of print]

Curriculum Vitae
Gary M. Vilke, M.D., FACEP, FAAEM

PUBLICATIONS, continued:

Articles

202. Lev R, Lee O, Petro S, Lucas J, Castillo EM, Vilke GM, Coyne CJ.  Who is prescribing controlled medications to patients who die of prescription drug abuse? Am J Emerg Med. 2016 Jan;34(1):30-5. Epub 2015 Sep 8.

203. Wilson MP, Nordstrom K, Shah AA, Vilke GM.  Psychiatric Emergencies in Pregnant Women.  Emerg Med Clin North Am. 2015 Nov;33(4):841-51.

204. Nordstrom K, Vilke GM, Wilson MP. Psychiatric Emergencies for Clinicians: Emergency Department Management of Serotonin Syndrome. J Emerg Med. 2016 Jan;50(1):89-91. Epub 2015 Oct 7.

205. Lev R, Petro S, Lee A, Lee O, Lucas J, Castillo EM, Egnatios J, Vilke GM.  Methadone related deaths compared to all prescription related deaths.  Forensic Sci Int. 2015 Oct 22;257:347-352.

206. Abraham MK, Perkins J, Vilke GM, Coyne CJ.  Influenza in the Emergency Department: Vaccination, Diagnosis, and Treatment: Clinical Practice Paper Approved by American Academy of Emergency Medicine Clinical Guidelines Committee. J Emerg Med. 2016 Mar;50(3):536-42.  Epub 2016 Jan 4.

207. Lev R, Petro S, Lee O, Lucas J, Stuck A, Vilke GM, Castillo EM.  A description of Medical Examiner prescription-related deaths and prescription drug monitoring program data. Am J Emerg Med. 2015 Dec 14.

208. Meurer WJ, Walsh B, Vilke GM, Coyne CJ. Clinical Guidelines for the Emergency Department Evaluation of Subarachnoid Hemorrhage.  J Emerg Med. 2017 Feb;52(2):255-261. Epub 2016 Jan 25.

209. Lam SH, Majlesi N, Vilke GM.  Use of Intravenous Fat Emulsion in the Emergency Department for the Critically Ill Poisoned Patient.  J Emerg Med. 2016 Aug;51(2):203-14. Epub 2016 Mar 10.

210. Kudenchuk PJ, Brown SP, Daya M, Rea T, Nichol G, Morrison LJ, Leroux B, Vaillancourt C, Wittwer L, Callaway CW, Christenson J, Egan D, Ornato JP, Weisfeldt ML, Stiell IG, Idris AH, Aufderheide TP, Dunford JV, Colella MR, Vilke GM, Brienza AM, Desvigne-Nickens P, Gray PC, Gray R, Seals N, Straight R, Dorian P; Resuscitation Outcomes Consortium Investigators. Amiodarone, Lidocaine, or Placebo in Out-of-Hospital Cardiac Arrest. N Engl J Med. 2016 May 5;374(18):1711-22. Epub 2016 Apr 4

211. Wilson MP, Vilke GM, Hayden SR, Nordstrom K.  Psychiatric Emergencies for Clinicians: Emergency Department Management of Neuroleptic Malignant Syndrome.  J Emerg Med. 2016 Jul;51(1):66-9. Epub 2016 May 28.

Curriculum Vitae
Gary M. Vilke, M.D., FACEP, FAAEM

PUBLICATIONS, continued:

Articles

212.  Healy ME, Kozubal DE, Horn AE, Vilke GM, Chan TC, Ufberg JW.   Care of the Critically
Ill Pregnant Patient and Perimortem Cesarean Delivery in the Emergency Department.  J
Emerg Med. 2016 Aug;51(2):172-7. Epub 2016 Jun 29.

213.  Lasoff D, Vilke G, Nordstrom K, Wilson M.  Psychiatric Emergencies for Clinicians:
Detection and Management of Anti-N-Methyl-D-Asparate Receptor Encephalitis.  J Emerg
Med. 2016;51(5):561-63. Epub Jul 15.

214.  Corbett B, Vilke GM, Nordstrom K, Wilson M.  Psychiatric Emergencies for Clinicians:
Diagnosis and Management of Steroid Psychosis.  J Emerg Med. 2016;51(5):577-60. Epub
Aug 15.

215.  Hornbeak K, Castillo EM, Sloane C, Vilke GM.  The Role of Subject Intoxication and Other
Characteristics in Law Enforcement Use-of-force Incidents. J For Med Leg Aff. 2016 1(3):
112.

216.  Maisel AS, Wettersten N, van Veldhuisen DJ, Mueller C,  Gerasimos Filippatos C, Nowak
R, Hogan C, Kontos MC, Cannon CM, Müller GA, Birkhahn R, Clopton P, Taub P, Vilke
GM, McDonald K, Mahon N, Nuñez J, Briguori C, Passino C, Murray PT.  Neutrophil
Gelatinase-Associated Lipocalin for Acute Kidney Injury During Acute Heart Failure
Hospitalizations: The AKINESIS Study.  JACC. 2016;68(13):1420-31.

217.  Coyne CJ, Abraham MK, Perkins J, Vilke GM.  Letter: Influenza in the Emergency
Department: Vaccination, Diagnosis, and Treatment.   J Emerg Med. 2016 Dec;51(6):735-
736. Epub 2016 Sep 26.

218.  Motov S, Rosenbaum S, Vilke GM, Nakajima Y.  Is There a Role for Intravenous
Subdissociative-Dose Ketamine Administered as an Adjunct to Opioids or as a Single Agent
for Acute Pain Management in the Emergency Department?  J Emerg Med. 2016
Dec;51(6):752-757. Epub 2016 Sep 29.

219.  Degner NR, Joshua A, Padilla R, Vo HH, Vilke GM.  Comparison of Digital Chest
Radiography to Purified Protein Derivative for Screening of Tuberculosis in Newly
Admitted Inmates. J Correct Health Care. 2016 Oct;22(4):322-330.

220.  Granata RT, Castillo EM, Vilke GM.  Safety of deferred computed tomographic imaging of
intoxicated patients presenting with possible traumatic brain injury.  Am J Emerg Med. 2017
Jan;35(1):51-54. Epub 2016 Sep 30.

Curriculum Vitae
Gary M. Vilke, M.D., FACEP, FAAEM

PUBLICATIONS, continued:

Articles

221.    Beri N, Marston NA, Daniels LB, Nowak RM, Schreiber D, Mueller C, Jaffe A, Diercks
DB, Wettersten N, DeFilippi C, Peacock WF, Limkakeng AT, Anand I, McCord J,
Hollander JE, Wu AH, Apple FS, Nagurney JT, Berardi C, Cannon CM, Clopton P, Neath
SX, Christenson RH, Hogan C, Vilke G, Maisel A.  Necessity of hospitalization and stress
testing in low risk chest pain patients.  Am J Emer Med 2017 (35): 274–280. Epub 2016 Oct
29.

222.    Meurer WJ, Barth BE, Gaddis G, Vilke GM, Lam SH.  Rapid Systematic Review: Intra-
Arterial Thrombectomy ("Clot Retrieval") for Selected Patients with Acute Ischemic
Stroke.  J Emerg Med. 2017 Feb;52(2):255-261. Epub 2016 Nov 15.

223.    Winters ME, Sherwin R, Vilke GM, Wardi G.  Does Early Goal-Directed Therapy Decrease
Mortality Compared with Standard Care in Patients with Septic Shock?  J Emerg Med. 2017
Mar;52(3):379-384.  Epub 2016 Nov 19.

224.    Coyne CJ, Le V, Brennan JJ, Castillo EM, Shatsky RA, Ferran K, Brodine S, Vilke GM.
Application of the MASCC and CISNE Risk-Stratification Scores to Identify Low-Risk
Febrile Neutropenic Patients in the Emergency Department.  Ann Emerg Med. 2017
Jun;69(6):755-764. Epub 2016 Dec 29.

225.    Blewer AL, Ibrahim SA, Leary M, Dutwin D, McNally B, Anderson ML, Morrison LJ,
Aufderheide TP, Daya M, Idris AH, Callaway CW, Kudenchuk PJ, Vilke GM, Abella BS.
Cardiopulmonary Resuscitation Training Disparities in the United States.   J Am Heart
Assoc. 2017 May 17;6(5).

226.    Evans CS, Platts-Mills TF, Fernandez AR, Grover JM, Cabanas JG, Patel MD, Vilke GM,
Brice JH. Repeated Emergency Medical Services Use by Older Adults: Analysis of a
Comprehensive Statewide Database. Ann Emerg Med. 2017 Oct;70(4):506-515.e3. Epub
2017 May 27.

227.    Starks MA, Schmicker RH, Peterson ED, May S, Buick JE, Kudenchuk PJ, Drennan IR,
Herren H, Jasti J, Sayre M, Stub D, Vilke GM, Stephens SW, Chang AM, Nuttall J, Nichol
G; Resuscitation Outcomes Consortium (ROC). Association of Neighborhood
Demographics with Out-of-Hospital Cardiac Arrest Treatment and Outcomes: Where You
Live May Matter. JAMA Cardiol. 2017;2(10):1110-1118.

228.    Kudenchuk PJ, Leroux BG, Daya M, Rea T, Vaillancourt C, Morrison LJ, Callaway CW,
Christenson J, Ornato JP, Dunford JV, Wittwer L, Weisfeldt ML, Aufderheide TP, Vilke
GM, Idris AH, Stiell IG, Colella MR, Kayea T, Egan DA, Desvigne-Nickens P, Gray P,
Gray R, Straight R, Dorian P.  Antiarrhythmic Drugs for Non-Shockable-Turned-Shockable
Out-of-Hospital Cardiac Arrest: The Amiodarone, Lidocaine or Placebo Study (ALPS).
Circulation. 2017 Nov 28;136(22):2119-2131. Epub 2017 Sep 13.

Curriculum Vitae
Gary M. Vilke, M.D., FACEP, FAAEM

PUBLICATIONS, continued:

Articles

229.    Sherwin R, Winters ME, Vilke GM, Wardi G. Does Early and Appropriate Antibiotic Administration Improve Mortality in Emergency Department Patients with Severe Sepsis or Septic Shock? J Emerg Med. 2017 Oct;53(4):588-595. Epub 2017 Sep 12.

230.    Wilson MP, Nordstrom K, Hopper A, Porter A, Castillo EM, Vilke GM.  Risperidone in the Emergency Setting is Associated with More Hypotension in Elderly Patients.  J Emerg Med. 2017 Nov;53(5):735-739. Epub 2017 Oct 5.

231.    Alfaraj DN, Vilke GM.  Tripartite Fracture of the Ulnar Sesamoid Bone of the Thumb.  J Emerg Med. J Emerg Med. 2017 Nov;53(5):758-759. Epub 2017 Oct 5.

232.    Lasoff D, Hall CA, Bozeman WP, Chan TC, Castillo EM, Vilke GM: Proning: Outcomes of Use of Force Followed with Prone Restraint. J Forensic Med 2017;2(2):1-3.

233.    Mills L, Morley EJ, Soucy Z, Vilke GM, Lam SHF. Ultrasound for the Diagnosis and Management of Suspected Urolithiasis in the Emergency Department. J Emerg Med. 2018 Feb;54(2):215-220. Epub 2017 Oct 28.

234.    Bruno E, Pillus D, Cheng D, Vilke G, Pokrajac N. During the Emergency Department Evaluation of a Well-Appearing Neonate with Fever, Should Empiric Acyclovir Be Initiated? J Emerg Med. 2018 Feb;54(2):261-265.  Epub 2017 Nov 29.

235.    Winters ME, Sherwin R, Vilke GM, Wardi G.  What is the Preferred Resuscitation Fluid for Patients with Severe Sepsis and Septic Shock?   J Emerg Med. 2017 Dec;53(6):928-939. Epub 2017 Oct 25.

236.    Hayes BD, Winters ME, Rosenbaum SB, Allehyani MF, Vilke GM. What is the Role of Reversal Agents in the Management of Emergency Department Patients with Dabigatran-Associated Hemorrhage? J Emerg Med. Apr;54(4):571-575.Epub 2018 Feb 15.

237.    Winters ME, Sherwin R, Vilke GM, Wardi G. Reply. J Emerg Med. 2018 Feb;54(2):245-246.

238.    Coyne CJ, Dang A-H, Castillo EM, Vilke GM.  Assessment of the Theorized Risks of Conducted Energy Weapons through Literature Review of Runaway Pacemakers.  J For Med Leg Aff 2(1):113-118.

239.    Motov S, Strayer R, Hayes B, Reiter M, Rosenbaum S, Richman M, Repanshek Z, Taylor S, Friedman B, Vilke G, Lasoff D.  The Treatment of Acute Pain in the Emergency Department: A White Paper Position Statement Prepared for the American Academy of Emergency Medicine.  J Emerg Med. 2018 May;54(5):731-736.Epub 2018 Mar 6.

Curriculum Vitae
Gary M. Vilke, M.D., FACEP, FAAEM

PUBLICATIONS, continued:

Articles

240.   Mullinax S, Chalmers CE, Brennan J, Vilke GM, Nordstrom K, Wilson MP. Suicide screening scales may not adequately predict disposition of suicidal patients from the emergency department. Am J Emerg Med. 2018 Oct;36(10):1779-1783. doi: 10.1016/j.ajem.2018.01.087. Epub 2018 Jan 31. PMID: 29530359.

241.   Meurer WJ, Barth B, Abraham M, Hoffman J, Vilke GM, DeMers G. Intravenous Recombinant Tissue Plasminogen Activator and Ischemic Stroke: Focused Update of 2010 Clinical Practice Advisory From the American Academy of Emergency Medicine. J Emerg Med. 2018 May;54(5):723-730. Epub 2018 Mar 12.

242.   Wilson MP, Frenkel S, Brennan J, Simanjuntak J, Deen J, Vilke GM.  Patients with Suicidal Ideation and Evidence of Alcohol Use are Discharged at Higher Rates from the Emergency Department. Int J Psychol Psychoanal 2017, 3:019.

243.   Kurz MC, Schmicker RH, Leroux B, Nichol G, Aufderheide TP, Cheskes S, Grunau B, Jasti J, Kudenchuk P, Vilke GM, Buick J, Wittwer L, Sahni R, Straight R, Wang HE. Advanced vs. Basic Life Support in the Treatment of Out-of-Hospital Cardiopulmonary Arrest in the Resuscitation Outcomes Consortium. Resuscitation. 2018 Jul;128:132-137. Epub 2018 Apr 30.

244.   Beri N, Daniels LB, Jaffe A, Mueller C, Anand I, Peacock WF, Hollander JE, DeFilippi C, Schreiber D, McCord J, Limkakeng AT, Wu AHB, Apple FS, Diercks DB, Nagurney JT, Nowak RM, Cannon CM, Clopton P, Neath SX, Christenson RH, Hogan C, Vilke G, Maisel A. Copeptin to rule out myocardial infarction in Blacks versus Caucasians. Eur Heart J Acute Cardiovasc Care. 2019 Aug;8(5):395-403. doi: 10.1177/2048872618772500. Epub 2018 May 8. PMID: 29737180.

245.   Lam SHF, Li DR, Hong CE, Vilke GM. Systematic Review: Rectal Administration of Medications for Pediatric Procedural Sedation. J Emerg Med. 2018 Jul;55(1):51-63. Epub 2018 May 24.

246.   Zive DM, Schmicker R, Daya M, Kudenchuk P, Nichol G, Rittenberger JC, Aufderheide T, Vilke GM, Christenson J, Buick JE, Kaila K, May S, Rea T, Morrison LJ; ROC Investigators. Survival and variability over time from out of hospital cardiac arrest across large geographically diverse communities participating in the Resuscitation Outcomes Consortium.  Resuscitation. 2018 Jul 24;131:74-82. Epub 2018 Jul 24.

247.   Shuen JA, Wilson MP, Kreshak A, Mullinax S, Brennan J, Castillo EM, Hinkle C, Vilke GM. Telephoned, Texted, or Typed Out: A Randomized Trial of Physician-Patient Communication After Emergency Department Discharge. J Emerg Med. 2018 Oct;55(4):573-581. doi: 10.1016/j.jemermed.2018.07.023. Epub 2018 Sep 1. PMID: 30181075; PMCID: PMC6163067.

Curriculum Vitae
Gary M. Vilke, M.D., FACEP, FAAEM

PUBLICATIONS, continued:

Articles

248.    Kreshak AA, Brennan JJ, Vilke GM, Tolia VM, Caccese M, Castillo EM, Chan TC. A Description of a Health System's Emergency Department Patients Who Were Part of a Large Hepatitis A Outbreak. J Emerg Med. 2018 Nov;55(5):620-626. doi: 10.1016/j.jemermed.2018.07.031. Epub 2018 Sep 22. PMID: 30253951.

249.    Okubo M, Schmicker RH, Wallace DJ, Idris AH, Nichol G, Austin MA, Grunau B, Wittwer LK, Richmond N, Morrison LJ, Kurz MC, Cheskes S, Kudenchuk PJ, Zive DM, Aufderheide TP, Wang HE, Herren H, Vaillancourt C, Davis DP, Vilke GM, Scheuermeyer FX, Weisfeldt ML, Elmer J, Colella R, Callaway CW. Variation in Survival After Out-of-Hospital Cardiac Arrest Between Emergency Medical Services Agencies. JAMA Cardiol. 2018 Oct 1;3(10):989-999.

250.    Alfaraj DN, Wilson MP, Akeely Y, Vilke GM, Nordstrom K. Psychiatric Emergencies for Clinicians: Emergency Department Management of Hypercalcemia. J Emerg Med. 2018 Nov;55(5):688-692. doi: 10.1016/j.jemermed.2018.07.018. Epub 2018 Oct 15. PMID: 30336968.

251.    Blewer AL, McGovern SK, Schmicker RH, May S, Morrison LJ, Aufderheide TP, Daya M, Idris AH, Callaway CW, Kudenchuk PJ, Vilke GM, Abella BS; Resuscitation Outcomes Consortium (ROC) Investigators. Gender Disparities Among Adult Recipients of Bystander Cardiopulmonary Resuscitation in the Public. Circ Cardiovasc Qual Outcomes. 2018 Aug;11(8):e004710. doi: 10.1161/CIRCOUTCOMES.118.004710. PMID: 30354377; PMCID: PMC6209113.

252.    Lutz M, Sloane CM, Castillo EM, Brennen JJ, Coyne CJ, Swift SL, Vilke GM. Physiological Effects of a Spit Sock.  Am J Emerg Med. 2019 Feb;37(2):291-293. doi: 10.1016/j.ajem.2018.09.050. Epub 2018 Oct 3. PMID: 30415982

253.    Khera R, Humbert A, Leroux B, Nichol G, Kudenchuk P, Scales D, Baker A, Austin M, Newgard CD, Radecki R, Vilke GM, Sawyer KN, Sopko G, Idris AH, Wang H, Chan PS, Kurz MC. Hospital Variation in the Utilization and Implementation of Targeted Temperature Management in Out-of-Hospital Cardiac Arrest. Circ Cardiovasc Qual Outcomes. 2018 Nov;11(11):e004829. doi: 10.1161/CIRCOUTCOMES.118.004829. PMID: 30571336.

254.    Supat B, Brennan JJ, Vilke GM, Ishimine P, Hsia RY, Castillo EM. Characterizing pediatric high frequency users of California emergency departments. Am J Emerg Med. 2019 Sep;37(9):1699-1704. doi: 10.1016/j.ajem.2018.12.015. Epub 2018 Dec 12.

255.    Childers R, Vilke GM. Ketamine for Acute Agitation. 2019. Current Emerg and Hosp Med Reports. https://doi.org/10.1007/s40138-019-00177-2.

Curriculum Vitae
Gary M. Vilke, M.D., FACEP, FAAEM

PUBLICATIONS, continued:

Articles

256. Kroll M, Ho J, Vilke GM. 8 Facts About Excited Delirium Syndrome (ExDS) We Learned
in 2018. 2019. PoliceOne.com. https://www.policeone.com/police-
training/articles/483189006-8-facts-about-excited-delirium-syndrome-ExDS-we-learned-in-
2018/

257. Dyson K, Brown SP, May S, Smith K, Koster RW, Beesems SG, Kuisma M, Salo A, Finn
J, Sterz F, Nürnberger A, Morrison LJ, Olasveengen TM, Callaway CW, Shin SD, Gräsner
JT, Daya M, Ma MH, Herlitz J, Strömsöe A, Aufderheide TP, Masterson S, Wang H,
Christenson J, Stiell I, Vilke GM, Idris A, Nishiyama C, Iwami T, Nichol G. International
variation in survival after out-of-hospital cardiac arrest: A validation study of the Utstein
template. Resuscitation. 2019 May;138:168-181. doi: 10.1016/j.resuscitation.2019.03.018.
Epub 2019 Mar 18.

258. Chalmers CE, Mullinax S, Brennan J, Vilke GM, Oliveto AH, Wilson MP. Screening Tools
Validated in the Outpatient Pain Management Setting Poorly Predict Opioid Misuse in the
Emergency Department: A Pilot Study. J Emerg Med. 2019 Apr 28. [Epub ahead of print]

259. Sieker JW, Castillo EM, Vilke GM. Timing of fatal BASE-jumping incidents: 1981-2018. J
Forensic Leg Med. 2019 May 3;65:39-44.

260. Li DR, Brennan JJ, Kreshak AA, Castillo EM, Vilke GM. Patients Who Leave the
Emergency Department Without Being Seen and Their Follow-Up Behavior: A
Retrospective Descriptive Analysis. J Emerg Med. 2019 May 8. [Epub ahead of print]

261. Murray PT, Wettersten N, van Veldhuisen DJ, Mueller C, Filippatos G, Nowak R, Hogan
C, Kontos MC, Cannon CM, Müeller GA, Birkhahn R, Horiuchi Y, Clopton P, Taub
P, Vilke GM, Barnett O, McDonald K, Mahon N, Nuñez J, Briguori C, Passino C, Maisel
A. Utility of Urine Neutrophil Gelatinase-Associated Lipocalin for Worsening Renal
Function during Hospitalization for Acute Heart Failure: Primary findings for urine N-gal
Acute Kidney Injury N-gal Evaluation of Symptomatic heart faIlure Study (AKINESIS). J
Card Fail. 2019 May 22. [Epub ahead of print]

262. Gleber R, Vilke GM, Castillo EM, Brennan J, Oyama L, Coyne CJ.  Trends in emergency
physician opioid prescribing practices during the United States opioid crisis.  Am J Emerg
Med. 2019 Jun 6. [Epub ahead of print]

263. Vilke GM, Mash DC, Pardo M, Bozeman W, Hall C, Sloane C, Wilson MP, Coyne CJ, Xie
X, Castillo EM.  EXCITATION study: Unexplained in-custody deaths:  Evaluating
biomarkers of stress and agitation.  J Forensic Leg Med. 2019 Jun 21;66:100-106.

264. Mathews BK, Fredrickson M, Sebasky M, Seymann G, Ramamoorthy S, Vilke G, Sloane
C, Thorson E, El-Kareh R. Structured case reviews for organizational learning about
diagnostic vulnerabilities: initial experiences from two medical centers. Diagnosis (Berl).
2019 Aug 24. [Epub ahead of print]

Curriculum Vitae
Gary M. Vilke, M.D., FACEP, FAAEM

PUBLICATIONS, continued:

Articles

265.  Pillus D, Bruno E, Farcy D, Vilke GM, Childers R. Systematic Review: The Role of
Thrombolysis in Intermediate-Risk Pulmonary Embolism.  J Emerg Med. 2019 Aug 30.
[Epub ahead of print]

266.  Vilke G, Chan T, Bozeman WP, Childers R.  Emergency Department Evaluation After
Conducted Energy Weapon Use: Review of the Literature for the Clinician. J Emerg
Med. 2019 Sept 6. [Epub ahead of print]

267.  Hoenigl M, Mathur K, Blumenthal J, Brennan J, Zuazo M, McCauley M, Horton LE,
Wagner GA, Reed SL, Vilke GM, Coyne CJ, Little SJ.  Universal HIV and Birth Cohort
HCV Screening in San Diego Emergency Departments. Scientific Reports. 2019 Oct 9.
9:14479 | https://doi.org/10.1038/s41598-019-51128-6.

268.  Lam SHF, Nakajima Y, Castillo EM, Brennan J, Vilke GM. Willingness to Consider
Alternatives to Ambulance Use Among Adult Emergency Department Patients. Am J
Emerg Med.  2020;38(5):1030-1033. [Epub 2019 Nov 18]

269.  Wettersten N, Horiuchi Y, van Veldhuisen DJ, Mueller C, Filippatos G, Nowak R, Hogan
C, Kontos MC, Cannon CM, Müeller GA, Birkhahn R, Taub P, Vilke GM, Barnett O,
McDonald K, Mahon N, Nuñez J, Briguori C, Passino C, Murray PT, Maisel A.  B-type
natriuretic peptide trend predicts clinical significance of worsening renal function in acute
heart failure. Eur J Heart Fail. 2019 Nov 25. [Epub ahead of print]

270.  Docter TA, Patel BH, Brennan JJ, Castillo EM, Lee RR, Vilke GM.  Utility of Shunt Series
in the Evaluation of Ventriculoperitoneal Shunt Dysfunction in Adults. J Emerg Med. 2020
Mar;58(3):391-397.

271.  Sawyer KN, Humbert A, Leroux BG, Nichol G, Kudenchuk PJ, Daya MR, Grunau B, Wang
HE, Ornato JP, Rittenberger JC, Aufderheide TP, Wittwer L, Colella MR, Austin M,
Kawano T, Egan D, Richmond N, Vithalani VD, Scales D, Baker AJ, Morrison LJ, Vilke
GM, Kurz MC; Resuscitation Outcomes Consortium. Relationship Between Duration of
Targeted Temperature Management, Ischemic Interval, and Good Functional Outcome from
Out-of-Hospital Cardiac Arrest. Crit Care Med. 2020 Mar;48(3):370-377.

272.  Soucy Z, Cheng D, Vilke GM, Childers R.  Systematic Review: The Role of Intravenous
and Oral Contrast in the Computed Tomography Evaluation of Acute Appendicitis.  J
Emerg Med. 2019 Dec 13. [Epub ahead of print]

Curriculum Vitae
Gary M. Vilke, M.D., FACEP, FAAEM

PUBLICATIONS, continued:

Articles

273.   Wettersten N, Horiuchi Y, van Veldhuisen DJ, Mueller C, Filippatos G, Nowak R, Hogan C, Kontos MC, Cannon CM, Müeller GA, Birkhahn R, Taub P, Vilke GM, Barnett O, McDonald K, Mahon N, Nuñez J, Briguori C, Passino C, Maisel A, Murray PT.  Short-term prognostic implications of serum and urine neutrophil gelatinase-associated lipocalin in acute heart failure: findings from the AKINESIS study.  Eur J Heart Fail. 2019 Dec 21. [Epub ahead of print]

274.   Blewer AL, Schmicker RH, Morrison LJ, Aufderheide TP, Daya M, Starks MA, May S, Idris AH, Callaway CW, Kudenchuk PJ, Vilke GM, Abella BS; Resuscitation Outcomes Consortium Investigators.  Variation in Bystander Cardiopulmonary Resuscitation Delivery and Subsequent Survival From Out-of-Hospital Cardiac Arrest Based on Neighborhood-Level Ethnic Characteristics. Circulation. 2020 Jan 7;141(1):34-41. Epub 2019 Dec 30.

275.   Daya MR, Leroux BG, Dorian P, Rea TD, Newgard CD, Morrison LJ, Lupton JR, Menegazzi JJ, Ornato JP, Sopko G, Christenson J, Idris A, Mody P, Vilke GM, Herdeman C, Barbic D, Kudenchuk PJ.  Survival After Intravenous Intraosseous Amiodarone, Lidocaine, or Placebo in Out-of Hospital Shock-Refractory Cardiac Arrest. Circulation. 2020 Jan 21;141(3):188-198.

276.   Finch NA, Vilke GM.  Unknown Tetrahydrocannabinol Edible Ingestion Resulting in Acute Stroke Presentation. J Emerg Med. 2020 Jan 22. [Epub ahead of print]

277.   Vilke GM, Akeely Y, Lin LC. Sequential Drug-Induced Severe Hyponatremia in a Minimally Symptomatic, 81-Year-Old Patient. J Emerg Med. 2020 Mar;58(3):e137-e140. doi: 10.1016/j.jemermed.2019.11.048. Epub 2020 Mar 20. PMID: 32205001.

278.   Rowland KD, Fuehrer J, Motov SM, Vilke G, Rosenbaum SB, Quenzer F. Should Antiemetics be Given Prophylactically with Intravenous Opioids While Treating Acute Pain in the Emergency Department?: Clinical Practice Paper Approved by American Academy of Emergency Medicine Clinical Guidelines Committee. J Emerg Med. 2020 Apr;58(4):706-709. doi: 10.1016/j.jemermed.2019.12.024. Epub 2020 Mar 23. PMID: 32216978.

279.   Marigold O, Castillo EM, Sloane C, Brennan J, Coyne CJ, Swift S, Vilke GM. Further study on the physiological effects of an alternative spit mask. J Forensic Leg Med. 2020 May;72:101945. doi: 10.1016/j.jflm.2020.101945. Epub 2020 Mar 31. PMID: 32275230.

280.   Gupta R, Roach C, Hryniewicki AT, Vilke GM, Shatsky RA, Coyne CJ. Management of Chimeric Antigen Receptor (CAR) T-Cell Toxicities: A Review and Guideline for Emergency Providers. J Emerg Med. 2020 Jul;59(1):61-74. doi: 10.1016/j.jemermed.2020.04.021. Epub 2020 May 28. PMID: 32473867.

Curriculum Vitae
Gary M. Vilke, M.D., FACEP, FAAEM

PUBLICATIONS, continued:

Articles

281.   Sloane C, Mash DC, Chan TC, Kolkhorst F, Neuman T, Castillo EM, Lasoff D, Wardi G, Xie X, Vilke GM. Assessment of stress markers in restrained individuals following physical stress with and without sham CED activation. J Forensic Leg Med. 2020 Aug;74:101982. doi: 10.1016/j.jflm.2020.101982. Epub 2020 Jun 26. PMID: 32658765.

282.   Horiuchi Y, Wettersten N, Patel MP, Mueller C, Neath SX, Christenson RH, Morgenthaler NG, McCord J, Nowak RM, Vilke GM, Daniels LB, Hollander JE, Apple FS, Cannon CM, Nagurney JT, Schreiber D, deFilippi C, Hogan C, Diercks DB, Headden G, Limkakeng AT Jr, Anand I, Wu AHB, Ebmeyer S, Jaffe AS, Peacock WF, Maisel A. Biomarkers Enhance Discrimination and Prognosis of Type 2 Myocardial Infarction. Circulation. 2020 Oct 20;142(16):1532-1544. doi: 10.1161/CIRCULATIONAHA.120.046682. Epub 2020 Aug 21. PMID: 32820656.

283.   Sieker J, Vilke GM, Schongalla M, Mei-Dan O. (2020). Injury Patterns and Wilderness Medical Preparedness in BASE Jumping. Muscle, Ligament, and Tendon Journal. 2020;10 (2):156-164.

284.   Meurer WJ, Barth B, Abraham M, Hoffman J, Vilke GM, DeMers G. Reply to Letter to the Editor. J Emerg Med. 2020 Jul;59(1):143. doi: 10.1016/j.jemermed.2020.05.015. PMID: 32900459.

285.   Vilke GM. Restraint physiology: A review of the literature. J Forensic Leg Med. 2020 Oct;75:102056. doi: 10.1016/j.jflm.2020.102056. Epub 2020 Sep 15. PMID: 32956928; PMCID: PMC7490248.

286.   Vilke GM, Brennan JJ, Cronin AO, Castillo EM. Clinical Features of Patients with COVID-19: Is Temperature Screening Useful? J Emerg Med. 2020 Sep 21:S0736-4679(20)30977-X. doi: 10.1016/j.jemermed.2020.09.048. Epub ahead of print. PMID: 33139117; PMCID: PMC7505592.

287.   Singarajah A, Wang A, Sayegh J, Vilke GM, Quenzer FC. "Botched": A Case Report of Silicone Embolism Syndrome After Penile and Scrotal Injection. Clin Pract Cases Emerg Med. 2020 Nov;4(4):595-598. doi: 10.5811/cpcem.2020.9.48838. PMID: 33217281; PMCID: PMC7676808.

288.   Horiuchi YU, Wettersten N, Veldhuisen DJV, Mueller C, Filippatos G, Nowak R, Hogan C, Kontos MC, Cannon CM, MÜeller GA, Birkhahn R, Taub P, Vilke GM, Barnett O, McDONALD K, Mahon N, NuÑez J, Briguori C, Passino C, Maisel A, Murray PT. Potential Utility of Cardiorenal Biomarkers for Prediction and Prognostication of Worsening Renal Function in Acute Heart Failure. J Card Fail. 2020 Dec 6:S1071-9164(20)31551-7. doi: 10.1016/j.cardfail.2020.11.025. Epub ahead of print. PMID: 33296713.

Curriculum Vitae
Gary M. Vilke, M.D., FACEP, FAAEM

PUBLICATIONS, continued:

Articles

289.    Akeely Y, Vilke GM, Alzahrani H, Alshowaihi I, Alsaadani A, Rabah A, Turkistani A, Abosamak MF. Postintubation Tracheal Perforation While on Long-Term Steroid Therapy: A Case Report. J Emerg Med. 2020 Dec 8:S0736-4679(20)31169-0. doi: 10.1016/j.jemermed.2020.11.001. Epub ahead of print. PMID 33308913.

290.    Mathur K, Blumenthal J, Horton LE, Wagner GA, Martin TC, Lo M, Gianella S, Vilke GM, Coyne CJ, Little SJ, Hoenigl M. HIV Screening in Emergency Departments: Linkage Works but What About Retention? Acad Emerg Med. 2020 Dec 12. doi: 10.1111/acem.14194. Epub ahead of print. PMID: 33314418.

291.    Gottlieb M, Farcy DA, Moreno LA, Vilke GM, Guittard JA. Triage Nurse-Ordered Testing in the Emergency Department Setting: A Review of the Literature for the Clinician. J Emerg Med. 2021 Jan 5:S0736-4679(20)31173-2. doi: 10.1016/j.jemermed.2020.11.004. Epub ahead of print. PMID: 33419653.

292.    Horiuchi Y, Wettersten N, van Veldhuisen DJ, Mueller C, Filippatos G, Nowak R, Hogan C, Kontos MC, Cannon CM, Müeller GA, Birkhahn R, Taub P, Vilke GM, Barnett O, McDonald K, Mahon N, Nuñez J, Briguori C, Passino C, Maisel A, Murray PT. Relation of Decongestion and Time to Diuretics to Biomarker Changes and Outcomes in Acute Heart Failure. Am J Cardiol. 2021 Feb 19:S0002-9149(21)00152-1. doi: 10.1016/j.amjcard.2021.01.040. Epub ahead of print. PMID: 33617811.

293.    Wu MYC, Vilke GM. Nonspecific Back Pain: A Manifestation of Choledocholithiasis With Cholecystitis. J Emerg Med. 2021 Feb 19:S0736-4679(21)00027-5. doi: 10.1016/j.jemermed.2021.01.018. Epub ahead of print. PMID: 33618931.

294.    Greene S, Cheng D, Vilke GM, Winkler G. How Should Native Crotalid Envenomation Be Managed in the Emergency Department? J Emerg Med. 2021 Feb 20:S0736-4679(21)00029-9. doi: 10.1016/j.jemermed.2021.01.020. Epub ahead of print. PMID: 33622584.

295.    Meurer WJ, Barth BE, Vilke GM, Guittard JA. Telemetry Bed Usage for Patients with Low-Risk Chest Pain: An Updated Review of the Literature for the Clinician. J Emerg Med. 2021 Mar 8:S0736-4679(21)00028-7. doi: 10.1016/j.jemermed.2021.01.019. Epub ahead of print. PMID: 33707075.

296.    Wettersten N, Horiuchi Y, van Veldhuisen DJ, Ix JH, Mueller C, Filippatos G, Nowak R, Hogan C, Kontos MC, Cannon CM, Müeller GA, Birkhahn R, Taub P, Vilke GM, Duff S, McDonald K, Mahon N, Nuñez J, Briguori C, Passino C, Maisel A, Murray PT. Decongestion discriminates risk for one-year mortality in patients with improving renal function in acute heart failure. Eur J Heart Fail. 2021 Mar 31. doi: 10.1002/ejhf.2179. Epub ahead of print. PMID: 33788989.

Curriculum Vitae
Gary M. Vilke, M.D., FACEP, FAAEM

PUBLICATIONS, continued:

Articles

297.   Rosenbaum S, Wilkerson RG, Winters ME, Vilke GM, Wu MYC. Clinical Practice
Statement: What is the Emergency Department Management of Patients with Angioedema
Secondary to an ACE-Inhibitor? J Emerg Med. 2021 May 15:S0736-4679(21)00182-7. doi:
10.1016/j.jemermed.2021.02.038. Epub ahead of print. PMID: 34006418.

298.   Vilke GM, Neuma T, Chan TC. Response to: Prone restraint cardiac arrest - A
comprehensive review of the scientific literature and an explanation of the physiology. Med
Sci Law. 2021 Jun 22:258024211025224. doi: 10.1177/00258024211025224. Epub ahead
of print. PMID: 34156879.

299.   Ha EL, Castillo EM, Vilke GM, Oyama LC, Brennan JJ, Birring P, Shah S, Coyne CJ.
Active Cancer Patients Presenting to the Emergency Department with Acute Venous
Thromboembolism: A Retrospective Cohort Study on Risks and Outcomes. J Emerg Med.
2021 Jun 29:S0736-4679(21)00470-4. doi: 10.1016/j.jemermed.2021.05.014. Epub ahead of
print. PMID: 34215470.

300.   Childers R, Cronin AO, Castillo EM, Neuman T, Chan TC, Coyne CJ, Sloane C, Vilke GM.
Evaluation of the ventilatory effects on human subjects in prolonged hip-flexed/head-down
restraint position. Am J Emerg Med. 2021 Jul 2;50:1-4. doi: 10.1016/j.ajem.2021.06.068.
Epub ahead of print. PMID: 34265730.

301.   Nichol G, Daya MR, Morrison LJ, Aufderheide TP, Vaillancourt C, Vilke GM, Idris A,
Brown S. Compression depth measured by accelerometer vs. outcome in patients with out-
of-hospital cardiac arrest. Resuscitation. 2021 Oct;167:95-104. doi:
10.1016/j.resuscitation.2021.07.013. Epub 2021 Jul 29. PMID: 34331984.

302.   Akeely Y, Alharbi MM, Saulat SR, Mehdar A, Alzhrany NM. Samarkandy FM, Vilke GM,
Alesa S.  The impacts of working 12-hour shifts in the emergency Department on
physicians' health, social life, and decision-making: A cross-sectional study. Saudi J Er
Med. 2021;2(3):244-249. https://doi.org/10.24911/SJEMed/72-1619037175.

303.   Mathur K, Blumenthal J, Horton LE, Wagner GA, Martin TCS, Lo M, Gianella S, Vilke
GM, Coyne CJ, Little SJ, Hoenigl M. HIV screening in emergency departments: Linkage
works but what about retention. Acad Emerg Med. 2021;28:913-917. DOI:
10.1111/acem.14194.

304.   Martin Hoenigl, Megan Lo, Christopher J. Coyne, Gabriel A. Wagner, Jill Blumenthal,
Kushagra Mathur, Lucy E. Horton, Thomas C.S. Martin, Gary M. Vilke & Susan J.
Little (2021) 4th Generation HIV screening in the emergency department: net profit or loss
for hospitals? AIDS Care, 2021.DOI: 10.1080/09540121.2021.1995838

Curriculum Vitae
Gary M. Vilke, M.D., FACEP, FAAEM

PUBLICATIONS, continued:

Articles

305.    Horiuchi Y, Wettersten N, van Veldhuisen DJ, Mueller C, Filippatos G, Nowak R, Hogan
        C, Kontos MC, Cannon CM, Müeller GA, Birkhahn R, Taub P, Vilke GM, Barnett O,
        McDonald K, Mahon N, Nuñez J, Briguori C, Passino C, Duff S, Maisel A, Murray PT.
        Decongestion, kidney injury and prognosis in patients with acute heart failure. Int J Cardiol.
        2022 Feb 21:S0167-5273(22)00261-3. doi: 10.1016/j.ijcard.2022.02.026. PMID: 35202737

306.    Peacock WF, Maisel AS, Mueller C, Anker SD, Apple FS, Christenson RH, Collinson P,
        Daniels LB, Diercks DB, Somma SD, Filippatos G, Headden G, Hiestand B, Hollander JE,
        Kaski JC, Kosowsky JM, Nagurney JT, Nowak RM, Schreiber D, Vilke GM, Wayne MA,
        Than M. Finding acute coronary syndrome with serial troponin testing for rapid assessment
        of cardiac ischemic symptoms (FAST-TRAC): a study protocol. Clin Exp Emerg Med.
        2022 Jun;9(2):140-145. doi: 10.15441/ceem.21.154. Epub 2022 Jun 30. PMID: 35843615;
        PMCID: PMC9288884

307.    Horiuchi Y, Wettersten N, Patel MP, Mueller C, Neath SX, Christenson RH, Morgenthaler
        NG, McCord J, Nowak RM, Vilke GM, Daniels LB, Hollander JE, Apple FS, Cannon CM,
        Nagurney JT, Schreiber D, deFilippi C, Hogan C, Diercks DB, Headden G, Limkakeng AT
        Jr, Anand I, Wu AHB, Ebmeyer S, Jaffe AS, Peacock WF, Maisel A. Prognosis is worse
        with elevated cardiac troponin in nonacute coronary syndrome compared with acute
        coronary syndrome. Coron Artery Dis. 2022 Aug 1;33(5):376-384. doi:
        10.1097/MCA.0000000000001135. Epub 2022 Mar 8. PMID: 35880560.

308.    Gandhi R, Vilke GM, Castillo EM. Intermittent Transient Flaring Rash Post Herpes Zoster.
        J Emerg Med. 2022 Jul 29:S0736-4679(22)00291-8. doi: 10.1016/j.jemermed.2022.04.017.
        Epub ahead of print. PMID: 35914988.

309.    Childers r, Liotta B, Brennan J, Wang P, Kattoula J, Tran T, Montilla-Guedez, H, Castillo
        E, Vilke GM.  Urine testing is associated with inappropriate antibiotic use and increased
        length of stay in emergency department patients.  Heliyon. 2022 Oct 12;8(10):e11049. doi:
        10.1016/j.heliyon.2022.e11049. eCollection 2022 Oct. PMID: 36281377

310.    Bozeman WP, Vilke GM, Hall C, Klinger DA, Ross DL, Bennell C, Petit NP, Miller DL,
        Ford KK, Hiestand B, Stopyra JP. Safety of Vascular Neck Restraint applied by law
        enforcement officers. J Forensic Leg Med. 2022 Oct 9;92:102446. doi:
        10.1016/j.jflm.2022.102446. Epub ahead of print. PMID: 36265294.

311.    Neuman T, Chan TC, Vilke GM. Commentary on: Prone restraint cardiac arrest in in-
        custody and arrest-related deaths. J Forensic Sci. 2022;67(5):1899-914. doi: 10.1111/1556-
        4029.15101. J Forensic Sci. 2022 Oct 28. doi: 10.1111/1556-4029.15159. Epub ahead of
        print. PMID: 36308010.

Curriculum Vitae
Gary M. Vilke, M.D., FACEP, FAAEM

PUBLICATIONS, continued:

Articles

312.   Wettersten N, Duff S, Horiuchi Y, van Veldhuisen DJ, Mueller C, Filippatos G, Nowak R,
Hogan C, Kontos MC, Cannon CM, Müeller GA, Birkhahn R, Taub P, Vilke GM,
McDonald K, Mahon N, Nuñez J, Briguori C, Passino C, Maisel A, Murray PT, Ix JH.
Implications of worsening renal function before hospitalization for acute heart failure. ESC
Heart Fail. 2022 Nov 3. doi: 10.1002/ehf2.14221. Epub ahead of print. PMID: 36325747.

313.   Horiuchi Y, Wettersten N, van Veldhuisen DJ, Mueller C, Filippatos G, Nowak R, Hogan
C, Kontos MC, Cannon CM, Müeller GA, Birkhahn R, Taub P, Vilke GM, McDonald K,
Mahon N, Nuñez J, Briguori C, Passino C, Duff S, Maisel A, Murray PT. Galectin-3, acute
kidney injury and myocardial damage in patients with acute heart failure. J Card Fail. 2022
Nov 1:S1071-9164(22)01171-X. doi: 10.1016/j.cardfail.2022.09.017. Epub ahead of print.
PMID: 36332898.

PUBLICATIONS, continued:

Consortium Publications

1.  Davis DP, Garberson LA, Andrusiek DL, Hostler D, Daya M, Pirrallo R, Craig A, Stephens
    S, Larsen J, Drum AF, Fowler R, and the Resuscitation Outcomes Consortium
    Investigators. A Descriptive Analysis of Emergency Medical Service Systems Participating
    in the Resuscitation Outcomes Consortium (ROC) Prehospital Research Network.
    Prehospital Emergency Care 11:369-382, 2007. (role: site investigator)

2.  J Christenson, D Andrusiek, S Everson-Stewart, P Kudenchuk, D Hostler, J Powell, CW
    Callaway, D Bishop, C Vaillancourt, D Davis, TP Aufderheide, A Idris, J Stouffer, I Stiell,
    R Berg, and the ROC investigators. Chest Compression Fraction Determines Survival in
    Patients with Out-of-hospital Ventricular Fibrillation. Circulation 120(13):1241-7, 2009.
    (role: site investigator)

3.  Newgard CD, Koprowicz K, Wang H, Monnig A, Kerby JD, Sears GK, Davis DP, Bulger
    E, Stephens SW, Daya MR; ROC Investigators. Variation in the type, rate, and selection of
    patients for out-of-hospital airway procedures among injured children and adults. Acad
    Emerg Med. 2009 Dec;16(12):1269-76. (role: site investigator)

4.  Bulger EM, May S, Brasel KJ, Schreiber M, Kerby JD, Tisherman SA, Newgard C, Slutsky
    A, Coimbra R, Emerson S, Minei JP, Bardarson B, Kudenchuk P, Baker A, Christenson J,
    Idris A, Davis D, Fabian TC, Aufderheide TP, Callaway C, Williams C, Banek J,
    Vaillancourt C, van Heest R, Sopko G, Hata JS, Hoyt DB; ROC Investigators. Out-of-
    Hospital Hypertonic Resuscitation Following Severe Traumatic Brain Injury: A randomized
    Controlled Trial. JAMA 304(13):1455-1464, 2010 (role: site investigator)

5.  Newgard CD, Rudser K, Atkins DL, Berg R, Osmond MH, Bulger EM, Davis DP,
    Schreiber MA, Warden C, Rea TD, Emerson S; ROC Investigators. The availability and use
    of out-of hospital physiologic information to identify high-risk injured children in a
    multisite, population based cohort. Prehosp Emerg Care. 2009 Oct-Dec;13(4):420-31. (role:
    site investigator)

6.  Rea TD, Cook AJ, Stiell IG, Powell J, Bigham B, Callaway CW, Chugh S, Aufderheide TP,
    Morrison L, Terndrup TE, Beaudoin T, Wittwer L, Davis D, Idris A, Nichol G;
    Resuscitation Outcomes Consortium Investigators. Predicting survival after out-of-hospital
    cardiac arrest: role of the Utstein data elements. Ann Emerg Med. 2010 Mar;55(3):249-57.
    (role: site investigator)

7.  Newgard CD, Schmicker RH, Hedges JR, Trickett JP, Davis DP, Bulger EM, Aufderheide
    TP, Minei JP, Hata JS, Gubler KD, Brown TB, Yelle JD, Bardarson B, Nichol G;
    Resuscitation Outcomes Consortium Investigators. Emergency medical services intervals
    and survival in trauma: assessment of the "golden hour" in a North American prospective
    cohort. Ann Emerg Med. 2010 Mar;55(3):235-246.e4. Epub 2009 Sep 23. (role: site
    investigator)

PUBLICATIONS, continued:

Consortium Publications (cont.)

8.   Newgard CD, Rudser K, Hedges JR, Kerby JD, Stiell IG, Davis DP, Morrison LJ, Bulger E, Terndrup T, Minei JP, Bardarson B, Emerson S; ROC Investigators. A critical assessment of the out-of-hospital trauma triage guidelines for physiologic abnormality. J Trauma. 2010 Feb;68(2):452-62. (role: site investigator)

9.   Brooks SC, Schmicker RH, Rea TD, Aufderheide TP, Davis DP, Morrison LJ, Sahni R, Sears GK, Griffiths DE, Sopko G, Emerson SS, Dorian P; ROC Investigators. Out-of-hospital cardiac arrest frequency and survival: evidence for temporal variability. Resuscitation. 2010 Feb;81(2):175-81. (role: site investigator)

10.   Weisfeldt ML, Sitlani CM, Ornato JP, Rea T, Aufderheide TP, Davis D, Dreyer J, Hess EP, Jui J, Maloney J, Sopko G, Powell J, Nichol G, Morrison LJ; ROC Investigators. Survival after application of automatic external defibrillators before arrival of the emergency medical system: evaluation in the resuscitation outcomes consortium population of 21 million.  J Am Coll Cardiol. 2010 Apr 20;55(16):1713-20. (role: site investigator)

11.   Hostler D, Everson-Stewart S, Rea TD, Stiell IG, Callaway CW, Kudenchuk PJ, Sears GK, Emerson SS, Nichol G, and the Resuscitation Outcomes Consortium Investigators. A prospective cluster-randomized trial of real-time CPR feedback during out-of-hospital cardiac arrest resuscitation. BMJ 2011;342:d512 (role: site investigator)

12.   Aufderheide TP, Nichol G, Rea TD, Brown SP, Leroux BG, Pepe PE, Kudenchuk PJ, Christenson J, Daya MR, Dorian P, Callaway CW, Idris AH, Andrusiek D, Stephens SW, Hostler D, Davis DP, Dunford JV, Pirrallo RG, Stiell IG, Clement CM, Craig A, Van Ottingham L, Schmidt TA, Wang HE, Weisfeldt ML, Ornato JP, Sopko G, and the Resuscitation Outcomes Consortium (ROC) Investigators. A Trial of an Impedance Threshold Device in Out-of-Hospital Cardiac Arrest. New England Journal of Medicine. 365:798-806, 2011 (role: site investigator)

13.   Reinier K, Thomas E, Andrusiek DL, Aufderheide TP, Brooks SC, Callaway CW, Pepe PE, Rea TD, Schmicker RH, Vaillancourt C, Chugh SS; Resuscitation Outcomes Consortium Investigators. Socioeconomic status and incidence of sudden cardiac arrest. CMAJ. 2011 Oct 18;183(15):1705-12. Epub 2011 Sep 12 (role: site investigator)

14.   Wang HE, Devlin SM, Sears GK, Vaillancourt C, Morrison LJ, Weisfeldt M, Callaway CW; ROC Investigators. Regional variations in early and late survival after out-of-hospital cardiac arrest. Resuscitation. 2012 Nov;83(11):1343-8. (role: site investigator)

Curriculum Vitae
Gary M. Vilke, M.D., FACEP, FAAEM

PUBLICATIONS, continued:

Consortium Publications (cont.)

15. Kudenchuk PJ, Brown SP, Daya M, Morrison LJ, Grunau BE, Rea T, Aufderheide T, Powell J, Leroux B, Vaillancourt C, Larsen J, Wittwer L, Colella MR, Stephens SW, Gamber M, Egan D, Dorian P; Resuscitation Outcomes Consortium Investigators. Resuscitation Outcomes Consortium-Amiodarone, Lidocaine or Placebo Study (ROC-ALPS): Rationale and methodology behind an out-of-hospital cardiac arrest antiarrhythmic drug trial. Am Heart J. 2014 May;167(5):653-9. (role: site investigator)

16. Ian G. Stiell, Siobhan P. Brown, Graham Nichol, Sheldon Cheskes, Christian Vaillancourt, Clifton W. Callaway, Laurie J. Morrison, James Christenson, Tom P. Aufderheide, Daniel P. Davis, Cliff Free, Dave Hostler, John A. Stouffer and Ahamed H. Idris and the Resuscitation Outcomes Consortium Investigators What Is the Optimal Chest Compression Depth During Out-of-Hospital Cardiac Arrest Resuscitation of Adult Patients?  Circulation 2014;130:1962-1970; epub 2014 Sep 24. (role: site investigator)

17. Idris AH, Guffey D, Pepe PE, Brown SP, Brooks SC, Callaway CW, Christenson J, Davis DP, Daya MR, Gray R, Kudenchuk PJ, Larsen J, Lin S, Menegazzi JJ, Sheehan K, Sopko G, Stiell I, Nichol G, Aufderheide TP; Resuscitation Outcomes Consortium Investigators. Chest Compression Rates and Survival Following Out-of-Hospital Cardiac Arrest. Crit Care Med. 2015 Apr;43(4):840-8. (role: site investigator)

18. Stub D, Schmicker RH, Anderson ML, Callaway CW, Daya MR, Sayre MR, Elmer J, Grunau BE, Aufderheide TP, Lin S, Buick JE, Zive D, Peterson ED, Nichol G; ROC Investigators. Association between hospital post-resuscitative performance and clinical outcomes after out-of-hospital cardiac arrest. Resuscitation. 2015 Jul;92:45-52. Epub 2015 Apr 24. (role: site investigator)

19. Salcido DD, Schmicker RH, Kime N, Buick JE, Cheskes S, Grunau B, Zellner S, Zive D, Aufderheide TP, Koller AC, Herren H, Nuttall J, Sundermann ML, Menegazzi JJ; Resuscitation Outcomes Consortium Investigators.  Effects of intra-resuscitation antiarrhythmic administration on rearrest occurrence and intra-resuscitation ECG characteristics in the ROC ALPS trial. Resuscitation. 2018 Aug;129:6-12. (role: site investigator)

20. Hansen M, Schmicker RH, Newgard CD, Grunau B, Scheuermeyer F, Cheskes S, Vithalani V, Alnaji F, Rea T, Idris AH, Herren H, Hutchison J, Austin M, Egan D, Daya M; Resuscitation Outcomes Consortium Investigators. Time to Epinephrine Administration and Survival From Nonshockable Out-of-Hospital Cardiac Arrest Among Children and Adults. Circulation. 2018 May 8;137(19):2032-2040. (role: site investigator)

Curriculum Vitae
Gary M. Vilke, M.D., FACEP, FAAEM

PUBLICATIONS, continued:

Abstracts

1.   Chan TC, Vilke GM, Hayden SR:  Structured curriculum in domestic violence and child abuse for emergency medicine residents.  Acad Emerg Med 1996;3(5):511.

2.   Moss ST, Vilke GM, Chan TC, Dunford JD:  Outcomes study of out-of-hospital patients signed out against medical advice by field paramedics.  Acad Emerg Med 1997;4(5):413.

3.   Chan TC, Vilke GM, Neuman TS, Clausen JL:  Does the hobble restraint position result in respiratory compromise?  Acad Emerg Med 1997;4(5):459.

4.   Evans SD, Fisher RP, Vilke GM, Chan TC:  Accuracy of urban field paramedics estimating blood loss.  Acad Emerg Med 1997;4(5):459.

5.   Davis DP, Bramwell KJ, Vilke GM, Rosen P:  Cricothyrotomy technique: Standard technique versus the rapid four-step technique.  Acad Emerg Med 1997;4(5):488.

6.   Bramwell K, Vilke G, Davis D, Rosen P:  Cricothyrotomy technique: Use of the Trousseau dilator for initial widening and subsequent stabilization of the opening during endotracheal tube passage.  Ann Emerg Med 1997;30(3):419.

7.   Neuman TS, Vilke GM, Chan TC, Clausen JL:  Changes in pulmonary function associated with position.  Undersea & Hyperbaric Med 1997;24(Suppl):13.

8.   Moats T, Chan TC, Ochs M, Buchanan J, Vilke GM:  Successful out-of-hospital airway management by emergency medical technician-Is using the Combitube.  Acad Emerg Med 1998;5(5):388.

9.   Hamilton RS, Davis DP, Chan TC, Vilke GM, Hayden SR:  The effect of blade type and cervical spinal immobilization on laryngoscopy in a cadaver model of intubation.  Acad Emerg Med 1998;5(5):397.

10.  Vilke GM, Chan TC, Neuman T, Clausen JL:  The effect of body position on pulmonary function.  Acad Emerg Med 1998;5(5):397.

11.  Friedman L, Vilke GM, Chan TC, Hayden SR, Krishel SJ, Rosen P:  Emergency department airway management before and after the start of an emergency medicine residency training program.  Acad Emerg Med 1998;5(5):444.

12.  Davis DP, Bramwell KJ, Hamilton RS, Chan TC, Vilke GM:  Cricothyrotomy speed and safety: A comparison between standard open technique and rapid four-step technique using a novel device.  Acad Emerg Med 1998;5(5):483.

13.  Davis DP, Fisher RP, Chan TC, Dunford JV, Vilke GM:  Rapid-sequence induction for out-of-hospital intubations: A multimedia course designed for paramedics.  Acad Emerg Med 1998;5(5):502.

PUBLICATIONS, continued:

Abstracts

14.  Chan TC, Vilke GM, Buchanan J, Anderson M:  Patient ethnicity and age in prehospital emergency ambulance use and acuity rates.  Prehospital Emerg Care 1998;2(3):223.

15.  Marino AT, Vilke GM, Chan TC, Buchanan J:  Precision of prehospital diazepam dosing for children in status epilepticus.  Prehospital Emerg Care 1998;2(3):232.

16.  Marino AT, Vilke GM, Chan TC, Buchanan J:  Comparison of prehospital IV and rectal diazepam for the treatment of pediatric seizures.  Prehospital Emerg Care 1998;2(3):233.

17.  Vilke GM, Chan TC, Buchanan J, Dunford JV:  Are opiate overdose deaths related to patient release after prehospital naloxone?  Prehospital Emerg Care 1998;2(3):236.

18.  Vilke GM, Dunford JV, Buchanan J, Chan TC:  Are opiate overdose deaths related to patient release after naloxone?  Ann Emerg Med 1998;32(3)Part 2:S6.

19.  Gerling MC, Hamilton RS, Davis DP, Morris GF, Vilke GM, Hayden SR, Garfin SR:  Effects of cervical spine immobilization technique and laryngoscope blade selection on an unstable cervical spine injury in a cadaver model of intubation.  Ann Emerg Med 1998;32(3)Part 2:S13.

20.  Marino AT, Chan TC, Buchanan J, Vilke GM:  Precision of prehospital diazepam dosing for children in status epilepticus.  Ann Emerg Med 1998;32(3)Part 2:S30.

21.  Marino AT, Vilke GM, Buchanan J, Chan TC:  Comparison of prehospital intravenous and rectal diazepam for the treatment of pediatric seizures.  Ann Emerg Med 1998;32(3)Part 2:S30.

22.  Davis D, Bramwell K, Hamilton R, Chan T, Vilke G:  The fresh-frozen cadaver free-larynx model for cricothyrotomy training.  Ann Emerg Med 1998;32(3)Part 2:S34-S35.

23.  Sloane C, Chan TC, Vilke GM, Hayden SR, Krishel SJ, Rosen P:  Rapid sequence induction intubation of trauma patients in the prehospital versus hospital setting.  Ann Emerg Med 1998; 32(3)Part 2:S50.

24.  Chan TC, Bramwell K, Hamilton R, Davis D, Vilke GM:  Comparison of Melcker cricothyrotomy versus standard technique in human cadaver model.  Ann Emerg Med 1998; 32(3)Part 2:S50-S51.

25.  Chew GS, Chan TC, Bramwell K, Davis DP, Vilke GM:  Does the syringe esophageal detector device accurately detect an esophageal intubation following gastric distention from air insufflation?  Ann Emerg Med 1998;32(3)Part 2:S51.

26.  Chan TC, Vilke GM, Kramer M, Buchanan J, Dunford J:  Does a complete neurologic examination adequately screen for significant intracranial abnormalities in minor head injury? J Emerg Med 1998;16(5):804.

Curriculum Vitae
Gary M. Vilke, M.D., FACEP, FAAEM

PUBLICATIONS, continued:

Abstracts

27.   Chan TC, Vilke GM, Kramer M, Buchanan J, Dunford J:  Does GCS score affect prehospital intubation success rates in trauma patients?  J Emerg Med 1998;16(5):804-805.

28.   Vilke GM, Chan TC, Guss DA:   Prospective study on the utility of head CT scan in patients with minor head injury and GCS scores of 15.  J Emerg Med 1998;16(6):984.

29.   Chan TC, Vilke GM, Ray LU, Anderson ME:  Use of prehospital crash injury data to assess regional automobile safety restraint use.  Prehospital Emerg Care 1999;3(1):83-84.

30.   Vilke GM, Chan TC:  Effect of a physician speaking directly to prehospital patients who want to sign out against medical advice.  Prehospital Emerg Care 1999;3(1):90.

31.   Marino A, Vilke GM, Chan TC:  Urban paramedics experience, comfort, and accuracy in the estimation of pediatric weights.  Prehospital Emerg Care 1999;3(1):92.

32.   Chan TC, Bramwell KJ, Davis DP, Hamilton RS, Vilke GM:  Comparison of wire-guided percutaneous Melcker cricothyrotomy versus standard cricothyrotomy technique in human cadaver models.  Acad Emerg Med 1999;6(5):514.

33.   Ma G, Hayden SR, Chan TC, Vilke GM, Schmitt J, Chan D:  Using ultrasound to visualize and confirm endotracheal intubation.  Acad Emerg Med 1999;6(5):515.

34.   Hamilton RS, Davis DP, Nordt SP, Vilke GM, Chan TC:  Lidocaine administration through an esophageally placed Combitube in a canine model.  Acad Emerg Med 1999;6(5):519-520.

35.   Chew GS, Chan TC, Bramwell K, Davis DP, Vilke GM:  Does gastric distention from air insufflation affect the accuracy of the syringe esophageal detector device in detecting esophageal intubation?  Acad Emerg Med 1999;6(5):520.

36.   Vilke GM, Marino A, Iskander J, Chan TC:  Knowledge of prescribed medications by emergency department patients.  Acad Emerg Med 1999;6(5):539.

37.   Davis D, Marino A, Vilke G, Dunford J, Videen J:  Hyponatremia in marathon runners:  Experience with the inaugural rock 'n' roll marathon.  Ann Emerg Med 1999;34(4)Part 2: S40-S41.

38.   Davis DP, Kimbro T, Vilke GM:  The use of midazolam for prehospital rapid-sequence intubation may be associated with a dose-related increase in hypotension.  Prehosp Emerg Care 2000;4(1):90.

39.   Marino AT, Sharieff G, Gerhart AE, Chan TC, Vilke GM:  The efficacy and complication rate of prehospital midazolam for the treatment of pediatric seizures.  Prehosp Emerg Care 2000; 4(1):92.

PUBLICATIONS, continued:

Abstracts

40.  Eisele JW, Chan T, Vilke G, Neuman T, Clausen J:  Comparison of respiratory function in the prone maximal restraint position with and without additional weight force on the back.  Proceedings of the American Acadamy of Forensic Sciences 2000;VI:202.

41.  Chan TC, Vilke GM, Neuman T, Clark RF, Clausen J:  Effect of oleoresin capsicum.  Acad Emerg Med 2000;7(5):471.

42.  Vilke GM, Marino A, Chan TC:  Survey of paramedics for latex allergy risk factors.  Acad Emerg Med 2000;7(5):483.

43.  Schmitt JM, Ma G, Hayden SR, Vilke G, Chan T:  Suprasternal versus cricothyroid ultrasound probe position in the confirmation of endotracheal tube placement by bedside ultrasound.  Acad Emerg Med 2000;7(5):526.

44.  Schmitt JM, Ma G, Hayden SR, Vilke G, Chan T:  Use of new air absorbing ultrasound contrast in the confirmation of endotracheal tube placement by bedside ultrasound.  Acad Emerg Med 2000;7(5):526.

45.  Wold RM, Davis DP, Patel R, Chan TC, Vilke GM:  Original clinical decision guideline to identify patients with spinal epidural abscess.  Acad Emerg Med 2000;7(5):574-575.

46.  Ma G, Chan TC, Vilke GM, Schmitt J, Hayden SR:  Confirming endotracheal intubation using ultrasound.  Ann Emerg Med 2000;36(4)Part 2:S20-S21.

47.  Deitch S, Vilke GM, Marino A, Vroman D, Chan TC:  Effect of prehospital use of nitroglycerine on EKG findings in patients with chest pain.  J Emerg Med 2001;20(3):321.

48.  Chan TC, Vilke GM, Neuman T, Clausen J, Schmidt P, Snowden T, Clark RF:  Does oleoresin capsicum "pepper spray" exposure impact cardiovascular function in human subjects?  Acad Emerg Med 2001;8(5):442.

49.  Chan TC, Vilke GM, Bender S, Saldamando V, Smith J, Dunford JV:  Effect of a multi-disciplinary community homeless outreach team on emergency department visits by homeless alcoholics.  Acad Emerg Med 2001;8(5):486.

50.  Davis DP, Ochs M, Hoyt DB, Vilke GM, Dunford JV:  The use of the Combitube as a salvage airway device for paramedic rapid-sequence intubation.  Acad Emerg Med 2001;8(5):500.

51.  Vilke GM, Simmons C, Brown L, Skogland P, Guss DA:  Approach to decreasing emergency department ambulance diversion hours.  Acad Emerg Med 2001;8(5):526.

Curriculum Vitae
Gary M. Vilke, M.D., FACEP, FAAEM

PUBLICATIONS, continued:

Abstracts

52.   Chan TC, Vilke GM, Clausen J, Clark R, Schmidt P, Snowden T, Neuman T:  Impact of oleoresin capsicum spray on respiratory function in human subjects in the sitting and prone maximal restraint positions positions, 1998 (computer file).  Inter-university Consortium for Political and Social Research (distributor), 2001.

53.   Cardall TY, Glasser JL, Davis D, Vilke GM:  Cricothyrotomy training in emergency medicine residencies.  Ann Emerg Med 2001;38(4):S9.

54.   Chan TC, Dunford JV, Vilke GM, Hix A, Schnell S, Liening J, Edgar J:  Effect of a multi-disciplinary serial inebriate program on emergency department visits by chronic alcoholics in two urban area hospitals.  Ann Emerg Med 2001;38(4):S33.

55.   Valentine C, Davis D, Ochs M, Hoyt D, Bailey D, Vilke G:  The use of the Combitube as a salvage airway device for paramedic rapid-sequence intubation.  Prehosp Emerg Care 2002;6(1):144.

56.   Chan TC, Dunford JV, Smith S, Sparrow W, Vilke GM:  Impact of an on-call physician on emergency 911 transports from a county jail.  Prehosp Emerg Care 2002;6(1):162.

57.   Vilke GM, Sardar W, Fisher R, Dunford JV, Chan TC:  Follow-up of elderly patients who refuse transport after accessing 9-1-1.  Prehosp Emerg Care 2002;6(1):164.

58.   Vilke GM, Steen PJ, Smith AM, Chan TC:  Out-of-hospital pediatric intubation by paramedics: The San Diego experience.  Prehosp Emerg Care 2002;6(1):165.

59.   Jin AS, Chan T, Davis D, Vilke G:  Prospective randomized study of viscous lidocaine vs Hurricaine in a GI cocktail for dyspepsia.  Acad Emerg Med 2002;9(5):381-382.

60.   Jenson P, Chan TC, Vilke GM, Leining J, Schnell R, Chester R, Berthelet J, Marcotte A, Simmons C, Kelly D, Dunford J:  Impact of a multi-disciplinary, community serial inebriate program on ED visits by chronic alcoholics to three urban emergency departments.  Acad Emerg Med 2002;9(5):389.

61.   Austin T, Chan TC, Nyheim E, Kelly D, Vilke GM:  Does the addition of parenteral opiate pre-medication increase risk for complications when combined with methohexital for moderate procedural sedation in the ED?  Acad Emerg Med 2002;9(5):407.

62.   Glasser JL, Cardall TY, Podboy M, Vilke GM:  Out-of-hospital pediatric rapid-sequence intubation by an aeromedical provider.  Acad Emerg Med 2002;9(5):422-423.

63.   Chan TC, Austin T, Nyheim E, Kelly D, Vilke GM:  Does parenteral opiate premedication increase risk of complications when combined with methohexital for orthopedic reductions in the emergency department?  Ann Emerg Med 2002;40(4):S7-S8.

Curriculum Vitae
Gary M. Vilke, M.D., FACEP, FAAEM

PUBLICATIONS, continued:

Abstracts

64.   Davis D, Tokhi R, Wold R, Patel R, Chan T, Vilke G:  The clinical presentation and outcome of emergency department patients with spinal epidural abscess.  Ann Emerg Med 2002;40(4): S103.

65.   Vilke GM, Loh A:  A prospective study of minimizing ambulance diversion and its effects on emergency department census and hospital admissions.  Prehosp Emerg Med 2003;7(1):171.

66.   Buono C, Vilke GM, Schwartz B, Brown L, Swabb C:  Identifying reasons for and outcomes of patients who access 9-1-1, then sign out against medical advice.  Prehosp Emerg Med 2003;7(1):172.

67.   Vilke GM, Sloane C, Smith AM, Chan TC:  Assessment for deaths in prehospital heroin overdose patients treated with Naloxone who refuse transport.  Prehosp Emerg Med 2003;7(1):190.

68.   Vilke GM, Lev R, Castillo EM, Murrin PA, Chan TC:  prospective countywide trial to decrease ambulance diversion hours.  Acad Emerg Med 2003;10(5):465.

69.   Tran A, Davis DP, Wold RM, Patel R, Chan TC, Vilke GM:  The use of risk factor assessment to screen for spinal epidural abcess in emergency department patients with spine pain.  Acad Emerg Med 2003;10(5):569.

70.   Chan TC, Kelso D, Dunford JV, Vilke GM:  Can trained health educators provide screening, brief intervention and referral services in an academic teaching hospital emergency department?  Acad Emerg Med 2003;10(5):515.

71.   Vilke GM, Lev R, Castillo EM, Metz MA, Murrin PA, Chan TC:  The effect of decreasing ambulance diversion hours on emergency department interfacility transfers. Ann Emerg Med 2003;42(4):S6.

72.   Vilke GM, Lev R, Castillo EM, Metz MA, Murrin PA, Chan TC:  San Diego County improved patient destination trial to decrease emergency department diversion hours and diverted patients.  Ann Emerg Med 2003;42(4):S2.

73.   Chan TC, Clausen J, Neuman T, Eisele JW, Vilke GM:  Does weight force during physical restraint cause respiratory compromise?  Ann Emerg Med 2003;42(4):S17.

74.   Davis D, Grossman K, Vilke G, Kiggins D, Chan TC:  Inadvertent anticoagulation of emergency department patients with aortic dissection.  Ann Emerg Med 2003;42(4):S99.

75.   Vilke GM, Wiesner C, Davis DP, Chan TC:  The efficacy of adding ipratropium bromide to albuterol for the prehospital treatment of reactive airways disease. Prehosp Emerg Care 2004; 8(1):112.

Curriculum Vitae
Gary M. Vilke, M.D., FACEP, FAAEM

PUBLICATIONS, continued:

Abstracts

76. Vilke GM, Vadeboncoeur T, Davis DP, Poste JC, Ochs M, Hoyt DB:  The predictive value of
paramedic assessment of aspiration in patients undergoing RSI.  Prehosp Emerg Care 2004;
8(1):88-89.

77. Vilke G, Castillo E, Metz M, Murrin P, Ray LU, Lev R, Chan T:  Community trial to
decrease ambulance diversion of patients and hours.  Prehosp Emerg Care 2004;8(1):84.

78. Chan TC, Killeen JP, Kelly D, Vilke GM, Guss DA:  Impact of a rapid emergency
department entry and an accelerated care initiative on patient wait times and length of stay.
Acad Emerg Med 2004;11(5):485.

79. Davis DP, Vadeboncoeur TF, Poste JC, Vilke GM, Ochs M, Hoyt DB:  The use of field
Glasgow coma scale to screen severely head-injured patients to undergo paramedic rapid
sequence intubation.  Acad Emerg Med 2004;11(5):492.

80. Patel RJ, Davis D, Vilke GM, Chan TC:  Comparison of wire-guided cricothyrotomy
technique with and without balloon-cuffed endotracheal tubes vs. standard surgical
cricothyrotomy.  Acad Emerg Med 2004;11(5):522.

80. Vilke GM, Chan TC, Dunford JV, Poste JC, Metz M, Ochs G, Smith A, Fisher R,
McCallum-Brown L, Davis DP:  The three-phase model of cardiac arrest as applied to
ventricular fibrillation in a large, urban emergency medical services system.  Acad Emerg
Med 2004;11(5):604.

82. Hutton K, Swanson E, Vilke G, Davis D, Jones S, Hoogeveen B:  Cricothyrotomies by air
medical providers in 2853 patient intubations. Air Med J 2004;23(5):33.

83. Davis D, Buono C, Vilke G, Sise M, Eastman B, Kennedy F, Vilke T, Hoyt D:  The efficacy
of air medical response to patients with moderate to severe traumatic brain injury.  Air Med J
2004;23(5):31.

84. Hutton K, Swanson E, Vilke G, Davis D, Jones S, Hoogeveen B:  Laryngoscopic
visualization grade predicts difficult intubations by air medical crews in the prehospital
setting.  Air Med J 2004;23(5):30.

85. Hutton K, Swanson E, Vilke G, Davis D, Jones S, Hoogeveen B:  Success and failure rates of
RSI versus non-RSI intubations by air medical providers in 2853 patients.  Air Med J 2004;
23(5):30.

86. Metz M, Marcotte A, Vilke GM:  The effect of decreasing ambulance diversion hours on ed
interfacility transfers. J Emerg Nurs 2004;30(5):411.

87. Metz M, Murrin P, Vilke GM:  Community trial to decrease ambulance diversion hours: the
San Diego county patient destination trial.  J Emerg Nurs 2004;30(5):410.

Curriculum Vitae
Gary M. Vilke, M.D., FACEP, FAAEM

PUBLICATIONS, continued:

Abstracts

88.   Metz M, Murrin P, Vilke GM:  The three-phase EMS cardiac arrest model for ventricular
       fibrillation. J Emerg Nurs 2004;30(5):405.

89.   Vilke GM, Murrin P, Gardina L, Upledger Ray L, Stepanski B, Chan TC:  Impact of a new
       booster seat law.  Ann Emerg Med 2004;44(4):S39-S40.

90.   Vilke GM, Marcotte A, Metz M, Upledger Ray L:  Pain management in the out-of-hospital
       setting.  Ann Emerg Med 2004;44(4):S63.

91.   Vilke GM, Murrin PA, Marcotte A, Upledger RL:  Impact of the San Diego County firestorm
       on emergency medical services.  Ann Emerg Med 2004;44(4):S102-S103.

92.   Davis DP, Pettit K, Poste JC, Vilke GM:  The efficacy of out-of-hospital needle and tube
       thoracostomy in major trauma victims.  Ann Emerg Med 2004;44(4):S103.

93.   Buono CJ, Davis DP, Vilke GM, Stepanski B.  Esophageal Intubation in an EMS system: a
       six-year experience.  Prehosp Emerg Care 2005; 9(1):113.

94.   Dunford JV, Vilke GM, Chan TC.  Utilization of EMS and hospital resources by serial
       inebriate program (SIP) clients. Prehosp Emerg Care 2005; 9(1):116.

95.   Davis DP, Serrano JA, Buono CJ, Vilke GM, Sise MJ, Hoyt DB.  The predictive value of
       field and arrival Glasgow coma score in moderate-to-severe brain injury.  Prehosp Emerg
       Care 2005; 9(1):124.

96.   Vilke GM, Castillo EM, Upledger-Ray L, Davis DP, Murrin PA, Kennedy F, Cox S, Coimbra
       R.  Evaluation of paramedic field triage of injured patients to trauma centers and emergency
       departments.  Prehosp Emerg Care 2005; 9(1):125.

97.   Vilke GM, Harley J, Metz M, Stepanski B, Vroman D, Anderson M, Shipp H.  Paramedic
       self-reported medication errors in an anonymous survey.  Prehosp Emerg Care 2005;
       9(1):127.

98.   Bush J, Chan TC, Killeen JP, Vilke GM.  The effect of changing from a latex agglutination
       D-Dimer to an ELISA D-Dimer on emergency physicians ordering imaging studies practices
       to evaluate for pulmonary embolism.  Acad Emerg Med 2005;12(5):41.

99.   Vilke GM, Michalewicz B, Kolkhorst FW, Neuman T, Chan TC.  Does weight force during
       physical restraint cause respiratory compromise?  Acad Emerg Med 2005;12(5):16.

100.  Levine SD, Sloane C, Chan TC, Vilke GM, Dunford J.  Cardiac monitoring of subjects
       exposed to the Taser.  Acad Emerg Med 2005;12(5):71.

Curriculum Vitae
Gary M. Vilke, M.D., FACEP, FAAEM

PUBLICATIONS, continued:

Abstracts

101.   Davis DP, Buono C, Serrano J, Vilke GM, Sise MJ, Hoyt DB.  The impact of hyper- and hypoventilation on outcome in traumatic brain injury.  Acad Emerg Med 2005;12(5):138-139.

102.   Davis D, Buono C, Ramanujam P, Fisher R, Vilke GM, Chan TC, Metz M, Dunford J:  The potential safety of designated cardiac arrest receiving facilities.  Ann Emerg Med 2005;46(3):S17.

103.   Chan TC, Killeen JP, Kelly DL, Vilke GM, Guss DA:  Accelerated care at triage: Physician-directed ancillary testing at triage for patients waiting in an emergency department.  Ann Emerg Med 2005;46(3):S107-S108.

104.   Lev R, Vilke G, Dunford J:  San Diego Regional STEMI Summit.  San Diego Physician. 2005;4:11-13.

105.   Davis D, Reynoso J, Harley J, Kanegaye J, Buono C, Vilke G:  The natural history of pediatric patients meeting criteria for paramedic intraosseous catheter insertion.  Prehosp Emerg Care 2006;10(1):110.

106.   Davis D, Ramanujam P, Buono C, Vilke G:  The sensitivity of capnometry to detect endotracheal intubation:  Where should we draw the line?  Prehosp Emerg Care 2006; 10(1):118.

107.   Levine S, Sloane C, Chan T, Dunford J, Vilke G:  Cardiac monitoring of subjects exposed to the Taser.  Prehosp Emerg Care 2006;10(1):130.

108.   Levine SD, Sloane C, Chan TC, Vilke GM, Dunford J:  Cardiac monitoring of human subjects exposed to the taser.  Acad Emerg Med 2006;13(5 Supp 1):S47.

109.   Vilke GM, Dolkas L, Stanley C, Smith AM, Chan TC:  Evaluation of deaths associated with choking.  Acad Emerg Med 2006;13(5 Supp 1):S49.

110.   Chan TC, Vilke GM, Michalewicz BA, Neuman T, Levy S, Kolkhorst F:  Does physical restraint impact metabolic oxygen consumption during exertion?  Acad Emerg Med 2006; 13(5 Supp 1):S46.

111.   Castillo EM, Vilke GM, Sturgis KN, Chan TC, Lindsay SP, Dunford JV:  Decrease of health care service utilization among chronic public inebriates.  Acad Emerg Med 2006;13 (5 Supp 1):S105-106.

112.   Vilke G, Johnson W, Castillo EM, Ederheimer JA, Wexler C, Sloane CM, Chan TC:  Evaluation of in-custody deaths proximal to use of conductive energy devices.  Ann Emerg Med 2006;48(4 Supp 1):S23-S24.

Curriculum Vitae
Gary M. Vilke, M.D., FACEP, FAAEM

PUBLICATIONS, continued:

Abstracts

113.    Tornabene SV, Chan TC, Davis DP, Deutsch R, Vilke GM:  Evaluating the use and timing of opioids for the treatment of migraine headaches in the ED.  Ann Emerg Med 2006;48 (4 Supp 1):S59-S60.

114.    Killeen JP, Chan TC, Vilke GM, Buono C, Griswold W, Rao R, Lenert L:  Wireless computerized rapid triage in the field:  How well does technology perform during mass casualty incidents and disaster events?  Ann Emerg Med 2006;48(4 Supp 1):S69.

115.    Davis D, Salazar A, Vilke G, Chan T:  The utility of a novel decision rule to diagnose spinal epidural abscess in ED patients with back pain.  Ann Emerg Med 2006;48(4 Supp 1):S66.

116.    Vilke GM, Castillo EM, Stepanski BM, Murrin PA, Upledger-Ray L, Metz MA, Chan TC:  San Diego County patient destination trial to decrease ambulance division hours: Three year follow-up.  Ann Emerg Med 2006;48(4 Supp 1):S90.

117.    Graydon C, Wilson S, Leahy D, Berthiaume S, Buesch B, Stein R, Vilke G, Davis D:  The positive predictive value of paramedic versus emergency physician interpretation of the prehospital 12-lead ECG.  Prehosp Emerg Care 2006;10(1):116.

118.    Ramanujam P, Stepanski B, Smith A, Upledger-Ray L, Vilke GM.  Impact of a state booster seat law on compliance in pediatric traffic crash victims.  Ann Emerg Med 2006; 48(4 Supp 1):S56.

119.    Michalewicz BA, Chan TC, Vilke GM, Levy SS, Neuman TS, Kolkhorst FW.  Ventilatory and metabolic demands during aggressive physical restraint in healthy adults.  Med Sci Sports Exerc 2006;38(5) Suppl:S452-S453.

120.    Chan T, Sloane C, Neuman T, Levine S, Castillo E, Vilke G, Bouton K, Kohokorst F.  The impact of the taser weapon on respiratory and ventilatory function in human subjects.  Acad Emerg Med 2007; 14(5 Suppl 1): S191-192.

121.    Buono C, Lyon J, Huang R, Brown S, Liu F, Vilke G, Killeen J, Chan T, Kirsh D, Lenert L.  Does wireless technology improve patient tracking in mass casualty incidents?  Acad Emerg Med 2007; 14(5 Suppl 1): S190.

122.    Vilke G, Sloane C, Levine S, Neuman T, Castillo E, Chan T.  Does the Taser Cause Electrical Changes in Twelve Lead ECG Monitoring of Human Subjects?  Acad Emerg Med 2007; 14(5 Suppl 1): S104.

123.    Vilke G, Sloane C, Bouton K, Levine S, Neuman T, Castillo E, Kolkhorst F, Chan T.  Cardiovascular and metabolic effects of the taser on human subjects.  Acad Emerg Med 2007; 14(5 Suppl 1): S104-105.

124.    Sloane C, Vilke G, Chan T, Levine S, Dunford J.  Serum troponin I measurement of subjects exposed to the taser x-26.  Acad Emerg Med 2007; 14(5 Suppl 1): S103-104.

Curriculum Vitae
Gary M. Vilke, M.D., FACEP, FAAEM

PUBLICATIONS, continued:

Abstracts

125. Bouton KD, Vilke GM, Chan TC, Sloane C, Levine S, Neuman TS, Levy SS, Kolkhorst FW. Physiological effects of a five second Taser exposure. Med Sci Sports Exerc 2007;39(5 Suppl):S323.

126. Firestone D, Band RA, Hollander JE, Castillo EM, Vilke GM.  Can Urine Dipstick and Brief Questionnaire Predict Abnormal Serum Creatinine in Emergency Department Patients?  Ann Emerg Med 2007; 50(3):S24.

127. Vilke GM, Sloane C, Suffecool AC, Neuman TS, Castillo EM, Kolkhorst FW, Chan TC. Physiologic Effects of the TASER on Human Subjects After Exercise. Ann Emerg Med 2007; 50(3):S55.

128. Chan TC, Killeen JP, Castillo EM, Vilke GM, Guss DA. Impact of Electronic Medication Reconciliation on Triage Times for Patients Seen in the Emergency Department. Ann Emerg Med 2007; 50(3):S71.

129. Marsan Jr RJ, Vilke GM, Chan TC, Davis DP, Stepanski BM. Description and Efficacy of Treatment of Hemodynamically Significant Bradycardia in a Large, Urban, Pacing-capable EMS System. Ann Emerg Med 2007; 50(3):S80.

130. Chan TC, Killeen JP, Castillo EM, Vilke GM, Kennedy S, FeinbergR, Guss DA. Impact of an internet based referral appointment system community clinic access and follow-up for ED patients with no primary care. Acad Emerg Med 2008; 15(5 Suppl 1): S104.

131. Vilke GM, Sloane CM, Suffecool A, Neuman T, Castillo EM, Kolkhorst F, Chan TC. Crossover-controlled human study of the physiologic effects of the Taser after vigorous exercise. Acad Emerg Med 2008; 15(5 Suppl 1): S155.

132. Vilke GM, Chan TC, Killeen JP, Castillo EM.  Impact of psychiatric patient holds in the emergency department on overcrowding. Acad Emerg Med 2008; 15(5 Suppl 1): S221.

133. Barnard AC, Sloane C, Vilke GM, Chan TC, Neuman TS, Kolkhorst FW. Physiological effects of TASER X-26 after intense exercise.  Med and Sci in Sports and Exercise 2008; 40(Suppl 5): S475.

134. Chan TC, Killeen JP, Vilke GM, Guss DA, Jones K, Marshall J, Moore T, Castillo EM. Impact of mandated nurse-patient ratios on emergency department crowding.  Ann Emerg Med 2008; 52(4):S44.

135. Davis D, Fong T, Lawrence B, Vilke GM. Psychosocial variables influence the decision to call 9-1-1 in emergency department patients with abdominal pain.  Ann Emerg Med 2008; 52(4):S71.

Curriculum Vitae
Gary M. Vilke, M.D., FACEP, FAAEM

PUBLICATIONS, continued:

Abstracts

136.    Bizek G, Castillo EM, Vilke GM, Chan TC. Characteristics and rates of rewarming of emergency department patients with moderate to severe accidental hypothermia. Ann Emerg Med 2008; 52(4):S105-6.

137.    Ramanujam P, Castillo EM, Patel E, Vilke GM, Wilson M, Dunford J.  Pre hospital transport time intervals for acute stroke patients. Ann Emerg Med 2008; 52(4):S154.

138.    Vilke GM, Killen J,P, Chan TC, Crumpacker J, Castillo EM.  Risk factors and characteristics of falls among emergency department elderly patients.  Ann Emerg Med 2008; 52(4):S160.

139.    Marsan R, Castillo EM, Chan TC, Stepanski B, Vilke GM: Comparison of prehospital retrospective chart review to prospectively obtained data. Acad Emerg Med 2009;16(4)Suppl 1: S85-S86.

140.    Killeen D, Killeen J, Castillo EM, Chan TC, Vilke GM: Emergency department patient evaluation of internet and email access for healthcare information.  Acad Emerg Med 2009;16(4)Suppl 1: S132-S133.

141.    Sloane CM, Chan TC, Kohlkorst F, Castillo EM, Neuman T, Vilke GM: Can a restraint chair cause respiratory or ventilatory compromise? Acad Emerg Med 2009;16(4)Suppl 1: S137.

142.    Castillo, EM, Vilke GM, Killeen J, Guss DA, Marshall J, Chan TC: Impact of mandated nurse-patient ratios on ED medication delivery. Acad Emerg Med 2009;16(4)Suppl 1: S157-S158.

143.    Slattery D, Pierson B, Stanley K, Vilke GM: Bridging the training gap in cardiac arrest: identification of cardiac arrest decision-making deficits in lay rescuers. Acad Emerg Med 2009;16(4)Suppl 1: S182.

144.    Slattery D, Stanley K, Vilke GM, Pierson B: non-medical responders are not accurate at identifying agonal respirations? Acad Emerg Med 2009;16(4)Suppl 1: S182.

145.    Castillo EM, Vilke GM, Killeen J, Guss DA, Feinberg R, Friedman L, Chan TC: Factors associated with community clinic follow-up from an ED internet-based referral system. Acad Emerg Med 2009;16(4)Suppl 1: S247-S248.

146.    Marmon J, Castillo EM, Vilke GM, Killeen J, Chan TC: The effect of admitting team resident turnover on emergency department patient flow. Acad Emerg Med 2009;16(4)Suppl 1: S257-S258.

Curriculum Vitae
Gary M. Vilke, M.D., FACEP, FAAEM

PUBLICATIONS, continued:

Abstracts

147.   Castillo EM, Vilke GM, Williams M, Turner P, Boyle J, Chan TC. Collaborative to decrease ambulance diversion: The California ED Diversion Project. Ann Emerg Med 2009; 54(3):S79.

148.   Lev R, Castillo EM, Vilke GM, Chan TC. Multi-center study of left without treatment rates from Emergency Departments serving a large metropolitan region. Ann Emerg Med 2009; 54(3):S86.

149.   Chan TC, Vilke GM, Killeen JP, Gus DA, Marshall J, Castillo EM. Impact of mandated nurse-patient ratios on time to antibiotic administration in the Emergency Department. Ann Emerg Med 2009; 54(3):S97.

150.   Vilke GM, Robertson NB, Castillo EM, Killeen JP, Chan TC. Erythrocyte sedimentation rate compared to C-reactive protein as a screening marker in the Emergency Department. Ann Emerg Med 2009; 54(3):S121.

151.   Stiell IG, Nichol G, Leroux BG, Rea TD, Ornato JP, Powell J, Christenson J, Callaway CW, Kudenchuk PJ, Aufderheide TP, Idris AH, Daya M, Wang HE, Morrison L, Davis D, Andrusiek D, Stephens S, Cheskes S, Schmicker RH, Fowler R, Vaillancourt C, Hostler D, Zive D, Pirrallo RG, Vilke G, Sopko G, Weisfeldt M, the Resuscitation Outcomes Consortium (ROC) Investigators: Resuscitation outcomes consortium ROC PRIMED trial of early rhythm analysis versus later analysis in out-of-hospital cardiac arrest. Resuscitation 2010;81S:S16.

152.   Castillo EM, Chan TC, Luu B, Prabhakar N, Vilke GM. Factors Associated With Injuries Among Subjects and Deputies During Law Enforcement Use of Force Events. Ann Emerg Med 2010; 56(3):S138.

153.   Wilson MP, MacDonald KS, Vilke GM, Feifel D. Potential Complications of Olanzapine and Benzodiazepines Compared to Haloperidol and Benzodiazepines In Emergency Department Patients. Ann Emerg Med 2010; 56(3):S155.

154.   Killeen JP, Castillo EM, Vilke GM, Marshall JB, Chan TC. Impact of Mandated Nurse-Patient Ratios on Emergency Department Discharge Time. Ann Emerg Med 2010; 56(3):S182.

155.   Chan TC, Castillo EM, Humber DM, Killeen JP.  Frequency of Pharmacy Interventions and Emergency Overrides Following Implementation of Electronic Pharmacy Review In the Emergency Department. Ann Emerg Med 2010; 56(3):S343.

156.   Chan TC, Castillo EM, Vilke GM, Killeen JP. Do Computerized Medication Alerts Change Medication Orders In the Emergency Department.  Ann Emerg Med 2010; 56(3):S372.

Curriculum Vitae
Gary M. Vilke, M.D., FACEP, FAAEM

PUBLICATIONS, continued:

Abstracts

157.   Wilson MP, Vilke GM, Govindarajan P, Itagaki MW.  Emergency Physicians Research
Commonly Encountered Patient-Oriented Problems in the the Proportion with Which They
Are Encountered in the Emergency Department.  Acad Emerg Med 2011;18 (5)Suppl:S67.

158.   Vilke GM, Anthony E, Castillo EM.  Factors Associated with Ambulance Use Among
Emergency Department Patients. Acad Emerg Med 2011;18 (5)Suppl:S114.

159.   Nordt SP, Castillo EM, Galinato M, Nguyen V, Clark RF, Cantrell FL, Chan TC, Vilke
GM: Energy Drink Use and Adverse Effects Among Emergency Department Patients. Clin
Toxicol 2011; 49(6):579.

160.   Savaser DJ, Campbell CC, Chan TC, Shah V, Sloane CS, Hansen AV, Castillo EM, Vilke GM.
The Effect of Prone Maximal Restraint (PMR, aka ''Hog-Tie'') Position on Cardiac Output
and Other Hemodynamic Measurements. Acad Emer Med 2012;19(4):S78.

161.   Castillo EM, Vilke GM, Killeen JP, Brennan JJ, Chan TC. Visit Urgency Between Frequent
Emergency Department Users In A Large Metropolitan Region Network. Acad Emer Med
2012;19(4):S96.

162.   Killeen JP, Castillo EM, Chan TC, Vilke GM. Emergency Department Patients on Warfarin
- How Often Is the Visit Due to the Medication? Acad Emer Med 2012;19(4):S121.

163.   Killeen JP, Chan TC, Vilke GM, Rafie S, Dunlay R, Castillo EM. Does Pharmacist Review
of Medication Orders Delay Medication Administration in the Emergency Department?
Acad Emer Med 2012;19(4):S166.

164.   Killeen JP, Vilke GM, Chan TC, Oyama L, Carey M, Castillo EM. Does the Residency
Selection Cycle Impact What Information Is Accessed on the Web? Acad Emer Med
2012;19(4):S202.

165.   Vilke GM, Ali S, Simmons T, Witucki P, Wilson MP. Does An Alcohol-based Hand
Sanitizer Affect Breathalyzer Levels? Acad Emer Med 2012;19(4):S278.

166.   Vilke GM, Patel N, Castillo EM, Demers G. Safety and Efficacy of Milk and Molasses in
the ED. Acad Emer Med 2012;19(4):S287.

167.   Castillo EM, Chan TC, Brennen JJ, Killeen JP, Vilke GM. Multiple Hospital Emergency
Department Visits Among "Frequent Flyer" Patients With a Pain Associated-discharge
Diagnosis. Acad Emer Med 2012;19(4):S321.

168.   Wilson MP, Chen N, Minassian A, Vilke GM, Castillo EM. In Combination With
Benzodiazepines And Alcohol Intoxication, Intramuscular But Not Oral Olanzapine Is
Associated With Decreased Oxygen Saturations. Acad Emer Med 2012;19(4):S356.

Curriculum Vitae
Gary M. Vilke, M.D., FACEP, FAAEM

PUBLICATIONS, continued:

Abstracts

169.   Killeen JP, Vilke GM, Dunford JV, Fisher R, Pringle J, Castillo EM, Chan TC: Impact of 12-lead ECG Wireless Transmission on Hospital STEMI Activations. Ann Emer Med 2012;60(4)S25.

170.   Castillo EM, Brennan JJ, Chan TC, Killeen JP, Vilke GM: Factors Associated With Frequent Users of Emergency Department Resources. Ann Emer Med 2012;60(4)S32.

171.   DeMers G, Graydon C, Stein M, Wilson S, Buesch B, Berthiaume S, Lee DM, Rivas J, Vilke GM, Davis D: Analysis of Inter-facility Transfer Rates After Initiation of a Regional PCI System. Ann Emer Med 2012;60(4)S44.

172.   Vilke GM, Brennan JJ, Castillo EM, Killeen JP, Chan TC: Multiple Hospital Emergency Department Visits Among Frequent Users With a Pain-Associated Discharge Diagnosis. Ann Emer Med 2012;60(4)S54.

173.   Benaron D, Castillo EM, Vilke GM, Guluma KZ: Emergency Department Patient Perception of Stroke. Ann Emer Med 2012;60(4)S58.

174.   Castillo EM, Chan TC, Killeen JP, Vilke GM: Knowledge of Acute Myocardial Infarction Symptoms: Do Sex Differences Still Exist? Ann Emer Med 2012;60(4)S83.

175.   Chan TC, Castillo EM, Dunford JV, Fisher R, Jensen AM, Vilke GM, Killeen JP:  Hot Spots and Frequent Fliers: Identifying High Users of Emergency Medical Services. Ann Emer Med 2012;60(4) S83-S84.

176.   Brennan JJ, Chan TC, Vilke GM, Killeen JP, Castillo EM: Identification of Frequent Users of Hospital Emergency Department Resources Using a Community-wide Approach. Ann Emer Med 2012;60(4)S102.

177.   Chan TC, Killeen JP, Brennan JJ, Vilke GM, Castillo EM: The Forgotten Emergency Department Visit When Assessing Hospital Readmissions. Ann Emer Med 2012;60(4)S105.

178.   Brennan JJ, Chan TC, Killeen JP, Castillo EM, Vilke GM: Multiple Hospital Emergency Department Visits Among "Frequent Flyer" Patients With a Psychiatric-Associated Discharge Diagnosis. Ann Emer Med 2012;60(4) S146-S147.

179.   Campillo A, MacDonald KS, Vilke GM, Wilson MP: The B52 Combination Is Not Frequently Used in Emergency Departments and Causes A High Proportion of Patients to Fall Asleep. Ann Emer Med 2012;60(4) S147.

180.   Lin GK, Vilke GM, Castillo EM, Chen N, Wilson MP: A Comparison of Oral Aripiprazole and Oral Olanzapine Use in the Emergency Department. Ann Emer Med 2012;60(4) S147-S148.

PUBLICATIONS, continued:

Abstracts

181.    Sloane C, Chan TC, Vilke GM, Castillo EM, Kolkhorst F, Neuman T: The Ventilatory
Effects of the Prone Maximal Restraint Position on Obese Human Subjects. Acad Emer
Med 2013;20(5):S105.

182.    Hogen R, Brennan JJ, Vilke GM, Chan TC, Castillo EM: Visit Urgency amongst the
Chronic Disease Population in a Large Metropolitan Region Emergency Department
Network. Acad Emer Med 2013;20(5):S172.

183.    Castillo EM, Chan TC, Vilke GM, Killeen JP, Brennan JJ: Factors Associated with Super
Users of Emergency Department Resources Admitted to Acute Care. Acad Emer Med
2013;20(5):S183.

184.    Brennan JJ, Chan TC, Vilke GM, Castillo EM, Killeen JP: Comorbidity among Frequent
Emergency Department Users with Psychiatric Associated Discharge Diagnoses. Acad
Emer Med 2013;20(5):S229.

185.    Brennan JJ, Castillo EM, Vilke GM, Killeen JP, Chan TC: Factors Associated with
Frequent Users of California Emergency Department Resources. Acad Emer Med
2013;20(5):S230.

186.    Chan TC, Brennan JJ, Killeen JK, Stevenson ME, Kuntz KE, Vilke GM, Castillo EM:
Impact of Social Services Case Management on Homeless, Frequent Users of Emergency
Departments. Acad Emer Med 2013;20(5):S231.

187.    Castillo EM, Chan TC, Brennan JJ, Roberts EE, Vilke GM. What Contributes to Subject
and Officer Injuries During Law Enforcement Use of Force Events? Ann Emerg Med 2013,
62(4), S107.

188.    Brennan JJ, Castillo EM, Wilson M, Chan TC, Killeen JP, Vilke GM. Psychiatric-
Associated Visits to California Emergency Departments: Presence of Licensed Psychiatric
Beds and Admission. Ann Emerg Med 2013, 62(4), S118.

189.    Granata RT, Vilke GM. Impact of deferred CT imaging of intoxicated patients presenting
with altered mental status.  J Invest Med 2014;61(1):214.

190.    Nowak RM, Schreiber D, Hollander J, Nagurney J, Hogan C, Wu A, Vilke GM, Apple F,
Cannon C, Daniels L, Anand I, deFillippi C, McCord J, Shah K, Marston N, Neath SX,
Christenson R, Diercks D, Limkakeng A, Jaffe A, Mueller C, Maisel A, Peacock F:
Copeptin Provides Prognostic Value in Emergency Department Patients Presenting with
Acute Undifferentiated Chest Pain. Acad Emerg Med 2014;21(5):S89.

Curriculum Vitae
Gary M. Vilke, M.D., FACEP, FAAEM

PUBLICATIONS, continued:

Abstracts

191.   Peacock W, Nowak R, Neath SX, Hollander J, Cannon C, Nagurney JT, Schreiber D, Hogan C, Diercks D, Stein JC, Headden G, Limkakeng AT, Mueller C, Vilke GM, Maisel A: Can a Second Measurement of Copeptin Improve Acute Myocardial Infarction Rule Out? Acad Emerg Med 2014;21(5):S90.

192.   Vilke GM, Lassoff D, Chan TC, Hall CA, Bozeman WP, Castillo EM. Proning: Outcomes of Use of Force Followed with Prone Restraint. Acad Emerg Med 2014; 21(Supp 1): S161.

193.   Vilke GM, Chan TC, Roberts EE, Moore JD, Parra KM, Castillo EM. Does Law Enforcement Use Different Levels of Force if the Subject Appears to be Mentally Impaired? Acad Emerg Med 2014; 21(Supp 1): S238.

194.   Hopper A, Dee J, Vilke GM, Castillo EM, Chen V, Hall D, Wilson MP. Hypotensive Effects of Risperidone Are Not Increased When Used in Conjunction with Benzodiazepines or in Alcohol Intoxicated Patients but May Increase in Elderly Patients. Acad Emerg Med 2014; 21(Supp 1):S56.

195.   Castillo, EM, Brennan JJ, Hsia RY, Killeen JP, Vilke, GM, Chan TC. Thirty-day Readmissions Through the Emergency Department in a Large, Metropolitan Region. Acad Emerg Med 2014; 21(Supp 1):S108.

196.   Castillo EM, Chan TC, Hsia RY, Killeen JP, Vilke GM, Brennan JJ. Should Rural Hospitals be Concerned about Frequent Users of Emergency Department Resources? Acad Emerg Med 2014; 21(Supp 1):S218.

197.   Brennan JJ, Chan TC, Vilke GM, Hsia RY, Killeen JP, Castillo EM. Traveling Super Users of California Emergency Departments. Acad Emerg Med 2014; 21(Supp 1):S220.

198.   Killeen JP, Castillo EM, Brennan JJ, Vilke GM, Chan TC. Does Emergency Department Interrogation Reduce ED Time for Patients with Pacemakers or ICDs? Acad Emerg Med 2014; 21(Supp 1):S274.

199.   Castillo EM, Brennan JJ, Hsia RY, Killeen JP, Vilke GM, Chan TC. Multiple Emergency Department Use and 30-day ED Visits. Acad Emerg Med 2014; 21(Supp 1):S322.

200.   Marston N, Shah K, Mueller C, Neath SX, Christenson R, McCord J, Nowak R, Vilke G, Daniels L, Hollander J, Apple F, Cannon C, Nagurney J, Schreiber D, DeFilippi C, Hogan C, Diercks D, Limkaken A, Anand I, Jaffe A, Peacock WF, Maisel A, Wu, A: Can a second measurement of copeptin improve acute myocardial infarction rule out?. J Am Coll Cardiol 2014;63(12_S).

Curriculum Vitae
Gary M. Vilke, M.D., FACEP, FAAEM

PUBLICATIONS, continued:

Abstracts

201. Chan TC, Killeen JP, Vilke GM, Castillo EM. Impact of the Affordable Care Act on the Health Care Coverage of Patients Seen in the Emergency Department: Initial First Quarter Findings. Ann Emerg Med 2014; 64(4s):S84 –S85.Smith C, Hopper AB,

202. Castillo EM, Dang AQ, Chan TC, Vilke GM. Mortality and Timing of Death in Patients With Runaway Pacemakers. Ann Emerg Med 2014; 64(4s):S111.

203. Brennan JJ, Chan TC, Hsia RY, Vilke GM, Killeen JP, Castillo EM. Predicting Frequent Use of Emergency Department Resources. Ann Emerg Med 2014; 64(4s):S118 – S119.

204. Campillo A, Castillo EM, Vilke GM, Wilson MP. Use of Quetiapine in the Emergency Department for Acute Agitation and Associated Physiologic Effects. Ann Emerg Med 2014; 64(4s):S138.

205. Vilke GM, Lev R, Chan TC, Lucas J, Smith J, Painter NA, Castillo EM. Prescription Drug Prescribing Patterns in a Large Regional Area. Ann Emerg Med 2014; 64(4s):S139-S140.

206. Hopper AB, Deen J, Smith C, Campillo A, Vilke GM, Castillo EM, Wilson MP. Hypotensive Effects of Oral Second Generation Antipsychotics in the Emergency Department. Ann Emerg Med 2014; 64(4s):S140-S141.

207. Marston N, Shah K, Mueller C, Neath SX, Christenson R, McCord J, Nowak R, Vilke GM, Daniels L, Hollander J, Apple F, Cannon C, Nagurney J, Schreiber D, deFilippi C, Hogan C, Diercks D, Limkakend A, Anand I, Wu A, Clopton P, Jeffe A, Peacock F, Maisel A. Does Copeptin Provide Additional Risk Stratification in Chest Pain Patients With a Mild Troponin Elevation? Circulation 2014; 130:A12996.

208. Egnatios J, Lev R, Petro S, Castillo E, Vilke G. Long Active Death: Medadone. Ann Emerg Med 2015; 66(4s):S140-S141.

209. Vilke GM, Guss DA. Pilot Study of Telemedicine in a County Jail to Assess and Treat Acutely Ill Inmates. Ann Emerg Med 2015; 66(4s): S14.

210. Brennan JJ, Vilke GM, Hsia RY, Chan TC, Killeen JP, Huang J, Castillo EM. Transient Ischemic Attack "Bouncebacks": Emergency Department Discharges Who Return as Admissions Within Seven Days. Ann Emerg Med 2015; 66(4s):S112.

211. Brennan JJ, Chan TC, Vilke GM, Killeen JP, Hsia RY, Tehaney K, Castillo EM. Admissions Within Seven Days of an Emergency Department Discharge. Ann Emerg Med 2015; 66(4s):S89.

Curriculum Vitae
Gary M. Vilke, M.D., FACEP, FAAEM

PUBLICATIONS, continued:

Abstracts

212.    Lev R, Lee O, Petro S, Lucas J, Castillo EM, Vilke GM, Coyne CJ. Specialty-Specific Prescribing Patterns to Patients Who Die From Prescription Drugs: How Do Emergency Physicians Compare? Ann Emerg Med 2015; 66(4s):S119.

213.    Castillo EM, Chan, TC, Vilke GM, Hsia RY, Ishamine P, Shah S, Kapoor K, Brennan JJ. A Description of Pediatric Frequent Users of Emergency Department Resources. Ann Emerg Med 2015; 66(4s):S8.

214.    Rentmeester L, Clark RF, Joshua A, Vilke, GM. (2015). Undetectable Total Phenytoin in a Patient with Elevated Kappa Light Chains. Clinical Toxicology. 2015;53. 658.

215.    Chan TC, Brennan JJ, Vilke GM, Hsia RY, Killeen JP, Castillo EM. The Changing Landscape of Emergency Department Visits in California. Acad Emerg Med 2016; 23:S15

216.    Castillo EM, Vilke GM, Killeen JP, Hsia RY, Wilson MP, Brennan JJ. ED Utilization Prior to a Suicide and Self-Inflicted Injury Related ED Visit. Acad Emerg Med 2016; 23:S17.

217.    Supat B, Brennan JJ, Vilke GM, Ishimine P, Shah S, Hsia RY, Castillo EM. Assessing Factors Associated with Pediatric Frequent Emergency Department Utilization. Acad Emerg Med 2016; 23:S32.

218.    Coyne CJ, Chiu C, Brennan JJ, Castillo EM, Vilke GM. Medication Adherence in the Emergency Department: What are the Barriers? Acad Emerg Med 2016; 23:S41.

219.    Spinosa DL, Brennan JJ, Castillo EM, Hsia RY, Vilke GM. Multivariate Analysis of 30-Day Readmission for Acute Myocardial Infarction. Acad Emerg Med 2016; 23:S118.

220.    Castillo EM, Brennan JJ, Shah S, Vilke GM, Hsia RY, Nguyen M. Asthma and Asthma-Mimicking Pediatric ED Revisit Within Three Days of an ED Discharge. Acad Emerg Med 2016; 23:S120.

221.    Castillo EM, Brennan JJ, Chan TC, Killeen JP, Hsia RY, Vilke GM. ED Utilization 3-Days Prior to a Fall-Related ED Visit Among Elderly Patients. Acad Emerg Med 2016; 23:S139.

222.    Coyne CJ, Le V, Brennan JJ, Castillo EM, Shatsky RA, Vilke GM. Low-Risk febrile Neutropenia: Can These Patients be Safely Discharged from the Emergency Department? Acad Emerg Med 2016; 23:S161.

223.    Brennan JJ, Vilke GM, Chan TC, Killeen JP, Hsia RY, Castillo EM. ED Revisits Within 3 Days of an ED Discharge Among Elderly Patients. Acad Emerg Med 2016; 23:S169.

Curriculum Vitae
Gary M. Vilke, M.D., FACEP, FAAEM

PUBLICATIONS, continued:

Abstracts

224.   Nakajima Y, Vilke GM, Castillo EM, Brennan JJ, Hsia R. Asthma Bouncebacks
       Emergency Department Discharges Who Return as Admission Within Three Days. Acad
       Emerg Med 2016; 23:S202.

225.   Benaron D, Castillo E, Vilke G, Guluma K. Emergency Department Patient Perception
       of Stroke: A Comparison of Elderly and Nonelderly Knowledge of Stroke. Acad Emerg
       Med 2016; 23:S256.

226.   Vilke GM, Castillo EM, Brennan JJ, Killeen JP. What Happens to Emergency Patients Who
       Leave Without Being Seen by a Physician? Ann Emerg Med 2016;68(4):S33.

227.   Castillo EM, Morgan AO, Vilke GM, Killeen JP, Hsia RY, Brennan JJ. Characteristics of
       Frequent Users of Emergency Departments With Pain-Related Diagnoses.  Ann Emerg Med
       2016;68(4):S56-57.

228.   Brennan JJ, Vilke GM, Killeen JP, Hsia RY, Castillo EM. Trends Among Emergency
       Department Visits for Suicide-Related Diagnoses, 2008 – 2014. Ann Emerg Med
       2016;68(4):S385.

229.   Coyne CC, Brennan JJ, Castillo EM, Vilke GM. Cancer-Related Emergency Department
       Bounce Backs: Describing the Population and Assessing Outcomes. Ann Emerg Med
       2016;68(4):S387.

230.   Kurz M C, Schmicker R, Leroux B, Nichol G, Aufderheide T, Cheskes S, Gray R, Jasti J,
       Kudenchuk P, Vilke G, Buick J , Wittwer L , Shani R, Brienza A, Straight R and Wang H
       E: Abstract 16472: Advanced vs. Basic Life Support in the Treatment of Out-of-Hospital
       Cardiopulmonary Arrest in the Resuscitation Outcomes Consortium.  Circulation.
       2016;134:A16472.

231.   Cheskes S, Schmicker R, Morrison L, Rea T, Grunau B, Drenna I, Leroux B, Vaillancourt
       C, Schmidtt A, Kudenchuk P, Aufderheide T, Herren H, Vilke G, Flickinger K, Charleston
       M, Straight R, Jasti J, Christenson J: Abstract 13871: Does Compliance With a Global Cpr
       Quality Benchmark Predict Survival From Out-Of-Hospital Cardiac Arrest?  Circulation.
       2016;134:A13871

232.   Castillo EM, Ko K, Howard J, Vilke GM, Hsia R, Killeen JP, Brennan J. The Rate and
       Patient Characteristics of 7-Day ED Revisits among Senior Patients. Acad Emerg Med
       Med 2017; 24 (S1):S37-S38.

233.   Hornbeak K, Castillo EM, Sloane C, Vilke GM. Injuries Associated with Law Enforcement
       Use-of-force Incidents with and without Subject Intoxication. Acad Emerg Med 2017; 24
       (S1):S131.

PUBLICATIONS, continued:

Curriculum Vitae
Gary M. Vilke, M.D., FACEP, FAAEM

Abstracts

234.    Coyne C, Li D, Brennan J, Castillo E, Vilke GM. Evaluating cancer-related pain management in the emergency department setting. Acad Emerg Med 2017; 24 (S1):S148-S149.

235.    Brennan J, Vilke GM, Hsia R, Killeen JP, Castillo EM. Emergency department visits following hospital admissions. Acad Emerg Med 2017; 24 (S1):S159.

236.    Vilke GM, Holman M, Brennan B, Castillo EM. Evaluation of the Risk of Carotid Artery Injury in Strangulation. Acad Emerg Med 2017; 24 (S1):S211-S212.

237.    Coyne CJ, Brennan J, Castillo EM, Vilke GM. Conducting Meaningful Population-Based Research on Patients with Cancer Who Present To the Emergency Department - A Study on The Methodology of Categorization. Acad Emerg Med 2017; 24 (S1):S223.

238.    Miller A, Brennan J, Vilke GM, Castillo EM. Knowledge and Concern over Ingredients in Packaged Food and Personal Hygiene Products among Emergency Department Patients. Acad Emerg Med 2017; 24 (S1):S248.

239.    Killeen JP, Castillo EM, Vilke GM, Chan TC, Dunford JK, Kahn C, Powell R, Sparks J, Pringle J, Chavez DJ, Branning MD. Prehospital to Emergency Department Data Exchange- a SAFR Transition of Care. Ann Emerg Med 2017; 70(4): S2.

240.    Sloane C, Mash DC, Chan TC, Kolkhorst F, Neuman T, Castillo EM, Vilke GM. Assessment of Stress Markers in Restrained Individuals Following Physical Stress with and Without a Sham TASER Activation. Ann Emerg Med 2017; 70(4): S41.

241.    Brennan JJ, Chan TC, Vilke GM, Killeen JK, Hsia RY, Castillo EM. ED Revisits within 3 Days of an ED Discharge for Urinary Tract Infection among Geriatric Patients. Ann Emerg Med 2017; 70(4): S85.

242.    Kreshak, Tolia VT, Chan TC, Killeen JP, Vilke GM, Castillo EM. A Four-Year Descriptive Analysis of Geriatric Patients' Visits to the Emergency Department. Ann Emerg Med 2017; 70(4): S97.

243.    Nakajima Y, Brennan JJ, Castillo EM, Vilke GM. Factors Associated with Ambulance Use in Emergency Department Patients. Ann Emerg Med 2017; 70(4): S102.

244.    Tolia VT, Chan TC, Killeen JP, Vilke GM, Kreshak AA, Castillo EM. Evaluation of Mobility and Fall Risk among Seniors Presenting to the Emergency Department. Ann Emerg Med 2017; 70(4): S102.

245.    Tolia VT, Chan TC, Killeen JP, Vilke GM, Kreshak AA, Castillo EM. Identification of Unrecognized Delirium in Senior Emergency Department Patients. Ann Emerg Med 2017; 70(4): S105.

PUBLICATIONS, continued:

Curriculum Vitae
Gary M. Vilke, M.D., FACEP, FAAEM

Abstracts

246.    Brennan JJ, Chan TC, Vilke GM, Hsia RY, Killeen JK, Castillo EM. Geriatric visits to California Emergency Department from 2008 through 2014. Ann Emerg Med 2017; 70(4): S158-S159.

247.    Coyne CJ, Ence T, Smyres C, Brennan J, Castillo E, Vilke GM. The relationship between medication knowledge, perceived importance, and medication adherence. Ann Emerg Med 2017; 70(4): S169.

248.    Vilke GM, Brennan JJ, Chan TC, Hsia RY, Killeen JP, Castillo EM. Emergency Department Utilization Three Days Prior to a Septicemia Diagnosis among Geriatric Patients. Acad Emerg Med 2018;70(4):S45.

249.    Coyne CJ, Ha E, Brennan JJ, Castillo EM, Birring P, Shah S, Vilke GM. Cancer-Related Venous Thromboembolism in the Emergency Department: A Retrospective Cohort Study. Acad Emerg Med 2018;70(4):S72.

250.    Castillo EM, Vuong CL, Vilke GM, Brennan JJ, Hsia RY, Killeen JP. 30-Day Readmissions among Elderly Patients Discharged with an Acute Myocardial Infraction. Acad Emerg Med 2018;70(4):S120.

251.    Coyne CJ, Brennan JJ, Castillo EM, Vilke GM. Cancer-Related Emergency Department Visits in the Elderly: Comparing Characteristics and Outcomes. Acad Emerg Med 2018;70(4):S121.

252.    Vilke GM, Lutz M, Sloane C, Castillo E, Brennan J, Swift S, Coyne C. Physiological Effects of a Spit Sock. Ann Emerg Med 2018; 72(4): S56.

253.    Tolia VM, Kreshak AA, Chan TC, Brennan JJ, Vilke GM, Castillo EM. Initial Risk Screening and Impact of Evaluation for Geriatric Emergency Department Patients. Ann Emerg Med 2018; 72(4): S83.

254.    Castillo EM, Cronin AO, Chan TC, Brennan JJ, Vilke GM, Killeen JP, Hsia RY. Trends in Drug and Alcohol Use from 2008 Through 2016. Acad Emerg Med 2019; 26(S1):S41.

255.    Castillo EM, Brennan JJ, Hsia RY, Vilke GM, Killeen JP, Chan TC. Trends in Emergency Department Discharges from 2008 Through 2016. Acad Emerg Med 2019; 26(S1):S61.

256.    Castillo EM, Tolia VM, Kreshak AA, Brennan JJ, Chan TC, Vilke GM, Hsia RY. A Description of Geriatric Patients Presenting to California Emergency Departments for a Fall-Related Complaint. Acad Emerg Med 2019; 26(S1):S90-1.

Curriculum Vitae
Gary M. Vilke, M.D., FACEP, FAAEM

PUBLICATIONS, continued:

Abstracts

257.  Killeen JP, Docter TA, Brennan JJ, Castillo EM, Vilke GM, Chan TC, Tolia VM. Comparison of Length of Stay for Patients with High Sensitivity Troponin vs Standard Troponin. Acad Emerg Med 2019; 26(S1):S352.

258.  Tolia VM, Chan TC, Brennan JJ, Castillo EM, Vilke GM, Wardi G, Kreshak AA. The Impact of a Short Hospital Worker Strike on Emergency Department Utilization. Acad Emerg Med 2019; 26(S1):S236.

259.  Vilke GM, Mash D, Pardo M, Bozeman W, Hall C, Sloane C, Wilson M, Coyne CJ, Xie C, Castillo EM. Excitation Study — Unexplained In-Custody Deaths: Evaluating Biomarkers of Stress and Agitation. Acad Emerg Med 2019; 26(S1):S260.

260.  Castillo EM, Tolia VM, Chan TC, Vilke GM, Kreshak AA, Brennan JJ. Impact of an Emergency Nurse Geriatric Specialist on Admissions and Emergency Department Revisits. Acad Emerg Med 2020; 27(S1):S152.

261.  Castillo EM, Vuong C, Brennan JJ, Chan TC, Cronin AO, Vilke GM. Electric Scooter-Related Injuries after Their Introduction into a Large Metropolitan Area. Acad Emerg Med 2020; 27(S1):S183.

262.  Castillo EM, Cronin AO, Vilke GM, Killeen JP, Brennan JJ. Emergency Department Utilization Trends during the COVID-19. Ann Emerg Med 2020; 76(4):S66.

263.  Castillo EM, Brennan JJ, Cronin AO, Killeen JP, Vilke GM. COVID-19 Symptoms among Emergency Department Patients and Implications for Screening. Ann Emerg Med 2020; 76(4):S66-67

264.  Cronin AO, Frink ER, Vilke GM, Killeen JP, Castillo EM. Influenza Reporting in an Academic Health System. Ann Emerg Med 2020; 76(4):S67.

265.  Childers R, Vilke GM, Brennan JJ, Castillo EM. A Descriptive Study of Antibiotic Use for Acute Respiratory Infections in Urgent Care Patients. Acad Emerg Med 2021; 28(S1):S267.

266.  Vilke GM, Kreshak AA, Castillo EM, Cronin AO. Prochnow C. Characteristics of 72-Hour Emergency Department Visits. Acad Emerg Med 2021; 28(S1):S285-6.

267.  Carlile M, Vilke GM, Killeen J, Tolia V, Kreshak A, Castillo EM, Dameff C. Impact of Clinical Informatics Tools on Critical Care Billing in an Academic Emergency Department. Acad Emerg Med 2021; 28(S1):S286-7.

268.  Brennan J, Vilke G, Tolia V, Castillo EM. Novel Coronavirus (COVID-19) Positivity Rates Among Hispanic Emergency Department Patients. Acad Emerg Med 2021; 28(S1):S321.

Curriculum Vitae
Gary M. Vilke, M.D., FACEP, FAAEM

PUBLICATIONS, continued:

Abstracts

269.   Childers R, Childers R, Liotta B, Wang P, Katoula J, Thien T, Montilla-Guedez H, Vilke G, Castillo E, Brennan J. Overdiagnosis of Urinary Tract Infections in the Emergency Department. Ann Emerg Med 2021;78(4S):S113.

270.   Childers R, Liotta B, Wang P, Katoula J, Thien T, Montilla-Guedez H, Vilke J, Castillo E, Brennan J. Overdiagnosis of Urinary Tract Infections in the Emergency Department. Annals of Emergency Medicine. 2021;78(4):S113. From the American College of Emergency Physicians 2021 Annual Meeting. doi: 10.1016/j.annemergmed.2021.09.292.

271.   Hokett S, Wilson M, Martel M, Vilke G, Kwong M.  Characterization of Patients with Acute Agitation and Schizophrenia Treated in Emergency Departments in the United States – A Retrospective Chart Review [AMCP abstract F14]. Journal of Managed Care Specialty Pharmacy 28(10-a):S54.

Curriculum Vitae
Gary M. Vilke, M.D., FACEP, FAAEM

ORAL PRESENTATIONS AT NATIONAL MEETINGS:

1.  Chan TC, Buchanan J, Anderson M, Vilke GM:  Patient ethnicity and age in prehospital emergency ambulance use and acuity rates.  NAEMSP Mid-Year Meeting, Lake Tahoe, Nevada; July 1998.

2.  Vilke GM, Dunford JV, Buchanan J, Chan TC:  Are opiate overdose deaths related to patient release after naloxone?  ACEP Research Forum, San Diego, California; October 1998.

3.  Gerling MC, Hamilton RS, Davis DP, Morris GF, Vilke GM, Hayden SR:  The effects of cervical spine immobilization on technique and laryngoscope blade selection on an unstable cervical spine injury in a cadaver model of intubation.  ACEP Research Forum, San Diego, California; October 1998.

4.  Vilke GM, Chan TC, Ray LU, Anderson ME:  Use of prehospital crash injury data to assess regional automobile safety restraint use.  NAEMSP Annual Meeting, Marcos Island, Florida; January 1999.

5.  Chew GS, Chan TC, Bramwell K, Davis DP, Vilke GM:  Does gastric distention from air insufflation affect the accuracy of the syringe esophageal detector device in detecting esophageal intubation?  SAEM Western Regional Research Forum, Redondo Beach, California; March 1999.

6.  Davis DP, Kimbro T, Vilke GM:  The use of midazolam for prehospital rapid-sequence intubation may be associated with a dose-related increase in hypotension.  NAEMSP Annual Meeting, Dana Point, California; January 2000.

7.  Marino AT, Sharieff G, Gerhart AE, Chan TC, Vilke GM:  The efficacy and complication rate of prehospital midazolam for the treatment of pediatric seizures.  NAEMSP Annual Meeting, Dana Point, California; January 2000.

8.  Eisele JW, Chan T, Vilke G, Neuman T, Clausen J:  Effect of weight placed on the back of subjects in the hobble restraint position.  American Academy of Forensic Sciences Annual Meeting, Reno, Nevada; February 2000.

9.  Chan TC, Vilke GM, Neuman TS, Clark RF, Clausen JL:  The effect of oleoresin capsicum spray inhalation on pulmonary and respiratory function.  SAEM Western Regional Research Forum, Portland, Oregon; April 2000.

10. Vilke GM, Chan TC, Seltzer A, Fisher R, Dunford JV:  Outcome of out-of-hospital refusal of paramedic transport by parents of pediatric patients.  State of California EMS Authority EMS for Children Annual Conference, San Diego, California; November 2000.

11. Deitch S, Vilke GM, Marino A, Vroman D, Chan TC:  Effect of prehospital use of nitroglycerine on EKG findings in patients with chest pain.  American Academy of Emergency Medicine Annual Conference, Orlando, Florida; March 2001.

Curriculum Vitae
Gary M. Vilke, M.D., FACEP, FAAEM

ORAL PRESENTATIONS AT NATIONAL MEETINGS, continued:

12.   Vilke GM, Steen PJ, Smith AM, Chan TC:  Pediatric intubation by paramedics: The San Diego
      County experience.  SAEM Western Regional Research Forum, Irvine, California; March 2001.

13.   Davis DP, Ochs M, Hoyt DB, Dunford JV, Vilke GM:  The use of the Combitube as a salvage
      airway device for paramedic RSI.  SAEM Western Regional Research Forum, Irvine,
      California; March 2001.

14.   Chan TC, Dunford JV, Vilke GM:  Impact of a community multidisciplinary homeless
      outreach team.  SAEM Annual Meeting, Atlanta, Georgia; May 2001.

15.   Chan TC, Dunford JV, Vilke GM:  Impact of a community multidisciplinary homeless
      outreach team.  CAL/ACEP Scientific Assembly, Santa Clara, California; June 2001.
      (Won Award for Best Oral Presentation)

16.   Valentine C, Davis D, Ochs M, Hoyt D, Bailey D, Vilke G:  The use of the Combitube as a
      salvage airway device for paramedic rapid sequence induction.  NAEMSP Annual Meeting,
      Tucson, Arizona; January 2002.

17.   Vilke GM, Lev R, Castillo EM, Metz MA, Murrin PA, Chan TC:  Prospective countywide
      trial to decrease ambulance diversion hours.  SAEM Western Regional Meeting, Scottsdale,
      Arizona; April 2003.

18.   Vilke GM, Lev R, Castillo EM, Murrin PA, Chan TC:  Prospective countywide trial to
      decrease ambulance diversion hours.  SAEM Annual Meeting, Boston, Massachusetts,
      May 2003.

19.   Vilke GM, Lev R, Castillo EM, Metz MA, Murrin PA, Chan TC:  San Diego County
      improved patient destination trial to decrease emergency department diversion hours and
      diverted patients.  American College of Emergency Physicians Research Forum, Boston,
      Massachusetts; October 2003.

20.   Vilke G, Castillo E, Metz M, Murrin P, Ray LU, Lev R, Chan T:  Community trial to
      decrease ambulance diversion of patients and hours.  NAEMSP National Conference, Tucson,
      Arizona; January 2004.

21.   Marcelyn Metz, Patricia Murrin, Gary M. Vilke:  The three-phase EMS cardiac arrest model
      for ventricular fibrillation.  ENA Annual Meeting; San Diego, California; October 2004.

22.   Michalewicz, BA, TC Chan, GM Vilke, SS Levy, TS Neuman, and FW Kolkhorst:
      Ventilatory and metabolic demands during aggressive physical restraint in healthy adults.
      American College of Sports Medicine Annual Meeting, Denver, CO; June 2006.  [*Medicine
      and Science in Sports and Exercise* 38(5 Supplement), 2006].

23.   Vilke GM, Ali S, Simmons T, Witucki P, Wilson MP. Does an alcohol-based sanitizer impact
      breathalyzer levels? SAEM Annual Meeting, Chicago, Illinois; May 2012.

Curriculum Vitae
Gary M. Vilke, M.D., FACEP, FAAEM

ORAL PRESENTATIONS AT NATIONAL MEETINGS, continued:

24.    Childers R, Liotta B, Vilke G, Castillo E, Wang P, Brennan J.  Urine Testing is Associated
       with an Increased Rate of Antibiotic Use in Emergency Department Patients at Risk of UTI
       Overdiagnosis. Annals of Emergency Medicine. 2020;76(4):S10. From the American College
       of Emergency Physicians 2020 Annual Meeting. doi:10.1016/j.annemergmed.2020.09.03.

25.    Childers R, Vilke G, Brennan J, Castillo E.  A descriptive study of antibiotic use for acute
       respiratory infections in urgent care patients.  SAEM Annual Meeting, Virtual Meeting; May
       2021.

26.    Vilke GM, Billberry E, Preese J, Castillo EM, Brennan JJ, Chan TC. Impact of
       Implementation of a New Weapon Screening at an Urban Emergency Department. ACEP
       Research Forum, Boston, MA; October 27, 2021.

27.    Vilke GM, Citrome L, Preskorn S, Rajachandran L, Risinger R. Dexmedetomidine
       Sublingual Film for Acute Agitation in Schizophrenia or Bipolar Disorder by Baseline
       Clinical Global Impression-Severity of Agitation. ACEP Research Forum, San Francisco,
       CA; October 1, 2022.

28.    Kwong M, Hockett S, Martel M, Rossom R, Vilke GM, Wilson MP.  Acute Agitation
       Management in Patients with Schizophrenia or Bipolar Disorder in Emergency Departments
       in the United States - A Retrospective Chart Review.  Annual Update on Behavioral
       Emergencies Conference. Scottsdale, Arizona, December 8, 2022.

Curriculum Vitae
Gary M. Vilke, M.D., FACEP, FAAEM

SELECTED SPEAKING ENGAGEMENTS:

1.  "Death of a Child: How to Treat the Survivors" -- Grand Rounds, Department of Emergency Medicine, UCSD Medical Center; April 1996.

2.  "Assessing GCS and the Field Neurologic Exam" -- Palomar College Paramedic Training; June 1998.

3.  "Prehospital Shock"; "Management of the Field Trauma Patient" -- Mercy Air, Ventura County Lecture Series; August 1998.

4.  "ER: Not Just a Television Show, But a Field of Research" -- Howard Hughes Foundation Lecture Series, University of California, San Diego; November 1998.

5.  "Multi-Casualty  Incident" -- UCSD Medical Center Trauma Conference; March 1999.

6.  "Managing the Prehospital Multi-Casualty Incident" -- Southwestern College Paramedic Training Institute; May 1999.

7.  "Aeromedical Transport: The Past and Current Environment" -- Trauma Morbidity and Mortality Conference, Children's Hospital, San Diego, California; July 1999.

8.  "Altitude Medicine"; "Carbon Monoxide Poisoning and Treatment Options"; "Aeromedical Transport Options"; "Emergent Airway Management Options" -- Rural Emergency Medicine Conference, Jackson Hole, Wyoming; August 1999.

9.  "Abdominal and Chest Trauma in Sports" -- First Annual San Diego County Athletic Coaches Workshop, San Diego, California; June 2000.

10.  "Tabletop Discussion on Chemical Weapon of Mass Destruction" -- Facilitator of Tabletop Training for San Diego County Metropolitan Medical Strike Team; July 2000.

11.  "Pediatric IV Access"; "Spinal Immobilization"; "Children with Special Health Care Needs"; "Cardiovascular Emergencies" -- American Academy of Pediatrics Pediatric Education for Prehospital Professionals Conference, San Diego, California; November 2000.

12.  "New Frontiers in Field Management of Pediatric Status Epilepticus" -- State of California EMS Authority Annual EMS for Children Conference, San Diego, California; November 2000.

13.  "EMS Medical Control: Avoiding your Day in Court" -- ACEP's Emergency Medicine Connection Conference, San Diego, California; March 2001.

14.  "Pediatric Intubations by Paramedics" -- San Diego Chapter of the Committee on Pediatric Emergency Medicine; April 2001.

15.  "Warfare and Terrorism: A Review of Chemical Agents -- San Diego County Metropolitan Medical Strike Team Training; August 2001.

Curriculum Vitae
Gary M. Vilke, M.D., FACEP, FAAEM

SELECTED SPEAKING ENGAGEMENTS, continued:

16. "Bioterrorism and San Diego County" -- Council of Community Clinics Meeting;
    October 2001.

17. "Bioterrorism and San Diego County Readiness" -- CTN interview with Bill Horn;
    October 2001.

18. "Future of Prehospital Care" -- Keynote Speaker, Southwestern Paramedic College
    Graduation; November 2001.

19. "Biological Agents for Terrorism" -- San Diego County Metropolitan Medical Strike Team
    Training; November 2001.

20. "Clinical Aspects of Bioterrorist Agents" -- Palomar Paramedic College; November 2001.

21. "Clinical Aspects of Bioterrorism" -- Grand Rounds, Fallbrook Hospital; January 2002.

22. "Bioterrorism and San Diego County Readiness" -- Poway Town Hall Meeting; January 2002.

23. "Bioterrorist Preparedness" -- National Medical Association, San Diego County; January 2002.

24. "Chemical Agents of Terrorism: Diagnosis and Treatment" -- Topics and Advances in
    Internal Medicine, San Diego, California; March 2002.

25. "Bioterrorism:  Implications for the Legal and Domestic Community" -- Thomas Jefferson
    School of Law, San Diego, California; April 2002.

26. "Prehospital Management of Pediatric Seizures" -- EMS-Children Annual Conference;
    San Diego, California; November 2002.

27. "Paramedicine – Past, Present and Future" -- Keynote Speaker, Southwestern Paramedic
    College Graduation; San Diego, California; December 2002.

28. "Medical Group Preparedness: How would you Respond to a Possible Victim of
    Bioterrorism?" -- Bioterrorism Preparedness Training Conference; San Diego California;
    January 2003.

29. "Update on Bioterrorism" -- The Western States Winter Conference on Emergency Medicine;
    Park City, Utah; January 2003.

30. "Academic Emergency Medicine and Research Opportunities" -- San Diego Health
    Information Association, San Diego, California; February 11, 2003.

32. "Blast and Radiological Injuries: Myths and Realities" -- San Diego County Metropolitan
    Medical Strike Team Training; San Diego, California; August 2003.

Curriculum Vitae
Gary M. Vilke, M.D., FACEP, FAAEM

SELECTED SPEAKING ENGAGEMENTS, continued:

33.   "Clinical Aspects of Bioterroism" -- American Correctional Health Services Association, California and Nevada Chapter Annual Conference, San Diego, California; September 2003.

34.   "Bioterrorism" -- UCSD/SDSU General Preventive Medicine Residency Lecture Series, La Jolla, California; October 2003.

35.   "Prehospital Pediatric Airway Obstruction" – Children's Hospital Grand Rounds, San Diego, California; July 2004.

36.   "Future of Healthcare in San Diego: Trends Impacting our Delivery System" -- San Diego Organization of Healthcare Leaders, San Diego, California; August 2004.

36.   "Firestorm 2003" -- Children's Hospital Grand Rounds, San Diego, California; January 2004.

37.   "EMS research: Unique ethical and regulatory issues" -- Applied Research Ethics National Association Annual meeting, San Diego, California; October 2004.

38.   "What happens when you call 911?" -- San Diego Sports Medicine Foundation, San Diego, California; October 2004.

39.   "Making the Metropolitan Medical Response System Work for You" -- Emergency Response 2004 Conference, San Diego, California; November 2004.

40.   "San Diego County Emergency Department Ambulance Bypass - Past, Present, Future" -- Urgent Matters Briefing, San Diego, California; November 2004.

41.   "San Diego County Emergency Department Ambulance Bypass - Past, Present, and Future" -- San Diego Community Emergency Departments, San Diego, California; December 2, 2004.

42.   "Emergency Response Management for Efficiency of Care and Fiscal Consideration" -- American Correctional Health Services Association, Oakland, California; April 2, 2005.

43.   "Conducted Energy Devices – Medical Updates and Issues" -- Police Executive Research Forum, Houston, Texas; October 18, 2005.

44.   "Conducted Energy Devices Proximity Deaths and Medical Response" -- 2005 Critical Issues in Policing Series, Police Executive Research Forum, San Diego, California; December 8, 2005.

45.   "Conductive Electrical Devices (Tasers®) and Patients with Excited Delirium for Law Enforcement and Emergency Medical Personnel" -- The U.S. Metropolitan Municipalities EMS Medical Directors Annual Meeting, Dallas, Texas; February 16, 2006.

46.   "Tasers and Sudden Death" -- Keynote speaker at One Day Symposium on In-Custody Deaths by the Florida Sheriffs Association, Orlando, Florida; June 1, 2006.

Curriculum Vitae
Gary M. Vilke, M.D., FACEP, FAAEM

SELECTED SPEAKING ENGAGEMENTS, continued:

47.  "Medical Aspects of the Use of Force Continuum" -- Department of Justice Community Oriented Policing Services (COPS) Conference, Washington, DC; July 29, 2006.

48.  "Resuscitation Outcomes Consortium" -- 7th Annual University of California Neurotrauma Meeting, Carmel, California; August 3, 2006.

49.  "Use of Force:  Sudden Death Myths and Excited Delirium" -- The Commission of Accreditation for Law Enforcement Agencies (CALEA) Less Lethal Technology Working Group Meeting, Washington, DC; September 10, 2006.

50.  "Police In-Custody Deaths and the Taser Controversy" -- UCSD/SDSU General Preventive Medicine Residency Lecture Series, La Jolla, California; September 2006.

51.  "Conductive Energy Devices:  The medical aspects of Taser Electronic Control Devices (ECDs) and other Energy Devices" – Sudden Death, Excited Delirium and In-Custody Death Conference by the Institute for the Prevention of In-Custody Deaths, Inc.  Las Vegas, Nevada; November 16-17, 2006.

52.  "Cardiac, Respiratory and Metabolic Effects of EMD" – Study of Deaths Following Electro Muscular Disruption, Meeting of the Chief Medical Panel for the National Institute of Justice. Washington D.C.; January 9, 2007.

53.  "The Medical Implications of Tasers and the Impact on EMS " – National Association of EMS Physicians National Conference.  Naples, FL; January 12, 2007.

54.  "Excited Delirium" - Solutions For Corrections Seminar for the California State Sheriff's Association.  Ontario, CA; February 7, 2007.

55.  "Excited delirium, positional asphyxia and restraint" -- EMS Today Conference, Baltimore, Maryland; March 10, 2007.

56.  "Medical implications of Tasers and other Conductive Energy Devices" -- EMS Today Conference, Baltimore, Maryland; March 10, 2007.

57.  "Excited Delirium" -- American Correctional Health Services Association, Oakland, California; September 19, 2007.

58.  "Human Physiologic Effects of Tasers" – Study of Deaths Following Electro Muscular Disruption, Meeting of the Chief Medical Panel for the National Institute of Justice. Washington D.C.; September 27, 2007.

59.  "The clinical impacts of TASER and other Conductive Energy Devices on Humans:  A Review of the latest Medical Research" – Sudden Death, Excited Delirium and In-Custody Death Conference by the Institute for the Prevention of In-Custody Deaths, Inc.  Las Vegas, Nevada; November 28-30, 2007.

Curriculum Vitae
Gary M. Vilke, M.D., FACEP, FAAEM

SELECTED SPEAKING ENGAGEMENTS, continued:

60.  "Physiological Effects of Tasers" – The City Council of Miami-Dade. Miami, Florida; January 17, 2008.

61.  "Excited Delirium: What is it? Why does it kill?  What do we need to know about it? Western States Winter Conference on Emergency Medicine.  Park City, Utah, February 8, 2008.

62.  "Medical Effects of Tasers" – The City Council of Houston. Houston, Texas; March 10, 2008.

63.  "Less Lethal Weapons" - Emergency Nurses Association, San Diego Chapter.  San Diego, California; April 18, 2008.

64.  "The Clinical Impacts of TASER and other Conductive Energy Devices on Humans and Why People Die Afterwards" -- American Correctional Health Services Association, San Diego, California; September 17, 2008.

65.  "Police In-Custody Deaths and Excited Delirium" -- UCSD/SDSU General Preventive Medicine Residency Lecture Series, La Jolla, California; October 2008.

66.  "The Clinical Impacts of TASER and other Conductive Energy Devices on Humans" – Sudden Death, Excited Delirium and In-Custody Death Conference by the Institute for the Prevention of In-Custody Deaths, Inc.  Las Vegas, Nevada; October 29, 2008.

67.  "Agitated Delirium – Role of Illicit Drug Use in Sudden Restraint Death" Western Medical Toxicology Fellowship Conference. San Diego, California; April 29, 2009.

68.  "Conducted Energy Devices:  Are They Safe Options?" Excited Delirium Conference by the Canadian Institute for the Prevention of In-Custody Deaths, Inc. Niagara Falls, Canada; May 26, 2009.

69.  "The Physiologic Effects of the Taser on Humans" UCSD Biomedical and Clinical Research Seminars. San Diego, California; June 2, 2009.

70.  "The Taser-Plastic Surgery Interface" UCSD Department of Plastic Surgery Grand Rounds. San Diego, California; June 17, 2009.

71.  "ECD Research Update and Safety Issues" – Sudden Death, Excited Delirium and In-Custody Death Conference by the Institute for the Prevention of In-Custody Deaths, Inc.  Las Vegas, Nevada; November 12, 2009.

72.  "Use of the Restraint Chair and Positional Asphyxia" – Southern California Jail Manager's Association.  Temecula, California; January 21, 2010.

Curriculum Vitae
Gary M. Vilke, M.D., FACEP, FAAEM

SELECTED SPEAKING ENGAGEMENTS, continued:

73.   "Excited Delirium Challenges and Best ER Practices" Excited Delirium Conference by the Canadian Institute for the Prevention of In-Custody Deaths, Inc. Niagara Falls, Canada; April 19, 2010.

74.   "Excited Delirium and TASERs:  What Physicians Need to Know" – Grand Rounds Scripps Encinitas Hospital.  Encinitas, California; July 15, 2010.

75.   "Excited Delirium and TASERs:  What Physicians Need to Know" – Grand Rounds University Medical Center.  Las Vegas Nevada; August 10, 2010.

76.   "Review of ECD Research and Reported Cardiac Capture" – Sudden Death, Excited Delirium and In-Custody Death Conference by the Institute for the Prevention of In-Custody Deaths, Inc.  Las Vegas, Nevada; November 17, 2010.

76.   "The Science Behind the American Heart Association ACLS Guidelines" – Puerto Vallarta ACLS Resuscitation Conference.  Puerto Vallarta, Mexico; February 18, 2011.

77.   "The Science Behind the American Heart Association ACLS Guidelines" – Cabo San Lucas ACLS Resuscitation Conference.  Cabo San Lucas, Mexico; March 25, 2011.

78.   "ROC Cardiac Arrest Outcomes" – San Diego Resuscitation Conference.  San Diego, California; April 9, 2011.

79.   "Do Electronic Control Devices Kill Humans: Review of the Data" – Sudden Death, Excited Delirium and In-Custody Death Conference by the Institute for the Prevention of In-Custody Deaths, Inc.  Las Vegas, Nevada; November 16, 2011.

80.   "Evaluation After Choking or Strangulation" – UCSD Forensic Nursing Conference. San Diego, California; April 28, 2012.

81.   "Prehospital Hypothermia for Cardiac Arrest" – Santa Clara County EMS Conference. San Jose, California; May 23, 2012.

82.   "The Science Behind the American Heart Association ACLS Guidelines" – Cabo San Lucas ACLS Resuscitation Conference.  Cabo San Lucas, Mexico; August 21, 2012.

83.   "Acute Cerebral Accidents" – Hermosillo ACLS Resuscitation Conference.  Hermosillo, Sonora, Mexico; September 11, 2012.

84.   "Excited Delirium Syndrome: TASERS, Restraints, and Sudden Death" – Emergency Nurses Association Annual Conference.  San Diego, California; September 15, 2012.

85.   "Electronic Control Devices and the not so Shocking Truth about their Lethality" – Sudden Death, Excited Delirium and In-Custody Death Conference by the Institute for the Prevention of In-Custody Deaths, Inc.  Las Vegas, Nevada; November 14, 2012.

Curriculum Vitae
Gary M. Vilke, M.D., FACEP, FAAEM

SELECTED SPEAKING ENGAGEMENTS, continued:

86.  "Medical Evaluation and Detection of Dementia and Delirium" – Annual Update on
     Behavioral Emergencies Conference. Las Vegas, Nevada, December 5, 2012.

87.  "Acute Cerebral Accidents" – Puerto Vallarta Resuscitation Conference.  Puerto Vallarta
     Mexico; January 17, 2013.

88.  "Excited Delirium Syndrome: TASERS, Restraints, and Sudden Death" – San Diego County
     Emergency Nurses Association 911 Conference.  San Diego, California; April 19, 2013.

89.  "Acute Cerebral Accidents" – Cabo San Lucas Resuscitation Conference.  Cabo San Lucas
     Mexico; April 27, 2013.

90.  "Acute Myocardial Infarction" – Mazatlan Resuscitation Conference.  Mazatlan Mexico;
     May 7, 2013.

91.  "Hypothermia Post Cardiac Arrest" –Acapulco Resuscitation Conference.  Acapulco,
     Mexico; May 28, 2013.

92.  "Bath Salts and In-Custody Death"- National Sheriff's Association.  Charlotte, NC; June 25,
     2013.

93.  "Updates in Cardiac Arrest:  The ROC Trials" – Mexico Association of Emergency Medicine
     Emergency Update Conference.  Mexico City, Mexico; June 28, 2013.

94.  "Management of Head Trauma" – Mexico Association of Emergency Medicine Emergency
     Update Conference.  Mexico City, Mexico; June 28, 2013.

95.  "Hypothermia Post Cardiac Arrest" –La Paz Resuscitation Conference.  La Paz, Mexico; July
     22, 2013.

96.  "Management of Head Trauma" – Mexico Association of Emergency Medicine Emergency
     Update Conference.  Monterrey, Mexico; September 26, 2013.

97.  "Updates in Cardiac Arrest:  The ROC Trials" – Mexico Association of Emergency Medicine
     Emergency Update Conference.  Monterrey, Mexico; September 26, 2013.

98.  "Risk Management and Minimizing Malpractice Exposure" – UCSD Department of
     Orthopedics Grand Rounds, San Diego, CA October 2, 2013.

99.  "Decreasing Your Risk in Labor and Delivery" – UCSD 9th Annual Perinatal Symposium,
     San Diego, CA October 11, 2013.

100. "Excited Delirium Syndrome: TASERS, Restraints, and Sudden Death" – UCSD Department
     of Emergency Medicine Grand Rounds, San Diego, CA November 11, 2013.

Curriculum Vitae
Gary M. Vilke, M.D., FACEP, FAAEM

SELECTED SPEAKING ENGAGEMENTS, continued:

101.  "Excited Delirium Syndrome" – Annual Update on Behavioral Emergencies Conference. Orlando, Florida; December 12, 2013.

102.  "The importance of CT on the initial evaluation of a trauma patient: ABC or AB-CT ?" – Primero Simposium Internacional BNH con UCSD Celebrado en Los Cabos.  Los Cabos, Mexico; December 7, 2013.

103.  "Management of Head Trauma" –Emergency Medicine Update Conference.  Puerto Vallarta, Mexico; December 18, 2013.

104.  "Updates in Cardiac Arrest:  The ROC Trials" – Emergency Medicine Update Conference. Puerto Vallarta, Mexico; December 18, 2013.

105.   "Pulmonary Embolism: Evaluation and Treatment"- 25th Annual Mexico Emergency Medicine Congress. Acapulco, Mexico; February 20, 2014.

106.  "Management of Head Trauma" –Emergency Medicine Update Conference.  Puerto Vallarta, Mexico; March 5, 2014.

107.  "Updates in Cardiac Arrest:  The ROC Trials" – Emergency Medicine Update Conference. Puerto Vallarta, Mexico; March 5, 2015.

108.  "Management of Burns" –Trauma Update Conference.  Puerto Vallarta, Mexico; April 3, 2014.

109.  "Management of Head Trauma" –Trauma Update Conference.  Puerto Vallarta, Mexico; April 3, 2014.

110.  "Cuffs, Chains and Chairs" – Restraint and In-Custody Death Conference by the Institute for the Prevention of In-Custody Deaths, Inc.  Las Vegas, Nevada; April 24, 2014.

111.  "Management of Burns" –Trauma Update Conference.  Los Cabos, Mexico; June 5, 2014.

112.  "Management of Head Trauma" - Primera Feria Annual de la Salud.  Guadalajara, Mexico; July 18, 2014

113.  "Management of Burns" - Primera Feria Annual de la Salud.  Guadalajara, Mexico; July 18, 2014.

114.  "Updates in Cardiac Arrest:  The ROC Trials" – Primera Feria Annual de la Salud. Guadalajara, Mexico; July 18, 2014.

115.  "Pulmonary Embolism: Evaluation and Treatment"- Primera Feria Annual de la Salud. Guadalajara, Mexico; July 18, 2014.

Curriculum Vitae
Gary M. Vilke, M.D., FACEP, FAAEM

116. "Risk Management and Minimizing Malpractice Exposure" – UCSD Department of Anesthesia Pain Service Grand Rounds, San Diego, CA September 24, 2014.

117. "The ABCs of CPR" –Huatulco Resuscitation Conference.  Huatulco, Mexico; October 2, 2014.

118. "Risk Management and Minimizing Malpractice Exposure" – UCSD Division of Gastroenterology Grand Rounds, San Diego, CA October 16, 2014.

119. "Identification and Treatment of Excited Delirium Syndrome" - Annual Update on Behavioral Emergencies Conference. Scottsdale, Arizona; December 11, 2014.

120. "Autopsy of an In-Custody Death" – Defense Research Institute Annual Conference, San Diego, CA January 30, 2015.

121. "TASERS:  The shocking truth"- 26th Annual Mexico Emergency Medicine Congress. Mazatlan, Mexico; February 5, 2015.

122. "Resuscitation Update:  CPR, Hypothermia and new devices" - 26th Annual Mexico Emergency Medicine Congress. Mazatlan, Mexico; February 5, 2015.

123. "Management of Head Trauma" - Segundo Feria Annual de la Salud.  Guadalajara, Mexico; May 22, 2015.

124. "Updates in Cardiac Arrest:  The ROC Trials" – Segundo Feria Annual de la Salud. Guadalajara, Mexico; May 22, 2015.

125. "Pulmonary Embolism: Evaluation and Treatment"- Segundo Feria Annual de la Salud. Guadalajara, Mexico; May 22, 2015.

126. "Resuscitation Update:  CPR, Hypothermia and new devices" – Altitude and Travel Medicine Symposium. Cusco, Peru; August 21, 2015.

127. "Approaches to Stabilization, Transfer and Disposition of Tourist with Multiple Trauma – Altitude and Travel Medicine Symposium. Cusco, Peru; August 21, 2015.

128. "Risk Management and Minimizing Malpractice Exposure" – UCSD Department of Orthopedics Grand Rounds, San Diego, CA December 2, 2015.

129. "Ketamine and EMS" – Annual Update on Behavioral Emergencies Conference.  Las Vegas, Nevada; December 3, 2015.

130. "Pulmonary Embolism: Evaluation and Treatment"- 27th Annual Mexico Emergency Medicine Congress. Puerto Vallarta, Mexico; February 4, 2016.

131. "The importance of CT on the initial evaluation of a trauma patient: ABC or AB-CT ?" – 27th Annual Mexico Emergency Medicine Congress. Puerto Vallarta, Mexico; February 4, 2016.

Curriculum Vitae
Gary M. Vilke, M.D., FACEP, FAAEM

SELECTED SPEAKING ENGAGEMENTS, continued:

132.  "Risk Management and Minimizing Malpractice Exposure" – UCSD Department of Dermatology Grand Rounds, San Diego, CA February 11, 2016.

133.  "Remembering the Provider" – Southern California Association of Health Risk Managers, Palm Desert, CA May 4, 2016.

134.  "The ABCs of CPR" –San Miguel Health Fair.  San Miguel, Mexico; July 15, 2016.

135.  "Beware of the Medically Fragile Patient"- Special Needs Conference by the Institute for the Prevention of In-Custody Deaths, Inc.  Las Vegas, Nevada; March 7, 2017.

136.  "Avances en Tromboembolia Pulmonar"- 3rd Annual Congreso Binacional de Medicine de urgencias y Trauma, Tijuana, Mexico; May 5, 2017.

137.  "Caso Clinico de Trauma"- 3rd Annual Congreso Binacional de Medicine de urgencias y Trauma, Tijuana, Mexico; May 5, 2017.

138.  "Avances en Aeromedicina"- 3rd Annual Congreso Binacional de Medicine de urgencias y Trauma, Tijuana, Mexico; May 6, 2017.

139.  "Science of Restraint, Position/Compression and Asphyxia, and Science Behind Asphyxial Death" – Police Use of Force in Today's World.  Miami, FL; June 26, 2017.

140.  "Excited Delirium Syndrome and the Risk of Litigation" – California Crisis Intervention Team Association Annual Meeting.  Costa Mesa, CA; August 24, 2017.

141.  "Medico-legal Issues in the Acutely Agitated Patient" – Coalition on Psychiatric Emergencies Pre-Conference. Scottsdale, Arizona, December 15, 2017.

142.  "Updates on Excited Delirium" – Annual Update on Behavioral Emergencies Conference. Scottsdale, Arizona, December 15, 2017.

143.  "When Should Ketamine be Used in the Treatment of Agitation?" – International Conference on Emergency Medicine.  Mexico City, Mexico, June 8, 2018.

144.  "Avances en Tromboembolia Pulmonar"- 3rd Annual Congreso Binacional de Medicine de urgencias y Trauma, Tijuana, Mexico; June 7, 2019.

145.  "Excited Delirium in the ED: Clinical Pearls" – Southern California EM Symposium, Los Angeles, California.  February 1, 2020.

146.  "Updates in Treating Excited Delirium Syndrome"- 31st Emergency and Reanimation Congress, Acapulco, Mexico.  February 12, 2020.

147.  "Management of Acute Agitation in the Emergency Department"- 31st Emergency and Reanimation Congress, Acapulco, Mexico.  February 12, 2020.

Curriculum Vitae
Gary M. Vilke, M.D., FACEP, FAAEM

SELECTED SPEAKING ENGAGEMENTS, continued:

148. "Debate on Excited Delirium and Treatment" – Annual Update on Behavioral Emergencies Conference. Zoom, December 2, 2020.

149. "Excited Delirium Syndrome" – San Diego County Methamphetamine Strike Force.  San Diego, California, December 4, 2020.

150. "Choose Your Mentor" – Deep Dive onto Clinical Research. King Fahd Hospital of the University, Saudi Arabia, August 22, 2021.

151. "Environmental Emergencies" - Mazatlán Beach Emergencies Conference. Mazatlán, Mexico, July 15, 2022.

152. "Summer Beach Cases" - Mazatlán Beach Emergencies Conference. Mazatlán, Mexico, July 15, 2022.

153. "Dexmedetomidine Sublingual Film for Acute Agitation in Schizophrenia or Bipolar Disorder" – ACEP Product Theater Presentation. San Francisco, CA, October 2, 2022.

154. "Los 5 artículos más relevantes del 2022"-5[th] Annual Congreso Binacional de Medicine de urgencias y Trauma, Tijuana, Mexico; November 4, 2022.

155. "COVID and Influenza Update" – Clinal East Cape Health Center Community Forum; Los Barriles, Mexico; November 10, 2022.

EXHIBIT "R"

1  Risa S. Christensen, Esq. (SBN: 227799)
2  Dennis E. Wagner, Esq. (SBN: 99190)
   **WAGNER ZEMMING CHRISTENSEN, LLP**
3  1325 Spruce Street, Suite 200
4  Riverside, CA  92507
   Tel.:        (951) 686-4800
5  Fax:        (951) 686-4801
6  *rsc@wzclawfirm.com*
   *dew@wzclawfirm.com*
7

8  Attorneys for Defendants, COUNTY OF SAN BERNARDINO; HUMBERTO
9  MIRANDA; JULIAN MATA; and JESSAQUA ATTLESEY

10

11            **UNITED STATES DISTRICT COURT**

12            **CENTRAL DISTRICT OF CALIFORNIA**

13

14

15  CECILIA VARGAS; ARIANA SALAS,        CASE NO: 5:20-cv-02646-JGB-KK
    individually and as a successor-in-interest
16  to RUBEN ESCUDERO, deceased,         **DECLARATION OF THEODORE**
                                          **C. CHAN, M.D., FACEP, FAAEM**
17          Plaintiffs,                   **IN SUPPORT OF DEFENDANTS'**
    vs.                                   **MOTION FOR SUMMARY**
18                                        **JUDGMENT OR IN THE**
    COUNTY OF SAN BERNARDINO; H.          **ALTERNATIVE, PARTIAL**
19  MIRANDA; S. CARTER; Z. VOGEL, J.      **SUMMARY JUDGMENT**
    MATA; Z. PRITCHETT; J. JIMENEZ;
20  A. MATA; T. KAUTZ; J. ATTLESEY;       *[Filed concurrently w/ Motion for*
    RODRIGUEZ (first initial unknown) and *Summary Judgment; Separate*
21  DOES 1-10, inclusive,                 *Statement; Declarations; (Proposed)*
                                          *Order and (Proposed) Judgment]*
22          Defendants.
                                          **DATE:**   March 6, 2023
23                                        **TIME:**   9:00 a.m.
                                          **CRTRM:**  1
24

25                                        Hon. Jesus G. Bernal
                                          United States District Judge
26

27

28

                                  1

I, THEODORE C. CHAN, declare as follows:

That I am a Board-Certified medical doctor and am the Chair of the Department of Emergency Medicine at the University of California, San Diego School of Medicine and Health System.  I am also a full Professor at the university. I have personal knowledge of the facts set forth in the instant case involving Ruben Escudero and if called to testify, I could do so competently thereon.

1.      During the course of my career as a medical doctor, I have treated patients and conducted research on the topics of restraint physiology and less lethal weapons that have been published in peer reviewed medical journals and presented at national and scientific assemblies.  I am practicing emergency physician, board certified in emergency medicine and a fellow of the American College of Emergency Physicians and the American Academy of Emergency Medicine. That attached hereto and incorporated herein by reference as **Exhibit 30** is a true and correct copy of my Curriculum Vitae which documents my professional and educational credentials.

2.  I have reviewed the following materials in conjunction with this case, these include:

- Plaintiffs First Amended Complaint
- Interview transcripts of Deputies Attlesey, Mata, and Miranda; Capt. Washington, Brett Lever, Alex Gabler, Karla Lugo, and Martin Alcon
- Belt recordings of Deputies Mata and Miranda
- Crime Report and CAD report
- City of Victorville Fire Department Report
- American Medical Response Report
- Hospital records from Victor Valley Global, St. Mary's Medical, and Desert Valley Medical

/ /

/ /

2

- Depositions of Julian Mata, Jessaqua Attlesey, Tiffany Kautz, Humberto Miranda, David Crummel, Dorothy Hernandez, Dr. Mark Fajardo, Dr. Cho Lwin, Alex Gabler and Captain Dyjuan Washington
- County Autopsy Report and protocol worksheets, Bio-Tox reports, and autopsy photos
- Photos of the incident scene
- Expert reports of Drs. Bennet Omalu, Vina Spiehler, Gary Vilke, and Binh Ly.

Any opinions that I have formed regarding what occurred with Ruben Escudero is based upon my scientific and clinical research in restraint physiology, review of medical and scientific literature and the case specific information that I listed above.

3.     That the term "positional restraint asphyxia" was initially used to describe deaths of individuals who were found in positions that had compromised respiratory function.  In the late 1980's the term positional asphyxiation was applied as a cause of death for persons who had been restrained while in law enforcement custody.  Proponents of this theory argued that the individuals placed in certain prone restraint positions, on their stomach while handcuffed behind their back and with ankles secured to handcuffs were unable to breath because of the position of the chest wall and abdomen which prevented adequate expansion or ventilation of the lungs.  This was largely based upon the work of Reay, et al. who studied ten healthy subjects after exercise and found delayed recovery of blood oxygen levels and heartrate when placed in the hobble position.  The hobble position being on your stomach, handcuffed from behind and secured to the ankles with cuffs.

4.     I have conducted a comprehensive study of the effects of body positioning and respiratory function after exertion.  In our study involving 15 human volunteers, we studied respiratory function in the sitting, supine (laying on

3

the back), prone (laying on the stomach), and hobble position. While we found a slight progressive decrease in pulmonary function (the amount of air movement in the lungs), these changes were within normal range. Accordingly, we found no evidence of decreased blood oxygen levels or increased carbon dioxide levels (to suggest inadequate ventilation) in the hobble position. These findings have been confirmed by other independent investigators who found no significant decrease in blood oxygen levels in individuals placed in similar restraint positions.  In other words, we  have found no scientific evidence supporting that a restraint position in a prone, chest-down, or prone hobbled position causes or contributes to asphyxiation or associated death.

5.      As a result of this evidence, Dr. Reay, one of the chief proponents of the positional asphyxia theory with prone restraint, has written that "the hog-tied prone position should be viewed as not producing significant physiologic respiratory compromise, and it does not produce any serious or life-threatening respiratory effects".

6.      In addition, we have conducted two studies on human volunteers investigating the effect of weight placed on persons who were restrained. In our initial study, we found no evidence of hypoxia (decrease in oxygen levels) or hypoventilation (increase in carbon  dioxide levels) in human subjects on whom moderate amounts of weight were placed on their back in the prone restraint position. In our subsequent study, we placed up to 225 pounds of weight force on human subjects in the prone restraint position and found no life-threatening abnormalities in ventilation.

7.      These results are consistent with other investigators who have conducted similar weight force studies on the prone restraint position and found no evidence of hypoxia to indicate increased risk for asphyxiation. In addition, large epidemiologic field studies, including research conducted by our own group, and involving thousands of actual law enforcement restraint incidents

4

found no association between prone positioning and death or asphyxiation.

8.      In Mr. Escudero's case, during the brief struggle with first responders lasting some 3-4 minutes, he was in a variety of different body positions including upright and on his knees. He was subsequently restrained in the less restrictive prone position and was not hobbled (his wrist and ankles were not secured together) nor was he placed in a TARP. Importantly, prior to any physical exertion by Escudero, first responders measured his oxygen levels by pulse oximetry and found markedly low levels consistent with severe hypoxia (as low as 40% oxygen saturation levels with normal being above 95%). Such severe hypoxia can cause brain tissue injury and damage and are associated with significant morbidity, mortality, and asphyxiation risk. Again, these levels were measured BEFORE any restraint or struggle with first responders. Accordingly, Mr. Escudero's life threatening hypoxia levels were not a result of his prone restraint or struggle, but due to his severe drug intoxication.

9.      The use of the TASER did not cause or contribute to any asphyxia injury or death in Mr. Escudero's case.  By way of background, TASER is one of a number of  Conducted Energy Devices (CEDs) that are a type of so-called less lethal weapons  widely used by law enforcement also known as neuromuscular incapacitating devices  (NIDs), electronic control weapons (ECWs), conducted electrical weapons (CEWs). The TASER delivers a high-voltage, low frequency/low-amperage electrical impulse via either probe-dart or drive-stun/contact mode. In the probe mode, the weapon fires barbs at a subject and delivers an electrical impulse across those barbs after making contact. This impulse results in a transient neuromuscular incapacitation to the subject, as well as the sensation of pain. In the drive-stun mode, the electrical impulse is delivered by direct contact of the weapon on the subject, as opposed to barbs, and delivers a painful stimulus, with less or no neuromuscular incapacitation. Numerous studies have now been conducted to evaluate the physiologic effects

and safety of the TASER device. My research group has conducted a number of these studies and have found no evidence of electrocardiographic changes, cardiac or heart injuries, respiratory compromise, or significant metabolic disturbances associated with the proper use of the device.

10.     Our TASER research findings have been replicated by other investigators who have also demonstrated no significant inherently deleterious physiologic effects in human subjects under laboratory testing or the field setting..

I declare under penalty of perjury under the laws of the State of California and the United States of America, that the foregoing is true and correct.

Executed this 25th day of January 2023 in San Diego, California, United States of America.

_____
THEODORE C. CHAN, M.D.,
FACEP, FAAEM, Declarant

DECLARATION OF THEODORE C. CHAN, M.D., FACEP, FAAEM IN SUPPORT OF DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT

EXHIBIT "30"

# CURRICULUM VITAE

## THEODORE CRAIG CHAN, M.D., FACEP, FAAEM

**OFFICE ADDRESS:**

Department of Emergency Medicine          Phone:  (619) 543-6463
UCSD Medical Center                       Fax:     (619) 543-3115
200 West Arbor Drive                      Email:   tcchan@ucsd.edu
San Diego, CA 92103-8676

**EDUCATION:**

| | |
|---|---|
| Academic: 1983-87 | B.A. in History with Highest Distinction in General Scholarship, University of California, Berkeley, Berkeley, California |
| Medical School: 1988-92 | M.D., University of California, San Francisco School of Medicine, San Francisco, California |
| Internship: 1992-93 | Department of Internal Medicine, University of California, San Francisco Medical Center, San Francisco, California |
| Residency: 1993-96 | Department of Emergency Medicine, University of California, San Diego Medical Center, San Diego, California (Chief Resident: 1995-96) |

**LICENSURE:**   California Medical License Number G-78148, 1994

**BOARD CERTIFICATIONS:**

National Board of Medical Examiners, 1993

Diplomate, American Board of Emergency Medicine, 1997; Recertification 2007, 2017

**PROFESSIONAL SOCIETY MEMBERSHIPS:**

American Medical Association, 1990

California Alumni Association, 1990

American College of Emergency Physicians, 1992

Society for Academic Emergency Medicine, 1996

Fellow, American College of Emergency Physicians, 1999

Fellow, American Academy of Emergency Medicine, 2005

Curriculum Vitae
Theodore C. Chan, M.D., FACEP

Association of Academic Chairs in Emergency Medicine, 2013

**APPOINTMENTS:**

| | |
|---|---|
| 7/13 – present | Chair, Department of Emergency Medicine, University of California, San Diego (UCSD) Medical Center |
| 7/12 – present | Professor of Emergency Medicine (ladder-rank), UCSD School of Medicine |
| 7/94 - Present | Base Hospital Physician, UCSD Medical Center |

**PREVIOUS EXPERIENCE:**

| | |
|---|---|
| 7/06 – 6/13 | Vice Chair and Associate Director, Department of Emergency Medicine, University of California, San Diego (UCSD) Medical Center |
| 7/05 – 6/12 | Professor of Clinical Medicine, UCSD School of Medicine |
| 1/05 – 6/13 | Medical Director and Clinical Service Chief, Emergency Department, UCSD-Hillcrest Medical Center |
| 1/05 – 6/13 | Medical Director and Clinical Service Chief, Emergency Department, UCSD-Thornton Hospital |
| 4/99 – 6/13 | Director, Custody Services, UCSD Medical Center |
| 1998-2008 | Medical Director, Metropolitan Medical Strike Team, County of San Diego |
| 7/96 – 7/06 | Assistant Director, Department of Emergency Medicine, UCSD Medical Center |
| 7/01 – 6/05 | Quality Assurance Director, Department of Emergency Medicine, UCSD Medical Center |
| 7/01 – 6/05 | Associate Professor of Clinical Medicine, UCSD School of Medicine |
| 7/01 – 12/04 | Associate Medical Director, Emergency Department, UCSD-Hillcrest Medical Center and UCSD-Thornton Hospital |
| 7/96 - 6/01 | Assistant Clinical Professor of Medicine, UCSD School of Medicine |
| 1994 - 1996 | Physician, Department of Emergency Medicine, Kaiser Permanente Medical Center, San Diego, California |
| 1994 - 1996 | Medical Consultant, Med America Health Resource, San Diego, California |
| 1/96 - 6/96 | Flight Physician, Mercy Air Medical Transport Service, San Diego, California |

Curriculum Vitae
Theodore C. Chan, M.D., FACEP

| 7/93 - 12/95 | Flight Physician, Life Flight Air Medical Transport Service, UCSD Medical Center |
| 1987 - 1988 | Fellow, California State Senate, Senate Committee on Insurance, Claims and Corporations, Sacramento, California |
| 1986 | Intern, Office of the Assistant Surgeon General, Washington, D.C. |

## CERTIFICATIONS:

Advanced Cardiac Life Support Provider, 1992

Advanced Cardiac Life Support Instructor, 1996

Pediatric Advanced Life Support (PALS) Provider, 1993

PALS Course Director for UCSD School of Medicine, 1996

Advanced Trauma Life Support Provider, 1993

HAZMAT Level I Training, 1996

## AWARDS:

| 1984 | Frank Kraft Award Scholarship, University of California, Berkeley |
| 1986 | Gordon Sproul Award Recipient, University of California, Berkeley |
| 1987 | Phi Beta Kappa, University of California, Berkeley |
| 1987 | University Medal Finalist, University of California, Berkeley |
| 1988 | California Senate Resolution of Commendation, Awarded by the Senate Rules Committee, August 22, 1988, Sacramento, California |
| 1996 | Outstanding Resident of the Year, Department of Emergency Medicine, University of California, San Diego Medical Center |
| 1996 | Resident Academic Achievement Award, Emergency Medicine Council of Residency Directors |
| 1999 | "Golden Apple" Teaching Award, UCSD Emergency Medicine Residency Graduating Class of 1999 |
| 2000 | Faculty of the Year, UCSD Emergency Medicine Residency Graduating Class of 2000 |
| 2000 | Best Research Poster Presentation, California Chapter of the American College ofEmergency Physicians (CAL/ACEP) Scientific Assembly, Dana Point, California |
| 2000 | Outstanding Consultant for 1999-2000, presented by the *Annals of Emergency* |

Curriculum Vitae
Theodore C. Chan, M.D., FACEP

*Medicine* Editorial and Consulting Boards, acknowledging dedicated effort to improve the quality of research published in the field of Emergency Medicine, and to the success of the journal

2001    Best Oral Presentation, CAL/ACEP Scientific Assembly, Santa Clara, California

2001    Top Consultant for 2000-2001, presented by the *Annals of Emergency Medicine* Editorial and Consulting Boards

2002    Top Consultant for 2001-2002, presented by the *Annals of Emergency Medicine* Editorial and Consulting Boards

2003    Top Consultant for 2002-2003, presented by the *Annals of Emergency Medicine* Editorial and Consulting Boards

2004    Academy of Clinician Scholars, University of California San Diego

2005    Top Peer Reviewer, *Annals of Emergency Medicine*

2005    2005 Top Doctors, San Diego County Medical Society

2005    Senior Reviewer, *Annals of Emergency Medicine*

2006    Senior Reviewer, *Annals of Emergency Medicine*

2006    2006 Top Doctors, San Diego County Medical Society

2007    Top Peer Reviewer, *Annals of Emergency Medicine*

2007    2007 Top Doctors, San Diego County Medical Society

2008    Finalist, Second Annual San Diego Health Care Champion Award, San Diego Business Journal

2008    2008 Top Doctors, San Diego County Medical Society

2008    Outstanding Community Partner, Community Health Improvement Partners (CHIP), Hospital Association of San Diego and Imperial Counties

2009    Public Health Champion Finalist, County of San Diego Health and Human Services Agency

2009    Top Peer Reviewer, *Annals of Emergency Medicine*

2009    Award Finalist for IMPACT-ED, 14th Annual Golden Watchdog Public-Private Parternship Award Finalist, San Diego County Taxpayers Association

2009    America's Top Emergency Medicine Physicians, Consumers' Research Council of America

2010    Health Care Champion Award, 2010, San Diego Business Journal

2011    2011 Top Doctors, San Diego County Medical Society

Curriculum Vitae
Theodore C. Chan, M.D., FACEP

2011    Top Peer Reviewer, *Annals of Emergency Medicine*

2012    Top Peer Reviewer, *Annals of Emergency Medicine*

2012    2012 Top Doctors Award, San Diego County Medical Society

2013    Top Peer Reviewer, *Annals of Emergency Medicine*

2014    2014 Top Doctors Award, San Diego County Medical Society

2014    Top Peer Reviewer, *Annals of Emergency Medicine*

2015    2015 Top Doctors Award, San Diego County Medical Society

2015    Top Peer Reviewer, *Annals of Emergency Medicine*

2016    2016 Top Doctors Award, San Diego County Medical Society

2017    2017 Top Doctors Award, San Diego County Medical Society

2017    Senior Reviewer, *Annals of Emergency Medicine*

2018    2018 Top Doctors Award, San Diego County Medical Society

2018    Distinguished Senior Reviewer, *Annals of Emergency Medicine*

2019    2019 Top Doctors Award, San Diego County Medical Society

2021    2021 Top Doctors Award, San Diego County Medical Society

## CURRENT ACTIVITIES:

Reviewer, *Journal of Emergency Medicine*, Elsevier Science, Inc., 1994

Editor, Cardiology Section, *Journal of Emergency Medicine*, Elsevier Science, Inc., 1997

Reviewer, *Annals of Emergency Medicine*, Elsevier Science, Inc., 1998

Reviewer, *Journal of Emergency Medicine*, 2000

Member, Editorial Board, *Emergency Medicine News*, Lippincott Williams & Wilkins, 2001

Reviewer, *Annals of Emergency Medicine*, 2008

Reviewer, *Journal of Forensic and Legal Medicine*, 2010

Member, University of California San Diego Health Sciences Board of Governors, 2013

Member, University of California San Diego Health Council of Clinical Chairs, 2013

Curriculum Vitae
Theodore C. Chan, M.D., FACEP

Advisory Board Member, National Foundation for Emergency Medicine, 2018

Reviewer, *Journal of Medical Economics*, 2018

Editorial Board Member, *Medicina*, 2019

Convener, Council of Health Sciences Chairs, University of California San Diego, 2020

Chair, San Diego Seniors Community Foundation Board, 2020

## PREVIOUS ACTIVITIES:

Seminar Coordinator, Health Policy Seminars, Interdepartmental Studies 130, University of California, Berkeley, 1985-87

Research Intern, International Debt Crisis Project, Institute of International Studies, Geneva, Switzerland, 1989

Student Rep, Legislation Committee, California Medical Association, 1989-90

Instructor, Science and Health Education Partnership Program, University of California,

San Francisco School of Medicine, San Francisco Unified Public School District, 1989-91

Clinical Scholars Training, Peking Union Medical College, Beijing, China, 1992

Representative, Clinical Practice Guidelines Committee, Department of Emergency Medicine, UCSD Medical Center, 1994-96

Representative, Quality Assurance Committee, Department of Emergency Medicine, UCSD Medical Center, 1994-96

Representative, California Emergency Medicine Residents Association, 1995-96

Associate Editor, *Journal of Emergency Medicine*, Pergamon Press, 1996

Strike Team Leader, Disaster Medical Assistance Team, 1996

   Biological and Chemical Hazardous Materials Medical Support

   FBI/SWAT Team Medical Support

   1996 Atlanta Olympic Games

Medical Support Physician, Super Bowl XXXII, San Diego, California, January 25, 1998

Physician Member, Disaster Medical Assistance Team (DMAT), SD, CA (CA-4), 1994

Member, Managed Care Task Force, Society for Academic Emergency Medicine, 1997-98

Member, Steering Committee, CHIPS (Community Health Improvement Partners), Health Care Association of San Diego and Imperial Counties, 1997-2002

Project Co-coordinator, Influenza immunization program for New Americans in the Mid-City and City Heights communities, in conjunction with San Diego City Fire and Life Safety Services and Project Concern International, Fall 1998

Curriculum Vitae
Theodore C. Chan, M.D., FACEP

Project Co-coordinator, 911 Educational Outreach Program for New Americans in the Mid-City and City Heights communities, in conjunction with San Diego City Fire and Life Safety

Services and Project Concern International, Fall 1998

Member, Pharmacy and Therapeutics Committee, UCSD Medical Center, 1998-99

Reviewer, *American Journal of Managed Care*, American Publishing Company, 1998-2001

Director, Emergency Department Clinical Resource Management, UCSD Medical Center, 1996

Co-Director, Pediatric Advanced Life Support Course, UCSD School of Medicine, 1997

Member, Research Subcommittee, Prehospital Audit Committee, San Diego County, 1997

Member, CPR Subcommittee, Prehospital Audit Committee, San Diego County, 1997

Member, Outpatient Clinical Guidelines Committee, UCSD Medical Center, 1998

Member, San Diego City EMS Oversight Committee, 1998

Member, San Diego City EMS Prehospital Cardiac Care Subcommittee, 1998

Medical Director, San Diego County Metropolitan Medical Strike Team, 1998

Reviewer, *Annals of Emergency Medicine*, Mosby, 1999

Director, Continuing Quality Assurance Program, UCSD Emergency Department,1999

Emergency Department Quality Improvement Representative, Patient Care Review Committee, UCSD Medical Center, 2000

Point of Care Advisory Committee, UCSD Medical Center, 2000

Associate Editor, *Emergency Medicine Alert*, publication of American Health Care Consultants, Atlanta, Georgia, 2000-2005

Member, Bioterrorism Communication Collaborative, Department of Health and Human Services Agency, County of San Diego, 2001

Member, School of Medicine Graduate Medical Education Committee, 2001

Faculty Search Committee, Department of Emergency Medicine, UCSD Medical Center, 1999, 2001

Faculty, Twenty-first Annual Mammoth Mountain Emergency Medicine Conference, Mammoth Lakes, California, March 2001

Faculty, Third Annual ACEP Emergency Medicine Connection, San Diego, California, March 2001

Member, Health and Human Services Committee, San Diego Foundation, May 2001-2005

Member, Editorial Board, *Emergency Medicine Specialty Reports*, publication of American Health Care Consultants, Atlanta, Georgia, 2001-2008

Curriculum Vitae
Theodore C. Chan, M.D., FACEP

Peer Reviewer, *Emergency Medicine Reports*, publication of American Health Care Consultants,Atlanta, Georgia, 2002-2009

Member, Community Acquired Pneumonia Multidisciplinary Team, JCAHO Oryx Core Measurements, UCSD Medical Center, 2002-2006

Member, Acute Myocardial Infarction Multidisciplinary Team, JCAHO Oryx Core Measurements, UCSD Medical Center, 2002-2006

Editor, *Clinical Briefs in Emergency Medicine*, publication of American Health Consultants, Atlanta, Georgia, 2003

UCSD/San Diego Sheriff Security Working Group, 2003-2007

UCSD Committee on Affirmative Action and Diversity, Member 2004-2007, Vice-Chair 2005-2006, Chair 2006-2007

Senior Reviewer, *Annals of Emergency Medicine*, Elsevier Science, Inc., 2005

Chair, Communications Subcommittee, Inpatient Task Force, UCSD Medical Center, 2005-2007

Member, UCSD Faculty Rights and Welfare Committee, 2006

Chair, San Diego Foundation Disaster Board, 2002-2011

Member, UCSD Academic Senate Council, 2006-2007

Member, UCSD Senate-Administration Council, 2006-2007

Member, US National Institute of Justice Less Lethal Technical Working Group, 2006

Member, Professional Standings Committee, UCSD Medical Center, 2006-2013

Institute of Medicine, Committee on Research Priorities in Emergency Preparedness and Response for Public Health Systems, 2007

Member, UCSD Department of Radiology Faculty Search Committee, 2007-2008

Member, UCSD Inpatient Redesign Task Force, UCSD Medical Center, 2007-2008

Member, Governor's Interagency Coordinating Council for the Prevention of Alcohol and Other Drug Problems - California Screening, Brief Intervention, and Referral to Treatment (CASBIRT) Subcommittee, 2007-2008

Member, Laboratory and Pathology Search Committee – 2007-2009

Member, California Screening Brief Intervention, Referral, and Treatment (CASBIRT), 2007-2009

Member, Thornton Improvement Task Force, 2007-2010

Member, CDC coordinating Office for Terrorism Preparedness and Emergency Response (CDC COPTER), Special Emphasis Panel for P01 RFA TP-08-001 (Preparedness and Emergency)

Response Research Centers: A Public Health Systems Approach, July 2008

Reviewer, *American Journal of Emergency Medicine, Elsevier*, Inc., 2008

Vice Chair, UCSD Committee on Academic Personnel, 2009; Member 2008-2011

Curriculum Vitae
Theodore C. Chan, M.D., FACEP

Member, ED/Pharmacy Review Committee, 2008-2013

Member, USAMRMC Broad Agency Announcements Review Committee, 2009

Member, CVC Facilities and Operations Committee, 2009-2011

Member, University of California San Diego Medical Staff` Executive Committee, 2013

Member, University of California San Diego Chair of Radiology Search Committee, 2013

Member, Deans & Chairs Committee, University of California, San Diego Health Sciences, 2013-2020

Chair, University of California San Diego Chair of Reproductive Medicine Search Committee, 2013

Judge, UC Health Hackathon, San Diego, CA, 2017

Faculty Mentor, Hispanic Center of Excellence, University of California, San Diego Health Sciences, 2017-19

Member, University of California San Diego Chief of Trauma/Critical Care, Department of Surgery Search Committee, 2018

Member, University of California San Diego Chief of Division of General Internal Medicine, Department of Medicine Search Committee, 2017-2018

Chair, University of California San Diego Chair of Orthopedic Surgery Search Committee, 2020-21.


## RESEARCH GRANT FUNDING:

1.  Co-Principal Investigator with Dr. Tom Neuman, for study entitled, "Restraint Position and Positional Asphyxia."  Study funded by the County of San Diego, Grant #94-1974R, 1995. Amount: $33,900.

2.  Principal Recipient, unrestricted grant from Cook, Incorporated for Research and Education on the Melcker Cricothyrotomy Kit, 1997-98.  Amount: $10,000.

3.  Co-Principal Investigator for study entitled, "Comparison of Respiratory Function in the Prone Maximal Restraint With and Without Additional Weight Force on the Back." American Academy of Forensic Sciences, with Doctors John Eisele, Jack Clausen, Tom Neuman and Gary Vilke, 1999-2000.  Amount: $3,000.

4.  Principal Investigator for study entitled, "The Impact of Oleoresin Capsicum Spray on Respiratory Function in Human Subjects in the Sitting and Prone Maximal Restraint Positions."  Study funded by the National Institute of Justice, U.S. Department of Justice, 1998-99.  UCSD No. 98-7107; USDOJ Federal Award #98-IJ-CX-0079. 2001-02.  Amount: $128,176.

5.  Co-Principal Investigator for study entitled, "Improving Access, Awareness and Use of the California Regional Poison Center in Two Ethnically Diverse Communities in San Diego."  UCSD Civic Collaborative, with Dr. Richard F. Clark, 2001-02.  Amount: $5,000.

Curriculum Vitae
Theodore C. Chan, M.D., FACEP

6.  Co-Principal Investigator for study to design and assess the impact of a community outreach program to improve awareness and use of the California Poison Control System by Latino and other underserved communities in San Diego.  Part of a Community Outreach Partnership Centers Program New Directions Grant from the federal Office of Housing and Urban Development, with Dr. Richard Clark and Dr. Vivian Reznik (UCSD Pediatrics Department), 2002-04.  Amount: $4,000.

7.  Principal Recipient, unrestricted grant from Cook, Incorporated for Research and Education on the Cuffed Melcker Cricothyrotomy Kit, 2003.  Amount: $12,000.

8.  Principal Investigator & Project Director, for project on Emergency Department Crowding & Safety Net Assessment, funded by the Urgent Matters Program, Robert Wood Johnson Foundation, grant # 048545.  2004-05. Amount: $150,000 total ($100,000 technical assistance; $25,000 UCSD project direction, $25,000 safety net assessment).

9.  Co-Investigator for study entitled Wireless Internet Information System for Medical Response to Disasters (WIISARD), funded by the National Library of Medicine. 2003-2008.  Amount: $3,200,000.

10.  Co-Principal Investigator, with Dr. Daniel Davis, for study entitled Emergency Department National Alcohol Screening Day, Alcohol Education Project, funded by NIH, grant #1 R03 AA015120-01. 2005.  Amount:  $25,000.

11.  Co-Principal Investigator, with Dr. Gary Vilke, for study entitled, "The effect of Taser on Cardiac, Respiratory and Metabolic Physiology in Human Subjects."  Study funded by the National Institute of Justice, U.S. Department of Justice, 2005-7.  UCSD No. 2006-0846; USDOJ Federal Award #98-IJ-CX-0079.  Amount: $213,941.49

12.  Principal Investigator, for study entitled, "Improving Medical Home and Primary Care Access to the Community Clinics Through the ED (IMPACT-ED)."  Study funded by the Alliance Healthcare Foundation, 2006-7.  Alliance Grant #06-3114.  Amount: $25,000.

13.  Principal Investigator, for study entitled, "Evaluation of the Ventilatory and Respiratory Effects of a Restraint Chair on Human Subjects."  Study funded by the Institute for the Prevention of In-Custody Deaths, Inc., 1/1/07 to 12/31/07.   Amount:  $11,658.00

14.  Co-Principal Investigator, with Jean Marshall, RN, for study entitled, "Impact of the State Mandated Nurse-Patient Ratio on ED Crowding, Flow and Patient Care".  EMF/ENAF (Emergency Medicine Foundation / Emergency Nurses Association Foundation) Directed Team Grant, ED Overcrowding Research Award, 2007-08.  Amount: $50,000.

15.  Co-Principal Investigator, with Dr. Joshua Lee, for project entitled, "San Diego Safety Net Health Information Exchange."  Project funded by Pacificare/United Healthcare, 2008-2011.  Amount: $715,000.

Curriculum Vitae
Theodore C. Chan, M.D., FACEP

16. Co-Investigator for study entitled, "California ED Diversion Project Evaluation." Funded by the California Healthcare Foundation, 05/2008 to 11/2008. Amount $50,990.

17. Co-Investigator for study entitled, "Safety Net Connect."  Funded by the Agreement for Healthcare Safety Net Services, County of San Diego Health and Human Services Agency, 09/2008 to 01/2011.  Amount: $2,016,196.

18. Co-Principal Investigator for study entitled Wireless Internet Information System for Medical Response to Disasters (WIISARD SAGE), funded by the National Library of Medicine, RO1LM009522-01A1. 10/2010-10/2012. Amount: $3,763,964.

19. Principal Investigator, for study entitled, "ONC/San Diego Beacon Community Collaborative Grant." to advance health information technology.  Funded by Office of the National Coordinator for Health Information Technology, Health Resources and Services Administration, 90BC0015/01, 04/2010 to 10/2013. Amount: $15,275,115.

20. Co-Investigator with Dr. James Killeen for study entitled "National Strategy for Trusted Identities in Cyberspace (NSTIC): Identity Ecosystem for Patient-Centered Coordination of Care", funded by the National Institute for Standards and Technology. Grant #70NANB12D296 9/2012-9/2013. Amount $165,000.

21. Co-Principal Investigator with Dr. Kevin Patrick for study entitled "DELPHI: Data e-Platform to Leverage multi-level Personal Health Information", funded by the National Science Foundation. NSF #1237174. 10/2012-9/2016. Amount: $2.0 million.

22. Co-Investigator with Dr. Gary Vilke for study entitled "EXCITATION: Unexplained In-custody Deaths: Evaluating Biomarkers of Stress and Agitation", funded by the National Institute of Justice, US Department of Justice. NIJ Award 2012-R2-CX-K006 11/2012-11/2014. Amount $431,942.

23. Co-Investigator for study entitled, "Point-of-Care Testing for Illicit Drugs and Alcohol Intoxication in an Emergency Room". Funded by the National Institute on Drug Abuse through Seacoast Science, Inc., 2013-2015. Amount: $50,163.

24. Co-Investigator for study entitled, "Exploring emergency room physician's knowledge and attitudes concerning the use of appropriate and safe home care as an alternative to hospital admission." Funded by the Gary and Mary West Health Institute, 2014-2015. Amount: $118,021.

25. Principal Investigator with Dr. James Killeen for study entitled: The Gary and Mary West Geriatric Center of Excellence (West COE): Phase 1 Research Development, funded by the Gary and Mary West Health Institute. 9/15-3/16. Amount $243,610.

26. Co-Investigator for study entitled, "Acute Care at Home." Funded by the Gary and Mary West Health Institute, 2015-17. Amount: $499,125.

Curriculum Vitae
Theodore C. Chan, M.D., FACEP

27. Co-Investigator for study entitled, "Observational Evaluation of GED's." Funded by Gary and Mary West Health Institute, 2016-17. Amount: $77,800.

28. Co-Investigator for study entitled, "Telemedicine Services for Senior Assisted Living Sites". Funded by Gary and Mary West Health Institute, 2017 – present. Amount: $2,616,445.

29. Principal Investigator for The Gary and Mary West Geriatric Center of Excellence: Phase 2 Implementation, funded by the Gary and Mary West Health Institute, 4/16-present. Amount: $261,169.

30. Senior Co-Investigator with Dr. Vaishal Tolia for the Gary and Mary West Geriatric Center of Excellence: Phase 3 Implementation, funded by the Gary and Mary West Health Institute, 3/17 – present. Amount: $2,405,584.

Curriculum Vitae
Theodore C. Chan, M.D., FACEP

## PUBLICATIONS:

### Articles

1. Chan TC, Williams SR, Clark RF:  Formic acid burns resulting in systemic toxicity. Ann Emerg Med 1995;26(3):383-386.

2. Chan T, Vilke GM, Williams S:  Bidirectional tachycardia associated with digoxin toxicity. J Emerg Med 1995;13(1):89.

3. Bauman BH, Vilke G, Chan T:  Dexamethasone use in croup.  West J Med 1996;164(1):66.

4. Chan TC, Krishel SJ, Bramwell KJ, Clark RF:  Survey of illegal immigrants seen in an emergency department.  West J Med 1996;164(3):212-216.

5. Chan T, Dunford J:  Severe tophaceous gout.  J Emerg Med 1996;14(2):223.

6. Chan TC, Hayden S:  Early retropharyngeal abscess formation after treatment of scarlet fever.  J Emerg Med 1996;14(3):377.

7. Chan TC:  Supracondylar fracture.  J Emerg Med 1997;15(1):99.

8. Chan TC, Evans SD, Clark RF:  Drug-induced hyperthermia.  Crit Care Clinics North Am 1997;13(4):785-808.

9. Chan TC, Hayden SR, Schwartz B, Fletcher T, Clark RF:  Patients' satisfaction when denied authorization for emergency department care by their managed care plan. J Emerg Med 1997;15(5):611-616.

10. Chan TC, Vilke GM, Neuman T, Clausen JL:  Restraint position and positional asphyxia.  Ann Emerg Med 1997;30(5):578-586.

11. Moss ST, Chan TC, Buchanan J, Dunford JV, Vilke GM:  Outcome study of prehospital patients signed out against medical advice by field paramedics.  Ann Emerg Med 1998;31(2):247-250.

12. Chan TC, Vilke GM, Neuman T:  Reexamination of custody restraint position and positional asphyxia.  Am J Forensic Med Pathol 1998;19(3):201-205.

13. Howard JD, Reay DT [32(1):116-117] / Chan TC, Vilke GM, Neuman T, Clausen J: Positional asphyxia (Reply to letter to the editor).  Ann Emerg Med 1998;32(1):117-118.

14. Vilke GM, Mahoney G, Chan TC:  Postpartum coronary artery dissection.  Ann Emerg Med 1998;32(2):260-262.

15. Ma G, Chan TC:  Atlantoaxial dislocation.  J Emerg Med 1999;17(1):113-114.

16. Friedman L, Vilke GM, Chan TC, Hayden SR, Guss DA, Krishel SJ, Rosen P: Emergency department airway management before and after an emergency medicine residency.  J Emerg Med 1999;17(3):427-431.

17. Brady WJ, Chan TC:  Electrocardiographic manifestations: Benign early repolarization.  J Emerg Med 1999;17(3):473-478.

18. Cardall TY, Chan TC, Brady WJ, Perry JC, Vilke GM, Rosen P:  Permanent cardiac pacemakers: Issues relevant to the emergency physician, Part I.  J Emerg Med 1999;17(3):479-489.

19. Cardall TY, Brady WJ, Chan TC, Perry JC, Vilke GM, Rosen P:  Permanent cardiac pacemakers: Issues relevant to the emergency physician, Part II.  J Emerg Med 1999;17(4):697-709.

20. Vilke GM, Buchanan J, Dunford JV, Chan TC:  Are heroin overdose deaths related to patient release after prehospital treatment with naloxone?  Prehosp Emerg Care 1999;3(3):183-186.

21. Roppolo LP, Vilke GM, Chan TC, Krishel S, Hayden SR, Rosen P:  Nasotracheal intubation in the emergency department, revisited.  J Emerg Med 1999;17(5):791-799.

22. Chan TC, Brady WJ, Pollack M:  Electrocardiographic manifestations: Acute myoperi-carditis.  J Emerg Med 1999;17(5):865-872.

23. Chan TC, Neuman T, Vilke GM, Clausen J, Clark RF:  Metabolic acidosis in restraint-associated cardiac arrest (Letter to the editor).  Acad Emerg Med 1999;6(10):1075-1076.

24. Chan TC, Vilke GM, Bramwell KJ, Davis DP, Hamilton RS, Rosen P:  Comparison of wire-guided cricothyrotomy versus standard surgical cricothyrotomy technique.  J Emerg Med 1999;17(6):957-962.

25. Reay DT, Howard JD [20(3):300-301] / Chan TC, Vilke GM, Neuman T:  Restraint position and positional asphyxia (Reply to letter to the editor).  Am J Forensic Med Pathol 2000; 21(1):93.

26. Brady WJ, Chan TC, Pollack M:  Electrocardiographic manifestations: Patterns that confound the EKG diagnosis of acute myocardial infarction - Left bundle branch block, ventricular paced rhythm, and left ventricular hypertrophy.  J Emerg Med 2000;18(1):71-78.

27. Torbati SS, Chan TC:  Classic helical CT scan findings of acute appendicitis.  J Emerg Med 2000;18(1):101.

Curriculum Vitae
Theodore C. Chan, M.D., FACEP

28.   Vilke GM, Chan TC, Guss DA:  Use of a complete neurological examination to screen for significant intracranial abnormalities in minor head injury.  Am J Emerg Med 2000;18(2): 159-163.

29.   Vilke GM, Chan TC, Neuman T, Clausen JL:  Spirometry in normal subjects in sitting, prone, and supine positions.  Respir Care 2000;45(4):407-410.

30.   Davis DP, Bramwell KJ, Hamilton RS, Chan TC, Vilke GM:  Safety and efficacy of the rapid four-step technique for cricothyrotomy using a Bair Claw.  J Emerg Med 2000;19(2):125-129.

31.   Chan TC:  Diagnostic imaging for appendicitis.  Emergency Medicine Alert 2000;7(2):12-15.

32.   Sloane C, Vilke GM, Chan TC, Hayden SR, Hoyt DB, Rosen P:  Rapid sequence intubation in the field versus hospital in trauma patients.  J Emerg Med 2000;19(3):259-264.

33.   Ochs M, Vilke GM, Chan TC, Moats T, Buchanan J:  Successful prehospital airway management by EMT-Ds using the Combitube.  Prehosp Emerg Care 2000;4(4):333-337.

34.   Vilke GM, Marino A, Iskander J, Chan TC:  Emergency department patient knowledge of medications.  J Emerg Med 2000;19(4):327-330.

35.   Chan TC, Vilke GM, Clausen J, Clark R, Schmidt P, Snowden T, Neuman T:  The impact of oleoresin capsicum spray on respiratory function in human subjects in the sitting and prone maximal restraint positions, final report.  NCJ 182433.  Washington, DC: United States Department of Justice, National Institute of Justice, 2000, 68 pages.

36.   Pollack ML, Chan TC, Brady WJ:  Electrocardiographic manifestations: Aberrant ventricular conduction.  J Emerg Med 2000;19(4):363-367.

37.   Ma G, Brady WJ, Pollack M, Chan TC:  Electrocardiographic manifestations: Digitalis toxicity.  J Emerg Med 2001;20(2):145-152.

38.   Vilke GM, Chan TC:  Physician effect on out of hospital patients signing out against medical advice.  Pre-hospital Immediate Care 2001;5(1):38-40.

39.   Brady WJ, Perron AD, Chan T:  Electrocardiographic ST-segment elevation: Correct identification of acute myocardial infarction (AMI) and non-AMI syndromes by emergency physicians.  Acad Emerg Med 2001;8(4):349-360.

40.   Brady WJ, Erling B, Pollack M, Chan TC:  Electrocardiographic manifestations: Acute posterior wall myocardial infarction.  J Emerg Med 2001;20(4):391-401.

Curriculum Vitae
Theodore C. Chan, M.D., FACEP

41. Brady WJ, Aufderheide TP, Chan T, Perron AD:  Electrocardiographic diagnosis of acute myocardial infarction.  Emerg Med Clin North Am 2001;19(2):295-320.

42. Patel RJ, Vilke GM, Chan TC:  The prehospital electrocardiogram.  J Emerg Med 2001; 21(1):35-39.

43. Harrigan R, Brady W, Chan T:  Cases in Electrocardiography - The Symptoms: Lethargy and tachycardia following antidepressant ingestion.  The Diagnosis: Tricyclic antidepressant overdose.  Emergency Medicine News 2001;XXIII(6):30,32.

44. Chan TC:  What's new in antibiotic therapy for acute otitis media.  Emergency Medicine Alert 2001;8(2):12-15.

45. Seltzer AG, Vilke GM, Chan TC, Fisher R, Dunford JV:  Outcome study of minors after parental refusal of paramedic transport.  Prehosp Emerg Care 2001;5(3):278-283.

46. Vilke GM, Marino A, Fisher R, Chan TC:  Estimation of pediatric patient weight by EMT-Ps. J Emerg Med 2001;21(2):125-128.

47. Ho C, Coimbra R, Hoyt DB, Chan TC:  Severe traumatic brain injury from unmotorized scooter.  J Emerg Med 2001;21(2):133-136.

48. Chan T, Harrigan R, Brady W:  Cases in Electrocardiography - The Symptoms: HIV-positive, hypertensive, unresponsive.  The Diagnosis: Verapamil-ritonavir drug interaction.  Emergency Medicine News 2001;XXIII(9):22,25.

49. Chan TC, Vilke GM, Pollack M, Brady WJ:  Electrocardiographic manifestations: Pulmonary embolism.  J Emerg Med 2001;21(3):263-270.

50. Ullman E, Brady WJ, Perron AD, Chan T, Mattu A:  Electrocardiographic manifestations of pulmonary embolism.  Am J Emerg Med 2001;19(6):514-519.

51. Brady WJ, Harrigan R, Chan T:  Cases in Electrocardiography - The Symptoms: Chest pain with ST segment elevation in a cocaine user.  The Diagnosis: Benign early repolarization.  Emergency Medicine News 2001;XXIII(12):24,30,36.

52. Chan TC, Vilke GM, Clausen J, Clark R, Schmidt P, Snowden T, Neuman T:  Pepper spray's effects on a suspect's ability to breathe.  Research in Brief (NCJ 188069), December 2001.  Washington, DC: United States Department of Justice, National Institute of Justice.

53. Vilke GM, Steen PJ, Smith AM, Chan TC:  Out-of-hospital pediatric intubation by paramedics: The San Diego experience.  J Emerg Med 2002;22(1):71-74.

54. Chan TC, Vilke GM, Clausen J, Clark RF, Schmidt P, Snowden T, Neuman T:  The effect of oleoresin capsicum "pepper" spray inhalation on respiratory function.  J Forensic Sci 2002;47(2):299-304.

Curriculum Vitae
Theodore C. Chan, M.D., FACEP

55.   Fijewski TR, Pollack ML, Chan TC, Brady WJ:  Electrocardiographic manifestations: Right ventricular infarction.  J Emerg Med 2002;22(2):189-194.

56.   Harrigan R, Chan T, Brady W:  Cases in Electrocardiography - The Symptoms: Dyspnea and chest pain.  The Diagnosis: Pulmonary embolism.  Emergency Medicine News 2002; XXIV(3):8,12.

57.   Vilke GM, Sharieff GQ, Marino A, Gerhart AE, Chan TC:  Midazolam for the treatment of out-of-hospital pediatric seizures.  Prehosp Emerg Care 2002;6(2):215-217.

58.   Vilke GM, Chan TC:  Agitated delirium and sudden death (Letter to the editor).  Prehosp Emerg Care 2002;6(2):259-260.

59.   Martinez-Lopez JI / Brady WJ, Ma G, Pollack M, Chan TC:  Electrocardiographic manifes-tations: Digitalis toxicity (Reply to letter to the editor).  J Emerg Med 2002;22(3):299-300.

60.   Vilke GM, Fisher R, Chan TC:  An evaluation of the risk for latex allergy in prehospital EMS providers.  J Emerg Med 2002;22(4):345-348.

61.   Chan TC:  Post-exposure prophylaxis for needlesticks and other occupational exposures.  Emergency Medicine Alert 2002;9(2):12-15.

62.   Chan T, Brady W, Harrigan R:  Cases in Electrocardiography - The Symptoms: Acute onset shortness of breath, nausea and atrial fibrillation.  The Diagnosis: Digoxin toxicity.  Emergency Medicine News 2002;XXIV(6):28,30.

63.   Brady W, Harrigan R, Chan T:  Cases in Electrocardiography - The Symptoms: Chest pain, diaphoresis, dyspnea, nausea.  The Diagnosis: Acute posterior wall myocardial infarction.  Emergency Medicine News 2002;XXIV(9):18,20-22.

64.   Chew GS, Vilke GM, Davis DP, Chan TC:  Toomey$^{TM}$ syringe aspiration may be inaccurate in detecting esophageal intubation following gastric insufflation.  J Emerg Med 2002;23(4): 337-340.

65.   Harrigan R, Chan T, Brady W:  Cases in Electrocardiography – Symptoms:  Extreme dyspnea and chest pain.  Diagnosis:  Pericardial tamponade.  Emergency Medicine News 2002;XXIV (12):25-27.

66.   Clark RF, Phillips M, Manoguerra AS, Chan TC:  Evaluating the utilization of a regional poison center by Latino Communities.  Clin Toxicol 2002; 40(7):855-860.

67.   Pollack ML, Brady WJ, Chan TC:  Electrocardiographic manifestations:  Narrow QRS complex tachycardias.  J Emerg Med 2003; 24(1):35-43.

68. Chan T, Brady W, Harrigan R:  Cases in Electrocardiography – Diagnosis:  Hyperkalemia.  Diagnosis:  Hyperkalemia.  Emergency Medicine News 2003;XXV(1):8-9.

69. Nelson JA, Knowlton KU, Harrigan R, Pollack ML, Chan TC:  Electrocardiographic manifestations:  wide complex tachycardia due to accessory pathyway.  J Emerg Med 2003; 24(3):295-301.

70. Austin T, Vilke GM, Nyheim E, Kelly D, Chan TC:  Safety and effectiveness of methohexital for procedural sedation in the emergency department.  J Emerg Med 2003; 24(3):315-18.

71. Brady W, Harrigan R, Chan T:  Cases in Electrocardiography – Symptoms:  A wide complex tachycardia.  Emergency Medicine News 2003;XXV (6):22-27.

72. Harrigan RA, Pollack ML, Chan TC:  Electrocardiographic manifestations:  Bundle branch blocks and fascicular blocks.  J Emerg Med 2003; 25(1):67-77.

73. Chan TC, Vilke GM, Smith S, Sparrow W, Dunford JV:  Impact of an after-hours on-call emergency physician on ambulance transports from a county jail.  Prehosp Emerg Care 2003; 7(3):327-331.

74. Vilke GM, Chan TC, Neuman T:  Patient Restraint in EMS.  Prehosp Emerg Care 2003; 7(3):417.

75. Deitch S, Davis DP, Schatteman J, Chan TC, Vilke GM:  The use of etomidate for prehospital rapid-sequence intubation.  Prehosp Emerg Care 2003; 7(3):380-83.

76. Vilke GM, Sloane C, Smith AM, Chan TC:  Assessment for deaths in out-of-hospital heroin overdose patients treated with naloxone who refuse transport.  Acad Emerg Med 2003; 10(8):893-896.

77. Harrigan R, Chan T, Brady W:  Cases in Electrocardiography – Symptoms:  Chest Pain and Palpitations.  Emergency Medicine News 2003;XXV (9):25, 28.

78. Hudson KB, Brady WJ, Chan TC, Pollack M, Harrigan RA:  Electrocardiographic manifestations:  Ventricular Tachycardia.  J Emerg Med 2003; 25(3):303-314.

79. Brady WJ, Harrigan RA, Chan TC:  Middle-aged man with chest pain after exercise.  Consultant 2003; 43(13):1540-1545.

80. Chan T, Brady W, Harrigan R:  Cases in Electrocardiography – Symptoms:  Weakness and muscle cramps.  Emergency Medicine News 2003;XXV (12):24,26.

81. Calkins T, Chan TC, Clark RF, Stepanski B, Vilke GM:  Review of prehospital sodium bicarbonate use for cyclic antidepressant overdose.  Emerg Med  J 2003; 20:483-486.

82. Patel RJ, Chan TC:  Images in emergency medicine.  Ann Emerg Med 2003; 43(2):291,295.

83. Austin T, Davis J, Chan TC:  Sialolithiasis of submandibular gland.  J Emerg Med 2004; 26(2):221-223.

84. Harrigan RA, Brady WJ, Chan TC:  Chest pain and dyspnea in an immobilized man.  Consultant 2004; 44(2):197-200.

85. Vilke GM, Smith AM, Chan TC:  Leaving against medical advice after out-of-hospital naloxone:  a closer look is needed.  Acad Emerg Med 2004; 11(3):323-324.

86. Vilke GM, Harrigan RA, Ufberg JW, Chan TC:  Emergency evaluation and treatment of priapism.  J Emerg Med 2004; 26(3):325-329.

87. Davis DP, Wold RM, Patel RJ, Tran AJ, Tokhi RN, Chan TC, Vilke GM:  The clinical presentation and impact of diagnostic delays on emergency department patients with spinal epidural abscess.  J Emerg Med 2004; 26(3):285-291.

88. Chan T, Brady W, Harrigan R:  Cases in Electrocardiography – Symptoms:  Sinus Bradycardia with ST Segment Elevation.  Emergency Medicine News 2004;XXVI (3):46,48,50,52.

89. Rotondo N, Pollack ML, Chan TC, Brady WJ, Harrigan RA:  Electrocardiographic manifestations:  acute inferior wall myocardial infarction.  J Emerg Med 2004; 26(4):433-440.

90. Chan TC, Ufberg J, Harrigan RA, Vilke GM:  Nasal foreign body removal.  J Emerg Med 2004; 26(4):441-445.

91. Vilke GM, Smith AM, Upledger Ray L, Steen PJ, Murrin PA, Chan TC:  Airway obstruction in children aged less than 5 years:  the prehospital experience.  Prehosp Emerg Care 2004; 8(2):196-199.

92. Chan TC, Brady WJ, Harrigan RA:  Sudden onset of palpitations and light-headedness in a young woman.  Consultant 2004; 44(4):613-616.

93. Chan TC:  Radiologic hazards and acute radiation exposure.  Emergency Medicine Alert 2004; 11(2):13-15.

94. Harrigan R, Chan TC, Brady W:  Cases in Electrocardiography – Symptoms:  Chest pain with ECG changes.  Emergency Medicine News 2004;XXVI (6):12,18,20.

95. Vilke GM, Jin A, Davis DP, Chan TC:  Prospective randomized study of viscous lidocaine versus benzocaine in a GI cocktail for dyspepsia.  J Emerg Med 2004; 27(1): 7-9.

Curriculum Vitae
Theodore C. Chan, M.D., FACEP

96. Diercks DB, Shumaik GM, Harrigan RA, Brady WJ, Chan TC:  Electrocardiographic manifestations:  electrolyte abnormalities.  J Emerg Med 2004; 27(2):153-160.

97. Brady WJ, Harrigan RA, Chan TC:  Man with persistent chest pain and ST-segment depression.  Consultant 2004; 44(8):1153-1159.

98. Chan TC, Neuman T, Clausen J, Eisele J, Vilke GM:  Weight force during prone restraint and respiratory function.  Am J Forensic Med Pathol 2004; 25(3):185-189.

99. Harrigan RA, Brady WJ, Chan TC:  Nausea and weakness in a woman with multiple diseases.  Consultant 2004; 44(9):1234-1238.

99. Ufberg JW, Vilke GM, Chan TC, Harrigan RA:  Anterior shoulder dislocations: Beyond traction-countertraction.  J Emerg Med 2004; 27(3):301-306.

100. Chan TC, Brady W, Harrigan R:  Cases in Electrocardiography – Symptoms:  Elderly woman with chest 'muscle tighness.'  Diagnosis: acute myopericarditis.  Emergency Medicine News 2004;XXVI (6):48,54,56.

101. Vilke, GM, Castillo EM, Metz MA, Upledger Ray L, Murrin PA, Lev R, Chan TC: Community trial to decrease ambulance diversion hours:  the San Diego County patient destination trial.  Ann Emerg Med 2004; 44(4):295-303.

102. Mancuso EM, Brady WJ, Harrigan RA, Pollack M, Chan TC:  Electrocardiographic manifestations:  Long QT syndrome.  J Emerg Med 2004; 27(4):385-393.

103. Chan TC, Killeen J, Griswold W, Lenert L:  Information technology and emergency medical care during disasters.  Acad Emerg Med 2004; 11(11):1229-1236.

104. Chan TC, Brady WJ, Harrigan RA.  Chest "tightness" in elderly woman.  Consultant 2004; 44(14):1792-1796.

105. Vilke GM, Castillo EM, Ray LU, Murrin PA, Chan TC. Evaluation of pediatric glucose monitoring and hypoglycemic therapy in the field. Pediatr Emerg Care 2005;21(1):1-5.

106. Brady WJ, Harrigan RA, Chan TC:  Woman with persistent ECG abnormalities after chest pain resolves.  Consultant 2005; 45(1):46-50.

107. Harrigan RA, Brady WJ, Chan TC:  Near-syncope in an elderly woman.  Consultant 2005; 45(2):177-182.

108. Vilke GM, Chan TC, Dunford JV, Metz M, Ochs G, Smith A, Fisher R, Poste JC, McCallum-Brown L, Davis DP:  The three-phase model of cardiac arrest as applied to ventricular fibrillation in a large, urban emergency medical services system. Resuscitation 2005; 64(3):341-6.

109. Harrigan R, Chan T, Brady W:  Cases in Electrocardiography – ST Segment

Curriculum Vitae
Theodore C. Chan, M.D., FACEP

Elevation:Putting the Vital in Vital Signs.  Emergency Medicine News 2005;XXVII (3):12,14,16.

110.  Chan TC, Harrigan RA, Brady WJ:  Weakness and dyspnea in a young man.  Consultant 2005; 45(6):696-699.

111.  Harrigan R, Chan T, Brady W:  Cases in Electrocardiography – Young man collapses after police arrest.  Emergency Medicine News 2005;XXVII (6):8,12,14.

112.  Chan TC, Richardson W:  Periumbilical pain in a young woman.  J Emerg Med 2005; 29(2):213-241.

113.  Davis DP, Grossman K, Kiggins DC, Vilke GM, Chan TC: The inadvertent administration of anticoagulants to ED patients ultimately diagnosed with thoracic aortic dissection. Am J Emerg Med. 2005;23(4):439-442.

114.  Brady W, Harrigan R, Chan T:  Cases in Electrocardiography – The Chest Pain Patient with Prominent T Waves.  Emergency Medicine News 2005;XXVII (9):8,10,11.

115.  Brady WJ, Harrigan RA, Chan T:  Syncope in a woman with a history of myocardial infarction. Consultant 2005; 45(10):1155-1162.

116.  Harrigan RA, Brady WJ, Chan T:  Chest pain in a woman with recent coronary stent.  Consultant 2005; 45(12):1267-1270.

117.  Chan TC, Killeen JP, Kelly D, Guss DA:  Impact of Rapid Entry and Accelerated Care at Triage on Reducing Emergency Department Patient Wait Times, Lengths of Stay, and Rate of Left Without Being Seen.  Ann Emerg Med 2005; 46(6):491-497.

118.  Brady WJ, Harrigan RA, Chan T:  Hypotension in a man with acute MI.  Consultant 2006; 46(1):65-70.

119.  Harrigan RA, Brady WJ, Chan T:  Chest pain and palpitations in a young woman.  Consultant 2006; 46(2):193-196.

120.  Chan T, Brady W, Harrigan R:  Young woman with sudden onset of palpitations and lightheadedness.  Emergency Medicine News 2006;XXVIII (3):49-51.

121.  Chan T, Harrigan R, Brady W:  Weakness and nausea in an elderly woman.  Consultant 2006; 46(4):447-452.

122.  Brady WJ, Harrigan RA, Chan T:  Chestpain, ST segment elevation with remote MI.  Emergency Medicine News 2006;XXVIII(6):30,38.

123.  Welch SJ, Slovis C, Jensen K, Chan T, Davidson SJ:  Time for a rigorous performance improvement for emergency medicine residents.  Acad Emerg Med 2006; 13(7):783-786.

Curriculum Vitae
Theodore C. Chan, M.D., FACEP

124. Brady WJ, Harrigan RA, Chan T:  Bradycardia in a man with acute chest pain.  Consultant 2006; 46(8):894-900.

125. Chan T, Brady WJ, Harrigan RA:  Elderly man with shoulder pain following fall.  Consultant 2006; 46(9):1173-1175.

126. Goldstein EH, Hradecky G, Vilke GM, Chan TC:  Impact of a standardized protocol to address methicillin-resistant *staphylococcus aureus* skin infections at a large, urban county jail system.  J Correctional Health Care 2006; 12(3):181-188.

127. Dunford JV, Castillo EM, Chan TC, Vilke GM, Jenson P, Lindsay SP. Impact of the San Diego Serial Inebriate Program (SIP) on the use of emergency medical resources. Ann Emerg Med 2006; 47(4): 328-36.

128.  Vilke GM, Smith AM, Stepanski B, Shipp HE, Upledger Ray L, Murrin PA, Chan TC:  Impact of the San Diego County firestorm on Emergency Medical Services.  Prehosp Dis Med 2006;21(5):353-358.

129. Chappel S, Vilke GM, Chan TC, Harrigan RA, Ufberg JW:  Peripheral venous cutdown.  J Emerg Med 2006;31(4):411-416.

130.  Soroudi A, Shipp HE, Stepanski BM, Ray LU, Murrin PA, Chan TC, Davis DP, Vilke GM.  Adult foreign body airway obstruction in the prehospital setting.  Prehosp Emerg Care. 2007 Jan-Mar;11(1):25-9.

131. Michalewicz BA, Chan TC, Vilke GM, Levy SS, Neuman TS, Kolkhorst FW: Ventilatory and metabolic demands during aggressive physical restraint in healthy adults.  J Forensic Sci 2007;52(1):171-175.

132. Chan T, Brady W, Harrigan R:  86-Year-Old woman not feeling well.  Emergency Medicine News 2007;XXIX(1):8,11.

133. Harrigan RA, Chan TC, Moonblatt S, Vilke GM, Ufberg JW:  Temporary transvenous pacemaker placement in the Emergency Department. J Emerg Med 2007;32(1):105-111.

134. Brady WJ, Harrigan RA, Chan TC:  A tale of two "pulseless electrical activity" cardiac arrest rhythms.  Consultant 2007; 47(1):65-70.

135. Chan T, Brady W, Harrigan R:  The adult chest pain patient with a nondiagnostic ECG.  Emergency Medicine News 2007; XXIX(3):14,20,22.

136. Ma G, Davis DP, Schmitt J, Vilke GM, Chan TC, Hayden SR:  The sensitivity and specificity of transcricothyroid ultrasonography to confirm endotracheal tube placement in a cadaver model.  J Emerg Med 2007;32(4):405-407.

Curriculum Vitae
Theodore C. Chan, M.D., FACEP

137. Chan T, Harrigan RA, Brady WJ:  Weakness in a young woman.  Consultant 2007;47(5):477-480.

138. Levine SD, Sloane CM, Chan TC, Dunford JV, Vilke GM:  Cardiac monitoring of human subjects exposed to the Taser.  J Emerg Med 2007; 33(2):113-117.

139. Firestone D, Wos A, Killeen JP, Chan TC, Guluma K, Davis DP, Vilke GM:  Can urine dipstick be used as a surrogate for serum creatinine in emergency department patients who undergo contrast studies?  J Emerg Med 2007; 33(2):119-122.

140. Khalegi M, Loh A, Vromin D, Chan TC, Vilke GM:  The effects of minimizing ambulance diversion hours on emergency departments.  J Emerg Med 2007; 33(2):155-159.

141. Chan T, Brady W, Harrigan R:  Cases in electrocardiography.  Two-day-old infant not feeding well.  Emergency Medicine News 2007; XXIX(9):6,10.

142. Harrigan RA, Brady WJ, Chan T: Deciphering an irregularly irregular rhythm.  Consultant 2007;47(10):905, 909-912.

143. Vilke GM, Chan TC:  Less lethal technology: medical issues.  Policing 2007;30(3):341-357.

144. Vilke GM, Sloane CM, Bouton KD, Kolkhorst FW, Levine SD, Neuman TS, Castillo EM, Chan TC:  Physiological effects of a conducted electrical weapon on human subjects.  Ann Emerg Med 2007;50(5):569-575.

145. Chan T, Harrigan RA, Brady WJ:  Middle-aged man with light-headedness, nausea, and palpitations.  Consultant 2007;47(13):1141-1148.

146.  The Academic ED SBIRT Research Collaborative (Chan TC, member):  An evidence-based alcohol screen, brief intervention and referral to treatment (SBIRT) curriculum for emergency department (ED) providers improves skills and utilization.  SUBA 2007;28(4):79-92.

147.  Academic ED SBIRT Research Collaborative (Chan TC, member):  The impact of screening, brief intervention, and referral for treatment on emergency department patients' alcohol use.  Ann Emerg Med 2007; 50(6):699-710.

148. Guss DA, Chan TC, Killeen JP:  The impact of a pneumatic tube and computerized physician order management on lab turnaround time.  Ann Emerg Med 2008; 51(2):181-185.

149. Committee on Research Priorities in Emergency Preparedness and Response for Public Health Systems (Chan TC, member):   Research Priorities in Emergency Preparedness and Response for Public Health Systems.  Institute of Medicine of the National Academies Report 2008; 1-27.

Curriculum Vitae
Theodore C. Chan, M.D., FACEP

150. Sloane CM, Chan TC, Vilke GM:  Thoracic spine compression fracture after Taser activation.  J Emerg Med 2008; 34(3):283-285.

151. Chan TC, Harrigan RA, Ufberg J, Vilke GM:  Mandibular reduction.  J Emerg Med 2008; 34(4):435-440.

152. Sloane CM, Chan TC, Levine SD, Dunford JV, Neuman T, Vilke GM:  Serum tropinin I measurement of subjects exposed to the Taser X-26.  J Emerg Med 2008; 35(1):29-32.

153.  Brady WJ, Harrigan RA, Chan T:  Wide-complex rhythm in a young woman with renal disease.  Consultant 2008; 48(6):547-554.

154. Vilke GM, Ufberg JW, Harrigan RA, Chan TC:  Evaluation and treatment of acute urinary retention.  J Emerg Med 2008; 35(2):193-198.

155. Chan TC, Sharieff GQ, Brady WJ:  Electrocardiographic manifestations: Pediatric ECG.  J Emerg Med 2008; 35(4):421-430.

156. Vilke GM, Johnson WD, Castillo EM, Sloane C, Chan TC:  Tactical and subject considerations of in-custody deaths proximal to use of conductive energy devices.  Am J Forensic Med Pathol 2009; 30(1):23-25.

157. Tornabene SV, Deutsch R, Davis DP, Chan TC, Vilke GM:  Evaluating the Use and Timing of Opioids for the Treatment of Migraine Headaches in the Emergency Department. J Emerg Med 2009; 36(4):333-337.

158. Vilke GM, Sloane CM, Suffecool A, Kolkhorst FW, Neuman TS, Castillo EM, Chan TC: Physiologic effects of the TASER after exercise.  Acad Emerg Med 2009; 16(8):704-710.

159. Chan TC, Killeen JP, Castillo EM, Vilke GM, Guss DA, Feinberg R, Friedman L: Impact of an internet-based emergency department appointment system to access primary care at safety net community clinics.  Ann Emerg Med 2009; 54(2):279-284.

160. Chan TC, Killeen JP, Vilke GM, Marshall JB, Castillo EM:  Effect of Mandated Nurse–Patient Ratios on Patient Wait Time and Care Time in the Emergency Department. Acad Emerg Med 2010; 17(5):545-552.

161. Castillo EM, Vilke GM, Williams M, Turner P, Boyle J, Chan TC: Collaborative to decrease ambulance diversion: the California Emergency Department Diversion Project. J Emerg Med 2011; 40(3):300-7.

162. Davis DP, Salazar A, Chan TC, Vilke GM. Prospective evaluation of a clinical decision guideline to diagnose spinal epidural abscess in patients who present to the emergency department with spine pain. J Neurosurg Spine; 14:765–770. Epub 2011 Mar 18.

Curriculum Vitae
Theodore C. Chan, M.D., FACEP

163. Vilke GM, Debard ML, Chan TC, Ho JD, Dawes DM, Hall C, Curtis MD, Costello MW, Mash DC, Coffman SR, McMullen MJ, Metzger JC, Roberts JR, Sztajnkrcer MD, Henderson SO, Adler J, Czarnecki F, Heck J, Bozeman WP. Excited Delirium Syndrome (ExDS): Defining Based on a Review of the Literature. J Emerg Med. 2011 Mar 24.

164. Vilke GM, Chan TC. Evaluation and management for carotid dissection in patients presenting after choking or strangulation. J Emerg Med 2011; 40(3):355-8.

165. Vilke GM, Bozeman WP, Chan TC. Emergency department evaluation after conducted energy weapon use: review of the literature for the clinician. Emerg Med. 2011 May;40(5):598-604.

166. Lenert LA, Kirsh D, Griswold WG, Buono C, Lyon J, Rao R, Chan TC. Design and evaluation of a wireless electronic health records system for field care in mass casualty settings. J Am Med Inform Assoc. Epub 2011 Jun 27.

167. Vilke GM, Sloane C, Castillo EM, Kolkhorst FW, Neuman TS, Chan TC. Evaluation of the ventilatory effects of a restraint chair on human subjects. J Emerg Med. 2011 Jun;40(6):714-8.

168. Chan TC, Griswold WG, Buono C, Kirsh D, Lyon J, Killeen JP, Castillo EM, Lenert L. Impact of Wireless Electronic Medical Record System on the Quality of Patient Documentation by Emergency Field Responders during a Disaster Mass-Casualty Exercise. Prehosp Disaster Med. 2011 Jul-Aug;26(4):268-75.

169. Vilke GM, Sloane CM, Chan TC. "Funding source and author affiliation in TASER research are strongly associated with a conclusion of device safety" (Letter). Am Heart J. 2012 Mar;163(3):e5; author reply e9. Epub 2012 Feb 2.

170. Vilke GM, Sloane CM, Chan TC. Clarification of funding sources in "Electronic control device exposures: a review of morbidity and mortality" (Letter). Ann Emerg Med. 2012 Apr;59(4):336.

171. Nordt SP, Vilke GM, Clark RF, Lee Cantrell F, Chan TC, Galinato M, Nguyen V, Castillo EM. Energy drink use and adverse effects among emergency department patients. J Community Health. 2012 Oct;37(5):976-81.

172. Tadros AS, Castillo EM, Chan TC, Jensen AM, Patel E, Watts K, Dunford JV. Effects of an emergency medical services-based resource access program on frequent users of health services. Prehosp Emerg Care. 2012 Oct-Dec;16(4):541-7. Epub 2012 Jun 19.

173. Harrigan RA, Chan TC, Brady WJ. Electrocardiographic electrode misplacement, misconnection, and artifact. J Emerg Med. 2012 Dec;43(6):1038-44. Epub 2012 Aug 25.

Curriculum Vitae
Theodore C. Chan, M.D., FACEP

174. Vilke GM, Chan TC, Karch S. Letter by Vilke et al regarding article, "sudden cardiac arrest and death following application of shocks from a TASER electronic control device" (Letter). Circulation. 2013 Jan 1;127(1):e258.

175. Repanshek ZD, Ufberg JW, Vilke GM, Chan TC, Harrigan RA. Alternative treatments of pneumothorax. J Emerg Med. 2013 Feb;44(2):457-66 Epub 2012 May 22.

176. DeMers G, Kahn C, Johansson P, Buono C, Chipara O, Griswold W, Chan T. Secure scalable disaster electronic medical record and tracking system. Prehosp Disaster Med 2013;28(5):1-4.

177. The Effect of the Prone Maximal Restraint Position with and without Weight Force on Cardiac Output and Other Hemodynamic Measures. J Forensic Legal Med. 2013 Aug;20: 991-995.

178. Sloane C, Chan TC, Kolkhorst F, Neuman T, Castillo EM, Vilke GM. Evaluation of the ventilator effects of the prone maximum restraint (PMR) position on obese human subjects. Forensic Science International 2014 Feb; 237: 86-89.

179. Vilke GM, Bozeman WP, Chan TC. Emergency department evaluation after conducted energy weapon use: review of the literature for the clinician (Letter to the editor) J Emerg Med. 2014 April;46(4):533-536.

180. Pao B, Riner M, Chan TC. Impact of the Balance Billing Ban on California Emergency Providers. West JEM. 2014 Jan, online.

181. Castillo EM, Chan TC, Brennan JJ, Killeen JP. Identifying Frequent Users of Emergency Department Resources. J Emerg Med. 2014 Sep; 47(3): 343-7.

182. Vilke GM, Chan TC, Savaser D, Neuman T. Response to "Hemodynamic Consequences of Restraints in the Prone Position in Excited Delirium Syndrome. J Forensic Leg Med. 2014 Oct; 27:82-4.

183. Del Portal DA, Horn AE, Vilke GM, Chan TC, Ufberg JW.  Emergency department management of shoulder dystocia. J Emerg Med 2014;46(3):378-82. Epub 2013 Dec 18.

184. Brennan JJ, Chan TC, Hsia RY, Wilson MP, Castillo EM. Emergency Department Utilization Among Frequent Users with Psychiatric Visits. Acad Emerg Med 2014 Sep: 21(9): 1015-1022.

185. Rowd AD, Ufberg JW, Chan TC, Vilke GM, Harrigan RA. Lateral Canthotomy and Catholysis: Emergency Management of Orbital Compartment Syndrome. J Emerg Med. 2015 Mar; 48(3):325-30.

186. Castillo EM, Coyne CJ, Chan TC, Hall CA, Vilke GM.  Review of the medical and legal literature on restraint chairs.  J Forens Legal Med.  2015;33:91-97.

187. Brennan JJ, Chan TC, Killeen JP, Castillo EM. Inpatient Readmissions and Emergency Department Visits within 30 Days of a Hospital Admission. West J Emerg Med. 2015 Dec; 16(7): 1025-9.

188. Chan TC, Sirlin C. Abdominal Pain in Young Man with Oral Pigmentations. J Emerg Med. 2016 Feb; 50(2): 335-336.

189. Healy ME, Kozubal DE, Horn AE, Vilke GM, Chan TC, Ufberg JW. Care of Critically Ill Pregnant Patient and Perimortem Cesarean Delivery in the Emergency Department. J Emerg Med. 2016 Aug; 51(2): 172-177.

190. Crowley C, Stuck AR, Martinez T, Wittgrove AC, Zeng F, Brennan JJ, Chan TC, Killeen JP, Castillo EM. Survey and Chart Review to Estimate Medicare Cost Savings for Home Health as an Alternative to Hospital Admission Following Emergency Department Treatment. J Emerg Med. 2016 Dec; 51(6):643-547.

191. Woodruff SI, McCabe CT, Hohman M, Clapp JD, Shillington AM, Eisenberg K, Sise CB, Castillo EM, Chan TC, Sise MJ. Characteristics of Cannabis-Only and Other Drug Users Who Visit the Emergency Department. Cannabis Cannabinoid Res. 2016 Jul 1;1(1):149-153. eCollection 2016.

192. Knepper, MM, Castillo, EM, Chan, TC, Guss DA. The Effect of Access to Electronic Health Records on Throughput Efficiency and Imaging Utilization in the Emergency Department. Health Serv Res. 2018; 53: 787-802.

193. Glober N, Tainter CR, Brennan J, Darocki M, Klingfus M, Choi M, Derksen B, Rudolf F, Wardi G, Castillo E, Chan T. Use of the d-dimer for Detecting Pulmonary Embolism in the Emergency Department. J Emerg Med. 2018 05; 54(5):585-592.

194. Stuck AR, Crowley C, Martinez T, Wittgrove A, Brennan JJ, Chan TC, Castillo EM. Perspectives on Home-based Healthcare as an Alternative to Hospital Admission After Emergency Treatment. West J Emerg Med. 2017 June; 18(4):761-769.

195. Lasoff D, Hall CA, Bozeman WP, Chan TC, Castillo EM, et al. (2017) Proning: Outcomes of Use of Force Followed With Prone Restraint. J Forensic Med 2: 119. doi: 10.4172/2472-1026.1000119

196. Kreshak AA, Neath SX, Tolia VT, Castillo EM, Chan TC. A Multidisciplinary Bootcamp as an Educational Launch to a Geriatric Emergency Department, The Journal of Emergency Medicine. 2018 June; 54(6): 855-860.

197. Chan TC, Heide S. Deaths in Police Custody. J Forens Legal Med. 2018 Jul; 57: 109-114.

198. Glober N, Tainter CR, Brennan J, Darocki M, Klingfus M, Choi M, Derksen B, Rudolf F, Wardi G, Castillo E, Chan T. The DAGMAR Score: D-dimer assay-guided moderation of adjusted risk. Improving specificity of the D-dimer for pulmonary embolism. Am J Emerg Med. 2018 Aug 08.

199. Kreshak AA, Brennan JJ, Vilke GM, Tolia VM, Caccese M, Castillo EM, Chan TC. A Description of a Health System's Emergency Department Patients Who Were Part of a Large Hepatitis A Outbreak. J Emerg Med. 2018 Nov; 55(5):620-626.

200. Castillo EM, Chan TC, Tolia VT, Trumm NA, Powell RA, Brennan JJ, Kreshak AA. Effect of a Computerized Alert on Emergency Department Hepatitis A Vaccination in Homeless Patients During a Large Regional Outbreak. J Emerg Med. 2018 Dec; 55(6): 764-768.

201. Castillo EM, Brennan JJ, Howard J, Hsia RY, Chalmers C, Chan TC, Ko KJ. Factors Associated With Geriatric Frequent Users of Emergency Departments. Ann Emerg Med. 2019 Aug; 74(2): 270-275.

202. Vilke G, Chan T, Bozeman WP, Childers R: Emergency department evaluation after conducted energy weapon use: review of the literature for the clinician. J Emerg Med 2019;57(5):740-6.

203. Dameff C, Farah J, Killeen J, Chan TC. Cyber Disaster Medicine: A New Frontier for Emergency Medicine. Ann Emerg Med. 2020 May; 75(5): 642-647.

204. Sloane C, Mash DC, Chan TC, Kolkhorst F, Neuman T, Castillo EM, Lasoff D, Wardi G, Xie X, Vilke GM. Assessment of Stress Markers in Restrained Individuals Following Physical Stress With and Without Sham CED Activation. J Forensic Leg Med. 2020 May: 74

205. Nene RV, Chan TC. Elderly woman with abdominal pain. *JACEP Open.* 2020;1:1750-1751.

206. Frankel AM, Frenkel S, Aminlari, Chan T: Kikuchi disease: a case report. J Emerg Med 2020;59(6):927-30.

207. Tresenriter M, Holdaway J, Killeen J, Chan TC, Dameff C. The Implementation of an Emergency Medicine Telehealth System During a Pandemic. J Emerg Med. 2021 Apr;60(4): 548-553.

208. Brüggemann S, Chan TC, Wardi G, Mandel J, Fontanesi J, Bitmead RR. Decision support tool for hospital resource allocation during the COVID-19 pandemic. Informatics in Medicine Unlocked. 2021;24:100618.

209. Shadyab AH, Tolia VM, Brennan JJ, Chan TC, Castillo EM. Ethnic Disparities in COVID-19 Among Older Adults Presenting to the Geriatric Emergency Department. J Emerg Med 2021;61(4):437-44.

210. Vilke GM, Neuman T, Chan TC. Response to: Prone restraint cardiac arrest – A comprehensive review of the scientific literature and an explanation of the physiology. Med Sci Law. 2021.bru

211. Childers R, Cronin AO, Castillo EM, Neuman T, Chan TC, Coyne CJ, Sloane C, Vilke GM. Evaluation of the ventilator effects on human subjects in prolonged hip-flexed/head-down restraint position. Am J Emerg Med 2021;50:1-4.

*Curriculum Vitae*
Theodore C. Chan, M.D., FACEP

212. Shadyab AH, Castillo EM, Chan TC, Tolia VM. Developing and Implementing a Geriatric Emergency Department (GED): Overview and Characteristics of GED Visits. J Emerg Med. 2021 January, vol. 61: 131-139.

213. Liotta B, Kuo D, Chan TC. Severe Corneal Ectasia After Blunt Eye Trauma. J Emerg Med. 2021 February. Vol. 61: 184-185.

214. Schwarz L, Castillo EM, Chan TC, Brennan, et al. T. Heat Waves and Emergency Department Visits Among the Homeless, San Diego, 2021-2019. Am J Public Health. 2022;112(1):98-106.


## Texts/Books

1. <u>Atlas of Emergency Procedures</u>.  Rosen P, Chan TC, Vilke GM, Sternbach G (Eds.); St. Louis: Mosby, Inc., 2001.

2. <u>Atlas of Emergency Procedures</u>.  (Edition translated to Spanish).  Rosen P, Chan TC, Vilke GM, Sternbach G (Eds.); St. Louis: Mosby, Inc., 2005.

3. <u>ECG in Emergency Medicine and Acute Care</u>.  Chan TC, Brady WJ, Harrigan RA, Ornato JP, Rosen P (Eds.); Philadelphia:  Elsevier Mosby, 2005.

4. <u>Sudden Deaths in Custody</u>.  Ross DL, Chan TC (Eds.); New Jersey: Humana Press, 2006.

5. <u>ECG in Emergency Medicine and Acute Care</u>. (Edition translated to Chinese). Chan TC, Brady WJ, Harrigan RA, Ornato JP, Rosen P (Eds.); Philadelphia:  Elsevier Mosby, 2009.


## Book Chapters

1. Chan TC:  Hemorrhagic Shock.  In: <u>The 5 Minute Emergency Medicine Consult</u>. Rosen P, Barkin RM, Hayden SR, Schaider JJ, Wolfe R (Eds.); Philadelphia: Lippincott Williams & Wilkins, 1999, pp 484-485.

2. Chan TC:  Malgaigne Fracture.  In: <u>The 5 Minute Emergency Medicine Consult</u>. Rosen P, Barkin RM, Hayden SR, Schaider JJ, Wolfe R (Eds.); Philadelphia: Lippincott Williams & Wilkins, 1999, pp 668-669.

3. Chan T:  Pelvic Fracture.  In: <u>The 5 Minute Emergency Medicine Consult</u>.  Rosen P, Barkin RM, Hayden SR, Schaider JJ, Wolfe R (Eds.); Philadelphia: Lippincott Williams & Wilkins, 1999, pp 830-831.

4. Chan TC:  Paracentesis (Chapter 12: Abdomen).  In: <u>Atlas of Emergency Procedures</u>. Rosen P, Chan TC, Vilke GM, Sternbach G (Eds.); St. Louis: Mosby, Inc., 2001, pp 112-113.

Curriculum Vitae
Theodore C. Chan, M.D., FACEP

5.  Chan TC:  Anterior Packing (Chapter 9: Ear, Nose, and Throat).  In: <u>Atlas of Emergency Procedures</u>.  Rosen P, Chan TC, Vilke GM, Sternbach G (Eds.); St. Louis: Mosby, Inc., 2001, pp 190-193.

6.  Chan TC:  Posterior Packing (Chapter 9: Ear, Nose, and Throat).  In: <u>Atlas of Emergency Procedures</u>.  Rosen P, Chan TC, Vilke GM, Sternbach G (Eds.); St. Louis: Mosby, Inc., 2001, pp 194-197.

7.  Chan TC:  Septal Hematoma Drainage (Chapter 9: Ear, Nose, and Throat).  In: <u>Atlas of Emergency Procedures</u>.  Rosen P, Chan TC, Vilke GM, Sternbach G (Eds.); St. Louis: Mosby, Inc., 2001, pp 198-199.

8.  Chan TC:  Auricular Hematoma Drainage (Chapter 9: Ear, Nose, and Throat).  In: <u>Atlas of Emergency Procedures</u>.  Rosen P, Chan TC, Vilke GM, Sternbach G (Eds.); St. Louis: Mosby, Inc., 2001, pp 200-201.

9.  Chan TC:  Fracture, Pelvic.  In: <u>The 5-Minute Sports Medicine Consult</u>.  Bracker MD (Ed.); Philadelphia: Lippincott Williams & Wilkins, 2001, pp 140-141.

10.  Chan TC:  Hemorrhagic Shock.  In: <u>Rosen and Barkin's 5-Minute Emergency Medicine Consult</u> (second edition).  Schaider J, Hayden SR, Wolfe R, Barkin RM, Rosen P (Eds.); Philadelphia: Lippincott Williams & Wilkins, 2003, pp 498-99.

11.  Chan T:  Malgaigne Fracture.  In: <u>Rosen and Barkin's 5-Minute Emergency Medicine Consult</u> (second edition).  Schaider J, Hayden SR, Wolfe R, Barkin RM, Rosen P (Eds.); Philadelphia: Lippincott Williams & Wilkins, 2003, pp 660-61.

12.  Chan T:  Pelvic Fracture.  In: <u>Rosen and Barkin's 5-Minute Emergency Medicine Consult</u> (second edition).  Schaider J, Hayden SR, Wolfe R, Barkin RM, Rosen P (Eds.); Philadelphia: Lippincott Williams & Wilkins, 2003, pp 808-09.

13.  Harrigan RA, Chan TC, Brady WJ:  Basic Electrocardiographic Techniques.  In: <u>Clinical Procedures in Emergency Medicine</u> (fourth edition).  Roberts JR, Hedges JR (Eds.); Philadelphia:  Saunders, 2004, pp 270-82.

14.  Chan TC:  Tachydysrhythmias.  In:  <u>ECG in Emergency Medicine and Acute Care</u>.  Chan TC, Brady WJ, Harrigan RA, Ornato JP, Rosen P (Eds.); Philadelphia:  Elsevier Mosby, 2005, pp 39-45.

15.  Chan TC:  P wave.  In:  <u>ECG in Emergency Medicine and Acute Care</u>.  Chan TC, Brady WJ, Harrigan RA, Ornato JP, Rosen P (Eds.); Philadelphia:  Elsevier Mosby, 2005, pp 48-52.

16.  Chan TC:  PR Interval and Segment.  In:  <u>ECG in Emergency Medicine and Acute Care</u>.  Chan TC, Brady WJ, Harrigan RA, Ornato JP, Rosen P (Eds.); Philadelphia: Elsevier Mosby, 2005, pp 53-55.

17. Chan TC:  U wave.  In:  <u>ECG in Emergency Medicine and Acute Care</u>.  Chan TC, Brady WJ, Harrigan RA, Ornato JP, Rosen P (Eds.); Philadelphia:  Elsevier Mosby, 2005, pp 72-76.

18. Cardall TY, Chan TC:  Pacemakers: Normal Function.  In:  <u>ECG in Emergency Medicine and Acute Care</u>.  Chan TC, Brady WJ, Harrigan RA, Ornato JP, Rosen P (Eds.); Philadelphia:  Elsevier Mosby, 2005, pp 129-135.

19. Cardall TY, Chan TC:  Pacemakers: Abnormal Fuction.  In:  <u>ECG in Emergency Medicine and Acute Care</u>.  Chan TC, Brady WJ, Harrigan RA, Ornato JP, Rosen P (Eds.); Philadelphia:  Elsevier Mosby, 2005, pp 136-142.

20. Chan TC:  Myopericarditis.  In:  <u>ECG in Emergency Medicine and Acute Care</u>.  Chan TC, Brady WJ, Harrigan RA, Ornato JP, Rosen P (Eds.); Philadelphia:  Elsevier Mosby, 2005, pp 199-203.

21. Chan TC:  Toxicology Section: Introduction.  In:  <u>ECG in Emergency Medicine and Acute Care</u>.  Chan TC, Brady WJ, Harrigan RA, Ornato JP, Rosen P (Eds.); Philadelphia:  Elsevier Mosby, 2005, pp 253-254.

22. Dunford JV, Chan TC:  EMS and Public Health.  In:  <u>Principles of EMS Systems</u>.  Brennan JA, Krohmer JR (Eds.); Sudbury:  Jones and Bartlett, 2005, pp 269-276.

23. Chan TC:  Medical Overview of Sudden In-Custody Deaths.  In:  <u>Sudden Deaths in Custody</u>.  Ross DL, Chan TC (Eds.); New Jersey: Humana Press, 2006, pp 9-14.

24. Brady WJ, Harrigan RA, Chan T:  Acute Coronary Syndromes.  In: <u>Rosen's Emergency Medicine: Concepts and Clinical Practices</u>. Marx JA (Ed.); Philadelphia: Mosby Elsevier, 2006, pp 1154-95.

25. Lowe LG, Chan TC, Bamber DL.  Ear, Nose, and Throat Emergencies.  In: <u>Emergency Medicine Handbook.  Clinical Concepts for Clinical Practice.</u>  Roppolo LP, Davis D, Kelly SP, Rosen P (Eds.);  Philadelphia: Elsevier Mosby, 2007, pp 785-800.

26. Vilke GM, Sloane CM, Chan TC.  Accelerated Triage for Medical Evaluations Following CED Activations.  In:  <u>Critical Issues in Policing Series:  Strategies for Resolving Conflict and Minimizing Use of Force</u>.  Ederheimer JA (Ed); Washington DC, Police Executive Research Forum, 2007, pp 108-109.

27. Chan T.  Pelvic Fracture.  In: <u>Rosen and Barkin's 5-Minute Emergency Medicine Consult</u> (third edition).  Schaider J, Hayden SR, Wolfe R, Barkin RM, Rosen P (Eds.); Philadelphia: Lippincott Williams & Wilkins, 2007, pp 810-11.

28. Chan TC, Vilke GM.  CEW Research Models: Animal and Human Studies.  In: <u>TASER Conducted Electrical Weapons: Physiology, Pathology and Law</u>.  Kroll MW, Ho JD (Eds.); New York: Springer, 2009, 109-118.

29.  Harrigan RA, Chan TC.  What is the ECG differential diagnosis of ST segment elevation?  In: <u>Critical Decisions in Emergency and Acute Care Electrocardiography</u>.  Brady WJ, Truwitt JD (Eds.); Hoboken: Blackwell Publishing, 2009, 419-427.

30.  Harrigan RA, Chan TC.  What is the ECG differential diagnosis of ST segment depression?  In: <u>Critical Decisions in Emergency and Acute Care Electrocardiography</u>.  Brady WJ, Truwitt JD (Eds.); Hoboken: Blackwell Publishing, 2009, 428-435.

31.  Chan TC, Harrigan RA.  What is the ECG differential diagnosis of the abnormal T wave?  In: <u>Critical Decisions in Emergency and Acute Care Electrocardiography</u>.  Brady WJ, Truwitt JD (Eds.); Hoboken: Blackwell Publishing, 2009, 436-443.

32.  Chan TC, Harrigan RA.  What is the ECG differential diagnosis of narrow complex tachycardia?  In: <u>Critical Decisions in Emergency and Acute Care Electrocardiography</u>.  Brady WJ, Truwitt JD (Eds.); Hoboken: Blackwell Publishing, 2009, 444-451.

33.  Chan TC, Harrigan RA.  What is the ECG differential diagnosis of wide complex tachycardia?  In: <u>Critical Decisions in Emergency and Acute Care Electrocardiography</u>.  Brady WJ, Truwitt JD (Eds.); Hoboken: Blackwell Publishing, 2009, 452-460.

34.  Harrigan RA, Chan TC.  What is the ECG differential diagnosis of bradycardia?  In: <u>Critical Decisions in Emergency and Acute Care Electrocardiography</u>.  Brady WJ, Truwitt JD (Eds.); Hoboken: Blackwell Publishing, 2009, 461-468.

35.  Chan TC, Harrigan RA.  What is the ECG differential diagnosis of abnormally wide or large QRS complex?  In: <u>Critical Decisions in Emergency and Acute Care Electrocardiography</u>.  Brady WJ, Truwitt JD (Eds.); Hoboken: Blackwell Publishing, 2009, 469-478.

36.  Harrigan RA, Chan TC.  What is the ECG differential diagnosis of a prolonged QT interval?  In: <u>Critical Decisions in Emergency and Acute Care Electrocardiography</u>.  Brady WJ, Truwitt JD (Eds.); Hoboken: Blackwell Publishing, 2009, 479-482.

37.  Brady WJ, Harrigan RA, Chan TC.  Acute coronary syndrome.  In: <u>Rosen's Emergency Medicine: Concepts and Clinical Practice</u>.  Marx JA (Ed.); Philadelphia: Mosby Elsevier, 2009, 947-983.

38.  Harrigan RA, Chan TC, Brady WJ.  Basic electrocardiographic techniques.  In: <u>Clinical Procedures in Emergency Medicine</u>.  Roberts JR, Hedges JR (Eds.); Philadelphia: Saunders Elsevier, 2010, 255-268.

39.  Chan T.  Hemorrhagic Shock.  In: <u>Rosen and Barkin's 5-Minute Emergency Medicine Consult</u> (fourth edition).  Schaider J, Hayden SR, Wolfe R, Barkin RM, Rosen P (Eds.); Philadelphia: Lippincott Williams & Wilkins, 2010, pp 498-99.

40. Chan T:  Malgaigne Fracture.  In: <u>Rosen and Barkin's 5-Minute Emergency Medicine Consult</u> (fourth edition).  Schaider J, Hayden SR, Wolfe R, Barkin RM, Rosen P (Eds.); Philadelphia: Lippincott Williams & Wilkins, 2010, pp 662-63.

41. Chan T.  Pelvic Fracture.  In: <u>Rosen and Barkin's 5-Minute Emergency Medicine Consult</u> (fourth edition).  Schaider J, Hayden SR, Wolfe R, Barkin RM, Rosen P (Eds.); Philadelphia: Lippincott Williams & Wilkins, 2010, pp 814-15.

42. Chan T. Superventricular tachycardia. In: <u>Cardiovascular Problems in Emergency Medicine</u> (first edition). Grossman S, Rosen S, Brady W, Brown D, Chan T, Harrigan R (Eds.); Oxford: John Wiley & Sons, Ltd. 2011, pp 97-107.

43. Chan T. Pacemakers and AICIDS in emergency medicine. In: <u>Cardiovascular Problems in Emergency Medicine</u> (first edition). Grossman S, Rosen S, Brady W, Brown D, Chan T, Harrigan R (Eds.); Oxford: John Wiley & Sons, Ltd. 2011, pp 147-159.

44. Chan T. Pericarditis. In: <u>Cardiovascular Problems in Emergency Medicine</u> (first edition). Grossman S, Rosen S, Brady W, Brown D, Chan T, Harrigan R (Eds.); Oxford: John Wiley & Sons, Ltd. 2011, pp 227-236.

45. Harrigan RA, Chan TC, Brady WJ.  Basic electrocardiographic techniques.  In: <u>Clinical Procedures in Emergency Medicine</u> (sixth edition).  Roberts JR, Custalow CB (Eds.); Philadelphia: Saunders Elsevier, 2014, pp 263-276.

46. Vaishal, T, Chan, TC. Complications of Impaled Cardiac Devices. In: <u>Cardiovascular Emergencies</u> Mattu, A, Brady WJ, Bresler MJ, Silvers, SM, Stahmer, SA, Tabas, JA (Eds.); Texas: American College of Emergency Physicians, 2014, pp 283-292.

47. Chan TC: Hemorrhagic Shock. In: <u>Rosen & Barkin's 5-Minute Emergency Medicine Consult</u> (fifth edition).  Schaider JJ, Barkin RM, Hayden SR, Wolfe RE, Barkin RE, Shayne P, Rosen P (Eds.); Philadelphia: Lippincott Williams & Wilkins, 2015, pp 508-509.

48. LaFree AT, Chan TC: Pelvic Fracture. In: <u>Rosen & Barkin's 5-Minute Emergency Medicine Consult</u> (fifth edition).  Schaider JJ, Barkin RM, Hayden SR, Wolfe RE, Barkin RE, Shayne P, Rosen P (Eds.); Philadelphia: Lippincott Williams & Wilkins, 2015, pp 816-817.

49. Savaser, Chan TC: Positional and Restraint Asphyxia. In: <u>Guidelines for Investigating Officer-Involved Shootings, Arrest-Related Deaths, and Deaths in Custody</u>. Ross DL, Vilke GM (Eds.); New York: Routledge, 2018, pp 149-162.

50. Brady WJ, Harrigan RA, Chan TC. Basic Electrocardiographic Techniques. In: <u>Clinical Procedures in Emergency Medicine and Acute Care.</u> (seventh edition). Roberts JR, Custalow CB, Thompsen TW (Eds.); Philadelphia: Elsevier, 2019, pp 275-287

Curriculum Vitae
Theodore C. Chan, M.D., FACEP

51.  Childers R, Chan TC, Vilke GM. TASER Conducted Electrical Weapons. In: <u>Clinical Forensic Medicine</u> (fourth edition). Stark MM (Ed); London: Springer, 2020, pp 279-312.

Curriculum Vitae
Theodore C. Chan, M.D., FACEP

## Abstracts

1. Chan T, Krishel S, Bramwell K, Clark R:  Survey of undocumented aliens using the emergency department.  Acad Emerg Med 1995;2(5):435.

2. Chan TC, Williams SR, Clark RF:  Formic acid skin burns resulting in systemic toxicity.
   Clin Toxicol 1995;33(5):491-492.

3. Chan T, Clark RF, Schwartz B, Fletcher T, Hayden S:  Survey of patients denied ED care by their managed care plan.  Acad Emerg Med 1996;3(5):496.

4. Chan TC, Vilke GM, Hayden SR:  Structured curriculum in domestic violence and child abuse for emergency medicine residents.  Acad Emerg Med 1996;3(5):511.

5. Moss S, Vilke GM, Chan TC, Dunford JV:  Outcome study of out-of-hospital patients signed out against medical advice by field paramedics.  Acad Emerg Med 1997;4(5):413.

6. Chan TC, Vilke GM, Neuman T, Clausen JL:  Does the hobble restraint position result in respiratory compromise?  Acad Emerg Med 1997;4(5):459.

7. Evans SD, Fisher RP, Vilke GM, Chan TC:  Accuracy of urban field paramedics estimating blood loss.  Acad Emerg Med 1997;4(5):459.

8. Neuman TS, Vilke GM, Chan TC, Clausen JL:  Changes in pulmonary function associated with position.  Undersea & Hyperbaric Med 1997;24(Suppl):13.

9. Moats T, Chan TC, Ochs M, Buchanan J, Vilke GM:  Successful out-of-hospital airway management by emergency medicine technician-Is using the Combitube.  Acad Emerg Med 1998;5(5):388.

10. Hamilton RS, Davis DP, Chan TC, Vilke GM, Hayden SR:  The effect of blade type and cervical spinal immobilization on larygoscopy in a cadaver model of intubation.  Acad Emerg Med 1998;5(5):397.

11. Vilke GM, Chan TC, Neuman T, Clausen JL:  The effect of body position on pulmonary function.  Acad Emerg Med 1998;5(5):397.

12. Friedman L, Vilke GM, Chan TC, Hayden SR, Krishel SJ, Rosen P:  Emergency department airway management before and after the start of an emergency medicine residency training program.  Acad Emerg Med 1998;5(5):444.

13. Davis DP, Bramwell KJ, Hamilton RS, Chan TC, Vilke GM:  Cricothyrotomy speed and safety: A comparison between standard open technique and rapid four-step technique using a novel device.  Acad Emerg Med 1998;5(5):483.

14. Davis DP, Fisher RP, Chan TC, Dunford JV, Vilke GM:  Rapid-sequence induction for

out-of-hospital intubations: A multimedia course designed for paramedics.  Acad Emerg Med 1998;5(5):502.

15.  Chan TC, Vilke GM, Buchanan J, Anderson M:  Patient ethnicity and age in prehospital emergency ambulance use and acuity rates.  Prehosp Emerg Care 1998;2(3):223.

16.  Marino AT, Vilke GM, Chan TC, Buchanan J:  Precision of prehospital diazepam dosing for children in status epilepticus.  Prehosp Emerg Care 1998;2(3):232.

17.  Marino AT, Vilke GM, Chan TC, Buchanan J:  Comparison of prehospital IV and rectal diazepam for the treatment of pediatric seizures.  Prehosp Emerg Care 1998;2(3):233.

18.  Vilke GM, Chan TC, Buchanan J, Dunford JV:  Are opiate overdose deaths related to patient release after prehospital naloxone?  Prehosp Emerg Care 1998;2(3):236.

19.  Vilke GM, Dunford JV, Buchanan J, Chan TC:  Are opiate overdose deaths related to patient release after prehospital naloxone?  Ann Emerg Med 1998;32(3)Part 2:S6.

20.  Marino AT, Chan TC, Buchanan J, Vilke GM:  Precision of prehospital diazepam dosing for children in status epilepticus.  Ann Emerg Med 1998;32(3)Part 2:S30.

21.  Marino AT, Vilke GM, Buchanan J, Chan TC:  Comparison of prehospital intravenous and rectal diazepam for the treatment of pediatric seizures.  Ann Emerg Med 1998;32(3) Part 2:S30.

22.  Davis D, Bramwell K, Hamilton R, Chan T, Vilke G:  The fresh-frozen cadaver free-larynx model for cricothyrotomy training.  Ann Emerg Med 1998;32(3)Part 2:S34-S35.

23.  Sloane C, Chan TC, Vilke GM, Hayden SR, Krishel SJ, Rosen P:  Rapid sequence induction intubation of trauma patients in the prehospital versus hospital setting.  Ann Emerg Med 1998;32(3)Part 2:S50.

24.  Chan TC, Bramwell K, Hamilton R, Davis D, Vilke GM:  Comparison of Melcker cricothyrotomy versus standard technique in human cadaver model.  Ann Emerg Med 1998;32(3)Part 2:S50-S51.

25.  Chew GS, Chan TC, Bramwell K, Davis DP, Vilke GM:  Does the syringe esophageal detector device accurately detect an esophageal intubation after gastric distention from air insufflation?  Ann Emerg Med 1998;32(3)Part 2:S51.

26.  Chan TC, Vilke GM, Kramer M, Buchanan J, Dunford J:  Does a complete neurologic examination adequately screen for significant intracranial abnormalities in minor head injury? J Emerg Med 1998;16(5):804.

27. Chan TC, Vilke GM, Kramer M, Buchanan J, Dunford J:  Does GCS score affect prehospital intubation success rates in trauma patients?  J Emerg Med 1998;16(5):804-805.

28. Vilke GM, Chan TC, Guss DA:   Prospective study on the utility of head CT scan in patients with minor head injury and GCS scores of 15.   J Emerg Med 1998;16(6):984.

29. Chan TC, Vilke GM, Ray LU, Anderson ME:  Use of prehospital crash injury data to assess regional automobile safety restraint use.  Prehosp Emerg Care 1999;3(1):83-84.

30. Vilke GM, Chan TC:  Effect of a physician speaking directly to prehospital patients who want to sign out against medical advice.  Prehosp Emerg Care 1999;3(1):90.

31. Marino A, Vilke GM, Chan TC:  Urban paramedics experience, comfort, and accuracy in the estimation of pediatric weights.  Prehosp Emerg Care 1999;3(1):92.

32. Chan TC, Bramwell KJ, Davis DP, Hamilton RS, Vilke GM:  Comparison of wire-guided percutaneous Melcker cricothyrotomy versus standard cricothyrotomy technique in human cadaver models.  Acad Emerg Med 1999;6(5):514.

33. Ma G, Hayden SR, Chan TC, Vilke GM, Schmitt J, Chan D:  Using ultrasound to visualize and confirm endotracheal intubation.  Acad Emerg Med 1999;6(5):515.

34. Hamilton RS, Davis DP, Nordt SP, Vilke GM, Chan TC:  Lidocaine administration through an esophageally placed Combitube in a canine model.  Acad Emerg Med 1999;6(5):519-520.

35. Chew GS, Chan TC, Bramwell K, Davis DP, Vilke GM:  Does gastric distention from air insufflation affect the accuracy of the syringe esophageal detector device in detecting esophageal intubation?  Acad Emerg Med 1999;6(5):520.

36. Vilke GM, Marino A, Iskander J, Chan TC:  Knowledge of prescribed medications by emergency department patients.  Acad Emerg Med 1999;6(5):539.

37. Brady WJ, Chase CD, Chan T:  Electrocardiographic ST-segment elevation: Correct identification of AMI and non-AMI syndromes by emergency physicians - Preliminary results. Ann Emerg Med 1999;34(4)Part 2:S23.

38. Marino AT, Sharieff G, Gerhart AE, Chan TC, Vilke GM:  The efficacy and complication rate of prehospital midazolam for the treatment of pediatric seizures. Prehosp Emerg Care 2000;4(1):92.

39. Eisele JW, Chan T, Vilke G, Neuman T, Clausen J:  Comparison of respiratory function in the prone maximal restraint position with and without additional weight force on the back.  Proceedings of the American Acadamy of Forensic Sciences 2000;VI:202.

Curriculum Vitae
Theodore C. Chan, M.D., FACEP

40.  Brady WJ, Viscardi GM, Chan T:  Electrocardiographic ST segment elevation: Correct identification of AMI and non-AMI syndromes by emergency physicians.  Acad Emerg Med 2000;7(5):452-453.

41.  Chan TC, Vilke GM, Neuman T, Clark RF, Clausen J:  Effect of oleoresin capsicum.  Acad Emerg Med 2000;7(5):471.

42.  Vilke GM, Marino A, Chan TC:  Survey of paramedics for latex allergy risk factors.  Acad Emerg Med 2000;7(5):483.

43.  Schmitt JM, Ma G, Hayden SR, Vilke G, Chan T:  Suprasternal versus cricothyroid ultrasound probe position in the confirmation of endotracheal tube placement by bedside ultrasound.  Acad Emerg Med 2000;7(5):526.

44.  Schmitt JM, Ma G, Hayden SR, Vilke G, Chan T:  Use of new air absorbing ultrasound contrast in the confirmation of endotracheal tube placement by bedside ultrasound.  Acad Emerg Med 2000;7(5):526.

45.  Wold RM, Davis DP, Patel R, Chan TC, Vilke GM:  Original clinical decision guideline to identify patients with spinal epidural abscess.  Acad Emerg Med 2000;7(5):574-575.

46.  Brady WJ, Viscardi G, Chase CD, Chan T:  Electrocardiographic ST-segment elevation: Correct identification of AMI and non-AMI syndromes by emergency physicians.  Ann Emerg Med 2000;35(5):S27-S28.

47.  Ma G, Chan TC, Vilke GM, Schmitt J, Hayden SR:  Confirming endotracheal intubation using ultrasound.  Ann Emerg Med 2000;36(4)Part 2:S20-S21.

48.  Deitch S, Vilke GM, Marino A, Vroman D, Chan TC:  Effect of prehospital use of nitroglycerine on EKG findings in patients with chest pain.  J Emerg Med 2001;20(3):321.

49.  Chan TC, Vilke GM, Neuman T, Clausen J, Schmidt P, Snowden T, Clark RF:  Does oleoresin capsicum "pepper spray" exposure impact cardiovascular function in human subjects?  Acad Emerg Med 2001;8(5):442.

50.  Chan TC, Vilke GM, Bender S, Saldamando V, Smith J, Dunford JV:  Effect of a multi-disciplinary community homeless outreach team on emergency department visits by homeless alcoholics.  Acad Emerg Med 2001;8(5):486.

51.  Chan TC, Vilke GM, Clausen J, Clark R, Schmidt P, Snowden T, Neuman T:  Impact of oleoresin capsicum spray on respiratory function in human subjects in the sitting and prone maximal restraint positions positions, 1998 (computer file).  Inter-university Consortium for Political and Social Research (distributor), 2001.

Curriculum Vitae
Theodore C. Chan, M.D., FACEP

52. Chan TC, Dunford JV, Vilke GM, Hix A, Schnell S, Liening J, Edgar J:  Effect of a multi-disciplinary serial inebriate program on emergency department visits by chronic alcoholics in two urban area hospitals.  Ann Emerg Med 2001;38(4):S33.

53. Clark RF, Phillips M, Manoguerra AS, Chan TC:  Home calls from predominantly Latino communities to a regional poison center.  Clin Toxicol 2001;39(5):519.

54. Chan TC, Dunford JV, Smith S, Sparrow W, Vilke GM:  Impact of an on-call physician on emergency 911 transports from a county jail.  Prehosp Emerg Care 2002;6(1):162.

55. Vilke GM, Sardar W, Fisher R, Dunford JV, Chan TC:  Follow-up of elderly patients who refuse transport after accessing 9-1-1.  Prehosp Emerg Care 2002;6(1):164.

56. Vilke GM, Steen PJ, Smith AM, Chan TC:  Out-of-hospital pediatric intubation by paramedics: The San Diego experience.  Prehosp Emerg Care 2002;6(1):165.

57. Jin AS, Chan T, Davis D, Vilke G:  Prospective randomized study of viscous lidocaine vs Hurricaine in a GI cocktail for dyspepsia.  Acad Emerg Med 2002;9(5):381-382.

58. Jenson P, Chan TC, Vilke GM, Leining J, Schnell R, Chester R, Berthelet J, Marcotte A, Simmons C, Kelly D, Dunford J:  Impact of a multi-disciplinary, community serial inebriate program on ED visits by chronic alcoholics to three urban emergency departments.  Acad Emerg Med 2002;9(5):389.

59. Austin T, Chan TC, Nyheim E, Kelly D, Vilke GM:  Does the addition of parenteral opiate pre-medication increase risk for complications when combined with methohexital for moderate procedural sedation in the ED?  Acad Emerg Med 2002;9(5):407.

60. Chan TC, Austin T, Nyheim E, Kelly D, Vilke GM:  Does parenteral opiate premedication increase risk of complications when combined with methohexital for orthopedic reductions in the emergency department?  Ann Emerg Med 2002;40(4):S7-S8.

61. Davis D, Tokhi R, Wold R, Patel R, Chan T, Vilke G:  The clinical presentation and outcome of emergency department patients with spinal epidural abscess.  Ann Emerg Med 2002;40(4): S103.

62. Vilke GM, Sloane C, Smith AM, Chan TC:  Assessment for deaths in prehospital heroin overdose patients treated with Naloxone who refuse transport.  Prehosp Emerg Med 2003;7(1):190.

63. Vilke GM, Lev R, Castillo EM, Murrin PA, Chan TC:  Prospective Countywide Trial to Decrease Ambulance Diversion Hours.  Acad Emerg Med 2003;10(5):465.

64. Tran A, Davis DP, Wold RM, Patel R, Chan TC, Vilke GM:  The Use of Risk Factor Assessment to Screen for Spinal Epidural Abscess in Emergency Department Patients with Spine Pain.  Acad Emerg Med 2003;10(5):569.

Curriculum Vitae
Theodore C. Chan, M.D., FACEP

65. Chan TC, Kelso D, Dunford JV, Vilke GM:  Can Trained Health Educators Provide Screening, Brief Intervention and Referral Services in an Academic Teaching Hospital Emergency Department?  Acad Emerg Med 2003;10(5):515.

66. Vilke GM, Lev R, Castillo EM, Metz MA, Murrin PA, Chan TC. The effect of decreasing ambulance diversion hours on emergency department interfacility transfers. Ann Emerg Med 2003; 42(4):S6.

67. Vilke GM, Lev R, Castillo EM, Metz MA, Murrin PA, Chan TC. San Diego County improved patient destination trial to decrease emergency department diversion hours and diverted patients.  Ann Emerg Med 2003; 42(4):S2.

68. Chan TC, Clausen J, Neuman T, Eisele JW, Vilke GM.  Does weight force during physical restraint cause respiratory compromise?  Ann Emerg Med 2003; 42(4):S17.

69. Davis D, Grossman K, Vilke G, Kiggins D, Chan TC.  Inadvertent anticoagulation of emergency department patients with aortic dissection.  Ann Emerg Med 2003; 42(4):S99.

70. Chan TC, Killeen JP, Kelly D, Vilke GM, Guss DA:  Impact of a rapid emergency department entry and an accelerated care initiative on patient wait times and length of stay.  Acad Emerg Med 2004;11(5):485.

71. Patel RJ, Davis D, Vilke GM, Chan TC:  Comparison of wire-guided cricothyrotomy technique with and without balloon-cuffed endotracheal tubes vs. standard surgical cricothyrotomy.  Acad Emerg Med 2004;11(5):522.

72. Vilke GM, Chan TC, Dunford JV, Poste JC, Metz M, Ochs G, Smith A, Fisher R, McCallum-Brown L, Davis DP:  The three-phase model of cardiac arrest as applied to ventricular fibrillation in a large, urban emergency medical services system.  Acad Emerg Med 2004;11(5):604.

73. Vilke GM, Murrin P, Gardina L, Upledger Ray L, Stepanski B, Chan TC.  Impact of a new booster seat law.  Ann Emerg Med 2004; 44(4):S39-S40.

74. Dunford JV, Vilke GM, Chan TC.  Utilization of EMS and hospital resources by serial inebriate program (SIP) clients. Prehosp Emerg Care 2005; 9(1):116.

75. Killeen JP, Chan TC, Guss, DA. Impact of bar coding technology and computerized physician order entry on reducing laboratory specimen misidentification errors in the emergency department.  Acad Emerg Med 2005;12(5):49.

76. Bush J, Chan TC, Killeen JP, Vilke GM.  The effect of changing from a latex agglutination D-Dimer to an ELISA D-Dimer on emergency physicians ordering imaging studies practices to evaluate for pulmonary embolism.  Acad Emerg Med 2005;12(5):41.

Curriculum Vitae
Theodore C. Chan, M.D., FACEP

77. Vilke GM, Michalewicz B, Kolkhorst FW, Neuman T, Chan TC.  Does weight force during physical restraint cause respiratory compromise?  Acad Emerg Med 2005;12(5):16.

78. Levine SD, Sloane C, Chan TC, Vilke GM, Dunford J.  Cardiac monitoring of subjects exposed to the Taser.  Acad Emerg Med 2005;12(5):71.

79. Davis D, Buono C, Ramanujam P, Fisher R, Vilke GM, Chan TC, Metz M, Dunford J.  The potential safety of designated cardiac arrest receiving facilities.  Ann Emerg Med 2005;46(3):S17.

80. Chan TC, Killeen JP, Kelly DL, Vilke GM, Guss DA.  Accelerated care at triage:  Physician-directed ancillary testing at triange for patients waiting in an emergency department.  Ann Emerg Med 2005;46(3):S107-S108.

81. Buono C, Chan TC, Brown S, Lenert L.  Role-tailored software systems for medical response to disasters: enhancing the capabilities of "mid-tier" responders.  AMIA Annu Symp Proc 2005: 908.

82. Lenert LA, Palmer DA, Chan TC, Rao R.  An intelligent 802.11 triage tag for medical response to disasters.  AMIA Annu Symp Proc 2005: 440-4.

83. Lenert LA, Chan TC, Griswold WG, Killeen J, Krisch D, Mishra R, Palmer DA, Rao RA.  Wireless internet information systems for medical response in disasters (WIISARD).  AMIA Annu Symp Proc 2006: 1192.

84. Demchak B, Chan TC, Griswold WG, Lenert LA.  Situational awareness during mass-casualty events: command and control.  AMIA Annu Symp Proc 2006: 905.

85. Chan TC, Buono C, Killeen J, Griswold W, Huang R, Lenert L.  Tablet computing for disaster scene managers.  AMIA Annu Symp Proc 2006: 875.

86. Buono C, Huang R, Brown S, Chan TC, Killeen J, Lenert L.  Role-tailored software systems for coordinating care at disaster sites: enhancing collaboration between the base hospitals with the field.  AMIA Annu Symp Proc 2006: 867.

87. Killeen J, Chan TC, Buono C, Griswold WG, Lenert LA.  A wireless first responder handheld device for rapid triage, patient assessment and documentation during mass casualty incidents.  AMIA Annu Symp Proc 2006: 429-33.

88. Levine SD, Sloane C, Chan TC, Vilke GM, Dunford J.  Cardiac monitoring of human subjects exposed to the taser.  Acad Emerg Med 2006; 13(5 Supp 1):S47.

89. Vilke GM, Dolkas L, Stanley C, Smith AM, Chan TC.  Evaluation of deaths associated with choking.  Acad Emerg Med 2006; 13(5 Supp 1):S49.

90. Chan TC, Vilke GM, Michalewicz BA, Neuman T, Levy S, Kolkhorst F.  Does physical restraint impact metabolic oxygen consumption during exertion?  Acad Emerg Med 2006; 13(5 Supp 1):S46.

91. Castillo EM, Vilke GM, Sturgis KN, Chan TC, Lindsay SP, Dunford JV.  Decrease of health care service utilization among chronic public inebriates.  Acad Emerg Med 2006; 13(5 Supp 1):S105-106.

92. Killeen JK, Chan T, Guss D.  The impact of a pneumatic tube and computerized physician order entry on laboratory turnaround for cardiac markers.  Acad Emerg Med 2006; 13(5 Supp 1):S114.

93. Guss DA, Chan T, Killeen J.  The impact of pneumatic tube specimen transport and computerized order entry on laboratory turnaround.  Acad Emerg Med 2006; 13(5 Supp 1):S63-64.

94. Chan TC, Killeen JP, Castillo EM, Guss DA.  The impact of delayed admissions held in the emergency department on wait time, patient care time, and length of stay for other patients.  Ann Emerg Med 2006; 48(4 Supp 1):S5.

95. Venieris PY, Chan TC, Killeen J.  Multicenter trial assessing the impact of an overnight international "nighthawk" teleradiology system on CT radiology re-interpretation rates.  Ann Emerg Med 2006; 48(4 Supp 1):S16.

96. Vilke G, Johnson W, Castillo EM, Ederheimer JA, Wexler C, Sloane CM, Chan TC.  Evaluation of in-custody deaths proximal to use of conductive energy devices.  Ann Emerg Med 2006; 48(4 Supp 1):S23-S24.

97. Tornabene SV, Chan TC, Davis DP, Deutsch R, Vilke GM.  Evaluating the use and timing of opioids for the treatment of migraine headaches in the ED.  Ann Emerg Med 2006; 48(4 Supp 1):S59-S60.

98. Davis D, Salazar A, Vilke G, Chan T.  The utility of a novel decision rule to diagnose spidal epidural abscess in ED patients with back pain.  Ann Emerg Med 2006; 48(4 Supp 1):S66.

99. Killeen JP, Chan TC, Vilke GM, Buono C, Griswold W, Rao R, Lenert L.  Wireless computerized rapid triage in the field:  How well does technology perform during mass casualty incidents and disaster events?  Ann Emerg Med 2006; 48(4 Supp 1):S69.

100. Vilke GM, Castillo EM, Stepanski BM, Murrin PA, Upledger-Ray L, Metz MA, Chan TC.  San Diego county patient destination trial to decrease ambulance division hours:  Three year follow-up.  Ann Emerg Med 2006; 48(4 Supp 1):S90.

101. Chan T, Sloane C, Neuman T, Levine S, Castillo E, Vilke G, Bouton K, Kohokorst F.  The impact of the taser weapon on respiratory and ventilatory function in human subjects.  Acad Emerg Med 2007; 14(5 Suppl 1): S191-192.

102. Buono C, Lyon J, Huang R, Brown S, Liu F, Vilke G, Killeen J, Chan T, Kirsh D, Lenert L.  Does wireless technology improve patient tracking in mass casualty incidents?  Acad Emerg Med 2007; 14(5 Suppl 1): S190.

103. Vilke G, Sloane C, Levine S, Neuman T, Castillo E, Chan T.  Does the Taser Cause Electrical Changes in Twelve Lead ECG Monitoring of Human Subjects?  Acad Emerg Med 2007; 14(5 Suppl 1): S104.

104. Vilke G, Sloane C, Bouton K, Levine S, Neuman T, Castillo E, Kolkhorst F, Chan T.  Cardiovascular and metabolic effects of the taser on human subjects.  Acad Emerg Med 2007; 14(5 Suppl 1): S104-105.

105. Sloane C, Vilke G, Chan T, Levine S, Dunford J.  Serum troponin I measurement of subjects exposed to the taser x-26.  Acad Emerg Med 2007; 14(5 Suppl 1): S103-104.

106. Chan TC, Killeen JP, Castillo EM, Vilke GM, Guss DA.  Impact of electronic medication reconciliation on triage times for patients seen in the emergency department.  Ann Emerg Med 2007; 50(3 Suppl 1):S71.

107. Vilke G, Chan T, Killen J, Castillo E.  Impact of psychiatric patient holds on the emergency department overcrowding.  Acad Emerg Med 2008; 15(5 Suppl 1):S221.

108. Buono C, Lyon J, Chan T, Griswold W, Castillo E, Killeen J, Kirsh D, Lenert L.  Does using a wireless, electronic patient data collection system increase patient time on the field?  Acad Emerg Med 2008; 15(5 Suppl 1):S12.

109. Chan T, Killeen J, Castillo E, Vilke G, Kennedy S, Feinberg R, Guss D.  Impact of an internet-based referral appointment system community clinic access and follow-up for ED patients with no primary care.  Acad Emerg Med 2008; 15(5 Suppl 1):S104.

110. Chan TC, Killeen JP, Vilke GM, Guss DA, Jones K, Marshall J, Moore T, Castillo EM.  Impact of mandated nurse-patient ratios on emergency department crowding.  Ann Emerg Med 2008; 52(4):S44.

111. Bizek G, Castillo E, Vilke G, Chan T.  Characteristics and rates of rewarming of emergency department patients with moderate to severe accidental hypothermia.  Ann Emerg Med 2008; 52(4):S104-S105.

112. Vilke GM, Killeen JP, Chan TC, Crumpacker J, Castillo EM.  Risk factors and characteristics of falls among emergency department elderly patients.  Ann Emerg Med 2008; 52(4):S160.

113. Marsan R, Castillo E, Chan T, Stepanski B, Vilke G.  Comparison of prehospital retrospective chart review to prospectively obtained data.  Acad Emerg Med 2009; 16(4):S85-S86.

114. Killeen D, Killeen J, Castillo E, Chan T, Vilke G.  Emergency department patient evaluation of internet and email access for healthcare information.  Acad Emerg Med 2009; 16(4):S132-S133.

Curriculum Vitae
Theodore C. Chan, M.D., FACEP

115. Sloane C, Chan T, Kohlkorst F, Castillo E, Neuman T, Vilke G. Can a restraint chair cause respiratory or ventilatory compromise? Acad Emerg Med 2009; 16(4):S137.

116. Castillo E, Vilke G, Killeen J, Guss D, Marshall J, Chan T. Impact of mandated nurse-patient ratios on ED medication delivery. Acad Emerg Med 2009; 16(4):S157-S158.

117. Castillo E, Vilke G, Killeen J, Guss D, Feinberg R, Freidman L, Chan T. Factors associated with community clinic follow-up from an ED internet-based referral system. Acad Emerg Med 2009; 16(4):S247-S248.

118. Marmon J, Castillo E, Vilke G, Killeen J, Chan T. The effect of admitting team resident turnover on emergency department patient flow. Acad Emerg Med 2009; 16(4):S257-S258.

119. Chan TC, Killeen JP, Castillo EM, Lee J. San Diego Safety New Health Information Exchange. Ann Emerg Med 2011;58(4) S390.

120. Chan TC, Killeen JP, Rafie S, Humber DM, Chan TC. Emergency Department Care Provider Perception of Department-Based Pharmacist Services. Ann Emerg Med 2011;58(4) S443.

121. Savaser DJ, Campbell CC, Chan TC, Shah V, Sloane CS, Hansen AV, Castillo EM, Vilke GM. The Effect of Prone Maximal Restraint (PMR, aka "Hog-Tie") Position on Cardiac Output and Other Hemodynamic Measurements. Acad Emer Med 2012;19(4):S78.

122. Castillo EM, Vilke GM, Killeen JP, Brennan JJ, Chan TC. Visit Urgency Between Frequent Emergency Department Users In A Large Metropolitan Region Network. Acad Emer Med 2012;19(4):S96.

123. Killeen JP, Castillo EM, Chan TC, Vilke GM. Emergency Department Patients on Warfarin - How Often Is the Visit Due to the Medication? Acad Emer Med 2012;19(4):S121.

124. Killeen JP, Chan TC, Vilke GM, Rafie S, Dunlay R, Castillo EM. Does Pharmacist Review of Medication Orders Delay Medication Administration in the Emergency Department? Acad Emer Med 2012;19(4):S166.

125. Killeen JP, Vilke GM, Chan TC, Oyama L, Carey M, Castillo EM. Does the Residency Selection Cycle Impact What Information Is Accessed on the Web? Acad Emer Med 2012;19(4):S202.

126. Castillo EM, Chan TC, Brennan JJ, Killeen JP, Vilke GM. Multiple Hospital Emergency Department Visits Among "Frequent Flyer" Patients With A Pain Associated-discharge Diagnosis. Acad Emer Med 2012;19(4):S321.

127. Killeen JP, Vilke GM, Dunford JV, Fisher R, Pringle J, Castillo EM, Chan TC: Impact of 12-lead ECG Wireless Transmission on Hospital STEMI Activations. Ann Emer Med 2012;60(4)S25.

128. Castillo EM, Brennan JJ, Chan TC, Killeen JP, Vilke GM: Factors Associated With Frequent Users of Emergency Department Resources. Ann Emer Med 2012;60(4)S32.

129. Vilke GM, Brennan JJ, Castillo EM, Killeen JP, Chan TC: Multiple Hospital Emergency Department Visits Among Frequent Users With a Pain-Associated Discharge Diagnosis. Ann Emer Med 2012;60(4)S54.

130. Castillo EM, Chan TC, Killeen JP, Vilke GM: Knowledge of Acute Myocardial Infarction Symptoms: Do Sex Differences Still Exist? Ann Emer Med 2012;60(4)S83.

131. Chan TC, Castillo EM, Dunford JV, Fisher R, Jensen AM, Vilke GM, Killeen JP:  Hot Spots and Frequent Fliers: Identifying High Users of Emergency Medical Services. Ann Emer Med 2012;60(4) S83-S84.

132. Brennan JJ, Chan TC, Vilke GM, Killeen JP, Castillo EM: Identification of Frequent Users of Hospital Emergency Department Resources Using a Community-wide Approach. Ann Emer Med 2012;60(4)S102

133. Chan TC, Killeen JP, Brennan JJ, Vilke GM, Castillo EM: The Forgotten Emergency Department Visit When Assessing Hospital Readmissions. Ann Emer Med 2012;60(4)S105.

134. Brennan JJ, Chan TC, Killeen JP, Castillo EM, Vilke GM: Multiple Hospital Emergency Department Visits Among "Frequent Flyer" Patients With a Psychiatric-Associated Discharge Diagnosis. Ann Emer Med 2012;60(4) S146-S147.

135. Sloane C, Chan TC, Vilke GM, Castillo EM, Kolkhorst F, Neuman T: The Ventilatory Effects of the Prone Maximal Restraint Position on Obese Human Subjects. Acad Emer Med 2013;20(5):S105.

136. Hogen R, Brennan JJ, Vilke GM, Chan TC, Castillo EM: Visit Urgency amongst the Chronic Disease Population in a Large Metropolitan Region Emergency Department Network. Acad Emer Med 2013;20(5):S172.

137. Castillo EM, Chan TC, Vilke GM, Killeen JP, Brennan JJ: Factors Associated with Super Users of Emergency Department Resources Admitted to Acute Care. Acad Emer Med 2013;20(5):S183.

138. Brennan JJ, Chan TC, Vilke GM, Castillo EM, Killeen JP: Comorbidity among Frequent Emergency Department Users with Psychiatric Associated Discharge Diagnoses. Acad Emer Med 2013;20(5):S229.

139.   Brennan JJ, Castillo EM, Vilke GM, Killeen JP, Chan TC: Factors Associated with Frequent Users of California Emergency Department Resources. Acad Emer Med 2013;20(5):S230.

140.   Chan TC, Brennan JJ, Killeen JP, Stevenson ME, Kuntz KE: Impact of Social Services Case Management on Homeless, Frequent Users of Emergency Departments. Acad Emer Med 2013;20(5):S231.

141.   Brennan JJ, Chan TC, Hsia RY, Vilke GM, Killeen JP, Castillo EM: Predicting Frequent Use of Emergency Department Resources. Ann Emer Med 2014; 64(4):S118-S119.

142.   Brennan JJ, Chan TC, Vilke GM, Hsia RY, Killeen JP, Castillo EM. Traveling Super Users of California Emergency Departments. Acad Emerg Med 2014; 21(Supp 1):S220

143.   Castillo EM, Dang AQ, Chan TC, Vilke GM: Mortality and Timing of Death in Patients with Runaway Pacemakers. Ann Emer Med 2014; 64(4):S111.

144.   Castillo EM, Brennan JJ, Killeen JP, Chan TC. Identifying frequent users of emergency department resources. J Emerg Med. 2014 Sep;47(3):343-7.

145.   Castillo, EM, Brennan JJ, Hsia RY, Killeen JP, Vilke, GM, Chan TC. Thirty-day Readmissions Through the Emergency Department in a Large, Metropolitan Region. Acad Emerg Med 2014; 21(Supp 1):S108.

146.   Castillo EM, Chan TC, Hsia RY, Killeen JP, Vilke GM, Brennan JJ. Should Rural Hospitals be Concerned about Frequent Users of Emergency Department Resources? Acad Emerg Med 2014; 21(Supp 1):S218.

147.   Castillo EM, Brennan JJ, Hsia RY, Killeen JP, Vilke GM, Chan TC. Multiple Emergency Department Use and 30-day ED Visits. Acad Emerg Med 2014; 21(Supp 1):S322.

148.   Chan TC, Killeen JP, Vilke GM, Castillo EM: Impact of the Affordable Care Act on the Health Care Coverage of Patients Seen in the Emergency Department: Initial First Quarter Findings. Ann Emer Med 2014; 64(4):S84-S85.

149.   Killeen JP, Castillo EM, Brennan JJ, Vilke GM, Chan TC. Does Emergency Department Interrogation Reduce ED Time for Patients with Pacemakers or ICDs? Acad Emerg Med 2014; 21(Supp 1):S274.

150.   Vilke GM, Chan TC, Roberts EE, Moore JD, Parra KM, Castillo EM. Does Law Enforcement Use Different Levels of Force if the Subject Appears to be Mentally Impaired? Acad Emerg Med 2014; 21(Supp 1): S238.

151.  Vilke GM, Lasoff D, Chan TC, Hall CA, Bozeman WP, Castillo EM. Proning: Outcomes of Use of Force Followed with Prone Restraint. Acad Emerg Med 2014; 21(Supp 1): S161

152.  Vilke GM, Lev R, Chan TC, Lucas J, Smith J, Painter NA, Castillo EM: Prescription Drug Prescribing Patterns in a Large Regional Area. Ann Emer Med 2014; 64(4):S139-S140.

153.  Brennan JJ, Vilke GM, Hsia RY, Chan TC, Killeen JP, Huang J, Castillo EM. Transient Ischemic Attack "Bouncebacks": Emergency Department Discharges Who Return as Admissions Within Seven Days. *Ann Emerg Med* 2015; 66(4s):S112.

154.  Brennan JJ, Chan TC, Vilke GM, Killeen JP, Hsia RY, Tehaney K, Castillo EM. Admissions Within Seven Days of an Emergency Department Discharge. *Ann Emerg Med* 2015; 66(4s):S89.

155.  Brennan JJ, Tomaszewski C, Chan TC, Hsia RY, Castillo EM. Seven and Thirty-day Hospital Admissions following an Emergency Department Discharge. *Acad Emerg Med* 2015; 22(Supp 1): S146.

156.  Castillo EM, Chan, TC, Vilke GM, Hsia RY, Ishimine P, Shah S, Kapoor K, Brennan JJ. A Description of Pediatric Frequent Users of Emergency Department Resources. *Ann Emerg Med* 2015; 66(4s):S8

157.  Killeen JP, Chan TC, Castillo EM, Grisworld WG. Integrating Environmental Data into a Personal Health Record for Asthma Patients. *Ann Emerg Med* 2015; 66(4s):S101.

158.  Brennan JJ, Vilke GM, Chan TC, Killeen JP, Hsia RY, Castillo EM. ED Revisits Within 3 Days of an ED Discharge Among Elderly Patients. Acad Emerg Med 2016; 23:S169.

159.  Castillo EM, Brennan JJ, Chan TC, Killeen JP, Hsia RY, Vilke GM. ED Utilization 3-Days Prior to a Fall-Related ED Visit Among Elderly Patients. Acad Emerg Med 2016; 23:S139.

160.  Chan TC, Brennan JJ, Vilke GM, Hsia RY, Killeen JP, Castillo EM. The Changing Landscape of Emergency Department Visits in California. Acad Emerg Med 2016; 23:S15

161.  Killeen JP, Castillo EM, Vilke GM, Chan TC, Dunford JK, Kahn C, Powell R, Sparks J, Pringle J, Chavez DJ, Branning MD. Prehospital to Emergency Department Data Exchange- a SAFR Transition of Care. *Ann Emerg Med* 2017; 70(4): S2

162.  Sloane C, Mash DC, Chan TC, Kolkhorst F, Neuman T, Castillo EM, Vilke GM. Assessment of Stress Markers in Restrained Individuals Following Physical Stress with and Without a Sham TASER Activation. *Ann Emerg Med* 2017; 70(4): S41.

Curriculum Vitae
Theodore C. Chan, M.D., FACEP

163.   Brennan JJ, Chan TC, Vilke GM, Killeen JK, Hsia RY, Castillo EM. ED Revisits
       within 3 Days of an ED Discharge for Urinary Tract Infection among Geriatric
       Patients. *Ann Emerg Med* 2017; 70(4): S85.

164.   Kreshak, Tolia VT, Chan TC, Killeen JP, Vilke GM, Castillo EM. A Four-Year
       Descriptive Analysis of Geriatric Patients' Visits to the Emergency Department. *Ann
       Emerg Med* 2017; 70(4): S97.

165.   Tolia VT, Chan TC, Killeen JP, Vilke GM, Kreshak AA, Castillo EM. Evaluation of
       Mobility and Fall Risk among Seniors Presenting to the Emergency
       Department. *Ann Emerg Med* 2017; 70(4): S102.

166.   Tolia VT, Chan TC, Killeen JP, Vilke GM, Kreshak AA, Castillo EM. Identification of
       Unrecognized Delirium in Senior Emergency Department Patients. *Ann Emerg
       Med* 2017; 70(4): S105.

167.   Brennan JJ, Chan TC, Vilke GM, Hsia RY, Killeen JK, Castillo EM.Geriatric visits to
       California Emergency Department from 2008 through 2014. *Ann Emerg Med* 2017;
       70(4): S158-S159.

168.   Glober NK, Tainter CR, Brennan J, Darocki M, Klingfus M, Derksen B, Choi M,
       Rudolf F, Castillo E, Chan T. D-dimer Assay-Guided Moderation of Adjusted Risk
       (DAGMAR) Score: Improving the Specificity of the D-dimer for Pulmonary Embolism
       in the Emergency Department. *Ann Emerg Med* 2017; 70(4): S161.

169.   Vilke GM, Brennan JJ, Chan TC, Hsia RY, Killeen JP, Castillo EM. Emergency
       Department Utilization Three Days Prior to a Septicemia Diagnosis among Geriatric
       Patients. *Acad Emerg Med* 2018;70(4):S45.

170.   Castillo EM, Kreshak AA, Tolia VM, Brennan JJ, Chan TC. Throughput Before and
       After a Geriatric Emergency Department Implementation. *Acad Emerg Med*
       2018;70(4):S64.

171.   Tolia VM, Kreshak AA, Brennan JJ, Castillo EM, Trumm NA, Chan TC. Emergency
       Department Vaccination of an at-Risk Population during a Severe Hepatitis A
       Outbreak. *Acad Emerg Med* 2018;70(4):S66-67.

172.   Derksen B, Glober N, Darocki M, Klingfus M, Choi M, Brennan JJ, Chan TC, Tolia
       VM. Is the Highly Sensitive HemosIL D-Dimer a Valuable Screening Tool to Rule
       Out Aortic Dissection? *Acad Emerg Med* 2018;70(4):S197-S198.

173.   Kreshak AA, Tolia VM, Brennan JJ, Castillo EM, Chan TC. Emergency Department
       Patients Seen During a Severe Hepatitis A Epidemic Outbreak. *Acad Emerg Med*
       2018;70(4):S243.

174.   Kreshak AA, Tolia VM, Chan TC, Killeen JP, Castillo EM. Insurance Coverage and
       Cost of Patients Enrolled in an Acute Care at Home Pilot Project for ED Patients.
       *Ann Emerg Med* 2018; 72(4):S27.

Curriculum Vitae
Theodore C. Chan, M.D., FACEP

175. Kreshak AA, Tolia VM, Chan TC, Brennan JJ, Castillo EM. ED Admissions among
Geriatric Medicare Patients Before and After Initiation of a Medicare ACO. *Ann
Emerg Med* 2018; 72(4):S64.

176. Tolia VM, Kreshak AA, Chan TC, Brenna JJ, Vilke GM, Castillo EM. Initial Risk
Screening and Impact of Evaluation for Geriatric Emergency Department Patients.
*Ann Emerg Med* 2018; 72(4):S83.

177. Shi E, Kreshak AA, Chan TC, Wardi G, Castillo EM, Tolia VT. Impact of specialized
geriatric care coordination within a senior emergency care unit. *Ann Emerg Med*
2018; 72(4):S96.

178. Kreshak AA, Tolia VM, Chan TC, Powell RA, Brenna JJ, Killeen JP, Castillo EM.
The Effect of an Electronic Decision Support Tool on Emergency Department
Prescribing of Naloxone. *Ann Emerg Med* 2018; 72(4):143.

179. Castillo, E, Brennan, JJ,  Hsia RY, Vilke GM, Killeen, JP, Chan TC. Trends in
Emergency Department Discharges From 2008 Through 2016. Acad Emerg Med
2019; 26(S1):S152.

180. Castillo, EM, Tolia, VM, Kreshak, AA, BRennan, JJ, Chan TC, Vilke, GM, Hsia, RY.
A Description of Geriatric Patients Presenting to California Emergency Departments
for a Fall-Related Complaint. Acad Emerg Med 2019;26(S1):S90.

181. Tolia, VM, Chan TC, Brennan, JJ, Castillo, EM, Vilke, GM, Wardi G, Kreshak, AA.
The Impact of a Short Hospital Worker Strike on Emergency Department Utilization.
Acad Emerg Med 2019;26(S1):S236.

182. Kreshak, AA, Chan TC, Friedman LS, Castillo, EM. Emergency Department Revisit
and Readmission Rates Among a Medicare Accountable Care Organizations
Population. Acad Emerg Med 2019;26(S1):S258.

183. Killeen, JP, Docter, TA, Brennan, JJ, Castillo, EM, Vilke, GM, Chan TC, Tolia, VM.
Comparison of Length of Stay for Patients with High Sensitivity Troponin vs
Standard Troponin. Acad Emerg Med 2019;26(S1):S152.

184. Tolia VM, Castillo EM, Kreshak AA, Brennan JJ, Killeen JP, Crisman T, Chan TC:
Impact of an emergency nurse geriatric specialist on care referrals for seniors seen
in the emergency department. Ann Emerg Med 2019;74(4S):s67.

185. Killeen J, Docter TA, Ko K, Lesser A, Cronin AO, Castillo EM, Chan TC: STAR
project – impact of urgent visits for seniors using telehealth at assisted living
residencies. Acad Emerg Med 2020;27(S1):s91-2.

186. Castillo EM, Tolia V, Chan TC, Vilke GM, Kreshak A, Brennan JJ: Impact of an
emergency nurse geriatric specialist on admissions and emergency department
revisits. Acad Emerg Med 2020;27(S1):s152.

187.  Kreshak A, Castillo EM, Chan TC, Killeen J: Telephone and electronic message contacts prior to an emergency department or urgent care visit. Acad Emerg Med 2020;27(S1):s175-6.

188.  Castillo EM, Vuong CL, Brennan JJ, Chan TC, Cronin AO, Vilke GM: Electric scooter-related injuries after their introduction into a large metropolitan area. Acad Emerg Med 2020;27(S1):s183.

189.  Castillo EM, Brennan JJ, Vilke GM, Chan TC: Emergency department utilization among homeless in a high-use urban area. Acad Emerg Med 2020;27(S1):s314.

190.  Kreshak AA, Guittard JA, Chan TC, Coyne CJ: Four-year reimbursement trends to a single health system from local out-of-network health plans. Ann Emerg Med 2020;76(4S):s28.

191.  Castillo EM, Brennan JJ, Hsia RY, Chan TC: Emergency department utilization before and after the affordable care act. Acad Emerg Med 2021;28(S1):s77-8.

192.  Shadyab A, Castillo EM, Brennan JJ, Chan TC, Tolia V: Ethnic disparities in COVID-19 among older adults presenting to the geriatric emergency department. Acad Emerg Med 2021;28(S1):s258-9.

193.  Dameff C, Farah J, Dotson M, Killeen J, Chan T: Impact of a hospital cyberattack on EMS arrivals at neighboring emergency departments. Ann Emerg Med 2021;78(4S):s4.

194.  Vilke G, Billberry E, Preese J, Castillo E, Brennan J, Chan T: Impact of implementation of a new weapons screening at an emergency department. Ann Emerg Med 2021;78(4S):s59.

195.  Dameff C, Brennan J, Chan T: Regional emergency department census impacts during a cyber attack. Ann Emerg Med 2021;78(S4):s66.

Curriculum Vitae
Theodore C. Chan, M.D., FACEP

## PRESENTATIONS/SPEAKING ENGAGEMENTS:

1. "Marine Envenomations" -- Emergency Medicine Toxicology Conference, UCSD Medical Center; August 1995.

2. "Child Abuse in the Emergency Department" –
   - Emergency Medicine Core Curriculum Conference, UCSD Medical Center; September 1995.
   - Noon Conference, Department of Emergency Services, San Francisco General Hospital; January 1996.

3. "Thrombolytics in Noncardiac Emergencies" -- Grand Rounds, Department of Emergency Medicine, UCSD Medical Center;  May 1996.

4. "Billing in the Emergency Department" -- Emergency Medicine Resident Orientation, UCSD Medical Center; July 1996.

5. "EMS Data Innovations - Prehospital AMA Patients" -- Shaping EMS for the 21st Century Conference, Emergency Medical Services Administrators Association of California, San Diego, California;  May 1997.

6. "Non-accidental Trauma (NAT)" -- County-wide Field Care Audit, presented by Mercy Hospital and UCSD Medical Center, San Diego, California;  May 1998.

7. "Trauma" -- UCSD National City School District Systemic Teacher Enhancement Project, National City, California;  June 1998.

8. "Prehospital Research" -- Prehospital Audit Committee, County of San Diego; September 15, 1998.

9. "Emergency Medicine Research" -- Howard Hughes Student Lecture, UC San Diego, November 3, 1998.

10. "The Impact of Oleoresin Capsicum Spray on Respiratory Function in the Sitting and Hobble Restraint Positions" --
    - San Diego Regional Public Safety Training Institute;  March 11, 1999.
    - San Diego SWAT Teams Unit;  May 12, 1999.

11. "Studies in Restraint Physiology" -- Grand Rounds, Department of Emergency Medicine, UCSD Medical Center;  July 13, 1999.

12. Results of the National Institute of Justice Study on Oleoresin Capsicum Spray, sponsored by the U.S. Department of Justice -- San Diego Regional Public Safety Training Institute; September 30, 1999.

13. "Outpatient Treatment of Deep Venous Thrombosis" -- Clinical Practice Guidelines for the Primary Care Physician, sponsored by UCSD School of Medicine, San Diego, California;  November 20, 1999.

Curriculum Vitae
Theodore C. Chan, M.D., FACEP

14. "Restraint Position and Positional Asphyxia" -- Invited presentation to the Health and Human Services Subcommittee, Grand Jury, County of San Diego;  November 1999.

15. "Management and Triage of Heart Failure Patients in the Emergency Department" -- Congestive Heart Failure Task Force Conference, UCSD Medical Center; January 26, 2000, February 9, 2000.

16. "Anatomy of a Lawsuit: The Dollars, Sense, and Strategies of Medical Malpractice Litigation" --
    - Housestaff Association, Alumni and Faculty, UCSD Medical Center; March 15, 2000.
    - Department of Medicine Noon Conference, UCSD Medical Center; March 16, 2000.

17. Findings of the National Institute of Justice Study on Oleoresin Capsicum Spray and Respiratory Function -- Nonlethal Defense IV Conference, National Defense Industrial Association, Tysons Corner, Virginia; March 22, 2000.

18. "Overview of Findings From Study on Positional Asphyxia and Pepper Spray" -- to the Liability Panel, Less-Than-Lethal Technology and Policy Assessment, National Institute of Justice, United States Department of Justice, Washington, DC;  June 20, 2000.

19. "Positional Asphyxia Review" -- 2000 PPCT Use of Force Conference, St. Louis, Missouri; July 14, 2000.

20. Keynote Address: "Myocardial Reperfusion" -- Emergency Medicine in Jackson Hole Conference, Jackson Hole, Wyoming; August 14, 2000.

21. Difficult Airway Panel (Davis D, Wolfe R, Chan T, Bramwell K) -- Emergency Medicine in Jackson Hole Conference, Jackson Hole, Wyoming; August 15, 2000.

22. "Conscious Sedation" -- Emergency Medicine in Jackson Hole Conference, Jackson Hole, Wyoming; August 17, 2000.

23. Airway Workshop (Wolfe R, Chan T, Bramwell K, Davis D) -- Emergency Medicine in Jackson Hole Conference, Jackson Hole, Wyoming; August 17, 2000.

24. "Findings of the National Institute of Justice Oleoresin Capsicum Exposure and Restraint Study" -- San Diego Special Enforcement Detail (SWAT), County of San Diego, California; October 18, 2000.

25.  "OC Spray and Positional Asphyxia: Separating Fact from Fiction" -- International Association of Chiefs of Police 107th Annual Conference, San Diego, California; November 11, 2000.

Curriculum Vitae
Theodore C. Chan, M.D., FACEP

26. "Positional Asphyxia and Oleoresin Capsicum: Results of the National Institute of Justice Study" -- Non-Lethal Chemical Agents for Trainers Conference, Carlsbad, California; November 15, 2000.

27. "Common ENT Emergencies Seen in the ED"; "Non-accidental Trauma"; "New Strategies for Acute Myocardial Perfusion"; "Procedural Analgesia and Sedation" -- Mammoth Mountain Emergency Medicine Conference, Mammoth Lakes, California; March 5-6, 2001.

28. "Emerging Infections: The Coming Plague" -- ACEP Emergency Medicine Connection, San Diego, California; March 20, 2001.

29. "Emergency Procedural Analgesia & Sedation" -- CAL/ACEP Scientific Assembly, Santa Clara, California; June 8, 2001.

30. "Clinical Aspects of Bioterrorism" -- San Diego County Health and Human Services; December 6, 2001.

31. "Awareness and Use of the California Regional Poison Center in Two Ethnically Diverse Communities in San Diego" -- San Diego Briefings of the UCSD Civic Collaborative, San Diego, California;  March 19, 2002.

32. "Bio-Terrorism: Disaster Preparedness in San Diego" -- Emergency Department Second Annual Symposium, Sharp Grossmont Hospital, San Diego, California; April 17, 2002.

33. "Emergency Management of Rhythm Disorders" -- Arrhythmic & Ischemic Emergencies: New Treatment Approaches - Dinner Symposium, Los Angeles, California; June 13, 2002.

34. Roundtable on Cultural Diversity Competency and Training -- Council of Residency Directors, ACEP Scientific Assembly, Seattle, Washington, October 7, 2002.

35. "Chemical Agent Overview" -- San Diego County Health and Human Services; January 8, 2003.

36. "Positional Asphyxia and Sudden Custody Death – Separating Fact from Fiction" -- American Society for Law Enforcement Training, Ontario, California; January 10, 2003.

37. "Reperfusion for AMI" -- Western States Winter Conference on Emergency Medicine, Park City, Utah; January 22, 2003.

38. "ENT Emergencies" -- Western States Winter Conference on Emergency Medicine, Park City, Utah; January 23, 2003.

Curriculum Vitae
Theodore C. Chan, M.D., FACEP

39.  "Bioterrorism Update: Smallpox and Smallpox Vaccination" -- San Diego County Sheriff's Department, SWAT, and Special Enforcement Detail, San Diego, California; February 10, 2003.

40.  "Academic Emergency Medicine and Research Opportunities" -- San Diego Health Information Association, San Diego, California; February 11, 2003.

41.  "Bioterrorism Update: Smallpox and Smallpox Vaccination" -- San Diego County Sheriff's Department, ASTREA Division, San Diego, California; March 14, 2003.

42.  "Positional Asphyxia" -- American Correctional Health Services Association Conference 2003, San Diego, California; September 25, 2003.

43.  "Challenging ECG cases in the ED:  Pearls and Pitfalls" -- Western States Winter Conference on Emergency Medicine, Park City, Utah; January 28, 2004.

44.  "Positional Asphyxia" -- San Diego County Sheriff's Department – Medical Division, San Diego, California; January 29, 2004.

45.  "Improving Patient Flow and Reducing ED Crowding: Findings from 10 Hospitals" -- Urgent Matters, Web-based program, World Wide Web; July 1, 2004.

46.  "After-the-Fire Grantee Summit" -- The San Diego Foundation, San Diego, California; October 21, 2004.

47.  "Wireless Internet Information System for Medical Response to Disasters – The WIISARD Project" -- San Diego Metropolitan Medical Strike Team, San Diego, California; November 17, 2004.

48.  "Urgent Matters Study (input, throughput, output) of UCSD Medical Center's Emergency Department" -- San Diego Community Emergency Departments, San Diego, California; December 2, 2004.

49.  "Best Practices of other Urgent Matters Hospitals" -- San Diego Community Emergency Departments, San Diego, California; December 2, 2004.

50.  "Emergency Room Problems in San Diego:  How Can We Improve Quality?" -- The San Diego Patient Safety Consortium Patient Safety Form, San Diego, California; December 16, 2004.

51.  "Emergency Response Management for Efficiency of Care and Fiscal Consideration" -- American Correctional Health Services Association, Oakland, California; April 2, 2005.

52.  "Promise and Pitfalls:  Emergency Department Information Systems" -- Urgent Matters Regional Conferences, Atlanta, Georgia; October 14, 2005.

Curriculum Vitae
Theodore C. Chan, M.D., FACEP

53.  "Promise and Pitfalls:  Emergency Department Information Systems" -- Urgent Matters Regional Conferences, Las Vegas, Nevada; October 28, 2005.

56.  "Wireless Internet Information System for Medical Response to Disasters" -- Metropolitan Medical Response System Quarterly Meeting, San Diego, California; January 19, 2006.

57.  "In-Custody Sudden Deaths" -- Florida Sheriffs Association One Day Symposium, Orlando, Florida; June 1, 2006.

58.  "They Didn't Need to Shoot Him: Providing Effective Alternatives to Lethal Force" Plenary Panel -- The National Institute of Justice Conference, Washington D.C.; July 18, 2006.

59.  "Use of Force:  Sudden Death Myths and Excited Delirium" - The Commission of Accreditation for Law Enforcement Agencies (CALEA) Less Lethal Technology Working Group Meeting, Washington D.C.; September 10, 2006.

60.  "Cardiac, Respiratory, and Metabolic Effects of EMD" - NIJ Steering Group Committee, US Department of Justice, Office of Justice Programs, Washington D.C.; October 30, 2006.

61.  "IT Innovation in an Academic Emergency Department" - Institute for Healthcare Improvement Meeting, San Diego, California; November 2, 2006.

62.   "Restraint Physiology: Separating Fact from Fiction" - Sudden Death, Excited Delirium and In-custody Death Conference, Las Vegas, Nevada; November 16, 2006.

63.  "Use of Force and Sudden In-Custody Death" - Minnesota Dept of Public Safety – Bureau of Criminal Apprehension, Minneapolis, Minnesota; April 30, 2007.

64.  "Chlorine Gas Exposure and Chemical Terrorism" - San Diego County Metropolitan Medical Strike Team, San Diego, California; September 19, 2007.

65.  "Power of Innovation: The Strategic Use of Technology to Improve the Patient Experience" – CEO Rounds, UCSD Medical Center, San Diego, California; September 20, 2007.

66.  "Tasers" – San Diego County EMS/ED American Medical Response Field Care Audit, San Diego, California; September 26, 2007.

67.  "ER Overcrowding;" Panelist – ER Overcrowding Summit, San Diego, California; October 2, 2007.

68.  "Restraints and Sudden Death" – Sudden Death, Excited Delirium and In-Custody Death Conference, Las Vegas, Nevada; November 28, 2007.

Curriculum Vitae
Theodore C. Chan, M.D., FACEP

69. "UCSD Emergency Medicine" – DOM Clinical Service Chief's Meeting, San Diego, California; May 20, 2008.

70. "ED Crowding and Project Impact" – UCSD Healthcare/Preuss School, San Diego, California; July 24, 2008.

71. "Restraint and Sudden Death" – California/Nevada American Correctional Health Services Association – Institute for Medical Quality, San Diego, California; September 18, 2008.

72. "UCSD Emergency Medicine and Community Outreach Efforts" – UCSD Leaders Team Meeting, San Diego, California; September 25, 2008.

73. "ED Clinic Project/Nurse Ratio Project" – San Diego's Annual Emergency Department Overcrowding Summit, San Diego, California; October 8, 2008.

74. "Excited Delirium Restraint and Sudden Death" – Sudden Death, Excited Delirium and In-Custody Death Conference, Las Vegas, Nevada; October 30, 2008.

75. "Safety Net Connect Update" – Hospital Association of San Diego and Imperial Counties, San Diego, California; November 13, 2008.

76. "Understanding Patient Demand in Emergency Department" - Institute for Operations Research and the Management Sciences (INFORMS) Annual Meeting, San Diego, California; October 14, 2009.

77. "ED-Community Clinics Collaboration" - Annual San Diego County Emergency Department Overcrowding Summit, San Diego, California; October 14, 2009.

78. "Lessons Learned - Emergency Department Crowding" - Urgent Matters Learning Network II, sponsored by the Robert Wood Johnson Foundation and Agency for Healthcare Research and Quality, Philadelphia, Pennsylvania; October 23, 2009.

79. "Restraint Chair Safety and Related Sudden In-Custody Death Asphyxia Issues: A Review of the Literature" – Institute for the Prevention of In-Custody Deaths, Inc., Las Vegas, Nevada; November 12, 2009.

80. Coordination of Care: The Patient Centered Medical Home and the Role of Community Resources at University of California Healthcare Retreat - Transforming Health Care Delivery at UC, Oakland, California; February 22, 2010.

81. "Technologic Innovations in Emergency Department Intake" - Intermountain Institute for Health Care Delivery Research, Salt Lake City, Utah; February 24, 2010.

82. "Linking Frequent ED Users with Primary Care - A successful program in San Diego" to the Inland Quality Collaborative, Riverside, CA; Aug 18, 2010.

83. "The Impact and Future of SBIRT" – Screening, Brief Intervention, Referral to Treatment Conference, San Diego, CA; Sep 9, 2010.

Curriculum Vitae
Theodore C. Chan, M.D., FACEP

84.   "Beacon Collaborative and Health Reform" – Annual San Diego Organization of Healthcare Leaders Conference, San Diego, CA; Sep 10, 2010.

85.   "San Diego Beacon Collaborative and Health IT Workforce" – HealthTECH Workforce Forum, San Diego, CA; Sep 17, 2010.

86.   "San Diego Beacon Community Collaborative Update" – Hospital Associate of San Diego and Imperial Counties 2010 Annual Membership Meeting, San Diego, CA; Nov 11, 2010.

87.   "Excited Delirium" – 5th Annual Sudden Death, Excited Delirium & In-Custody Death Conference, Las Vegas, NV; Nov 18, 2010.

88.   "Healthcare IT: BEACON Community Collaborative" – UK Digital Economy Workshop, San Diego, CA; March 17, 2011.

89.   "Health IT in an Era of Accountable Care: Update from the Beacon Communities" – Brookings Institute, Washington DC; May 17, 2011.

90.   "Emergency Room Diversion/Health Information Exchange" – Health Care Community Network Quarterly Meeting, San Diego, CA; June 15, 2011.

91.   Information Technology in Disaster Response - California Institute for Telecommunications and Information Technology - 10 year academic review, San Diego, CA; Oct 12, 2011.

92.   Information Technology in the Emergency Department San Diego Overcrowding Summit, Scripps Healthcare, San Diego, CA; Oct 27, 2011.

93.   The New Prescription: IT's role in transforming medicine. BIOCOM, San Diego, CA; December 9, 2011.

94.   Beacon Community Town Hall. Healthcare Information and Management Systems Society, Las Vegas, NV; Feb 22, 2012.

95.   San Diego Beacon e-Health Community Update; 7th annual Wireless Health Convergence Summit, San Diego, California; May 2012.

96.   "Health Information Technology and Quality: View from the Safety Net in Beacon Communities" - National Association of Public Hospitals and Health Systems Annual Conference, San Francisco, June 2012.

97.   White House Town Hall Panelist - Health Information Technology and Improving Care Quality and Patient Health. White House, Washington DC, June 19, 2012.

98.   "San Diego Beacon and EMS" - Next Generation 911, West Wireless Health Institute, San Diego, CA; June 2012.

Curriculum Vitae
Theodore C. Chan, M.D., FACEP

99. "San Diego Initiatives and Beacon Community Update" – Care Transitions Learning and Action Network – Community Action to Reduce Avoidable Readmissions – Health Services Advisory Group, Medicare Quality Improvement Organization for California, San Diego, August 6, 2012

100. "Update on Restraint Physiology Research" – IPICD Excited Delirium and Sudden, In-custody Death Conference, Las Vegas, NV; November 2012.

101. "Federal Health Reform Initiatives and Emergency Medicine in San Diego" – David Brenner Chair Search Seminar, San Diego, CA; November 30, 2012.

102. "Health Information Technology: Federal and Local Perspectives with the San Diego Beacon Community" – UCSD Health Sciences Leadership Academy, San Diego, CA; Jan 2013.

103. "Information Exchange" - Health and Social Services National Health Policy Forum, San Diego, CA; Feb 20, 2013.

104. Health Information Technology and Payment Reform.  Invited Speaker, Pew Charitable Trust, Washington DC, May 22, 2013

105. Health Information Exchange: Promise, Practice, Prospects.  Invited Participant. National Health Policy Forum, George Washington University, Washington DC, May 22, 2013.

106. Overview of Health Sciences. Invited Participant, School of Medicine Committee on Academic Personnel Panel Discussion, San Diego, CA; October 11, 2013.

107. Physiology of Restraint, at the Lega, Medical and Scientific Constraints on Human Restraint Symposium, Institute for the Prevention of In-Custody Deaths, Las Vegas NV, April 2014.

108. Community of Health – The San Diego Beacon Project and Public Health. Invited speaker. Center for Population Health, Stanford University, April 24, 2015.

109. Geriatric Emergency Room Project. Center for Healthy Aging Think Tank. UC San Diego Rady School of Management, June 21, 2015.

110. "Health and the Internet" at the People-Centered Internet Conference, Stanford University, October 24, 2015.

111. Fireside Chat: Building a Better Service Delivery System for Seniors. MedCity ENGAGE, San Diego, CA, October 19, 2016.

112. Geriatric Emergency Medicine. Gary and Mary West Foundation and Health Institute, San Diego, CA, November 10, 2016.

Curriculum Vitae
Theodore C. Chan, M.D., FACEP

113. Healthy Aging and IT. UC Health Hackathon, San Diego, CA, March 4, 2017.

114. "Redefining Health: Living Healthy Longer" – UCSD Future of Care Event, Rancho Santa Fe, CA, May 2017.

115. "Science of Restraint and Positional/Compression Asphyxia" at the Police Use of Force in Today's World, Miami, FL, June 2017.

116. "Ethical Considerations in Data Generation and Use" at the California Initiative to Advance Precision Medicine Annual Meeting, Oct 13, 2017, La Jolla CA.

117. The Opportunity is Now: Providing Excellence in Care for our Nation's Seniors. Worth Magazine's Health Summit: The New Frontier of Health.  La Jolla CA, November 5, 2017.

118. University of California, San Diego – China Air Medical Rescue Cooperation, Conference and Signing Ceremony between UC San Diego and Ruikin Hospital, Shanghai, China, December 2017.

119. "Medical Care and Disaster Response." Conference on Institutional Coordination in Disaster Management in the Asia Pacific, Institute for East Asian Studies and Berkeley APEC Study Center, University of California, Berkeley, CA, April 9, 2018.

120. "From Research to Reality: Highlighting Real-world Care Models of Excellence for Seniors".  American Geriatrics Society 2018 Annual Scientific Assembly Meeting Pre-Conference, Orlando, Florida, May 2, 2018.

121. Opening Remarks and Master of Ceremonies, Ribbon-Cutting for the Gary and Mary West Senior Emergency Care Unit, UC San Diego, La Jolla, CA, February 19, 2019.

122. State-of-the-Art Senior Emergency Care Unit, UC San Diego Health Board of Advisors, UC San Diego, La Jolla, CA, May 10, 2019.

123. Opening Remarks and Welcome, Inaugural Symposium for San Diego Women in Emergency Medicine, UC San Diego, San Diego, CA, May 24, 2019.

124. Impacts on Emergency Care, (at invitation of San Diego County Health & Human Services Agency) for California State Surgeon General Dr. Nadine Burke Harris Community Conversation, San Diego, CA, May 28, 2019.

125. Panel Chair (with Luigi Di Gregorio of Italy) on Health, Aging and Technology, at the Cilento Science 2019 conference, Cuccaro Vetera Italy, Oct 3, 2019

126. Round table participant, "Phenotypes description of health living in Cilento Internal Region with more need for health system organization within Remote Villages", at the Cilento Science 2019 conference, Cuccaro, Vetera, Italy, Oct 3, 2019.

Curriculum Vitae
Theodore C. Chan, M.D., FACEP

127. "Telemedicine and Acute Senior Care", at the "Cilento Lifestyle: A new model of preventive medicine and healthy aging – between old traditions and new advanced research", at GREAT VII Italy 2019 conference, Ascea Marina, Italy, Oct 4, 2019.

128. "Improving Emergency Department Care for Seniors" at Neurodegenerative Diseases: Updates in Research and Community Resources, La Jolla, CA, November 2019.

129. "Improving the Health and Medical Care of Seniors in the Acute Emergency Setting", Grand Rounds Seminar, Geriatrics Division, GRC presentation, October 8, 2020.

130. Panelist, Careers in the Arts & Humanities, San Diego City College PATH (Preparing Accomplished Transfers to the Humanities) program, April 15, 2021, San Diego California.

131. "Model of Excellence: UC San Diego's GED & UC System-wide Spread",  Presentation to the California Hospital Association and Department of Aging with focus on the State Master Plan for Aging.  April 15, 2021, Virtual Meeting.

132. "San Diego Seniors Community Foundation Briefing" with House of Representative Honorable Juan Vargas, December 21, 2020.

133. Update on Emergency Care, walking tour for Honorable Todd Gloria, Mayor, City of San Diego, January 19, 2021.

134. Panelist for Convening on the Epidemic of Isolation Among Older San Diegans, Catalyst, February 2, 2021.

135. "The Future of Hillcrest Medical Center" – luncheon briefing with California Senate Pro Tem Honorable Toni Atkins, April 15, 2021.

136. HealthTalks: Evolution of Emergency Medicine and Whole Patient Care.  June 29, 2021.  Zoom Webinar for University of California, San Diego Health Sciences.

Last revised, July 2021