Risa S. Christensen, Esq. (SBN: 227799)
Dennis E. Wagner, Esq. (SBN: 99190)
**WAGNER ZEMMING CHRISTENSEN, LLP**
1325 Spruce Street, Suite 200
Riverside, CA 92507
Tel.: (951) 686-4800
Fax: (951) 686-4801
rsc@wzclawfirm.com
dew@wzclawfirm.com

Attorneys for Defendants, COUNTY OF SAN BERNARDINO; HUMBERTO MIRANDA; JULIAN MATA; and JESSAQUA ATTLESEY

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

CECILIA VARGAS; ARIANA SALAS, individually and as a successor-in-interest to RUBEN ESCUDERO, deceased,

Plaintiffs,

vs.

COUNTY OF SAN BERNARDINO; H. MIRANDA; S. CARTER; Z. VOGEL, J. MATA; Z. PRITCHETT; J. JIMENEZ; A. MATA; T. KAUTZ; J. ATTLESEY; RODRIGUEZ (first initial unknown) and DOES 1-10, inclusive,

Defendants.

CASE NO: 5:20-cv-02646-JGB-KK

**DEFENDANTS' STATEMENT OF UNDISPUTED FACTS**

*[Filed concurrently w/ Notice of Motion and Motion for Summary Judgment; Declarations; and (Proposed) Order]*

**Date:** March 6, 2023
**Time:** 9:00 a.m.
**Courtroom:** 1

Hon. Jesus G. Bernal
United States District Judge

COME NOW Defendants, COUNTY OF SAN BERNARDINO; HUMBERTO MIRANDA; JULIAN MATA; and JESSAQUA ATTLESEY, and hereby file their Statement of Undisputed Facts, (per Crt. Dkt, 8, pg.6) in Support of their Motion for Summary Judgment, as follows:

| SUF NO. | FACT | SUPPORTING EVIDENCE |
|---|---|---|
| **STATEMENT OF UNDISPUTED MATERIAL BACKGROUND FACTS** | | |
| **A. The Need for Emergency Responders** | | |
| 1. | On the morning of October 19, 2019, Plaintiffs' decedent Ruben Escudero became unresponsive after suffering a suspected drug overdose at the residence of an acquaintance. | **Ex. 22**, David Crummel depo. at 14:8 to 15:8 [1] (*Hernandez is referred to as "Dee" or sometimes his sister*) & 30:21 to 31:10; & 33:1-3; & 37:12 to 38:24; and **Ex. 23**, Dorothy "Dee" Hernandez depo. at 42:4 to 43:13.[2] |
| 2. | Escudero's associates, (who knew him only as "Ruben") tried waking him up; put ice under his scrotum; tapped him on the face and considered putting him in the shower before finally calling 911. / / / | **Ex. 22**, Crummel depo. at 38:10-24; & 44:20 to 45:1; **Ex. 9**, Crummel statement to Kautz at 25:1-12;[3] and **Ex. 23**, Dorothy "Dee" Hernandez depo. at 45:21 to 46:10; and 46:9-19. |

---

[1] The authentication and foundation for Ex. 22, Depo. of Crummel is shown in the Decl. of Risa Christensen, (Exhibit O), at ¶1.

[2] The authentication and foundation for Ex. 23, Hernandez is shown in the Decl. of Risa Christensen, (Exhibit O) at ¶2.

[3] The authentication and foundation for Crummel's statement to Kautz, is shown in Exhibit D, Kautz' declaration, at ¶¶1-3.

| | | |
|---|---|---|
| 3. | First responders were dispatched: the three defendant deputies from the Sheriff's Department; three City of Victorville Fire Depart. responders, and two American Medical Response (AMR) responders.<br>/ / /<br>/ / /<br>/ / / | **Ex. F**, Decl. Miranda at ¶¶3, 7. **Ex. 25**, Gabler depo. at 5:22-25[4] (*foundation*), & 8:15-20, & 9:6-16; **Ex. 3**, Washington's Statement to Moreno/Ogaz (transcript) at 1:23 to 2:13 (*re the nature of the call for service being an overdose*)[5]; and **Ex. 24**, Washington's depo. at 11:17-24, and 12:8 to 13:7 [6][7] |

**B The Deputies' Entry and Initial Contacts**

---

[4] The authentication and foundation for Gabler's deposition is shown in Exhibit O, the Decl. of Christensen, ¶4.

[5] The authentication and foundation for Washington's evidence re his statement to Moreno/Ogaz as used to cite to Exhibit 3, is shown in Exhibit 3, at 1:6 to 2:13. Moreno authenticates the transcript in Exhibit B, ¶2.

[6] Authentication and foundation for Captain Washington's deposition (Ex. 24) is shown in Exhibit "O" the Declaration of Risa Christensen, ¶3. Foundation for Washington's testimony is shown at Ex. 24 Washington's depo. at 5:9-16; & 10:16-21.

[7] Detective Moreno conducted interviews of City of Victorville Fire Department witnesses, Brett Lever (Ex. 2); Captain Dyjuan Washington (Ex. 3);, and interviews of AMR witnesses Alex Gabler (with Det. Steers)(Exs. 5 & 6), and Karla Lugo (Ex. 4). Moreno sets forth the authentication for the recordings and transcripts of these interviews in his Declaration, which is Exhibit B, at ¶1 for Lever's interview evidence; ¶ 2 for Captain Washington's statement evidence; ¶3 for Lugo's statement evidence; and ¶¶ 4-5, for Gabler's statement evidence. Moreno sets forth foundation for his presentation of this evidence in the opening paragraph, and throughout the declaration.

| | | |
|---|---|---|
| 4. | At approx. 09:10 a.m., deputies Julian Mata and Humberto Miranda were the first to arrive and Hernandez directed to Escudero's location in the back room. | **Ex. F**, Decl. Miranda; see also **Ex. 15**, Miranda's belt recording transcript at 1:14 to 2:13 (*the audio itself is on Exhibit 1(n) thumb-drive submitted with Request to Lodge Non-Paper Exhibit*)[8] |
| 5. | The deputies found Ruben (whom Hernandez said he had taken "pills or heroin or something") in the bedroom unresponsive and unsuccessfully tried to wake him up. | **Ex. 15**, Miranda's Belt Recording transcript, at 2:15 to 5:2.[9] |
| 6. | The deputies moved Escudero first to the kitchen so that the medical responders would have more room to treat him. /// | **Ex. 24**, Washington's depo. at 15:5-16; **Ex. 3**, Washington's statement (transcript) to Moreno/Ogaz, at 11:23 to 12:24 (*deputies moved him with care*)(the actual audio is Ex. 1(b); and |

[8] The Belt Recording Transcript and some other documents contain a Bate Stamped number in the lower right corner, however when referencing an exhibit by a page number, the Bate Stamped number is not used unless it is the only page number shown on the document.

[9] Miranda authenticates his belt recording & its transcript in Exhibit F, at ¶¶1-2.

| | | |
|---|---|---|
| | | **Ex. 15**, Belt Recording transcript at 5:3-16).[10] |
| **C. Medical Responders Arrive and Initiate Medical Response** | | |
| 7. | The Fire Department responders, Captain Washington, paramedic Brett Lever and engineer Martin Alcon, arrived minutes later and wanted Escudero moved to the living room so the deputies moved him to the living room where the medical responders would have more room to treat him. | **Ex. 24**, Washington's depo. at 15:5-16;<br>**Ex. I**, Decl. Brett Lever at ¶1;<br>**Ex. 15**, Belt Recording transcript at 5:11-23;<br>**Ex. 7**, Alcon's statement transcript to Craig/Sousa (transcript), at 16:23 to 17:13 (*the kitchen was too small to render aid*);[11] and<br>**Ex. 3**, Washington's Statement (transcript) to Moreno/Ogaz at 1:23 to 2:13. |
| 8. | The deputies stood back while the medical responders initiated | **Ex. F**, Decl. Miranda at ¶5<br>**Ex. 5**, Gabler's statement (transcript) |

[10] The transcripts are referenced as evidence in the SUFs, but each transcript has a concomitant audio recording (*for which there are time references in the transcript*) and these recordings are made available to the court on Thumb-drive (Notice of Lodging Non-paper Exhibit) Exhibit "1." For example, the belt recording transcript (Ex. 15) is cited often, and the audio for that transcript is Ex. 1(n). Each recording is authenticated in the individual's declaration as set forth in the Declaration of Dennis E. Wagner, who authenticated the thumb-drive, ¶,1, and the table/index of the recordings.

[11] The foundation for the statement evidence of Martin Alcon (Ex. 7) is given in Exhibit C, the Decl. of N. Craig, who conducted the interview. See Exhibit C, at ¶¶5-6. The foundation for witness Alcon's statement is shown in Ex. 7, at 1:16-21, & 3:3-10, & 7:7-17.

| | | |
|---|---|---|
| | medical aid to Escudero. | to Moreno/Steers, at 58:15 to 60:1; **Ex. 25**, Gabler depo. at 49:23-25 (*when he first arrived the fire dept. was rendering aid to Escudero*); and **Ex. 24**, Washington's depo. at 16:21 to 17:24. |
| 9. | The fire department paramedic and engineer immediately began assessing Escudero who was breathing, but completely unconscious. | **Ex. I**, Decl. Lever at ¶¶ 2-3; **Ex. 24**, Washington's depo. at 16:21 to 17:24; and **Ex. 15**, Belt Rec. transcript at 5:11 to 10:16. |
| 10. | The fire paramedic Brett Lever (hereinafter "Lever") administered Narcan to counter the effects of heroin. | **Ex. I**, Decl. Lever at ¶2; and **Ex. 15**, Belt Recording transcript at 6:17 to 7:13. |
| 11. | Escudero was not breathing sufficiently to sustain life, so the medical responders began using a device to get enough oxygen to him and monitor him. | **Ex. I**, Decl. Brett Lever at ¶¶2-3; [12] **Ex. 15**, Belt Rec. transcript at 7:14 to 10:4; and **Ex. Q**, Decl. Dr. Vilke, at ¶¶2-4.[13] |
| 12. | The AMR responders, paramedic Alex Gabler, and EMT Karla Lugo, arrived and were given a | **Ex. 25**, Gabler depo. at 12:19 to 13:1; and 13:20-24; and 14:16 to 15:9; and |

[12] The foundation for Brett Lever's declaration testimony is given at ¶1 of his declaration, which is Exhibit I.

[13] The foundation for Dr. Vilke's declaration testimony is shown in Exhibit Q, in the opening paragraph and paragraphs 1-2, and subsets.

| | | |
|---|---|---|
| | run down by paramedic Lever (hereinafter "Lever"). | **Ex. 15**, Belt Recording transcript at 8:2 to 9:12. |
| 13. | Medical responders found Escudero's SpO2 was dangerously low at 40 and still dropping, and his blood pressure was at 169/108, so they started to move him to the carrying tarp to take him to the gurney which was just outside the door. | **Ex. I**, Lever decl. at ¶3 (*re vital signs*); **Ex. 25**, Gabler depo. at 22:11-19; **Ex. 24**, Washington's depo. at 17:7-19; and **Ex. 5**, Gabler to Moreno/Steers (transcript) at 12:7 to 13:20.[14] |
| 14. | Captain Washington stood in the threshold between the kitchen and living room where he could observe the scene in the living room while also keeping an eye on Crummel and Hernandez who were in the kitchen. | **Ex. 24**, Washington's depo. at 17:7 to 19:8. |
| 15. | Deputy Attlesey arrived about six minutes after Deputy Mata and Miranda, at around 09:16 a.m. and stood near the door near the AMR's EMT Karla Lugo. | **Ex. 15**, Miranda belt recording transcript (and at belt recording at 9:17-21, *for time of her arrival*); and **Ex. 5**, Gabler statement to Moreno/Steers, (transcript) at 60:3-18; and **Ex. 25**, Gabler depo., at 19:24 to |

[14] Foundation for Gabler's Statement to Moreno & Steers as cited to Exhibit 5, is shown in Exhibit 5, at 1:2-19, and at 2:6-9, and incorporated into Ex. 6 as well.

| | | |
|---|---|---|
| | | 20:1. |
| **D. Escudero's Violent Response to Medical Assistance** | | |
| 16. | About two minutes after the Narcan was administered, as the responders started to move Escudero, he woke up and started to get up. | **Ex. 15**, Miranda Belt Rec. transcript at 6:19 to 10:18 (*for times of events*) **Ex. 1(n)**, belt recording audio at 3:35 min. to 6:55 min[15].; and **Ex. I**, Decl. Lever at ¶ 4; **Ex. 5**, Gabler's statement to Moreno/Steers, (transcript) at 12:7 to 13:25. |
| 17. | The medical responders wanted to keep Ruben on the ground and began giving him commands to stay down and/or lie down. | **Ex. 15**, Miranda Belt Recording Transcript at 10:18 to 11:14 (*and at Ex. 1(n) belt recording at 6:55 to 7:19 min.*); and **Ex 5**, Gabler's statement to Moreno/Steers (transcript) at 14:22 to 16:9; & at 74:16 to 77:4 (*re: efforts to, and need to keep him on the ground*). |
| 18. | The deputies also gave commands to Ruben to stay down. | **Ex. 15**, Miranda Belt Rec. transcript at 11:1-24; and **Ex. 25**, Gabler depo. at 20:2 to 21:5. |
| 19. | Escudero took a couple swings at the medical responders who were treating him. | **Ex. 3**, Washington's statement (transcript) to Moreno/Ogaz, at 1:23 to 3:12; and |

[15] Authentication and Foundation for Miranda's Belt Recording (Ex. 1(n)) and the transcript, (Ex. 15) is given in Exhibit F, Decl. Miranda at ¶2.

| | | |
|---|---|---|
| | | **Ex. 24**, Washington's depo. at 23:13 to 24:7. |
| 20. | All of the responders tried to be reassuring to Escudero with their actions and verbal directive to stay down. | **Ex. 15**, Miranda belt recording transcript 10:18 to 11:24; (Ex. 1(n) audio at 6:55 min. to 7:30 min.) |
| 21. | Ruben then took a strong hard swing at the medical responders who were on the ground providing medical care to him. | **Ex. I**, Lever Decl. at ¶4 (*Escudero took a powerful swing at him*); and **Ex. 5**, Gabler's statement (transcript) to Moreno/Steers at 14:23 to 17:2 (*re: Escudero's initial swings at medical responders*). |
| 22. | Even after Escudero initially took a swing at the paramedics, the deputies did not strike or use force on Escudero. | **Ex. 3**, Washington's statement to Moreno/Ogaz transcript at 1:23 to 3:12, & at 25:21 to 27:13, and 30:20 to 31:9; and **Ex. 25**, Gabler's depo.at 20:2-22 |
| 23. | Escudero would not lie down or follow any commands and started swinging hard with closed fists at the deputies and anyone near him. | **Ex. 3**, Washington' statement to Moreno/Ogaz transcript at 1:23 to 3:12, & 31:26 to 33:7. |
| 24. | The medical responders moved out of the way because they were not trained how to handle a violent subject. | **Ex. 3**, Washington's statement to Moreno at 23:6-14 (*re his paramedic got out of the way to avoid getting hit*); and **Ex. 5**, Gabler's statement to Moreno/Steers transcript at 14:23 to |

| | | |
|---|---|---|
| | | 16:2; & 19:10 to 20:11; & 80:10-20; & 84:1 to 85:23; and **Ex. 2**, Lever's statement to Moreno/Ogaz, at 2:4 to 3:22, & 4:13 to 5:24 (*when Escudero became assaultive he stepped back relying on the deputies handle the situation*). [16] |
| 25. | The deputies, Mata and Miranda tried to hold Ruben down, but could not due to his size and strength and determination to get up. | **Ex. 3**, Washington's statement to Moreno/Ogaz transcript, at 1:23 to 5:2. |
| 26. | The medical responders' description of Escudero included opinions and observations that Escudero was a very large man who was very strong. | **Ex. 5**, Gabler to Moreno/Steers transcript at 53:18 to 54:11; and **Ex. 3**, Washington to Moreno/Ogaz transcript at 19:17 to 20:22. |
| 27. | Escudero's friend said Escudero was "rampaging." | **Ex. 22**, Crummel depo. at 56:20 to 57:5, & at 58:15-21. |
| 28. | Escudero continued fighting, throwing punches, and would not follow commands including | **Ex. G**, Decl. Attlesey at ¶4;[17] and Ex. 15 Miranda Belt Recording transcript at 10:18 to 12:8 (Ex. 1(n) |

---

[16] Foundation for Ex. 2, Lever's statement to Moreno & Ogaz, is given in Exhibit B, the Decl. of Geraldo Moreno, at ¶1, and foundation for his statement is shown in Ex. 2, at 1:5-10, & 2:4 to 3:22.

[17] Foundation for Attlesey's Declaration testimony is given in Ex. G, at the opening paragraph and ¶¶1-3.

| | | |
|---|---|---|
| | Attlesey's command to "Stop." | audio at 6:55 min. to 7:39 min). |
| 29. | Attlesey deployed her TASER at Escudero because he was being assaultive and not following commands. | **Ex. 5**, Gabler's statement to Moreno/Steers, (transcript) at 84:2 to 85:23; and<br>**Ex. G**, Decl. Attlesey at ¶4. |
| 30. | The initial tasering was briefly effective and Escudero fell to the ground. | **Ex. G**, Decl. Attlesey at ¶4. |
| 31. | Escudero asked what they were doing to him, but had already resumed fighting and throwing punches. | **Ex. G**, Decl. Attlesey at ¶5; and |
| 32. | Escudero resumed getting to his feet while throwing punches. | **Ex. H**, Decl. Mata at ¶8; and<br>**Ex. 4**, Lugo's statement to Moreno/Ogaz (transcript) at 31:6-17, & 31:22 to 32:3. |
| 33. | At one point Escudero landed a punch on Mata's jaw. | **Ex. H**, Decl. Mata at ¶8; and<br>**Ex 3**, Washington to Moreno/Ogaz at 33:19-23 |
| 34. | Escudero continued fighting so Mata struck Escudero in the face four times to try to stop the attack. | **Ex. H**, Decl. Mata at ¶8; [18]and<br>**Ex. 15**, Belt Rec. Transcript at 12:14 to 13:9 (audio at Ex 1(n) 7:44 min to 8:14) |
| 35. | Escudero asked why he was hit, but Escudero continued punching at the deputies even as he was | **Ex. 24**, Washington's depo. at 42:14-24; and |

[18] Foundation for Mata's declaration testimony is given in Exhibit H, at opening paragraph and ¶¶1-3

| | | |
|---|---|---|
| | asking why he was hit. | **Ex. 3**, Washington statement to Moreno/Ogaz (transcript) at 32:11 to 33:7. |
| 36. | Deputy Attlesey activated the TASER again, but it was completely ineffective. | **Ex. 15**, Miranda Belt Rec. transcript at 12:3 to 13:4); and **Ex. 5**, Gabler's statement to Moreno/Steers (transcript) at 86:17 to 89:12. |
| 37. | Attlesey tried using Miranda's TASER, but it too was completely ineffective and Escudero continued fighting and throwing punches. | **Ex. 5**, Gabler's statement to Moreno/Steers, (transcript) at 86:2 to 89:13; and **Ex. G**, Decl. Attlesey at ¶4; and **Ex. 4**, Lugo's statement to Moreno/Ogaz, (transcript) at 77:26 to 78:8. |
| 38. | Escudero got to his feet and continued swinging punches. | **Ex. 15**, Belt Recording transcript at 12:15 to 14:5 (audio at 7:44 min. to 8:37 min.); and **Ex. F**, Decl. Miranda at ¶8. |
| 39. | Miranda expanded his baton and ordered Escudero to get on the ground. | **Ex. F**, Decl. Miranda at ¶8; and **Ex. 15**, Miranda Belt Rec. transcript at 13:1-5. |
| 40. | The deputies were unable to control or contain Escudero or stop him from fighting. | **Ex. 3**, Washington's statement to Moreno/Ogaz (transcript) at 41:10 to 43:15; **Ex. 24**, Washington's depo. at 27:23 to 28:19; and |

| | | |
|---|---|---|
| | | **Ex. 4**, Lugo's statement to Moreno/Ogaz, (transcript) at 71:25 to 72:3. |
| 41. | Escudero charged at Attlesey. | **Ex. 5**, Gabler's statement to Moreno/Steers transcript, at 24:1-14; and at 88:11 to 89:27; and Ex. 3 Washington's statement to Moreno/Ogaz transcript at 43:17 to 44:25. |
| 42. | Mata tried to bring him back to the ground using a headlock. | **Ex. H**, Decl. Mata at ¶8. |
| 43. | Escudero overpowered Mata and lifted Mata on his back while moving toward Attlesey. | **Ex. G**, Decl. Attlesey at ¶5. |
| 44. | Attlesey used the taser as a direct impact weapon and struck Escudero in the head four times to try to get him to stop his assault. | **Ex. 3**, Washington's statement to Moreno/Ogaz (transcript) at 43:17 to 44:25;<br>**Ex. 5**, Gabler's statement to Moreno/Steers, (transcript) at 86:17 to 89:12;<br>**Ex. J**, Fonzi decl., ¶¶ 35-37;[19] and **Ex. 15**, Miranda Belt Rec. transcript at 14:3-10; and Ex. G, Decl. Attlesey at ¶5. |

[19] Foundation for Fonzi's declaration testimony is shown in Exhibit J, at ¶¶1-10.

| | | |
|---|---|---|
| 45. | The TASER strikes did nothing to stop Escudero from continuing to fight. | **Ex. G**, Decl. Attlesey at ¶5; and **Ex. 7**, Alcon's statement to Craig/Sousa (transcript), at 84:15-19. |
| 46. | Escudero asked about why he was being hit, while at the same time still struggling and not following commands. | **Ex. 24**, Washington's depo. at 42:14-24. |
| 47. | Escudero and Mata fell to the ground on their stomachs with Mata falling on top of Escudero. | **Ex. 3**, Washington's statement to Moreno/Ogaz (transcript) at 44:23 to 45:5; and **Ex. 5**, Gabler's statement to Moreno/Steers, (transcript) at 85:25 to 86:26. |
| 48. | Escudero continued struggling and trying to get to his feet after he and Mata had fallen to the ground. | **Ex. 25**, Gabler depo. at 60:6-21; and at 61:3-19; and **Ex 3**, Washington to Moreno/Ogaz (transcript) at 36:26 to 38:1. |
| 49. | The three deputies struggled to try contain Escudero and get him into handcuffs. | **Ex. 3**, Washington's statement to Moreno/Ogaz (transcript) at 46:26 to 47:25; and **Ex. 24**, Washington's depo. at 28:8-19; 33:11 to 34:7 & 43:14-23 (*Escudero was on his side after handcuffs put on and someone was on his feet to hold them but he was still fighting*); and at 37:1-6. |
| 50. | Throughout the struggle the deputies continued giving commands to Escudero to stop | **Ex. 1(n)**, Miranda's belt recording from 7:31 minutes to 11:03 minutes; |

| | | |
|---|---|---|
| | fighting. | and<br>**Ex. 15**, Miranda's Belt Rec. transcript, at 12:1 to 17:25. |
| 51. | Throughout the ordeal Escudero's associate, Crummel was yelling at Escudero from another room, "Ruben Stop" and "Ruben quit." | **Ex. 15**, Miranda Belt Rec. transcript at 11:20, & 13:10, & 14:14, & 15:18, & 17:18; and<br>**Ex. 22**, Crummel depo. at 74:14 to 75:25; & at 78:19-23. |
| 52. | Escudero had pinned Attlesey against the couch and leaned his body weight onto her. | **Ex. 24**, Washington's depo. at 45:13 to 46:3; and at 33:11 to 34:7. |
| 53. | The deputies could not contain Escudero to get him into handcuffs. | **Ex. 3**, Washington's statement to Moreno/Ogaz (transcript) at 57:26 to 58:20; and<br>**Ex. 24**, Washington's depo. at 43:4-6. |
| 54. | The deputies tried different positions and tried holding on to parts of Escudero's body and legs as he continued to twist around, kick, and actively resist. | **Ex. H**, Decl. Mata at ¶8. |
| 55. | Mata lay diagonally across Escudero's lower back while trying to hold him and get his arms out from under him because Escudero still resisting and struggling to get up. | **Ex. 7**, Alcon's statement to Craig/Sousa (transcript), at 35:6-23, & 37:11 to 39:24, & 40:4-24, & 43:6-21, & 44:7-21, & 64:10 to 65:17. |
| 56. | Escudero kept his hands tight under him and would not follow commands to put his hands back or give the deputies his hands. | **Ex. G**, Decl. Attlesey at ¶6. |

| | | |
|---|---|---|
| 57. | The medical responders would not be able to assist Escudero unless and until the deputies could get him contained. | **Ex. 24**, Washington's depo. at 28:5-19;<br>**Ex. 4**, Lugo statement to Moreno/Ogaz, (transcript) at 52:20-27; and<br>**Ex. 3**, Washington's statement to Moreno/Ogaz, (transcript) at 64:16 to 65:7. |
| 58. | Captain Washington placed a foot on Escudero's back at his shoulder and braced himself with his hands up against the ceiling to prevent Escudero from getting to his feet again. | **Ex. 24**, Washington's depo. at 35:24 to 36:17. |
| 59. | The fire engineer, Alcon assisted in handcuffing one of Escudero's hands. | **Ex. G**, Decl. Attlesey at ¶6;<br>**Ex. 10**, Alcon's statement to Kautz, (transcript) at 2:5-22. |
| 60. | Even in handcuffs Escudero continued struggling and trying to get up. | **Ex. 3**, Washington's statement to Moreno/Ogaz, (transcript) at 47:1-25; and<br>**Ex. 24**, Washington's depo. at 37:1-6, & 43:14-23. |
| 61. | Deputy Attlesey used Miranda's baton to leverage one of Escudero's arms out from under his chest. | **Ex. 3**, Washington's statement to Moreno/Ogaz (transcript) at 45:20 to 46:24; and Ex. 24 Washington's depo. at 33:11 to 34:7 (*Attlesey used the baton at a pressure point and leverage to get his arm out, but did not strike him with the baton*). |

| | | |
|---|---|---|
| 62. | Paramedic Gabler administered the sedatives to Escudero. | **Ex. 3**, Washington's statement to Moreno/Ogaz (transcript) at 47:20-26; and<br>**Ex. 5**, Gabler's statement to Moreno/Steers (transcript) at 24:20 to 26:14. |
| 63. | Escudero was fighting even as the paramedic was giving the sedative. | **Ex. 25**, Gabler depo. at 63:9 to 64:6 |
| 64. | Escudero continued struggling even *after* the first dose of sedative was given. | **Ex. F**, Decl. Miranda at ¶10;<br>**Ex. 3**, Washington's statement to Moreno/Ogaz, (transcript) at 46:26 to 48:4;<br>**Ex. 6**, Gabler statement to Moreno/Steers, (transcript) at 2:5-25; and<br>**Ex. G**, Decl. Attlesey at ¶¶6-7. |
| 65. | Escudero continued fighting and kicking as the deputies, and Captain Washington struggled to gain control of him, and Alcon (the fire engineer) assisted and ultimately placed a hobble restraint on his legs to prevent him from kicking or getting up. | **Ex. G**, Decl. Attlesey at ¶6. |
| 66. | The medical responders resumed control of the scene and custody of Escudero when they made the decision to sedate Escudero and administered the sedative. | **Ex. 3**, Washington's statement to Moreno/Ogaz, (transcript) at 6:10-26, & 47:20-26;<br>**Ex. 5**, Gabler's statement to Moreno/Steers (transcript) at 111:4 |

| | | |
|---|---|---|
| | | to 113:4; and **Ex. 6**, Gabler' (follow-up) statement to Moreno/Steers, (transcript) at 2:6-24. |
| 67. | Even in handcuffs, Escudero continued struggling and resisting so Gabler administered another dose of sedative because they did not feel safe around him and were not going to be able to transport Escudero to the hospital while he was fighting. | **Ex. 5**, Gabler to Moreno/Steers (transcript) at 29:13 to 31:8; & at 45:18-26; and at 102:10 to 103:8; **Ex 6**, Gabler (follow up statement) to Moreno/Steers (transcript) at 2:6-24; **Ex. 5**, Gabler's statement to Moreno/Steers at 24:20 to 26:14, & 111:4 to 113:4; **Ex. 24**, Washington's depo. at 42:25 to 43:6 (*Escudero fought the entire time until the Versed took effect*), and at 37:1-6 (*Escudero did not calm down in handcuffs, only after Versed*), & 43:14-23; and **Ex. 3**, Washington to Moreno/Ogaz (transcript) at 47:1-25 (*Re Escudero fighting hard enough to break the handcuffs so sedative necessary before transporting him*). |
| 68. | Once the second dose of sedative was given Escudero became fully sedated and was no longer fighting. | **Ex. 5**, Gabler statement to Moreno/Steers (transcript) at 29:13 to 31:8; & 45:18-26; and at 102:10 to |

| | | |
|---|---|---|
| | | 103:8;<br>**Ex. 6**, Gabler (follow up) to Moreno/Steers, at 2:6-24; and<br>**Ex. 24**, Washington's depo. at 42:25 to 43:6 (*Escudero fought the entire time until the Versed took effect*), and at 37:1-6 (*Escudero did not calm down in handcuffs, only after Versed*). |
| 69. | Once he was completely sedated, the medical responders moved Escudero to the Mega Mover to transport him to the hospital. | **Ex. I**, Lever Decl. at ¶6. |
| 70. | The paramedics assessed Escudero to have a Glasgow score of 15, indicating he was still very much alive and breathing at the time the medical responders resumed custody and care of Escudero *after* the altercation with deputies was over. | **Ex. 25**, Gabler depo. at 34:6 to 35:1, (& *Exhibit "58" to his deposition, (his AMR report, listing Escudero as "John Doe" which shows Glasgow score at the time of 09:24*), and his depo. at 44:18 to 45:5, (*authenticating and laying foundation for exhibit "58" to his deposition, his AMR report*); & 66:6-16, & 73:5-14;<br>**Ex. 24**, Washington's depo. at 28:24 to 29:23; & at 38:4-9;<br>**Ex. P.**, Decl. Dr. Ly at ¶¶ 2-8;[20] and |

[20] The foundation for Dr. Ly's declaration testimony is shown in Exhibit P, in the opening paragraph and ¶¶ 1-2, and subsets.

| | | |
|---|---|---|
| | | **Ex. Q.**, Decl. Dr. Vilke, at ¶¶2-7. |
| 71. | The altercation between the deputies and Escudero lasted no more than four minutes. | **Ex. H**, Decl. Mata at ¶13; and **Ex. 15**, Miranda Belt Rec. transcript at 11:21 to 17:20 (*which includes the deputies using only verbal prompts and trying to keep him from getting to his feet, to the time the paramedic gives the second dose of Versed.* The *first dose of Versed is given by paramedic at 14:18 to 15:3, the second dose of Versed is given at 17:21 to 18:203-25*) |
| **E. Escudero Becomes Pulseless Upon Arrival at the Hospital** | | |
| 72. | Escudero was taken to the hospital where he became pulseless upon arrival. | **Ex. 25**, Gabler depo. at 48:3-11. |
| 73. | Escudero died a few days later. The medical examiner ruled the cause of death to be Acute Methamphetamine, Heroin and Phencyclidine toxicity. Listed as significant conditions were hypertensive cardiovascular disease, multiple blunt force trauma associated with restraint maneuvers. | **Ex. 26**, Fajardo depo. at 8:1-15, & 12:22 to 13:3, & 13:8 to 14:11 & 14:17 to 16:1, & 16:2 to 17:6, & 20:2-19, & 23:6 to 24:15, & 25:21 to 26:6, & 27:6-15, 27:22 to 30:8.[21] |

[21] Authentication and foundation for Dr. Fajardo's deposition as Exhibit 26, is set forth in Exhibit "O," the Decl. of Risa Christensen, at ¶5. The foundation for his testimony is found in Ex. 26, his depo. at 4:1-15, & 5:2-20, & 6:2-6.

| | | |
|---|---|---|
| 74. | Dr. Cho Lwin did a separate autopsy on the brain and spinal cord and determined the head wounds were superficial. | **Ex. 26**, Fajardo depo. at 16:2-25, & 17:1-6, and **Ex. 27**, Dr. Cho depo. at 10:12 to 12:20, and 13:24 to 14:6, and 14:15 to 15:14, & 16:5-14, & 18:14 to 19:14, and 21:6 to 22:15, & 30:15-18.[22] |
| **NO FOURTH AMENDMENT VIOLATION** | | |
| **A. There was no Unlawful Detention and Arrest** | | |
| 75. | The deputies were on scene as back-up to the medical responders. | **Ex. F**, Decl. Miranda at ¶¶3, 12; and **Ex. 2**, Lever's statement to Moreno/Ogaz, (transcript) at 16:9-11, & 17:7-12, & 17:15-18.[23] |
| 76. | The medical responders were grateful to the deputies because they themselves were not trained on how to handle a subject like Escudero. | **Ex. 5**, Gabler's statement to Moreno/Steers (transcript) at 14:23 to 16:2; & 19:10 to 20:11; & 80:10-20; & 84:1 to 85:23. |
| 77. | Initially the deputies initially only used physical prompts and verbal commands to assist medical responders to keep Escudero on the ground while medical attention was being provided. | **Ex. 3**, Washington statement to Moreno/Ogaz (transcript) at 25:21 to 27:13, & at 29:19 to 31:9; **Ex. 5**, Gabler's statement (transcript) to Moreno/Steers at 18:4-27; and |

[22] Authentication and foundation for Dr. Cho's deposition as Exhibit 27, is set forth in Exhibit "O," the Decl. of Risa Christensen, at ¶6. The foundation for his testimony is found in Ex. 27, his depo. at 4:4-25, & 5:10-21, & 7:12-17, & 12:23 to 8:23.

[23] The foundation for Brett Lever's statement to Moreno/Ogaz as cited to Exhibit 2, is shown in Exhibit 2, at 1:4-10, and 1:23 to 2:17.

| | | |
|---|---|---|
| | | **Ex. 25**, Gabler depo. at 18:10-18, and 20:2-22, and at 54:1 to 55:6. |
| 78. | The deputies only tried to restrain Escudero only after Escudero started throwing punches at medical responders. | **Ex. 3**, Washington's statement to Moreno/Ogaz (transcript) at 31:26 to 32:14; and<br>**Ex. 25**, Gabler depo. at 20:2 to 21:23. |
| 79. | The deputies only used physical force after Escudero repeatedly and continually attempted to assault them. | **Ex. 3**, Washington's statement to Moreno/Ogaz (transcript) at 33:19-35:1; & 35:11 to 36:6, & 36:13 to 37:26;<br>**Ex. J**, Fonzi decl., ¶¶ 35-41; and<br>**Ex. 5**, Gabler's statement to Moreno/Steers (transcript) at 19:25 to 20:26, and 21:10-24; and at 81:9-15. |
| 80. | The medical responders were not going to be able to get Escudero to the hospital unless and until he was effectively under control and not fighting, which meant he had to be restrained *after* he became combative. | **Ex. 24**, Washington's depo. at 28:5-19, & 34:18 to 35:18. |
| 81. | Even after the Narcan was used to counter the effects of the heroin, Escudero remained under the influence of a lethal dose of methamphetamine and toxic level of PCP.<br>/ / / | **Ex. P**, Decl. Dr. Ly, at ¶¶ 2-8; and<br>**Ex. 5**, Gabler's statement to Moreno/Steers, (transcript) at 66:16-24, and 67:23-27. |

| | | |
|---|---|---|
| | **B. No Excessive Force** | |
| 82. | Escudero posed a serious threat of injury to the deputies and medical responders. | **Ex. 25**, Gabler's depo. at 16:8 to 17:19 & 18:18 to 19:18, & continuing at 20:2-22;<br>**Ex. J**, Fonzi decl., ¶¶ 22-26; and<br>**Ex. I**, Decl. Lever at ¶¶ 4-7. |
| 83. | The deputies were standing back while medical responders attended to Escudero. | **Ex. 5**, Gabler's statement to Moreno/Steers, (transcript) at 58:15 to 60:2;<br>**Ex. 25**, Gabler's depo. at 49:23-25; and<br>**Ex. 24**, Washington's depo. at 16:21 to 17:24. |
| 84. | Escudero was assaultive, and violent toward the medical responders first and then the deputies, prior to any use of force by the deputies. | **Ex. 3**, Washington's statement to Moreno/Ogaz, (transcript) at 14:17 to 15:26, & at 20:24 to 21:9 & at 21:14 to 22:8. |
| | **C. Verbal Commands and Physical Prompts Were Ineffective** | |
| 85. | Prior to trying to restrain Escudero, the deputies tried verbal commands and physical prompts. | **Ex. 3**, Washington's statement to Moreno/Ogaz, (transcript), at 29:19 to 31:9;<br>**Ex. 15**, Miranda Belt Rec. transcript at 10:18 to 12:15; and<br>**Ex. I**, Decl. Lever at ¶¶ 5, 6. |
| 86. | The struggle with the deputies lasted no more than four minutes with Escudero fighting, resisting, struggling, attempting to punch | **Ex. 24**, Washington's depo. at 28:8-19;<br>**Ex. H**, Decl. Mata at ¶13; |

| | | |
|---|---|---|
| | and/or kick, and assault the deputies and medical responders the entire time. | **Ex. 15**, Miranda Belt Rec. transcript at 11:21 to 17:20 (*which includes the deputies using only verbal prompts and trying to keep him from getting to his feet, to the time the paramedic gives the second dose of Versed. The first dose of Versed is given by paramedic at 14:18 to 15:3, the second dose of Versed is given at 17:21 to 18:203-25*); and **Ex. 3**, Washington's statement to Moreno/Ogaz, at 36:26 to 38:1. |
| 87. | Escudero did not follow verbal commands or physical prompts to stay down or get on the ground. | **Ex. G**, Decl. Attlesey at ¶¶ 4-6. |
| 88. | Escudero did not follow verbal commands to stop fighting. | **Ex. G**, Decl. Attlesey at ¶¶ 4-6. |
| 89. | Escudero was the one who made the first punch at medical responders before any use of force by the deputies | **Ex. 3**, Washington's statement to Moreno/Ogaz, (transcript) at 19:17 to 21:9 and 21:14 to 22:8; and **Ex. 24**, Washington's depo. at 23:13-24. |
| 90. | The deputies tried physical prompting to get Escudero to stay down and/or get back down. | **Ex. 3**, Washington's statement to Moreno/Ogaz, (transcript) at 25:21 to 27:23, & 31:26 to 32:14; & 61:25 to 63:23; **Ex. 25**, Gabler's depo. at 20:2 to 21:23; and |

| | | |
|---|---|---|
| | | **Ex. G**, Decl. Attlesey at ¶¶ 4-6. |
| 91. | Escudero was combative and actively resistive the entire time from the time he regained consciousness and was given verbal prompts to lie down until he was completely sedated. | **Ex. G**, Decl. Attlesey at ¶¶ 4-6, 10; **Ex. 13**, Gabler's statement to Pritchett, (transcript) at 1:5 to 2:7, & 3:3-11 & 3:18 to 6:11, & 6:25 to 8:3, & 8:23 to 9:14, & 10:8 to 11:12; and **Ex. 6**, Gabler to Moreno/Steers, (transcript) at 2:5-25.[24] |
| 92. | It was ***not*** the deputies' actions that caused Escudero to become unresponsive, it was a deliberate decision by medical responders to fully sedate him so they could get him to the hospital. | **Ex. G**, Decl. Attlesey at ¶¶ 4-6, 10; **Ex. 5**, Gabler's statement to Moreno/Steers, at 92:12 to 93:5, & 110:2 to 113:4; **Ex. 6**, Gabler's (follow-up) statement to Moreno/Steers, at 2:5-24; and **Ex. 3**, Washington's statement to Moreno/Ogaz, at 6:9 to 7:6. |
| **D. Attlesey's Initial Use of the Taser** | | |
| 93. | Deputy Attlesey's first TASER deployment occurred only *after* the verbal commands and physical prompts were ineffective and Escudero continued to try to assault the deputies and get to his feet.<br>/ / / | **Ex. G**, Decl. Attlesey at ¶¶ 4-6. |

[24] Foundation for the transcript and recording of Gabler's statement to Pritchett (Ex. 13), is shown in Pritchett's Decl. which is Exhibit E, at ¶2.

| | | |
|---|---|---|
| **E. Attlesey's Subsequent TASER Deployments and Activations** | | |
| 94. | Attlesey's subsequent TASER activations/deployments were done only *after* the verbal commands were ineffective and Escudero was still trying to fight the deputies. | **Ex. G**, Decl. Attlesey at ¶ 4-6. |
| 95. | Attlesey's subsequent TASER activations were completely ineffective. | **Ex. 5**, Gabler's statement to Moreno/Steers at 84:1 to 89:12; and Ex 24 Washington's depo. at 27:16-22;<br>**Ex. G**, Decl. Attlesey at ¶ 4-6. |
| **F. Attlesey's TASER Strikes** | | |
| 96. | Attlesey's use of the plastic TASER as a direct impact weapon was only *after* Mata's fist punches, and the TASER applications and the verbal commands were ineffective and Escudero continued throwing punches at the deputies. | **Ex. 24**, Washington's depo. at 27:16-22; and<br>**Ex. G**, Decl. Attlesey at ¶¶ 4-5. |
| **G. Mata's Fist Strikes** | | |
| 97. | Mata's fist strikes were done for distraction blows to try to get Escudero to stop trying to assault them and the medical responders. | **Ex. H**, Decl. Mata at ¶¶8, 14. |
| 98. | Mata's fist strikes were done *after* Escudero successfully landed a punch to Mata's jaw. | **Ex. H**, Decl. Mata at ¶8 |
| 99. | Mata's fist strikes were done only *after* the TASER and verbal commands were ineffective and | **Ex. H**, Decl. Mata at ¶ 8. |

| | | |
|---|---|---|
| | Escudero was continuing to try to assault the deputies. | |
| **H. Mata's Headlock/Chin Restraint** | | |
| 100. | Mata's attempted a headlock by putting his arm around Escudero's chin to try to get him to the ground *after* Escudero continued trying to assault the deputies. | **Ex. H**, Decl. Mata at ¶8. |
| 101. | Mata did not apply pressure around Escudero's neck, his arm was around his chin area. | **Ex. H**, Decl. Mata at ¶8. |
| 102. | Mata tried to take Escudero to the ground by putting him a headlock/chin restraint only *after* the verbal commands, the TASER, and the fist strikes proved ineffective to stop Escudero from trying to assault the deputies and medical responders. | **Ex. G**, Decl. Attlesey at ¶¶ 4, 5; and **Ex. H**, Decl. Mata at ¶8. |
| 103. | Escudero lifted Mata off the ground and moved toward Attlesey with Mata hanging onto him. | **Ex. H**, Decl. Mata ¶8. |
| **I. The Deputies' Struggled to Restrain Escudero to get him into Handcuffs and Under Control for the Medical Responders** | | |
| 104. | Escudero was big and very strong. | **Ex. 3**, Washington's statement to Moreno/Ogaz, transcript at 19:17 to 20:22, and 45:6-17 (*Escudero very strong*); and **Ex. 24**, Washington's depo. at 23:13 to 24:7; and **Ex. 22**, Crummel depo. at 83:11-19 |

| | | |
|---|---|---|
| | | (*he estimated Escudero was six foot and 250 pounds*.);<br>**Ex. 4**, Lugo's statement to Moreno/Ogaz (transcript) at 71:20-23. |
| 105. | Escudero was assaultive and resistive, and his punches were purposeful and powerful. | **Ex. I**, Decl. Lever at ¶4;<br>**Ex. 4**, Lugo's statement to Moreno/Ogaz, at 23:8-13, & 23:20-22;<br>**Ex. 24**, Washington's depo. at 23:13-24; and<br>**Ex. 5**, Gabler's statement to Moreno/Steers at 78:13 to 79:2 |
| 106. | The medical responders were not trained how to handle a violent subject such as Escudero in that situation and the deputies were needed to intervene. | **Ex. 5**, Gabler's statement to Moreno/Steers, at 17:8-18, & at 14:23 to 16:2; & 19:10 to 20:11; & 80:10-20; & 84:1 to 85:23, & 34:22-25;<br>**Ex. 24**, Washington's depo. at 40:21-23 (*he was glad the deputies were there*); and<br>**Ex. 4**, Lugo's statement to Moreno/Ogaz, (transcript), at 52:20-27. |
| 107. | Pepper spray was not a viable option because everyone would have been subjected to it.<br>/ / / | **Ex. F**, Decl. Miranda, at ¶8. |

| | | |
|---|---|---|
| 108. | Escudero was under the influence of methamphetamine and PCP while he fought with the deputies. | **Ex. P**, Decl. Dr. Ly at ¶¶2-7; and **Ex. 26**, Fajardo depo. at 8:1-15, & 12:22 to 13:3, & 13:8 to 14:11 & 14:17 to 16:1, & 16:2 to 17:6, & 20:2-19, & 23:6 to 24:15, & 25:21 to 26:6, & 27:6-15, 27:22 to 30:8. |
| 109. | The deputies did not strike Escudero with a baton. | **Ex. 24**, Washington's depo. at 36:18-25;<br>**Ex. 7**, Alcon's statement to Craig at 43:6-14; and<br>**Ex. I**, Lever Decl. ¶5. |
| 110. | The baton was used on pressure points to try to get him to stop resisting and to pry one of his arms out from under him. | **Ex. 24**, Washington's depo. at 36:18-25;<br>**Ex. 7**, Alcon's statement to Craig at 43:6-14; and<br>**Ex. I**, Lever Decl. ¶5. |
| 111. | The deputies struggled to get Escudero into handcuffs. | **Ex. 24**, Washington's depo. at 28:8-19; and 44:4-8 (*the deputies would not have been able to get Escudero into handcuffs without the assistance of the fire responders*); and<br>Ex. I Lever at ¶6. |
| 112. | Without getting him into handcuffs the medical responders were not going to be able to get him contained to take him to the hospital. | **Ex. 24**, Washington's depo. at 28:5-19;<br>**Ex. 4**, Lugo statement to Moreno/Ogaz, (transcript) at 52:20-27; and |

| | | |
|---|---|---|
| | | **Ex. 3**, Washington's statement to Moreno/Ogaz, (transcript) at 64:16 to 65:7. |
| 113. | Escudero continued fighting, kicking and struggling to get up even as the deputies tried to restrain him. | **Ex. G**, Decl. Attlesey at ¶¶ 4-7, 10; and<br>**Ex. 3**, Washington's statement to Moreno/Ogaz, (transcript) at 36:26 to 38:1. |
| 114. | The deputies tried to restrain Escudero by holding his legs and sitting next to his side and using their body weight as leverage to try to keep him down to stop him from trying to assault they and the medical responders. | **Ex. G**, Decl. Attlesey at ¶¶ 4-7, 10; and<br>**Ex. 3**, Washington's statement to Moreno/Ogaz, (transcript) at 36:26 to 38:1. |
| 115. | Escudero kept his hands under his chest as the deputies tried to get his hands out from under him to place handcuffs on him. | **Ex. G**, Decl. Attlesey ¶6; and<br>**Ex. 3**, Washington's statement to Moreno/Ogaz, (transcript) at 44:5 to 47:1. |
| 116. | The deputies could not control or contain Escudero due to his size and strength. | **Ex. 3**, Washington's statement to Moreno/Ogaz, transcript at 47:1-14, & at 19:17 to 20:22;<br>**Ex. 24**, Washington's depo. at 27:23 to 28:19;<br>**Ex. G**, Decl. Attlesey at ¶¶4-5; and<br>**Ex. 7**, Alcon's statement to Craig/Sousa at 31:10-18, & continuing at 31:23 to 32:23, & at 35:6-23, & 37:11 to 39:24, & 40:4- |

| | | |
|---|---|---|
| | | 24, & at 43:6-21, & 44:7-21, & 57:11 to 58:24. |
| 117. | Mata did not have his full body weight on the back of Escudero's lungs, he lay over Escudero diagonally and Escudero's back was exposed without weight constricting his breathing. | **Ex. 7**, Alcon's statement to Craig/Sousa, at 37:11 to 39:24 ([*Mata] was lying diagonally across Escudero's lower back, which is why Escudero's upper back was wide open and is why Captain Washington put his foot at Escudero's shoulder to keep him from rising back up*), & at 64:10 to 65:17; **Ex R,** Dr. Chan decl., ¶¶ 3-10; [25] **Ex. H**, Decl. Mata at¶¶8, 14, and **Ex. 3**, Washington's statement to Moreno/Ogaz, at 36:26 to 38:1. |
| 118. | None of the deputies placed all their body weight over Escudero's upper back, or had body weight on Escudero for more than a couple of seconds. | **Ex. 5**, Gabler's statement to Moreno/Steers (transcript) at 104:19 to 105:16; and Ex. 25 depo. Gabler at 72:1-4; **Ex. 7**, Alcon's statement to Craig/Sousa, (transcript) at 37:24 to 39:24 ([*Mata] was lying diagonally across Escudero's lower back, which is why Escudero's upper back was wide open and is why Captain* |

[25] The foundation for Dr. Chan's declaration testimony is shown in Exhibit R in the opening paragraph, and ¶¶1-2, and subsets.

| | | |
|---|---|---|
| | | *Washington put his foot at Escudero's shoulder to keep him from rising back up*); & at 64:10 to 65:17 (Escudero still moving from side to side, Mata's pressure was reasonable per the opinion of this medical responder); and **Ex. H**, Decl. Mata at¶¶8, 14. |
| 119. | Escudero tried kicking while the deputies tried to get him into handcuffs. | **Ex. F**, Decl. Miranda at ¶9; and **Ex. 15**, Miranda Belt Recording Transcript at 14:12-25. |
| 120. | The fire captain used his body weight as leverage on Escudero's shoulder to try to hold him down so he could be placed in handcuffs. | **Ex. 24**, Washington's depo. at 35:24 to 36:17; and **Ex. 3**, Washington's statement to Moreno/Ogaz, (transcript) at 44:21 to 47:1. |
| 121. | The fire engineer had to assist in getting one of Escudero's hands out so it could be placed in handcuffs. | **Ex. 7**, Alcon's statement to Craig/Sousa, transcript, at 37:11 to 38:18. |
| 122. | Escudero did not stop resisting and struggling even after the handcuffs were placed on him. | **Ex. 24**, Washington's depo. at 37:1-6, & at 43:14-23; and **Ex. 3**, Washington's statement to Moreno/Ogaz (transcript) at 46:26 to 47:26. |
| 123. | Escudero exhibited incredible strength in trying to fight and assault the deputies. / / / | **Ex. 3**, Washington's statement to Moreno/Ogaz, transcript at 47:1-14. |

| | | |
|---|---|---|
| 124. | Escudero continued fighting even as the paramedic tried to administer the sedative. | **Ex. 5**, Gabler's statement to Moreno/Steers, transcript, at 26:16-26; and 27:9 to 28:23. |
| 125. | Escudero did not stop fighting until after the full amount of sedative had been given. | **Ex. 5**, Gabler to Moreno/Steers at 29:13 to 31:8; & at 111:4 to 113:8; **Ex. 6**, Gabler (follow-up) statement to Moreno/Steers (transcript) at 2:6 to 24; and **Ex. 24**, Washington's depo. at 42:25 to 43:3 (*Escudero fought the entire time until the full amount of Versed was given and took effect*), and at 37:1-6 (Escudero did not calm down in handcuffs, only after Versed). |
| 126. | The second dose of Versed (the sedative) was given by the paramedics at their decision to do so because the paramedics did not feel safe with Escudero in the ambulance because he was still trying to fight after the first dose. | **Ex. 5**, Gabler's statement to Moreno/Steers (transcript) at 111:4:11 to 113:8; and **Ex. 6**, Gabler's follow up statement to Moreno/Steers, at 2:6-25. |
| 127. | Escudero was alive and breathing when the paramedics resumed their care of him.<br><br>/ / / | **Ex. 25**, Gabler depo. at 34:6 to 35:6; and Gabler's AMR report (showing Glasgow score of 15) that was authenticated at his deposition, at 44:18 to 45:5; and **Ex. 24**, Washington's depo. at 28:20 to 29:8. |

| | | |
|---|---|---|
| 128. | Deputy Miranda did not use any force, other than struggling to restrain and contain Escudero who was actively fighting and resisting the entire time. | **Ex.I**, decl. Lever, at ¶¶ 1-6. |
| 129. | AMR paramedic Alex Gabler testified that he gave a statement to a deputy on the day of the incident and another statement later to detectives, and his memory of the incident at his deposition (three years later) was hazy, and that his prior statements to the detectives at the Sheriff's Department on 10/24/19, and the statement he gave to the deputy at the scene on the day of the incident were more accurate than his deposition testimony. | **Ex. 25**, Depo. Gabler, at 23:24 to 24:21; & at 38:8 to 39:16, & 40:5 to 42:22; & 72:7-9 |
| 130. | Gabler's statement to detectives close in time to the incident was that Escudero became violent about 30 seconds after he woke up and started throwing punches at the medical responders and then the deputies who tried to keep him on the ground. | **Ex. 5**, Gabler's statement to Moreno at 12:7 to 13:25, and 14:23 to 18:22. |
| 131. | Gabler's prior, more accurate statement was that he did *not* see two deputies hit Escudero, he did **not** see **any** deputy strike Escudero, except Attlesey may have struck him with the TASER. | **Ex. 5**, Gabler to Moreno/Steers, at 27:18 to 28:9; and at 91:18-21. |
| 132. | Gabler's prior, more accurate statement was that he did **not** see a | **Ex. 5**, Gabler's statement to Moreno/Steers transcript at 41:3-5; |

| | | |
|---|---|---|
| | baton used as a weapon. | & 108:16-19. |
| 133. | If anything, Gabler saw the baton used as a pry tool. | **Ex. 25**, depo. Gabler at 47:8-19; & 71:19 to 72:9. |
| 134. | Gabler's prior, more accurate statement, was that when Escudero was being tased, everyone stepped back to see if it was effective. | **Ex. 5**, Gabler to Moreno/Steers at 86:17 to 90:21. |
| 135. | Gabler's prior and more accurate statement was that the deputies tried to restrain Escudero by kneeling next to him, with either one or both feet on the ground. | **Ex. 5**, Gabler to Moreno/Steers, transcript at 104:19 to 105:16, (*when on the ground*) & at 86:17 to 89:12 (*stepped back during tasering*), & 42:23-27 (*Escudero still fighting, trying to hit deputies after tasering*) |
| 136. | To the extent plaintiffs introduce evidence that Attelsey struck Escudero with the TASER more than four times, or that deputies punched or kicked him, the uses of force are clearly heard on the belt recording and coincide with Escudero's comments about being hit. | **Ex. 15**, Miranda Belt Rec. transcript at 12:2 to 14:25 (*Escudero complains about being hit following TASER activations, Mata's four strikes, and Attlesey's TASER strikes*.) **Ex. 1(n)**, Miranda Belt Recording, at 7:31 minutes to 8:41. |
| 137. | Alcon didn't see Escudero try to punch the paramedics because Escudero's back was toward Alcon and Alcon's view was otherwise blocked. | **Ex. 7**, Alcon statement to Craig/Sousa, transcript at 27:10 to 28:7, and 31:10-18. |
| 138. | Even taking allegations as true that Attlesey kicked Escudero, or Miranda punched him or that Mata | **Ex. 3**, Washington's statement to Moreno/Ogaz, transcript at 40:14-22; |

| | | |
|---|---|---|
| | struck him more than four times, it would have been in self-defense and defense of others in response to Escudero's own continued punches and fighting and resisting. | & 42:14 to 43:7; & 61:1-8, & 61:25 to 62:11, & 62:24 to 63:23, & 64:16-23;<br>**Ex. 5**, Gabler's statement to Moreno/Steers (transcript) at 100:12-25;<br>**Ex. 4**, Lugo's statement to Moreno/Ogaz, at 72:5-17[26];<br>**Ex. 24**, Washington's depo. at 40:11-13; and<br>**Ex. I**, Decl. Lever at ¶¶4-8. |
| 139. | The deputies only used the force reasonably necessary under the circumstances. | **Ex. 3**, Washington's statement to Moreno/Ogaz, transcript at 40:14-22; & 42:14 to 43:7; & 61:1-8, & 61:25 to 62:11, & 62:24 to 63:23, & 64:16-23;<br>**Ex. J**, Fonzi decl., ¶¶ 22-40; and<br>**Ex. 5**, Gabler's statement to Moreno/Steers (transcript) at 100:12-25. |
| 140. | David Crummel told Deputy Kautz he did not see anything concerning the incident between the deputies and Escudero. | **Ex. 9**, Crummel's statement to Kautz, transcript, at 26:1-22, & 27:16-19, & 28:17 to 29:23. |
| 141. | Crummel told Kautz he didn't see anything, but he heard Escudero | **Ex. 9**, Crummel's statement to Kautz, transcript, at 26:1-22, & |

[26] Foundation for Lugo's evidence transcript (Ex. 14) is given in the Declaration of Z. Pritchett (Exhibit E) at ¶3. Foundation for her statement is at 1:5-9 of Ex. 14.

| | | |
|---|---|---|
| | "Ruben" rampaging. | 27:16-19, & 28:17 to 29:23. |
| 142. | Crummel yelled at Ruben during the rampaging to "Ruben Stop" and Ruben quit." | **Ex. 15**, Miranda Belt Rec. transcript at 11:20, & 13:10, & 14:14, & 15:18, & 17:18; and<br>**Ex. 22**, Crummel depo. at 74:14 to 75:25; & at 78:19-23. |
| 143. | David Crummel contradicted his statement to Kautz by testifying he saw the deputies beat Escudero by one deputy hitting Escudero four times and a blonde deputy held a TASER near his ear. | **Ex. 22**, Crummel depo. at 21:2-4, & 12-15, & 21:22 to 22:2, and 87:22 to 88:7, & 90:13-16, & at 76:15 to 77:21. |
| 144. | Crummel only saw two deputies at the scene, an "old white guy" and a blonde lady deputy. | **Ex. 22**, Crummel depo. at 100:15 to 101:2. |
| 145. | Crummel testified that these were the only uses of force he saw: one "old white guy" deputy strike Escudero with a fist and the blonde deputy held a TASER by his ear. | **Ex. 22**, Crummel depo. at 76:15 to 77:21; 84:18 to 85:3; 99:19 to 100:10; and at 79:2-10 (*he did not see the TASER being used*). |
| 146. | The deputy who he claims to have seen hit Escudero he described as the "old white guy." | **Ex. 22**, Crummel's depo. at 76:19 to 77:6; 77:15-21; 96:6-10; and at 99:19 to 100:4. |
| 147. | There were no "old white guy" deputy at the scene, both Miranda and Mata are young Hispanic males and Attlesey is a young blonde female. | **Ex 3**, Washington to Moreno/Ogaz, transcript, at 7:16 to 10:7 (*identifying the three deputies there as two Hispanic males, Mata and Miranda, and a female, Attlesey*);<br>**Ex. F**, Decl. Miranda at ¶ 13(*all* |

| | | |
|---|---|---|
| | | *three deputies were in their 20's, and the fire paramedic and engineer were Caucasian males*); and<br>**Ex. 7**, Alcon's statement to Craig/Sousa (transcript) at 1:16-21 (*he was born in 1961, making him around 58 years old at the time of the incident*). |
| 148. | Crummel later testified that the statements he gave to the deputy at the scene was the truth in that he did not lie about anything he told her at the scene. | **Ex. 22**, Crummel depo. at 55:20 to 56:18. |
| 149. | Crummel testified he *heard* only 4-5 strikes. | **Ex. 22**, Crummel depo. at 97:7-12. |
| 150. | Hernandez told Deputy Kautz that she did not see anything during the incident. | **Ex. 23**, Hernandez' depo. at 117:14-25; and<br>**Ex. 8**, Hernandez' statement to Kautz, at 3:17 to 4:24, & at 15:24 to 16:7, & 17:4-25, & 18:1-8.[27] |
| 151. | Hernandez's testified later that she silhouettes of deputies hitting Escudero and Escudero coming out of an overdose. | **Ex. 23**, Hernandez depo. at 70:19 to 71:6; and 65:8 to 67:14. |
| 152. | Hernandez admitted however *after* having her memory refreshed by the recording of her prior statement to Deputy Kautz, that | **Ex. 23**, Hernandez depo. at 99:1 to 100:12 |

[27] The foundation for Ex. 8, Hernandez' statement to Kautz, is given in Ex. D, Decl. of Tiffany Kautz, at ¶¶1-3.

| | | |
|---|---|---|
| | her memory of the incident at the time of her deposition was **not** as fresh as the day she gave her statement to Deputy Kautz. | |
| 153. | Hernandez testified she was trying to be truthful when she gave her statement to Deputy Kautz on the day of the incident. | **Ex. 23**, Hernandez depo. at 71:13 to 72:1. |
| 154. | Hernandez was not able to see the incident because Captain Washington was standing in the threshold blocking her view. | **Ex. 23**, Hernandez depo. at 62:6-18; & 123:1-11; & at 128:12 to 129:9; **Ex. 8**, Hernandez's statement to Kautz, at BS 4803:1-8; and **Ex. 24**, Captain Washington's depo. at 18:5 to 19:8 |
| 155. | Hernandez never saw Attlesey do anything, she didn't even see Attlesey at the scene. | **Ex. 23**, Hernandez depo. at 118:15-25 (*she only saw one woman, the brunette EMT, which would have been Lugo*) |
| 156. | The medical responders believed the deputies' actions were reasonable under the circumstances.<br><br>/ / / | **Ex. 4**, Lugo's statement to Moreno, at 72:5-17; **Ex. 24**, Washington's depo. at 40:11-13; **Ex. 3**, Washington to Moreno/Ogaz, transcript, at 61:1-8, & 63:10-23; **Ex. 5**, Gabler to Moreno/Steers at 74:21 to 77:21, & 77:27 to 79:2, & 100:12 to 101:4; and **Ex. I**, Decl. Lever at ¶¶4-8. |

| | | |
|---|---|---|
| 157. | Escudero did not become unresponsive while deputies were struggling with him, he became unresponsive because the paramedics heavily sedated him. | **Ex. I**, Decl. Lever at ¶6;<br>**Ex. 24**, Washington's depo. at 37:1-6 and 42:25 to 43:23 (*Escudero did not calm down after the handcuffs, he did not calm down until the Versed was given*);<br>**Ex. 5**, Gabler to Moreno/Steers (transcript) at 99:4 to 101:15 (*paramedics resumed medical decisions and deemed it necessary to give Escudero a sedative or they were not going to be able to transport him to the hospital*);<br>**Ex. 6**, Gabler to Moreno/Steers, follow up statement (transcript) at 2:5-25; and<br>**Ex. 3**, Washington to Moreno/Ogaz transcript at 6:10-26. |
| | **J. There was No Denial of Medical Care** | |
| 158. | Medical care was timely provided. | **Ex. 2**, Brett Lever's statement to Moreno/Ogaz at 2:4 to 3:22; and<br>**Ex. 15**, Miranda's Belt Rec. transcript at 1:14 to 10:18. |
| 159. | The medical responders arrived on scene a couple minutes after the deputies and immediately began assessing Escudero and providing medical treatment to him. | **Ex. 2**, Brett Lever's statement to Moreno/Ogaz (transcript) at 2:4 to 3:22; and<br>**Ex. 15**, Miranda's Belt Rec. |

| | | |
|---|---|---|
| | | transcript at 1:14 to 10:18. |
| 160. | Escudero's own actions interfered with the medical care, not the deputies' actions. | **Ex. 2**, Brett Lever's statement to Moreno/Ogaz (transcript) at 2:4 to 3:22, & 4:13 to 5:24;<br>**Ex. 24**, Washington's depo. at 34:18 to 35:18;<br>**Ex. 15**, Miranda's Belt Rec. transcript at 1:14 to 10:18; and<br>**Ex. I**, Decl. Lever at ¶¶1-7. |
| 161. | The medical responders could not handle Escudero or provide care to him while he was being assaultive. | **Ex. 5**, Gabler's statement to Moreno/Steers, (transcript) at 17:8-18, & at 14:23 to 16:2; & 19:10 to 20:11; & 80:10-20; & 84:1 to 85:23, & 34:22-25. |
| 162. | The medical responders were not trained how to handle the situation presented by Escudero. | **Ex. 5**, Gabler's statement to Moreno/Steers, (transcript) at 17:8-18, & at 14:23 to 16:2; & 19:10 to 20:11; & 80:10-20; & 84:1 to 85:23, & 34:22-25; and<br>**Ex. 7**, Alcon to Craig/Sousa at 57:11 to 58:22 (AMR responders stayed back during the altercation because it is not in their job description to deal with an assaultive subject). |
| 163. | After Escudero was handcuffed and hobbled with the assistance of the fire responders, the medical responders resumed responsibility | **Ex. 24**, Washington's depo. at 44:4-8; & 28:8-19, & at 34:18 to 35:18;<br>**Ex. F**, Dec. Miranda at ¶¶9-10; |

| | | |
|---|---|---|
| | for Escudero and his care. | **Ex. 5**, Gabler statement to Moreno/Steers (transcript) at 29:13 to 30:8; & 30:23 to 31:9; & 33:16 to 34:3; and<br>**Ex. 6**, Gabler's statement to Moreno/Steers (transcript) at 2:4-25. |
| **NO SUBSTANTIVE DUE PROCESS VIOLATION** | | |
| 164. | The deputies had no time to deliberate in that Escudero went from being unconscious to violent within seconds. | **Ex. 4**, Lugo's statement to Moreno at 20:8-26; 22:2 to 23:2; 23:8-13, and 23:20-22. |
| 165. | The deputies tried verbal commands, physical prompts, prior to using any force. | **Ex. 14**, Lugo statement to Pritchett, transcript, at 1:16 to 4:3; 4:24 to 6:21; 8:6 to 9:6; 9:21 to 10:1; 10:4 to 11:1; 11:7-25; and<br>**Ex. 15**, Miranda Belt Rec. transcript at 10:18 to 12:15; and<br>**Ex. 11**, Washington's statement to Kautz (transcript) at 6:9-20. |
| 166. | The deputies only used force when Escudero continued fighting and aiming to assault the deputies.<br><br>/ / / | **Ex 4**, Lugo's statement to Moreno/Ogaz, (Transcript) at 16:13-25, & 17:26 to 18:5, & 20:8-26, & 22:4 to 23:1, & 23:8-14, & 23:20-22, & 31:6-17, & 31:22 to 32:3, & 52:20-27, & 59:6-17, & 71:25 to 72:3.<br>**Ex. J**, Fonzi decl., ¶¶ 22-40. |

| | | |
|---|---|---|
| 167. | Escudero was sedated by the paramedics due to his persistent struggling and resisting. | **Ex. 5**, Gabler statement to Moreno/Steers (transcript) at 24:20-26:14; & 29:13 to 31:8; 110:18-113:9; and<br>**Ex. 6**, Gabler's statement to Moreno/Steers (transcript) at 2:4-25. |
| 168. | Escudero was alive and breathing when after the physical altercation with the deputies. | **Ex. 25**, Gabler depo. at 34:6 to 35:1, (& *Exhibit "58" to his deposition, (his AMR report, listing Escudero as "John Doe" which shows Glasgow score at the time of 09:24*), and his depo. at 44:18 to 45:5, (*authenticating and laying foundation for exhibit "58" to his deposition, his AMR report*); & 63:9-65:10; 65:16-25 to 66:1-16; & 73:1-14;<br>**Ex. Q**, Dr. Vilke decl., ¶¶ 2-7;<br>**Ex. R**, Dr. Chan decl., ¶¶ 2-10; and<br>**Ex. 24**, Washington's depo. at 28:24 to 29:23; & at 38:4-9. |
| 169. | The Deputies and responders were trying to contain Escudero so they could resume medical intervention. | **Ex. 24**, Washington's depo. at 28:5-19, & 34:18 to 35:18. |
| 170. | Deputy Miranda said he would move closer to Escudero after the Narcan in case he tried to fight, meaning struggle or push the | **Ex. F**, Decl. Miranda at ¶5; and<br>**Ex. I**, Decl. Lever, at ¶¶2, 4, and 7. |

| | | |
|---|---|---|
| | medical responders away, as is common, not that he meant they anticipated a full on fight from Escudero. | |
| 171. | Escudero was under the influence of methamphetamine and PCP. | **Ex. P**, Decl. of Dr. Ly at ¶¶ 2-8; and **Ex. 26**, Fajardo depo. at 8:1-15, & 12:22 to 13:3, & 13:8 to 14:11 & 14:17 to 16:1, & 16:2 to 17:6, & 20:2-19, & 23:6 to 24:15, & 25:21 to 26:6, & 27:6-15, 27:22 to 30:8. |
| 172. | The deputies' actions were made with the goal of protecting all of the responders and gaining control so the medical responders could continue their efforts to help Escudero. | **Ex. 24**, Washington's depo. at 25:18-25; & 26:1-8; & 26:17-25; **Ex. H**, Decl. Mata at ¶¶5-14; **Ex. F**, Decl. Miranda at ¶¶ 4-12; **Ex. G**, Decl. Attlesey, at ¶¶4-13; and **Ex. I**, Decl. Lever, at ¶¶4-7. |
| | **QUALIFIED IMMUNITY** | |
| 173. | Mata's fist strikes were used as distraction blows because Escudero continued fighting and verbal commands, and lesser force had been ineffective. / / / | **Ex. H**, Decl. Mata at ¶¶ 5-14; **Ex. 4**, Lugo's statement to Moreno/Ogaz, (transcript) at 22:4 to 23:1, & 23:20-23, 56:25 to 58:18, 59:6-17; and **Ex. 12**, Lever statement to Kautz, (transcript) at 2:10 to 3:3, 3:6 to 4:16, and 6:20 to 7:24.[28] |

[28] Foundation for Lever's statement transcript and recording is set forth in Kautz' Declaration (Ex. D, at ¶6.

| | | |
|---|---|---|
| 174. | All the deputies efforts to contain Escudero for the medical responders were ineffective to stop him and he kept fighting till he was sedated. | **Ex. 3**, Washington's statement to Moreno/Ogaz, transcript at 47:1-14; **Ex. 5**, Gabler's statement to Moreno/Steers (transcript) at 111:4 to 113:4; **Ex. 6**, Gabler to Moreno/**Steers,** at 2:6-24; and **Ex. 11**, Washington's statement to Kautz (transcript) at 1:6-11; & 2:3 to 4:20, & 6:9-20. |
| 175. | Escudero fought the entire time and the taser deployments and activations, other than the very first one, were ineffective to stop Escudero from fighting. | **Ex. 24**, Washington's depo. at 26:17-25; & 27:16-22; and **Ex 4**, Lugo's statement to Moreno/Ogaz, (Transcript) at 16:13-25, & 17:26 to 18:5, & 20:8-26, & 22:4 to 23:1, & 23:8-14, & 23:20-22, & 31:6-17, & 31:22 to 32:3, & 52:20-27, & 59:6-17, & 71:25 to 72:3. |
| 176. | To the extent plaintiffs argue the deputies used more strikes and more than 4 TASER strikes, Mata's fist strikes, and Attlesey's TASER strikes are heard on the audio and coincide with Escudero's responses of Ow and asking why he was being hit. | **Ex. 15**, Miranda Belt Rec. transcript at 12:2 to 14:25 (*Escudero complains about being hit following TASER activations, Mata's four strikes, and Attlesey's TASER strikes*.) and **Ex. 1(n)**, Miranda Belt Recording, at 7:31 minutes to 8:41. |

| | | |
|---|---|---|
| 177. | Attlesey used the TASER as a direct impact weapon, intending to strike Escudero in the face, only after she felt she had no other option because all lesser -force options were ineffective. | **Ex. G**, Decl. Attlesey at ¶¶4-9. |
| **THE COUNTY IS ENTITLED TO SUMMARY JUDGMENT AS TO THE *MONELL* (FIFTH, SIXTH, AND SEVENTH) CLAIMS** | | |
| 178. | The County did not have an unconstitutional policy regarding administration of Narcan and positioning for Narcan administration by untrained deputies. | **Ex. K**, Decl. Kevin Fries, at ¶15.[29] |
| 179. | The medical responders gave the Narcan and were in control of the medical decisions concerning Escudero. | **Ex. I,** Decl. Lever, at ¶¶2-6 and **Ex. 5**, Gabler's statement to Moreno/Steers (transcript) at 24:20 to 26:14, & 111:4 to 113:4; and **Ex. 6**, Gabler to Moreno/**Steers,** at 2:6-24. (*medical responders made the decisions to give the sedative, and gave it.*) |
| 180. | The call was for medical assistance and the deputies were there as back-up to medical responders.<br><br>/ / / | **Ex. F**, Decl. Miranda at ¶¶3, 4, 12; and **Ex. 2**, Lever's statement to Moreno/Ogaz, (transcript) at 16:9-11, & 17:7-12, & 17:15-18. |

[29] The foundation for Mr. Fries declaration testimony is shown in Exhibit K, ¶1.

| | | |
|---|---|---|
| 181. | Medical responders do not have a protocol requiring handcuffing or restraining prior to Narcan administration, nor did they think it was necessary because they didn't anticipate a reaction like Escudero's. | **Ex. 24**, Depo. Captain Washington at 20:5-10 (*it is not standard practice to handcuff someone prior to Narcan*); and 20:13 to 21:1; **Ex. I**, Decl. Lever at ¶8 (*no formal or written protocol to restrain a subject prior to administering Narcan and it would have been impracticable for the deputies to have done so*); and **Ex. 5**, Gabler's statement to Moreno/Steers (transcript) at 113:10-19 (*AMR had no policy for restraining a subject prior to administering Narcan*); and **Ex. 4**, Lugo to Moreno/Ogaz (transcript) at 26:4-22 (she hadn't seen someone react as Escudero did with violence). |
| 182. | Captain Washington and paramedic Gabler believed Escudero was strong enough to break the handcuffs if he had not been sedated. | **Ex. 3**, Washington's statement to Moreno/Ogaz, transcript at 47:1-14; **Ex. 5**, Gabler's statement to Moreno/Steers (transcript) at 111:4 to 113:4; and **Ex. 6**, Gabler to Moreno/**Steers,** (transcript) at 2:6-24. |
| 183. | Escudero was not just overdosing on heroin, he also had a large | **Ex. P**, Decl. Dr. Ly at ¶¶ 3-7; and |

| | | |
|---|---|---|
| | amount of methamphetamine in his system as well as PCP. | **Ex. 26**, depo. Dr. Fajardo, at 8:1-15, & 23:6 to 24:15, & 27:22 to 30:8. |
| 184. | The County's hiring and retention policies are in line with the State mandates of POST and they do not hire or retain officers with a known propensity for abusing their authority. | **Ex. L**, Decl. Al Huff, at ¶¶2-4.[30] |
| **A. NO RATIFICATION OF UNCONSTITUTIONAL CONDUCT** | | |
| 185. | No reason for the County to know or believe the deputies' actions were wrongful when every witness gave a statement or statements similar to the deputies and which supported the deputies' actions to be reasonable. | **Ex. 3**, Washington's statement to Moreno/Ogaz (transcript) at 61:25 to 62:13, & at 62:18 to 63:23, & 64:16 to 65:7;<br>**Ex. 10**, Alcon's statement to Kautz, transcript, at 2:5 to 4:23;<br>**Ex. 13**, Gabler's statement to Pritchett, transcript at 1:5 to 2:7, & 3:18 to 6:11, & 6:25 to 8:3, & 8:23 to 9:14, & 10:8 to 11:12;<br>**Ex. J,** Decl. Fonzi at ¶¶ 30-40; and<br>**Ex. F**, Decl. Miranda at ¶¶2-12;<br>**Ex. H**, Decl. Mata at ¶¶1-14;<br>**Ex. G**, Decl. Attlesey ¶¶ 2-13;<br>**Ex. I**, Lever Decl. at ¶¶ 1-7; and<br>**Ex. 14**, Lugo statement to Pritchett, |

[30] The foundation for Lt. Huff's declaration testimony is shown at Exhibit L, ¶1.

| | | |
|---|---|---|
| | | transcript, at 1:16 to 4:3, & 4:24 to 6:21.[31] |
| 186. | Crummel and Hernandez said they did not see anything. | **Ex. 8**, Hernandez' statement to Kautz, transcript, at 3:17 to 4:24, & 6:19-24, & 15:10 to 16:7, & 17:4 to 18:8; and **Ex. 9**, Crummel's statement to Kautz, transcript, at 26:1-22, & 27:16-19, & 28:17 to 29:23. |
| 187. | Crummel said Escudero was rampaging. | **Ex. 9**, Crummel's statement to Kautz at 26:1-22, & 27:16-19, & 28:17 to 29: 23. |
| 188. | The deputies used verbal prompts and physical prompts and only used force after Escudero continued trying to assault medical responders and/or deputies. | **Ex. 14**, Lugo statement to Pritchett, transcript, at 1:16 to 4:3, & 4:24 to 6:21, & 8:6 to 9:6, and 9:21 to 10:1, & 10:4 to 11:1, and 11:7-25. |
| 189. | The belt recording and transcript capture the incident and is consistent with the statements of the medical responders and deputies. | **Ex. 15**, Miranda Belt Rec. transcript, at 1:14 to 20:12; and **Ex. 1(n)**, Miranda's Belt Recording from start to finish, approx. 13 min, 8, seconds. |
| 190. | The autopsy determined the cause of death was a drug overdose. | **Ex. 26**, Fajardo depo. at 8:1-15, & 12:22 to 13:3, & 13:8 to 14:11 & 14:17 to 17:6, & 20:2-19, & 23:6 to 24:15, & 25:21 to 26:6, & 27:6-15, |

[31] Foundation for Lugo's statement to Pritchett is found at 1:4-9, and in Ex. E, Decl. Pritchett at ¶ 3.

| | | |
|---|---|---|
| | | 27:22 to 30:8. |
| 191. | The County does discipline employees who violate the rights of its citizens. | **Ex. N**, Decl. Miles Kowalski, at ¶¶1-2, and subsets; [32] and **Ex. M**, Decl. Tyson Niles, at ¶¶1-6.[33] |
| 192. | The County terminated and disciplined numerous individuals who were involved in the list of cases in the FAC. | **Ex. N**, Decl. Miles Kowalski, at ¶¶1-2, and subsets |
| | **B. TRAINING** | |
| 193. | The call reported a drug overdose, not a mental ill crisis. | **Ex. 13**, Gabler to Pritchett, at 1:5 to 2:7. |
| 194. | The deputies did not administer the Narcan, the paramedic did. | **Ex. I**, Decl. Lever at ¶ 2. |
| 195. | The medical responders made all the decisions for Escudero's care until he became violent and tried to assault them. | **Ex. I**, Decl. Lever at ¶¶ 2-5. |
| 196. | The County does train on proper procedures for restraining a subject and the use of lethal force and less than lethal force, including the TASER. | **Ex. K**, Decl. Fries, at ¶¶3-6, 9-14, |
| 197. | Deputies do not administer Narcan, nor are they required by the state to do so. | **Ex. K**, Decl. Kevin Fries, at ¶15. |

[32] Foundation for Miles Kowalski's declaration testimony is shown in the opening paragraph of Exhibit N, and ¶¶ 1-2.

[33] Foundation for Niles' declaration testimony is shown in the opening paragraph of Exhibit M.

| | | |
|---|---|---|
| | / / / | |
| 198. | Deputies are trained to use only the amount of force that is objectively reasonable to protect themselves or others or to overcome resistance to their lawful authority. | **Ex. K**, Decl. Kevin Fries, at ¶4. |
| 199. | Deputies are taught it is a violation of a person's rights to use excessive force or deadly force when the circumstances to not justify it. | **Ex. K**, Decl. Kevin Fries, at ¶¶4-6. |
| 200. | Deputies are taught they may use deadly force only in limited circumstances such as where there is probable cause to believe a subject poses an imminent danger of serious physical harm to the officer or others. | **Ex. K**, Decl. Kevin Fries, at ¶¶4-6. |
| 201. | Deputies are taught that a violation of a person's civil rights is a violation of agency policies and procedures and is unacceptable and can subject any officer to disciplinary action regardless of that officer's rank | **Ex. K**, Decl. Kevin Fries, at ¶6. |
| 202. | Deputies are taught to give a warning before using the TASER or lethal force, if it is feasible to do. | **Ex. K**, Decl. Kevin Fries, at ¶¶4-5. |
| 203. | The San Bernardino County Sheriff's Department policies do not tolerate excessive force. Deputies are instructed throughout | **Ex. K**, Decl. Kevin Fries, at ¶¶4-6. |

| | | |
|---|---|---|
| | their training that excessive force can lead to suspension, termination, civil liability and possibly criminal prosecution. | |
| 204. | When the Sheriff's Department receives a citizen's complaint of excessive force, the use of force is investigated. If, after the investigation it is determined that a deputy used excessive force, he or she is disciplined | **Ex. K**, Decl. Kevin Fries, at ¶8. |
| 205. | If an officer has used deadly force, an exhaustive investigation by the homicide team is instigated to determine if the use of deadly force was necessary. | **Ex. C**, Decl. N. Craig, at ¶¶1-4. |
| **DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT AS TO THE STATE CLAIMS AS WELL** | | |
| **NO FALSE ARREST/IMPRISONMENT** | | |
| 206. | The deputies were on scene as back-up to the medical responders. | **Ex. F**, Decl. Miranda at ¶¶3, 12; **Ex. 2**, Lever's statement to Moreno/Ogaz, at 16:9-11, & 17:7-12, & 17:15-18; **Ex. 24**, Washington's depo. at 27:23 to 28:19; and **Ex. I**, Decl. Lever at ¶¶1-7. |
| 207. | The handcuffs and hobble were placed on Escudero with the assistance of medical/fire responders because Escudero was too strong for the deputies to contain on their own. | **Ex. 24**, Washington's depo. at 35:24 to 36:25; **Ex. 10**, Alcon statement to Kautz, at 2:4 to 4:23; **Ex. 7**, Alcon statement to Craig at |

| | | |
|---|---|---|
| | | 31:23 to 32:23, & 35:6-23, & 37:11 to 39:24, & 40:4-24, & 43:6-21, & 44:7-21, & 64:10 to 65:17, and 74:1-14; and **Ex. F**, Decl. Miranda, at ¶¶9-10. |
| 208. | The handcuffs and hobble were necessary to try to save Escudero's life by getting him to the hospital. | **Ex. 3**, Washington's statement to Moreno/Ogaz, at 64:16 to 65:7; **Ex. 24**, Washington's depo. at 34:18 to 35:18, & 28:11-19, & 37:1-6; and **Ex. 4**, Lugo statement to Moreno/Ogaz, at 52:20-27. |
| | **NO BANE ACT VIOLATION** | |
| 209. | The deputies did not use any threats or intimidation or coercion, they used verbal prompts and verbal commands. | **Ex. 4**, Lugo's statement to Moreno/Ogaz (transcript) at 59:6-17; **Ex. 15**, Miranda Belt Rec. transcript, at 11:22 to 17:24; and **Ex. 1(n)**,audio of Miranda Belt Rec. at 7:12 minutes to 11:05 minutes; and **Ex. 14**, Lugo statement to Pritchett, transcript, at 1:16 to 4:3, & 4:24 to 6:21. |
| 210. | The deputies only used force when it became necessary to do so because Escudero continued fighting. | **Ex. 13**, Gabler's statement to Pritchett, at 1:5 to 2:7, & 3:3-11 & 3:18 to 6:11, & 6:25 to 8:3, & 8:23 to 9:14, & 10:8 to 11:12; and **Ex. 24**, Washington's depo. at 34:18 |

| | | |
|---|---|---|
| | | to 35:18. |
| **NO BATTERY BECAUE THE FORCE WAS REASONABLE** | | |
| 211. | The deputies only used force to defend the medical responders and themselves and to contain Escudero for the medical responders. | **Ex 24**, Washington's depo. at 26:17-22;<br>**Ex. 25**, Gabler's depo. at 16:8 to 17:19 & 18:18 to 19:18, & continuing at 20:2-22;<br>**Ex. 3**, Washington's statement to Moreno/Ogaz (transcript) at 61:25 to 62:13, & at 62:18 to 63:23, & 64:16 to 65:7;<br>**Ex. 10**, Alcon's statement to Kautz, transcript, at 2:5 to 4:23;<br>**Ex. 13**, Gabler's statement to Pritchett, transcript at 1:5 to 2:7, & 3:18 to 6:11, & 6:25 to 8:3, & 8:23 to 9:14, & 10:8 to 11:12;<br>**Ex. I**, Decl. Lever, at ¶¶4-7;<br>**Ex. G**, Decl. Attlesey, at ¶¶4-10;<br>**Ex. F**, Decl. Miranda at ¶¶4-11;<br>**Ex. H**, Decl. Mata, at ¶¶5-11; and<br>**Ex. 14**, Lugo statement to Pritchett, transcript, at 1:16 to 4:3, & 4:24 to 6:21, & 8:6 to 9:6, and 9:21 to 10:1, & 10:4 to 11:1, and 11:7-25. |
| 212. | The level of force used was necessary because Escudero continued fighting and had | **Ex. 3**, Washington's statement to Moreno/Ogaz (transcript) at 61:25 to |

| | | |
|---|---|---|
| | overpowered the deputies. | 62:13, & at 62:18 to 63:23, & 64:16 to 65:7; **Ex. 10**, Alcon's statement to Kautz, transcript, at 2:5 to 4:23; **Ex. 13**, Gabler's statement to Pritchett at 1:5 to 2:7, & 3:18 to 6:11, & 6:25 to 8:3, & 8:23 to 9:14, & 10:8 to 11:12; **Ex. I**, Decl. Lever, at ¶¶4-7; **Ex. G**, Decl. Attlesey, at ¶¶4-10; **Ex. F**, Decl. Miranda at ¶¶4-11; **Ex. H**, Decl. Mata, at ¶¶5-11; and **Ex. 14**, Lugo statement to Pritchett, transcript, at 1:16 to 4:3, & 4:24 to 6:21, & 8:6 to 9:6, and 9:21 to 10:1, & 10:4 to 11:1, and 11:7-25. |
| 213. | The levels of force used were necessary because the less-restrictive uses of force were completely ineffective. | **Ex. 13**, Gabler's statement to Pritchett, (transcript) at 1:5 to 2:7, & 3:3-11 & 3:18 to 6:11, & 6:25 to 8:3, & 8:23 to 9:14, & 10:8 to 11:12; and **Ex. 24**, Washington's depo. at 27:16-22 (taser not effective). |
| **THE DEPUTIES' ACTIONS WERE NOT NEGLIGENT** | | |
| 214. | The deputies did not administer the Narcan. | **Ex. I**, Decl. Lever at ¶2. |
| 215. | The deputies used verbal prompts and commands. | **Ex. 11**, Washington's statement to Kautz (transcript) at 6:9-20; and **Ex. 14**, Lugo statement to Pritchett, |

| | | |
|---|---|---|
| | | transcript, at 1:16 to 4:3, & 4:24 to 6:21, & 8:6 to 9:6, and 9:21 to 10:1, & 10:4 to 11:1, and 11:7-25. |
| 216. | The deputies only used force as necessary to counter Escudero's attempts to assault the medical responders and themselves. | **Ex. 11**, Washington's statement to Kautz (transcript) at 1:6-11; & 2:3 to 4:20, & 6:9-20. |
| 217. | Escudero fought the entire time until he was fully sedated by the paramedics. | **Ex. 11**, Washington's statement to Kautz (transcript) at 1:6-11; & 2:3 to 4:20, & 6:9-20; and **Ex. 6**, Gabler to Moreno/**Steers,** (transcript) at 2:6-24. |
| 218. | Escudero became unresponsive only after a second dose of sedative fully sedated him. | **Ex. 3**, Washington's statement to Moreno/Ogaz at 47:20-26; and **Ex. 5**, Gabler's statement to Moreno/Steers (transcript) at 111:4 to 113:4; **Ex. 6**, Gabler' (follow-up) statement to Moreno/**Steers,** (transcript) at 2:6-24. |

## CONTENTIONS OF LAW

## STATEMENT OF SUMMARY JUDGMENT STANDARD

### 1. SUMMARY JUDGMENT STANDARD

The defendants are entitled to summary judgment in this case in that the Federal Rule of Civil Procedure 56 requires summary judgment for the moving party when "there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56 (a). "…[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly

supported motion for summary judgment; the requirement is that there be no *genuine issue* of *material fact*." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 247-248 (1986) (Italics in original).

Here, there are no genuine issues of fact that should preclude this court from granting judgment in favor of the defendants on all claims.

The County has met its burden of establishing the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). At the summary judgment stage, facts must be viewed in the light most favorable to the nonmoving party *only* if there is a *genuine* dispute as to those facts." *Scott v. Harris*, 550 U.S. 372, 380 (2007) (Emphasis added.)

The County defendants have no burden to negate or disprove matters on which the opponent will have the burden of proof at trial. Rather, the moving party may satisfy its burden by "'showing' -that is, pointing out to the district court — that there is an absence of evidence to support the nonmoving party's case." *Celotex*, at 325. Once the moving party has met its initial burden, the nonmoving party must affirmatively present admissible evidence and identify specific facts sufficient to show a genuine issue for trial. *Anderson,* at 248 (1986).

> When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should ***not*** adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007) (Emphasis added).

In the present case, the evidence set forth by the defendants refutes plaintiffs' claims and allegations.

**2. NO UNLAWFUL DETENTION**

Case authority is not consistent with a finding that any of the defendant deputies violated the decedent or the plaintiffs' civil rights by trying to restrain Escudero on the

ground while he was fighting, struggling to get up, and violently attempting to assault the first responders. See *A.B. v. Cnty. of San Diego*, 2022 WL 1055558, at *1(9th Cir. 2022),

> The fourth action, the restraint of Birtcher in prone position, lasted for approximately seven minutes. For the first six and a half of those minutes, Birtcher continued struggling and actively resisted detention. But during the last 30 seconds, Birtcher stopped moving and was not resisting. Even assuming that the deputy defendants used more force than necessary to hold Birtcher in place during the final 30 seconds, <u>we know of no clearly established law that would have put them on notice that the force they used was excessive.</u>(Underlining added.)

The Constitution only forbids *unreasonable* searches and seizures. The reasonableness of a seizure is generally assessed by carefully weighing 'the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion. *Cook v. Dep't of Highway Patrol*, 2019 WL 8013101, at *2-3 (C.D. Cal. 2019) (internal quotation marks and citations omitted.) Here, the restraint of Escudero and the uses of force were reasonable and necessary.

In Fourth Amendment excessive force claims, the court examines whether the officers' actions are objectively reasonable under the totality of the circumstances. The analysis must balance the nature and quality of the intrusion upon an individual's rights against the countervailing government interests at stake, with careful attention to the facts and circumstances of each particular case, considering among other potential factors, (1) whether the suspect posed an immediate threat to anyone; (2) whether the suspect resisted or attempted to evade arrest; and (3) the severity of the crime at issue." *Graham v. Connor*, 490 U.S. 386, 396 (1989).

"Ultimately, the most important *Graham* factor is whether the suspect posed an immediate threat to the safety of the officers or others." *Mattos v. Agarano*, 661 F.3d 433, 441 (9th Cir. 2011). (Internal quotation marks, citations omitted.)

The lack of effectiveness from Attlesey's subsequent TASER attempts establishes that Escudero did not experience any painful electric shock from them and thus, there was no unreasonable detention or excessive force as to the subsequent TASER activations. (See *Tabares v. City of Huntington Beach,* 2019 WL 4455999, at *5 (C.D. Cal. 2019); reversed on other grounds in *Tabares v. City of Huntington Beach* 988 F.3d 1119 (9th Cir. 2021.)

Moreover, Attlesey's TASER applications were reactive, not provocative. They were used <u>only</u> *after* verbal commands and physical prompts were ineffective and Escudero continued fighting and actively resisting. (See *A.B. v. County of San Diego* 2020 WL 5847551 *14 (S.D. Cal. 2020)).

Not every use of force even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment. Rather, "the calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments -- in circumstances that are tense, uncertain, and rapidly evolving -- about the amount of force that is necessary in a particular situation. *Graham v. Connor*, 490 U.S. 386, 396-397 (1989).

It is not an act of excessive force by deputies to struggle with an assaultive, resistive, subject and endeavor to contain the subject by way of prone restraint, even to the point of placing body weight on the subject momentarily while the subject is actively resisting and out of control. *A.B. v. County of San Diego* 2020 WL 5847551 *17-18 (S.D. Cal. 2020) (Affirmed by Ninth Circuit in *A.B. v. Cnty. of San Diego*, 2022 WL 1055558 (9th Cir. 2022).)

It is not excessive force for deputies to physically struggle to contain a subject who is actively resisting. *James v. Oakland Police Dep't*, 2016 U.S. Dist. LEXIS 76672, *21 (N.D.Cal. 2016)

Plaintiffs' contentions that a deputy should never place any weight on a subject's back, or that doing so when the subject is in a prone position is tantamount to lethal force, is not a proposition which is supported by legal authority. Restraining a subject who is

fighting, resisting and struggling, even putting weight on the subject's back under these circumstances, is not excessive force. (See *A.B. v. County of San Diego* 2020 WL 5847551 *17-18 (S.D. Cal. 2020) (citation omitted).

To overcome a claim of failure to render medical care, the deputy only needs to promptly summon necessary medical assistance. *A.B. v. Cnty. of San Diego*, 2022 WL 1055558, *4 (9th Cir. Apr. 8, 2022). In the present case, medical responders were on scene and providing care. There is no evidence to support the plaintiffs' claim and the defendants are entitled to judgment in their favor.

**3. NO SUBSTANTIVE DUE PROCESS VIOLATION**

Plaintiffs allege the defendants interfered with their familial relationship with Escudero in a manner that would "shock the consciousness." While a Fourteenth Amendment substantive due process claim, that "shocks the conscience" is cognizable, (*Porter v. Osborn*, 546 F.3d 1131, 1136-37 (9th Cir. 2008) (citation omitted)), the court must first determine which threshold standard applies. The first standard, "deliberate indifference," requires a plaintiff to show that the officers acted with "deliberate indifference," that is the officers "disregarded a known or obvious consequence of [their] actions." *Nicholson v. City of Los Angeles*, 935 F.3d 685, 692-693 (9th Cir. 2019) (citation omitted). The deliberate indifference standard *only* applies if the circumstances are such that "actual deliberation is practical." *Zion v. County of Orange*, 874 F.3d 1072, 1077 (9th Cir. 2017) (citation omitted).

The second standard, the "purpose to harm" standard is what must be applied in this case. This standard requires a plaintiff to demonstrate that the officers acted "with a purpose to harm unrelated to legitimate law enforcement objectives." *Nicholson*, at 693 (citation omitted).

The purpose to harm standard applies here because Escudero started the altercation by attempting to punch medical responders and deputies and continued the attempts to assault in a fluid and dangerous situation was never controlled until paramedics were able to sedate him. (See *A.B. v. Cnty. of San Diego*, 2022 WL 1055558,

at *2 (9th Cir. 2022) *the purpose to harm standard appropriate in situation where deputies did not have control of the situation due to the struggle and resistance of the subject.*)

**4. QUALIFIED IMMUNITY**

To determine whether a defendant is entitled to qualified immunity, the court evaluates: (1) whether defendant's conduct violated a constitutional right and (2) whether that right was clearly established at the time of the incident. *S.B. v. County of San Diego*, 864 F.3d 1010, 1013 (9th Cir. 2017). When evaluating an excessive force claim, we analyze the familiar Graham factors and ask whether a defendant's actions were “objectively reasonable” in light of the facts and circumstances. *Graham v. Connor*, 490 U.S. 386, 397 (1989). “The [legal] precedent must be clear enough that every reasonable official would interpret it to establish the particular rule the plaintiff seeks to apply.” *District of Columbia v. Wesby*, 138 S. Ct. 577, 590 (2018).

Qualified immunity is a demanding standard that protects ‘all but the plainly incompetent or those who knowingly violate the law.” *District of Columbia v. Wesby,* 138 S.Ct. 577, 589 (2022) (citation omitted). To successfully rebut the affirmative defense of qualified immunity, the plaintiff must demonstrate that the law was so clearly established at the time to give the officer notice of the unlawfulness. The clearly established standard may not be based on a high degree of generality. It requires that the legal principle clearly prohibit the officer’s conduct in the particular circumstances he confronted. *Id.* 589-590.

The law is/was not clearly established that Deputy Attlesey’s use of the TASER to try to stop Escudero from fighting was unconstitutional under the circumstances confronting her. *A.B. v. County of San Diego* 2020 WL 5847551 *14-15 (S.D. Cal. 2020).

Similarly, Deputy Mata’s fist strikes were intended to distract Escudero and stop him from fighting. They were delivered at a time when Escudero was actively resisting and throwing punches. Even if these limited strikes were excessive force, there is no established law on point that the fist strikes as distraction blowers were unconstitutional.

*A.B. v. County of San Diego* 2020 WL 5847551 *14-17 (S.D. Cal. 2020).

The law is not clearly established that the use of the TASER as a weapon of necessity under these circumstances would be unconstitutional. Thus, Attlesey is entitled to qualified immunity. *A.B. v. County of San Diego* 2020 WL 5847551 *14-17 (S.D. Cal. 2020).

The restraining and attempts to contain Escudero was not a Fourth Amendment violation, but to the extent the court finds that it was, the deputies are entitled to qualified immunity. *A.B. v. Cnty. of San Diego*, 2022 WL 1055558, at *1 (9th Cir. 2022).

**5. NO *MONELL* CLAIMS EXIST**

Plaintiffs' Fifth Claim alleges that pursuant to an unconstitutional policy or practice everything the deputies did or did not do, violated his constitutional rights, though they do not identify any specific expressly adopted policy. Instead, they rely on conclusory allegations, of unconstitutional *practices*. (FAC ¶¶ 68-71.) In cases where the plaintiffs have *not* identified an expressly adopted policy, and relies instead on an alleged longstanding custom or practice, the plaintiff must establish that the practices complained of are "so persistent and widespread as to practically have the force of law." *Almarou v. City of Gardenia*, 2019 WL 7945590 *3 (C.D. Cal. 2019).

**A. No Ratification of Unconstitutional Conduct**

A municipality may be liable under a theory for ratification if it knowingly ratified an unconstitutional act. The policymaker had to have knowledge that the conduct was unconstitutional and yet approved of it anyway. *Hermosillo v. Cty. of San Bernardino*, 2016 WL 10566648, *12 (C.D. Cal. 2016).

Plaintiffs cannot prevail on their ratification theory. First, ratification requires knowledge of the "constitutional violation." In other words, Plaintiffs must establish that deputies' actions did violate Escudero's Fourth Amendment rights and the County *knew* that their conduct was a constitutional violation and specifically ratified it anyway. *Peck v. Cty. of Orange*, 501 F.Supp. 3d 852, 871 (C..D. Cal. 2020).

**B. No Unconstitutional Training**

In only limited circumstances may a failure to train rise to the level of an official policy for purposes of §1983. *Myles v. Cty. of San Diego by & through San Diego Cty. Sheriff's Dep't,* 2017 WL 4169722, at *15 (S.D. Cal. 2017) . The plaintiff must first establish that the County of San Bernardino's alleged failure to train amounted to deliberate indifference to the rights of persons to whom the deputies come into contact. *Id*., at 15. Plaintiff must provide some evidence to show that the training *caused* the constitutional violation, and that Defendant made a conscious choice in being deliberately indifferent to Plaintiff's rights. See *Santos v. City of Culver City*, 228 Fed. Appx. 655, 659 (9th Cir. 2007); *Price v. Sery*, 513 F.3d 962, 973 (9th Cir. 2008); *City of Canton, Ohio v. Harris*, 489 U.S. 378, 388, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989).

For a *Monell* theory of a failure to train, the plaintiffs are required to establish the County had demonstrated a pattern of *similar* constitutional violations by untrained employees. *Connick v. Thompson*, 563 U.S. 51, 62, (2011). Plaintiffs' list of prior cases does not establish. None of the cases cited by Plaintiffs concern a prior similar incident wherein deputies allegedly violated someone's civil rights because they were untrained in the use of less than lethal force with respect to restraints, the administration of Narcan and the risks of prone positions or dealing with a drug overdose.

Findings that similar conduct was unconstitutional provides notice to the entity, and without the notice that a "course of training is deficient in a particular respect, the [public entity] can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights." *Connick v. Thompson*, 563 U.S. 51, 62 (2011).

**6. No Bane Act Violation**

California Civil Code § 52.1 (Bane Act) liability is limited to violations that are accomplished by "threats, intimidation, or coercion. "In other words, the Bane Act requires a showing that there was a § 1983 violation accompanied by threat, coercion, or intimidation that is independent from the constitutional deprivation itself." *Allen v. Cty. of Riverside,* 2019 WL 4233588, at *6 (C.D. Cal. 2019). Here, the deputies used verbal

commands, not threats, and that they only used force when it became necessary to do so to defend themselves and the medical responders.

**7. No Battery Exists**

Even to the extent the plaintiffs allege the deputies used deadly force, the use of such force satisfies Fourth Amendment standards where the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others. *Blanford v. Sacramento Cnty.*, 406 F.3d 1110, 1115 (9th Cir. 2005) (quoting Garner, 471 U.S. at 11)

A reasonable use of deadly force, encompasses a range of conduct. The availability of less intrusive alternatives will not render conduct unreasonable. *Wilkinson v. Torres*, 610 F.3d 546, 551 (9th Cir. 2010).

There is no tort of battery where the officer's use of force is objectively reasonable. In analyzing the use of deadly force, the central issue is whether it was objectively reasonable under the circumstances for the deputies to believe that Escudero posed an immediate threat their safety and/or the safety of the other responders. *Brown v. Ransweiler*, 171 Cal.App.4th 516, 527 (2009).

A state law battery claim against a peace officer is a counterpart to a federal claim of excessive force under 42 U.S.C. section 1983. The question is were the officer's actions objectively reasonable based on the facts and circumstances confronting the officer. The test is highly deferential to the officer's need to protect himself and others. *Brown* at 527. It is well settled that the reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene. For this reason, the court takes into account the beliefs or perceptions of officers when determining whether actions based on those beliefs were reasonable. *Dominguez v. City of Los Angeles*, 2018 WL 6164278, at *6 (C.D. Cal. 2018). The critical inquiry is what did the officer perceive. *Wilkinson v. Torres*, (9th Cir. 2010) 610 F.3d 546, 551-552. [SUF Nos. 211-213.]

/ / /

/ / /

///

///

**8. No Negligence Exists**

The law has never suggested there is only one reasonable action that an officer is required to take in a given set of circumstances. There will always be a range of conduct that is to be considered reasonable and as long as an officer's conduct falls within that range, there is no requirement that he choose the most reasonable action that is the least likely to cause harm in order to avoid liability for negligence. *Brown*, supra at 537-538.

Dated: January 27, 2023

WAGNER ZEMMING CHRISTENSEN

*/s/ Dennis E. Wagner*

RISA S. CHRISTENSEN, Esq.
DENNIS E. WAGNER, Esq.
Attorneys for Defendants, Attorneys for Defendants, COUNTY OF SAN BERNARDINO; HUMBERTO MIRANDA; JULIAN MATA; and JESSAQUA ATTLESEY